# Exhibit 2

Transcript of August 28 Hearing,
Part 1 of 2

1            UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4  THE STATE OF GEORGIA,          )
                                  )
5                  PLAINTIFF,     )
                                  )       DOCKET NO:
6                                 )  1:23-CV-03621-SCJ
                                  )
7          -VS-                   )
                                  )
8  MARK RANDALL MEADOWS,          )
                                  )
9                  DEFENDANT.     )
   _____

10

11         TRANSCRIPT OF EVIDENTIARY PROCEEDINGS
        BEFORE THE HONORABLE STEVE C. JONES
            UNITED STATES DISTRICT JUDGE
12              MONDAY, AUGUST 28, 2023

13  APPEARANCES:

14  ON BEHALF OF THE PLAINTIFF:

15   ADAM NEY, ESQ.
     ANNA GREEN CROSS, ESQ.
16   DAYSHA D'ANYA YOUNG, ESQ.
     FRANCIS MC DONALD WAKEFORD, IV, ESQ.
17   JOHN WOOTEN, ESQ.
     NATHAN J. WADE, ESQ.
18

   ON BEHALF OF THE DEFENDANT:
19

20   GEORGE J. TERWILLIGER, III, ESQ.
     JOHN S. MORAN, ESQ.
21   JOSEPH MATTHEW ENGLERT, ESQ.
     MICHAEL LEE FRANCISCO, ESQ.
     EMILY ERB KELLEY, ESQ.
22   FRANCIS J. AUL, ESQ.

23       VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
      OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
24             UNITED STATES DISTRICT COURT
                   ATLANTA, GEORGIA
25                   404-215-1479
             VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

1                        I N D E X

2

WITNESSES:                                  PAGE:

3

MARK RANDALL MEADOWS

4
5            DIRECT EXAMINATION........................  9
             CROSS-EXAMINATION......................... 55
             REDIRECT EXAMINATION.....................147
6
7  KURT ROBERT HILBERT

8
             DIRECT EXAMINATION.......................161
             CROSS-EXAMINATION........................183
9

10 BRAD RAFFENSPERGER

11
             DIRECT EXAMINATION.......................186
             CROSS-EXAMINATION........................215
12           REDIRECT EXAMINATION.....................222

13

14                        - - - - -

15

16

17

18

19

20

21

22

23

24

25

1          (HELD IN OPEN COURT AT 10 A.M.)

2          THE COURT:  Good morning.  You-all can be seated.

3          I hope everybody had a nice, cool weekend.  We're

4    getting ready to start today.

5          Let me say this, a couple of logistic matters.  If

6    you-all have a seat in the courtroom right now, you have a

7    seat for the entire day.  If you're with the media and if

8    you're sitting there, you have a seat there for the entire

9    day.  If you're sitting out in the audience, you have a seat

10   there for the entire day.

11         Here's why I'm saying this.  We're probably not going

12   to finish before lunch.  We're probably going to have some

13   breaks.  You don't have to sit there saying, if I leave my

14   seat, I can't get in again.  That's not a problem.

15         We're going to try to proceed as orderly and

16   cautiously as possible.  Again, if you have a seat in the

17   courtroom now, you have that seat all day long.  Okay?

18         Second matter.  It is to me vitally important that

19   the public knows what goes on in this courtroom.  The

20   courtroom belongs to the public, not to the judges, not to the

21   lawyers.  And it is very important to me that the public hear

22   what's going on and be notified what's going on and being

23   involved in what's going on.

24         However, it's also important to me that courtroom

25   decorum is adhered to and followed.  I need you-all in the

1  public to be as quite as possible, to be as courteous as

2  possible, and let the lawyers do their jobs.  I do not want to

3  be put in a situation where I have to say to one of the

4  marshals remove that person from the courtroom.  I want to

5  concentrate on what these individuals are saying.  It is

6  vitally important to Mr. Meadows and vitally important to the

7  State of Georgia that I hear everything.  Now, I'm saying this

8  because I know I'm not going to have any problem whatsoever.

9  However, I need to say it.  Okay?

10        Now, what's going to happen in a moment, Ms. Wright

11  is going to call the case for the day.  Once the case is

12  called, the lead attorney for each side will stand up and

13  introduce themselves and then they will introduce whoever is

14  with them today.  And after that, I will give you-all further

15  instructions.

16        Ms. Wright, you can call the case for the day.

17        THE DEPUTY CLERK:  Yes, sir.  The Court calls the

18  State of Georgia v. Mark Randall Meadows, Civil Action No.

19  1:23-CV-3621-SCJ.

20        MR. TERWILLIGER:  Good morning, Your Honor.

21        THE COURT:  Good morning.

22        MR. TERWILLIGER:  George Terwilliger from McGuire

23  Woods for Mr. Meadows.  With me this morning are my

24  colleagues, Michael Francisco and John Moran.  And in the

25  back, from left to right, Robert Bittman, Francis Aul, Emily

1  Kelley, and Joseph Englert.  And, of course, this is

2  Mr. Meadows.

3          THE COURT:  Good morning to everyone.

4          MR. TERWILLIGER:  Thank you, Your Honor.

5          THE COURT:  Good to see you-all.

6          MR. WAKEFORD:  Good morning, Your Honor.  I'm Donald

7  Wakeford and along with my colleagues here, we represent the

8  State of Georgia.  I'm joined at the counsel table by Anna

9  Cross, special prosecutor, and Nathan Wade, special

10 prosecutor.  Behind me here we have Deputy District Attorney

11 Will Wooten and Deputy District Attorney Daysha Young.

12          THE COURT:  Good morning to each one of you-all.

13          Now, on August 13, 2023, a grand jury of Fulton

14 County returned a 41-count indictment against 19 individuals,

15 one of those individuals is Mr. Mark Meadows.  Mr. Meadows is

16 charged in Count One and Twenty-eight of the indictment.

17          In Count One Mr. Meadows is charged with violation of

18 Georgia's RICO Act under 16-14-4(c).  And in Count

19 Twenty-eight he is charged with solicitation and violation of

20 oath of a public officer for unlawfully soliciting or

21 requesting the Georgia Secretary of State, Brad Raffensperger,

22 a public officer, to engage in conduct constituting a federal

23 offense of violation of oath of public office.

24          Now, August 15, Mr. Meadows by and through his

25 attorneys, filed a motion with this Court to remove the case

6

1 from the Superior Court of Fulton County to the United States

2 District Court for the Northern District of Georgia.

3         On August the 16th of this year, this Court reviewed

4 the motion and determined that some of the reprimand was not

5 going to happen, and this Court denied summary remand and

6 decided that an evidentiary hearing would need to be held on

7 this case under

8 28 U.S.C. 1455.  The Court entered that order on August 16,

9 2023, setting up an evidentiary hearing for today, August 28,

10 2023.

11         The State of Georgia, by and through Fani Willis,

12 United States District Attorney for Fulton County, filed a

13 response on August 23, 2023, asking that the case remain in

14 the Fulton County Superior Court.  A reply brief was filed on

15 August 25 by Mr. Meadows asking that the case remain here.

16         Now, to have this case remain in the United States

17 District Court for the Northern District of Georgia,

18 Mr. Meadows, by and through his attorneys, have the burden of

19 showing this Court three matters:

20         One, he was an officer or any person acting under an

21 officer of the United States;

22         Two, he is facing criminal charges for or relating to

23 any act under color of such office;

24         And, three, that he has raised or will raise a

25 plausible federal defense.

1          Now, Mr. Meadows indicated through his briefs that he

2    meets all three requirements:  That he is a federal officer;

3    that his action as Chief of Staff for then President Donald

4    Trump was part of his duties; and there was a causal

5    connection between his jobs and what he was doing at the time.

6          And he's indicated through the supremacy clause that

7    he has three defenses:

8          One is the supremacy clause defense.  He's also

9    indicated through the 1st and 14th Amendment that he has a

10   defense.

11         The State of Georgia represented by District Attorney

12   Fani Willis disputes that, says there is no casual connection

13   between his job as Chief of Staff and what he was doing

14   through any of the 14 acts that are alleged in the indictment.

15   In particular, the act of calling Secretary of State Brad

16   Raffensperger at the time and arranging a call in which it is

17   alleged -- and the Court puts at this time, there is no

18   evidence in front of this Court of anything -- that it is

19   alleged that then President Donald Trump requested the

20   Secretary of State to remove 11,780 votes.  There's also an

21   allegation dealing with Mr. Meadows coming to Cobb County to

22   watch a vote count.

23         They also allege under the Hatch Act that

24   Mr. Meadows' job did not allow him to be involved in political

25   activity and, therefore, no casual connection, and, therefore,

1  this case should remain in the Fulton County Superior Court.

2  And that brings us here today.

3      With that stated, the Court thinks I have a pretty

4  good idea of what this case is about.  However, if either

5  party wishes to make an opening statements, I will give you

6  ten minutes for an opening statement, followed by evidence

7  from Mr. Meadows, followed by evidence from the State.  At the

8  close of all the evidence, each side will have 30 minutes for

9  closing arguments.

10      Any questions about the procedure coming from

11  Mr. Meadows?

12      MR. TERWILLIGER:  No, thank you, Your Honor.  And

13  we'll save the argument for after we present evidence.

14      THE COURT:  A wise attorney.

15      Any question about procedure coming from the State?

16      MR. WAKEFORD:  No questions, Your Honor.  And I'm

17  picking up what you're putting down, and I will stay quiet as

18  well.

19      THE COURT:  Another wise attorney.  I've always been

20  told when you pick up what the Judge is trying to tell you,

21  that tells the Judge I'm dealing with wise attorneys.

22      With that stated, you may proceed with your case.

23      MR. TERWILLIGER:  Thank you very much, Your Honor.

24      I assume you'd like us to work from the podium?

25      THE COURT:  Yes, sir.  Yes, sir.  You can talk from

1   the podium or from the ELMO system there.

2           MR. TERWILLIGER:  Thank you, Your Honor.

3           Your Honor, we call Mr. Mark Meadows to the stand.

4           THE COURT:  Mr. Meadows, you can come up.

5           Good morning, Mr. Meadows.  If you will remain

6   standing, Ms. Wright is going to administer an oath to you.

7                          ******

8                   MARK RANDALL MEADOWS,

9           having been duly sworn, testified as follows:

10                         ******

11  DIRECT EXAMINATION

12  BY MR. TERWILLIGER:

13  **Q.**   Sir, would you please state your full name and tell the

14  Court where you currently reside.

15  **A.**   Mark Randall Meadows, and I live in Sunset, South

16  Carolina.

17  **Q.**   Mr. Meadows, did there come a time in your professional

18  life when you were in public service positions?

19  **A.**   Yes, sir, there was.

20  **Q.**   Would you please briefly describe what those positions

21  were and what periods of time?

22  **A.**   In January of 2013, I was sworn in as a member of

23  Congress to represent the Eleventh District of North Carolina,

24  a position that I continued to represent for the better part

25  of four terms.  In March of 2020, I left that position,

1  resigned that position to be the Chief of Staff for President

2  Trump and remained in that position until January 20th of

3  2021.

4  **Q.**    In that position as Chief of Staff, were you a

5  commissioned officer of the United States?

6  **A.**    Yes, sir, I was.

7         MR. TERWILLIGER:  May I approach with an exhibit,

8  Your Honor?

9         THE COURT:  Yes, sir.  Have you-all seen this

10  exhibit?

11         MS. CROSS:  No, Your Honor.

12         MR. TERWILLIGER:  We'll give it to them.

13         THE COURT:  Well, let them see it before you hand it

14  to Mr. Meadows.  Let the State see it.

15         MS. CROSS:  Thank you, Your Honor.

16         THE COURT:  You may proceed, sir.

17  BY MR. TERWILLIGER:

18  **Q.**    Do you recognize that document, Mr. Meadows?

19  **A.**    Yes, sir, I do.

20  **Q.**    Could you just tell the Court briefly what it is?

21  **A.**    It looks like a photocopy of the commission that

22  appointed me as assistant to the President and Chief of Staff,

23  signed by Donald Trump.  And it looks like signed by the

24  Secretary of State Mr. Pompeo.

25  **Q.**    What size is the original commission?

 1  **A.**   It's probably about that -- that big.  I mean, it's --

 2  it's ceremonial, and it's framed on my wall.  But too big --

 3  well, I guess not too big to bring in here, but it would have

 4  been very difficult.

 5          MR. TERWILLIGER:  Your Honor, we would move the

 6  admission of Exhibit 1, unless there's an objection.

 7          THE COURT:  Any objections?

 8          MS. CROSS:  No objection, Your Honor.

 9          THE COURT:  It's admitted without objection.

10          (Government's Exhibit 1 was received and marked into

11  evidence.)

12          MR. TERWILLIGER:  Thank you for that.

13  BY MR. TERWILLIGER:

14  **Q.**   Mr. Meadows, first I'd like to ask you some questions

15  about your role as Chief of Staff in general.

16          Approximately how long did you serve as Chief of Staff?

17  **A.**   I served from the end of March of 2020 until January --

18  noon, January 2021.  So about ten months or so.

19  **Q.**   And if you could, would you give the Court an idea of

20  what the atmospherics were like working in the White House as

21  Chief of Staff?  What your working hours were, you know, in

22  general, who you dealt with, what you did, and those sorts of

23  things?

24  **A.**   I don't know that I was really fully prepared.  I don't

25  know that anybody that's not done the job is ever fully

12

1  prepared for what would happen.  It was -- it was a 24-hour,

2  7-day-a-week kind of job.  I can tell you my -- if this would

3  be appropriate -- kind of just what my schedule was.

4  **Q.**  Please.

5  **A.**  So I would normally try to get to the office between 7

6  and 7:30 in the morning.  And as I got there, I would get my

7  -- my security daily presidential briefing with CIA and others

8  about threats to the United States.  I would try to get caught

9  up on as many to-dos that I could get done prior to the

10 President coming down from the residence.

11      Once the President would come down from the residence, I

12 was on call and oftentimes would be called in the oval on a

13 minute's notice.

14      Beyond that, you know, meeting with cabinet members,

15 meeting with elected officials, meeting with state officials,

16 meeting with business leaders, meeting with staff, trying to

17 manage the staff.  It was a very broad responsibility.  I

18 would work trying to set -- set up all of the meetings making

19 sure that everything flowed.

20      Candidly, trying to catch-up on what things that the

21 President might be addressing that was not part of our to-do

22 for that day.  And in addition to that, would stay generally

23 until the President would go up to the residence between 7 and

24 8 or 9 o'clock.

25      From there, would drive to the apartment, making phone

1  calls, returning phone calls, and trying to finish up on

2  things that I didn't have the time to do.

3       Those were challenging times, bluntly.  COVID had just

4  hit, and what would normally be your schedule got -- really

5  set a different priority because people's lives were at risk.

6  **Q.**   You mentioned and your commission indicates you're the

7  Chief of Staff.  Did you formally have another title?

8  **A.**   Well, most of the time they called me chief, but Chief of

9  Staff.  But it was actually assistant to the President and

10  Chief of Staff would be the official commission.  And so,

11  broadly, my function was to oversee all the federal operations

12  -- not just in the West Wing, but more broadly than that.

13  **Q.**   You mentioned in your description the staff, quote,

14  unquote.  Could you explain to the Court what constitutes the

15  Executive Office of the President?

16  **A.**   Well, the Executive Office of the President is not just

17  the West Wing.  I know a lot of people just see it as the --

18  the West Wing from TV and things like that, but it would not

19  be just that, that group of people.

20       The executive, they called it EOP.  You would have either

21  an EOP e-mail address -- so we had the Eisenhower Building

22  that was opposite of west -- west of that as well.  And so you

23  had a very broad staff that was -- in addition to just the

24  core people that were there in the West Wing, you would have

25  people in the Eisenhower Building.  And then you had a variety

1  of -- of cabinet members that were dispersed throughout the

2  country.

3  **Q.**    And other than the President, who is the senior official

4  in charge of the Executive Office of the President?

5  **A.**    That would have been me, sir.

6  **Q.**    You mentioned the President and coming down.  How often

7  in a given day, if you can quantify it this way, might you see

8  the President over the course of a day or a week or a month,

9  for that matter?

10  **A.**    Well, perhaps, it's best just on a daily basis.  I mean,

11  multiple times during the day.  So it was less so on weekends,

12  even though I would be in the office the majority of the

13  weekends.  Less so on weekends.  But certainly during the day,

14  by multiple -- you know, it could be a dozen to 20 or 30, I

15  mean, and that's on a daily basis.  But hundreds if not

16  thousands of times over a monthly basis.

17  **Q.**    And did you have formal working hours in your role as

18  Chief of Staff?

19  **A.**    24/7.  You know, not -- I don't -- you mean clock in,

20  like, at 7 or out at 11?  No, sir, I didn't.

21  **Q.**    And as Chief of Staff, were you ever given leave?  Did

22  you have a vacation schedule that you were entitled to or

23  anything of that sort?

24  **A.**    When -- when I took the job, I told the President that I

25  had one particular prepaid vacation of sorts, that ended up

1   not being much of a vacation, but that my kids had given me

2   for our 40th wedding anniversary.  And that I had to be away

3   on one weekend for my daughter's wedding.

4   **Q.**  I guess what I was trying to get at is, as civil servants

5   who have allocated leave in a given year, keep a time sheet

6   and are entitled to take a certain number of hours or days,

7   did you have that?

8   **A.**  No, sir.  If I did, I was not aware of it.

9   **Q.**  Did your job ever take you outside of the White House

10   complex and the West Wing?

11   **A.**  Yes, often.  I mean, I would travel -- I would travel

12   with the President.  I would travel to meet with members in

13   Congress up on Capitol Hill.  I mentioned COVID earlier, there

14   were a number of trips up to Capitol Hill when we were

15   negotiating relief, but yes.

16   **Q.**  Without getting into anything that might be classified,

17   was there any requirement with your position that you had to

18   fulfill in connection with presidential travel?

19   **A.**  Yes.  I mean, to not get into anything classified, I

20   think it's pretty well-known that -- that the Chief of Staff

21   or his designee has to travel with -- with the President

22   whenever he travels along with the military aid.  And

23   obviously we don't know -- there's threats daily to the

24   American citizens in this great country, and you never know

25   when those threats are going to come in.  And so you have to

1  travel.

2  **Q.**   You mentioned a couple of times in your description of

3  the job in general, Mr. Meadows, meetings.  Could you be more

4  specific and talk about what kinds of meetings you would

5  attend, where they would be, with whom they might be, and why

6  you -- you might be there?

7  **A.**   So -- a variety of meetings, but -- but to try to be

8  specific for the Court, for Your Honor, I would be invited to

9  almost every meeting that the President was having, whether it

10 was as a principal or whether it was as an observer.  Part of

11 my job was to not only be aware of everything that was going

12 on or try to be aware of everything, which ended up being a

13 much more difficult task than I could ever, ever imagine, but

14 trying to be aware of everything that was going on even if I

15 was not a principal in that particular meeting.

16     So, you know, the types of meetings, many times the

17 President would have meetings with cabinet members, certainly

18 as it dealt with military operations, national security

19 issues, policy issues, policy discussions.  Some on executive

20 orders -- less so on executive orders.

21     I would actually be meeting oftentimes with -- with

22 people that were trying to get in -- in to see the President.

23 So instead of actually seeing the President, they would --

24 they would see me as the next best thing -- which, you know,

25 seeing the President is here (indicating), and, you know, Mark

1  Meadows is way down here.  But they felt like if they couldn't

2  get to the President, they could get to me and that was

3  getting his ear.

4       You know, one thing that comes to mind, if you don't mind

5  me sharing, sir -- excuse me, Your Honor.

6       THE COURT:  I answer to everything.  Sometimes it's

7  even worse at home.

8       THE WITNESS:  Me, too.

9       I can remember one, the Secretary of Agriculture

10  called me because I had a previous relationship from North

11  Carolina.  He was the Secretary of Agriculture from North

12  Carolina.  He said, Mark, we're about to have a crisis of no

13  protein, no chicken, no pork, no beef because of COVID,

14  everything that's happening.  You know, you need to make sure

15  that the President understands that this is -- you know,

16  people will starve.

17       And I trusted this individual even though I, you

18  know, only knew him on a professional basis.  And then we

19  ended up very quickly putting together a group of people that

20  worked on both poultry, swine, and beef, in terms of trying to

21  make sure that -- that all of that came together.

22       So setting that -- that call up was, basically --

23  started with an informal -- one of those informal

24  conversations between the Secretary of Agriculture, Mr.

25  Troxler, and me, that ended up with industry leaders where we

1   were actually trying to make sure that we address it and did

2   address it.

3         It's one of the things that honestly didn't get

4   reported on that much.  You know, it fortunately was one of

5   the crises that we averted.  During a COVID meeting with

6   airline executives, because they were concerned that they were

7   all going bankrupt because nobody was flying, obviously, and

8   so we would bring them in.  They actually -- I met with most

9   of those in the Roosevelt Room -- talking about everything

10  from prescription drug policies, bringing in doctors, and

11  industry leaders there.  So a variety of -- maybe I've gone on

12  way too much, but just trying to give some specifics.

13  BY MR. TERWILLIGER:

14  **Q.**   So just sticking with meetings for a minute.  You said

15  sometimes -- I believe you said, the record will reflect,

16  sometimes you were a participant, sometimes you were more an

17  observer.  Could you sharpen that distinction a little bit?

18  And at whose discretion would you either be -- so I'm asking

19  you two questions -- would you either be at a meeting or not?

20  So tell us a little bit about what you mean by the distinction

21  between participant or principal and observer, and then why

22  would you -- what would control whether or not you went to a

23  given meeting or not?

24  **A.**   Well, the first part of that is a principal versus just

25  an observer.  Oftentimes as a principal you would come in, you

1  might have a particular position, whether it was three or four

2  cabinet members, you were talking about a particular issue.

3  So what -- a lot of times I would come in and say, all right,

4  well, we've got the Secretary of Agriculture who thinks that

5  we need to do this, the Secretary of Energy thinks we need to

6  do this.  Set the plate, try to show the pros and cons of both

7  of their arguments so that some resolution could be made.  So

8  that would be more as a principal.

9      If the President was having meetings, again, I was copied

10  on certainly setting up the schedule.  The scheduler was right

11  outside of my complex.  So the West Wing has the Oval Office

12  kind of over here, there's a long hallway, the Chief of Staff

13  is on the other corner.  And so outside of my office is the

14  scheduler, executive assistants, Deputy Chief of Staff.  So

15  the scheduler is there working that.

16      So I would be aware of the President's schedule.  There's

17  always a demand on the President's schedule.  Part of me being

18  there as an observer is -- was to try to move meetings along.

19  The President would have -- would spend more time talking to

20  people than was ever on the schedule.  And so trying to, you

21  know, do the wrap-up and -- and bring things to a close where

22  there was an action item there.

23      The other is to be generally aware of what's going on.

24  So a lot of times the meetings asked for were getting so I

25  could give the President advice, either in private or in the

1   meeting.  Most often, Your Honor, that advice would be more

2   one-on-one after the meeting; you know, if I was an observer

3   and not a principal, where, you know, here's some concerns as

4   I dealt with that.  But really it was about me trying to be

5   aware.  You know, you play offense and defense, and I found

6   myself on defense a whole lot with things coming at me that

7   came from a million different directions.

