No. 23-12958

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

The State of Georgia

*Plaintiff-Appellee,*

v.

Mark R. Meadows,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Northern District of Georgia, No. 1: 23-cv-03621-SCJ

———————————

## BRIEF FOR APPELLANT MARK R. MEADOWS

———————————

George J. Terwilliger, III
John S. Moran
Michael L. Francisco
Francis J. Aul
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006
(202) 857-2473
gterwilliger@mcguirewoods.com

*Counsel for Defendant-Appellant Mark R. Meadows*

No. 23-12958, *The State of Georgia v. Mark R. Meadows*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

To the best of Appellant's knowledge, no associations of persons, partnerships, or corporations have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock; the following is a list, in alphabetical order, of all trial judges, attorneys, law firms, and persons with such an interest[1]:

1.  Alksne, Cynthia, *amicus* below

2.  Anulewicz, Christopher Scott, attorney for Robert David Cheeley

3.  Arora, Manubir, attorney for Kenneth John Chesebro

4.  Aul, Francis, attorney for Mark R. Meadows

5.  Ayer, Donald B., *amicus* below

6.  Barron, Lynsey M., attorney for Scott Graham Hall

7.  Beckermann, Wayne R., attorney for Robert David Cheeley

8.  Bever, Thomas Dean, attorney for Shawn Micah Tresher Still

9.  Bittman, Robert, attorney for Mark R. Meadows

10. Bondurant Mixson & Elmore LLP

---

[1] For all parties who appeared below, Appellant has included the parties, their attorneys, and their attorneys' law firms. In order to facilitate this Court's review for potential conflicts, Appellant has also included the other named defendants in the state proceeding and their attorneys, where available.

No. 23-12958, *The State of Georgia v. Mark R. Meadows*

11.   Carr, Christopher M., Attorney General of the State of Georgia

12.   Cheeley, Robert David, Defendant in *Georgia v. Trump*

13.   Chemerinsky, Erwin, *amicus* below

14.   Chesebro, Kenneth John, Defendant in *Georgia v. Trump*

15.   Christenson, David Andrew, *pro se*, denied intervention below

16.   Clark, Jeffrey Bossert, Defendant in *Georgia v. Trump*

17.   Cohen, Darryl B., attorney for Trevian C. Kutti

18.   Copeland, Amy, *amicus* below

19.   Cromwell, William Grant, attorney for Cathleen Alston Latham

20.   Cross, Anna Green, Fulton County District Attorney's Office

21.   Cross Kincaid LLC

22.   Durham, James D., attorney for Mark R. Meadows in *Georgia v. Trump*

23.   Eastman, John Charles, Defendant in *Georgia v. Trump*

24.   Ellis, Jenna Lynn, Defendant in *Georgia v. Trump*

25.   Englert, Joseph Matthew, attorney for Mark R. Meadows

26.   Farmer, John J. Jr., *amicus* below

27.   Floyd, Harrison William Prescott, Defendant in *Georgia v. Trump*

28.   Floyd, John Earl, Fulton County District Attorney's Office

29.   Francisco, Michael Lee, attorney for Mark R. Meadows

30.   Fried, Charles A., *amicus* below

31.   Fulton County District Attorney's Office

No. 23-12958, *The State of Georgia v. Mark R. Meadows*

32.   Gerson, Stuart M., *amicus* below

33.   Gillen, Craig A., attorney for David James Shafer

34.   Giuliani, Rudolph William Louis, Defendant in *Georgia v. Trump*

35.   Griffin Durham Tanner & Clarkson LLC

36.   Grohovsky, Julie, *amicus* below

37.   Grubman, Scott R., attorney for Kenneth John Chesebro

38.   Hall, Scott Graham, Defendant in *Georgia v. Trump*

39.   Hampton, Misty (a/k/a Emily Misty Hayes), Defendant in *Georgia v. Trump*

40.   Harding, Todd A., attorney for Harrison William Prescott Floyd

41.   Hogue, Franklin James, attorney for Jenna Lynn Ellis

42.   Hogue, Laura Diane, attorney for Jenna Lynn Ellis

43.   Jones, Steve C., U.S. District Court Judge for the Northern District of Georgia

44.   Kammer, Brian S., attorney for *amici* below

45.   Kelley, Emily E., attorney for Mark R. Meadows

46.   Kutti, Trevian C., Defendant in *Georgia v. Trump*

47.   Lake, Anthony C., attorney for David James Shafer

48.   Latham, Cathleen Alston, Defendant in *Georgia v. Trump*

49.   Lee, Stephen Cliffgard, Defendant in *Georgia v. Trump*

50.   Little, Jennifer L., attorney for Donald J. Trump

51.   Luttig, J. Michael, *amicus* below

No. 23-12958, *The State of Georgia v. Mark R. Meadows*

52.    MacDougald, Harry W., attorney for Jeffrey Bossert Clark

53.    McAfee, Scott, Fulton County Superior Court Judge

54.    McFerren, William Coleman, attorney for Shawn Micah Tresher Still

55.    McGuireWoods, LLP

56.    Meyer, Joseph Michael, attorney for *amici* below

57.    Moran, John S., attorney for Mark R. Meadows

58.    Morgan, John Thomas III, attorney for *amici* below

59.    Morris, Bruce H., attorney for Ray Stallings Smith, III

60.    Ney, Adam, Fulton County District Attorney's Office

61.    Novay, Kristen Wright, attorney for Ray Stallings Smith, III

62.    Palmer, Amanda, attorney for Ray Stallings Smith, III

63.    Parker, Wilmer, attorney for John Charles Eastman

64.    Pierson, Holly Anne, attorney for David James Shafer

65.    Powell, Sidney Katherine, Defendant in *Georgia v. Trump*

66.    Rafferty, Brian T., attorney for Sidney Katherine Powell

67.    Ragas, Arnold M., attorney for Harrison William Prescott Floyd

68.    Raul, Alan Charles, *amicus* below

69.    Rice, Richard A., Jr., attorney for Robert David Cheeley

70.    Roman, Michael A., Defendant in *Georgia v. Trump*

71.    Rood, Grant H., Fulton County District Attorney's Office

72.    Sadow, Steven H., attorney for Donald J. Trump

No. 23-12958, *The State of Georgia v. Mark R. Meadows*

73. Saldana, Sarah R., *amicus* below

74. Samuel, Donald Franklin, attorney for Ray Stallings Smith, III

75. Shafer, David James, Defendant in *Georgia v. Trump*

76. Smith, Ray Stallings, III, Defendant in *Georgia v. Trump*

77. Still, Shawn Micah Tresher, Defendant in *Georgia v. Trump*

78. Terwilliger, George J., III, attorney for Mark R. Meadows

79. Trump, Donald J., Defendant in *Georgia v. Trump*

80. Twardy, Stanley A. Jr., *amicus* below

81. Volchok, Daniel, attorney for *amici* below

82. Wade, Nathan J., Fulton County District Attorney's Office

83. Wade & Campbell Firm

84. Wakeford, Francis McDonald IV, Fulton County District Attorney's Office

85. Waxman, Seth P., attorney for *amici* below

86. Weld, William F., *amicus* below

87. Wertheimer, Fred, attorney for *amici* below

88. Willis, Fani T., Fulton County District Attorney's Office

89. Wilmer Cutler Pickering Hale and Dorr LLP

90. Wooten, John William, Fulton County District Attorney's Office

91. Wu, Shan, *amicus* below

92. Young, Daysha D'Anya, Fulton County District Attorney's Office

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Mark R. Meadows respectfully requests oral argument, unless the Court concludes that it should dispense with oral argument in order to provide a prompt ruling on the merits.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION...........................................................3

STATEMENT OF THE ISSUE..................................................................3

STATEMENT OF THE CASE....................................................................3

    A.    Meadows served as White House Chief of Staff ...................3

    B.    Georgia indicted Meadows for conduct during his federal service ......5

    C.    Meadows expeditiously removed to federal court ...............5

    D.    The district court held an evidentiary hearing......................6

    E.    The district court declined jurisdiction and remanded.......................12

SUMMARY OF ARGUMENT .................................................................12

STANDARD OF REVIEW .....................................................................16

ARGUMENT ........................................................................................16

I.    Meadows Has Cleared the "Quite Low" Bar for Removal Under the Federal Officer Removal Statute ...............................................................16

    A.    The Federal Officer Removal Statute effectuates the Supremacy Clause by providing federal officials a federal forum ......................17

    B.    This Court's precedent establishes a low bar for federal officer removal, consistent with its purpose ...................................................19

    C.    Meadows has comfortably cleared the low bar for removal..............24

    D.    The Executive Branch has broadly defined the role of Chief of Staff throughout history, as is its prerogative .............................................26

II.    The District Court Erred in Declining Jurisdiction and Remanding the Prosecution to State Court ..............................................................29

A.    The court wrongly created a "conspiracy" exception to removal by holding that the State's Georgia RICO charges present a "novel question" justifying departure from ordinary removal principles.......31

B.    The court wrongly created a "political" exception to removal by holding that "political activity" categorically lies beyond a Chief of Staff's duties........................................................................................34

C.    The court wrongly credited the State's allegations and theories over Meadows's testimony and asserted defenses ......................................45

D.    The court committed other clear errors in rejecting removal ............48

CONCLUSION ........................................................................................................50

## TABLE OF AUTHORITIES

**Cases**

*Barr v. Matteo,*
    360 U.S. 564 (1959)..................................................................... *passim*

*Baucom v. Martin,*
    677 F.2d 1346 (11th Cir. 1982) ................................................... 18, 23

*Bd.of Regents v. Southworth,*
    529 U.S. 217 (2000)............................................................................38

*Bowsher v. Synar,*
    478 U.S. 714 (1986)............................................................................44

*Bradford v. Harding,*
    284 F.2d 307 (2d Cir. 1960) ..............................................................19

*Buckley v. Valeo,*
    424 U.S. 1 (1976)...............................................................................15

*Bush v. Gore,*
    531 U.S. 98 (2000)..............................................................................41

*Bush v. Palm Beach Cnty. Canvassing Bd.,*
    531 U.S. 70 (2000)..............................................................................41