8        And so the President had a style that was such that, you

9   know, he would ask you about any given topic.  You know, the

10  topic could be on withdrawal from Afghanistan, which is one of

11  the things that was there while we were there.  But he might

12  ask about three or four different other topics in that

13  particular meeting.  So it's trying to understand what was

14  going on and be aware of that.

15  **Q.**   The second part of my question -- which I thank you for

16  that -- I'll repeat.  Was did somebody set a schedule, the

17  President or otherwise, for what meetings you would attend or

18  not or was that up to you?

19  **A.**   Oftentimes, that was -- was up to me.  I was certainly

20  welcome at all kinds of meetings.  If I was a principal,

21  certainly I had to be there, but on a lot of the others, I

22  would make a very quick pop in, see if things were going --

23  and, bluntly, see if there was someone there who could, you

24  know, wrap-up a meeting, basically bring the meeting to a

25  close.

1    There were times when, bluntly, I would get a call from

2   the Outer Oval.  And, Your Honor, again, you had the Oval and

3   then in the Outer Oval, right outside of there was two

4   executive assistants, a Deputy Chief of Staff, and that was

5   between that and the cabinet room.

6    And so that Outer Oval, you know, they could hear a lot

7   more that was going on.  And so sometimes it was a meeting

8   that I wasn't planning to attend, and then all of a sudden I'd

9   get a call and they'd say, you know, you may want to get down

10   here.  You know, there are some issues that will have to be

11   addressed.

12   **Q.**   Before we leave meetings, just to make sure we're being

13   clear and complete, you've mentioned meeting with members of

14   Congress, other executive branch officials.  You alluded to

15   some outside parties such as airline executives.  Did you ever

16   meet with state or local government officials from outside of

17   the federal establishment?

18   **A.**   Yes, certainly.  Oftentimes, we would met with state

19   officials on a variety of topics, and would do that pretty

20   regularly.  You know, some of the highest profile state

21   officials that I can recall would be the Governor of New York,

22   the Governor of New Jersey, the Governor of Texas, and meeting

23   with some of their -- their cabinet officials or elected

24   officials as well.  Yes, sir.

25   **Q.**   Turning to communications, what part of your job involved

1  communications that you were involved in?  And could you,

2  again, like you did with meetings, kind of give the Court an

3  overview of what kind of communications came with your role as

4  Chief of Staff?

5  **A.**   So communications, like --

6  **Q.**   All forms.

7  **A.**   All forms, okay.

8       So we had, obviously, a press secretary and

9  communications director.  We had a deputy communications

10 director, one of which would sit close to my office.

11      But in terms of all of the communication that was going

12 out, there were daily presidential briefings.  When I got

13 there as Chief of Staff, they hadn't done briefings like --

14 you know, like President Biden is having briefings at the

15 White House.  Those had not been done in a while.  We started

16 those back up.

17      Similar to, Your Honor, what you said, the people had the

18 right to know.  And so in -- in doing that, you know, I was

19 intimately involved in a number of those, setting those

20 functions in place.

21      Communications in terms of going out personally and

22 getting updates in terms of -- at the White House, they have

23 what we commonly refer to -- if this is too much detail, I'm

24 sorry.

25           THE COURT:  No, I have a question.

1           THE WITNESS:  Yes.  Yes, sir.

2           THE COURT:  When the person went out and got

3   information, how did you do it?  If you got something -- you

4   said you personally went out.  Tell me more about that.

5           THE WITNESS:  So oftentimes what would happen is

6   there would be a question where we would actually have a

7   particular issue.  So let me pick COVID, because COVID seemed

8   to dominate at that particular point.

9           I would actually reach out to the FDA in terms of

10  some of the progress they were making.  I would reach out to

11  HHS in terms of some of the progress they were making there.

12  And so communicating that.  There was a big interaction with

13  state officials and certainly with the American people because

14  of the relief packages that had been approved by Congress.

15          THE COURT:  Excuse me for interrupting.

16          THE WITNESS:  No, no.

17          THE COURT:  What kind of communications did you make

18  with state officials?

19          THE WITNESS:  I beg your pardon?

20          THE COURT:  What type of communications did you make

21  with state official, governors?

22          THE WITNESS:  So all types.  So governors, state

23  legislators, secretaries of -- of ag, like I mentioned with

24  Mr. Troxler.  We would deal with a number of them on FEMA

25  issues as well.  So as you probably recall, you know,

1  everybody was looking for federal aid because of -- and so my

2  interaction with state officials got probably a lot more.

3       And one of the nuances is FEMA approval, it actually

4  goes through the National Security Advisor.  Makes no sense to

5  me, but it made sense to somebody at some point.  And so the

6  National Security Advisor actually had the other corner office

7  just down from mine.  And so we would actually interact with

8  them as well.

9       And so it could be a variety -- again, a lot of those

10 state officials were just looking for access to the President.

11 There were times when I felt like my phone number was

12 plastered all over every bathroom wall in America.  I mean, it

13 just -- phone calls kept coming.

14      But to that point, having that communication, we

15 would try to go out and make sure the American people knew

16 what was coming.  One of the big ones was when we had

17 approved, you know, billions of dollars for relief.  We would

18 start getting calls from, well, the relief is not getting to

19 this hospital or it's not getting to that hospital.

20      My communication with members of Congress elevated

21 because they were all looking at their own constituency, and

22 rightfully so, both Republican and Democrat.  And there was an

23 area out on -- in front of the White House, we refer to it as

24 Pebble Beach, only because there are a lot of pebbles, but if

25 you see a picture of the White House where, you know,

1  reporters are there, that's commonly referred to Pebble Beach.

2         So from time to time, I would go out there and

3  actually talk to reporters.  There's always a pool of

4  reporters at the White House to make sure we got the message

5  out.

6         THE COURT:  Thank you.  And I'm sorry.

7         THE WITNESS:  No, no, very insightful question.

8         THE COURT:  I'm sorry to interrupt your line of

9  questioning.

10         MR. TERWILLIGER:  Not at all, Your Honor.  Please,

11  any time.  We want you to know what you believe you need to

12  know.  Thank you for that.

13  BY MR. TERWILLIGER:

14  **Q.**   In talking about communications, you mentioned telephone

15  calls.  I assume you also communicated by other means?

16  **A.**   Yes.  I mean, I think everybody knows text messages, but

17  not -- you know, in-person meetings.  We would have telephone

18  text message and, certainly, individual meetings.

19  **Q.**   So in terms of text messages, I think it probably is

20  true, as you say, everybody knows that you had a lot of text

21  messages that, for example, wound up with the January 6th

22  committee in the House of Representatives.

23         Tell the Court a little bit about your receiving text

24  messages, particularly, frankly, in the post-election period

25  and how they got to you, what they were about, and what was

1 your protocol, if any, for handling them.

2 **A.**    Well, there were more than I could handle.  I mean, I had

3 all kinds of incoming from everywhere.  What I tried to do is,

4 you know, give a courteous response, regardless of the merits

5 of what was being asked or not.  Give a courteous response.

6 Some of those I would just leave as not doing anything with.

7 **Q.**    Can you think of an example of that?

8 **A.**    There were so many.  Yeah.  Yeah.  You know, I think

9 there's -- there was a couple recommendations of what the --

10 are we talking pre or post --

11 **Q.**    Either way.  I'm trying to give the Court a flavor of

12 what the incoming was and what you did with it.

13 **A.**    Yeah.  So there would be a lot of recommendations in

14 terms of, you know, what we should do on a particular policy;

15 engaging in withdrawal from Afghanistan was one of those.

16 There were a number of people that believed that we ought to

17 increase our troop levels in Afghanistan.  The President had

18 already made a pretty clear decision on that.

19       And so, you know, I don't know that I got text messages

20 on that, but certainly phone calls on that subject.  And would

21 not follow up on that mainly because the President had already

22 made a decision on which -- which way to go there.

23       You know, that being said, you know, if the question came

24 up, you know, are people with us 100 percent on this, we would

25 say, no, we're still hearing from individuals that believe

1  that we need to ramp up our support -- some of which were on

2  Capitol Hill.

3  **Q.**    You also communicated by e-mail, I presume.  Did you have

4  an e-mail address?

5  **A.**    Yes.  Both -- both personal e-mail and a White House

6  e-mail.

7  **Q.**    Obviously, 2020 was an election year when you came into

8  the job.  Did you -- what -- what aspects of your job as Chief

9  of Staff intersected with political matters?  And it might be

10 useful -- well, let me just ask that first.

11 **A.**    So a lot of them.  I mean, everything from the policies

12 that you're considering, executive orders at your decision.

13 There's, you know, certainly a political component to all of

14 that.

15        You know, in an election year there's always a demand for

16 the President's time.  I think the campaign team, they would

17 like 100 percent of his time.  You know, for me, trying to

18 make sure that not only we were addressing the official duties

19 of -- of the country, but trying to allocate that time.  So

20 there was a large intersection where you would intersect with

21 those individuals as well.

22        Politically, the things that you're doing, what are the

23 priorities?  Do you send -- one, you know, do you send a

24 direct check to the American people?  Is that going to be

25 viewed positively or negatively?  And largely, positively, you

1 know, people -- people were hurting.  I mean, people were

2 really hurting.  And so -- so there was a political component

3 to -- to certainly everything that we did.

4 **Q.**   Let me direct your attention specifically to the period

5 after the November Election Day and the Inauguration in

6 January.

7     Was -- what things -- leaving the election matters aside

8 for a moment, what other things, if any, occupied your

9 attention and/or matters?  I think you just said priority for

10 the administration.  What was going on?

11 **A.**   Well, in those last, you know, 60 days or so, you know,

12 bluntly, I know we are here today on an issue that seems like

13 that that was the, you know, the top paramount issue.  But for

14 me, it was not.  There was all kinds of things that we were

15 having to get done.

16 **Q.**   Could you give some examples?

17 **A.**   Yeah.  I mean, so I mentioned Afghanistan withdrawal.

18 That was one of those we were still working on.  There was

19 national security threats.  We continued to have threats that

20 were real.  There was trying to not only get the -- the last

21 package of COVID relief out the door, you know, I think that

22 didn't come to a screeching halt because of the political

23 implications, both would it be seen as positive or -- not from

24 our standpoint, we were pushing, but I think Capitol Hill

25 didn't want that to get done.  So those ramped up.  So we were

1 actually working on trying to get the final relief there.

2    There was the National Defense Authorization Act that was

3 coming up that had to get done as well.  And Mr. Mnuchin and I

4 -- excuse me -- Secretary Mnuchin and I were intimately

5 involved in trying to make sure that we got at-home tests for

6 COVID.

7    One of the things that we felt like was, is that it would

8 give confidence to people being able to get back to work.  And

9 so, you know, we originally told -- you know, having, you

10 know, an at home -- and what I refer to as kind of like a

11 pregnancy test, where you can take it at home.  And, you know,

12 the same we wanted for COVID.  And so he and I were in ways

13 myopically focused on that, trying to get that done.

14    There was pardons and -- and executive orders that the

15 President wanted to get done.  It actually had a vetting

16 process.  So when you do an executive order, it actually goes

17 through a number of different processes before it ever gets

18 seen by the President.  It may start with an idea, but it goes

19 through a process where you have principals that weigh in.

20 And ultimately the staff secretary is the one that drafts it

21 up before it -- so all of that was there, in addition to a

22 peaceful transfer of power, there was a transition that --

23 that, you know, we had to start and address.

24    You know, getting a secure place from -- where at that

25 point President Elect Biden could actually review some of the

1 national security threats that we were getting and making sure

2 that he was getting his briefings and still working with

3 Mr. Klain who was ultimately his Chief of Staff at the time.

4 **Q.**    Again, without going into classified -- any classified

5 information, did there come a time where you were having a

6 daily telephone call or regular telephone call with Secretary

7 Pompeo and General Milley, the Chief of Staff?

8 **A.**    Yes.  That was actually in the last 15 days or so, after

9 January 6.  We would have normal -- normal national security

10 briefings where you would do that, but trying to make sure

11 that --

12 **Q.**    How did that phone call come about, setting that up?

13 **A.**    There was -- it was raised as an issue that some of our

14 adversaries may see us as weaker after January 6, after what

15 happened at the Capitol.  So I set up a morning call between

16 myself, Secretary Pompeo and General Milley, the Chairman of

17 the Joint Chiefs, so that we could in realtime -- and most of

18 those were not long conversations -- but just identify, you

19 know, are any of our adversaries coming after us.  That was on

20 a secure line that I set up and recommended that we do after

21 January 6.

22 **Q.**    So if I could go back over a couple of things.  You've

23 mentioned a number of national security issues:  Withdrawal

24 from Afghanistan, the reauthorization of the National Defense

25 Authorization Act, COVID relief, some other programs and

1  whatnot.  What -- what involvement was required in your job

2  with those things in terms of dealing directly with political

3  figures, whether in the federal government or elsewhere?

4  **A.**    Certainly my direct involvement was -- was there and

5  required at a 100 percent, primarily, because it had to be

6  expedited.  I mean, there was only 60 days left.  And so as --

7  I was acting as a principal, and so I'd have a number of

8  conversations with those individuals.

9  **Q.**    But what individuals?

10  **A.**    Well, so in terms of the principals, in terms of those

11  particular -- that was responsible.  So if it was -- I can

12  remember Senator Schumer was real concerned about money

13  getting to some of the hospitals in New York.  And so I had

14  the deputy secretary for HHS, along with a number of his

15  people saying, all right, where are we on the money, why is

16  not getting here, how much is actually going, so that we could

17  actually have a conversation with Senator Schumer and update

18  him on that.  That's one -- one example that comes to mind.

19  **Q.**    In the -- in the campaign period, explain your role, if

20  any, in relation to the President's reelection campaign and

21  what, if any, interactions you would have with people in

22  charge of or running the campaign?

23  **A.**    You mean was I -- was I --

24  **Q.**    Yes.

25  **A.**    I'm not -- I was never paid by the campaign, never

1  supervised the campaign, and they had their own structure.

2          Certainly I would interact with them.

3  **Q.**    Why would you interact with them?

4  **A.**    Well, the President oftentimes, even if it's just simple

5  schedulings -- that's the simplest thing.  But we'd interact

6  with them on a regular basis.  They would come in and, you

7  know, be giving a briefing prior to the election, prior to

8  November 30 -- November 3rd, they would actually come in and

9  meet with the President oftentimes.  And so something as

10 mundane as just setting up those meetings to -- to actually

11 following up with a number of those at the President's

12 direction.

13 **Q.**    When you mentioned travel before and going with the

14 President, did you travel to any, for lack of a better term,

15 I'll call it campaign rallies that the President was the

16 principal?

17 **A.**    Yes, sir, a number of them.

18 **Q.**    And why would you travel to those?

19 **A.**    Well, in my official capacity, again, we had to be -- I

20 want to just try to make sure I'm not violating any --

21          THE COURT:  Yes.

22          THE WITNESS:  I'm in enough trouble as it is.

23          THE COURT:  Just take your time, think about it, you

24 know.

25          THE WITNESS:  Yeah.  So, thank you, sir.  Your Honor.

1          So in traveling with the President, both from the

2   standpoint of the -- the way that you staff the President, so

3   those logistics concerns, you're there, you're working in your

4   official capacity to make sure that if anything happens while

5   he is out at a rally, that you would be there.

6          In addition to that, there were still demands on his

7   time for official actions that had to take place.  I can

8   remember one specifically where we were trying to get a

9   hostage out of a country in Northern Africa, and so we were

10  dealing with that in realtime while we were actually traveling

11  with the President on Air Force One.  And so running the

12  country continued to go on.

13  BY MR. TERWILLIGER:

14  **Q.**    Going specifically to political matters, you've mentioned

15  a couple of times needing to know what's going on --

16  **A.**    Yes.

17  **Q.**    -- as a reason you would go to a meeting or about taking

18  some other discretionary action on your part.  Why did you

19  need to know what was going on, including politically?

20  **A.**    One, to give advice to the President of the United

21  States.  To help prioritize his time.  But the other is, is

22  trying to skate to where the public is.  There were no rhyme

23  or reason where questions might come up, whether they were

24  political in nature, whether they were policy in nature,

25  whether they were national security in nature, those would

1  come up.

2      And so having -- having a broad understanding of what was

3  going on was -- was critically important as a senior advisor

4  to the President so that I could anticipate what logistics

5  were needed and what we needed to do.

6  **Q.**   You've no doubt heard the expression "policy is

7  politics"?

8  **A.**   Yes.

9  **Q.**   What does that mean to you?

10  **A.**   Well, it just means that everything that you do from a

11  policy standpoint has a political implication.

12  **Q.**   And was it part of your job to be aware of those

13  political implications?

14  **A.**   Sure.  I mean, understanding whether it was something

15  that -- that would be viewed to help the American people,

16  knowing the pushback we would get both from the American

17  people but from Congress.  I mean, you know, it would be

18  different if it were just the President of the United States

19  signing things into law.  But it's, you know, we've got three

20  equal branches of government, and one of those had to

21  understand the politics of those policies and how they'd be

22  viewed on Capitol Hill as well.

23  **Q.**   Directing your attention specifically to the

24  post-election period, did you maintain, or not, a general

25  awareness of what was going on with the challenges to election

1    results by the President and/or his campaign?

2    **A.**    Certainly a general awareness and tried to have a deeper

3    understanding -- are there things that even recently I've

4    become aware of that I wasn't aware of?  Yes.  But having an

5    understanding of what was going on and who was in the

6    President's ear.  The President, Your Honor, would have a

7    number of people that would have direct access to him.  And so

8    trying to understand that even though one of my jobs is trying

9    to be a gatekeeper, that was a lot more challenging with

10   President Trump.

11   **Q.**    Did you, in fact, try to limit or eliminate the access of

12   anyone to the President in the post-election period?

13   **A.**    Yeah, there were times where I -- I did try to limit some

14   of the access.

15   **Q.**    Because why?

16   **A.**    Well, it just -- it created a number -- a number of

17   challenges for me, because it would raise issues, whether they

18   were allegations or things to deal with that I felt like it

19   was -- you know, having the team -- and by the team what I'm

20   talking about is his legal team addressing those issues

21   directly, trying to limit that would -- I thought would allow

22   him more time to do the things that were part of the official

23   duties.

24   **Q.**    Did people from either the inside or the outside, whether

25   it's the campaign, the legal team supporting the President, or

1  just other people on the outside, did you receive any

2  communications from those people concerning the potential for

3  challenging the election or the election results?

4  **A.**    Yes.  I mean, I would get text messages, phone calls,

5  some were one-on-one meetings.  But certainly would get -- a

6  number of allegations were made.

7  **Q.**    And what was the volume of those, say, in the period of

8  November and December?

9  **A.**    More than -- than you could deal with.  There were times

10 where, you know, it reminded me of, like, an Andy Griffith,

11 you know, where all this incoming is coming -- like an

12 operator, you know, that you might get something and plug it

13 into this hole and, you know, try to route it on the -- on

14 some of the legitimate stuff, but, you know, hitting all of

15 these cross wires trying to get it here or there, but more

16 than you could handle.

17 **Q.**    I'm not sure that it's clear what you mean by that.  You

18 mentioned the concept of routing it and you also mention the

19 concept of legitimate.  Did you do any separating of the wheat

20 from the chaff, as those things came up?

21 **A.**    Yeah, certainly.  There were some that just didn't get

22 dealt with.  There were others that, you know, if I got

23 something and felt like that, okay, regardless of the merits

24 of this, you know, that's something that DOJ should look at,

25 this is something the campaign can follow up on.  You know, I

1  was -- I was oftentimes seen as the one that if -- you know,

2  if they just got to me, they would be able to have the

3  President's ear.  And so some of those that you would just

4  leave by the wayside, the others you try to -- that's what I

5  was talking about with the operator, try to get them to

6  somebody to take care of the issue and without opining on the

7  merits of those.

8  **Q.**   It's been publicly reported that you were in attendance

9  at a meeting where then Attorney General Barr met with the

10 President in the Oval Office in the post-election period.

11 What was that meeting -- do you recall that meeting?

12 **A.**   Yes.

13 **Q.**   What was that meeting?

14 **A.**   I believe.  I mean, I was in several meetings

15 post-election with General Barr.

16 **Q.**   But was there a meeting where General Barr said he was

17 going to resign?

18 **A.**   Yes, sir, there was.

19 **Q.**   As to that meeting, what do you recall about it, where it

20 was and what occurred?

21 **A.**   When he mentioned that he was going to resign?

22 **Q.**   Yes.

23 **A.**   We were actually -- again, the Oval Office is here, Outer

24 Oval here, there's a dining room that's part of the Oval

25 complex.  It was actually in the dining room area there.  And

1  I was actually in that meeting.  We were --

2  **Q.**    What was that meeting about?  What was --

3  **A.**    Well, we talked about the election -- some of the

4  allegations that had been made, and the election --

5  **Q.**    Allegations concerning what?  Be as specific as you can

6  on the subject matter.

7  **A.**    Okay.  So some of the allegations of fraud and election

8  irregularities and a number of those issues that were making

9  headlines at that particular point, and that the President

10  would continue to -- to bring up.  But we were discussing

11  those issues.

12  **Q.**    Do you recall the date of that meeting?

13  **A.**    I don't, sir.

14  **Q.**    Do you know about when it was?

15  **A.**    It would have been -- I believe, as best I can recall,

16  sometime in December, early December, I believe.

17  **Q.**    And to your recollection, did General Barr take a

18  position with the President about election irregularities?

19  **A.**    Yes, sir, he did.

20  **Q.**    And what did he say?

21  **A.**    I think -- well, he just said a lot of it had no merits

22  and that some of it, I think, to use his term, was bullshit.

23  **Q.**    Why were you at that meeting?

24  **A.**    Well, again, as part of -- of being -- advising the

25  President of the United States.  I was -- any meeting that the

1  President would -- would have, generally speaking, I would be

2  there.  We were discussing something that the President had

3  brought up on a regular basis.  I didn't know that Attorney

4  General Barr was -- was going to offer his resignation, but I

5  think he had made some public comments that prompted that

6  meeting as well.

7  **Q.**   You're aware of a federal statute or a series of

8  statutes, actually, that are generally known as the Hatch Act?

9  **A.**   Yes, sir, I am.

10 **Q.**   You're not a lawyer, are you?

11 **A.**   No.

12 **Q.**   In your understanding, and particularly in regard to the

13 execution of your role in -- as Chief of Staff, tell the Court

14 your understanding of what the Hatch Act required and allowed,

15 for that matter.

16 **A.**   Well, my understanding is you can't advocate for a

17 particular candidate in your official -- and by advocating,

18 you know, be out there and saying, you know, please vote for

19 President Trump or President Biden, you know.  I think it's

20 come up recently with the press secretary and, you know, under

21 President Biden, that you can't campaign actively for -- in

22 your official title is my understanding.

23      And broadly, you know, other activities that I was

24 involved with, you know, from my standpoint were certainly

25 allowed.

1   **Q.**   Did there come a time where you were actually dinged for

2   an alleged Hatch Act violation?

3   **A.**   Yes, sir, there was.

4   **Q.**   Tell the Court what the circumstances of that was.