*Castleberry v. Goldome Credit Corp.,*
    408 F.3d 773 (11th Cir. 2005) ...........................................................16

*Caver v. Cent. Alabama Elec. Coop.,*
    845 F.3d 1135 (11th Cir. 2017) ................................................. *passim*

*Cheney v. U.S. Dist. Ct. for D.C.,*
    542 U.S. 367 (2004)....................................................... 14, 29, 44

*Clifton v. Cox,*
    549 F.2d 722 (9th Cir. 1977) ..................................................... 23, 48

*Comm. on Judiciary, U.S. House of Representatives v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008)....................................................27

*Denson v. United States*,
  574 F.3d 1318 (11th Cir. 2009) ........................................................ 2, 13, 18, 46

*Diaz v. Sheppard*,
  85 F.3d 1502 (11th Cir. 1996) ...........................................................19

*Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
  463 U.S. 1 (1983)..................................................................20

*In re Asbestos Prod. Liab. Litig. (No. VI)*,
  770 F. Supp. 2d 736 (E.D. Pa. 2011)........................................................ 19, 25

*In re Lindsey*,
  158 F.3d 1263 (D.C. Cir. 1998)........................................................37

*In re Neagle*,
  135 U.S. 1 (1890)................................................................ 2, 12, 17

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008) ................................................................20

*Jefferson Cnty v. Acker*,
  527 U.S. 423 (1999)..................................................................... *passim*

*Jefferson Cnty. v. Acker*,
  137 F.3d 1314 (11th Cir. 1998) ....................................................... 2, 13, 18, 35

*Johnson v. Maryland,*
  254 U.S. 51 (1920).................................................................46

*Kircher v. Putnam Funds Tr.*,
  547 U.S. 633 (2006)................................................................... *passim*

*Kordash v. United States*,
  51 F.4th 1289 (11th Cir. 2022) .................................................... 13, 18

*Latiolais v. Huntington Ingalls, Inc.*,
  951 F.3d 286 (5th Cir. 2020) ...........................................................33

*Lobo v. Celebrity Cruises, Inc.*,
  704 F.3d 882 (11th Cir. 2013) ...........................................................35

*Magnin v. Teledyne Cont'l Motors*,
   91 F.3d 1424 (11th Cir. 1996) ............................................................. 2, 13, 20, 22

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   31 F.4th 178 (4th Cir. 2022) ...................................................................33

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ...............................................................17

*Mesa v. California*,
   489 U.S. 121 (1989) ................................................................................22

*Myers v. United States*,
   272 U.S. 52 (1926) .................................................................................38

*Nadler v. Mann*,
   951 F.2d 301 (11th Cir. 1992) ......................................................... 15, 32

*New York v. Tanella*,
   374 F.3d 141 (2nd Cir. 2004) ......................................................... 12, 17

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ...............................................................................36

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ...............................................................................37

*Osborn v. Bank of U.S.*,
   22 U.S. (9 Wheat.) 738 (1824) ..............................................................22

*Tennessee v. Davis*,
   100 U.S. 257 (1879) ....................................................................... 2, 18, 19

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022) .......................................................42

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) ...........................................................................37

*United States v. Moll*,
   No. 22-CR-00266-NYW, 2023 WL 2042244 (D. Colo. Feb. 16, 2023)............23

*United States v. Nixon,*
    418 U.S. 683 (1974)................................................................36

*Verlinden B.V. v. Cent. Bank of Nigeria,*
    461 U.S. 480 (1983)................................................................22

*Watson v. Philip Morris Cos.,*
    551 U.S. 142 (2007)............................................................2, 19

*Willingham v. Morgan,*
    395 U.S. 402 (1969).......................................................... *passim*

*Winpisinger v. Watson,*
    628 F.2d 133 (D.C. Cir. 1980)................................................35

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
    566 U.S. 189 (2012)........................................................ 29, 44

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015)...................................................................36

**Statutes**

28 U.S.C. § 1441 ........................................................................19

28 U.S.C. § 1442(a) .............................................................. *passim*

28 U.S.C. § 1447(d) .....................................................................3

28 U.S.C. § 1455 ............................................................... 3, 5, 16

Electoral Count Act,
    3 U.S.C. § 5, *et seq.* ...............................................................40

Help America Vote Act,
    52 U.S.C. § 20901, *et seq.* ......................................................40

National Voter Registration Act,
    52 U.S.C. § 20501, *et seq.* ......................................................40

Removal Clarification Act of 2011,
    Pub. L. No. 112-51, 125 Stat. 545 .........................................21

Uniformed and Overseas Citizens Absentee Voting Act,
  52 U.S.C. § 20301, *et. seq.* ...................................................................40

Voting Rights Act,
  52 U.S.C. § 10301, *et seq.* ....................................................................40

O.C.G.A. § 16-4-7 ....................................................................................5

O.C.G.A. § 16-10-1 ..................................................................................5

O.C.G.A. § 16-14-4(c) ..............................................................................5

## Constitutional Provisions

U.S. CONST., art. I, § 4, cl. 1 .................................................................47

U.S. CONST., art. II, § 3 ..........................................................................51

U.S. CONST., art. VI, ¶ 2 ...................................................................1, 19

## Other Authorities

Application for a Stay,
  *Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023)....................37

*Assertion of Executive Privilege with Respect to Clemency Decision*,
  23 Op. O.L.C. 1 (1999)...........................................................................4

Brief for United States as Amicus Curiae,
  *Blassingame v. Trump*, Case Nos. 22-5069, 22-7030, 22-7031 (D.C. Cir. Mar. 2, 2023) ................................................................................36

Elana Kagan, *Presidential Administration*,
  114 HARV. L. REV. 2245 (2001) .........................................................27

*Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*,
  38 Op. O.L.C. __ (July 15, 2014) .......................................................27

*Immunity of the Former Counsel to the President From Compelled Congressional Testimony*,
  31 Op. O.L.C. 191 (2007).....................................................................27

Lisa Marshall Manheim, *Presidential Control of Elections*,
 74 Vand. L. Rev. 385 (2021) ...........................................................................41

Office of Legal Counsel, U.S. Dep't of Justice, *Congressional Oversight of the White House*,
 slip op. (Jan. 8, 2021)................................................................... 27, 28

S. Rep. No. 104–366 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4202......................18

Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*,
 45 Willamette L. Rev. 701 (2009) .......................................... 28, 38

The Nerve Center: Lessons in Governing from the White House Chiefs of Staff (Terry Sullivan ed., College Station: Texas A&M Univ. Press 2004) .....4, 28, 29, 38

U.S. Department of Justice, *Federal Prosecution of Election Offenses* (Richard C. Pilger ed., 8th ed., 2017) ................................................................41

Wright & Miller, Federal Practice and Procedure (rev. 4th ed. 2009)........25

## INTRODUCTION

The district court unnecessarily complicated a straightforward federal officer removal case, and in the process, committed errors that raise serious constitutional concerns. This case involves the Chief of Staff to the President, not an oil or tobacco company or some other individual with a tenuous claim to be acting as a federal officer; a prosecution against the federal officer, rather than someone purportedly "acting under" him; and not just any federal officer, but a uniquely prominent federal officer who would be a particularly popular target for a state prosecutor seeking to distract or hamstring a President. This is not a case where the Chief of Staff went down to Georgia in his private capacity and got in some kerfuffle; it is a criminal prosecution of the Chief of Staff based on actions taken in the White House while discharging his official duties. Appellant Mark R. Meadows did not volunteer for or seek to inject himself into the events that give rise to this case. He is here solely because he served as Chief of Staff.

The Federal Officer Removal Statute, 28 U.S.C. § 1442(a), enacted over 140 years ago, allows officials from all three branches of the Federal Government to remove civil or criminal cases against them to federal court where the case relates (at least in part) to their official duties, so they may assert a federal defense in a federal forum. The statute effectuates a core principle under the Supremacy Clause, *see* U.S. CONST., art. VI, ¶ 2, which "prevent[s] state law or state law officials from

interfering with or otherwise impeding federal officers as they perform their lawful duties." *Denson v. United States*, 574 F.3d 1318, 1346 (11th Cir. 2009) (citing *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)). And it "fulfills Congress' intent that questions concerning the exercise of Federal authority, the scope of Federal immunity and Federal–State conflicts be adjudicated in Federal court." *Jefferson Cnty. v. Acker*, 137 F.3d 1314, 1323 (11th Cir. 1998) (quotation omitted), *rev'd on other grounds*, 527 U.S. 423 (1999). The Supreme Court thus insists that § 1442(a) be "liberally construed" in favor of removal. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

Meadows established the right to removal under § 1442(a) by (1) showing "'a causal connection between what [he] has done under asserted official authority and the action against him,'" *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)), and (2) asserting "a colorable federal defense," *id.*, of Supremacy Clause immunity, *see generally In re Neagle*, 135 U.S. 1, 75 (1890).

The district court resisted that straightforward conclusion in a 49-page remand order. *See* App.720–68. In the process, the court issued erroneous pronouncements on a range of federal issues, including that the Federal Government has no role in state administration of federal elections, that the Executive has no interest in federal election law, and that the Hatch Act cabins the scope of a Chief of Staff's authority

to arrange and staff meetings for the President about "politics." These legal pronouncements are completely wrong. But more importantly, their very presence in the case proves it is the kind of case Congress made removable to federal court under § 1442(a). The district court further ignored precedent and crafted its own new tests for removal. In so doing, the court committed multiple errors that, if left uncorrected, will undermine the strong federal interests the Federal Officer Removal Statute are meant to vindicate.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this removed prosecution. 28 U.S.C. §§ 1442 & 1455. This Court has appellate jurisdiction. *Id.* § 1447(d).

## STATEMENT OF THE ISSUE

Whether the district court erred in declining jurisdiction under 28 U.S.C. § 1442(a) and remanding this case to state court.

## STATEMENT OF THE CASE

### A.    Meadows served as White House Chief of Staff

Only 38 people have served as Chief of Staff to the President. President Ford described the role as "a person that you have total confidence in who works so closely with you that in effect his is almost an alter ego." THE NERVE CENTER: LESSONS IN GOVERNING FROM THE WHITE HOUSE CHIEFS OF STAFF 3 (Terry Sullivan

ed., College Station: Texas A&M Univ. Press 2004); *accord Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999).