5   **A.**   I was actually doing an interview out on Pebble Beach and

6   on a totally unrelated topic, and -- and kind of, I think, at

7   the end of that interview -- as I recall it.  I mean, you

8   know, it's three years ago.  But as I recall it, at the

9   interview they asked me about a candidate that was going to

10   replace my old congressional seat.  And I think I made the

11   comment, I think, you know, he'll make a fine member of

12   Congress.

13        And very shortly after that was a -- you know, there was

14   a group that said that I had violated the Hatch Act and made

15   the allegation.  And I know from there it had two effects:

16   One, I went to our ethics attorneys and said, you know, what

17   am I supposed to do?  You know, I'm having an interview about

18   other subjects and then all of a sudden, you know, they ask

19   this question.  Am I supposed to say no comment?

20        And, you know, he -- he basically said, well, you know,

21   maybe not have on the chyron that you're the Chief of Staff

22   and -- but I was talking about other -- other...

23        So it made me extremely cautious from there, because, you

24   know, any time that, you know, somebody would start to ask a

25   political question -- but really what it had, the chilling

1  effect is, is that I did a whole lot less interviews at that

2  point.

3         THE COURT:  Was this as a result of a report from the

4  special counsel, this event?

5         THE WITNESS:  No, sir, I think that came later, Your

6  Honor.  But early on, I mean, almost immediately, one of the

7  groups said, Well, you know, Meadows has violated.  I found

8  out about it reading a headline, honestly.

9         THE COURT:  Okay.

10        THE WITNESS:  Yeah.

11 BY MR. TERWILLIGER:

12 **Q.**  Do you know whether or not the office of the White House

13 counsel took a position as to whether or not you violated the

14 Hatch Act in that interview?

15 **A.**  Yes, sir.

16        MS. CROSS:  I object, Your Honor, to any hearsay that

17 the witness is being called for.  I think as phrased, it was

18 "are you familiar with," and I have no objection to the

19 witness answering that question.

20        MR. TERWILLIGER:  I think he can say whether or not

21 he knows --

22        THE COURT:  Hold on, hold on.  She's talking.

23        MR. TERWILLIGER:  Sorry.

24        MS. CROSS:  I think it's the content of any advice or

25 any response from another White House counsel or anybody else

1  that would be hearsay, and we object.

2       THE COURT:  I will allow Mr. Meadows to testify to

3  anything what we deem resulted, but not what the special

4  counsel said specifically.

5       MS. CROSS:  Thank you, Your Honor.

6       MR. TERWILLIGER:  So you're allowing --

7       THE COURT:  What happened?  Did anything happened to

8  you?  What was the result?  Don't tell me what the special

9  counsel said.  What was the result after the end of the

10  conversation?

11       THE WITNESS:  My understanding from the White House

12  counsel's office is that they said that I had not violated the

13  Hatch Act.  Did I mess up?

14       THE COURT:  No, you did fine.

15       Move on.

16       THE WITNESS:  All right.  Sorry, Your Honor.

17       MR. TERWILLIGER:  Your Honor, may I approach?

18       THE COURT:  Yes.

19       MR. TERWILLIGER:  Thank you.  I'm going to show

20  Mr. Meadows what has been marked as Defense Exhibit 2, which

21  is the indictment in this case, which I assume our opponents

22  are familiar with.

23       THE COURT:  You may approach, sir.  Yes, sir.

24       MR. TERWILLIGER:  Your indulgence for a second, Your

25  Honor.

 1           THE COURT:  Yes.

 2  BY MR. TERWILLIGER:

 3  **Q.**   I'm going to direct your attention, Mr. Meadows, to page

 4  21 -- well, maybe I should have you identify the exhibit first

 5  for the record.

 6  **A.**   This says defense -- or Exhibit Defense 2, and it appears

 7  to be an indictment filed on August 14, 2023, from --

 8  Ché Alexander, Clerk of Court, Fulton County Superior Court.

 9  **Q.**   Thank you.  I direct your attention to page 21.

10           THE COURT:  Are you moving for it to being admitted?

11           MR. TERWILLIGER:  Pardon me, Your Honor?

12           THE COURT:  Are you moving to have it admitted?  Are

13  you going to have him testify from it?

14           MR. TERWILLIGER:  Well, I assume --

15           THE COURT:  Let's just have it admitted for the

16  record.

17           MR. TERWILLIGER:  Okay.

18           MS. CROSS:  I have no objection.

19           THE COURT:  It's admitted without objection.

20           (Defense Exhibit 2 was received and marked into

21  evidence.)

22           MR. TERWILLIGER:  Thank you, Your Honor.

23  BY MR. TERWILLIGER:

24  **Q.**   Directing your attention to what's denominated as Act No.

25  5 in that indictment, to the extent that you engaged in the

1  conduct described therein, if any, can you tell the Court

2  whether or not you undertook that activity in connection with

3  or related to your role as Chief of Staff?

4  **A.**  Act No. 5?

5  **Q.**  Yes, sir.

6  **A.**  So certainly.  That was -- it would be in my capacity as

7  Chief of Staff, that particular meeting as I recall happened

8  late in the evening.  As I mentioned earlier, it's very -- it

9  was very common to meet with -- I was not a principal, but --

10  but to be in meetings in the Oval Office, particularly when

11  there was no one else there to -- to kind of do the wrap-up

12  and try to get, you know, to bring a meeting to a close.  But

13  it would have been in my official capacity as Chief of Staff.

14  **Q.**  Is there anything about that meeting that you

15  particularly recall as occurring that you were involved in?

16  **A.**  As I recall, most of the state legislators were -- were,

17  you know, in a "U" right in front of the President's desk in

18  the Oval.  Again, would not have been as much as a

19  participant.  The President would have been leading that

20  meeting.  And as we wrapped that up, I think most of that had

21  to do with allegations of potential fraud in Michigan, and

22  what, you know, they may or may not do as a legislature.

23  **Q.**  And why would you need to be aware of what was happening

24  in that meeting as Chief of Staff?

25  **A.**  Well, certainly as Chief of Staff, again, giving advice

1  to the President, but, also, making sure that White House

2  counsel is informed, others being able to give advice to the

3  President.  And certainly as a gatekeeper trying to round

4  things -- you know, wind things up.

5          But, again, in that broader scope of trying just to be

6  aware of what is consuming the President's time or taking his

7  attention.

8  **Q.**   Did you give political advice to the President?

9  **A.**   Certainly.

10 **Q.**   Did the President ask you for political advice?

11 **A.**   Yes, sir.

12 **Q.**   While we're on that, is there one or more offices in the

13 Executive Office of the President under the Chief of Staff

14 that are involved in political affairs?

15 **A.**   Two that I know of.  We would actually have a couple of

16 different federal roles within -- and, actually, most of those

17 were housed, as I talked about earlier, in the -- they're part

18 of the EOP, part of the Executive Office of the President, but

19 would be either housed in -- not in the West Wing, but

20 certainly in either the Eisenhower Building or other parts of

21 the White House.

22 **Q.**   When you were a member of Congress --

23 **A.**   Yes.

24 **Q.**   -- part of that time was during the Obama administration?

25 **A.**   Yes, sir.

1  **Q.**   Did you ever deal with any political officers of that

2  administration while you were a member of Congress?

3  **A.**   I don't know that I -- political in nature in that there

4  was a -- what they would call a congressional liaison.  So I

5  dealt with their congressional liaison who was reaching out to

6  me as an elected official.  Because if you'll recall, during

7  parts of that the Republicans had a majority in the house, I

8  believe, not in the Senate.  And I can't remember when I had

9  that contact.  But certainly had contact with those

10  individuals in the Obama administration.

11  **Q.**   Did you meet with other people on the White House staff

12  in that time when you were in Congress?

13  **A.**   Not as much, just -- I don't know that President Obama

14  was seeking my advice on -- but -- but not as much.  I was a

15  newer member of -- of Congress, and so most of our

16  interactions had to do with, early on, just some of the

17  legislation that we were dealing with.

18  **Q.**   Directing your attention again on page 21 of the

19  indictment to Act No. 6, as it's denominated there, can you

20  tell us if any -- to the extent you engaged in the conduct

21  described there, if any, to any degree, can you tell us

22  whether or not you undertook that activity in connection with

23  your role as Chief of Staff?

24  **A.**   Yes.  And, certainly, as -- in my role as Chief of Staff

25  to get additional phone numbers for the President on a variety

1 of individuals.

2     Most of the time, Your Honor, the White House switchboard

3 had, you know, a pretty wide Rolodex.  It was -- but from time

4 to time, the President or the White House switchboard or

5 Ms. Michael -- Ms. Michael was his executive assistant that

6 sat in the Outer Oval -- would ask me for, you know, do you

7 have contact for this particular person.  Sometimes not even,

8 you know, with the context of why they wanted it.  Just the

9 President wanted the phone number.  So I was asked on a pretty

10 regular occasion for numbers.

11     And if -- if it helps the Court to give a little color, I

12 mean, to this, the President typically would see someone in a

13 particular state as being all knowing in terms of everything

14 in that particular state.  I know when I was a member of North

15 Carolina, he would call me for just about anything that was

16 happening in North Carolina and expect me to know.  And I

17 assume a similar kind of thing here with Mr. Perry, because he

18 was a member of Congress from Pennsylvania, asking for those

19 numbers.

20 **Q.**  Directing your attention to Act No. 9 on page 22 of the

21 indictment, Mr. Meadows, to the extent that you engaged, if

22 any, in the conduct described therein, did you undertake those

23 activities in connection with your role as Chief of Staff?

24 **A.**  Well, as I previously stated, it was not uncommon for me

25 to, as Chief of Staff of --

 1  **Q.**    Can you answer that first question yes or no?

 2  **A.**    Can you ask it again?  I'm sorry.

 3  **Q.**    Yeah.

 4       To the extent that you engaged in any of the activity, if

 5  you did, described in Act No. 9, did you undertake that

 6  activity in connection with your role as Chief of Staff?

 7  **A.**    Yes.

 8  **Q.**    And is there something in particular you wanted to say

 9  about this?

10  **A.**    Yeah.  On this particular meeting, Your Honor, I -- to

11  the best of my recollection, I was not actually in this

12  meeting.  Again, a lot of this may be fuzzy, but what I seem

13  to recall about the Pennsylvania meeting was -- actually, I

14  was in my office, in my Chief of Staff office down the hall

15  when this delegation came in.  They actually came into, I

16  mentioned earlier, the cabinet rooms, not into the Oval

17  Office.

18       And I had somebody come to me in my Chief of Staff office

19  and said that three people had positive for COVID.  At that

20  particular point, we were testing everybody for COVID that

21  came in to meet with the President.  And they came into my

22  office and said that there's three people that have COVID.

23       I recall going down to -- to the cabinet room where they

24  were assembling at that particular point, introduced myself as

25  the Chief of Staff, and then tried to let the individuals know

1  that there was three of them that wouldn't be able to meet

2  with the President because they had -- had, you know, come

3  down with a positive COVID test.

4       And then trying to make sure that -- that -- if the

5  meeting was to go on, that it would actually keep the

6  President safe and keep him a proper distance away from --

7  from individuals.  And so I don't recall being in -- in the

8  rest of that meeting, but if I had been, certainly it would

9  have been like other meetings being the Chief of Staff.

10 **Q.**   Let me direct your attention to page 24 of the indictment

11 and Act 19, please.

12 **A.**   Act 19 you said?

13 **Q.**   Yes.

14      To the extent you engaged in the activity described

15 therein, if any, would you have undertaken that -- did you

16 undertake that activity in your role as Chief of Staff?

17 **A.**   Yes.  Any -- any action on -- it was common for the Chief

18 of Staff, in his role of Chief of Staff, to ask individuals

19 for memos on a variety of topics, and -- and I often did so.

20 **Q.**   Who is Mr. McEntee and what was his role, if any, in the

21 Executive Office of the President?

22 **A.**   Mr. McEntee was head of personnel policy, and would deal

23 with setting up resumes, people to consider for vacancies and

24 the like in the administration.  He had been the President's

25 body man at one time as well.  He had a very close

1  relationship with the former President.  And -- but at that

2  particular point, he would have been the head of personnel

3  policy.

4  **Q.**   Do you believe you asked Mr. McEntee for a memorandum for

5  a strategy for disrupting and delaying the joint session of

6  Congress on January 6?

7  **A.**   No, sir, I don't.  I -- when this came out in the

8  indictment, this was the biggest surprise for me because I had

9  zero recollection.

10          THE COURT:  You don't remember asking or you did not

11  ask?

12          THE WITNESS:  I did not ask and -- well, certainly I

13  don't remember asking.  But I'm saying I did not ask and

14  here -- can I -- can I --

15          THE COURT:  Stop, think about it.  There is a big

16  difference between not asking and not remembering asking.

17  Which one is it?

18          THE WITNESS:  And so I would say I did not ask.  And

19  here is the -- and that's not to infringe on anybody's

20  credibility.  I want to make sure the Court knows that.

21  Here's -- here's the reason.  One, it was a surprise to me.

22          Two, the second part of that is, is that Mr. McEntee

23  was over personnel.  I remember asking him for recommendations

24  in terms of personnel things, but I don't believe he's an

25  attorney.  Most -- if I were to ask for this kind of memo,

1  Your Honor, it would have been with Pat Cipollone or Eric

2  Cushman or one of the lawyers in the White House counsel's

3  office.  I oftentimes spent more time in their office than I

4  did in mine.

5        And that's why, you know, I'm always -- want to be

6  cautious to make sure I'm truthful and honest with the Court.

7  But I can tell you that me asking Johnny McEntee for this kind

8  of a memo, just -- just didn't happen.

9        THE COURT:  Okay.

10       MR. TERWILLIGER:  Do you have further questions on

11 that, Your Honor?

12       THE COURT:  No, sir, you can proceed.

13       MR. TERWILLIGER:  Thank you.

14 BY MR. TERWILLIGER:

15 **Q.**   Directing your attention to page 44 of the indictment, if

16 I could, please.  Just take a moment and look at that.

17 **A.**   Which act?  I'm sorry.

18 **Q.**   92.  I'm sorry.

19 **A.**   Yes, sir.

20 **Q.**   To the extent, if any, you engaged in the activity

21 described in Act 92 of the indictment, was that in connection

22 or related to your role as Chief of Staff or not?

23 **A.**   It certainly was in my role as Chief of Staff.

24 **Q.**   Would you just briefly explain to the Court the

25 circumstances of you being there and why you went, in

1 particular, assuming you did?

2 **A.**   I did go.  Your Honor, actually, I was in the Atlanta

3 area visiting my children for Christmas.  Both of my children

4 live here in the Atlanta -- greater Atlanta area, and I was

5 here.  There was -- not just with Cobb County, but with Fulton

6 County as well -- concern over the signature verification.

7 I'm not sure who made an allegation, but there were concerns

8 about that process and how it would actually be meted out, and

9 I felt like that anticipating where the President would not

10 only ask, but bring it up, that interrupting my Christmas with

11 my children for a trip over to Cobb County to see the actual

12 count in process would keep me well-informed so that I could

13 advise the President of what I observed in person instead of

14 reading about it or hearing speculation from other people.

15 **Q.**   And what did you observe?  Could you characterize that?

16 **A.**   I -- I observed a very professional operation that was

17 being done, in my opinion, in all the proper ways that it

18 should be.  And -- and as I was able to see a number of

19 investigators, I was able to see the GBI, Georgia Bureau of

20 Investigation, working hand in glove.  You know, there were

21 stacks of ballots up, but -- now, I didn't actually seeing

22 them doing the counting process. I actually looked into the

23 room.  They stopped the counting while I did that.  And -- and

24 I felt like they had done a very professional job.

25 **Q.**   Did any kind of confrontation or other unpleasantness

1  take place while you were there?

2  **A.**    No.  I've read some of the reports that would indicate

3  otherwise, but I've -- I believe that I acted like a gentleman

4  the whole time and was very deferential and truly just in a

5  fact-finding mode to observe what they were doing and felt

6  like the Secretary of State's office was doing a good job on

7  that.

8  **Q.**    And without telling us about any particular

9  communications, did you relay your -- your observations, as

10  you've recounted them here, to the President?

11  **A.**    I did.

12  **Q.**    Directing your attention to Act 93 of the indictment,

13  also on page 44, if you would take a look at that.

14  **A.**    Act 93?

15  **Q.**    Yes.

16  **A.**    Yes, sir.

17  **Q.**    To the extent you engaged, if any, in the activity

18  described therein, did you undertake that activity in

19  connection with your role as the Chief of Staff?

20  **A.**    Yes.  In my role as Chief of Staff, I recommended that

21  the President reach out to Ms. Watson.

22  **Q.**    Directing your attention to the next page, page 45, at

23  96.

24  **A.**    Yes, sir.

25  **Q.**    To the extent, if any, that you engaged in the activity

1   described in Act 96, did you undertake that activity in your

2   role as the Chief of Staff or not, as the case may be?

3   **A.**   Certainly any outreach to the Secretary of State's office

4   that I made was in my role as Chief of Staff.

5   **Q.**   And directing your attention further --

6   **A.**   Can I clarify one thing, though?

7   **Q.**   Yeah, absolutely.

8   **A.**   I don't -- I don't know -- I see what this says in terms

9   of me reaching out to Chief Investigator Frances Watson.  I

10  don't recall reaching out to Ms. Watson.  You know, they've

11  got a quote there, and I don't think that quote actually was

12  to Ms. Watson.

13  **Q.**   Okay.  Thank you for that.

14      Let me direct your attention further to page 50, what is

15  Act 112.

16  **A.**   Page 50?

17  **Q.**   Yes, sir.

18  **A.**   Yes, sir.

19  **Q.**   To the extent, if any, that you engaged in the activity

20  described in Act 112, did you undertake that activity in

21  connection with or related to your role as Chief of Staff or

22  not, as the case may be?

23  **A.**   Yes.  In my role as Chief of Staff, it was not uncommon

24  for me to set up phone calls with the President and state

25  officials, other individuals, everybody, from the King of

1  Saudi Arabia to others.  And so it was not uncommon for me to

2  help set those up -- whether I personally did it or worked

3  with our switchboard or national security team.

4          MR. TERWILLIGER:  May I have a moment, Your Honor?

5          THE COURT:  Yes, sir.

6          MR. TERWILLIGER:  Thank you, Your Honor.

7          No further questions.

8          THE COURT:  Your witness.

9          MS. CROSS:  Thank you, Your Honor.

10 CROSS-EXAMINATION

11 BY MS. CROSS:

12 **Q.**  Good morning, Mr. Meadows.

13 **A.**  Good morning.

14 **Q.**  We met briefly this morning but, otherwise, we haven't

15 met; correct?

16 **A.**  To the best of my recollection.

17 **Q.**  I think that's right.

18     I want to ask you a few questions.  And we've been going

19 for a minute, so with the Court's permission, if you'll just

20 let me know if you need to take a few minutes break.

21          THE COURT:  Do you need to take a break?  I think

22 this cross-examination is not going to be short.  But if you

23 need to take a break, we can stop and take a break now.

24          THE WITNESS:  I'm fine, Your Honor.

25          THE COURT:  Are you fine?

1          MS. CROSS:  I'm fine, sir.

2          MR. TERWILLIGER:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MS. CROSS:  Thank you.

5   BY MS. CROSS:

6   **Q.**    So your attorney, Mr. Meadows, asked you a series of

7   questions about the specific acts in the indictment.  And

8   you've still got the indictment there in front of you, don't

9   you?

10  **A.**    Yes, ma'am.

11  **Q.**    All right.  And he asked them in a lawyerly kind of way:

12  To the extent you participated in this alleged activity, was

13  it within the scope of your employment.

14         Do you recall those series of questions?

15  **A.**    Yes, ma'am.

16  **Q.**    Okay.  I'm going to ask you a slightly different version

17  of that question.  If you would turn for me, please, to page

18  21 of the indictment, Act 5.  And I'm going to ask you,

19  Mr. Meadows, did you, in fact, on November 20, 2020, meet with

20  then President Trump and members of the Michigan State

21  legislature in the Oval Office regarding the Trump campaign's

22  allegations of fraud in the election?

23  **A.**    I met with --

24         MR. TERWILLIGER:  Object to the form of the question,

25  Your Honor.  There are multiple questions there:  Did he met

1  with him; what the subject matter was.  I ask that he be asked

2  one question at a time.

3           THE COURT:  Let's do one question at a time.

4           Did you met with him?

5           MS. CROSS:  Absolutely.  Thank you.

6  BY MS. CROSS:

7  **Q.**   Mr. Meadows, did you meet on November 20, 2020, with then

8  President Trump and members of the Michigan State legislature

9  in the Oval Office?

10 **A.**   I don't have my calendar here in front of me, but I do

11 recall meeting with the Michigan State legislative group

12 sometime I believe, in November.  So if -- the 20th sounds

13 about the right date.

14 **Q.**   Okay.  Without committing to the date, on or about

15 November 20, 2020, do you recall a meeting that's described in

16 this way?

17 **A.**   Yes, ma'am.

18 **Q.**   And, in fact, was Mr. Giuliani, Mr. Rudy Giuliani, did he

19 attend by phone?

20 **A.**   I believe he did, yes.

21 **Q.**   Okay.  Now, the Trump campaign at that time had an

22 election challenge pending in Michigan; is that correct?

23 **A.**   I don't know.

24 **Q.**   You don't know that?

25 **A.**   I don't.

58

1  **Q.**   Do you know if the federal government had any litigation

2  ongoing in Michigan at that time related to the presidential

3  election?

4  **A.**   I don't.

5  **Q.**   All right.

6  **A.**   I don't know.

7  **Q.**   What was the official role of you as a Chief of Staff in

8  that meeting?

9  **A.**   Well, as I said earlier, when they actually came in to

10  meet with the President, you do normal introductions.  Part of

11  that is you're trying to be aware of what -- any do-outs that

12  may be required, so you would listen to that.

13  **Q.**   Let's make sure -- I'm going to stop you there for just a

14  minute.

15  **A.**   Yes, ma'am.

16  **Q.**   I just want to make sure for our court reporter that the

17  record is clear.  When you say "do-outs," is that a kind of a

18  colloquial term for action items or to-do items that might

19  come out of that meeting?

20  **A.**   Where the President might request at a later date

21  something that would happen.  Now, sometimes that happens

22  whether I was in a meeting or not.

23      This particular one, as I recall, was later in the

24  evening, and Mr. Giuliani was not there in person.  So I don't

25  know that there was anybody that could wrap-up the meeting.

1  And so part of me being there in my official capacity would

2  have been to try to assist with time management and wrap-up

3  the meeting as well.

4  **Q.**   What was the federal policy, if any, that was advanced by

5  you being present in that meeting?

6  **A.**   Well, certainly -- you know, speaking to any federal

7  policy, certainly making sure you have an accurate and fair

8  election would be the only policy that I would know of.

9  But --

10 **Q.**   I'm sorry, can I finish my question.

11                THE COURT:  Hold on, hold on.

12                MR. TERWILLIGER:  Your Honor, let him finish his

13 answer, please.