Meadows assumed the role on March 31, 2020.[2] He had both the privilege and the challenge of serving in a turbulent period of American history, which included a global pandemic, a sudden economic collapse, social unrest, a tumultuous post-election period, and a breach of the U.S. Capitol on January 6, 2021. As Meadows testified below, "I don't know that anybody that's not done the job is ever fully prepared for what would happen." App.382:24–383:1. He served until January 20, 2021.

The Chief of Staff advises the President on seemingly limitless issues affecting the federal government. App.404:22–23 ("There were no rhyme or reason where [the President's] questions might come up."); *see also* App.388:9–389:12 (food shortages, airline bankruptcies, prescription drugs), App.391:8–14 (military operations), App.294:2–14 (COVID-19), App.422:24–423:14 (election integrity), App.452:19–453:5 (legislation, executive orders, and election integrity). He helps the President oversee all federal operations and ensures that "everything flow[s]" in the Executive Office of the President. App.383:17–19, 384:10–12.

---

[2] He was commissioned as "Assistant to the President and Chief of Staff," App.667, but the position is colloquially known (and referred to here) as "Chief of Staff."

**B.** **Georgia indicted Meadows for conduct during his federal service**

On August 14, 2023, Meadows was indicted alongside former President Trump and 17 others in Fulton County, Georgia. *See* App.15–112 (Indictment). The 41-count Indictment includes just two charges against Meadows: Count 1, for violating Georgia's Racketeer Influenced and Corrupt Organizations (RICO) Act, O.C.G.A. § 16-14-4(c); and Count 28, for Solicitation of Violation of Oath by Public Officer, *id.* § 16-4-7 & 16-10-1. *See* App.27, 101. The bulk of the Indictment recites 161 "overt acts" in support of Count 1. Only eight mention Meadows, *see* App.35–36, 38, 58–59, 64, and each took place during his service as Chief of Staff.[3]

**C.** **Meadows expeditiously removed to federal court**

Within 24 hours of indictment, Meadows filed his Notice of Removal below. The Notice, brought under 28 U.S.C. §§ 1442 & 1455, explained that Meadows had a right to remove because (1) he was a federal official at the time of the charged conduct; (2) the charged conduct related to his role as Chief of Staff; and (3) he asserts federal defenses—in particular, immunity under the Supremacy Clause. *See* App.113–126 (Notice). Consistent with 28 U.S.C. § 1455(b)(4)–(5), the District Court declined summary remand on August 16 and ordered an evidentiary hearing. *See* App.127–37 (Order).

---

[3] Count 28 arises from a January 2, 2021, call with Georgia Secretary of State Brad Raffensperger, which is also "Act 112." App.64, 101.

5

### D.    The district court held an evidentiary hearing

The evidentiary hearing took place on August 28 before Judge Steve C. Jones. Meadows testified for several hours and submitted two declarations from former White House colleagues. He explained the role of Chief of Staff, specifically addressed its intersection with politics, and described his work in the post-election period. He also addressed the eight acts charged in the Indictment, explaining why his conduct was lawful and related to his official duties. The State put on two witnesses: a private attorney who participated in the January 2, 2021, phone call with Georgia Secretary of State Brad Raffensperger, and Secretary Raffensperger himself. Neither testified that Meadows had done anything unlawful, and both agreed that he participated in the January 2 call as Chief of Staff.

Meadows began with his public-service background, including his time in Congress. App.380:17–381:3. He explained that, as Chief of Staff, he was the most "senior official in charge of the Executive Office of the President" (aside from the President himself), App.385:3–5, and a trusted advisor to the President, App.405:2–5. He described the demanding nature of the job, App.382:19–384:12, and his dozens of daily interactions with the President, App.385:6–16. He also described how the President's "style" of spitfire questions required him to "play offense and defense . . . with things coming . . . from a million different directions." App.391:4–14.

As a trusted advisor, Meadows frequently attended meetings with or for the President. App.383:14–19, 392:12–24. He arranged and attended meetings with federal and state officials, business leaders, and White House staff, App.383:14–17, even seemingly unimportant ones, since there was "no rhyme or reason where [the President's] questions might come up." App.404:22–23. His participation allowed him to "prioritize [the President's] time," "anticipate what logistics were needed and what we needed to do," and have "an understanding of what was going on." App.404:20–405:5.

Meadows also testified about the intersection of politics and his official duties. To provide candid advice, he needed to consider politics alongside policy. App.404:14–405:5. "Everything that you do from a policy standpoint has a political implication." App.405:10–11. He therefore developed a "deeper understanding" of the President's and the campaign's efforts after the election. App.405:23–406:3. Meadows made clear, however, that he had no role in the campaign itself. App.402:19–403:1, 493:20–21 ("I have no campaign role."). In fact, he regularly competed with the campaign for the President's attention. App.398:15–19. As to the Hatch Act, he understood that the Act precludes "advocating . . . please vote for President Trump or President Biden . . . in your official title," but permits other conduct related to politics, particularly for senior White House officials. App.410:12–25.

7

As Chief of Staff in the post-election period, Meadows was inundated with allegations of voter fraud. App.406:16–408:7. Understanding the President's post-election challenges was essential to functioning as gatekeeper and advisor. App.405:23–406:10. Meadows described a particularly tense meeting with President Trump in which Attorney General Bill Barr dismissed allegations of election fraud based on the Justice Department's investigations. App.408:8–410:6.

Meadows testified that others were less discerning about what they told the President. App.407:21–408:7. As Chief of Staff, he had to understand who was talking to the President and what they were saying so that, when necessary, he could limit access to the President, App.406:11–23, and advise him directly about what he was hearing from others, App.409:24–410:3—whether that came from "the campaign, the legal team supporting the President, or just other people on the outside," App.406:24–407:4. Meadows helped to separate the "wheat from the chaff," routing allegations of election fraud to DOJ or the campaign, as appropriate. App.407:19–25.

Meadows also explained how the overt acts in the Indictment related to his duties, App.414:24–426:3, including managing the President's time and setting up meetings with stakeholders, App.44:9–13 (Act 5); App. 452:9–15 (Act 92); App.425:23–426:3 (Act 93); App.481:16–18 (Act 112); maintaining awareness of matters before the President, App.416:5–7 (Act 5); App.417:24–418:1 (Act 6); App.

420:17–19, 421:22–422:4 (Act 19); App.423:9–14, 424:2–21, 448:18–449:1 (Act 92); App.387:8–15, 460:7–8 (Act 93); App.463:15–17 (Act 96); App.498:23–499:12, 500:16–19 (Act 112); advising the President and coordinating advice from other White House staff, App.415:25–416:3 (Act 5); App.421:22–422:4 (Act 19); App.452:10–11 (Act 92); App.463:6–464:2 (Act 96); addressing matters of federal interest, including ensuring fair elections consistent with federal law, App.430:18–24 (Act 5); App.452:22–453:5, 454:10–14 (Act 92); App.481:2–6 (Act 112); administering White House policies and protecting the President's physical well-being, App.419:23–420:3 (Act 9); and directing and supervising White House staff, App.419:23–420:3 (Act 9). In specific reference to the January 2 phone call with Secretary Raffensperger, Meadows explained his core objectives as Chief of Staff:

> [F]or me it was all about trying to make sure that a number of these allegations . . . make sure we've got those issues dealt with. And . . . be able to finish up the things that we had in 60 days, have a peaceful transfer of power, make sure that we got all of that done. . . . And if I knew that [allegations] were not true, it was much easier for me to speak with authority with the President.

App.498:23–499:12; 503:15–504:1 (same). The State presented no evidence to rebut Meadows's testimony and nothing to rebut his subjective belief that his actions were within the scope of his duties. App.415:6–7 (Act 5); App.417:18–418:19 (Act 6); App.419:4–7 (Act 9); 420:14–19 (Act 19); App.422:20–23 (Act 92); App.424:17–21 (Act 93); App.425:3–4 (Act 96); App.422:4–11, 495:16–17 (Act 112).

Following Meadows's testimony, the court admitted declarations from two former colleagues: Scott Gast, former Deputy Counsel to the President; and Ben Williamson, former Senior Advisor to the Chief of Staff. App.668–71 (Gast); 672–75 (Williamson). Gast explained that, "in his capacity as Chief of Staff [Meadows] stayed in communication with the campaign to ensure that the demands on the President's time and attention were considered and coordinated and so that [Meadows] could anticipate an address any situation where developments from the campaign could affect the President's exercise of his official duties." App.670. He also explained that, for senior White House officials, "[i]t was not uncommon for questions to arise" about the Hatch Act, as "conduct involving the political or electoral processes . . . often involved difficult lines to draw" and "came down to a prudential judgment." App.670–71. Williamson explained why the Chief of Staff was involved in so many meetings:

> It is part of the duties of the Chief of Staff to attend meetings, telephone conferences, and other engagements with the President so that (a) he is aware of the issues and information provided to the President; (b) he is aware of any decisions made; (c) he is able to follow up with the President or other parties as necessary after the meeting; and (d) he can provide advice to the President and/or arrange for the President to be provided with relevant advice.

App.673. He also explained that Meadows commonly arranged phone calls or meetings "on matters of priority to the President" because "an individual is more likely to confirm a call or meeting if the Chief of Staff requested [it]." App.674.

10

The State presented two witnesses: Kurt Hilbert and Brad Raffensperger. Hilbert represented the Trump campaign in post-election litigation in Georgia, App.534:15–535:3, and participated in the January 2 call, App.546:19–22. Hilbert testified that he did not "consult with Mr. Meadows about settlement negotiations" in the ongoing litigation, App.550:17–20, though he *did* consult with other outside attorneys, including Cleta Mitchell and Alex Kauffman, and with Eric Herschmann, who Hilbert testified was an attorney in the Office of White House Counsel. App.538:4–540:1, 542:17–543:6. Hilbert had no contact with Meadows before or after January 2, 2021. App.175:18–22, 536:11–13, 552:3.