14                THE COURT:  Let him finish.

15                THE WITNESS:  You know, if you're looking at

16 policies, I think all of us as Americans want to make sure

17 there are vote counts and that there are -- that it is a free

18 and fair election.  And so certainly from a standpoint of

19 trying to make sure that elections are -- are accurate, you

20 know, does that have a federal nexus, I would assume it would

21 have a federal nexus.  I mean, we have operations within the

22 federal government that tries to make sure our elections are

23 accurate, whether it's the Department of Homeland Security,

24 DOJ or others.

25                THE COURT:  Let me say this.  The witness has the

1 | right to give an answer, but it has to be responsive to the
2 | question.
3 |      MS. CROSS:  That's where I was going.
4 |      THE COURT:  And you can't go beyond the scope of the
5 | question.  I want you to give your answer for that.
6 |      THE WITNESS:  I'm sorry.
7 |      THE COURT:  Again, sir, if it goes beyond the scope
8 | of the question, I will allow you to be cut off.
9 |      THE WITNESS:  Yes, sir.  Yes, sir.
10 |      THE COURT:  You're not a lawyer.  That's their jobs.
11 |      THE WITNESS:  Okay.
12 |      MS. CROSS:  Thank you, Your Honor.
13 | BY MS. CROSS:
14 | **Q.**  All right.  So let me ask my question again, Mr. Meadows,
15 | and see if we can keep it a little more targeted.  Okay?  Yes?
16 | **A.**  Yes.  Yeah.  I'm sorry.
17 | **Q.**  So the -- you talked about a general, as Americans, the
18 | interest that we all have in secure and safe elections;
19 | correct?
20 | **A.**  Sure.
21 | **Q.**  All right.  So what I'm wondering, though, is the federal
22 | policy, outside one that would apply to everyone, every
23 | American, I'm wondering what federal policy was that -- your
24 | participation in that meeting -- was advanced by you being
25 | there?

1  **A.**   You mean is there a law that's come to be since I've been
2  in that meeting?

3  **Q.**   No.  I want to know what you --

4  **A.**   I'm not following you.  And I'm trying to follow you.
5  I'm not following you.

6         THE COURT:  How would you being in that meeting
7  affect the federal operations for America?

8         THE WITNESS:  Well, certainly from a standpoint of --
9  of the President, it is trying to make sure that I manage his
10 time and make sure that he continues to focus on other federal
11 policies that -- that require his time.  So if nothing more
12 than a time manager on that would be part of it.  But, you
13 know, I would have to speculate on -- on any other federal
14 role.

15 BY MS. CROSS:

16 **Q.**   I don't want you to speculate.  But I'm hearing you say
17 that the management of the President's time, that was the
18 federal interest -- please wait until --

19 **A.**   Yeah.

20 **Q.**   -- I finish my questions.

21 **A.**   My apologies.

22 **Q.**   The court reporter is going to -- it's going to make it a
23 lot easier for her --

24 **A.**   Okay.

25         THE COURT:  Hold on, hold on, hold on.  One talking

1  at a time.  You ask the question, you give an answer, and the

2  court reporter can write it down.  Okay?

3  BY MS. CROSS:

4  **Q.**    Other than the time management of the President's

5  schedule that you told us about, is that the only federal

6  interest or policy that you rely on to -- for your testimony

7  on direct that your presence in that meeting was necessary and

8  proper to your role as Chief of Staff?

9  **A.**    No, that would not be the only option.  In addition to

10  that, the President of the United States often makes

11  recommendations on legislation that could come up, makes

12  recommendations on how to make sure elections are safer and

13  securer.  There is potential for executive orders that would

14  come up, to make sure that all of that happens.  So all of

15  those things would be part of why you would have to be in a

16  meeting like that.

17  **Q.**    I understand your testimony that all of those things

18  could potentially be federal interests involved.  And I'm

19  wondering what was the federal interest involved in your

20  participation in this meeting?

21          MR. TERWILLIGER:  Your Honor, I have to object.  That

22  is asked and answered, and this is bordering on badgering.

23          THE COURT:  I disagree.

24          Overruled.  Go ahead.

25          MS. CROSS:  Thank you.

1  BY MS. CROSS:

2  **Q.**    Did you understand my question?

3  **A.**    I think I do.  And so in doing that, again, trying to

4  make sure that elections are safe and secure, and that as

5  issues come up, being able to advise the President on future

6  legislation that may or may not happen, is -- is part of the

7  Chief of Staff's role.  And there are meetings you're in where

8  it actually helps with -- with that particular cause.  There

9  are meetings that are a bust as well.  But that would be why I

10  would have been there in my role as Chief of Staff.

11  **Q.**    Okay.  I think you bring up an interesting point.

12  President Trump certainly had -- then President Trump had a

13  personal interest in the outcome of the election in Michigan;

14  is that correct?  Would you agree with me on that?

15  **A.**    Yes.

16  **Q.**    He was running for reelection; correct?

17  **A.**    At this point the election had already happened, but

18  prior to November 3 he was running for reelection, yes.

19  **Q.**    Correct.

20       And then President Trump was contesting the election

21  results in Michigan; correct?

22  **A.**    You said that earlier.  I was not -- I mean, he was

23  concerned about the election results, but in terms of a

24  lawsuit, I'm not aware of it.

25  **Q.**    And I'm not asking in particular about any litigation

1 that was ongoing at that time.  I understand your response

2 that you don't have that information.  But the subject of this

3 meeting, if I understand your testimony, the subject matter of

4 this meeting was -- were allegations of potential fraud in

5 Michigan that then President Trump was relaying and discussing

6 with the legislators from Michigan; is that correct?

7 **A.**    That is my understanding, yes.

8 **Q.**    All right.  And then President Trump had a personal

9 interest in potentially seeing the election in Michigan, which

10 he had lost, reversed in some way; correct?  He was interested

11 in that?  That was his personal interest?

12 **A.**    I think it would be fair to say that that was his

13 personal interest, yes.

14 **Q.**    Okay.  The federal government, of course, has no role in

15 overseeing the certification of elections in Michigan;

16 correct?

17 **A.**    No role?  I don't know that I would agree with that.  I

18 mean, the Department of Justice would certainly be concerned

19 if something were fraudulent.

20 **Q.**    Outside of an area of fraud, the general administration

21 of the presidential election certification in Michigan, that's

22 not something that the federal government has a role in;

23 correct?

24 **A.**    My understanding is, is that's a -- to certify is a

25 state-by-state role.

1 **Q.**   State-by-state role, not a federal one?

2 **A.**   Well, to say that there are no federal connections, I

3 don't know that that's accurate, if that's what you're saying.

4 **Q.**   I'm wondering if you know what -- if there is a federal

5 connection?  What is the federal connection or nexus that you

6 are relying on?

7 **A.**   Well, certainly having an accurate election that is free

8 from fraud and nefarious activities.

9 **Q.**   I understand.

10     All right.  Do you still have the indictment there in

11 front of you, Mr. Meadows?

12 **A.**   Yes, ma'am.

13 **Q.**   On that same page, page 21, Act 6.

14     Do you see that?

15 **A.**   Yes.

16 **Q.**   And your testimony on direct addressed whether you

17 acknowledge or admit the conduct that is charged there.

18     Do you acknowledge that on or about November 21, 2020,

19 you sent a text to United States Representative Scott Perry

20 from Pennsylvania and stated:  "Can you send me the number for

21 the speaker and the leader of the PA, Pennsylvania,

22 Legislature?  POTUS wants to chat with them?"

23     Did you send that text?

24 **A.**   I believe I did, yes.

25 **Q.**   No reason to dispute that?

1      You're shaking your head no?

2  **A.**   Oh, I'm sorry.  No, no.

3  **Q.**   That's all right.  I understand.  It's easy to do.

4      There was -- the Trump campaign had an election

5  challenge -- or at least understanding that you're not

6  familiar with all the litigation pieces that were ongoing at

7  that time.  You know, though, of course, that the Trump

8  campaign raised allegations of fraud in the Pennsylvania

9  presidential election; correct?  You're aware of that?

10 **A.**   That's my understanding, yes.

11 **Q.**   What was the official role of you as a Chief of Staff in

12 arranging for a meeting between -- or obtaining the contact

13 information as described in that text?

14 **A.**   It was a request that came to me.  And getting a phone

15 number for the President of the United States was -- was

16 something that I did regularly.  And so as Chief of Staff,

17 getting numbers that was not readily available for the White

18 House switchboard, I did on a pretty regular basis.

19 **Q.**   What is your understanding or what was your understanding

20 at or around the time that you sent this text for why then

21 President Trump wanted to chat with the speaker and the leader

22 of the Pennsylvania Legislature?

23 **A.**   I don't know that I had a full understanding of what he

24 wanted to talk to them about at that particular point.

25 **Q.**   And what -- what was your understanding, whether it was

1  full and robust or not?

2  **A.**   I don't know that I had an understanding of what he

3  wanted to talk to him about.

4  **Q.**   As you sit here now, is it your testimony that you did

5  not know what then President Trump --

6  **A.**   I don't recall.  Excuse me.  Go ahead, I'm sorry.

7  **Q.**   It's easier for the court reporter.

8  **A.**   No.  It's polite, too.  Sorry.

9  **Q.**   I understand.

10      Is it your testimony that you did not know why then

11  President Trump wanted to chat with individuals identified

12  there from the Pennsylvania Legislature or that you don't

13  recall whether you knew or you didn't know?

14  **A.**   At this particular date, on the 21st of November, I don't

15  believe I knew why he wanted it.  But I can't say with

16  certainty to the Court that I didn't know.  I actually came

17  down with COVID on November 4th or 5th, and so I was just

18  getting back, you know -- I actually worked from home during

19  that time, but would certainly have been back at that

20  particular time.

21      But knowing all the things that -- you know, all of the

22  reasoning behind it, might not necessarily know that.  You

23  know, certainly, it appears -- but you asked me not to

24  speculate.  So I don't want to speculate.

25  **Q.**   I don't want you -- no, I don't -- I'm asking now what

1  you recall as you sit here of what you were aware of at the

2  time.

3  **A.**   I didn't even recall that I did it, you know, just to be

4  blunt.  It's not unusual, but I didn't recall that I did it.

5  **Q.**   And your testimony here this morning was that this

6  communication, though, you don't recall it specifically, you

7  don't dispute it, this communication was necessary and proper

8  to your role as a Chief of Staff to further what federal

9  interest?

10  **A.**   Well, serving the President of the United States

11  certainly, you know, whether it's phone numbers for state

12  legislators or others.  You know, I was asked oftentimes for

13  phone numbers.

14  **Q.**   All right.  With the indictment there in front of you,

15  Defense 2, can you take a look at page 22 for me, please.  I'm

16  going to direct your attention to Act 9.

17  **A.**   Yes, ma'am.

18  **Q.**   Do you acknowledge, Mr. Meadows, that you did on November

19  25, 2020, have a group of Pennsylvania legislators and others

20  meet with you at the White House?

21  **A.**   There was, on or about that date -- and, again, as long

22  as we're not specific to that date, but -- and I'm not

23  contesting it, I just don't know.  There were a group of state

24  legislature -- legislators from Pennsylvania that came, along

25  with others, with Mr. Giuliani.  And as I previously

1  testified, my recollection of my involvement in that was in

2  the -- the cabinet room.  I don't recall being in any further

3  meeting from that.

4  Q.   And I'm not -- I'm going to ask you to be as specific as

5  you can.  And I'm not picking on you, I just want to make sure

6  I understood your direct -- your testimony on direct.

7        Your recollection now, as you sit here, was that you

8  participated in the meeting insofar as you relayed the COVID

9  results for part of the delegation; is that correct?

10 A.   Yes.  I introduced myself when I came in.  I think I said

11 that earlier.  But as I recall, and trying to be visual, you

12 know, I came in the side door of the cabinet room.  I think,

13 it's not mentioned here, but I think Bernie Kerik was there,

14 as I recall.

15 Q.   I'm sorry, who is Mr. Kerik?

16 A.   I just know ex-New York police guy.  He worked along with

17 Mr. Giuliani.  But I think he was there.

18 Q.   Mr. Kerik had no federal employment at that time;

19 correct?  He was associated with the campaign?

20 A.   Not to my knowledge.  He didn't work for me.  Yeah, so...

21 Q.   I believe at one time he received a pardon from President

22 Trump towards the end of the administration; is that correct?

23 A.   I do believe so.  I don't recall with specificity, but I

24 know his name came up.

25 Q.   I understand.  And Mr. Giuliani was someone who was,

1  again, associated with the campaign; correct?  Or Mr. Trump's

2  personal attorney?

3  **A.**   I think he was an attorney.  His relationship with the

4  campaign, you'd have to speak to the campaign people about

5  that.  I don't -- I don't know what their structure is.

6  **Q.**   Well, he certainly wasn't a federal employee; correct?

7  **A.**   Mr. Giuliani?

8  **Q.**   Correct.

9  **A.**   No, he was not.

10  **Q.**   He was not somebody who worked under your supervision;

11  correct?

12  **A.**   No, he did not.

13  **Q.**   Did he take direction from you?

14  **A.**   No, he did not.

15  **Q.**   Did he give you direction?

16  **A.**   No, he did not.

17  **Q.**   All right.  And what about Ms. Ellis, was Ms. Ellis

18  someone who was --

19  **A.**   You mean by giving -- excuse me.

20        THE COURT:  Yes, go ahead.

21        THE WITNESS:  I want to make sure, by giving me

22  direction -- I mean -- you mean did I report to him or did he

23  at times tell me he wanted something done?  Because I want to

24  make sure I'm clear.  I mean, there's lots of times where

25  Mr. Giuliani might say he wanted something done, but I didn't

1  work for him, if that's what you were asking.

2  BY MS. CROSS:

3  **Q.**    Let's phrase it carefully for both of us.

4         Did you accept direction from Mr. Giuliani?

5  **A.**    As a supervisor of me?  No.

6  **Q.**    Um-hum.

7  **A.**    No.

8  **Q.**    That was no?

9  **A.**    That was a no.  I'm sorry.

10  **Q.**    All right.  And Ms. Ellis was someone, again, who was not

11  under your supervision as a federal employee; correct?

12  **A.**    That is correct.

13  **Q.**    All right.  And in whatever capacity she worked for Mr.

14  Trump, whether it was for the campaign or personally, it was

15  not something that was associated with the federal government;

16  correct?

17  **A.**    That is correct.

18  **Q.**    That was in President Trump's personal capacity, if any?

19  **A.**    Well, I can't speak to that, because they were his

20  attorneys, and so I don't -- you would be asking me to

21  speculate on that.

22  **Q.**    I don't want you to speculate.  Thank you for making it

23  clear.

24  **A.**    They were not federal employees.

25  **Q.**    All right.  So when you talk about what your specific

1  recollection now is, you recall being at that early portion of

2  the meeting with this delegation; correct?

3  **A.**    I do recall that, yes.

4  **Q.**    Do you specifically recall then not being part of any

5  further discussion among this group?

6  **A.**    As -- as I mentioned earlier, I don't recall being part

7  of any further discussions with them.  I'm more of a visual

8  individual, and I don't -- with the Michigan meeting, I can

9  remember, you know, people sitting, you know, and where I was.

10 In this particular one, it doesn't conjure that up.  Again, I

11 want to be careful that I'm not saying anything that's not

12 accurate, but I don't recall being in any other meeting that

13 went on in terms of the Oval Office or anything.

14 **Q.**    Okay.  I think I understand.

15       You don't have a recollection, but would you say it is

16 possible that you did participate further beyond the portion

17 of the meeting that you do recall?

18       MR. TERWILLIGER:  Objection to the form of the

19 question.  Anything's possible.

20       THE COURT:  Rephrase your question.  Make it a little

21 more specific.

22       MS. CROSS:  Sure.

23 BY MS. CROSS:

24 **Q.**    Do you dispute that you were present during any other

25 portion of this meeting?

73

1   **A.**   Well, based on my recollection, I would dispute it.  I

2   mean, because I don't believe I was there.  But at the same

3   time, if -- if, you know, if there is something that would jog

4   my memory where I could see it, but I just don't -- I don't

5   recall seeing it.

6   **Q.**   Okay.  And, again, I'm just trying to discern how certain

7   you are of your testimony.  Are you certain that you weren't

8   present for any remainder of that meeting?

9   **A.**   What I am certain of is that I went down and informed

10  those individuals of the COVID -- what I believe I did was

11  help escort them out so that they weren't there, is what I

12  believe that I did.  You know, we're asking for three years

13  back.  That's what I think I did, but my wife will tell you

14  sometimes I forget to take out the trash.  So I mean, it's

15  just -- it's just --

16  **Q.**   And I'm on trash patrol, too.  I understand how that can

17  be.

18      So -- but I'm hearing you say that -- are you certain or

19  are you not certain that you participated in the remainder of

20  the meeting?

21  **A.**   To the best of my recollection, I did not participate in

22  the rest of the meeting.  That's my testimony.

23  **Q.**   Okay.  All right.  And your involvement in this meeting,

24  such as it was, what was the federal interest that you were

25  advancing by your participation?

1  **A.**    So you're assuming that I was in the meeting that I don't

2  recall, is what you're saying?

3  **Q.**    No, sir.

4  **A.**    Okay.

5  **Q.**    The part --

6  **A.**    So the federal role, obviously, was protecting the

7  President of the United States when I went down to make sure

8  that he was not getting COVID.  So security of our Commander

9  in Chief, that was a federal role in me being there, and

10 trying to make sure that we followed protocols, White House

11 protocols, protocols that I put in place.  So those certainly

12 were being advanced when I was there.

13 **Q.**    Any other federal role outside the COVID protocol that

14 was in place at that time to protect the President and other

15 White House employees?

16 **A.**    Well, since I don't remember being in any part of a

17 meeting, for me to opine on what federal role that I may have

18 been there part of, is me trying to speculate on what may or

19 may not have been said, because I don't recall it.

20 **Q.**    Mr. Meadows, and, you know, just quickly.  If there --

21 I'm fine with an answer of "I don't know" or "I don't recall."

22 **A.**    Yeah, I'm just trying to -- and if it's coming across

23 that I'm not being courteous, I don't mean it that way.

24 **Q.**    I didn't take it that way at all.

25 **A.**    Okay.  All right.

 1  **Q.**   All right.  Can you turn your attention, please, to page

 2  24 of the indictment that's in front of you and Act 19.

 3       Do you recall being asked questions about -- first of

 4  all, I think you -- I understood your testimony on direct

 5  examination that you would not have asked Mr. McEntee -- am I

 6  pronouncing it correctly?

 7  **A.**   McEntee.

 8  **Q.**   McEntee.

 9       You don't believe that you would have asked Mr. McEntee

10  for a memo that -- as it's described there.  Do you recall if

11  then President Trump did?

12  **A.**   I don't recall.

13  **Q.**   Okay.  You don't recall this interaction at all?

14  **A.**   I don't recall.  Like I say, when I read the indictment,

15  it was a surprise to me.

16  **Q.**   Okay.  Okay.  And are you affirmatively stating that you

17  know it didn't happen or are you saying as you sit here now

18  you don't recall and it doesn't sound familiar to you?

19  **A.**   Well, I think His Honor asked me to -- I said that based

20  on what I believe today, that it didn't happen.  Because he

21  asked me to clarify, I believe.

22  **Q.**   He did?  Okay.

23            THE COURT:  That's how I've got it.

24            MS. CROSS:  Uh-huh.

25  BY MS. CROSS:

1  **Q.**    All right.  And being asked questions about it doesn't

2  jog your memory at all?

3  **A.**    No, ma'am.

4  **Q.**    Okay.  All right.  Can I direct your attention, then, to

5  page 44 of the indictment in front of you, Act 92.

6  **A.**    Page 44, ma'am?

7  **Q.**    Yes, sir.  Have you got it there in front of you?

8  **A.**    Yes, ma'am.

9  **Q.**    Okay.  All right.  And I understood your testimony to be

10  that, yes, you were in the Atlanta area anyway for personal

11  reasons, it was around the holiday, you were visiting your

12  children; correct?

13  **A.**    That is correct.

14  **Q.**    Okay.  And you acknowledge that you did, on December 22,

15  2020, travel to the Cobb County Civic Center for the purposes

16  of observing the signature audit that was going on at that

17  time; correct?

18  **A.**    Signature audit process, yes, ma'am.

19  **Q.**    The process, correct.

20  **A.**    Yes, ma'am.

21  **Q.**    And were you invited to that event?

22  **A.**    No, I was not.

23  **Q.**    How was it that you arrived there, then?

24  **A.**    I called to say that I was going to come over and take a

25  look at what was going on.  I actually read in the paper where

1  it was happening in -- because I think it was at the Cobb

2  County Civic Center, as the indictment would indicate.  My

3  Secret Service detail actually arranged for me to arrive there

4  in a secure manner.  We came in the back where I met with

5  Ms. Fuchs and Ms. Watson and members of the GBI.

6  **Q.**    Why was it that you took the initiative to attempt to

7  observe a portion of the signature audit that was ongoing at

8  that time?

9  **A.**    There had been allegations of fraud in both Cobb and

10 Fulton County that the President had received from others, and

11 -- and my concern was that -- that if there was an audit

12 procedure being done, to reiterate with the President the

13 veracity of that audit procedure, that any results from that

14 would be accepted and looked at as -- as good government work.

15 **Q.**    Were you directed by then President Trump or anyone else

16 to take the action to observe part of the signature audit that

17 was ongoing?

18 **A.**    I was not directed by him to do that.  Again, that was

19 trying to be aware of questions, anticipate questions that

20 would come up.  And in doing so, indeed, that question came

21 up.  I can't remember if it came from President Trump or

22 others, but that question did come up and I was able to talk

23 about how I felt like Ms. Watson and the GBI had done an

24 outstanding job in Cobb County.  I had no reason to believe

25 that if -- if there was fraud, I believe they would find it.

1  If there was no fraud, I believe that they would report that

2  accurately as well.

3  **Q.**   Mr. Meadows, was this activity on or about December 22,

4  2020, was that before or after the meeting with then Attorney

5  General Barr and then President Trump that your attorney asked

6  you about on direct examination?

7  **A.**   Based on the timeline, this would be after that.

8  **Q.**   And I don't think you said, did you agree with General

9  Barr's assessment that the allegations of widespread fraud in

10  the presidential -- 2020 presidential election, did you agree

11  with his assessment of those allegations?

12  **A.**   Yeah.  For me, at that particular point, it was more in

13  trying to make sure that any allegation that was made was

14  dealt with and disposed of and being able to be handled and

15  vetted by the proper groups.

16       THE COURT:  Mr. Meadows --

17       THE WITNESS:  Yeah.

18       THE COURT:  -- that's not responsive to her question.

19       THE WITNESS:  Okay.  All right.

20       THE COURT:  Repeat your question again.  Repeat your

21  question.

22  BY MS. CROSS:

23  **Q.**   Did you agree with then General Barr's assessment, I

24  think you used a colorful term and I will not, but quoting

25  him, so I guess it might be okay, we'll say BS.

1  Would you agree or did you agree at the time you had the

2  meeting with then Attorney General Barr and then President

3  Trump, that the allegations of widespread fraud were unfounded

4  and, in fact, were bullshit?

5  **A.**  It was my opinion at that particular point that there had

6  been a number of allegations that had been made that needed to

7  be -- have further investigation.  That was my personal --

8  **Q.**  Is that to say that you had no opinion?  You agreed with

9  Attorney General Barr?  Or you disagreed with Attorney General

10  Barr?

11  **A.**  My personal opinion at that point was, is that additional

12  investigation into allegations of fraud needed to continue.

13  He was making an opinion on what he had found to date.  Those

14  investigations were ongoing and would continue to go on after

15  that meeting where Mr. Barr -- it was -- I had no reason to

16  doubt Mr. Barr's word and -- and still don't to this day.

17  You know, he said based on what he had seen to the date,

18  during that meeting, that he had found no widespread fraud,

19  but the investigations were continuing.