Secretary Raffensperger testified about the election administration and results in Georgia. He confirmed that the Federal Government plays a role in election administration as "spelled out in . . . federal law," App.188:20–23, and that the F.B.I. and U.S. Attorney's office were involved in post-election investigations in Georgia. App.587:3–19. As to the January 2 call, Secretary Raffensperger confirmed that Meadows "was acting on behalf of the President," App.590:14, that Meadows did not request any change to vote totals App.593:4–9, and that Meadows did not say or request anything "inappropriate" during the call, App.591:12–16.

11

### E.    The district court declined jurisdiction and remanded

After the hearing, the court requested, and the parties submitted, supplemental briefing on whether removal would be permitted if "at least one (but not all) of the overt acts charged occurred under the color of Meadows's office." App.370.

The court issued its Remand Order on September 8, 2023. The court held that there was "insufficient evidence to establish that the gravamen, or a heavy majority of overt acts alleged against Meadows relate to his role as White House Chief of Staff." App.761. The court relied on a legal determination that "political activities . . . exceed[] the outer limits of the Office of the White House Chief of Staff." App.746. The court also accepted the State's disavowal of the overt acts charged in the Indictment, suggesting that they "only serve to tell a broader story about the conspiracy." App.740. The court therefore concluded that "there is no federal jurisdiction." App.767.

## SUMMARY OF ARGUMENT

The district court should have granted removal because Meadows met the low threshold for federal jurisdiction under § 1442(a). The Federal Officer Removal Statute implements a core principle under the Supremacy Clause to "protect[] federal operations from the chilling effect of state prosecution." *New York v. Tanella*, 374 F.3d 141, 147 (2nd Cir. 2004); *see generally In re Neagle*, 135 U.S. 1 (1890). Substantively, the Supremacy Clause provides robust immunity to federal officials

against claims under state law related to official conduct. *See, e.g.*, *Kordash v. United States*, 51 F.4th 1289, 1293 (11th Cir. 2022); *Denson*, 574 F.3d at 1347. Procedurally, § 1442(a) ensures that "questions concerning the exercise of Federal authority, the scope of Federal immunity and Federal–State conflicts [are] adjudicated in Federal court." *Acker*, 137 F.3d at 1323 (quotation omitted).

This Court has thus made clear that the threshold for federal officer removal is "quite low." *Caver*, 845 F.3d at 1144 (quotation omitted). It requires only (1) "a causal connection between what [the officer] has done under asserted official authority and the action against him," and (2) "a colorable federal defense." *Id.* at 1142 (quotations omitted). These requirements are "liberally construed" in favor of removal, *Watson*, 551 U.S. at 147, and the official need not prove his defense to obtain removal, *see Magnin*, 91 F.3d at 1427; *Caver*, 845 F.3d at 1145.

Meadows has comfortably cleared that low bar. He testified in detail about the breadth of his duties as Chief of Staff, bolstered by the declarations of his former colleagues. And for each overt act charged in the Indictment, he explained specifically how it related to his duties. In response, the State offered a generalized allegation of "conspiracy" and contested only by legal argument the scope of the Chief of Staff's role. But those are precisely the disputes that § 1442(a) is designed to bring to federal court. *See Willingham v. Morgan*, 395 U.S. 402, 409 (1969).

13

Meadows's evidence about the breadth of his role as Chief of Staff is also consistent with federal law, both Executive and Judicial precedent, and the accounts of former Chiefs of Staff. And it is the unique prerogative of the Executive Branch, and the President in particular, to define "the outer perimeter of [a Chief of Staff's] line of duty." *Barr v. Matteo*, 360 U.S. 564, 575 (1959). Under the Separation of Powers, it is not for the Judiciary to define the role, *see Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 387 (2004); and under the Supremacy Clause, it is not for the States to do so either.

The district court erred in departing from these well-established principles based on its "novel" approach to Meadows's removal effort.

*First*, the court erred in focusing on the "gravamen or 'heart' of the charges," and requiring Meadows to prove that "a heavy majority" of the charged conduct related to his role as Chief of Staff. That novel approach converts the measure of removal from an "act under color of . . . office," 28 U.S.C. § 1442(a), to the State's charging theory. No removal decision requires the official to rebut the State's charges, let alone an undefined allegation of "conspiracy." Rather, the law clearly provides that removal hinges on the *defendant's* pleading of his federal defense, not the State's articulation of its charges, *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006); that one connection to an official act suffices to remove the whole

14

case, *see Nadler v. Mann*, 951 F.2d 301, 305 n.9 (11th Cir. 1992); and that the defendant need not prove his innocence to remove, *see Caver*, 845 F.3d at 1145.

**Second**, the court erred both in ruling that the limits of the Chief of Staff's role could be judicially prescribed and in holding that "political activity" lies categorically beyond those duties. Judicial defining of the Chief of Staff's role by itself creates a Separation of Powers issue, made worse when it involves Presidential activity within the shield of the First Amendment. The court's erroneous "political" exception to removal also rests on a total misapplication of the Elections Clause, which confirms, not excludes, a role for the Federal Government in state administration of national elections, *see also Buckley v. Valeo*, 424 U.S. 1, 90 (1976) ("Congress has power to regulate Presidential elections and primaries."); and of the Take Care and Recommendation Clauses, which confirm the President's role in the same matters. Further, the district court's interpretation of the Hatch Act converts a guide for officials to avoid partisan activity in an official capacity into a self-executing limit on official immunity that conflicts with the free exercise of Executive authority in the political arena. That this case raises such important federal issues just highlights its removability under § 1442(a).

**Third**, the court imposed a heightened burden by discounting Meadows's unimpeached testimony and crediting the State's unsupported allegations. While the court drew its "gravamen" test from Justice Scalia's partial dissent in *Jefferson*

15

*County v. Acker*, 527 U.S. 423 (1999), it should have followed the majority, which explained that a court should "credit the [removing official's] theory of the case for purposes of . . . [the] jurisdictional inquiry." *Id.* at 432. Since *Acker*, moreover, Congress has expanded the reach of § 1442(a).

*Finally*, the court committed additional reversible errors of law.

The Court should reverse and remand with instructions to permit removal and so notify the state court. *See* 28 U.S.C. § 1455(b)(5).

## STANDARD OF REVIEW

This Court conducts *de novo* review of the district court's determination on jurisdiction and removal. *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 780–81 (11th Cir. 2005); *Acker*, 137 F.3d at 1316 (11th Cir. 1998).

## ARGUMENT

### I.  MEADOWS HAS CLEARED THE "QUITE LOW" BAR FOR REMOVAL UNDER THE FEDERAL OFFICER REMOVAL STATUTE

The district court unnecessarily complicated a simple case of federal removal. The statute is meant to apply where, as here, a defendant seeks a federal forum to assert a federal defense—particular, Supremacy Clause immunity—to a state law charge for conduct that has some "'connection' or 'association' to the federal office." *Caver*, 845 F.3d at 1144 (quotation omitted). The "hurdle erected by this requirement is *quite low*." *Id.* (emphasis added; quotation omitted). Meadows's

unrebutted testimony about the breadth of the Chief of Staff role, and about the connection between that role and the conduct charged in the Indictment, were more than enough to clear it.

### A.    The Federal Officer Removal Statute effectuates the Supremacy Clause by providing federal officials a federal forum

The Federal Officer Removal Statute implements a core constitutional principle reflected in the Supremacy Clause:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, ***shall be the supreme law of the land***; and the judges in every state shall be bound thereby, ***any thing in the Constitution or laws of any State to the contrary notwithstanding***.

U.S. CONST., art. VI, ¶ 2 (emphasis added). The Supreme Court has long interpreted this Clause to provide federal officials "immunity from suit" to "protect[] federal operations from the chilling effect of state prosecution." *Tanella*, 374 F.3d at 147; *see generally In re Neagle*, 135 U.S. 1 (1890). "[T]he states have no power . . . to retard, impede, burden, or in any manner control, the operations of . . . the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). Thus, while the police power, including the power to define and punish crime, is generally reserved to the States, that power may not be used against the Federal Government to "'obstruct its authorized officers . . . or withhold from it for a moment the cognizance of any subject . . . committed to it.'" *Neagle*, 135 U.S. at 62 (quoting

*Davis*, 100 U.S. at 263); *see also Kordash*, 51 F.4th at 1293; *Baucom v. Martin*, 677 F.2d 1346, 1348 (11th Cir. 1982).

The Supreme Court first formulated this immunity in *Neagle*, but it has been refined and clarified since, including in this Court's precedent. *See, e.g.*, *Denson*, 574 F.3d at 1347. In granting immunity, this Court "look[s] to (1) whether the officers were acting 'within the outer perimeter of [their] line of duty' as defined by federal statutory and regulatory law," *id.* (quoting *Barr*, 360 U.S. at 575 (plurality opinion)); and "(2) whether 'in doing [those acts, they] did no more than what was necessary and proper for [them] to do' as demarcated by the Constitution," *id.* (quoting *Neagle*, 135 U.S. at 57). A federal official need not prove he was expressly authorized to take a particular course of action, *see Baucom*, 677 F.2d at 1350 ("In *Neagle*, it was held that the necessary authority could be derived from the general scope of the officer's duties."), and a *federal*-law violation may defeat immunity, but only if it was clear and willful, *see id.*

The Federal Officer Removal Statute provides a critical mechanism to assert Supremacy Clause immunity in federal court. Section 1442(a) "'fulfills Congress' intent that questions concerning the exercise of Federal authority, the scope of Federal immunity and Federal–State conflicts be adjudicated in Federal court." *Acker*, 137 F.3d at 1323 (quoting S. Rep. No. 104–366 at 31 (1996), *reprinted in*

1996 U.S.C.C.A.N. 4202, 4210). This is not some outlier effort to remove under § 1442(a); it lies in the heartland.

### B.    This Court's precedent establishes a low bar for federal officer removal, consistent with its purpose

Meadows is entitled to removal under § 1442(a) because he has met the threshold for removal, which is low, consistent with the statute's underlying purpose. Federal courts construe the statute broadly in favor of removal. *See Watson*, 551 U.S. at 147 (the Federal Officer Removal Statute "must be liberally construed") (quotation omitted); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011) ("[T]he presumption under the federal officer removal statute favors removal."). Compared to § 1441, which federal courts construe *narrowly*, *see, e.g.*, *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996), § 1442(a) "rests upon far stronger considerations of policy. Section 1441 relates to the rights of individuals. Section 1442, although dealing with individuals, vindicates also the interests of government itself." *Bradford v. Harding*, 284 F.2d 307, 309–10 (2d Cir. 1960) (Friendly, J.) (citing *Davis*, 100 U.S. at 262).