20  **Q.**  From the time of that meeting with then Attorney General

21  Barr and then President Trump until the time that you arrived

22  at the Cobb County Civic Center to observe a portion of the

23  signature audit on or about December 22, 2020, had you learned

24  new information that provided you sufficient evidence to reach

25  a conclusion?

1  **A.**    To reach a conclusion on what?

2  **Q.**    To reach a conclusion about the allegations of widespread

3  fraud in the presidential election.

4  **A.**    As I stated earlier, there were continuing -- there would

5  continue to be allegations of fraud that were being

6  investigated by DOJ and others at that particular point, and

7  so I don't know that they had reached a conclusion, and

8  because of that I hadn't reached a conclusion.

9  **Q.**    Okay.  And that was kind of where I was going.

10     So you went to the Civic Center in Cobb County to observe

11  what was then the ongoing signature audit in that county;

12  correct?

13  **A.**    That's correct.

14  **Q.**    That audit was being conducted by the Secretary of

15  State's office in Georgia; correct?

16  **A.**    Yes.

17  **Q.**    Among other entities?

18  **A.**    And the GBI.

19  **Q.**    Among other entities.

20     At that time, did you have an opinion about whether the

21  allegations about widespread fraud in Georgia, in particular,

22  were valid or invalid?

23  **A.**    I didn't have enough information to make a determination

24  one way or another.

25  **Q.**    All right.  Do you recall as you sit here now that the

1  Trump campaign had ongoing litigation in Georgia on December

2  22, 2020?

3  **A.**   I don't know about that specific date.  I do know that

4  they had litigation with Georgia, et al., I guess is the best

5  way for me to put it, at some point in December.

6  **Q.**   And what was the federal policy or interests that you

7  were advancing in observing the Cobb County Civic Center

8  signature audit that was ongoing?

9  **A.**   So, again, trying to make sure that I kept the President

10  well informed.  The President -- be able to inform him of any

11  potential for executive orders, future legislation.  Broadly

12  looking at his time and trying to make sure that, with all of

13  the other things that were going on, checking off a box to say

14  this has been checked, that's a question that's been asked and

15  answered.

16      But, again, it was working with the President to try to

17  make sure that he was -- had proper advice and -- and -- and

18  understood what was going on.

19  **Q.**   No federal interests outside the management of the

20  President's time and the general interests that you've

21  described for us?

22  **A.**   Well, I think I mentioned in my testimony just now that

23  the potential federal interest, the potential for future

24  legislation, for executive orders, the potential for other

25  federal agencies to be aware.  You know, it's not just the

1  President.  It would be -- in terms of elections, it's the

2  Department of Homeland Security, it's DOJ, it's others that

3  all are concerned about a free and fair election.  And so

4  being able to advise him of that was -- was critical.  That's

5  part of -- part of my role.

6  Q.  That's interesting.

7      Did you advise anybody else about your observations or

8  conclusions after your visit to the Cobb County signature

9  audit?

10 A.  Have I advised anybody else?

11 Q.  You let us know that you reported back to then President

12 Trump and described the findings as you testified here earlier

13 that the GBI was going a great a job, that the Secretary of

14 State's office was doing a great job.  Is that the sum and

15 substance of your testimony that you reported to President

16 Trump?

17 A.  I think it's -- yes.  So I did -- but there would have

18 been other attorneys that I would have shared that with as

19 well.

20 Q.  Who are those other attorneys?

21 A.  So as I mentioned earlier, most of my interactions would

22 have been with the White House general counsel's office.  So

23 Mr. Herschmann on many of these matters, Mr. Cipollone.

24 That's not to the exclusion of other attorneys in the White

25 House counsel's office, but those would be the two -- my two

1  primary contacts.

2  **Q.**   Okay.  All right.  But much like the Michigan procedure,

3  you know of no federal agency that's involved in the

4  administration of or certification of election results in

5  Georgia, do you?

6  **A.**   So when you say "certification," that's one thing.  If

7  you're talking about is there a federal role in terms of

8  working with secretaries of state, is there a federal role of

9  working with board of elections in terms of a federal role,

10 without a doubt.  There's been hearings on Capitol Hill.  I

11 actually was part of those hearings on Capitol Hill when I was

12 a member of Congress.  And so there is a federal

13 interconnection there.  If that's -- if you're suggesting that

14 there's not --

15 **Q.**   Well, I'm not suggesting.  I'm just asking questions,

16 Mr. Meadows, and perhaps you could answer the questions that I

17 ask you.

18         THE COURT:  Hold on, hold on, hold on.

19         MR. WAKEFORD:  I don't know how to get her attention

20 from way over there.  Myapologies, Your Honor.

21         MS. CROSS:  Okay.

22 BY MS. CROSS:

23 **Q.**   The question I asked you was a little different, though.

24 Let me rephrase, see if we can narrow it even more.

25         What is the federal role in the administration of

1  presidential elections in Georgia?

2  **A.**    The federal role in presidential elections would be

3  working with state and local officials.  The federal role

4  would be included with our Department of Homeland Security and

5  other areas in terms of that interaction, in terms of giving

6  advice for cyber threats, how to keep votes -- so there's a

7  federal role there.

8          THE COURT:  Let me ask this question.  Is there a

9  role under Article II of the Constitution for the President in

10 state elections or any elections?

11         THE WITNESS:  In Article II of the Constitution, I

12 don't -- I don't know that I'm well-versed enough in Article

13 II to go through it.

14         THE COURT:  Article II deals with --

15         THE WITNESS:  No, no.  I --

16         THE COURT:  Is there a role --

17         THE WITNESS:  There's Article I, Article II,

18 Article III, yeah.

19         THE COURT:  Is there a role in Article II for the

20 President in state elections, or any elections, Electoral

21 College or any of those aspects?

22         THE WITNESS:  I don't know enough to --

23         THE COURT:  That's fair.

24         THE WITNESS:  -- to opine on that, sir.

25         THE COURT:  That's fair.

1         MS. CROSS:  And that's -- thank you, Your Honor.

2   BY MS. CROSS:

3   **Q.**   So you weren't acting -- at the time you went to observe

4   the signature audit in Cobb County, you weren't acting out of

5   the belief that you were there in furtherance of a specific

6   article of power that the President had?

7   **A.**   I believed I was there supporting the President, as I've

8   mentioned earlier, in my federal role as Chief of Staff,

9   which, bluntly, is to keep him well-informed and well-advised

10  on a variety of issues.  This particular issue was a good

11  report on what was happening here, and -- and having him

12  advised of that, I did then and still today think that that

13  was the role that I was expected to do as Chief of Staff.

14  **Q.**   I asked you earlier about the administration of

15  elections.

16      Do you know of any or are you aware of any federal role

17  by anybody, any agency, in the certification of elections in

18  Georgia?

19  **A.**   I am not.

20  **Q.**   When you were describing, Mr. Meadows, this period of

21  time post-election -- you were Chief of Staff for

22  approximately ten months --

23  **A.**   Yes, ma'am.

24  **Q.**   -- correct?  Okay.

25      From approximately March 2020 until the January 20, 2021;

1  is that correct?

2  **A.**   That's correct, yes, ma'am.

3  **Q.**   Okay.  All right.  And when your lawyer was asking you

4  questions on direct examination about all of the things that

5  were going on in the post election period, do you recall those

6  questions?

7  **A.**   Most of them, yes, ma'am.

8  **Q.**   Recall the general topic?

9  **A.**   Yes.  Yes, ma'am.

10 **Q.**   Fair enough.

11       And COVID was something that you mentioned, correct?

12 **A.**   Yes, ma'am.

13 **Q.**   The federal response to the COVID pandemic; correct?

14 **A.**   Yes, ma'am.

15 **Q.**   I wrote down that you referred to Afghanistan, the

16 potential withdrawal from Afghanistan, that was something that

17 was occupying a lot of your time; correct?

18 **A.**   Well, it was one of the things, yes.

19 **Q.**   One of the things.

20 **A.**   And --

21 **Q.**   Go ahead.

22 **A.**   I'm sorry.  Go ahead.  I'll let you ask the question.

23          THE COURT:  You can finish your answer.

24          THE WITNESS:  Yes, sir.

25          You know, the withdrawal of Afghanistan actually

1  brought in a whole lot of other, you know, other

2  considerations, and -- you know, I don't want to indicate that

3  that was myopic, I mean, but it was an important issue.  I was

4  just trying to give specifics under the questions for His

5  Honor.

6  BY MS. CROSS:

7  **Q.**    I understand.  Of course, in fact, I think you used the

8  word "myopic."  I think you used that before, you had a new

9  myopic focus on making the COVID tests more accessible and

10  more practical for use; is that correct?

11  **A.**    Yes, ma'am.

12  **Q.**    Okay.  But even amid all of the other duties and

13  responsibilities that you had, you made time on December 22 to

14  go to Cobb County?

15  **A.**    Yes, ma'am.

16  **Q.**    Okay.  To your knowledge, Mr. Meadows, did Mr. Trump's

17  campaign reimburse your travel?

18  **A.**    No.

19  **Q.**    You don't know or they did not?

20  **A.**    I'm not aware of them reimbursing it, no, I don't -- I

21  mean, if --

22  **Q.**    Okay.  All right.

23  **A.**    I would be surprised -- I didn't put in for

24  reimbursement, no.  So I would be surprised.

25  **Q.**    If the Chief of Staff accompanies the President on

1  campaign travel, as you described for us earlier, is that

2  something that is reimbursed by the campaign?

3  **A.**    I don't believe so.

4  **Q.**    Do you know for sure that it is not?

5  **A.**    I've asked that question.  And my understanding is, is

6  that because so much of my work requires me to be there as

7  Chief of Staff and to be there, that there was a certain group

8  of people that were required to be there in the Chief of Staff

9  role, and that was one of those.  And so that didn't get

10  reimbursed.  That was my understanding from discussing it with

11  an attorney, in-house attorney.

12         THE COURT:  I don't want to get into attorney/client

13  discussion.  That's good enough, what he said.

14         MS. CROSS:  Yeah, I'm happy to move on from that.

15  That's fine.

16  BY MS. CROSS:

17  **Q.**    Do you recognize, Mr. Meadows, of course, that then

18  President Trump had a personal interest in that election

19  outcome in Georgia; correct?

20  **A.**    Sure.

21  **Q.**    And, in fact, he was pretty personally invested in the

22  Georgia election outcome; correct?

23  **A.**    I think to say the President was interested in all of the

24  election outcomes would be accurate as they affected him, yes.

25  **Q.**    All right.  I think you acknowledged in your direct

1  testimony -- we're still there on page 44, Mr. Meadows,

2  Act 93, if you could take a look at that for me, please.

3  **A.**    Which act?  I'm sorry.

4  **Q.**    93.

5  **A.**    Yes, ma'am.

6  **Q.**    Okay.  Do you acknowledge, sir, that you did, on December

7  23, 2020, arrange a telephone call between Ms. Watson and then

8  President Trump?

9  **A.**    Yes, ma'am.

10  **Q.**    Were you on that call?

11  **A.**    I was not.

12  **Q.**    Are you aware of anyone other than then President Trump

13  and Ms. Watson on that call?

14  **A.**    I am not.

15  **Q.**    And you used the contact information for Ms. Watson that

16  she had provided to you the day before at the Cobb County

17  energy center -- Civic Center?

18  **A.**    Either -- either that contact or Ms. Fuchs, one or --

19  Ms. Fuchs was my primary contact, Ms. Jordan Fuchs, I'm sorry.

20  But I seem to have a vague recollection that, yes, it was a

21  phone number that I gave him.

22  **Q.**    Okay.  And Fuchs, for the court reporter, is spelled

23  F-U-C-H-S.  Is that your understanding?

24  **A.**    Yes, ma'am.

25  **Q.**    Okay.  All right.  If you turn to the next page, Act 96,

1  can you take a look at that for us, please, on page 45.  You

2  let us know that there -- the allegation is that a text

3  message was sent to Ms. Watson, but actually your recollection

4  is that text message was sent to Ms. Fuchs; correct?

5  **A.**   I don't know that I said that for the Court, but that is

6  my recollection, yes.

7  **Q.**   Okay.  All right.  So you do acknowledge that on or about

8  the 27th of December, 2020, you sent a text message -- we

9  believe to be to -- do you have a specific recollection that

10  it was to Ms. Fuchs?

11  **A.**   The phone number I believe is Ms. Fuchs'.  And so

12  Ms. Watson, I don't -- I don't know that I communicated with

13  Ms. Watson after visiting Cobb County.  I can't say with

14  certainty.  But I don't recall any conversation with her.  But

15  my belief is, is this particular one was not Ms. Watson.  It

16  would have been Ms. Jordan Fuchs.

17  **Q.**   All right.  Is the content of that text consistent with

18  your recollection?

19  **A.**   I think there were several text messages, as I was going

20  back and forth with Ms. Fuchs on that.  And I believe we

21  provided those to the January 6th committee.

22  **Q.**   You were subpoenaed for your phone records and your

23  texts.  What were you subpoenaed?  What was the scope of the

24  subpoena that you received from the January 6th commission?

25  **A.**   I -- I don't -- I -- broad, I'm sure.  But --

1  **Q.**    I'm sure that's true.

2  **A.**    -- I don't remember.

3  **Q.**    All right.  Let's ask it a little differently, then.

4       Did you provide your phone records and whatever content

5  of text messages you had in your possession at that time in

6  response to the subpoena?

7  **A.**    We -- we provided some text messages.  I'd have to have

8  my attorneys weigh in.  They did all that.  And I'm sure there

9  were some questions of privilege and other questions that may

10 have kept some of -- some of the things from being shared.

11 **Q.**    Okay.  Certainly.  For our purposes today, all I need to

12 know, Mr. Meadows, is that you did indeed send, on or about

13 December 27, 2020, you sent a text, among others, to Ms. Fuchs

14 that read in part, "Is there a way to speed up Fulton County's

15 signature verification in order to have results before Jan 6

16 if the Trump campaign assists financially?"

17 **A.**    That seems to be consistent with a message I sent to

18 Ms. Fuchs, yes.

19 **Q.**    That's accurate, to the best of your knowledge?

20 **A.**    To the best of my knowledge, yes, without looking at it.

21 **Q.**    Why are you as the Chief of Staff making a financial

22 offer to the Georgia Secretary of State's office on behalf of

23 the Trump campaign?

24 **A.**    To be clear, the way you're phrasing, I didn't make a

25 financial offer to them.  This particular question was asking

1 a question about whether it was -- we were able to speed

2 things up.  And I can tell you the reason why I asked that

3 question.

4 **Q.**   Sure.

5          THE COURT:  Go ahead.

6          THE WITNESS:  I was in a meeting prior to that in --

7 earlier that -- in that time period.  I don't know exactly

8 when, Your Honor.  But where in Wisconsin, there was a

9 recount.  And they indicated that they would do a recount in

10 that particular particular state if -- if the campaign was

11 willing to pay for it.

12          My -- my question was more if this was an overtime

13 financial drain on a particular government entity, as we all

14 in the government have financial constraints, wanted to be

15 able to speak to that particular question.  But that's why it

16 came up, was really from a financial assistance that the

17 campaign made in the Wisconsin case.

18 BY MS. CROSS:

19 **Q.**   Did anyone direct you to inquire as to whether campaign

20 funds could be available for assistance in the Secretary of

21 State's procedure?

22 **A.**   In terms of campaign funds, I think the question was

23 posed by me, just seeing if the resources -- I didn't speak

24 for the campaign, didn't work for the campaign, but certainly

25 being able to advise the President of the United States.  You

1  know, he was looking at ways to make sure that we could get a

2  definitive yes or no quickly.

3       And so it's just in keeping of me trying to ask a person

4  who should know whether it's a financial resource issue, you

5  know, manpower issue or whatever.  So I wasn't speaking on

6  behalf of the campaign.

7  **Q.**   You had no authority or ability to offer federal funds

8  for that purpose, did you?

9  **A.**   No.

10  **Q.**   There was no federal funds available for a campaign

11  request of a Secretary of State's office in Georgia; correct?

12  **A.**   There should be no federal.

13  **Q.**   Why is that?

14  **A.**   You mean in terms of American taxpayer dollars?

15  **Q.**   Yes.

16  **A.**   You know, having American taxpayer dollars paying for

17  campaign-related issues is, you know, it gets back -- speaks

18  to the question about me traveling with the President and why

19  some of the people that travel with the President, they get

20  reimbursed for their -- their time.  Mine was unique in that,

21  as the Chief of Staff, I had to travel with the President.

22  But having campaigns pay for those kinds of activities is what

23  I deem inappropriate.

24  **Q.**   All right.  Mr. Meadows, you mentioned on direct

25  examination that you had a personal e-mail and an official

1    e-mail.

2         Do you recall that testimony?

3    **A.**   Yes.

4    **Q.**   How did you distinguish how you used those two separate

5    e-mail accounts?

6    **A.**   If -- oftentimes what I would do is -- on my personal

7    e-mail is -- would copy it and send it to the archives in

8    terms of a federal record.  Many times it was incoming that

9    came to me personally, whether it's on my White House e-mail

10   or my e-mail that was a Gmail account at that point.

11   **Q.**   The responsive documents that you produced in -- after

12   you received a subpoena from the January 6th committee, did

13   those include -- I don't want to know anything you talked

14   about with your attorneys.  So if you can answer without

15   telling me about anything you talked about with your

16   attorneys.

17        Were responsive documents produced from both of those

18   accounts?

19   **A.**   It's my understanding they were.

20   **Q.**   Thank you.

21   **A.**   I don't know that for a fact, though.  But, I mean --

22   **Q.**   To the best of your knowledge?

23   **A.**   Yeah.  To the best of my knowledge, I would assume that

24   it came from both accounts.

25   **Q.**   Okay.

1  **A.**   I don't know -- so I haven't -- can I be clear?

2          THE COURT:  Yes, sir, go ahead.

3          THE WITNESS:  So my White House e-mail I didn't have

4  access to, you know.  So if you're saying that I got a

5  subpoena -- I assume that they got my White House e-mails, but

6  they didn't get them from me, because I didn't have them.  And

7  so I -- so, again, trying not to speculate.  I would find it

8  surprising if they didn't have my White House e-mails, but I

9  didn't have access to them.

10 BY MS. CROSS:

11 **Q.**   Understood.  Thank you.

12     All right.  Can I direct your attention, then,

13 Mr. Meadows, to --

14         MR. WAKEFORD:  I'm sorry, Ms. Cross.

15         One second, Your Honor.

16         THE COURT:  We need to move on.

17         MS. CROSS:  Yes, sir.

18 BY MS. CROSS:

19 **Q.**   When -- Mr. Meadows, when you were answering my questions

20 about the texts you sent to Ms. Fuchs about the campaign

21 potentially paying for expedited signature review, do you

22 recall that?

23 **A.**   Yeah.  Based on the quote, you mean, from -- I guess that

24 would be from Act 96?

25 **Q.**   Correct, yes.  And you said that, well, we were just

1  looking for an answer quickly or we wanted an answer --

2  **A.**   If I used the word -- I'm sorry.  Go ahead.

3          THE COURT:  Let her finish the question.

4  BY MS. CROSS:

5  **Q.**   Yeah.  You see where I'm going.

6          I was wondering who you referred to in the "we?"

7  **A.**   Yeah.  "We" is -- is a term that I default to a lot,

8  trying not to give -- take undue credit myself when I was in

9  Congress.  And so using the term "we" is probably not the

10  accurate word there in terms of "we."

11          In terms of expedited verifications, certainly that would

12  have been the campaign or the President himself.

13  **Q.**   So then why was it you who sent the text instead of

14  someone on the campaign reaching out to the Secretary of

15  State's office?

16  **A.**   Again, I had had conversations with Ms. Fuchs.  What I

17  had observed in Cobb County was impressive.  I felt like that

18  her goal and the Secretary's goal was to make sure that the

19  signature verification was accurate, and there in -- certainly

20  in Cobb County.  And being able to take this particular

21  question of signature verifications, whether it's in Cobb

22  County or Fulton County or any other county in the State of

23  Georgia off the table, would allow for one area to be closed.

24  Be able to work towards, you know, a peaceful transition of

25  power, continue to work on the other issues that we've already

1  talked about.  But, for me, it was being able to take an open

2  question off the table.

3  **Q.**  Did you report to anyone in the campaign the response you

4  got to that text?

5  **A.**  Not that I recall, no.

6  **Q.**  Was there any transfer, to your knowledge, of campaign

7  funds to the Secretary of State's office in Georgia to

8  facilitate or expedite any sort of review?

9  **A.**  Not to my knowledge.  I think Ms. Fuchs didn't indicate

10 that it was much of a financial as it was a time constraint.

11 **Q.**  Okay.  All right then.  If you're on page 50?

12 **A.**  Which page?

13 **Q.**  50.

14 **A.**  50?  Okay.

15 **Q.**  I want to direct your attention -- you acknowledge -- I

16 believe I understood your testimony to be that you were on the

17 January 2, 2021, call between then President Trump and

18 Secretary of State Raffensperger?

19 **A.**  Yes, ma'am.

20 **Q.**  Okay.  Can you tell me who initiated that call?

21 **A.**  Who set the call up?

22 **Q.**  How the call came to be?  What is your understanding of

23 the purpose of the call, who set it up, and why it was placed?

24 **A.**  My understanding of the call was to try to find -- I

25 think judges -- I mean, attorneys call it a compromise and

1  settle.  My understanding was, is that it was to try to find

2  some common ground in terms of signature verifications between

3  the attorneys and -- and the Secretary of State's office, and

4  to handle the issue in a less litigious manner.

5  **Q.**  Is it your testimony that the initiation of the call came

6  from campaign lawyers?

7  **A.**  I don't know exactly who it came from.  I know that

8  certainly the President of the United States wanted to have --

9  have this issue resolved, and my understanding was, is to put

10  everybody together.  Again, this flows out of a -- what I

11  would consider a good meeting that I had observed prior to

12  Christmas with the Secretary of State's office.

13  **Q.**  Let me ask it a slightly different way.

14      How did you learn that -- did you take the suggestion of

15  a call between then President Trump and Secretary of State

16  Raffensperger, did you take that to the President and suggest

17  it?

18  **A.**  Not to my knowledge, no.

19  **Q.**  Do you recall the then President suggesting to you that

20  he wanted to speak with Secretary of State Raffensperger?

21  **A.**  Yes.

22  **Q.**  That idea initiated with him; correct?  And by "him," I

23  mean then President Trump?

24  **A.**  I believe so, yes.  I don't know whether it came from his

25  attorneys to him, but I was asked to reach -- reach out.

1  **Q.**   First you heard of any potential call between then

2  President Trump and Secretary of State Raffensperger was from

3  then President Trump; correct?

4  **A.**   Yes.

5  **Q.**   Do you recall the content of that conversation?

6  **A.**   You mean the phone call?

7  **Q.**   No.  I mean, you first learning that then President Trump

8  wished to contact Secretary of State Raffensperger.

9  **A.**   I don't recall, I mean...

10  **Q.**   What, then, did you do to facilitate the call, if

11  anything?

12  **A.**   This phone call here?

13  **Q.**   Yes, sir.

14  **A.**   I'm sure I dealt with Ms. Fuchs to set the call up.  It

15  certainly would have been set up through our White House

16  switchboard in getting both attorneys and the President on the

17  phone with Mr. Raffensperger.  And I believe Mr. Germany was

18  on the phone as well.