Meadows indisputably served as a federal official.[4] To obtain removal, he therefore needs only (1) to "show 'a causal connection between what [he] has done

---

[4] The Court previously directed the parties to brief whether *former* federal officials may remove under § 1442(a)(1). As explained in Meadows's supplemental brief, *see* ECF No. 21, the text, history, and purpose of § 1442(a) and unanimous judicial precedent make clear that they may.

under asserted official authority and the action against him,'" *Caver*, 845 F.3d at 1142 (quoting *Magnin*, 91 F.3d at 1427), and (2) to "raise a colorable federal defense," *id*. Those showings, by constitutional design, are not difficult to make.

Contrary to the district court's approach, *see* Part II.C *infra*, a reviewing court must focus on the removing official's articulation of his federal defense, not the State's articulation of its state allegations. That is because § 1442(a) "is an exception to the 'well-pleaded complaint' rule" and allows removal "'despite the nonfederal cast of the complaint.'" *Kircher*, 547 U.S. at 644 n.12 (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 10 (1983)); *Acker*, 527 U.S. at 431. A court may not "demand[] an airtight case on the merits in order to show the required causal connection," but instead must "credit the [removing official's] theory of the case for purposes of both elements of [the] jurisdictional inquiry." *Acker*, 527 U.S at 432.

***Connection or Association***. The action or prosecution needs only some "connection" to or "association" with federal duties. *Caver*, 845 F.3d at 1144. This lenient standard derives from the statute's broad language, which covers any claim "for or relating to any act" under color of federal office. 28 U.S.C. § 1442(a)(1). The "'hurdle erected by this requirement is ***quite low***.'" *Caver*, 845 F.3d at 1144 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)) (emphasis added).

20

Removal does *not* depend on a line between "official" or "unofficial" conduct. The parties frequently dispute that issue, which can be relevant for immunity.[5] But the Supreme Court has made clear that a dispute over the propriety of an official's conduct *supports*, rather than defeats, removal. The official "should have the opportunity to present [his] version of the facts to a federal, not a state, court," since "[t]his is exactly what the removal statute was designed to accomplish." *Willingham*, 395 U.S. at 409 (quotation omitted).

Resolving the dispute too early "would defeat the purpose of the removal statute." *Acker*, 527 U.S. at 432 (citing *Willingham*, 395 U.S. at 432). The case need not relate to conduct "required by the responsibilities of [the defendant's] office[]," nor even to conduct "undertaken in the course of job performance." *Id*. The required "connection" can be far more indirect. The *Acker* Court held that an action to collect occupational taxes from federal judges was sufficiently connected to their office because the duty to pay arose from federal employment. *See id.* at 433. And that was before Congress broadened § 1442(a) by adding "relating to." *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545.

**Colorable Federal Defense**. Having shown some connection or association, a federal official then must "raise a colorable federal defense." *Caver*, 845 F.3d at

---

[5] Even on the merits, immunity requires only that the "federal official's acts have **some nexus** with furthering federal policy." *Kordash*, 51 F.4th at 1293 (emphasis added; quotation omitted). The threshold remains low.

1142. This requirement is met in "all cases where federal officers can raise a colorable defense arising out of their duty." *Id.* at 1145 (cleaned up). In deciding removal, the Court does not adjudicate immunity on the merits. A colorable "defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Magnin*, 91 F.3d at 1427; *accord Caver*, 845 F.3d at 1145 ("The law does not require that the removing defendant virtually win his case before it can be removed.").

The Supreme Court articulated this requirement in *Mesa v. California*, 489 U.S. 121 (1989), but made clear that it was not a substantial hurdle.[6] This requirement is not meant to force federal officials to litigate immunity defenses in state court. Just the opposite. It weeds out cases where "***absolutely no federal question is even at issue***." *Id.* at 138 (emphasis added). Indeed, while *Mesa* held that certain mailtruck drivers could not remove criminal traffic violations because they did not assert a federal defense, *see id.* at 124, 138–39, other courts have *allowed* federal mailtruck drivers to remove traffic proceedings where they have plausibly

---

[6] The Court analogized it to asking whether the defendant has asserted a defense "arising under" federal law for Article III jurisdictional purposes. *See id.* at 136. That is a very low bar. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 492 (1983) ("*Osborn* thus reflects a broad conception of 'arising under' jurisdiction, according to which Congress may confer on the federal courts jurisdiction over any case or controversy that might call for the application of federal law.") (discussing *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738 (1824)). A dispute among the parties over the meaning of federal law is a textbook example of what is sufficient to establish federal jurisdiction. *See id.*

asserted a federal immunity defense, *see United States v. Moll*, No. 22-CR-00266-NYW, 2023 WL 2042244, at \*7 (D. Colo. Feb. 16, 2023).

Supremacy Clause immunity is a common defense in § 1442(a) cases. *See* Part I.A *supra*. For senior federal officials who exercise discretion, immunity is necessarily co-extensive with the scope of this discretion. This Court in *Baucom v. Martin*, 677 F.2d 1346 (11th Cir. 1982), cited favorably the Ninth Circuit's decision in *Clifton v. Cox*, 549 F.2d 722, 727 (9th Cir. 1977), for the proposition that "[e]ven if the officer makes an error in judgment in what the officer conceives to be his legal duty, that alone will not serve to create criminal responsibility in a federal officer." *Baucom*, 677 F.2d at 1350. The *Clifton* Court further explained that officers who exercise discretion are protected just as robustly as those who follow the demands of federal law or their superiors "because 'the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.'" 549 F.2d at 726–27 (quoting *Barr*, 360 U.S. at 575). As the record in this case establishes beyond dispute, the Chief of Staff's job is a model of the exercise of broad discretionary authority. Thus, even on the merits, the standard is low; the broader an official's discretion, the more relevant his subjective belief that he stayed within his lawful authority. *Accord Baucom*, 677 F.2d at 1350.

At the removal stage, the barrier is necessarily lower; the already-low showing for immunity just has to be plausibly asserted. And again, where the parties dispute whether the case relates to official conduct (as they often do), this "lenient colorable federal defense requirement," *Caver*, 845 F.3d at 1145–46, focuses on the removing official's version of the case, not the State's competing narrative. The reviewing court "need not . . . determine the merits of that position" in order to permit removal, *id.* at 1146, because the point of removal is to establish a federal forum for resolving the merits of the dispute, *see, e.g.*, *Willingham*, 395 U.S. at 409.

### C.    Meadows has comfortably cleared the low bar for removal

Measured against these low standards and the acts charged in the Indictment, Meadows has far exceeded the needed showings of (i) a connection between the prosecution and an act under color of his office and (ii) a colorable defense. The connection and colorable defense should have been readily obvious. All but one of the charged acts took place within the White House while Meadows was carrying out his official duties. And for the other, his visit to the Cobb County Civic Center, he explained that he did it to gather information for the President which was a core part of his duties. App.447:14–449:2, 451:9–454:1.[7]

---

[7] The State cannot evade removal by disavowing the acts specified in the Indictment. Because § 1442(a) creates an exception to the well-pleaded complaint rule, *see Kircher*, 547 U.S. at 644 n.12; *Acker*, 527 U.S. at 430–31, Meadows could remove by pleading a connection to his official acts, even if the State had not included *any*

The district court did not need piles of evidence to discern the requisite connection, but in any event, that is what Meadows provided. His testimony established both the broad scope of his official duties and how each of the acts attributed to him in the indictment were "related to or associated with" those responsibilities. *See* pp. 7–9 *supra*.

His unrebutted testimony described the broad responsibilities of his office, including providing the President close, confidential advice; using his discretion to gather information on a wide range of federal interests and potential policies; and acting as a "gatekeeper" to the President and managing the President's time to advance federal interests. Managing the President's time was especially critical after Election Day to ensure the federal government continued to function and there was a "peaceful transition of power." App.467:24–25. In conjunction with these broader duties, Meadows was also responsible for managing the White House staff and coordinated meetings between the President and others, including state officials. In

---

of his conduct. That the State did so only makes the task simpler. A plaintiff (or here, the State) cannot evade removal even by expressly disclaiming *all* reliance on official acts. *See* Wright & Miller, Federal Practice and Procedure § 3726 (rev. 4th ed. 2009) (explaining that "purported disclaimers" of reliance on official acts are "ineffective, as impermissibly attempting to deprive federal officers of their right to have jurisdiction under the federal officer removal statute determined by a federal court under the requirements established by Section 1442"); *Asbestos Prod. Liab. Litig.*, 770 F. Supp. 2d at 741–43. But the State has not even purported to do that. And the district court's flawed Remand Order seems to contemplate that the State could still prosecute Meadows for official acts on remand.

the post-election period in particular, Meadows faced an increasing volume of incoming claims about election fraud, and he frequently acted as a router, making sure things were dispatched to others for appropriate handling. App.407:7–25. His overarching duty was to ensure that the President could effectively lead the federal government and its operations.

Meadows went above and beyond by testifying specifically about how each alleged act related to his role as Chief of Staff. While Meadows did not need to prove his case to remove, *see Caver*, 845 F.3d at 1145, he effectively did so by tying the only acts charged against him to his duties as Chief of Staff. *See* pp. 8–9 *supra*. The State presented no evidence to rebut Meadows's testimony that these acts related to his official duties or to overcome his subjective belief that his actions were within the scope of those duties.

### D.    The Executive Branch has broadly defined the role of Chief of Staff throughout history, as is its prerogative

Meadows's broad articulation of his role of Chief of Staff is not *sui generis*. It is consistent with Executive and Judicial precedent, with federal law, and with the accounts of former Chiefs of Staff.