19  **Q.**   Who did you reach out to -- once the President came to

20  you, initiated the idea of a conversation with Secretary of

21  State Raffensperger, who then did you reach out to to arrange

22  the participation of the litigation attorneys?

23  **A.**   So who did I reach out to -- I missed the last part of

24  that.  Litigation attorneys, what is that?

25  **Q.**   You, I believe, referenced that some attorneys for then

1  President Trump personally and the Trump campaign that was --

2  had ongoing litigation at that time.  Is that your

3  understanding?

4  **A.**   I think there were three attorneys that were -- were

5  involved in the phone call.  I'm not sure in what capacity,

6  whether they worked for the campaign or whether they worked

7  for Mr. -- for President Trump directly.  I can't speak to

8  that.

9  **Q.**   How did they learn about the call?

10  **A.**   I don't know.

11  **Q.**   You didn't reach out to them?  Who did you reach out to,

12  if anyone, do you recall?

13  **A.**   I don't recall.  I've tried to recall a number of times

14  exactly.  I know I was asked to reach out to the secretary

15  previous to this phone call and to his Chief of Staff

16  previously, but I don't recall how that -- that came about.

17  **Q.**   Did you make previous attempts to reach President -- I'm

18  sorry -- to reach Secretary of State Raffensperger or his

19  Chief of Staff?

20  **A.**   I did.

21  **Q.**   What were those attempts?

22  **A.**   What were those -- I mean, call -- I called and left a

23  message saying that the President wanted to speak with the

24  secretary.

25  **Q.**   So January 2, 2021, that wasn't the first time the

1  President had informed you that he wished to speak to

2  Secretary of State Raffensperger?

3  **A.**    That is correct.

4  **Q.**    How many times did then President Trump indicate to you

5  that he wished to speak with Secretary of State Raffensperger?

6  **A.**    I don't recall.  I know that, you know, I've read reports

7  and all that, but I -- a lot of those reports are not

8  accurate.

9  **Q.**    That's why I'm interested in what you remember,

10 Mr. Meadows.

11 **A.**    Yeah, so...

12 **Q.**    And what you know from your experience.

13 **A.**    I don't know.

14 **Q.**    Do you know how many times?

15 **A.**    The only thing I do recall is -- is at least twice.

16 **Q.**    At least twice?

17 **A.**    Yeah.

18 **Q.**    Over a period of what time?

19 **A.**    You know, a week or two.  You know...

20 **Q.**    Understanding we can't be precise, but --

21 **A.**    Yeah.

22 **Q.**    -- that's the best of your recollection?

23 **A.**    Yeah.

24 **Q.**    All right.  So over a period of a week or two before this

25 January 2, 2020, call, the President indicated to you that he

1  wished to speak to Secretary of State Raffensperger; correct?

2  **A.**    That's correct.

3  **Q.**    And you made attempts to make that happen; correct?

4  **A.**    That is correct.

5  **Q.**    And your attempts to make that happen, as I understand

6  your testimony today, was to reach out and leave messages for

7  both, the secretary personally; correct?

8  **A.**    I believe one time for the secretary personally, yes.

9  **Q.**    And then another attempted phone connection with a staff

10  member?

11  **A.**    As I recall, yes.

12  **Q.**    Were either of those calls returned?

13  **A.**    No.

14  **Q.**    When you attempted to arrange those --

15  **A.**    I say -- excuse me.  I say they're not returned.  I

16  didn't talk to them.  So, I mean, if they returned them, I

17  didn't --

18  **Q.**    Thank you.

19  **A.**    They may have returned them, but I didn't talk to them,

20  no.

21  **Q.**    Okay.  When you attempted to arrange those previous phone

22  conversations at the direction -- was it at the direction of

23  President Trump?

24  **A.**    Yes.

25  **Q.**    When you attempted to arrange those previous connections

1  with Secretary of State Raffensperger at the direction of then

2  President Trump, who else was involved in that procedure?

3  **A.**    Who else tried to reach out?

4  **Q.**    No.  Who else did you involve in the attempt to reach

5  out?

6  **A.**    I don't recall.

7  **Q.**    Okay.  And here's why I'm kind of asking, so maybe you'd

8  have a better recollection if I asked it a different way.

9        You said that you believed the purpose of the call on

10  January 2, 2021, was for purposes of settlement, correct, of

11  the pending litigation?  That was your testimony?

12  **A.**    Well, they -- the purpose was trying to get signature

13  verification in Fulton County.

14  **Q.**    Whose purpose was that?

15  **A.**    The President wanted to -- wanted to have signature

16  verification.  He felt like a signature verification in Fulton

17  County was appropriate.

18  **Q.**    He relayed that information to you?

19  **A.**    He did.

20  **Q.**    And that was a goal of his campaign; correct?

21  **A.**    I don't know.

22  **Q.**    You don't know that?

23  **A.**    I don't speak for the campaign.

24  **Q.**    I'm not asking you to speak for the campaign.

25        To your knowledge, was that also a goal of the Trump

1 presidential campaign, to have further signature audits in

2 Georgia?

3 **A.**    I do not know.

4 **Q.**    You do not know.

5      You believe, however, President Trump -- please explain

6 to me as best you can recollect his request or direction to

7 you to arrange this call with Secretary of State

8 Raffensperger.

9 **A.**    I'm sorry, I missed you there.  So can you rephrase or

10 repeat the question?

11 **Q.**    Sure.

12      I'm wondering, as best you can recall, what were the

13 words he used?  What did he tell you he wanted to talk to

14 Secretary of State Raffensperger for?  And, again, I'm asking

15 you for the best as you can recollect then President Trump's

16 words.

17 **A.**    Yeah.  I don't know that he gave me a whole lot of

18 specifics on why he wanted to do that.  I don't recall any

19 specifics.

20 **Q.**    Okay.  All right.  In your previous attempts, did you try

21 to loop in anyone from the campaign on that call?

22 **A.**    I don't recall looping in anybody on the campaign.

23 **Q.**    Did you attempt to loop in or have input from anyone

24 else?

25 **A.**    In trying to set up the calls?

1  Q.  Yes, sir.

2  A.  Maybe the White House switchboard.  Yeah, I think they

3  made several attempts.

4  Q.  Okay.

5  A.  I don't know that I asked them to do -- the President may

6  have asked them.  I just know that -- I just know that -- I

7  know that -- well, I've come to know that the White House

8  reached out to the Secretary as well.

9  Q.  Okay.

10 A.  White House switchboard.

11 Q.  The White House switchboard.  All right.

12     Do you recall on January 2nd -- prior to the call, do you

13 recall having any conversation with Cleta Mitchell?

14 A.  Certainly I had conversations with Cleta Mitchell.

15 Q.  What were those conversations about?

16 A.  A variety of aspects as it relates to Georgia and -- in

17 terms of any details of election fraud, what she was doing.  I

18 had conversations with her.

19 Q.  Who is Ms. Mitchell?

20 A.  Cleta Mitchell is an attorney that represented the

21 President I think in a pro bono manner.  Again, I don't know

22 the exact arrangements, but Cleta Mitchell -- I know Cleta

23 Mitchell well.

24 Q.  She was involved in the campaign litigation?

25 A.  It's my understanding, yes.

1  **Q.**   Okay.  Without defining her role, that might be outside

2  the scope of your knowledge, but she was involved in some way

3  and you had conversations -- she was involved in some way in

4  the campaign litigation for then President Trump?

5  **A.**   Again, you used the word "campaign litigation."  I'm not

6  sure if it was litigation on the President's half or the

7  campaign, but certainly involved in some way with litigation

8  is my understanding.

9  **Q.**   She wasn't a federal employee, Ms. Mitchell?

10 **A.**   She was not a federal employee.

11 **Q.**   She didn't work at DOJ?

12 **A.**   She did not.

13 **Q.**   She had no role in -- she was not a federal employee in

14 any respect that you're aware of in December 2000 -- January

15 2021, correct?

16 **A.**   That's correct.

17 **Q.**   So what conversation, if any, did you have with

18 Ms. Mitchell about the phone call that was, again, requested

19 by then President Trump with Secretary of State Raffensperger?

20 **A.**   I don't recall any specific conversation with

21 Ms. Mitchell.  I'm sure I had a conversation with

22 Ms. Mitchell.  But I don't recall any specific conversation.

23 You know, as I've gone back over this -- this phone call

24 that's been widely reported about for many, many months trying

25 to -- trying to remember everything around it and all of that.

1  I don't remember anything specific as it relates to

2  Ms. Mitchell.

3      You know, as I've said, my understanding and my belief

4  then and certainly my belief today was, is that this was more

5  about Fulton County signature verifications.  It was

6  particularly a concern for the President of the United States

7  and -- and this phone call was hoping to find a way to have a

8  less litigious way of resolving that.

9  **Q.**  What was going to be a less litigious way of resolving?

10 **A.**  I beg your pardon?

11 **Q.**  What would be a less litigious way to resolve the

12 concerns that then President Trump was expressing to you?

13 **A.**  My understanding was, is that the attorneys desired to

14 work with Secretary of State's office for some of the records.

15 **Q.**  Whose attorneys?  What attorneys?

16 **A.**  I think it was three attorneys, Ms. Mitchell, Alex, I

17 think it's Kaufman, and Kirk -- it starts with an H.  I'm not

18 sure.

19 **Q.**  Does Hilbert sound --

20 **A.**  It sounds correct.

21 **Q.**  -- correct?

22      So those were campaign attorneys?

23 **A.**  I don't know.  Again, you keep coming back to say they're

24 campaign attorneys.  I don't know how they were compensated or

25 if they were compensated or who they worked for, if they

1  worked for the President directly or some other group.

2  Q.   I'm wondering, then, if you weren't clear about the scope

3  of their representation to the extent you didn't know who they

4  represented, why did you want them on this call?

5  A.   My -- my understanding, again --

6  Q.   Go ahead.

7  A.   Okay.  My understanding was -- is that there was -- that

8  the President wanted signature verifications in Fulton County.

9  He believed that there was fraud there.  And that if signature

10 verifications took place there, they would show justification

11 for allegations -- for some of the allegations of fraud that

12 had been made.

13      Whether there was fraud or not, I had no knowledge --

14 still don't to this day.  And -- and so in this meeting, this

15 phone call, setting it up with the attorneys where they could

16 find some kind of compromise -- again, I think you-all call it

17 compromise and settle.

18 Q.   I don't call it that.

19 A.   Okay.  So...

20 Q.   Were you clear about the roles of the individual

21 attorneys that you mentioned, Mr. Hilbert, Mr. Kaufman, and

22 Ms. Mitchell, at the time you placed the call?

23 A.   Was I clear on their roles?  I think, as I just

24 testified, other than them being attorneys that were involved,

25 that was the extent of my understanding of their role, that

1  they were involved in a lawsuit.

2  **Q.**   If, for example, you introduced them on the call as

3  Mr. Kirk Hilbert and Alex Kaufman as attorneys that represent

4  the President, does that suggest to you -- assume for the

5  purpose of my question that you did, in fact, introduce Mr.

6  Hilbert and Mr. Kaufman on the call as attorneys that

7  represent the President, if that's true, do you believe at the

8  time you had a better understanding of their roles?

9  **A.**   No.  As I say -- and if I've said anything that would

10  indicate a contradiction of that, I believe that I did

11  introduce them as attorneys.  But whether they work for the

12  President directly or the campaign -- because I think your

13  question said they represented the campaign.  I don't know

14  that.  All I know is they were attorneys involved in a

15  lawsuit.  Whether it was for him personally or for the

16  campaign, I don't know.  I do know that they were attorneys

17  and I believe at the beginning of the call, I identified

18  myself as the Chief of Staff, and that we had kind of place

19  set the call saying we've got these other people on the call

20  -- as setting up the call.

21  **Q.**   Mr. Meadows, at the time you placed the call, what

22  Article II, authority was advanced -- did you believe was

23  advanced by this phone conversation?

24  **A.**   Again, getting back to His Honor's question of Article II

25  and specifically there, I don't know that I'm learned enough

1  to be able to talk about the Article II aspects of -- of the

2  call.  I mean, certainly in a broaden sense, trying to make

3  sure that we had accurate, fair elections, and advancing that

4  and that principal, whether that's an Article II

5  responsibility or an Article II -- or an Article I, II, and

6  III responsibility, we all want an accurate election.

7  **Q.**   Is settlement of private litigation, does that have any

8  federal purpose?

9  **A.**   When that federal -- when that legislation -- when that

10  litigation involves elections, I saw it as part of my role as

11  the Chief of Staff to try to deal with that.  The President

12  gave clear direction on wanting to deal with it.  Did I get

13  involved in other litigation matters, generally not.  I left

14  attorneys to, hopefully, work out the attorneys -- work it out

15  with other attorneys.

16      Me setting up a phone call for the President of the

17  United States at his direction was certainly something that I

18  believe was in my duty as Chief of Staff to help facilitate.

19  **Q.**   Your testimony is that you believed it was necessary and

20  proper for your role as Chief of Staff to participate and

21  arrange a settlement conference of the President's private

22  litigation?

23  **A.**   That is my testimony -- you added the settlement part of

24  that.  Serving the President of the United States and -- and I

25  want to be clear with His Honor, you know, it takes on all

1  kinds of forms.

2      I mean, listen, I dealt with the President's personal

3  physician on a number of things that, you know, you wouldn't

4  normally as a Chief of Staff think that, okay, you're going to

5  be talking to his doctor and other people, but you do that.

6      And, you know, in Article II of the Constitution, does it

7  say the Chief of Staff is supposed to talk to the attorney to

8  make sure the President is feeling well?  Well, it doesn't say

9  that, but it's still part of my job to make sure that the

10  President is safe and secure and able to perform his job.  And

11  that's what I was doing.

12  **Q.**   Under that interpretation, Mr. Meadows, is there

13  anything, anything that you did at the direction of then

14  President Trump that is outside the scope of your

15  responsibilities as Chief of Staff?

16  **A.**   Would there be anything?

17  **Q.**   My question was, was there?

18  **A.**   I don't know that I did anything that was outside of my

19  scope as Chief of Staff that we've discussed today.

20  **Q.**   Every direction the then President gave you, you consider

21  to be necessary and proper in your role as Chief of Staff?

22  **A.**   No, ma'am.

23  **Q.**   Were there some times that the President gave you

24  direction that you thought to be outside the scope of your

25  Chief of Staff duties and responsibilities?

1  **A.**    Potentially.

2  **Q.**    Can you give me an example?

3  **A.**    I'm trying to think of one.  But I'm sure there are times

4  where he would have asked me to do something and I didn't do

5  it, but that would have been a give and take, back and forth

6  between the President and me.

7  **Q.**    That's a little different.

8      I'm asking you whether you did it or didn't do it.  My

9  question was, is there any direction that the then President

10 gave you that you consider to be outside the scope of your

11 role as Chief of Staff?

12 **A.**    I can't come up with an example.  I mean, you're asking

13 me to speculate on -- if you're asking me for an example that

14 comes to mind, I don't have an example that comes to mind.

15 **Q.**    Can you think of a circumstance -- even if it wasn't your

16 experience -- can you think of a circumstance where the

17 President would have given you direction and you thought it

18 was outside the scope of your duties and responsibilities as

19 Chief of Staff?

20 **A.**    If he were to ask me to get up on a stage and campaign

21 for him, that would have been outside of my -- that would have

22 been clearly me advocating for him in terms of President of

23 the United States.

24 **Q.**    You advocating for him would have been outside the scope

25 of your role as Chief of Staff?

1  **A.**    Campaigning for him.

2  **Q.**    You acting on behalf of his campaign would be outside

3  your role as Chief of Staff?

4  **A.**    Interacting with, but working for the campaign, if I were

5  working for the campaign, that would not be my role as Chief

6  of Staff.

7  **Q.**    It wouldn't, would it?

8      There's a pretty clear differentiation between campaign

9  functions and the role of a federal employee; correct?

10 **A.**    There is -- there is a line that certainly campaign

11 individuals are not federal employees.  As we've discussed all

12 morning, both with your questions and with questions from

13 Mr. Terwilliger.

14     Me talking with and communicating with campaign officials

15 and interacting with campaign officials, is certainly part of

16 my role.  It's been part of -- I would -- it should be part of

17 the role of every Chief of Staff.  To suggest that there's not

18 a political component of it would be disingenuous.

19 **Q.**    Do you agree with me, Mr. Meadows, that solely advancing

20 the interest of a campaign would be outside your role as Chief

21 of Staff?

22 **A.**    Solely advancing a campaign related -- well, a --

23 **Q.**    Or interest.

24 **A.**    -- campaign-related goal?  Well, give me an example of

25 that.  And I think if you give me an example, I can -- I can

 1   -- I can speak to it.

 2            THE COURT:  Hold on, hold on, hold on.

 3   BY MS. CROSS:

 4   **Q.**   I'm going to ask you to please answer the questions that

 5   I ask you.

 6            MR. TERWILLIGER:  Your Honor, I'm going to object to

 7   the questions she's asking, because it's a hypothetical and

 8   it's asking him for an opinion.  He's not an expert.

 9   BY MS. CROSS:

10   **Q.**   If you can't think of anything --

11            THE COURT:  Hold on one second.  Let me rule on the

12   objection.  I think he can answer it.  If he can't answer, he

13   can say, "I can't answer."  So ask the question again.

14            MS. CROSS:  Okay.

15            THE COURT:  If you can answer it, answer it.  If you

16   can't, tell the truth.

17   BY MS. CROSS:

18   **Q.**   Would you agree with me, Mr. Meadows, that acting to

19   advance -- solely acting to advance a campaign goal or

20   interest would be outside the scope of the Chief of Staff's

21   responsibilities?

22   **A.**   I would not agree with that.

23   **Q.**   You would not agree with that?

24   **A.**   No.  The way -- so -- can you read back exactly the way

25   that you asked that?

1          THE COURT:  She can't.

2          THE WITNESS:  Oh, she can't do that?  Okay.

3          So you said advancing a campaign goal.  A campaign

4  goal is lowering prescription drug prices.  Is that -- do I

5  have a federal nexus there?  Without a doubt I've got a

6  federal nexus.  And so there's lots of things that are said on

7  the campaign trail that, quite frankly, my job as Chief of

8  Staff is to make sure that it's not just campaign rhetoric.

9  That's part of the problem with America is they campaign one

10  way and they legislate another.

11  BY MS. CROSS:

12  **Q.**   Sir --

13          MS. CROSS:  I'm going to object to the responsiveness

14  of the answer.

15          THE COURT:  Let's go to the next question.

16  BY MS. CROSS:

17  **Q.**   My question, though, was solely a campaign goal or

18  interest.  Is advancing a campaign goal or interest something

19  that you consider to be within the scope of the Chief of

20  Staff's role?

21          MR. TERWILLIGER:  Objection, Your Honor.  Asked and

22  answered.

23          MS. CROSS:  I don't believe I've gotten an answer.

24          THE COURT:  I don't think he's answered the question

25  yet.  So I'm going to overrule the objection.

 1  BY MS. CROSS:

 2  **Q.**   Did you understand my question?

 3  **A.**   Yes.  So my response would be, campaign goals and

 4  objectives, there is a role for the Chief of Staff to make

 5  sure that those campaign roles and objectives get implemented

 6  at the federal level, and it's part of my job as Chief of

 7  Staff.

 8  **Q.**   Thank you for your candor.

 9         THE COURT:  Thank you.

10         THE WITNESS:  Thank you, sir.

11  BY MS. CROSS:

12  **Q.**   Let's go back, Mr. Meadows, although we are --

13         THE COURT:  How much more do you have on cross?

14         MS. CROSS:  I've got a minute.  Probably about 35, 40

15  minutes.

16         THE COURT:  All right.  Let's stop right here for a

17  lunch break.

18         Mr. Meadows -- everybody sit down.

19         Mr. Meadows, you can't discuss your testimony with

20  anyone while at the break.  Okay?  You can talk to your

21  lawyers, but you can't discuss your testimony.

22         Any questions?

23         THE WITNESS:  Even with them?

24         THE COURT:  You can talk to them, but you can't

25  discuss your testimony.  They know the rules.  They're

1  experienced lawyers.

2              Okay.  We'll start back at 2 o'clock.  Thank you-all.

               (A lunch break was taken from 12:50 p.m. to 2 p.m.)

4              (Court Reporter Penny Coudriet, RPR, RMR, CRR,

5  commenced reporting the proceedings.)

6              THE COURT:  I hope everybody had a good lunch.  You

7  ready?  It looks like you had a good lunch, you're ready to

8  go.

9              MS. CROSS:  Thank you, Your Honor.  I am ready to go.

10             THE COURT:  Mr. Meadows, I'll remind you you're still

11 under oath, sir.

12             THE WITNESS:  Yes, sir.

13 BY MS. CROSS (CONT'D):

14 **Q.**  Mr. Meadows, prior to us breaking for lunch you had the

15 indictment in front of you that was an exhibit.  Do you still

16 have that in front of you?

17 **A.**  No, ma'am, I don't.  I think --

18 **Q.**  If you don't mind, I'm going to --

19             MS. CROSS:  Your Honor, may I approach the witness?

20             THE COURT:  Yes, ma'am.

21 BY MS. CROSS:

22 **Q.**  All right.  I'm just going to put that in front of you in

23 case you need to refer to it for any reason.

24 **A.**  Thank you.

25 **Q.**  Thank you.

1     All right.  Mr. Meadows, you spoke to us this morning

2  about your role as Chief of Staff.  And at times it was

3  appropriate for you to reach out to various state officials on

4  different reasons; correct?

5  **A.**    Yes.

6  **Q.**    And one of the states you mentioned I think was New York;

7  correct?

8  **A.**    Yes.  In terms of state officials that I met with, yes.

9  **Q.**    Correct.  Absolutely.

10     And I think another one of the states you referenced was

11  Texas; correct?

12  **A.**    Yes.

13  **Q.**    And when you were given examples, I think in response to

14  Judge Jones' questions about why it was necessary for you to

15  have these interactions with state officials, I think you

16  referenced FEMA, federal aid for disaster relief.  That was a

17  typical subject matter of your outreach to state officials; is

18  that right?

19  **A.**    That's one of them, yes.

20  **Q.**    COVID, I think you told us, was another one; correct?

21  **A.**    Yes.  Just trying to give examples, sure.

22  **Q.**    Absolutely.  Yeah.  And those come to mind.

23     The federal government was coordinating the response to

24  the COVID pandemic, correct, during your time as Chief of

25  Staff?

1  **A.**    Yes.

2  **Q.**    So that was a centralized federal role that you were

3  facilitating state cooperation with; correct?

4  **A.**    Yes.

5  **Q.**    Okay.  Same thing with FEMA.  I think you referenced

6  FEMA.  The federal government has a role in dispersing federal

7  emergency funds, correct, in the result -- in response to a

8  disaster?

9  **A.**    Yes.

10  **Q.**    That's typically what FEMA does?

11  **A.**    Yes.

12  **Q.**    And so when you described for us using an example of your

13  outreach to various state officials as being potentially part

14  of a FEMA response and coordination, that's what you were

15  referring to?

16  **A.**    On that particular example, yes.

17  **Q.**    Yes.  Okay.  All right.