The Chief of Staff "play[s] a unique role in the Executive Branch, providing the President with close and confidential advice and assistance on a daily basis," and "act[s] as the President's primary information-gathering and policy development-arm." Office of Legal Counsel, U.S. Dep't of Justice, *Congressional Oversight of*

*the White House*, slip op. at 9 (Jan. 8, 2021) (hereinafter *Congressional Oversight*). The Executive Branch has thus maintained for decades that there is a compelling federal interest in protecting the relationship between the President and his most senior aides. *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, at *5 (July 15, 2014); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007). Those opinions have addressed the Separation of Powers and Congress's authority to compel testimony, but they set forth concerns of outside interference on operation of the White House that apply just as strongly to Federalism and Supremacy. *See also Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008) (explaining the persuasive authority of OLC opinions and granting them "as much weight as the force of their reasoning will support").

Congress recognized this important federal interest in authorizing the Executive Office of the President (EOP), in response to the Brownlow Committee's 1937 conclusion: "'The President needs help.'" Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2274 (2001) (quoting President's Comm. on Admin. Mgmt., *Report of the Committee with Studies of Administrative Management in the Federal Government* 5 (1937)). Congress thus "authorized President Roosevelt to establish the EOP under the Reorganization Act of 1939; soon

27

thereafter, [Roosevelt] issued Reorganization Plan No. 1, which became effective in July 1939." *Congressional Oversight*, slip op. at 7 (citations omitted). The EOP has since become "something of a central nervous system of the executive branch." Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 WILLAMETTE L. REV. 701, 714 (2009).

Former Chiefs of Staff have also described the breadth of the role. James Baker (Bush (41)), described part of the role as:

> Making the trains run on time . . . . There are literally hundreds, if not thousands, of claimants on the president's time, and somebody has to say 'not now.' That someone is almost always the chief of staff . . . . Managing that process also means that the chief of staff has to ensure that the president hears all sides of an issue . . . .

THE NERVE CENTER, *supra*, at xv (Baker). Other former officials confirm that the Chief of Staff must broadly gather information on issues of interest to the President, and be aware of everything, personal or otherwise, commanding the President's attention.[8] Former Chiefs also describe the unavoidable "political" component of the role: "There is, in fact, some political component in almost every president decision," and a "critical component for any, Chief of Staff, is the third 'P,' politics."

---

[8] *See, e.g.*, *id.* at 90 (Jack Watson (Carter)) ("The chief of staff is a little like a shortstop. You're cutting short the balls to keep them from getting in the outfield, that is to say all the way to the president. . . . It's about performing the functions and the responsibilities of the office as a reflector of the president's power and as a monitor, a gauge of where his own personal time and own personal attention should be applied.").

*Id.* at xvi (Baker). When the President runs for reelection, "[t]here is literally no way in the real world of the White House and governing the country and a national political campaign involving an incumbent president where you can separate the politics from the governing that the president and his administration are doing in Washington." *Id.* at 80 (Jack Watson (Carter)).

These sources all confirm Meadows's testimony. In discounting that testimony, *see* App.747, the district court erred not only as a matter of fact, but also as a matter of law (a) by applying a heightened standard, *see* Part II.C *infra*, and (b) by purporting to limit the role of the President's Chief of Staff through judicial fiat. It is the distinct prerogative of the Executive Branch, and the President in particular, to define "the outer perimeter of [a Chief of Staff's] line of duty." *Barr*, 360 U.S. at 575. Having a court establish the scope of the Chief of Staff's duties is constitutionally barred by the Separation of Powers. *See Cheney*, 542 U.S. at 387 (warning against "unnecessary intrusion into the operation of the Office of the President"); *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (striking down a statute that "impermissibly intrudes upon Presidential powers under the Constitution"). The Supremacy Clause imposes the same limit on the State.

## II.    THE DISTRICT COURT ERRED IN DECLINING JURISDICTION AND REMANDING THE PROSECUTION TO STATE COURT

The district court's task was thus straightforward: to determine whether even one of the acts in question had some connection to or association with Meadows's

role and whether he presented a colorable federal defense. *Caver*, 845 F.3d at 1142. Had it done so, the district court would have readily concluded that binding precedent and the evidentiary record supported removal.

Instead, the district court applied the wrong legal framework, inverted the evidentiary burden, and committed other clear errors. Rather than applying statutory text and settled precedent, the court focused on what it considered a "novel question" presented by the Georgia RICO charge. App.733. The court then used this purported novelty to justify departing from the well-established rule that removal turns on a defendant's articulation of how the prosecution relates to "any act" he carried out as a federal official, not on the State's articulation of its allegations. The court also drew an untenable distinction between official and "political" acts, ruling that the Chief of Staff—the seniormost advisor to the singular head of a political branch of government—may not engage "political" activity of any kind. App.746.[9] To make matters worse, the court inverted the burden by crediting the State's allegations and its theories about the prosecution's nexus to Meadows's federal duties over Meadows's unrebutted testimony and asserted defenses. These fundamental errors plagued the district court's reasoning throughout and erected a heightened burden that squarely conflicts with the precedent of this Court and the U.S. Supreme Court.

---

[9] *Id.* ("[P]olitical activities . . . exceed[] the outer limits of the Office of the White House Chief of Staff.").

**A.**   **The court wrongly created a "conspiracy" exception to removal by holding that the State's Georgia RICO charges present a "novel question" justifying departure from ordinary removal principles**

The district court cited, but as a practical matter ignored, the "quite low" standard for removal. The court seized on the purported novelty of the RICO charge and asked an entirely different question that it cut from whole cloth: whether "the gravamen, or 'heart' of the charges relates to [Meadows's] federal office." App.740. The court thereby flipped the standard on its head, allowing the State to defeat removal if it could possibly try the federal official without relying on an official act, even if official acts appear on the face of the Indictment. App.736–40.

That novel approach changes the measure of removal from what the statute says to look for—any claim that "relate[s] to any act under color of . . . office," 28 U.S.C. § 1442(a)—into balancing the gist of the State's charging theory against the (undefined) weight of official conduct. But no removal decision requires the official to answer and rebut the State's charges, let alone an undefined allegation of "conspiracy." To the contrary, the caselaw makes clear that a removing official does *not* need to rebut the charges to remove. *See Caver*, 845 F.3d at 1145.

The district court's analysis also squarely conflicts with additional precedent. The court held that the State could avoid removal because it had alleged a "conspiracy" that did not depend on proving any particular official act. *See* App.738–41. But that ignores clear precedent on removal under § 1442(a), which is

31

an exception to the ordinary well-pleaded complaint rule; in evaluating federal jurisdiction, the court does not focus on the State's articulation of its charges, but on Meadows's articulation of his federal defense. *See Kircher*, 547 U.S. at 644 n.12; *Acker*, 527 U.S. at 431. His contention that the charges relate to his official conduct are bolstered by the overt acts expressly charged in the Indictment, whether or not the State would need to prove them to convict. The district court's analysis also conflicts with settled law that, "if one claim cognizable . . . is present, the entire action is removed, regardless of the relationship between the Section 1442 claim and the non-removable claims." *Nadler*, 951 F.2d at 305 n.9 (quotation omitted).

The district court lifted its erroneous "gravamen" framework from Justice Scalia's partial *dissent* in *Acker*. There, Justice Scalia argued that a federal "officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official functions." *Acker*, 527 U.S. at 447 (Scalia, J., concurring in part, dissenting in part). Although Meadows would meet that standard, it is not the standard adopted in *Acker*. To the contrary, the Court held that it was sufficient for removal purposes for those defendants to allege that the licensing tax was "for" broadly "engag[ing] in [their] occupation" as judges. *Id.* at 432–33. Moreover, since *Acker*, "Congress amended section 1442(a) to add 'relating to,'" *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th

Cir. 2020) (en banc), which is just the latest part of a broader pattern in which "Congress ha[s] consistently broadened the statute," *id.* at 295.

The district court also wrongly relied on *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022), for the proposition that it needed to consider the "heart" of the State's case. But *BP P.L.C.* is not remotely relevant here. That case involved state claims against private companies based on climate change. The Fourth Circuit held that one of eight removal theories was "too tenuous," *id.* at 234, because the alleged federal act (granting federal leases) was unrelated to the claims (alleged concealment of the truth about climate change). In passing, the Fourth Circuit observed that it "might be inclined to think otherwise" if "federal control" of "production and sales [of fossil-fuel products] went to the heart of Baltimore's claims." *Id.* But Baltimore's claims were not about production or sales to begin with. And that passing remark did not establish a new test under § 1442(a), let alone one that would overrule contrary authority in this Circuit.

The infirmity of the district court's test predictably infected its analysis. Relying on *BP P.L.C.* and Justice Scalia's *Acker* dissent, App.752, the district court found "insufficient evidence to establish that the ***gravamen, or a heavy majority of overt acts*** alleged against Meadows relate to his role as White House Chief of Staff," App.761 (emphasis added). This novel analysis, which puts each charged act to one

side of a scale and asks whether a "heavy majority" (how heavy? we are not told) relates to official duty, is untethered from Supreme Court and this Court's precedent.

The district court's effort to evade this well-established precedent reflects a "narrow, grudging" interpretation of the federal officer removal statute that the Supreme Court has soundly rejected. *Willingham*, 395 U.S. at 407. And it leaves the door open to mischief. Under the district court's heightened test, an enterprising district attorney could thwart removal by alleging a series of acts both with and without a nexus to a federal officer's duties so long as enough were unofficial. Such a novel theory flies in the face of more than a century of precedent, and this Court should soundly reject it.[10]

### B. The court wrongly created a "political" exception to removal by holding that "political activity" categorically lies beyond a Chief of Staff's duties

The district court also erroneously narrowed the scope of Meadows's duties when it invented an arbitrary rule that "political activities . . . exceed[] the outer limits of the Office of the White House Chief of Staff." App.746. For all but one

---

[10] The district court defended its newly-minted theory because the State's inclusion of a RICO charge presented a "novel question." App.733. But the district court acknowledged that this Court has confronted RICO charges in this context before. App.734 (discussing *Baucom*). That did not lead this Court to displace well-established law. More importantly, applicable law makes clear that the State's framing of the case does not control the removal analysis; what controls is Meadows's articulation of his federal defense. *Acker*, 527 U.S. at 431–32. The ins-and-outs of Georgia RICO law are beside the point.

overt act, the court thus held that Meadows exceeded his official duties (*e.g.*, in setting up an Oval Office meeting) because the meetings and calls were "political" in nature and therefore did not "relate[] to any legitimate purpose of the executive branch." App.756–57, 759, 761.