18      Well, let's, then, direct our attention to the

19  January 2nd, 2021, call between the then President Trump and

20  Secretary of State Raffensperger.  That's kind of where we

21  ended the questioning before lunch; do you recall?

22  **A.**    Yes, ma'am.

23  **Q.**    Okay.  All right.  As I recall your testimony, the then

24  President came to you and wanted you to initiate a call with

25  Secretary of State Raffensperger; correct?

1  **A.**    Make contact with the secretary so he could talk to him.

2  **Q.**    He wanted to talk to him?

3  **A.**    That's correct.

4  **Q.**    And he asked you, make that happen?

5  **A.**    That's correct.

6  **Q.**    All right.  And this was the at least third such attempt

7  in the week or two prior to the January 2nd call; correct?

8  **A.**    The January 2nd would have been the third, yes.

9  **Q.**    Okay.  All right.  And you're aware, of course, that by

10  January 2nd, 2021, that the election result in Georgia had

11  been certified; correct?

12  **A.**    I believe it was certified in December.

13  **Q.**    Yes.  Sometime prior to your January 2nd, 2021, call;

14  correct?

15  **A.**    That's correct.

16  **Q.**    Okay.  All right.  Do you recall having a conversation

17  with anyone -- in between the time then President Trump wanted

18  you -- told you to get Secretary of State Raffensperger on the

19  phone, did you have a phone conversation with any of -- anyone

20  that you recall in between that time and the time you actually

21  got on the phone?

22  **A.**    I probably did, but I don't recall anything specifically.

23  **Q.**    Do you recall being on the phone with any of the

24  attorneys who were involved in President Trump's campaign

25  litigation?

1  **A.**    Okay.  You keep saying attorneys, campaign.  Are you

2  talking about Alex and Kurt?

3  **Q.**    I am.

4  **A.**    Okay.  All right.

5  **Q.**    So Mr. Hilbert, Mr. Kaufman, the people who ended up on

6  the call, I'm wondering if you had any conversation with them

7  in between the time then President Trump told you to initiate

8  this call and the time you actually got on the call?

9  **A.**    I may have, but I don't recall if I did.

10  **Q.**    Okay.  And as I understood your answers earlier, you may

11  have had a conversation with Ms. Mitchell, but you don't

12  recall specifically?

13  **A.**    Right.  It's highly probable.  I talked to Ms. Mitchell

14  more than I did those other two attorneys.

15  **Q.**    Did you have a prior relationship with -- professional

16  relationship with Ms. Mitchell before the election

17  litigation -- I'm sorry -- the post-election phase, let's call

18  it that, the post-2020 election, did you know Ms. Mitchell

19  prior to?

20  **A.**    I did.

21  **Q.**    How long is your association with Ms. Mitchell?

22  **A.**    Many years.  I don't know specifically, but I've known

23  Ms. Mitchell for many years.

24  **Q.**    Are you personal friends?

25  **A.**    We've never been to dinner together that I know of, if

1  that's what you're meaning.  But we had a professional

2  relationship.  She was an attorney that represented me when I

3  was a member of Congress.

4  **Q.**   What was the subject matter of her representation of you?

5  We don't need a lot of details but just --

6  **A.**   Right.  FEC.

7  **Q.**   FEC litigation or matters?

8  **A.**   Matters.

9  **Q.**   Matters.  Okay.

10     All right.  Did you have any role in bringing

11  Ms. Mitchell, then, to advise the President on any

12  campaign-related issue?

13  **A.**   Actually, I asked Ms. Mitchell to come down and

14  volunteer -- early on to Georgia to volunteer when it looked

15  like the election results were going to be close.

16  **Q.**   Why did you do that?

17  **A.**   Because I felt like we needed a number of attorneys on

18  both sides because it was going to be close.

19  **Q.**   Did you make that outreach on behalf of the campaign?

20  **A.**   No.  Again, I've got -- from my standpoint I have no

21  campaign role.

22  **Q.**   No campaign role.  I'm going to write that.  No campaign

23  role.

24        MR. TERWILLIGER:  Can he finish his answer?

25        THE COURT:  Hold on.  Hold on.

1        MR. TERWILLIGER:  I'm sorry.  Just if you could

2   admonish counsel to let him finish his answer before

3   commentary on it.

4        THE COURT:  Let him finish his full answer and then

5   ask your next question.

6        MS. CROSS:  Yes, sir.

7   BY MS. CROSS:

8   **Q.**   Are you finished with your answer, Mr. Meadows?

9   **A.**   I beg your pardon?

10  **Q.**   Are you finished with your answer?

11  **A.**   So in terms of interacting with campaign, certainly I did

12  in my role as Chief of Staff, reaching out to make sure that

13  we had attorneys in areas.  It was something that served the

14  President.

15       And certainly reaching out to Ms. Mitchell, because of my

16  prior relationship, she had been in Montana, I believe,

17  working on election issues -- election campaigns there, and so

18  I had asked her to come down.

19  **Q.**   Did you request Ms. Mitchell's presence on the phone

20  call, the January 2nd phone call?

21  **A.**   Again, I'm not sure how all of that actually transpired.

22  It's my understanding that Ms. Mitchell and others had

23  conversations with the President directly that I was not

24  involved with, but I don't know that for certain.

25  **Q.**   Understood.

 1      By whatever means, Ms. Mitchell ended up on the call;
 2   correct?
 3   **A.**   Yes.
 4   **Q.**   We talked about Mr. Hilbert ending up on the call;
 5   correct?
 6   **A.**   Yes.
 7   **Q.**   Mr. Kaufman ended up on the call; correct?
 8   **A.**   Yes.
 9   **Q.**   You were on the call for the entirety of the phone call?
10   **A.**   Yes.
11   **Q.**   Then President Trump was on the phone call for the
12   entirety -- entire duration?
13   **A.**   With the secretary and Mr. Germany, yes.
14   **Q.**   Okay.  Who else from your side of the phone call was on
15   the line?
16   **A.**   That's all that I know of.  I was actually in my Chief of
17   Staff's office by myself.  So, I mean, I didn't introduce
18   anybody else.  Those were the only people on that I was aware
19   of.
20   **Q.**   Are you aware of anyone from the White House Counsel's
21   Office who was on the call?
22   **A.**   I am not.
23   **Q.**   Are you aware of anyone from the Department of Justice
24   who was on the call?
25   **A.**   I am not.

1  **Q.**    Did you reach out to anyone in the Department of Justice

2  to participate in the phone call?

3  **A.**    I did not.

4  **Q.**    Did you reach out to anyone from the Office of White

5  House Counsel to participate in the phone call?

6  **A.**    Not to my knowledge.  That would be a question for

7  Mr. Herschmann probably.  He would be the only one.  But not

8  to my knowledge.

9  **Q.**    You don't have any recollection?

10 **A.**    I have no recollection of that.

11 **Q.**    Okay.  Do you have any recollection of reaching out to

12 anyone for participation in this phone call that for whatever

13 reason wasn't on the call?

14 **A.**    Not to my knowledge, no.

15 **Q.**    Okay.  All right.  And the phone call that we're talking

16 about, Mr. Meadows, it didn't have anything to do with COVID;

17 correct?

18 **A.**    No, ma'am.

19 **Q.**    It didn't have anything to do with the federal response

20 to the COVID pandemic; correct?

21 **A.**    Do you mean to FEMA?  No, it did not.

22 **Q.**    It didn't have anything to do with FEMA or other funds

23 that were being requested or released; correct?

24 **A.**    That's correct.

25 **Q.**    Okay.  You spoke on the call?

1  A.    I did.

2  Q.    If you could, please summarize for us the substance of

3  the call to the best of your recollection.

4  A.    Obviously it was the President -- the former President

5  talking mostly about a number of the allegations of fraud that

6  he believed occurred in Georgia.  I set up the meeting,

7  introduced myself as Chief of Staff, introduced Ms. Mitchell.

8  I believe I introduced the other two by just their first

9  names.

10        And then the vast majority of the phone call was the

11  President talking about the allegations of fraud and how much

12  fraud was there in different aspects, whether it was

13  fraudulent voters, whether it was the -- it was a fairly

14  lengthy call.

15  Q.    It was?

16        To the best of your recollection, it was slightly over an

17  hour?

18  A.    To my recollection, I think that's correct, yes.

19  Q.    Perhaps even longer?

20        THE COURT:  What did you say?  I didn't hear you.

21        MS. CROSS:  I'll withdraw that, Your Honor.

22  BY MS. CROSS:

23  Q.    You had let us know, Mr. Meadows --

24        THE COURT:  I asked you a question --

25        THE WITNESS:  She said "perhaps longer."

1          THE COURT:  Okay.

2          MS. CROSS:  I wasn't going to make him answer that.

3   BY MS. CROSS:

4   **Q.**   You let us know, Mr. Meadows, a little earlier in our

5   questioning about that meeting you had with then Attorney

6   General Barr, that he expressed his satisfaction that there

7   had been no widespread fraud proven in the presidential

8   election.

9          Do you recall those questions?

10  **A.**   Yes.

11  **Q.**   Okay.  And when I asked you about your trip to the Cobb

12  County Civic Center to observe a portion of the signature

13  verification audit that was going on conducted by the

14  Secretary of State's office, among other agencies, at that

15  time you had not come to a conclusion about whether you agreed

16  with Attorney General Barr's assessment or not; correct?

17  **A.**   Yeah.  I think what I said, there were other allegations.

18  The investigation was ongoing, and so no conclusion in terms

19  of what was there or not there.

20  **Q.**   Right.  You didn't feel that you had enough information

21  to make a --

22  **A.**   Well, I knew the investigation was ongoing.

23         You know, for me it was all about trying to make sure

24  that a number of these allegations that were out there --

25  there were probably more allegations that the President heard

1 than I ever heard directly.

2      You know, my job was to land the plane, is to try to deal

3 with all of those issues, make sure that we've got those

4 issues dealt with.  And in dealing with all of those issues,

5 be able to finish up the things that we had in 60 days, have a

6 peaceful transfer of power, make sure that we got all of that

7 done.

8      And so certainly with these issues, being able to speak

9 with some kind of direction and authority on allegations that

10 were being made.  And if I knew that they were not true, it

11 was much easier for me to speak with authority with the

12 President.

13 **Q.**   By the time of this phone conversation on January 2nd,

14 2021, were there allegations that had been made that you

15 believed were unfounded?

16 **A.**   Certainly there were allegations -- to answer your

17 question specifically, there were certain allegations that

18 were unfounded at that point that I knew -- what I believed

19 were unfounded, sure.

20 **Q.**   Okay.  And at the time of the January 2nd, 2021, call,

21 did you feel as though at that point you had sufficient

22 information to either agree or disagree with then Attorney

23 General Barr's assessment?

24 **A.**   I think, as I said earlier, and I would reiterate, is

25 there was still ongoing investigations.  Even at January 2nd

1  there were still ongoing, at least meting out, trying to

2  figure out whether the veracity of some claims were there.

3      The outstanding issue from the President's perspective

4  was Fulton County signature authorizations.  There had been a

5  number of allegations as it related to that that were still

6  outstanding.  And even though Cobb County had been going

7  through their verification, Fulton County, to my knowledge,

8  had not started or been done.

9  **Q.**   So when you say "still outstanding," an allegation was

10 "still outstanding," I'm wondering from whose perspective are

11 you drawing that conclusion?  Are you trying to tell me that

12 from then President Trump's perspective those allegations were

13 still outstanding, or is it your testimony you mean that the

14 official recount and certification process in Georgia had not

15 been resolved to your knowledge?

16 **A.**   What I'm saying is I kept getting asked about it in my

17 official duties as Chief of Staff of the President of the

18 United States.  I kept asking -- getting asked about Fulton

19 County and was there going to be a signature verification.

20 And a number of allegations had been made, and so I continued

21 to get asked about that.

22 **Q.**   Okay.  That's a little different than my question,

23 though.

24 **A.**   Okay.  I'm sorry.

25 **Q.**   That's okay.  That's all right.

1    Who kept asking you?  Who kept bringing it up to you?

2  **A.**   The President had asked me about it.

3  **Q.**   Okay.  Were you aware at that time that the Secretary of

4  State of Georgia for that office had any open investigation

5  into any of the allegations that President Trump was

6  repeatedly raising with you?

7  **A.**   That the Secretary of State for the State of Georgia had

8  an open investigation, I believed they did.

9  **Q.**   You believe that they did?

10  **A.**   I believed that they --

11  **Q.**   After -- okay.

12    And after the certification of the vote, you believe that

13  that was still an outstanding issue?

14  **A.**   When did the certification happen?

15  **Q.**   I can't answer your question.

16  **A.**   Oh, you can't answer.  So --

17  **Q.**   If I orient you a little bit to early December -- yeah.

18  If I orient you a little bit to early December --

19  **A.**   Your Honor, without me having a calendar -- in the spirit

20  of trying to be totally transparent, I thought certification

21  happened sometime the middle part of December, and yet there

22  was still -- the Secretary of State's office was looking at

23  signature verifications in Cobb County.  I witnessed that

24  personally.

25    I think Ms. Watson indicated that not only would she

1  verify those signatures, but that she would go further to

2  verify other counties within the state to make sure.  And so I

3  assumed from that that there was an ongoing investigation.

4  **Q.**  Okay.  The allegations that were raised by then President

5  Trump on the call were varied; would you agree with that?

6  There were several allegations that he raised?

7  **A.**  Yes.  In rereading the transcript, yes.

8  **Q.**  Did you reread the transcript prior to your testimony

9  today in preparation?

10 **A.**  I went back over it, yes, ma'am.

11 **Q.**  Okay.  All right.  And I don't want to know anything you

12 did with your attorneys.

13 **A.**  No.

14 **Q.**  But you've reviewed it since January 2nd, 2021?

15 **A.**  Well, to be clear, I reviewed an AP report of what was

16 there, so...

17 **Q.**  No.  I appreciate that.

18 **A.**  I mean, to the point that that was accurate, that's what

19 I read.

20 **Q.**  Okay.

21      THE COURT:  The AP people love that answer.

22      THE WITNESS:  Yeah, I bet they do.

23 BY MS. CROSS:

24 **Q.**  Okay.  So as you were approaching the conversation with

25 Secretary of State Raffensperger, did you share then President

1    Trump's concerns about the specific allegations that he raised

2    during the call?

3    A.    The only allegation that had been consistent that I felt

4    like there needed further investigation would have been the

5    signature verification for Fulton County.  Other things were

6    raised in there.  And in rereading it, some of the other

7    allegations, I'm not sure exactly where they came from.

8         I can tell you that as his Chief of Staff the thing that

9    I heard about the most was Fulton County's signature

10   authorizations.

11   Q.    But to the best of your recollection at the time this

12   call was initiated, you had insufficient information to

13   determine whether that allegation about the signature matching

14   had merit; is that a fair --

15   A.    I think even on the phone call I said, you know, can we

16   get together?  I saw an opening.  At the end of the phone call

17   where -- is it Mr. Hilbrin (phonetic), is that --

18   Q.    Hilbert.  H-I-L-B-E-R-T, I believe it is.

19   A.    Mr. Hilbert.  Okay.

20        Mr. Hilbert made a suggestion, and I saw an opening.  I

21   took that opening to say, all right, great.  You know, at

22   least we've got something here that hopefully we can agree

23   upon, bring -- you know, land the plane.  Let's get this

24   particular issue off the table.  Hopefully get the attorneys

25   together where they can talk about it.  And at that particular

1  point used that as an opportunity to close out the call.

2  **Q.**    Okay.  You were comfortable that the other allegations

3  that then President Trump made during the course of that phone

4  call didn't require further investigation by the Secretary of

5  State?

6  **A.**    I don't know if they did or didn't, just -- there were a

7  number of allegations that were made.  I can tell you what I

8  know from my time as Chief of Staff, that the one that I

9  heard about most frequently was the signature verification.

10  Beyond -- should the others have been looked at?  I can't

11  speak to the veracity of that.

12  **Q.**    Okay.  And you make no representations here about the

13  veracity of the allegations that were raised?

14  **A.**    So your question is I've made no allegations here as --

15  **Q.**    I could ask that a little better.  Let me ask a better

16  question.

17  **A.**    Okay.  Okay.

18  **Q.**    President Trump on the call to your recollection -- or do

19  you recall then President Trump during the discussion with

20  Secretary of State Raffensperger being very convinced that he

21  had, in fact, won the presidential election in Georgia?

22  **A.**    Yes.

23  **Q.**    That was something that he appeared confident in?

24  **A.**    He believed that.

25  **Q.**    Did you believe that?

1  **A.**   I believe that there was additional things that needed to

2  be investigated at that particular point.

3  **Q.**   Okay.  That really wasn't my question, though.

4      Did you believe that President Trump had won the State of

5  Georgia in the 2020 presidential election?

6  **A.**   Again, I felt like that what had to be -- had to happen

7  is, is some of these allegations of fraud needed to be looked

8  at in a real way, like with anything else that you would do.

9  **Q.**   Okay.  You thought the Secretary of State's office had

10  been doing a wonderful job with the signature audit; correct?

11  **A.**   I did.

12  **Q.**   And I'm not trying to trip you up.  Maybe your answer is,

13  I didn't have enough information on January 2nd, 2021, when

14  this phone call was going on to reach an opinion.  Is that

15  what you're trying to tell me?  Or are you telling me that you

16  did believe that he had -- that then President Trump had won

17  Georgia, or you didn't believe that he had won Georgia?

18  **A.**   What I'm saying was is there were a number of allegations

19  that were made.  And the allegation as it relates to the

20  Fulton County signatures seemed to have more credibility than

21  some of the others in my opinion, and that those needed to be

22  further investigated in order to be able to fully ascertain

23  whether President Trump or President Biden had won the State

24  of Georgia.

25  **Q.**   Okay.  And until you resolved those questions, you didn't

1  feel able to make a determination?

2  **A.**   If you're talking about me personally, yeah.

3  **Q.**   I am.

4  **A.**   In my mind that was an open question, yes.

5  **Q.**   Okay.  Okay.  All right.  Mr. Meadows, I'm almost done.

6       You talked with us a little bit earlier today about the

7  Hatch Act.  Do you recall those questions?

8  **A.**   Yes, ma'am.

9  **Q.**   Being asked those questions?

10 **A.**   By Mr. Terwilliger, yes.

11 **Q.**   Yes.  Okay.

12      And you seemed to concede that, as the Chief of Staff,

13 the Hatch Act prohibition applied to you; correct?

14          MR. TERWILLIGER:  Objection to "seemed to concede,"

15 Your Honor.  It's not consistent with the record.

16          THE COURT:  I don't think he conceded.  He gave his

17 definition of the Hatch Act, but I don't think he conceded

18 that it did.

19          MS. CROSS:  Fair enough.  I'll rephrase it.

20 BY MS. CROSS:

21 **Q.**   Mr. Meadows, did you believe at the time you served as

22 the Chief of Staff that the Hatch Act applied to you?

23 **A.**   I believe the Hatch Act is a statute that applies to all

24 federal employees in some degree or another.

25 **Q.**   And you were a federal employee during the time that

1  we're talking about; correct?

2  **A.**    Yes, I was.

3  **Q.**    So the Hatch Act as a federal employee would apply to

4  you; correct?

5  **A.**    Yes, ma'am.

6  **Q.**    Okay.  And, in fact, you told us that when there was an

7  allegation raised about a potential violation on your behalf,

8  that you got kind of dinged a little bit about that

9  previously; correct?

10  **A.**    I got what about it?

11  **Q.**    I said "dinged."

12  **A.**    Yeah.

13  **Q.**    I thought that's what you had said but --

14  **A.**    Well, that's accurate.  I got dinged, yes.

15  **Q.**    Okay.  Okay.  And when that happened -- and that happens.

16      When that happened, you went to, I think, seek some

17  advice from an ethics counsel or ethics personnel?  Who was it

18  that you referenced speaking to about that and how to avoid

19  any future violations?

20  **A.**    Yes.  Someone with the White House Counsel's Office.

21  Mainly because it was extremely awkward figuring out how to do

22  TV.  And reporters will ask a number of questions that are not

23  necessarily on the topic that you're asked to be commenting

24  about.

25  **Q.**    Reporters perhaps not so aware of the distinction between

1  what is prohibited by the Hatch Act and what is permitted;

2  correct?

3  **A.**   Well, I think reporters just trying to get your opinion

4  on things, I don't...

5  **Q.**   Sure.

6       Is that resource that you used in the White House

7  Counsel's Office, was that something that was a resource that

8  you could have used at any time during your tenure as the

9  Chief of Staff?

10 **A.**   Certainly.  I mean, the White House Counsel's Office was

11 available to me.  They worked for me.

12 **Q.**   Sure.

13      So any time you had a question or concern about potential

14 violations of the Hatch Act, then you had someone you could

15 call to run that by?

16 **A.**   Yes.

17 **Q.**   At any time?

18 **A.**   Yeah.  I mean, not in the middle of the night generally.

19 But, I mean, I could wake somebody up and ask them.

20 **Q.**   I suspect they would answer your call.

21      If you had a Hatch Act emergency and you called someone

22 from the White House Counsel's Office in the middle of the

23 night, I suspect they'd take your call.  Would you suspect

24 they'd take your call?

25 **A.**   Most of the time they would take a call from the Chief of

1  Staff.

2  **Q.**   And that was you?

3  **A.**   That was me, yeah.

4  **Q.**   All right.  Okay.  All right.

5      So we can agree that the role of Chief of Staff is

6  governed in part by the prohibitions of the Hatch Act;

7  correct?

8  **A.**   The role of Chief of Staff is governed -- I don't know

9  that I would say it's governed.  I mean, does the Hatch Act

10  apply to a Chief of Staff?  Yes.

11      Is the Hatch Act something that is sitting there as your

12  guiding light necessarily?  No.

13  **Q.**   I understand that distinction.

14      I think the first part is what I was looking for.

15  Whether you're in the role of Chief of Staff or anybody else

16  is in the role of Chief of Staff, the Hatch Act is something

17  that applies to that role; correct?

18  **A.**   It applies to the Chief of Staff, even though there are

19  some differences of opinion, just to be frank, on how it

20  should apply.  But it applies to all federal employees.  So,

21  yes.  I'm a federal employee, it would apply to me.

22  **Q.**   All right.  You let us know, Mr. Meadows, that you had no

23  campaign role.  Is that what you testified to a little

24  earlier?

25  **A.**   That is correct.

1  **Q.**   You had no campaign role?

2  **A.**   No official campaign role.

3  **Q.**   All right.  Did you have an unofficial campaign role?

4  **A.**   No, I did -- I did not.

5  **Q.**   You did not?  Okay.

6       And it sounds like the Chief of Staff role is a robust

7  one.  You had enough on your plate without an additional

8  responsibility of the campaign; is that correct?

9  **A.**   Yeah.  I hadn't wanted to work for the campaign.  I would

10 love for the campaign to do everything that they could do on

11 their own.

12      You know, bluntly, if -- I had more than I could say

13 grace over in terms of everything that I was doing.  Now, did

14 that mean that I could completely ignore them?  Absolutely

15 not.  I mean, you know, it -- it consumed part of the

16 President's time and schedule.  And certainly I had to be

17 aware of everything that was going on.

18 **Q.**   Were you aware of the Hatch Act and the restrictions on

19 your ability as a federal employee to participate in the

20 campaign during the post-election period?

21 **A.**   So your question is to participate in the campaign.