To start, the whole issue of lines between politics and policy is a red herring and should not have played any role in determining the removal question. The very fact that the district court engaged in such line-drawing makes clear there is at least a colorable federal defense here and federal jurisdiction under § 1442(a). Any test for removal that effectively requires a federal court to adjudicate a federal defense to determine jurisdiction is mistaken. *See, e.g.*, *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 891 (11th Cir. 2013). The whole point of requiring only a colorable federal defense is that the federal courts ought to be the ones resolving the federal questions on the merits. *See Willingham*, 395 U.S. at 409; *Acker*, 137 F.3d at 1323.

But even on its own terms, this "political" exception to removal blinks reality. And it unnecessarily injects the Judiciary into problems of a constitutional dimension when it purports to judicially define the outer limits of the official duties of the highest-ranking Executive Branch official, other than the President himself. Neither Congress nor the Judiciary (much less the States) may dictate the contours of the duties of the President's closest aide. *See* Part I.D *supra*; *see also Winpisinger v. Watson*, 628 F.2d 133, 140 (D.C. Cir. 1980) ("In the most basic sense, prudential

35

barriers developed as an adjunct to standing to restrict the courts to their appropriate ambit. The judiciary is not to act as a management overseer of the Executive Branch. . . . The courts are not suited to undertake a neutral consideration of every Executive action, ranging from White House invitations and space reservations on the Presidential aircraft to the decision to award funds to a particular state or other political subdivision for general or specific projects.").

The President is an inherently "political leader[]," *United States v. Nixon*, 418 U.S. 683, 715 (1974), who "occupies a unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). He embodies in himself one of "the two political branches." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015). The "Constitution entrusts the President with vast and unremitting public responsibilities, including taking care that the laws are faithfully executed; commanding the Armed Forces; nominating, appointing, and removing officers; making treaties; recommending, signing, and vetoing bills; sending and receiving ambassadors; and granting pardons and reprieves." Brief for United States as Amicus Curiae, *Blassingame v. Trump*, Case Nos. 22-5069, 22-7030, 22-7031 at 8 (D.C. Cir. Mar. 2, 2023) (hereinafter "DOJ Amicus"). He thus "acts within the scope of his office [even] when he urges Members of Congress to act in a particular way with respect to a . . . matter, such as a congressional investigation, in which the President has no constitutional role." *Id.* at 14.

36

When a President runs for reelection, "'because the Presidency is tied so tightly to the persona of its occupant,' 'the line between official and personal' is 'both elusive and difficult to discern.'" *Id.* at 1–2 (quoting *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (per curiam) (Tatel, J., concurring in part and dissenting in part)). By virtue of his election, the President is entrusted to advance the federal policies on which he campaigned and to advocate his vision to the country and Congress. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2029 (2020) (describing the "hurly-burly, the give-and-take of the political process between the legislative and the executive") (quotations omitted); *NLRB v. Noel Canning*, 573 U.S. 513, 555–56 (2014) ("[T]he President and Senators engage with each other in many different ways and have a variety of methods of encouraging each other to accept their points of view.").

Every Presidential act that bears some connection to his broad constitutional authority is thus "political activity" by definition. And his role extends beyond specifically enumerated authority, *see* DOJ Amicus at 11, to include the "traditional 'bully pulpit' of the Presidency" because "the President can and must engage with the public on matters of public concern," *id.* at 12; *see also* Application for a Stay, *Murthy v. Missouri*, No. 23A243, at 3 (U.S. Sept. 14, 2023) ("A central dimension of presidential power is the use of the Office's bully pulpit to seek to persuade Americans—and American companies—to act in ways that the President believes

would advance the public interest."); *id.* ("It is axiomatic that the government is entitled to provide the public with information and to 'advocate and defend its own policies.'") (quoting *Bd. of Regents v. Southworth*, 529 U.S. 217, 229 (2000)).

The Chief of Staff too "play[s] a unique role in the Executive Branch, providing the President with close and confidential advice and assistance on a daily basis," and "act[s] as the President's primary information-gathering and policy-development arm." *Congressional Oversight*, slip op. at 9; Prakash, 45 WILLAMETTE L. REV. at 714 (explaining that the Executive Office of the President has become "something of a central nervous system of the executive branch"). Indeed, "[t]he highest and most important duties which [the President's] subordinates perform are those in which they act for him . . . [when] they are exercising not their own but his discretion. This field is a very large one. It is sometimes described as political." *Myers v. United States*, 272 U.S. 52, 132 (1926). As former Chief of Staff Jack Watson explained, "[t]here is literally no way in the real world" to separate an incumbent President's reelection campaign "from the governing that the president and his administration are doing in Washington." THE NERVE CENTER, *supra*, at 80.

The Chief of Staff's official duties are at least coextensive with those of the President because the Chief of Staff's core duty is to ensure that the President effectively exercises his constitutional role. If the Chief of Staff's duties did not include political activity, the position would cease to function altogether. Even when

the President acts in a purely personal or political capacity, the Chief of Staff still must exercise discretion to act on behalf of the President, *Myers*, 272 U.S. at 132–33, and continues in his official capacity as the crucial conduit between the Executive branch and the President. Senior Presidential aides like the Chief of Staff necessarily act in a "political" manner and "must be the President's alter ego in the matters of that department where the President is required by law to exercise authority." *Id.* At 133. It is, therefore, impossible to draw a bright-line distinction between a Chief of Staff's engaging in official and "political activity."

The testimony in this case established that Meadows's official responsibilities as Chief of Staff necessarily included broad discretion as to what meetings to attend, what issues to address, and whether and when to route various items of incoming information to the President. It should be beyond dispute that the Chief of Staff can and should manage the President's time and attention to ensure the effective operation of government. The district court nevertheless defended its artificial "political" activity distinction on several grounds. None withstands scrutiny.

***The Elections Clause***. Relying on the Elections Clause, the district court took the extraordinary position that "[t]he Constitution does not provide any basis for executive branch involvement with State election and post-election procedures" and "executive power does not extend to overseeing states' elections." App.748–51. That

39

myopic view ignores reality, which the Constitution and federal law clearly paint.[11] The Federal Government has a substantial interest in the administration of elections, and it is beyond dispute that "Congress has power to regulate Presidential elections and primaries." *Buckley*, 424 U.S. at 90.[12]

Congress has exercised that authority to regulate state administration of federal elections on numerous occassions. *See, e.g.*, Electoral Count Act, 3 U.S.C. § 5, *et seq.* (1887) (governing process for electoral vote counting and certification by the States); Voting Rights Act, 52 U.S.C. § 10301, *et seq.* (1965) (illegal to deny or restrict voting rights because of a citizen's race); National Voter Registration Act, 52 U.S.C. § 20501, *et seq.* (1993) (requires most States to allow registration to vote by mail); Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301, *et. seq.* (1999) (governing right to register and vote absentee in federal elections); Help America Vote Act, 52 U.S.C. § 20901, *et seq.* (2002) (requiring use

---

[11] Even the State's own witness at the removal hearing, Georgia Secretary of State Brad Raffensperger, conceded as much. App.559:20–23 ("Q. What role, if any, does the federal government play in the administration of the elections in Georgia? A. None, other than what is spelled out in, you know, federal law.").

[12] The district court relied on the Elections Clause, which speaks specifically only to congressional elections. *See* App.748–51. But there too, the text makes clear that Congress has the authority to enact federal regulation (executed, of course, by the Executive Branch) of States' administration of congressional elections: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; ***but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators***." U.S. CONST., art. I, § 4, cl. 1 (emphasis added).

of provisional ballots in federal elections); *see generally* U.S. Code, Title 52 ("Voting and Elections"). And the other two branches of the Federal Government have likewise been substantially involved in the post-election administration of federal elections. *See Bush v. Gore*, 531 U.S. 98, 100 (2000) (addressing post-election challenge to counting of ballots and election procedures in Presidential election); *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 73 (2000) (addressing whether "changing the State's elector appointment procedures after election day, violated the Due Process Clause or 3 U.S.C. § 5 [Electoral Count Act], and whether the decision of that court changed the manner in which the State's electors are to be selected, in violation of the legislature's power to designate the manner for selection under Art. II, § 1, cl. 2"); Lisa Marshall Manheim, *Presidential Control of Elections*, 74 VAND. L. REV. 385, 396 (2021) ("In the decentralized system adopted by the United States, the federal government does not itself conduct elections. Instead, elections are run by state and local governments, with limited but important oversight and regulation by the federal government."); U.S. Department of Justice, *Federal Prosecution of Election Offenses* 1 (Richard C. Pilger ed., 8th ed., 2017) ("[T]he effective prosecution of corruption of the election process is a significant federal law enforcement priority."). The Department of Justice includes a Voting Section in its Civil Rights Division, which enforces the civil provisions of the federal laws that protect the right to vote, as well as other criminal and civil

41

components, such as the Election Crimes Branch, which investigate and prosecute election-related offenses.

To the extent the district court meant to suggest that the Federal Government as a whole has no role in state elections, that is plainly refuted by the examples above. It is also belied by the facts of this very case, since the federal Electoral Count Act governs the procedures for certifying State election results to Congress that is at the core (perhaps the gravamen?) of the alleged conspiracy here.

To the extent the district court meant to suggest that the Federal Government has a role *but not the President or the Executive Branch*, that too is plainly wrong.

***Executive Interest in Elections***. The mere fact that the Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections makes no difference. The President has authority under the Take Care Clause to ensure that federal voting laws are enforced. In a footnote, the district court dismissed the President's interests under the Take Care Clause because that authority "does not extend to government officials over whom [the Executive] has no power or control." App.750 n.13 (quoting *Thompson v. Trump*, 590 F. Supp. 3d 46, 78 (D.D.C. 2022)). But the President does not need to exercise direct control over specific individuals or pull the levers of power himself to have a legitimate interest. *See* DOJ Amicus at 11 ("[A] President acts within the scope of his office when he urges Members of Congress to act in a particular way [even] with respect to a . . .