22 What -- are you meaning working for the campaign?

23 **Q.**   No.  I mean, for example, participating in the

24 January 2nd, 2021, call about -- with attorneys who

25 represented then President Trump in his personal campaign

1  capacity.

2  **A.**    Yeah.  So my understanding of the Hatch Act is that my

3  interaction with campaign-related people and campaign

4  personnel is a permitted use for the Chief of Staff in the

5  role that he has as Chief of Staff.  So I didn't see that as a

6  violation of the Hatch Act.

7  **Q.**    Okay.  You acknowledged that it applied.  And whether it

8  was a violation or not, that's something that maybe someone

9  else will resolve down the line.  But you were aware of the

10  Hatch Act at the time, December and January -- December 2020

11  and January 2021, and that it did apply to your role as Chief

12  of Staff; correct?

13  **A.**    That's correct.

14  **Q.**    Okay.  And you had no role in the campaign; correct?  And

15  by "the campaign" I'm talking about then President Trump's

16  reelection campaign.  You had no role in that campaign;

17  correct?

18  **A.**    That is correct.

19  **Q.**    Did you have any role, Mr. Meadows, in coordinating the

20  various electors in the contested states for the Trump

21  campaign?

22  **A.**    No, I did not.

23  **Q.**    No role at all?

24  **A.**    The only time that I know of from the electors's point

25  was when somebody raised the issue with me and I referred it

1  on to the campaign.

2  **Q.**   So you had no role for the campaign or as Chief of Staff

3  in coordinating those efforts across contested states?

4  **A.**   As Chief of Staff, no, I did not coordinate those

5  efforts.

6  **Q.**   Okay.

7           MS. CROSS:  May I approach the witness, Your Honor?

8           THE COURT:  Yes.

9           MS. CROSS:  We've marked this as State's Exhibit

10  Number 1.

11  BY MS. CROSS:

12  **Q.**   I'm going to show you, Mr. Meadows, State's Exhibit

13  Number 1 and ask you to take a look at it for me and see if

14  you recognize State's Exhibit Number 1?

15  **A.**   Yes, I do.

16  **Q.**   How do you recognize it?

17  **A.**   It was an e-mail from me to Mr. Miller.

18  **Q.**   It's complete and accurate to the best of your

19  recollection?

20  **A.**   I have no reason to doubt its veracity.  I mean...

21  **Q.**   I appreciate that.

22           MS. CROSS:  Your Honor, at this time we'd move

23  State's Exhibit Number 1 into evidence.

24           THE COURT:  Any objections?

25           MR. TERWILLIGER:  One moment, Your Honor.

1    I guess, no, Your Honor.

2    THE COURT:  State's 1 is admitted without objection.

3  You may proceed.

4    MS. CROSS:  Thank you.

5  BY MS. CROSS:

6  **Q.**   If you take a look at that, that's a two-page document.

7  Is that State's Number 1 in front of you?

8  **A.**   Yes.  It is two pages.

9  **Q.**   And it looks to be an e-mail exchange between you and

10  Jason Miller; is that correct?

11  **A.**   Yes, ma'am, it is.

12  **Q.**   All right.  And all of those e-mails seem to be sent and

13  received between 4:11 p.m. on December 6th, 2020, and then

14  the final one, then, from you at the top is the same date,

15  December 6th, 2020, at 4:39 p.m.; is that correct?

16  **A.**   I'm not seeing -- oh, yes.  Yes.  That is correct.

17  **Q.**   Okay.  So it looks to be a series of e-mails between you

18  and Mr. Miller over a period of maybe 30 minutes or so;

19  correct?

20  **A.**   That's correct.

21  **Q.**   Okay.  And who is Mr. Miller, Jason Miller?

22  **A.**   Jason Miller worked for the Trump reelect committee and

23  was part of their campaign.

24  **Q.**   Okay.  In December 2020 did Mr. Miller have any federal

25  employment that you're aware of?

1  A.    He did not, not that I'm aware of.

2  Q.    Okay.  And your e-mail is redacted from this exhibit but

3  Mr. Miller is not.  And I apologize to Mr. Miller.  But

4  the domain name on Mr. Miller's e-mail is, in fact,

5  donaldtrump.com; correct?

6  A.    Yes, that's what it says.

7  Q.    Okay.  And that is a domain name that was associated with

8  the Trump campaign during this time period; correct?

9  A.    I believe so, yes, ma'am.

10  Q.    Okay.  All right.

11        MS. CROSS:  On the second page, Your Honor, since

12  it's been admitted, may I have permission to publish it?

13        THE COURT:  Yes.

14        MS. CROSS:  Thank you.

15  BY MS. CROSS:

16  Q.    The second page, I'm going to start there, Mr. Meadows,

17  because this appears to be an attachment that was on the first

18  e-mail, first-in-time --

19  A.    Right.

20  Q.    -- e-mail that was sent.

21        Does that appear the same to you?

22  A.    It does appear the same to me, yes, ma'am.

23  Q.    And this is looking to me like -- please look at that.

24  What's the attachment on that exhibit, can you tell?

25  A.    It says "Chesebro memo on real deadline."

1  **Q.**    Is there a date on the memo?

2  **A.**    11/20/2020.

3  **Q.**    And, of course, we don't know the date of any particular

4  memo or what was the substance of the attachment, that's not

5  in this State's Exhibit Number 1, but that's what the

6  attachment purports to be?

7  **A.**    Right.

8  **Q.**    Okay.  And if we then look at the first page of that

9  State's Exhibit Number 1, the very bottom of the page that

10 that attachment appears to be connected to or associated with,

11 that's an e-mail from you to Mr. Miller it appears.  "Let's

12 have a discussion about this tomorrow," correct?

13 **A.**    Yes.  So I'm not sure if that's me writing him or him

14 writing me, but, yes, that's what it says.

15 **Q.**    We can check.

16      The next one up is a response that is clearly from

17 Mr. Miller about seven minutes later at 4:18 p.m. on

18 December 6th, 2020.

19      Is that what that appears to be?

20 **A.**    Yes, ma'am.

21 **Q.**    And the response -- I'll read it and you can just follow

22 along and you tell me if I'm reading it correctly, okay, so

23 that it's clear in the record.

24      Mr. Miller responds to you that, "You bet.  So you know,

25 Justin and I did on background calls this very subject with

1  Maria, Leven, Chuck Todd, and Margaret Brennan yesterday.  (I

2  might be missing 1-2 others).  Justin, should we just do a

3  national press call tightly focused on this tomorrow, no?"

4       And then "JM."

5       Did you know Mr. Miller to sign his e-mails "JM," by his

6  initials?

7  **A.**   I would assume that's him, but I don't know.

8  **Q.**   And then it appears on State's Exhibit Number 1 you

9  respond at 4:34 p.m.

10       Do you see that, Mr. Meadows?

11 **A.**   Yes.

12 **Q.**   And can you read for me what your response to Mr. Miller

13 was?

14 **A.**   "Let's have a discussion about this tomorrow."

15 **Q.**   I'm sorry --

16 **A.**   Oh, that's 4:11, I'm sorry.

17 **Q.**   That's fine.

18       About midway through the page.

19 **A.**   "If you were on it, then never mind the meeting, we just

20 need to have someone coordinating the electors for the

21 states."

22 **Q.**   We just need to have someone coordinating the electors

23 for the state?

24 **A.**   Right.

25 **Q.**   Who is the "we" you're referring to, Mr. Meadows?

1  **A.**    My understanding, it would be the campaign would need to

2  have someone coordinating that.

3  **Q.**    And when you're referring to "the campaign" in this

4  e-mail exchange, you used the term "we"; correct?

5  **A.**    Yes.  I mean, that's what I wrote.

6  **Q.**    Okay.  Mr. Meadows, did you have a personal interest in

7  then President Trump winning reelection?

8  **A.**    Wanting him to stay in office?

9  **Q.**    Yes.

10  **A.**    Certainly.

11  **Q.**    You wanted him to win?

12  **A.**    Sure.

13  **Q.**    You worked very hard for him to win?

14  **A.**    Well, not on the campaign.  I worked very hard for the

15  President, again, to be specific.  But, sure, I wanted him to

16  win.

17  **Q.**    You voted for him?

18  **A.**    Yes, I did.

19  **Q.**    In North Carolina?

20  **A.**    Yes, I did.

21  **Q.**    And your position in federal government, of course,

22  depended on Mr. Trump being reelected; correct?

23  **A.**    Yeah.  I can't imagine that I would be Chief of Staff for

24  Joe Biden.

25  **Q.**    That's yes?

1    A.    Yes.

2    Q.    And he didn't call you, did he?

3    A.    Mr. Biden -- President Biden?

4    Q.    Yes.

5    A.    No, I was not on the short list.

6          MS. CROSS:  All right.  Those are all my questions,

7    Mr. Meadows.  Thank you.

8          THE COURT:  Redirect?

9          MR. TERWILLIGER:  Thank you, Your Honor.

10                     REDIRECT EXAMINATION

11   BY MR. TERWILLIGER:

12   Q.    While we're on the question --

13         MR. TERWILLIGER:  Can I have the exhibit, please?

14         MS. CROSS:  There's your copy.

15         MR. TERWILLIGER:  Yeah, I know, but I'd like to have

16   the exhibit.

17         Thank you.

18   BY MR. TERWILLIGER:

19   Q.    So you just testified about this exhibit and the

20   statement here where you say "we."  Were you trying to

21   indicate that "we" meant you and the campaign together?  Who's

22   the "we"?

23   A.    No, sir.  The -- as I've mentioned earlier, I use "we"

24   far too often.  And I've -- it was normally out of deference

25   to other people where you would say we accomplished this and

1  we accomplished that.  It's a habit that's left over from my

2  Congressional days.

3       But, bluntly, on this it -- I took it to mean the Trump

4  campaign specifically.  Not me and the Trump campaign.

5  **Q.**   And if you can say, if you recall, why did you care

6  whether the electors were coordinated?

7  **A.**   So about this time, maybe on this given day, it was

8  mentioned to me that there was litigation going on and that

9  you had to have a provisional or conditional elector.  Should

10 a court or should a legislature rule that you can't just have

11 one set of electors, you had to have a provisional set.  And

12 what I didn't want to happen was for the campaign to prevail

13 in certain areas and then not have this.  It was brought --

14 **Q.**   Why did you not want that to happen?

15 **A.**   Well, because I know I would get yelled at if we had

16 not --

17 **Q.**   By whom?

18 **A.**   By the President of the United States.

19      -- had we not had what I saw more as a procedural

20 provisional issue.  And so I forwarded it on to the campaign

21 team.  And it sounded like they were well on top of it and

22 working that in.

23 **Q.**   The district attorney asked you about the Hatch Act and

24 made some comment, I don't believe it was a question, that

25 maybe it's down the line somebody else will adjudicate your

1  violation of it.  Did you believe you violated the Hatch Act

2  in the January 2nd call?

3  **A.**    Absolutely not.  Just the opposite.

4  **Q.**    Okay.  Let's talk about why.

5      The district attorney's office seems to have made the

6  assumption that if you were involved in something political --

7          THE COURT:  Hold on.  Hold on.  We have an objection.

8          MS. CROSS:  I am going to object to the phrasing of

9  that question, Your Honor, insofar as it asks the witness to

10 speculate on the motivations of the prosecution agency.

11         MR. TERWILLIGER:  I'm not speculating on the

12 motivations.  I'm talking about the factual basis for their

13 questions.

14         THE COURT:  Let's rephrase the questions and leave

15 the district attorney out of it.

16         MS. CROSS:  Thank you.

17         MR. TERWILLIGER:  Okay, Your Honor.

18         THE COURT:  Go ahead.

19 BY MR. TERWILLIGER:

20 **Q.**    When you got on the January 2nd call, and you testified

21 that on that call you were trying -- you looked for an

22 opening, I believe you said, to bring something to closure,

23 what exactly were you trying to bring to closure?

24 **A.**    I felt like that if we could get both groups together

25 where the attorneys were talking to each other, that they

1  would be able to look at the veracity of some of the claims

2  that had been made and make a determination whether they were

3  valid or not valid and hopefully get this off of the

4  President's concern list and as we look to continue on towards

5  January 20th and what ultimately would happen.

6  **Q.**    Why did that matter to you on January 2nd?

7  **A.**    It continued to be a concern for the President that he

8  brought up a number of times.  But there were a number of

9  other things that had to get done in order -- I think I used

10  the term earlier in order to land the plane.  I mean --

11  **Q.**    Let me stop you there, if I may.

12       What plane are you talking about landing?

13  **A.**    Well, the whole transfer of power.  All the final things

14  that have to happen at the end of an administration to be able

15  to make sure that we address those.

16       But it was not just those.  I think I told His Honor

17  earlier, it was executive orders, a number of other duties

18  that had to get done prior to January 20th.  It was a

19  transition that had to take place as well.

20  **Q.**    And what -- how did you view January 6th prior to that

21  date in terms of that process?

22  **A.**    I viewed January 6th as kind of the final day that would

23  allow for any open questions to be finished with certification

24  in Washington, DC.  And --

25  **Q.**    So if you can, can you relate that back to why you were

1  participating on January 2nd?

2  **A.**   Well, you know, again, there were a number of issues that

3  continued to get raised in the White House.  Questions of

4  whether allegations of fraud, of which there were many, had to

5  get raised.

6      But I also had a timeline in terms of getting certain

7  things done.  And those, as long as they were open questions,

8  would not allow us to continue on with the transition.

9  **Q.**   Is it fair to say, then, that you wanted the question

10  closed, it really didn't matter how?

11  **A.**   Well, it didn't matter how.  I think I said that, you

12  know, on the end of the call, whether it's for or against.

13  And that's not the exact words that I used, but certainly

14  whether there was veracity, as I mentioned earlier to the DA

15  counsel, to those claims.  But having open questions continued

16  to be a roadblock for initiating other items.

17  **Q.**   You're talking around things a little bit it seems to me.

18  Initiating what other items?

19  **A.**   We had to do the transfer of power.  We actually had to

20  work with the transition teams.  Those had started actually

21  earlier.  But those -- there were certain things that once you

22  put into process, those would continue on.

23      We had to wind down some of the federal agencies that

24  were there.

25      Staffing issues.

1  Certainly making plans for a new administration to come

2  in.

3  **Q.**  How were these issues obstacles?

4  **A.**  Because they were consuming the President's time and his

5  thought, they continued to do that.  And certainly as an open

6  question, you know, there was a belief certainly in the

7  President's mind that some of these allegations were true and

8  might potentially have a different outcome.

9  **Q.**  How does that relate to your December visit to the Cobb

10  County courthouse?

11  **A.**  Well, it relates completely.  It's exactly in line with

12  that, because what I did was go to the Cobb County convention

13  center to look at the process that they were going through.

14  And in doing so was trying to, again, check that box to say,

15  all right, everything is being done right here, and so if

16  there's allegations of fraud, we need to move on to something

17  else.

18  **Q.**  And when you went there, did you go there -- I believe

19  you were asked did somebody direct you?

20  **A.**  No one directed me to go.

21  **Q.**  You went there as a matter of your own discretion?

22  **A.**  Yes, sir.

23  **Q.**  A couple of times Article II of the Constitution has come

24  up in the discussions.  What is -- is there a responsibility

25  of the President's and thus the Executive Office of the

1  President, that's spelled out in Article II that you're aware
2  of?
3  **A.**   Certainly.  The presidential responsibilities for Article
4  II -- Article I is legislative, I believe --
5  **Q.**   No.  I'm asking you in Article II is there a specific
6  obligation that is placed on the President by Article II of
7  the Constitution that you recall?
8  **A.**   Again, I'm -- I told His Honor I don't know that I'm --
9  I'll get dinged on this one, too, but I don't know that I'm --
10  **Q.**   You're familiar with the phrase "take care that the laws
11  be faithfully executed"?
12  **A.**   Sure.
13       MS. CROSS:  Your Honor, I'm going to object to the
14  leading nature of the question.  This is their own witness.
15       THE COURT:  I'm going to give him a little leeway on
16  this.  This is not a lawyer.  I'll allow him to ask that
17  question.
18       MR. TERWILLIGER:  Thank you, Your Honor.
19       THE WITNESS:  Thank you, Your Honor.
20  BY MR. TERWILLIGER:
21  **Q.**   And in that connection, are you aware of whether or not
22  there are federal laws that govern elections, including
23  presidential elections?
24  **A.**   Yes.
25  **Q.**   Can you name some of them?

154

**A.**    Well, I mean, certainly there's the Electoral Count Act.
There's -- as I mentioned to the counsel earlier, there's
duties and responsibility in terms of cybersecurity that DHS
has as part of that but -- in that federal role.  Those would
be two federal roles.

**Q.**    When you were a member of Congress, do you ever recall
there being any policy issues or legislative -- discussions of
legislation or potential legislation about providing aid to
the states in connection with elections?

**A.**    Yes.  I mean -- and we had hearings on that, I think I
mentioned that earlier, where actually that was part of it.

But that does bring to mind, you know, you talk about the
legislative part of that, during the COVID relief package, a
big part of that package that we were negotiating there and
one of the stumbling blocks that we had was actually on the
amount of federal money that was going to go to federal
elections and how it was getting deployed.

And, you know, it didn't come to me until you mentioned
that, but in my conversations with Speaker Pelosi and Leader
Schumer, Secretary Mnuchin and myself, that was part of that.
So there was certainly from an appropriations standpoint real
discussions that took place as it relates to funding.

But from a legislative standpoint, we had that.  You
know, that would be Article I, but we had those kinds of
discussions and hearings quite a bit.

1  Q.   I just want to go back briefly to the January 2nd call.

2  And if I can find it, something else that you said.

3           MR. TERWILLIGER:  Your indulgence, Your Honor.

4           THE COURT:  Yes.

5  BY MR. TERWILLIGER:

6  Q.   I believe in response to one of counsel's questions you

7  said you were hoping to find a way.  Could you explain a

8  little bit more about what you mean by that?  Hoping that you

9  could find a way to resolve those issues?

10  A.   Well, hoping that -- me personally resolving those was

11  not something that I was going to be able to do personally.  I

12  mean, obviously the President had attorneys, the Secretary of

13  State had attorneys.  But what I was hopeful for is that that

14  conversation would actually result in the attorneys talking to

15  one another and being able to say, listen, you know, this

16  allegation, you can look at this, you can look at X, Y or Z

17  and resolve the issue.

18           MR. TERWILLIGER:  One moment, Your Honor.

19           No further questions.  Thank you, Your Honor.

20           THE COURT:  Thank you, sir.

21           Recross?

22           MS. CROSS:  No, thank you, Your Honor.

23           THE COURT:  Thank you, Mr. Meadows.  You can step

24  down.

25           THE WITNESS:  Thank you, sir.  I appreciate it.

1          THE COURT:  Leave all that right there.  They'll get

2   it.  Thank you.

3          (Witness excused.)

4          THE COURT:  Sir, you can call your next witness.

5          MR. TERWILLIGER:  Your Honor, I'm going to turn

6   things over to Mr. Moran for a moment.

7          THE COURT:  Hi, Mr. Moran.

8          MR. MORAN:  Good afternoon, Your Honor.

9          We don't have any additional witnesses to call at

10  this time.  We do have -- would move the admission of two

11  declarations.

12         THE COURT:  All right.

13         MR. MORAN:  Which I've shared with counsel for the

14  State, and I've marked for identification purposes as Defense

15  Exhibits 3 and 4.  I would be happy to hand those up.

16         May I approach?

17         THE COURT:  Yes, sir.

18         And you-all have seen these?

19         MS. CROSS:  I have, Your Honor.  I do have an

20  objection, though, so I don't consent to their admission.

21         THE COURT:  Okay.  Well, before I look at them --

22  well, I guess I need to look at them and then you can tell me

23  what you're objecting to.

24         Are you objecting to 3 and 4 or one or the other one?

25         MS. CROSS:  I have an objection, Your Honor, to both

1  of them, and they are the same.  These are unsworn,

2  unnotarized, purporting to be declarations of individuals who

3  have not been subject to cross-examination.

4      The information itself is in large part hearsay or

5  unsourced.  So I don't believe these are appropriate

6  consideration for the Court without a notarization or a

7  cross-examination.  So we do object to their admission.

8      MR. TERWILLIGER:  Your Honor, I'm sorry.  I'm sorry

9  to interrupt.  While you-all discuss this, may I be excused

10 for a moment?

11      THE COURT:  Yes.

12      MR. MORAN:  Your Honor, I refer the Court to

13 28 USC 1746, which provides that an unsworn declaration with

14 a declaration under penalty of perjury is sufficient for

15 evidentiary purposes in federal court.

16      As to the question of admissibility, I do think this

17 is a natural question to ask.  Under Rule 1101 of the Rules of

18 Evidence, those rules do not apply to, quote, miscellaneous

19 proceedings such as a preliminary examination in a criminal

20 case.

21      District courts have taken different approaches to

22 this question on an evidentiary hearing called for by

23 Section 1455(b)(5).  As Your Honor is probably aware, these

24 don't happen every day.  They're also not unheard of.

25      We can offer three citations of cases where courts

1  determined that receiving declarations or affidavits on

2  relevant issues were appropriate to be admitted in this

3  context.

4       I would also note that the State has admitted

5  numerous hearsay transcripts in support of their opposition to

6  removal.  And so at a minimum, what's good for the goose is

7  good for the gander.

8       MS. CROSS:  Well, whose gander?  I don't know that

9  I'm going to agree with that.

10      I believe that 902(5) permits the excerpts that the

11 State is relying on are actually publications from government

12 offices that are self-authenticating.  So I don't believe any

13 equivalence there is well taken.

14      The State relies on its objections.  These are

15 unsworn declarations on even an affidavit.  It had asked

16 opposing counsel if they intended to call witnesses.  Perhaps

17 had they informed us of these people, we could have addressed

18 it with a proper what the cross-examination might show.

19      But given the posture that we're in, I think the

20 Court is not under an obligation to accept them.  We encourage

21 that you not accept them.  I don't believe they are evidence

22 worthy, so we stand on our objection.

23      THE COURT:  The Court will allow that and give it

24 whatever weight is due, if any.

25      MR. MORAN:  All right.  Your Honor, I have an

 1  objection to the suggestion that the transcripts are

 2  different, but given that --

 3          THE COURT:  You're ahead of me now, sir.

 4          MR. MORAN:  I'll let it sit.  Yeah.  Thank you.

 5          THE COURT:  And I note your objection for the record,

 6  but, again, the Court will give it whatever weight I think is

 7  appropriate at this time.

 8          MS. CROSS:  I understand.  Thank you.

 9          THE COURT:  Thank you.

10          What else?

11          MR. TERWILLIGER:  No further evidence, Your Honor.

12          THE COURT:  All right.  Defendant rests.

13          Are you ready to proceed presenting evidence?

14          MS. CROSS:  We are, Judge Jones.  Can you give us

15  about five minutes to make sure that the witness is ready to

16  be called?

17          THE COURT:  It's 2:55.  At 3:00 I'm going to walk

18  back in here and hope you have your first witness ready.

19          MS. CROSS:  Appreciate it.  Thank you.

20          THE COURT:  Each one of you-all should have a room on

21  the 17th and 18th floor to keep your witnesses.  I'll give you

22  all a chance to bring them up.  Try to bring up more than one

23  so we can flow them right.  Okay?

24          Start back at 3:00.

25          COURT SECURITY OFFICER:  All rise.