42

matter, such as a congressional investigation, in which the President has no constitutional role.").[13] The district court's facile analysis ignores the legitimate role of the President to assess the conduct of state officials, for instance, to inform his supervision of federal officials who might interact with or even investigate those officials, or to propose to Congress further revisions to federal election law that better reflect the facts on the ground.

*The Hatch Act*. The district court also artificially narrowed the scope of the Chief of Staff's duties because "the Hatch Act prohibits 'an employee' from 'us[ing] his official authority or influence for the purpose of affecting the result of an election.'" App.745 (quoting 5 U.S.C. § 2732(a)(1)). In its view, "the Hatch Act provides that political activity is not included in the outer limits of the role of the White House Chief of Staff." App.751. Such reference to and reliance on the Hatch Act is misguided. The Act does not operate to define the role of a President or his senior aides; if anything, the suggestion that Meadows's conduct implicated the

---

[13] Relatedly, the district court was "unpersuaded" that the President and his Chief of Staff had "executive power to advise Congress." App.750 n.13. Anyone who has ever watched a State of the Union address knows that is wrong. *See also Noel Canning*, 573 U.S. at 555–56 ("[T]he President and Senators engage with each other in many different ways and have a variety of methods of encouraging each other to accept their points of view."); DOJ Amicus at 8 ("recommending, signing, and vetoing bills"). The Recommendations Clause expressly provides that the President "shall from time to time . . . recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. CONST., art. II, § 3.

Hatch Act only further proves that it relates to his official duties and that the case presents a federal question because the Hatch Act applies only to official conduct.

Even if the Hatch Act purported to limit the duties of the President's Chief of Staff, such limitations would violate the Separation of Powers. *See Zivotofsky*, 566 U.S. at 196 (striking down a statute that "impermissibly intrudes upon Presidential powers under the Constitution"); *Cheney*, 542 U.S. at 387 (warning against "unnecessary intrusion into the operation of the Office of the President"); *Bowsher v. Synar*, 478 U.S. 714, 734 (1986) (striking down a statute as unconstitutional because it "intruded into the executive function").

In all events, the district court's purported bright-line distinction between official and political activity is illusory. That is not to say that a Chief of Staff never acts in a personal capacity. Giving a speech in support of the President at a campaign rally for the President is something a Chief of Staff would likely do in a personal capacity, and which would likely fall outside the scope of his office. But that is not what happened here. And all that matters in the removal analysis is that Meadows has a colorable argument that his conduct fell within the scope of his office. He does. The district court's overly intensive scrutiny notwithstanding, Meadows has met his

burden here. The district court will have a chance to look closely at the merits, but only after removal.[14]

### C.    The court wrongly credited the State's allegations and theories over Meadows's testimony and asserted defenses

The district court further erred by imposing a heightened burden that contradicts precedent and threatens the very principles removal vindicates.

To start, Meadows' unimpeached testimony at the evidentiary hearing showed that each overt act specified in the Indictment was an act Meadows took, if at all, pursuant to his Chief of Staff role. Following that compelling testimony, the State dramatically shifted its legal position, positing that the "overt acts" naming Meadows in the State's indictment were not the relevant "acts" for purposes of § 1442(a). Rather, the State submitted that his allegedly joining a RICO conspiracy was the only relevant "act." Adopting this view, the district court held that the

---

[14] The absurdity of the "political" activity exception is apparent from the district court's assertion that "activities by Meadows—*even if characterized as scheduling meetings or phone calls or taken for the purpose of advising the President*—are 'political activities' under the pertinent regulations if they were for the purpose of furthering the common objective of success of a particular presidential candidate." App.759 (emphasis added). As explained, the President is an inherently political leader, and the Chief of Staff's core duty is to advise and support the President. It is impossible to seal off the Chief of Staff from supporting the President's exercise of constitutional authority if it bears on "politics." Under the district court's analysis, a Chief of Staff would need to walk on eggshells around an incumbent President running for reelection lest he inadvertently help him get reelected, and that would no doubt interfere with his effectiveness in the role. Needless to say, that is not the system of government we have, and it is not what the Supremacy Clause and the Federal Officer Removal Statute allow.

alleged RICO conspiracy was the "gravamen" of the case and that joining it was necessarily outside of his legitimate functions and thus beyond the scope of § 1442(a). App.740, 761. The court also reduced the expressly alleged acts to mere window dressing, stating that they "only serve to tell a broader story about the conspiracy." App.740 (citation and quotation omitted). The analysis that followed was controlled by the State's framing of its own allegations. In so doing, the district court inverted the relevant factors by which the asserted colorable federal defense is measured for removal purposes.

This Court long ago disposed of the notion that a State can circumvent the Supremacy Clause by alleging that a federal officer's performance of his duties violated state law and thus fell outside of his legitimate functions as a federal officer:

> An act cannot simultaneously be necessary to the execution of a duty under the laws of the United States and an offense to the laws of a state. On the contrary, the obligations imposed by federal law are supreme, and where any supposed right or claim under state law would impede an officer from performing his duties, it must relent.

*Denson*, 574 F.3d at 1347 (citing *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920)). Under the Supremacy Clause and the Federal Officer Removal Statute, removal cannot—as the district court believed—be defeated by the State's simply pleading a generalized allegation of a violation of state law and then claiming that any such violation is necessarily outside the legitimate functions of a federal office. If it were otherwise, then any time a State claimed that a federal official violated state law,

removal would be thwarted on the theory that violating state law is necessarily outside the scope of legitimate federal duties. What controls is instead Meadows's articulation of his federal defense, not the State's articulation of its state charges. *See Kircher*, 547 U.S. at 644 n.12.

The district court's misapprehension of the relevant legal framework was also manifest in its decision to give Meadows's testimony "less weight" about the scope of his duties because "Meadows was unable to explain the limits of his authority, other than his inability to stump for the president or work on behalf of the campaign." App.747. But no case requires a defendant to identify the outer limits of his authority in order to remove. To the contrary, courts routinely reject state prosecutors' efforts to cabin federal authority. Meadows's unrebutted testimony should have carried the day. *See Acker*, 527 U.S. at 432 (requiring courts to "credit[] the [defendant's] theory of the case"). In *Acker*, it was enough for the judges to allege that the county tax "declare[d] it 'unlawful' for them to 'engage in [their] occupation.'" *Id.* The Court squarely rejected the Solicitor General's argument that "there is no causal connection between the suits and the judges' official acts because the tax was imposed only upon the judges personally and not upon the United States or upon any instrumentality of the United States." *Id.* (cleaned up). The Court could not have been clearer that "[t]o choose between those readings of the Ordinance is to decide the merits of this case," so it "credit[ed] the judges' theory of the case" and

"conclude[d] that the judges have made an adequate threshold showing" for removal. *Id.* Meadows's lengthy and unrebutted testimony concerning his duties generally and how they related to the acts in the Indictment far exceed what was required of the judges in *Acker*. *See* pp. 7–9 *supra*.

Indeed, when it comes to the "outer perimeter of [a federal officer's] line of duty, " "the fact that a petitioner is not required by law or by direction of his superiors to act as he did is not controlling because 'the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.'" *Clifton*, 549 F.2d at 726 (quoting *Barr*, 360 U.S. at 575). Acknowledging and respecting a federal officer's legitimate sphere of discretion is no more important anywhere than it is for the President's closest advisor.

### D.    The court committed other clear errors in rejecting removal

The district court's clear errors run deeper still.

Overt Act 9 alleged that Meadows met with President Trump, Rudy Giulliani, Jenna Ellis, and a group of Pennsylvania legislators at the White House in furtherance of the conspiracy. App.36. The district court observed only that Meadows did not recall attending the meeting. App.755 n.14. But Meadows testified further that he did not attend the meeting ***except*** to inform three attendees that they

"wouldn't be able to meet with the President because they had . . . come down with a positive COVID test"; Meadows was acting to "keep the President safe and keep him a proper distance away from – [those] individuals." App.419:4–420:9. Without further explanation, the court then "treat[ed] the evidence" that Meadows was protecting the health and safety of the President "as neutral to the determination of whether" his conduct was "within the scope of [his] federal office." App.755 n.14.

Similarly, for Overt Act 19, Meadows testified that he "did not ask" McEntee for this memo, App.421:7, 421:12, 422:7–8, but that, to the extent he was involved, it would have been as Chief of Staff, App.420:17–19, and consistent with his duties. The State presented no contrary evidence. Nevertheless, the district court flatly refused to "credit [Meadows's] theory," *Acker*, 527 U.S. at 432, and treated this evidence again as "neutral to the determination of whether" this conduct was "within the scope of Meadows's federal office." App.755 n.14.

It is impossible to show that the "heavy majority of overt acts," App.761, relate to one's official duties when the court finds that connections to official duties do not weigh at all in favor of removal but are merely "neutral."

The district court's unwillingness to credit the only evidence before it is further apparent from its refusal even to acknowledge relevant portions of Meadows's testimony. The most striking example concerns Meadows's testimony about his duties in the post-election period. He clearly explained that managing the

49

President's time was especially critical to ensure continued government function and a "peaceful transition of power." App.498:23–499:12, 520:20–521:19, 522:2–8. The district court ignored Meadows's clear and unrebutted testimony about the federal interests at play while repeatedly asserting that his actions did not "relate[] to any legitimate purpose of the executive branch." App.756, 757, 759, 761.

## CONCLUSION

For the reasons explained, the Court should reverse the judgment below and remand with instructions to permit removal and so notify the state court.

Respectfully submitted,

*/s/ George J. Terwilliger, III*
George J. Terwilliger, III
John S. Moran
Michael L. Francisco
Francis J. Aul
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006
(202) 857-2473
gterwilliger@mcguirewoods.com

*Counsel for Defendant-Appellant*
*Mark R. Meadows*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 28-1, because it contains 12,659 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. 2.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Respectfully submitted this 18th day of September, 2023.

*/s/ John S. Moran*
John S. Moran

*Counsel for Defendant-Appellant Mark R. Meadows*

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ John S. Moran*
John S. Moran