No. 23-12958

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————

The State of Georgia

*Plaintiff-Appellee*,

v.

Mark R. Meadows,

*Defendant-Appellant.*

————————

On Appeal from the United States District Court
for the Northern District of Georgia, No. 1:23-cv-03621-SCJ

————————

## DEFENDANT-APPELLANT'S APPENDIX
## VOLUME II OF V

————————

George J. Terwilliger, III
John S. Moran
Michael L. Francisco
Francis J. Aul
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Washington, D.C. 20006
(202) 857-2473
gterwilliger@mcguirewoods.com

*Counsel for Defendant-Appellant Mark R. Meadows*

# INDEX

**Docket/
Tab No.**

## Volume I

District Court Docket Sheet, No. 1:23-cv-3621-SCJ ............................................... A

Indictment, 23SC188947 (Fulton Cnty. Sup. Ct. Aug. 14, 2023) ........................... B

Notice of Removal (Aug. 15, 2023) .......................................................................... 1

Order that the Parties Participate in an Evidentiary Hearing Concerning the Notice of Removal (Aug. 16, 2023) ............................................................................. 6

Motion to Dismiss Charges Based on Supremacy Clause Immunity (Aug. 18, 2023) ................................................................................................................. 15

    Corrected Brief in Support of Motion to Dismiss (Aug. 19, 2023) .......... 16-1

Emergency Motion for Relief Immediate Removal, or an Order Prohibiting DA Willis from Arresting Defendant Mark Meadows (Aug. 22, 2023) .............. 17

    Declaration of John S. Moran (Aug. 22, 2023) ........................................ 17-1

    Email from John Moran to DA Willis (Aug. 16, 2023) ........................... 17-2

    Email from DA Willis to John Moran (Aug. 16, 2023) ........................... 17-3

    Letter from John Moran to DA Willis (Aug. 21, 2023) ........................... 17-4

    Email from DA Willis to John Moran (Aug. 22, 2023) ........................... 17-5

    Letter from John Moran to DA Willis (Aug. 22, 2023) ........................... 17-6

    Motion for Entry of Pretrial Scheduling Order and Proposed Pretrial Scheduling Order, 23SC188947 (Fulton Cnty. Sup. Ct. Aug. 16, 2023) ................................................................................................... 17-7

State's Response to Emergency Motion for Relief Immediate Removal, or an Order Prohibiting DA Willis from Arresting Defendant Mark Meadows (Aug. 23, 2023) ................................................................................................................. 23

**Docket/**
**Tab No.**

## Volume II

Order Denying Emergency Motion for Immediate Removal or an Order Prohibiting DA Willis from Arresting Defendant Mark Meadows (Aug. 23, 2023).......25

State's Response to Notice of Removal (Aug. 23, 2023)........................................27

    Excerpt of Michael Shirkey Interview (June 8, 2022) .............................. 27-1

    Excerpt of Cassidy Hutchinson Interview (Mar. 7, 2022) ....................... 27-2

    Excerpt of John McEntee Deposition (Mar. 28, 2022) ............................ 27-3

    Excerpt of Office of Special Counsel Hatch Act Report (Nov. 9, 2021).. 27-4

Reply to State's Response to Notice of Removal (Aug. 25, 2023) .........................45

Order Requesting Supplemental Briefing (Aug. 29, 2023) ...................................63

## Volume III

Transcript of Evidentiary Proceedings (August 28, 2023), *1 of 2* ..........................65

    Mark Randall Meadows

        Direct Examination................................................................... *App.380*
        Cross Examination ................................................................... *App.426*
        Redirect Examination............................................................... *App.518*

## Volume IV

Transcript of Evidentiary Proceedings (August 28, 2023), *2 of 2* ..........................65

    Kurt Robert Hilbert

        Direct Examination................................................................... *App.532*
        Cross Examination ................................................................... *App.554*

**Docket/**
**Tab No.**

Brad Raffensperger

    Direct Examination....................................................*App.557*
    Cross Examination ...................................................*App.586*
    Redirect Examination ...............................................*App.593*

Exhibits Admitted During Evidentiary Proceedings

    Mark Meadows's Commission (Mar. 31, 2020) [Def.'s Ex. 1] ....................C

    Declaration of Scott Gast (Aug. 27, 2023) [Def.'s Ex. 3]............................D

    Declaration of Benjamin Williamson (Aug. 27, 2023) [Def.'s Ex. 4] .......... E

    Email from Mark Meadows to Jason Miller (Dec. 6, 2020) [State's Ex. 1] .. F

    Entry of Appearance for Kurt R. Hilbert, *Trump v. Raffensperger*, 2020-cv-343255 (Dec. 7, 2020) [State's Ex. 2] ...................................G

    Recording of Call with Secretary Raffensperger (Jan. 2, 2021) [State's Ex. 3]...........................................................................................H

## Volume V

State's Supplemental Brief (Aug. 31, 2023).............................................66

Meadows's Supplemental Brief (Aug. 31, 2023) ....................................67

Order Declining Jurisdiction and Remanding Case to Fulton County Superior Court (Sept. 8, 2023)................................................................69

Notice of Appeal (Sept. 8, 2023) ..........................................................71

Emergency Motion to Stay Remand Order (Sept. 11, 2023)...................74

State's Opposition to Emergency Motion to Stay Remand Order (Sept. 12, 2023) ...................................................................................78

Order Denying Emergency Motion to Stay Pending Appeal (Sept. 12, 2023) .......80

**Tab 25**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **THE STATE OF GEORGIA,** | **CIVIL ACTION FILE** |
| **v.** | **No. 1:23-CV-03621-SCJ** |
| **MARK R. MEADOWS,** | **RE: NOTICE OF REMOVAL OF FULTON COUNTY SUPERIOR COURT INDICTMENT NO. 23SC188947** |
| **Defendant.** | |

## ORDER

This matter appears before the Court on Defendant Mark Meadows's Emergency Motion for Immediate Removal or to Prohibit his Arrest.[1] Doc. No. [17]. Having reviewed the Motion and the Fulton County District Attorney's Office's response in opposition (Doc. No. [23]), the Court **DENIES** Meadows's Motion.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

Meadows seeks to stay his upcoming arrest on Friday, August 25, 2023.[2] Doc. No. [17], 1. Meadows argues that his federal officer status and federal immunity defense protect him from being arrested and being brought to trial in state court. Id. at 2–3. He further specifies that issuing a stay of the Fulton County proceedings, including his upcoming arrest, is consistent with and facilitates the purposes of these federal officer protections. Id. Meadows urges the Court to bypass the evidentiary hearing on his removal and assume federal jurisdiction over the case (with the understanding that the Court then can reconsider such decision after the hearing previously scheduled occurs). Id. at 5–6. Alternatively, Meadows requests the Court to enter an injunction against District Attorney Fani Willis enjoining her from executing Meadows's arrest until after the August 28 hearing. Id. at 9–13.

As the Court indicated in its summary remand order, "the filing of a notice of removal of a criminal prosecution under Section 1455 'shall not prevent the State court in which such prosecution is pending from proceeding further[.]'"

---

[2]  The Court incorporates its previous discussion of the factual and procedural background from its order denying summary remand and requiring the Parties to appear at an evidentiary hearing on August 28, 2023. See Doc. No. [6].

2

Doc. No. [6], 6 (quoting 28 U.S.C. § 1455(b)(3)). Meadows cites two cases in support of his argument that the Court can bypass the evidentiary hearing anticipated in Section 1455(b)(5). Doc. No. [17], 5 (citing New York v. Tanella, 239 F. Supp. 2d 291, 295 (E.D.N.Y. 2003) and City of Jackson v. Jackson, 235 F. Supp. 2d 532, 534 & n.2 (S.D. Miss. 2002)). The Court finds neither citation to be persuasive.[3]

In Tanella, the parties consented to the facts alleged in the removal and agreed an evidentiary hearing was not necessary. 239 F. Supp. 2d at 295 ("[B]oth the State and defendant agree that no evidentiary hearing is necessary because there is no disagreement about the facts relevant to the court's determination of the removal issue."). In this case, however, there is no similar agreement and neither Party has indicated that an evidentiary hearing is unneeded. Doc. No. [23].

---

[3] While the District Attorney's Office correctly indicates that these cases occurred prior to the enactment of 28 U.S.C. § 1455 (Doc. No. [23], 4), the Court understands that the removal provisions for criminal proceedings were previously found in 28 U.S.C. § 1446. The removal statutes were amended in 2011 to create separate statutory provisions for criminal and civil removal actions, but the relevant substance of the criminal removal provision was not altered in this amendment process. See 28 U.S.C. § 1446(c)(1) (2011) (specifying the same procedures for removal of criminal prosecutions as Section 1455(b)).

3

Likewise, Jackson does not convince the Court of Meadows's argument because in that case, the district court did not mention the criminal removal procedures, let alone an evidentiary hearing. Such omission was appropriate however because federal removal had already been ordered and the court was merely determining if the federal immunity defense would result in a dismissal of the criminal case. See 235 F. Supp. 2d at 534. Here, conversely, the Court has not yet made its determination on removal and thus Jackson's persuasiveness is limited.

Section 1455's statutory language makes clear that an evidentiary hearing is to be conducted once a summary remand order has been entered. 28 U.S.C. § 1455(b)(5). As Meadows's arguments and cases cited to the contrary are not persuasive, the Court denies Meadows's request for the Court to decide its jurisdiction over his criminal case before holding an evidentiary hearing.

Meadows alternatively requests that the Court enjoin District Attorney Fani Willis from enforcing the arrest warrant against him until after the August 28 evidentiary hearing. Doc. No. [17], 9–16. The Court denies this request. While Meadows's imminent arrest may present an actual injury, there are strong countervailing reasons to not enjoin the state criminal proceedings (e.g.,

4

abstention doctrines and principles of federalism). Section 1455 reinforces this conclusion by clearly requiring state criminal proceedings continue until the federal court has assumed jurisdiction and notified the state court. 28 U.S.C. § 1455(b)(3), (5). Indeed, in another case involving the removal of a criminal prosecution, a criminal defendant proceeded to *trial* even after a notice of removal had been filed pursuant to Section 1455.[4] Simmons v. City of Warren, No. CV 19-11531, 2020 WL 520956, at *1 n.2 (E.D. Mich. Jan. 6, 2020), report and recommendation adopted, No. 19-11531, 2020 WL 515866 (E.D. Mich. Jan. 31, 2020). Thus, the Court determines that, the clear statutory language for removing a criminal prosecution, does not support an injunction or temporary stay prohibiting District Attorney Willis's enforcement or execution of the arrest warrant against Meadows.

---

[4] While the Court understands Meadows's argument that the federal immunity defense includes an immunity against arrest, the statutory language of Section 1455(b)(3) is clear that the state court proceedings continue until the Court has assumed jurisdiction over the case—a determination that, in fact, requires assessing whether Meadows asserts a colorable federal defense. The Court has made no determinations at this time about the viability of Meadows's defense, and leaves such findings for after the evidentiary hearing.

For the foregoing reasons, the Court **DENIES** Meadows's Emergency Motion (Doc. No. [17]).[5]

**IT IS SO ORDERED** this 2 3rd day of August, 2023.

_____

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

_____

[5] Meadows furthermore suggests that "the Court *could* construe this motion as a petition for a writ of habeas corpus." Doc. No. [17], 16 n.3. The Court declines to so construe Meadows's Motion.

6

**Tab 27**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | CIVIL ACTION NO. |
| | ) | 1:23-cv-03621-SC |
| | ) | |
| v. | ) | |
| | ) | RE: NOTICE OF REMOVAL |
| | ) | OF FULTON COUNTY |
| | ) | SUPERIOR COURT |
| MARK RANDALL MEADOWS | ) | INDICTMENT NO. |
| | ) | 23SC188947 |

## STATE OF GEORGIA'S RESPONSE
## TO DEFENDANT MARK MEADOWS'S NOTICE OF REMOVAL

Defendant Mark Randall Meadows has asked this Court to remove his criminal case from the Superior Court of Fulton County to the Northern District of Georgia. Because the defendant faces charges that do not arise from conduct under the color of his office, and because he can offer no plausible federal defense, the State of Georgia respectfully requests that this Court remand the case to the Superior Court of Fulton County.

The defendant is the former Chief of Staff to the President of the United States, and his lack of care for the lawful scope of his official duties is a matter of record. Federal law prohibits employees of the executive branch from engaging in political activity in the course of their work. The law in question, known as the Hatch

Act, bars a federal employee from "us[ing] his official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). On November 9, 2021, the Office of Special Counsel issued an investigative report finding that prior to Election Day, during Donald J. Trump's campaign for the presidency in 2020, the defendant and at least a dozen other Trump administration officials "did precisely that":

> And while the specific facts of each case are different, they share this fundamental commonality—senior Trump administration officials chose to use their official authority not for the legitimate functions of the government, but to promote the reelection of President Trump in violation of the law.[1]

The report concluded that, "[f]rom OSC's perspective, the administration's attitude toward Hatch Act compliance was succinctly captured by then-Chief of Staff Mark Meadows, who said during an interview that 'nobody outside the Beltway really cares' about Trump administration officials violating the Hatch Act."[2]

It is therefore unsurprising that the defendant now petitions this Court to remove the prosecution of his pending criminal case, in which he stands accused of

---

[1] Exhibit D, Investigation of Political Activities by Senior Trump Administration Officials During the 2020 Presidential Election, 9 November 2021, at 3. The OSC found that Meadows and twelve other Administration officials violated the Hatch Act, a "pattern" that demonstrated "that the Trump administration tacitly or expressly approved of using the power of the executive branch to assist President Trump's reelection." *Id.* at 17.

[2] Exhibit D at 4.

participating in a criminal enterprise that conspired to overturn Georgia's 2020 election in favor of Mr. Trump, invoking his status as a former federal officer. The defendant's indictment in this case results directly from his disregard for the lawful scope of his official duties, a disregard which now forms the basis of his Notice of Removal. Indeed, the defendant has now expressly stated that *all* of his relevant conduct was impermissible political activity. Because the defendant was not acting within the lawful scope of his federal authority during any of the activity described in the indictment, and because he can offer no plausible federal defense for his actions, the State of Georgia respectfully asks that removal not be permitted in this case.

## ARGUMENT

The defendant seeks to remove his pending criminal case under 28 U.S.C. § 1455, on the basis that at the time he engaged in the conduct described in the indictment, he was a "federal officer" under 28 U.S.C. § 1442(a)(1). Federal officer removal is available to any officer, agent, or agency of the United States (1) "for any act under color of such office" so long as they can (2) "raise a colorable defense arising out of its duty to enforce federal law." *Florida v. Cohen*, 887 F.2d 1451, 1454-55 (11th Cir. 1989). The removing party bears the burden of demonstrating that removal is proper, and if the non-removing party "appropriately challenges" the

facts presented in the notice of removal, the removing party "must support [its factual averments] by competent proof." *People v. Trump*, 2023 U.S. Dist. LEXIS 124733, *15 (S.D.N.Y. 19 July 2023) (citations omitted).

The defendant cannot satisfy either element of his burden in this case. Count 1 of the Indictment alleges that the defendant, while associated with a criminal enterprise, unlawfully conspired and endeavored to conduct and participate in the enterprise through a pattern of racketeering activity, both directly and indirectly. That conspiracy contained a common plan and purpose to unlawfully change the outcome of Georgia's presidential election in Mr. Trump's favor. *See* Indictment at 13-14. Count 28 charges the defendant with soliciting Georgia Secretary of State Brad Raffensperger to violate his oath of office by unlawfully "altering, adjusting, or otherwise influencing" the certified returns of the presidential election in Georgia. *Id.* at 87. Neither of these alleged acts fall within the scope of a Chief of Staff's official duties, and the defendant's proffered federal defense of Supremacy Clause immunity cannot apply to them. Put simply, as other courts have previously explained, "the long-recognized purpose of federal-officer removal is the protection of federal *authority*. There is no federal authority to protect here." *State v. Meade*, 2022 U.S. Dist. LEXIS 28535, *18 (S.D. Ohio 17 Feb. 2022) (emphasis original) (citing *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)).

## I.    The defendant was not acting under color of office.

In seeking removal of his case, the defendant must first make a showing that he is a federal officer subjected to criminal prosecution "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "The phrase 'relating to' is broad and requires only a 'connection' or 'association' between the act in question and the federal office." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (internal citations omitted). This is not typically a high bar to clear. However, "[n]ot every act of or on behalf of a federal officer is an act under color of office." *Trump*, 2023 U.S. Dist. LEXIS 124733 at *20. "[T]he person seeking the benefit of [federal officer removal] should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was *confined to his acts as an officer*." *Colorado v. Symes*, 286 U.S. 510, 520 (1932) (emphasis added).

The defendant asserts that "[t]he charged conduct comprises acts taken by Mr. Meadows, whether in an individual or official capacity, under color of his role as Chief of Staff to the President of the United States." Not. at 6.[3] The defendant then

---

[3] It is not clear what the defendant means by "whether in an individual or official capacity"; if the defendant was not acting as a federal officer when he performed the activities giving rise to his indictment, the inquiry ends, and he is not entitled to removal.

characterizes the conduct at issue as "arrang[ing] meetings for the President at the White House and communicat[ing] with state lawmakers and officials"; traveling to Georgia in order to "report back" to then-President Trump about the status of an ongoing post-election audit; and "arrang[ing]" phone calls between Mr. Trump and Georgia officials, including Secretary of State Raffensperger and the Secretary's Chief Investigator, Frances Watson. *Id.* These activities, defendant asserts, "fall squarely within his conduct as chief of staff." *Id.*

In his Notice, the defendant makes no mention of the fact that every single one of the activities giving rise to his indictment constitutes impermissible political activity which a Chief of Staff may not lawfully perform "under color of office." As noted above, federal law forbids any employee of the executive branch from "us[ing] his official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). Federal employees are expressly prohibited from using their official title or position while participating in political activity, which is defined as activity directed toward the success or failure of a political party, partisan political group, or candidate for partisan political office. 5 C.F.R. § 734.101.

This is *precisely* what the defendant is charged with doing, and he does not dispute it. In fact, he has readily admitted it. In his Motion to Dismiss (Document

16-1), filed on August 19, the defendant unreservedly declares that "[a]ll of the alleged conduct as to Mr. Meadows relates to protected political activity that lies in the heartland of First Amendment" and "[a]ll the substantive allegations in the Indictment concern ***unquestionably political activity*** and thus, if not covered by Supremacy Clause immunity, the charges would be barred by the First Amendment." Doc. 16-1 at 23-24. Activities are either political or they are not; the defendant has acknowledged that his activities at issue in this case are "unquestionably political" because they clearly are. However, the defendant does not cite or even acknowledge the Hatch Act, the federal statute that expressly forbids such political activity for executive branch employees acting, or appearing to act, under their official authority. Having admitted that all of his pertinent activity is political, the defendant has acknowledged that all of the activity falls outside the scope of his duties and his "color of office" because he could never, as Chief of Staff, engage in such political activity without violating a federal statute. The defendant fails to satisfy the first requirement for removal because he has stated his actions are, by definition, of a type that can never be taken "under color of office," or even bear a "connection" or "association" to such office. The inquiry can end there.

Even if it does not, however, the defendant is accused of joining a conspiratorial enterprise that sought to overturn an election, as well as soliciting a

Georgia state official to violate his oath of office by somehow altering or affecting the election's returns. It is not clear (and the defendant offers no explanation) how such activity could fall within the color of office of the Chief of Staff. In his Notice, the defendant's cursory examination of the activities directly referenced in the Indictment ignores their plainly political nature, a fact which he went on to clearly admit in his Motion to Dismiss:

- Count 1, Act 5 concerns a November 20, 2023 meeting between the defendant, Mr. Trump, and a collection of Michigan legislators in the Oval Office. Mr. Trump used the meeting to make a series of baseless and false claims about fraud in Michigan's presidential election, saying it had cost him the election. The legislators contradicted Mr. Trump, who then allowed Rudy Giuliani, serving as an attorney for the Trump Campaign and as a personal attorney to Mr. Trump, to join by phone in order to continue to assert false claims of fraud. The defendant was present for the entire meeting. *See* Exhibit A. The defendant's participation in this meeting was clearly political activity prohibited by the Hatch Act.

- As noted in Count 1, Act 6, the very next day after the meeting described in Act 5, the defendant asked a congressman to connect him

8

to two Pennsylvania legislators because Mr. Trump wanted to "chat" with them. This was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 9 concerns the defendant's participation in a separate meeting with another group of Pennsylvania legislators on November 25, 2020. In this meeting, Mr. Trump personally thanked these legislators for supporting claims about supposed election fraud in Pennsylvania earlier that day, and he discussed with them the possibility of holding a special legislative session for the express purpose of unlawfully appointing presidential electors loyal to Mr. Trump. *See* Exhibit B. The defendant's participation in this meeting was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 19 concerns a meeting between the defendant, Mr. Trump, and John McEntee, the Director of the White House Presidential Personnel Office. The defendant and Mr. Trump asked Mr. McEntee to prepare legal arguments and strategy designed to allow Vice President Mike Pence to disrupt or delay the counting of electoral votes on January 6, 2021, in violation of the requirements of the Electoral Count Act. McEntee did so at the behest of the defendant and Mr. Trump. *See*

9

Exhibit C. This was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 92 describes the defendant's December 22, 2020 unscheduled arrival at the location of an ongoing signature match audit being conducted by Georgia's Secretary of State. Georgia officials, including the Secretary of State's Chief Investigator, prevented the defendant from entering the area where the audit was being conducted. The audit concerned evaluation of absentee ballot signatures under applicable Georgia law and had no connection to any federal executive branch authority, duty, or power.

- As described in Count 1, Act 93, the defendant arranged a phone call the next day between the Chief Investigator and Mr. Trump during which Mr. Trump again repeated false claims of victory in Georgia's election and said that if the "right answer" were to come out, the Investigator would be "praised." The defendant's participation in this Act was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 96 describes how, four days later, the defendant personally texted the Chief Investigator asking whether the Secretary of State's signature audit would "speed up" and be complete by January 6 "if the

10

trump campaign assist financially." The defendant thus explicitly contacted a Georgia official on behalf of the Trump campaign, which is political activity prohibited by the Hatch Act.

- Both Count 1, Act 112 and Count 28 concern the defendant's participation in the January 2, 2021 phone call between Mr. Trump and Secretary of State Raffensperger. During the call, the defendant identified himself as the Chief of Staff. The only other speakers on the call were Mr. Trump, attorneys working on behalf of the Trump campaign, and officials from the Georgia Secretary of State's Office. The defendant contradicted the Secretary of State's own conclusions about the number of "dead voters" in the presidential election and suggested that the Secretary's General Counsel make plans to meet with the Trump campaign's attorneys in order to see "what we've got" in additional meetings. Mr. Trump made numerous false statements and asked the Secretary to "find 11,780 votes," exactly the quantity of votes needed to reverse his electoral loss in Georgia, saying "All I want to do is this."[4] At the time, Georgia's electoral results had already been

---

[4] "Here's the full transcript and audio of the call between Trump and Raffensperger," Amy Gardner and Paulina Firozi, *Washington Post*, 5 January

certified twice after a hand recount, and the Trump campaign was actively suing the Secretary of State. At no point during the call did either Mr. Trump or the defendant cite or acknowledge any federal authority concerning the topics discussed. The defendant's participation in this phone call was clearly political activity prohibited by the Hatch Act.

Since the defendant was forbidden by law to use his authority or influence to interfere with or affect the result of an election or otherwise participate in activity directed toward the success of Mr. Trump as a candidate for the presidency, every single one of these activities fell outside the scope of his duties, both as a matter of fact and as a matter of law. However, without even considering the legal requirements of the Hatch Act, it is still clear that these activities were not taken "under color of office." Employing an analysis that considered "the relationship of the challenged conduct to the claimed corresponding function of the President," another federal court has already found that Mr. Trump's "direct outreach to state election officials" were "not official acts." *Thompson v. Trump*, 590 F. Supp. 3d 46,

---

2021, found at https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

12

82-83 (D.D.C. 2022). All of the defendant's actions here, like the actions of Mr. Trump discussed in *Thompson*, "do not relate to [the President's] duties of faithfully executing the laws, conducting foreign affairs, commanding the armed forces, or managing the Executive Branch. They entirely concern his efforts to remain in office for a second term." *Id.* at 84. Finally, while the defendant is expected to make a "candid, specific and positive" showing "explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was confined to his acts as an officer," the defendant has not made any such showing. And he cannot, because "[a] sitting President is prescribed no role" in the election of a president.[5] *Id.* at 77. While the Constitution and the Electoral Count Act specify the duties of various officials in Congress and at the state level, there is no role whatsoever for the president to play and thus no authority the defendant can cite to claim his activities were taken "under color of office." *See id.* at 77-78.

The defendant has admitted that all of his relevant actions relating to the indictment were "political activity," which is precisely the sort of activity federal

_____

[5] This is very intentional, as a sitting president running for reelection should not have any role in determining whether he has won or lost his own race. A House of Representatives committee proposing reforms to the Hatch Act in 1975 wrote that, "it is imperative that [partisan political activities] be kept as far removed from the official duties of the President and the Vice President as the public interest will permit." H.R. Rep. No. 94-444, at 5 (1975).

law forbade him from taking under the color of his office. An evaluation of the actions named in the indictment makes clear that all of them were intended to "interfere with or affect" the presidential election in Georgia and elsewhere in order to somehow transform Mr. Trump from an unsuccessful candidate into a successful one. The activities are precisely the type which other courts have already determined to be "unofficial" and therefore beyond the color of the defendant's office, and he can point to no presidential authority that would bring the activities within the scope of his official duties. For all of these reasons, the defendant fails to make a "more detailed showing" that he was acting under color of office for all of the activity named in the indictment. His Notice of Removal must fail.

## II.    The defendant cannot assert a colorable federal defense.

To remove a case under § 1442, the defendant also must raise a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 136 (1989). In the context of removal, "colorable" means "plausible." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996). In his Notice, the defendant raises the defense of Supremacy Clause immunity. Supremacy Clause immunity requires the defendant to show both that he was performing "an act which he was authorized to do by the law of the United States" and that, in performing that authorized act, "he did no more than what was necessary and proper for him to do." *In re Neagle*, 135 U.S. 1, 75

(1890). In the Eleventh Circuit, a defendant's claim of Supremacy Clause immunity is negated by evidence that they acted out of "personal interest, malice, actual criminal intent, or for any other reason than to do [their] duty as [they] saw it." *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

The defendant cannot demonstrate that he has a plausible defense of Supremacy Clause immunity for several reasons. First, as detailed above, he has admitted that his pertinent activities were all "unquestionably political" in nature and therefore, by definition, outside the lawful scope of his authority as Chief of Staff. Additionally, the activities in which he assisted Mr. Trump were all "unofficial" activities concerning his efforts to remain in office for a second term, and there is no authority for a president or his chief of staff to take any actions concerning the administration of a presidential election under either the Constitution or federal law.

Under the Constitution, it is the States that are empowered to select Electors who will cast votes for President and Vice President, and the Electors transmit a tally of those votes to the President of the Senate. U.S. Const. art. II, § 1, cl. 3; *id.* amend. XII. The States are left to determine the manner of their elections. State officials, and not federal ones, prepare the elections, conduct them, assemble the ballots, count the votes, and certify the results. No doubt this is why the defendant, Mr. Trump, and other codefendants spent enormous time and effort contacting, cajoling,

persuading, and otherwise interacting with State officials in the relevant time period: because the President himself *had no authority of his own* in the administration of the election. Federal removal is designed to protect federal functions from State interference, but that was not a risk in 2020 or 2021 and is not a risk now. Instead, this case concerns attempts to interfere in *State* functions by *federal* officials without any authority of their own.

Second, even if the defendant somehow had been acting as authorized under federal law (rather than directly contrary to it), that authority would be negated by the evidence of his "personal interest, malice, actual criminal intent" or any motivation "for any other reason than to do his duty as he saw it." *Id.* The audio of the phone call to Secretary Raffensperger alone demonstrates that the defendant shared a "personal interest" with Mr. Trump in seeing the Trump campaign achieve its goal of reversing Trump's electoral loss in Georgia; it also demonstrates the defendant's actual criminal intent in participating in the solicitation of the violation of the Secretary's oath of office by "finding votes" or otherwise changing the outcome of the election. Additionally, Count 1, Act 96 demonstrates the defendant's explicit, personal interest in these matters: he asked a state official *whether the Trump campaign could pay to "speed up" a signature verification audit* in order to complete it prior to January 6. The defendant cannot plausibly argue that these

activities were somehow "authorized" by federal law when there is evidence demonstrating his personal interest, criminal intent, and overall motivations "for any other reason than to do his duty as he saw it," particularly when he has admitted that the activities were clearly political and tied to the "vigorous and tireless" advocacy in favor of Trump's election.[6]

Third, the defendant cannot plausibly argue that he did no more than that which was "necessary and proper" for him to do. "For conduct to be 'necessary and proper,' an officer must subjectively believe that his actions were appropriate to carry out his federal duties, and that belief must be objectively reasonable." *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017). As shown above, there is no authority anywhere for the President or his Chief of Staff to insert themselves into the electoral processes of the state of Georgia, meaning none of the defendant's actions were either necessary or proper. "The Office of the President has no preference for who occupies it…A function of the presidency therefore is *not* to secure or perpetuate

---

[6] Other Circuits have similarly looked to the presence of any "personal interest" in a defendant's actions, or any reason for a defendant's action aside from the proper discharge of their federal duties. *See Texas v. Kleinert*, 855 F.3d 305, 317 (5th Cir. 2017) (officer in foot chase did not take action "out of personal interest"); *Reed v. Madden*, 87 F.2d 846, 851 (8th Cir. 1937) (officer believed "in good faith" that his life and others were in danger); *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977) (officer's belief in necessity of his actions was objectively reasonable where he did not "otherwise act out of malice or with some criminal intent").

incumbency." *Thompson*, 590 F. Supp. at 82 (emphasis original). The defendant

points to nothing supporting a conclusion that could demonstrate why it would be

"objectively reasonable" to believe that his duties as Chief of Staff included acting

on behalf of the Trump campaign, pressuring state officials, or pursuing unlawful

strategies designed to ensure Mr. Trump's reelection. Even if there were some

authority supporting the defendant's actions, violating state law for a purported

federal purpose "must be the rare exception" and in every case must be "clearly seen

to be reasonable, necessary, and proper." *Id.* at 1351. It is not enough to merely say

that the defendant acted at the behest of or in service to the person who was President

at the time. "Presidents and other officials face a variety of demands on their

time,…some private, some political, and some as a result of official duty." *Clinton

v. Jones*, 520 U.S. 681, 705 n.40 (1997). A claim of immunity for unofficial acts

cannot be "grounded purely in the identity of [the President's] office." *Id.* at 695.

There is no demonstrable basis for federal authority related to the defendant's

actions, while there is ample evidence of personal, political, unofficial intentions and

activities.[7]

---

[7] This case is also not one where the defendant was a federal law enforcement
officer forced to make some kind of split-second decision. *Compare New York v.
Tanella*, 374 F.3d 141, 144 (2d Cir. 2004) (activities arising from a physical fight
in course of official duty) *with Whitehead v. Senkowski*, 943 F.2d 230 (2d. Cir.
1991) (official accused of grand larceny). *See also North Carolina v. Ivory*, 906

Finally, to the extent that the defendant seeks to claim that his Supremacy Clause immunity defense could be plausible because all his overt acts in Count 1 of the Indictment are somehow within the scope of his duties and necessary and proper for their execution, the defendant misapprehends the nature of Georgia RICO law and conspiracy law generally. An overt act "need not be a crime in itself." *McCright v. State*, 176 Ga. App. 486, 487 (1985); *see also Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975) (overt act may be "innocent in nature, provided it furthers the purpose of the conspiracy"). Thus, arguing that some or even all of the alleged overt acts are not "per se criminal" does not demonstrate that Meadows cannot remain a part of a RICO enterprise. Additionally, there are two elements to a conventional conspiracy: "an agreement and an overt act." *McCright*, 176 Ga. App. at 486. That overt act may be committed by anyone else in the conspiracy, and every conspirator is jointly responsible for the acts of every other conspirator. *Whaley v. State*, 343 Ga. App. 701, 704 (2017).[8] In order for his Supremacy Clause immunity defense to apply

---

F.2d 999, 1003 (4th Cir. 1990) (no "exigency" stemming from official duty that authorized violation of state law); *North Carolina v. Cisneros*, 947 F.2d 1135, 1140 (4th Cir. 1991) (same); *Reed*, 87 F.2d at 851 (officer made split-second decision in good faith); *Clifton*, 549 F.2d at 728 (mistaken shooting of fleeing suspect made on objectively reasonable belief).

[8] As O.C.G.A. 16-14-4(c)(1) provides, a person violates Georgia's RICO law when "[h]e or she together with one or more persons conspires to violate any of the provisions of subsection (a) or (b) of this Code section and *any one or more of*

to the RICO charge, the defendant must show that the actions demonstrating his participation in the *agreement* were authorized, necessary, and proper. He has not done so, and he cannot do so because, as the Indictment alleges, he associated with the other defendants for an unlawful purpose. Indictment at 13-14.

The defendant's actions, which he has admitted constituted improper political activity, were outside the lawful scope of his duties. He has pointed to no federal authority that would authorize his actions. He has demonstrated no basis for an objectively reasonable belief that his actions were necessary and proper to perform his duties, while evidence demonstrates that he had personal or criminal motivations for acting. He has not shown how his participation in a RICO enterprise that conspired to overturn an election had any relationship to his official duties, much less how his participation in such an agreement was necessary for him to perform as a Chief of Staff. For all of these reasons, the defendant cannot plausibly raise a Supremacy Clause immunity defense, and his Notice of Removal must fail.

## CONCLUSION

The defendant has been indicted for joining a common plan to overturn a lawful election and for asking a state official to violate his oath of office by altering

---

*such persons commits any overt act* to effect the object of the conspiracy" (emphasis added).

election returns. His indictment is the result of activities taken by him solely to advance the personal and electoral interests of Donald J. Trump. He can point to no legal basis authorizing his actions as part of his "official duties" as Chief of Staff, and he does not even attempt to explain how his activities could be lawful under the Hatch Act. The defendant's actions were not made under "color of his office" and do not support a claim of Supremacy Clause immunity. Instead, they demonstrate his characteristic disregard for the proper scope of his duties as a federal official. For all of these reasons, the State of Georgia respectfully requests that this Court find that removal should not be permitted in this case.

Respectfully submitted, this 23rd day of August 2023.

FANI T. WILLIS
DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT

By: *s/ F. McDonald Wakeford*
F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit
Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
fmcdonald.wakeford@fultoncountyga.gov

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this pleading complies with

the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.)

in that it is double-spaced and composed in 14-point Times New Roman font.

This 23rd day of August 2023.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify the foregoing was served upon the following by email:

Joseph M. Englert
McGuire Woods LLP
1230 Peachtree Street NE, Suite 2100
Atlanta GA 30309
(404) 443-5500
jenglert@mcguirewoods.com

George J. Terwilliger
John S. Moran
Michael Francisco
McGuire Woods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com

Dated this 23rd day of August, 2023.

*s/ F. McDonald Wakeford*
F. McDonald Wakeford

# Tab 27-1

**EXHIBIT A**

EXCERPT OF JUNE 8, 2022, DEPOSITION OF MICHAEL SHIRKEY

1          A     You are correct.

2          Q     So if you could --

3          A     Go ahead.

4          Q     Yeah.    I'm sorry.

5          So in that larger group, who made the trip to Washington with you and Speaker

6    Chatfield?

7          A     In addition to Speaker Chatfield and myself, we had Senators Barrett,

8    Lauwers, and Nesbitt, and Representatives Wentworth and Lilly, and then we each had

9    our own respective general counsels with us.

10         Q     And which members of that group actually attended the Oval Office

11   meeting?

12         A     Everyone except the general counsels.

13         Q     Do you recall approximately how long that meeting lasted in the Oval Office?

14         A     From the time we left the Roosevelt Building, I think it's called -- Eisenhower

15   Building -- until the time we got back, it was approximately 90 minutes.

16         Q     Who else, other than the Michigan delegation that you've described, who

17   else was present for the meeting in the Oval Office?

18         A     Physically present, all I recall is Mark Meadows.

19         Q     Were there other people who participated by phone?

20         A     Yes.

21         Q     Who do you recall participating by phone?

22         A     I recall Ronna Romney McDaniel and Rudy Giuliani.

23         Q     Do you know Ms. McDaniel from Michigan days?

24         A     I do know of her from her Michigan days, yes.

25         Q     I take it, did you invite her to this meeting?

1       A       I don't think I invited her to the meeting, no.

2       The video went out.

3       Q       Okay.    And I take it the same is true for Mr. Giuliani, you didn't invite him to

4    participate in the meeting?

5       A       No.     President Trump invited him to the meeting once the meeting started.

6       Q       And is that true for Ms. McDaniel, that she was not present on the phone

7    when the meeting started?

8       A       Neither Ronna nor Rudy were on the phone when the meeting started.

9       Mr. Schneider.       ▮▮▮▮ can you hold on a second?    We're just having an issue

10   with the video.

11      ▮▮▮▮▮▮   Sure.     Let's go off the record.

12      [Discussion off the record.]

13      ▮▮▮▮▮▮   Okay.    We'll go back on the record.

14      ▮▮▮▮▮▮▮▮▮▮▮▮

15      Q       So, Senator Shirkey, you said the meeting lasted about 90 minutes.    Could

16   you just give us, before we get into the details, just a brief overview of what took place

17   during that 90-minute meeting?    And then I'll want to dig in on some of the specifics.

18      A       So we left the Eisenhower Building, made our way across the walkway, went

19   up through a narrow set of stairs, went into the reception area, which I believe was

20   immediately adjacent to the Oval Office.

21      Had an interaction with the receptionist for the United States of America.

22   Challenged her on that title that she got, and she showed me her business card.    So she

23   indeed was the receptionist for the United States of America.

24      I don't think we were there more than 5 to 7 minutes.    Didn't feel like a long

25   time.    And then we were escorted into the Oval Office.

1          And Mr. -- President Trump was behind his desk.   Came out from behind it and

2     shook everybody's hands.

3          And then there were seven chairs set up across the front of the desk, and we all

4     took positions on those chairs.   Mark Meadows sat on the sofa behind us.   And to the

5     best of my recollection, he was there for the entire meeting.

6          And then we ran through the cordials.   So everybody had a chance to introduce

7     themselves and where they're from in Michigan and maybe -- I think some of them even

8     acknowledged some of the committees that they serve on.

9          And then we started, began to have a conversation.   Conversation for a while.

10    And then at one point in time, the President got up and went out in the Rose Garden for a

11    few minutes.   I don't know how long.   It was 7, 8 minutes maybe.   I don't think it was

12    10 minutes.

13          And then after that the conference call occurred with Ronna and with Giuliani.

14    We did have an entertaining interaction with the fellow that brought Diet Coke in to the

15    President.

16          Then we finished up our conversations.   We concluded with a presentation of

17    our letter to him and explained the purpose of it.   And there were photo ops for all of

18    the members that were there.   One member, I think Senator Nesbitt actually had

19    something he wanted the President to sign so he could have a signature from him.

20          And at that point in time, we departed from the Oval Office with Mark Meadows.

21    He took us on a detailed tour, a very interesting detailed tour of the Situation Room and

22    the Cabinet Room.

23          We spent not an insignificant amount of time in both of those locations because I

24    was full of questions regarding particularly the Situation Room.   He went through a

25    number of scenarios in which he was actually present and personally was able to observe

1    with regards to things like rescuing people in remote parts of the world.

2    　　　　Then he presented to us some trinkets and souvenirs to leave with.    And then we

3    left.    And we did not go back to see the President or the Oval Office.

4    　　Q    Thank you for that overview.    That's helpful.

5    　　　　So I want to focus on the portion, the conversation, what you described as sort of

6    the meeting starting after that, after the introductions, and so forth, but before the

7    President went out to the Rose Garden.

8    　　　　So what was the -- I assume the President at some point early on in that discussion

9    announced the reason that he had called you to Washington?

10    　　A    I don't think there was -- to the best of my recollection, I don't think there

11    was ever a formal statement of reason for coming, but there wasn't a mystery about it

12    either in terms of he's inquiring as to what Michigan is doing to investigate the allegations

13    on fraud.

14    　　Q    Can you give us more specifics about what the President said about the

15    allegations of fraud?

16    　　A    You know, I'm going to disappoint you a bit because there's not a lot of

17    specifics that he said that I'm going to remember directly.    I'm doing the best I can to

18    remember the essence of the conversations.

19    　　　　One thing I do remember is that he never, ever, to the best of my recollection,

20    ever made a specific ask.    It was always just general topics about, you know, did you

21    hear about this or what are you doing about -- you know.    And he would make mention

22    about Wayne County and TCF Center and all of the video that was shown on national TV

23    with respect to that and did it in the form of questioning what's actually going on there.

24    　　　　He was a bit disparaging about Wayne County.    At one point in time I made it

25    clear to him that he didn't lose Michigan because of Wayne County.    And that was -- I

1   could tell by his body language that wasn't necessarily what he wanted to hear.

2         Q     Can I stop you there for one second?

3         What do you recall him saying that was disparaging of Wayne County?

4         A     Just that all of the chaos going on with TCF Center and the late night band

5   showing up that everybody has seen a thousand times on TV and the boxes being

6   unloaded, and then the inference that if none of that had happened he would have won

7   Michigan.   And that's not a true statement.

8         Q     Did he make comments along the line of Detroit is corrupt or they're corrupt

9   in Detroit or in Wayne County, sort of broader statements about sort of his views of

10   Detroit politics, Wayne County politics, or elections?

11        A     I don't recall if he ever used the word "corrupt," but I do think he probably

12   referenced that Wayne County has a history.

13        Q     And you said you made some response -- or responded to that by telling him

14   that's not why he lost Michigan.    Do you remember what you said to him in that regard?

15        A     I do, because I have had to repeat it a few hundred times to other people

16   besides President Trump.

17        Q     What did you say?

18        A     I said he primarily lost Michigan because of two counties that are routinely

19   Republican counties, Kent County and Oakland County, and more specifically he

20   underperformed with educated females.

21        And I'm going to be even more specific.    If he had received the same number of

22   votes as the two winning sheriffs in those two counties, he likely would have won

23   Michigan.

24        Q     So I take it by November 18th, 2 weeks after the election, you already had

25   fairly specific demographic information about how sort of the votes broke out in various

1    parts of the State.

2         A    Yes.    It was sliced and diced pretty well.

3         Q    And do you know how he did in -- how the President did in Wayne County as

4    compared to, say, 2016?

5         A    He actually outperformed considering the increase in voter turnout in 2020

6    than he did in 2016.    It was not enough, obviously, to carry the election.    He didn't

7    underperform in Wayne County if you compare it to 2016.

8         Q    You said that when you made that comment to him he didn't seem to like

9    the answer.    What made you think that?

10         A    My recollection is he quickly changed the topic and went a different

11    direction, but don't ask me what that was because I don't remember that.

12         Q    Do you remember what he said about concerns about the TCF Center

13    specifically?

14         A    He's famous for broad strokes.    Can you believe all the cardboard that they

15    were taping up on Plexiglass?    And can you believe the yelling and screaming that

16    occurred?    And can you believe they locked certain people out who wanted ostensibly

17    to come in to observe?    There was a litany of those things that he was going through.

18         Q    Did you push back on any of those claims?

19         A    No, because I didn't know enough at that time.

20         Q    So the meeting was on -- I don't know if we even established this yet -- the

21    meeting was on November 20th, on a Friday.    Is that right?

22         A    Yeah.    Yes.

23         Q    So the evening before, or late in the afternoon before, on November 19th,

24    there was a press conference that Mayor Giuliani, Sidney Powell, and others held at the

25    RNC headquarters in Washington.

1          Do you recall that press conference or anything about it?    It got a lot of national

2    media attention.

3          A      Yeah, I don't remember any -- I remember many, watching many press

4    conferences, but I don't remember -- I don't recall any specific press conferences.    I

5    recall seeing Rudy Giuliani on television more often than I care to remember on this topic.

6          Q      This is a press conference that got a lot of attention.    Mr. Giuliani had some

7    hair dye or what appeared to be hair dye running down his face during it.    And there

8    was a lengthy discussion at the press conference by Sidney Powell and Mr. Giuliani about

9    Dominion voting machines and Hugo Chavez.    I'm just wondering if that rings a bell for

10    you.

11          A      I can remember Giuliani mentioning Dominion voting machines.    I'm just

12    not sure I remember it at that particular press conference.

13          Q      And the reason I bring up the press conference is that the Oval Office

14    meeting was the day after, and I'm wondering whether -- for a lot of people that press

15    conference left a lasting impression, and whether that was something that was front of

16    mind for you or came up in the discussions during the White House meeting.

17          A      So when he was on the conference call in the Oval Office he was repeating

18    things that I had heard him say multiple times.    Whether or not it was the night before

19    or not, to me, he hadn't changed his mantra much at all.

20          Q      Got it.    Okay.    Let's move to that part of the meeting.

21          So you had this initial discussion.    The President left the Oval Office for a period

22    of time, a few minutes, less than 10 minutes, and then came back in.    And you said at

23    that point Ms. McDaniel and Mr. Giuliani joined by phone.

24          Am I getting that sequencing right?

25          A      You are.

1      Q      How is it that they joined the conversation, if you know?

2      A      If I recall correctly, the President hit a button on his phone and had

3      somebody connect them.   He did not directly dial them.

4      Q      But he requested that they be brought into the conversation, to your

5      recollection?

6      A      That is true.

7      Q      Did the President bring Ms. McDaniel and Mr. Giuliani in at the same time or

8      was it at different points during the meeting?

9      A      I remember Ronna speaking first.   I don't remember if they were on at the

10     same time or it was one call then the next one.

11     Q      What do you remember Ms. McDaniel saying during that meeting?

12     A      It was no substance.   It was a lot of, "Sorry I wasn't able to be there to see

13     my friends from Michigan, yada, yada, yada."   But there was no -- to my recollection,

14     there was no real substance as relates to the election.

15     Q      Did Mr. -- did the President tell the group why he was bringing Ms. McDaniel

16     into the call?   So, in other words, "Hey, I'm going to get Ronna McDaniel on for X, Y, or Z

17     reason."

18     A      I don't remember.

19     Q      Okay.   How about Mr. Giuliani?   What do you recall his role being in the

20     meeting?

21     A      There was an interaction between the President and us about questioning

22     how were we looking into allegations of fraud and so forth.   And we were -- again, that's

23     when we were talking about TCF and Wayne County and Oakland County and Kent

24     County.

25            And I believe the strong inference from both Speaker Chatfield and I was that we

1    saw no reason for anything to be done on our end other than to investigate some of the

2    allegations.

3         And he asked if you'd like to -- no.   He asked, "Would you mind if I dialed in

4    Giuliani?"   What am I going to say?   Yeah, I don't want Giuliani on the phone?   So I

5    think even if I said no, he would have just done it anyway.

6         But that's the best of my recollection.

7         Q      And when Mr. Giuliani came on the phone, did you get the sense that he was

8    surprised to be brought in?   Had he been sort of -- did he know what he was getting into

9    or what you guys were doing when he was brought on the line?   I know I'm asking you

10   to speculate somewhat here.

11        A      Yeah.   I don't think I recall vividly enough to be able to comment on that,

12   other than it didn't take him long to get into his routine.

13        Q      He got up to top speed pretty quickly?

14        A      Yes.

15        Q      So tell me about what Mr. Giuliani said when he got on the line.

16        A      He started going through his litany of claims and observations that he's

17   made and the reasons why, in his opinion, the election was problematic, if not worse.

18   And he went on.   He was filibustering, is what he was doing.

19        Of everybody in that room, I'm not so sure he wasn't the one that talked the

20   longest of all of us for that entire time.   He talked a long time.   That's what he was

21   doing.

22        Q      And was this -- was the President participating in that part of the discussion

23   or was Mr. Giuliani pretty much just on a long monologue?

24        A      He was on a long monologue.   And so I'm not sure if this was ever talked

25   about post-meeting, but I may have offended him a little bit because I did my best to

1    interrupt him because he was going -- literally going on and on and on.    It was just

2    getting to the point of uncomfortable.

3        So I was, "Rudy?    Rudy?    Rudy?"    He finally stopped talking.    I simply asked,

4    "So when are you going to file charges, file a lawsuit in Michigan?"    And there may have

5    been a 2-second void, and then he just kept talking.

6        Q    So he didn't answer the question about when he would file the lawsuit?

7        A    Never answered the question.

8        Q    Why did you feel the need to interrupt him to ask that question?

9        A    Because I'm impatient.

10       Q    Did you find his presentation compelling in terms of the points that he was

11   making about election fraud?

12       A    I found that there was nothing new that I hadn't already heard.

13       Q    Did any of the other members of the Michigan delegation speak up and

14   challenge Mr. Giuliani in the same way that you did?

15       A    I don't think anybody else spoke -- to the best of my recollection, I don't

16   think anybody else spoke while Rudy was speaking.

17       Q    Did the President make any comments during Mr. Giuliani's lengthy

18   discussion about his concerns or claims about election fraud?

19       A    I don't -- I honestly don't recall.

20       Q    Did the President respond in any way when you challenged Mr. Giuliani and

21   asked him when he was going to file a lawsuit?

22       A    I recall that he sat up a little bit, but he never said a word that I recall.

23       Q    When you asked Mr. Giuliani whether he was going to file a lawsuit, what

24   did you mean by that or what was the point of making that -- or asking that question?

25       A    My point then, and it always has been, that I got -- I was tired of hearing all

1    of these loosely calculated claims and allegations but no substance to back them up.

2        Something as serious as this, it was my strong personal feeling that we were

3    destroying the country by talking like this without having something to follow it up with

4    and creating unnecessary doubt across the country.

5        Q    Did you share that feeling explicitly at the meeting?

6        A    No.

7        Q    Did you ever say words to the effect that this is dangerous or we're

8    destroying the country by raising these claims without any evidence to back it up?

9        A    No.

10        Q    And I said "we are."   I'm not suggesting that you were raising these claims, I

11    guess.   Did you suggest that it was irresponsible or dangerous for Mr. Giuliani to be

12    raising these claims without evidence to back them up?   Did you say words to that

13    effect?

14        A    I don't know.   I don't think I did.   But that was the -- you asked what was

15    the reason for me to say it, and that was the reason for me, to try to get to the point.

16        Q    At any point during the meeting did you tell the President your personal

17    view regarding the claims that had been raised regarding Michigan?

18        A    Yeah.   I told him about he didn't lose it because of Wayne County and all

19    the rest of the stuff I just shared with you.

20        Q    You did share that.   I'm sorry.   I neglected that piece.

21        How about concerns about whether there was evidence to back up those specific

22    claims of election fraud?   Did you ever raise concerns or questions about that in your

23    meeting with the President?

24        A    That was a strongly implied question when I asked Rudy whether or not he

25    was ever going to file a lawsuit.   But I never mentioned it specifically.

1        Q    Any other comments to Mr. Giuliani -- or did you make any other comments

2  to Mr. Giuliani along the same lines, expressing skepticism or challenging him with

3  respect to the claims that he made, other than the comment you described about the

4  lawsuit?

5        A    I don't think I -- I don't think there was any more exchange between Giuliani

6  and I after that.

7        Q    At some point Mr. Giuliani stopped talking, I take it?

8        A    Yeah.    Yes, he did.

9        Q    And then where did the meeting go from there?

10       A    It was terminated -- that call was terminated.   I don't recall if it was

11  terminated by the President or by Giuliani.

12       Q    After Mr. Giuliani was off the line, did your conversation with the President

13  continue regarding election fraud?   I know you've mentioned the COVID issue that you

14  brought up towards the end of the meeting, but was there any further discussion about

15  election fraud claims after Mr. Giuliani was off the line?

16       A    Marc, I don't recall that.   It doesn't mean that it didn't happen.   But it

17  was -- any comments that the President made regarding that, they were always just

18  general things.   They were not specific.

19       █████████    Okay.   Before I move on to another topic, ████  do you have any

20  questions on this?

21       Ms. ████.   No.   Thanks, ████

22       ████████████

23       Q    So I'm going to -- I know you described some other things that took place in

24  that meeting, but I'm going to move on to sort of the post-meeting time period, Senator

25  Shirkey.

**Tab 27-2**

**EXHIBIT B**

EXCERPT OF MARCH   , 2022, DEPOSITION OF CASSIDY HUTCHINSON

1    and then not coming.    And then Mr. Meadows asked Mr. Giuliani who he could have his

2    team coordinate with.    And then that's when they put me in contact with Mr. Epshteyn

3    and Mr. Kerik.

4        Now, there's people's information coming from Mr. Epshteyn, Mr. Kerik.    People

5    were communicating to Ms. Molly Michael, and then Ms. Molly Michael would either call

6    me -- I typically -- this might have been one of the first times I did meeting logistics.    It

7    wasn't something I really ever did before.

8        So it was a little bit more discombobulated.    We were pretty short staffed that

9    day because it was the day before Thanksgiving, so there was a lot of cooks in the kitchen

10   on this particular event.    Ms. Michael, Mr. Kerik, and Mr. Epshteyn were the primary

11   people I think I was in contact with that day.

12       Q    Okay.    If we can scroll -- continue scrolling.    I'll show you page 4 of exhibit

13   No. 21.    These are still messages with Mr. Kerik, showing his vehicle registration

14   information.    And we stop there.    An identification for an individual named James

15   Phillip Waldron.    And if we keep scrolling, some personal information for him.

16       And then on to page 5, it says:    We should be arriving just before 6.    And you

17   send what looks to be a final list, as best I can tell at this point, with 29 individuals.

18       Is it your understanding that all of these people showed up to meet at the White

19   House on November the 25th after the hearing in Pennsylvania?

20       A    Yes.    And I do believe there were maybe a couple more because I do

21   remember having to go and edit the list.

22       Q    Okay.    And Phil Waldron, had you ever talked to him before or seen him

23   before November 25th?

24       A    I believe November 25th is the first time I saw -- I had met Mr. Waldron.    I

25   know that we met several times after that, but I believe November 25th was the first time

1     that I had communicated with and met him in person.

2          Q     What was your understanding of Mr. Waldron's role with respect to what I'll

3     call the campaign, whatever is left over from the campaign in the postelection period?

4          A     On November 25th, I had absolutely no idea who he was.

5          Q     Were you in the meeting --

6          A     I didn't know that he was -- I didn't know that he was going to end up taking

7     a more prominent role.    I thought that he would have just -- I thought at the time he

8     was just another guest that was coming that day to meet the President.

9          Q     And you said he did take a more prominent role ultimately?

10         A     He came back to the White House, and he continued speaking with Mr.

11    Meadows on and off throughout November, December, January, where a lot of these

12    other individuals, you know, November 25th was the first and last time they came to the

13    White House.

14         Q     Do you know what Mr. Waldron came to talk to Mr. Meadows about

15    throughout that period?

16         A     Issues of election fraud.

17         Q     Would he come by himself or with others?

18         A     I believe he always came with others.    I don't believe him and Mr.

19    Meadows ever met individually.

20         Q     Now, this is jumping ahead a bit, and we don't have this as an exhibit.    We

21    understand that Mr. Waldron had some role in a PowerPoint presentation about options

22    for January the 6th.    And this has been circulating more recently, so I don't want you to

23    base your answers on anything you learned recently.    But do you remember Mr.

24    Waldron and his role in that PowerPoint at all?

25         A     I remember Mr. Waldron bringing up the PowerPoint, and I don't recall

1    whether he emailed it to me or -- but I recall him saying it'll be in your email.    I don't

2    recall how.    And I do recall the PowerPoint from that time.

3        Q    Is that one of the PowerPoints you referred to earlier, do you think, when we

4    talked about PowerPoints and Mr. Eastman and some of the other theories?

5        A    Yes, sir.

6        Q    And you received that PowerPoint directly from Mr. Waldron?

7        A    I don't -- I don't recall who I received it from, but I recall Mr. Waldron

8    discussing that PowerPoint, either that I would be soon receiving or that he would be

9    sending me.

10        Q    What did he ask -- or what did he want you to do with that PowerPoint, if

11    anything, and to your understanding?

12        A    I don't recall him asking me to take specific action on it, other than I knew

13    that he wanted it to be discussed, knew that it would be a topic of conversations if not

14    meetings.    But I don't recall him asking me at the time to take specific instruction or

15    action on any materials that may or may not have come across my desk that he was

16    involved in.

17        Q    Do you remember whether this PowerPoint was ever presented to Members

18    of Congress?

19        A    I guess the PowerPoint that I'm thinking of that was presented to members

20    in the Cabinet Room meeting on December 21st.    But to be fair, there were several

21    PowerPoints that had come across my desk.    So, I mean, I'm thinking of the ones that I

22    believe was in that meeting, but there is numerous -- a number of presentations.

23        Q    Okay.    And we'll get to that meeting in particular in a moment.    But you

24    remember discussions on December 21st in the meeting in the Cabinet Room about

25    something related to options for January the 6th and the Joint Session of Congress?

1     A    Yes, sir.

2     Q    Okay.   And we will get to that.

3     Getting back to the exhibit that we had up, which is the text messages with Bernie

4    Kerik --

5     A    I put those away.

6     Q    I'm sorry.

7     A    That's okay.   I jumped the gun on that one.

8     Mr. Passantino.   Optimism.

9     BY MR.███████:

10    Q    All right.   So on page 6, you say -- this is at 1753, so 5:53, if I can do my

11   math right.   It says, You are all cleared to enter the complex at 17th Street and State

12   Place.   Secret Service will show everyone where to park.

13    You talk about security.   And you say, From there, they'll bring you into the West

14   Wing.   I am with POTUS and the chief, but call me if you have any questions or issues.

15    So it seems like you were with the President and Mr. Meadows before this

16   meeting with Pennsylvania personnel.   Is that right?

17    A    I don't recall if I was in the Oval Office at the time of sending this text

18   message or if I had stepped out to send it or ran back to my office, but I was in and out of

19   the Oval Office throughout that entire afternoon.   So it was likely me checking in with

20   them to let them know that they're all cleared to go in and that, like, I was available to

21   have conversations with them if any issues happened at the gate.

22    Q    What was your understanding of the purpose of this meeting when they

23   came to the White House?

24    A    My understanding at the time was it was more of a -- Mr. Trump is a very

25   hospitable man and he's an entertainer and he likes people to feel appreciated.   So my

1    understanding at the time was he wanted to welcome the people to the White House

2    that night, have a conversation with them so he could personally thank them for speaking

3    out against allegations of election fraud on the national stage that day.

4         Q     Were you in the meeting with the President when the people identified in

5    the list that you sent in the text showed up?

6         A     So it wasn't a formal meeting, but I was in physical proximity with the

7    individuals on and off throughout that night, and I was in the Oval when they went in for

8    photos with him.

9         Q     Okay.   So they took --

10        A     [Inaudible] from start to finish, no.   I had been going in and out.

11        Q     It sounds like they took photographs in the Oval Office.   Did they also

12   discuss what had happened that day in the hearings in Pennsylvania with the President in

13   the Oval Office?

14        A     Between the Oval Office and the Cabinet Room, yes.

15        Q     And were those discussions the ones you just described about the President

16   expressing his thanks for raising these issues?

17        A     Broadly speaking, yes.

18        Q     Do you remember the President making any requests of the group from

19   Pennsylvania?

20        A     Not specifically, no.

21        Q     Okay.   So we understand that the President may have asked the

22   Pennsylvania delegation to hold a special session to appoint Trump and Pence electors for

23   the purposes of the later electoral college vote, even though the certification had already

24   happened of the vote in Pennsylvania.

25             Do you remember that coming up at all in the meeting with the Pennsylvania

1    delegation on November 25th?

2         A      I remember that being discussed, but I don't remember interpreting that as a

3    specific request or action that he wanted them to take.    But I recall that coming up

4    generally.

5         Q      Can you tell us what you remember on that topic coming up?

6         A      I don't recall any verbatim phrasing of it.    I apologize if this is redundant.    I

7    recall that topic coming up in several of the individuals that traveled to see him that night

8    saying, We'll look into it, sir, anything to keep you around, you know, more of the

9    chummy conversation that they were engaging in at the time.    It was friendly

10   conversation, and I don't recall it being anything that was -- had nefarious intent or an

11   explicit request.

12        Q      Do you know if anybody from Pennsylvania who attended the meetings in

13   the White House or the greeting in the White House on November 25th told the

14   President that they couldn't hold a special session to appoint Trump or Pence electors?

15        A      No, I don't recall that, but it also wasn't really a conversation I was paying

16   super close attention to.

1

2       [3:14 p.m.]

3                       BY MR. ████:

4       Q      Do you remember anything else about that meeting that the President said

5       to the group?

6       A      Nothing specifically at this time.

7       Q      So I understand that, I believe maybe just earlier or just after that, that two

8       representatives from Michigan, Senate Majority Leader Shirkey and House Speaker Lee

9       Chatfield also went to the White House and met with the President in the Oval Office.

10      Do you know anything about that meeting?

11      A      Could you repeat their names, please?

12      Q      Sure.   Senate Majority Leader Shirkey and House Speaker Lee Chatfield

13      from Michigan.

14      A      I recall the Michigan meeting, but I don't recall those certain individuals.

15      Q      Okay.   What do you remember about the Michigan meeting?   And, to be

16      clear, there were other people who attended the White House meeting along with

17      Senator Shirkey and Speaker Chatfield.

18      A      I honestly don't recall that many specifics about that meeting.

19      Q      Do you remember why the President wanted to meet with them in the

20      White House, where he specifically invited them?

21      A      Broadly speaking, to discuss the results of the election, to discuss potential

22      instances of voter fraud and how the State was going to approach that when addressing it

23      on the national level, and it was elevated to Congress later the next month and the

24      following month after that.

25      Q      And when you say "elevated to Congress," are you referring to the joint

**Tab 27-3**

# EXHIBIT C

EXCERPT OF MARCH 28, 2022, DEPOSITION OF JOHN MCENTEE

1    Bill Olson" -- who sent it to you.    Who is Bill Olson?

2         A    I don't know.

3         Q    Okay.

4              Then, "Bob Marshall (former member of Virginia House of delegates, 26 years)."

5    Other than the description there in the parenthetical, do you know who Bob Marshall is?

6         A    No, I don't.

7         Q    Okay.    And "Kurt Olsen."    Who is Kurt Olsen?

8         A    Don't know.

9         Q    Okay.

10             Do you have any familiarity with a January 4, 2021, meeting between President

11   Trump, Vice President Pence, John Eastman, Marc Short, and Greg Jacob?

12        A    I don't, but this could've been the meeting that I was referring to earlier

13   when we went up after and he said, "Michael, do the right thing."

14        Q    Okay.

15        A    I think John Eastman was there and that meeting was concluding, but I can't

16   say definitively.    I think it was that same meeting.

17        Q    Okay.

18             We went over that one-page set of bullet points that you wrote up regarding

19   Thomas Jefferson's role in the electoral count.    Did you do any other memos for the

20   President regarding the joint session of Congress?

21        A    Yeah.    There was one other -- somebody brought up a point in one of these

22   meetings -- I don't remember who it was -- about splitting some sort of count, and they

23   said, "Can you go look into that?"

24             So, again, me and Dan Huff went back to my office and just researched that.    And

25   we gave them what we found on that, which was kind of, like -- I don't know.    It had

1    never been done, but we just kind of broke down what this person was referring to.

2        Q    Okay.    And we'll go to exhibit 32, which might help refresh your

3    recollection here.

4        Okay.    This is a handwritten note.    "This is probably our only realistic option

5    because it would give Pence an out."    Signed, "Johnny."

6        Is that from you?

7        A    Yeah.

1

2      [3:16 p.m.]

3                   BY ▮▮▮▮▮▮ :

4      Q      And was that written to the President?

5      A      I think this was to Meadows, but Meadows-slash-the President.   He would

6   read it and give it to him, or I gave it to him directly, I'm not sure.   They were both in the

7   meeting when this thing was being talked about.

8      Q      Okay.   So could you explain how it came about that you did this memo?

9      A      Yeah.   Somebody brought up splitting some sort of vote.   And like the

10   other thing they said, can you look into that, like exactly what they meant by that?   I

11   don't know if it was one of these guys who called, because I don't know why they couldn't

12   get the information from that person.   So I went back, worked on this document, and

13   then brought it back to them.

14      Q      Okay.   So were you in the meeting where it came up, or did somebody call

15   you and ask you to do this?

16      A      No, they had spoken previously to one of these lawyers -- I don't know if it

17   was one of the Olsen twins or who -- about something about splitting the vote, and they

18   were trying to understand it.   So he said, can you look into what they mean by that?

19   So based on the very little information I had, this is what we came up with.

20      Q      Do you -- you don't remember who it was who asked you to do this?

21      A      It was probably the President.

22      Q      But, again, do you remember were you in a meeting when you were asked to

23   do this or somebody reach out to you?

24      A      No, it's -- so I spend the day in the outer Oval usually after the morning stuff.

25   So I'm just kind of there, you know.   So they're meeting about something.   Then he just

1    calls me in, says, can you look into this?    So then I go over to my office, type it up, bring

2    it back, you know.

3        Q    Okay.    So to the best of your recollection, as you were in the outer Oval not

4    participating in the meeting, but you were called in, given this assignment, you looked

5    into it, and wrote this up?

6        A    Yeah.

7        Q    And then did a handwritten cover note.    And do you recall who you gave

8    that note to?

9        A    I don't.

10        Q    Okay.    But was the meeting still going on?

11        A    No, this was later in the -- later in the day.

12        Q    Okay.    So to the best of your recollection, what was the question you were

13    asked to look into?

14        A    How could he possibly split the vote or something like that.

15        Q    And did anybody help you research this question?

16        A    Just the guy in my office.

17        Q    Who was that?

18        A    Dan Huff.

19        Q    Okay.    And, roughly, how long did it take you to do this assignment?

20        A    Maybe a few hours that day.

21        Q    And how did he go about doing it?

22        A    I think Dan was familiar with this argument for some reason because he had

23    talked to one of these lawyers.    But he mostly ran point on it, and I just kind of saw if it

24    made sense or not.    When it was finished I brought it back over and just said this is the,

25    you know, this is the only option.

1     Q    So did Mr. Huff write this up?

2     A    I mean, me and him working together, but it was his research, yeah.

3     Q    And do you know what sources he relied on for his research?

4     A    I don't.   I don't know if he put a source on it or not.

5     ██████    Do you have a question?   Go ahead.

6     BY ██████

7     Q    Sure.

8     So I just want to talk through the sort of text, you know, the handwritten note on

9 top of this memo.

10    So you wrote, "This is probably our only realistic option."   Only realistic option to

11 do what?

12    A    Whatever they were trying to do at that time.

13    Q    So it refers to the only realistic option to split electoral votes?

14    A    I think, yeah, I think the goal at that time, from what I heard, was to send it

15 back to the States.   So I think it's referring to that.

16    Q    So was the question to how was it possible to split electoral votes, or was

17 the question how to send the electoral vote back to the States?

18    A    I don't -- I don't remember.

19    Q    So, I mean, at least in my mind, those are kind of two different concepts,

20 right?   You know, one is, like, how many electoral votes you select or not, and the other

21 is, you know, adjourning the joint session and letting State legislatures have some time to

22 look into this issue.

23    Do you have any understanding of what those concepts were he was talking about

24 then?

25    A    No, I don't.

1     Q     Okay.   So later, sort of at the end of this note, you wrote, "This is probably

2     our only realistic option because it would give Pence an out."    What did you mean by

3     "give Pence an out"?

4     A     Well, I thought it was, like, pretty obvious he wasn't going to just reject

5     whatever, you know, reject the electors or whatever was being asked of him at that time.

6     So when we looked into this, it was like, oh, this sort of puts it back to the States to

7     decide.    I mean, I'd have to relook at the document, but that's what I mean by giving him

8     an out.

9     Q     Yeah, why did you think it was obvious that he wasn't going to do that?

10     A     Just the demeanor of him and his chief of staff.    I could just tell they were

11     not going to do it.

12     Q     Like his demeanor in the meeting?

13     A     Yeah.    Yeah.    I could tell he was just, you know, he was being cordial, but

14     it didn't seem like he was going to do anything out of the ordinary in this process.

15     Q     Can you describe what his demeanor was like that gave you that impression

16     that he wasn't going to do it?

17     A     No, it's just body language, you know, and just pretty timid.

18     Q     Did he ever say to the President, you know, "I don't think I'm going to do

19     that"?

20     A     Not that I ever saw, no.

21     Q     Okay.   So it was just your sort of read of body language that he wasn't

22     going to do that?

23     A     Yeah.

24     Q     And so what was it about those options that you felt like Mike Pence could

25     accept?

1      A      I would have to read it again, but basically this I don't think made him

2   reject -- yeah, okay.    "So the VP doesn't" -- yeah, I don't know, it was just an interesting

3   idea that somebody proposed, that he would accept half of the disputed States, and then

4   I don't know if this would, like, give them the necessary time they needed.    I don't really

5   remember.

6      Q      Okay.    Other than the meetings that you were just telling me about, do you

7   recall any conversations, either with the President or with Mark Meadows or anyone else

8   in the White House, about what you thought Mike Pence was likely to do or not likely to

9   do?

10      A      No, I didn't.

11      Q      That's all I have.

12          BY ███████████:

13      Q      So in preparing this memo that's up on the screen there, or set of bullet

14   points, whatever you want to call it, did you consult with the White House Counsel's

15   Office?

16      A      No.    But I probably gave them this document.

17      Q      Did they review it before it went to the President?

18      A      No.

19      Q      Why didn't you consult with them?

20      A      That -- I mean, that's just usually a waste of time.

21      Q      Why?

22      A      Well, it's for them to discuss.    You know, they were in the meeting.    Or,

23   you know, they say look into this, so I give it to everyone that was in that meeting, here

24   you go.    You know, it's not for me to decide.    Otherwise they'd say, where is that thing

25   I asked you about?    And I was like, White House counsel's reviewing it.    Like, well, that

1    was a week ago, you know.

2           They knew -- I don't know about this particular one, but the Thomas Jefferson

3    one, they definitely knew because they were in that meeting.

4        Q    Okay.    So with regard to the Thomas Jefferson one, your recollection is that

5    Mr. Cipollone was in the meeting?

6        A    Yeah, when it was asked if there was any precedent, yeah.

7        Q    And this one, the Pence can let the States decide, do you recall whether Mr.

8    Cipollone was in that meeting?

9        A    I don't.    It's likely, but I can't say definitively.

10       Q    Do you know whether Greg Jacob was in that meeting?

11       A    I don't know who that is.

12       Q    He was counsel to the Vice President?

13       A    Oh.    No, I doubt it.

14       Q    Do you know if Marc Short was in that meeting?

15       A    I don't believe so.

16       Q    Was the Vice President in that meeting?

17       A    No.

18       Q    Okay.    Do you remember anybody who was in that meeting?

19       A    Meadows and President Trump.

20       Q    Okay.    And do you remember if there were any outside lawyers there?

21       A    I don't think there were, no.

22       Q    So you think it was just the President and the chief of staff?

23       A    Yeah, because, I mean, if Short was in the meeting, I would have given him

24   this memo, but I don't remember giving him this memo.    You know, whoever was in the

25   meeting, I'm basically doing the research and giving it back to them.    So I think it was

1       just Meadows and Trump.

2           Q       And you think you gave this to the White House Counsel's Office after the

3       fact?

4           A       I believe I did, yeah, but I can't say definitively.    Definitely -- they definitely

5       saw the Thomas Jefferson one.

6           Q       Okay.    For this one, do you recall whether they responded in any way?

7           A       No, I don't.

8           Q       Okay.    What about on the Thomas Jefferson one?

9           A       I don't think this one went anywhere.    I think the Thomas Jefferson one

10      was discussed, but I don't think they even discussed this.

11          Q       Okay.    The Thomas Jefferson one, do you know what the reaction was from

12      the White House counsel?

13          A       Yeah, I remember Philbin just bringing up something about the FEC rule now

14      that kind of changed the way, that made the, like, Pence's role more like perfunctory or

15      something.

16          Q       Okay.    But was it the Electoral Count Act?

17          A       I think it could have been, yeah.

18          Q       Okay.    And had you looked at the Electoral Count Act in the course of your

19      research on the Thomas Jefferson memo?

20          A       Yeah, I think we even made a footnote of it.

21          Q       Let's look at exhibit 33.    And it's a memorandum for the President, subject,

22      "Operation 'Pence' Card --    December 23rd."    But the memo itself is dated

23      December 22nd, 2020.

24              Do you know who wrote this?

25          A       No.

**Tab 27-4**

**EXHIBIT D**

NOVEMBER 9, 2021, REPORT OF THE U.S. OFFICE OF SPECIAL COUNSEL

"Investigation of Political Activities by Senior Trump Administration Officials
During the 2020 Presidential Election"

# INVESTIGATION OF POLITICAL ACTIVITIES BY SENIOR TRUMP ADMINISTRATION OFFICIALS DURING THE 2020 PRESIDENTIAL ELECTION



**U.S. Office of Special Counsel**
**November 9, 2021**

TABLE OF CONTENTS

Part I:  Executive Summary ............................................................................. 1

Part II:  The Hatch Act .................................................................................... 7

Part III:  Pervasive Hatch Act Violations in the Trump Administration ....................................... 10

1.  The 2020 Republican National Convention Generated Substantial Public Discussion of the Hatch Act and an Unprecedented Number of Hatch Act Complaints ................................. 10

2.  OSC Received Numerous Complaints Alleging that Senior Trump Administration Officials Violated the Hatch Act in the Months Prior to the 2020 Election ....................................... 12

3.  Legal Standard Required to Establish a Hatch Act Violation ............................................... 14

    A. The employees described in this Part were all covered by the Hatch Act. ................... 14

    B. It is a prohibited use of official authority for an employee to support or oppose a candidate for partisan political office while acting in an official capacity. ................. 14

4.  The Subject Officials Violated the Hatch Act by Campaigning on Behalf of President Trump's Reelection While Acting Within the Scope of Their Official Duties.................. 17

    A. Eleven senior Trump administration officials violated the Hatch Act during official interviews or media appearances.................................................................... 17

        i.  Factual Findings ......................................................................... 18

            a.  Secretary of Energy Dan Brouillette ................................................... 18

            b.  Senior Counselor to the President Kellyanne Conway ......................................... 18

            c.  White House Director of Strategic Communications Alyssa Farah..................... 20

            d.  U.S. Ambassador to Israel David Friedman ................................................. 20

            e.  Senior Advisor to the President Jared Kushner..................................... 21

            f.  White House Press Secretary Kayleigh McEnany ............................... 21

            g.  White House Chief of Staff Mark Meadows ........................................ 22

            h.  Senior Advisor to the President for Policy Stephen Miller................................. 23

            i.  White House Deputy Press Secretary Brian Morgenstern ................................... 24

            j.  National Security Advisor Robert O'Brien........................................... 25

            k.  Chief of Staff to the Vice President Marc Short ................................. 25

i

      ii.   Analysis ................................................................................................ 27

   B. Senior Trump administration officials violated the Hatch Act during the Republican

     National Convention. .......................................................................................... 29

      i.   Factual Findings – Secretary of State Michael Pompeo and the Jerusalem Speech 30

      ii.  Analysis – Secretary of State Michael Pompeo and the Jerusalem Speech ........... 32

      iii.  Factual Findings – Acting Secretary of Homeland Security Chad Wolf and the

       Naturalization Ceremony ................................................................................ 34

      iv.  Analysis – Acting Secretary of Homeland Security Chad Wolf and the

       Naturalization Ceremony ................................................................................ 37

5.  The Trump Administration Ignored the Hatch Act and Approved of Senior Officials

    Illegally Campaigning on Behalf of President Trump ......................................................... 38

   A. The Trump administration refused to hold senior officials accountable for violating the

     Hatch Act and in at least one case publicly defended a senior official who OSC found

     violated the Act. .............................................................................................. 39

   B. The Trump administration took no apparent action to control or prevent senior

     administration officials from committing frequent and similar violations of the Hatch

     Act. ................................................................................................................ 41

Part IV:  Enforcement Challenges ................................................................................ 45

1.  OSC's enforcement tools are limited with respect to Senate-confirmed presidential

    appointees (PAS) and White House commissioned officers. ............................................... 45

2.  OSC did not receive from the Trump administration the good faith cooperation necessary

    to ensure full compliance with the Hatch Act. .................................................................. 46

3.  Prior OSC advice to executive branch agencies—that the Hatch Act does not prohibit

    agencies from defending an administration's policy positions—appears to have been

    interpreted in a way that allowed senior agency officials to engage in political activity

    under the guise of defending the Trump administration's policy positions. ....................... 49

4.  OSC does not have the authority to issue or update Hatch Act regulations. ...................... 53

5.  Existing law is unclear with respect to which portions, if any, of the White House may be

    used for public partisan political events and who may authorize such uses. ...................... 55

ii

6.  OSC has no clear mechanism for obtaining reimbursement for taxpayers when a government official engages in taxpayer-funded campaign activity while on official government travel........................................................................................................... 56

7.  The MSPB has not had a quorum since January 2017..................................................... 58

Part V:  Conclusion................................................................................................................... 59

iii

## PART I:  EXECUTIVE SUMMARY

This report presents the United States Office of Special Counsel's (OSC) investigative findings and conclusions regarding complaints OSC received—largely in response to the 2020 Republican National Convention (RNC)—alleging that senior Trump administration officials used their official authority or influence to interfere with or affect the 2020 presidential election in violation of the Hatch Act.  As described herein, OSC investigated those complaints and determined that hosting the RNC at the White House did not itself violate the Hatch Act, but that at least 13 senior Trump administration officials did violate the Hatch Act prior to the election. Each of these high-profile violations was committed by an official OSC believes, based on current law, could only have been disciplined by then-President Donald J. Trump.  Thus, the cases described herein demonstrate both a willingness by some in the Trump administration to leverage the power of the executive branch to promote President Trump's reelection and the limits of OSC's enforcement power under the existing statutory scheme to prevent them from doing so.  OSC is issuing this report to educate employees about Hatch Act-prohibited activities, highlight the enforcement challenges that OSC confronted during its investigations, and deter similar violations in the future.

During a press conference on August 5, 2020, President Trump was asked about the Hatch Act implications of using the White House as the venue for the  RNC.  He responded, "There is no Hatch Act because it doesn't pertain to the president."[1]  Although true that the president is exempt from the Hatch Act, the law most certainly does apply to senior members of the president's administration.  Nonetheless, with respect to an administration's senior-most officials—whom only the president can discipline for violating the Hatch Act—the Hatch Act is only as effective in ensuring a depoliticized federal workforce as the president decides it will be. Where, as happened in the Trump administration, the White House chooses to ignore the Hatch Act's requirements, there is currently no mechanism for holding senior administration officials accountable for violating the law.

Part II of this report briefly describes the history of restrictions on federal employees' political activity and the developments that led Congress to pass the Hatch Act in 1939.  It focuses, in particular, on why Congress chose to prohibit federal employees from using their official authority or influence for the purpose of interfering with or affecting elections.  Each of the violations described in Part III implicates that prohibition.

Part III contains OSC's determination that some officials in the Trump administration intentionally ignored the law's requirements and tacitly or expressly approved of senior administration officials violating the law.  Many of the complaints that prompted this investigation were filed during or after the RNC, which, because of the coronavirus pandemic, featured events held on White House grounds.  As far as OSC is aware, it was the first political party convention since passage of the Hatch Act to do so.  The complaints raise three issues:

---

[1] All citations and references in this report are to documents or videos that are publicly available or on file with OSC.  The quotations from Trump administration officials in this executive summary are cited in full where they appear elsewhere in this report.

1

The first issue is whether President Trump or then-Vice President Michael Pence violated the Hatch Act.  Neither did, because both the president and the vice president are expressly exempt from coverage under the provisions of the Hatch Act that OSC enforces.[2]

The second issue is whether the Hatch Act prohibits a political party from holding a convention at the White House.  It does not.  The Hatch Act only applies to federal executive branch employees.  Assuming that the president or the vice president, neither of whom is subject to the Hatch Act, authorizes use of the White House for a political convention and the convention itself is produced by nonfederal employees, that circumstance alone would not violate the Hatch Act.  And as OSC said publicly during the RNC, ambiguities in existing law mean that there are certain areas of the White House and its grounds in which even federal employees are permitted to engage in political activity.

The final issue is whether a number of senior Trump administration officials violated the Hatch Act, in connection with the RNC or otherwise, prior to the 2020 election.  OSC concludes that at least 13 senior Trump administration officials did so and, furthermore, that they did so with the administration's approval.  Under current law, OSC may seek disciplinary action, up to and including removal from federal service, against most federal employees who violate the Hatch Act by prosecuting alleged violations before the Merit Systems Protection Board (MSPB).  But in the case of violations by Senate-confirmed presidential appointees—and, in OSC's view, also by commissioned officers[3] within the Executive Office of the President—OSC may only submit a report to the president.  This is both legally required, as OSC believes there are significant constitutional concerns with the MSPB disciplining alleged commissioned officers,[4] and as a practical matter the only recourse available to OSC when there is no MSPB quorum, as was the case during the entirety of the Trump administration.  It is then up to the president to discipline those employees.  President Trump not only failed to do so, but he publicly defended an employee OSC found to have repeatedly violated the Hatch Act.  This failure to impose discipline created the conditions for what appeared to be a taxpayer-funded campaign apparatus within the upper echelons of the executive branch.  And it allowed for, as one federal court said of a senior administration official, members of the administration to "violate the Hatch Act with seeming impunity . . . ."[5]

OSC received complaints alleging that the 13 senior Trump administration officials listed in Part III violated the Hatch Act in one of two ways:  by making statements supporting or opposing a candidate for partisan political office while speaking in an official capacity, or by using their official authority in connection with, and in furtherance of, the RNC.  Section 7323(a)(1) of Title 5 of the *U.S. Code* prohibits federal executive branch employees from using their official authority or influence to interfere with or affect the results of an election.  Under that prohibition, it is illegal for an employee to support or oppose a candidate for partisan political office while acting in an official capacity.  Yet Trump administration officials did

---

[2] The Hatch Act also contains criminal provisions, but those are outside of OSC's jurisdiction.  As used in this report, the term "Hatch Act" relates only to those matters within OSC's jurisdiction.

[3] The term "commissioned officer" refers not to military personnel but rather to senior White House officials appointed directly by the president.

[4] *See infra* Part IV(1).

[5] Citizens for Responsibility and Ethics in Washington v. U.S. Office of Special Counsel, 480 F. Supp. 3d 118, 134 (D.D.C. 2020).

2

precisely that.  And while the specific facts of each case are different, they share this fundamental commonality—senior Trump administration officials chose to use their official authority not for the legitimate functions of the government, but to promote the reelection of President Trump in violation of the law.

The administration's willful disregard for the law was especially pernicious considering the timing of when many of these violations took place.  OSC cannot, in most cases, stop violations from happening in real time.  Even apparently straightforward violations of the Hatch Act may not turn out to actually be violations upon further investigation.  Therefore, investigating alleged violations is the only way to ensure a fair result.  Accordingly, OSC affords appropriate due process to the subject of a complaint and gathers the relevant facts before reaching a conclusion.  As a result, OSC's investigations can often stretch out for weeks or even months.  This reality creates a window for an administration that is so inclined to ignore the Hatch Act in the final months of an election cycle, knowing full well that any public report or disciplinary action would not likely occur until well after the election.  However, the benefit to the administration and resultant harm—the use of official authority or influence to interfere with or affect an election—would accrue on or before election day.  As described in Part III, OSC has concluded that the Trump administration tacitly or expressly approved myriad Hatch Act violations committed within that critical period immediately prior to the 2020 election during which OSC was unable to both investigate and resolve the violations before election day.

Many of the officials who violated the Hatch Act when speaking in an official capacity during media interviews expressly referenced the 2020 election campaign and/or the candidacy of President Trump's principal opponent, then-candidate Joseph R. Biden, Jr., and his running mate, then-candidate Kamala Harris.  For example, Brian Morgenstern, then a White House Deputy Press Secretary, said in one interview that candidate Biden was "hiding away" because the Biden campaign knows "the more America sees of their ticket, the less they like them."  Robert O'Brien, then the National Security Advisor, said in an interview "I expect the president to be reelected and reelected overwhelmingly" and moments later rhetorically asked "who do you want to turn to to rebuild the economy—the guy who's proven he can do it, President Trump, or somebody who's been in Washington for 40 years?"  And Marc Short, then the Vice President's Chief of Staff, said during one interview that the election would "present a tremendous contrast to the American people to choose between a freedom and opportunity agenda that the Trump/Pence administration stands for versus a path to socialism and decay that we believe the Biden/Harris ticket stands for."  In short, each official campaigned on behalf of President Trump while speaking as a representative of the United States government.

The decision by some in the Trump administration to flout the law by commingling campaign-related activity and governmental operations is further illustrated by the two cases related to the RNC.  The first involves then-Secretary of State Michael Pompeo, who OSC concludes violated the Hatch Act by changing U.S. Department of State (State Department) policy to allow himself to speak at the convention and then, when engaging in political activity by delivering that speech, using his official authority by repeatedly referencing the work of the State Department.  The second involves then-Acting Secretary of Homeland Security Chad Wolf, who OSC concludes violated the Hatch Act by presiding over a naturalization ceremony that was orchestrated for the purpose of creating content for the convention.  Each took official acts in

3

furtherance of President Trump's reelection campaign.  It appears that both violations stemmed from requests that originated within the White House—or, in Secretary Pompeo's case, possibly the Trump campaign or President Trump himself—and thus they reflect the Trump administration's willingness to manipulate government business for partisan political ends.

Trump administration officials knew of the Hatch Act's restrictions.  Prior to the 2020 election, OSC issued two reports to President Trump documenting Hatch Act violations by a senior administration official and an unprecedented 15 warning letters to senior administration officials notifying them that they had violated the Hatch Act.  And OSC made itself available and did provide advice on the Hatch Act to the White House, as well as training materials and advisory opinions when requested.  Well aware of the Hatch Act's requirements, some senior officials in the Trump administration disregarded OSC's advice and chose to engage in prohibited political activity anyway.  From OSC's perspective, the administration's attitude toward Hatch Act compliance was succinctly captured by then-Chief of Staff Mark Meadows, who said during an interview that "nobody outside of the Beltway really cares" about Trump administration officials violating the Hatch Act.

In direct contradiction to that unfortunate comment, OSC was inundated with calls, emails, and complaints from members of the public in response to the violations described in this report.  The cumulative effect of these repeated and public violations was to undermine public confidence in the nonpartisan operation of government.  Equally troubling, the obvious noncompliance by senior administration officials also caused career federal employees to ask OSC whether they were still required to comply with the Hatch Act.  As OSC previously stated in a letter to President Trump documenting Hatch Act violations by a senior administration official, such flagrant and unpunished violations erode the principal foundation of our democratic system—the rule of law.

Part IV lists seven enforcement challenges that substantially affected OSC's ability to ensure that senior Trump administration officials complied with the restrictions that Congress imposed upon their political activity.  Those enforcement challenges, and potential fixes for each, are as follows:

**1.  OSC's enforcement tools are limited with respect to Senate-confirmed presidential appointees (PAS) and White House commissioned officers.**

Potential fix:  A statutory amendment that (1) allows OSC to pursue substantial monetary penalties against PAS and commissioned officers before the MSPB, and (2) grants the MSPB jurisdiction over former employees for Hatch Act violations committed during their period of federal employment.

**2.  OSC did not receive from the Trump administration the good faith cooperation necessary to ensure full compliance with the Hatch Act.**

Potential fix:  A statutory amendment granting the MSPB greater authority to enforce OSC's subpoenas and other investigative requests.

**3.  Prior OSC Hatch Act advice to executive branch agencies—that the Hatch Act does not prohibit agencies from defending an administration's policies—appears to have been interpreted in a way that allowed senior agency officials to engage in political activity under the guise of defending the Trump administration's policy positions.**

Potential fix:  In response to incidents that arose during the 2020 election cycle, OSC is using this report to provide updated advice to agencies regarding agency communications that reference a candidate for elected office, including an incumbent president, and are scheduled to be disseminated within 60 days of an election.  Agency ethics officials should conduct inquiries into the purpose of such communications to ensure that they are not intended to promote or oppose a candidate.  If agency ethics officials have concerns about a particular communication, OSC recommends that they advise delaying the communication until after the election.  OSC is also available to answer questions from agency officials about whether a given communication might implicate the Hatch Act.

**4.  OSC does not have the authority to issue or update Hatch Act regulations.**

Potential fix:  Either a statutory amendment expressly granting OSC rulemaking authority or a determination within the executive branch that rulemaking authority for the Hatch Act should be vested with OSC.

**5.  Existing law is unclear with respect to which portions, if any, of the White House may be used for partisan political events and who may authorize such uses.**

Potential fix:  A statutory amendment clarifying in which areas of the White House grounds employees are prohibited from engaging in political activity and under what circumstances, if any, such areas may be used by nonfederal employees for political activity.

**6.  OSC has no clear mechanism for obtaining reimbursement for taxpayers when a government official engages in taxpayer-funded campaign activity while on official government travel.**

Potential fix:  A statutory amendment allowing OSC to seek reimbursement before the MSPB from the traveling official personally.

**7.  The MSPB has not had a quorum since January 2017.**

Potential fix:  Ensuring that there are always at least two confirmed MSPB members.  Furthermore, a statutory amendment authorizing OSC to seek enforcement of its subpoenas in Article III courts in the event that the MSPB does not have a quorum would guard against a recurrence of these issues if the MSPB were to ever lack a quorum in the future.

      Part V concludes by noting that Congress's judgment in passing the Hatch Act was that "partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences."[6]  None of those goals is achievable if the power of the federal government is used to campaign for candidates in partisan elections, as happened during the 2020 election cycle.  Moving forward, senior executive branch officials must not allow compliance with the Hatch Act to be viewed as optional or an unnecessary burden.  Indeed, lower-ranking employees have faced, and continue to face, potentially severe consequences, including removal from federal service, for violating this law.  OSC hopes that the enforcement challenges identified in this report can be addressed and that the conduct of the Trump administration officials described in Part III turns out to be an anomaly, not a precedent.

---

[6] U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 564 (1973).

### PART II:  THE HATCH ACT

This Part describes the developments that led Congress to pass the Hatch Act and why Congress chose, in particular, to prohibit federal employees from using their official authority or influence for the purpose of interfering with or affecting elections.  All the violations described in Part III implicate that prohibition.  Both the Trump White House and some senior Trump administration officials argued that the conduct at issue—in essence, campaigning while acting in an official capacity—was not the sort of conduct that the Hatch Act was meant to prohibit.  But the historical record shows that one of Congress's motivations in passing the Hatch Act was to prevent the creation of a "powerful, invincible, and perhaps corrupt political machine . . . using the thousands or hundreds of thousands of federal employees, paid for at public expense, to man [a political party's] political structure and political campaigns."[7]  OSC therefore recounts that historical record before analyzing the individual violations in Part III.

The Hatch Act is the culmination of efforts, dating back nearly to the country's founding, to limit the partisan political activity of federal employees.  The underlying rationale for these efforts is that "efficiency in Government service requires a lack of partisanship in administration."[8]  Yet, historically the executive branch was staffed largely through political patronage—i.e., employees owed their employment to the political party in power.  So a conflict of interest arose when those employees had to decide between using their power and authority for the general public welfare or for the benefit of their patron party.  The nation's experience with the patronage system led Congress to mandate, primarily through the enactment of laws such as the Pendleton Act in 1883 and the Hatch Act in 1939, that such conflicts be resolved in favor of the general public welfare and that the power, prestige, and influence that executive branch employees wield must not be used for partisan advantage.

As early as 1801, Thomas Jefferson recognized that the party in power could use the federal government to influence or control elections, thereby becoming impervious to the electoral will of the people.  He wrote that "interferences with elections . . . by officers of the [federal government] will be deemed cause of removal[] because the constitutional remedy by the elective principle, becomes nothing, if it may be smothered by the enormous patronage of the" federal government.[9]  In his view, executive branch interference in elections would end the American experiment in self-government, replacing it with a system of perpetual one-party rule.

Despite the efforts of President Jefferson and others to keep partisan politics separate from the administration of government,[10] the political patronage system expanded within the executive branch.  Congress attempted to rein in the patronage system with the Pendleton Civil Service Reform Act of 1883,[11] which created a merit-based civil service system and the federal

---

[7] U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548, 565-66 (1973).
[8] S. Rep. No. 102-278, at 2 (1992).
[9] Letter from Thomas Jefferson to Thomas McKean (Feb. 2, 1801), *available at* *https://founders.archives.gov/?q=Project%3A%22Jefferson%20Papers%22%20mckean&s=1511311111&r=53*.
[10] *E.g.*, Circular from Daniel Webster, Secretary of State (Mar. 20, 1841) (noting President Tyler's instruction to executive branch department heads that "partisan interference in popular elections . . . will be regarded by [Tyler] as cause of removal"), *available at* https://www.presidency.ucsb.edu/documents/special-message-3446.
[11] 22 Stat. 403 (1883).

7

Civil Service Commission (CSC).  Civil Service Rule I stated that "no person in the Executive civil service shall use his official authority or influence for the purpose of interfering with an election or affecting the result thereof."[12]  However, even after the Pendleton Act, roughly two-thirds of federal employees remained outside of the civil service and were not subject to Rule I.[13]

The election of 1938 demonstrated the corrupting effect that a federal workforce largely exempt from limitations on using its power and influence for partisan aims could have on elections.  In one egregious case an entire regional supervisory force of the Works Progress Administration (WPA) was used to determine the political affiliation of 18,000 WPA employees.  The resulting list was handed to a political campaign, and employees not supportive of that campaign's candidate were fired.[14]  Another example involved 70 individuals hired under a federal relief program who did "no highway work at all during the period they were on the rolls but upon reporting for work were instructed to go back to their respective precincts and canvass them in behalf" of a partisan political campaign.[15]

In response, in 1939, Congress passed An Act to Prevent Pernicious Political Activities, commonly referred to as the Hatch Act.[16]  Section nine made it unlawful for "any person employed in the executive branch of the Federal Government, or any agency or department thereof, to use his official authority or influence for the purpose of interfering with an election or affecting the result thereof."[17]  Congress intentionally made section nine—now 5 U.S.C. § 7323—virtually identical to Civil Service Rule I, but, notably, expanded the prohibition to cover essentially all executive branch employees.[18]  In doing so, Congress aimed to further insulate government administration from partisan politics and prevent federal employees from creating a "powerful, invincible, and perhaps corrupt political machine" within the federal government.[19]

The Hatch Act does not define "official authority or influence," but congressional debates show it was interpreted broadly.[20]  Senators also distinguished between actions taken in an official capacity, which implicate the use of official authority, and those taken as a private citizen, which do not.[21]  And the breadth of abuses to which Congress was responding— including creation of a taxpayer-funded campaign staff—provides additional context.

---

[12] Exec. Order No. 209 (1903).

[13] *See* H.R. Rep. No. 94-444, at 10 (1975).

[14] *See* Report of the Special Committee to Investigate Senatorial Campaign Expenditures and Use of Governmental Funds in 1938, 75th Cong. 12-13 (1939).

[15] *Id.* at 30.

[16] Pub. L. No. 76-252, 53 Stat. 1147 (1939).

[17] *Id.* § 9(a).

[18] S. Rep. No. 76-221, at 2 (1939) ("Section 9 is a restatement of the law now in effect as regards civil-service employees.  It provides in almost the exact language of the civil-service rule that it shall be unlawful for any person employed in any administrative or supervisory capacity of any agency of the Federal Government to use his official authority for the purpose of interfering with an election or affecting the result thereof.").

[19] U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 565 (1973).

[20] References to the phrase include that it is the "power which [an employee] would not have were it not for his office," 86 Cong. Rec. 2347 (1940) (statement of Sen. Hatch), and "the power that is vested in [an employee] by the law of the land for the service of all the people," 86 Cong. Rec. 2703 (1940) (statement of Sen. O'Mahoney).

[21] *See* 86 Cong. Rec. 2705 (1940) (statement of Sen. O'Mahoney).

8

Further evidence of the broad scope of the phrase "official authority or influence" comes from CSC rulings interpreting Civil Service Rule I, which Congress in 1940 incorporated by reference into the Hatch Act.[22]  The CSC found the rule to prohibit employees from engaging in partisan political activity while acting, or appearing to act, within the scope of their government employment.  For example, the CSC held that Civil Service Rule I prohibited signing, "as a government employee," a petition related to a candidacy for elected office.[23]  Accordingly, the Hatch Act has been understood to prohibit partisan political activity undertaken as a government employee—such as by using an official title in connection with one's political activity—which risks implying that the government itself has a preference for one political party or candidate over another.[24]

In the face of subsequent challenges, the Supreme Court twice affirmed the constitutionality of the Hatch Act,[25] finding that it is "a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited."[26]

Congress has repeatedly amended the Hatch Act, but even when loosening its restrictions Congress has maintained that employees may not engage in political activity while acting in an official capacity.[27]  And with the Hatch Act Reform Amendments of 1993, Congress emphasized that political activity while on duty, in the workplace, or wearing an agency uniform—which give at least the appearance that one is acting in an official capacity—is strictly prohibited.[28]

All three branches of government have been united in recognizing the harm that results to American democracy when the executive branch interferes with the electoral process.  The executive branch under President Jefferson was the first to take actions to limit such interference.  When those rules proved insufficient, Congress passed increasingly strict rules governing executive branch employees' participation in campaign activities.  The Supreme Court then validated their concerns by upholding the Hatch Act's prohibitions notwithstanding that they implicate employees' First Amendment rights.  The actions of the senior Trump administration officials described in the next Part represent an unprecedented challenge to this foundational principle of executive branch neutrality with respect to political parties and candidates for partisan political office.

---

[22] Pub. L. No. 76-753, § 4, 54 Stat. 767, 771 (1940).

[23] *Letter Carriers*, 413 U.S. at 589 (quoting Civil Service Commission Form 1236, Political Activity and Assessments (Sept. 1939)).

[24] This restriction is grounded in the idea that "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Id.* at 565.

[25] *See Letter Carriers*, 413 U.S. 548; United Pub. Workers of Am. v. Mitchell, 330 U.S. 75 (1947).

[26] *Letter Carriers*, 413 U.S. at 556.

[27] For example, a House of Representatives committee proposing reforms to the Hatch Act in 1975 wrote that "it is imperative that [partisan political activities] be kept as far removed from the official duties of the President and the Vice President as the public interest will permit."  H.R. Rep. No. 94-444, at 5 (1975).

[28] *See* 139 Cong. Rec. 15,739 (1993) (statement of Sen. Glenn).

### PART III:  PERVASIVE HATCH ACT VIOLATIONS IN THE TRUMP ADMINISTRATION

In this Part, we address the following:

- the 2020 Republican National Convention (RNC) and the unprecedented number of Hatch Act complaints the public filed with OSC concerning the event;
- the myriad allegations of Hatch Act violations by senior Trump administration officials;
- the legal standard required to establish a Hatch Act violation;
- OSC's factual findings and legal conclusions with respect to the allegations; and
- the pattern of conduct by those senior Trump administration officials that led OSC to conclude that the administration tacitly or expressly approved of them violating the Hatch Act.

### 1.     The 2020 Republican National Convention Generated Substantial Public Discussion of the Hatch Act and an Unprecedented Number of Hatch Act Complaints

The RNC was, as far as OSC is aware, the first political party convention since passage of the Hatch Act in 1939 to feature events held on White House grounds.[29]  Though the convention was originally scheduled to be held in Charlotte, North Carolina, logistical considerations resulting from the coronavirus pandemic led the Republican National Committee to move it first to Jacksonville, Florida, and then ultimately to a format featuring events from multiple locations, including the White House.  The convention was broadcast across all of the major news media outlets and received primetime coverage on network television.  The use of such a prominent federal landmark for a high-profile and quintessentially partisan political event generated substantial public discussion of whether hosting the RNC at the White House was permissible under the Hatch Act and resulted in hundreds of complaints being filed with OSC alleging that various officials within the Trump administration, including then-President Donald J. Trump and then-Vice President Michael Pence, had violated the Hatch Act.

The complaints raise three issues.  The first is whether either President Trump or Vice President Pence violated the Hatch Act.  Neither did.  Pursuant to 5 U.S.C. § 7322(1), the president and the vice president are expressly exempt from coverage under the provisions of the Hatch Act that OSC enforces.  Because neither President Trump nor Vice President Pence was subject to any of the Hatch Act's restrictions, neither violated that law.

The second issue is whether it was prohibited under the Hatch Act for the Republican National Committee to hold its 2020 convention at the White House.  As described in detail in Part IV of this report, the current statutory scheme does not categorically preclude a political party from holding events at the White House.  While the Hatch Act bars most federal employees from engaging in political activity while on duty or in the federal workplace, it does not impose any similar restrictions upon nonfederal employees.  Thus, under current law, if the president or vice president—neither of whom is subject to the Hatch Act—authorizes a political party's event at the White House and the event is produced by nonfederal employees, that alone would not

---

[29] In 1940 President Franklin D. Roosevelt delivered his address accepting his party's nomination for president from the White House, but the convention itself was held in Chicago.

violate the Hatch Act.  Furthermore, as OSC said publicly during the convention, ambiguities in existing law mean that there are certain areas of the White House and its grounds, such as the South Lawn and the Rose Garden, in which even federal employees are not prohibited from engaging in political activity.[30]  Thus, while the complaints OSC received show that some Americans apparently found the use of the White House for a political convention jarring and inconsistent with the Hatch Act's underlying purpose of keeping partisan political matters out of the federal workplace, using the White House as the venue for the RNC did not violate the Hatch Act.

The final issue is whether, apart from the legally permissible use of the White House for the RNC, Trump administration officials otherwise violated the Hatch Act.  As detailed in this report, OSC concludes that senior Trump administration officials did violate the Hatch Act.  Some of those violations related to the convention, while others were committed during the 2020 election cycle and in furtherance of President Trump's reelection but outside of the convention context.  The number of violations demonstrates how OSC's Hatch Act enforcement tools were inadequate to deter senior administration officials from breaking the law.

Indeed, the 2020 election revealed that, at least with respect to an administration's senior-most officials, the Hatch Act is only as effective as the White House decides it will be.  Where, as happened here, the White House chooses to ignore the Hatch Act's requirements, then the American public is left with no protection against senior administration officials using their official authority for partisan political gain in violation of the law.  This is the case because OSC's usual enforcement tool—prosecuting alleged violations before the Merit Systems Protection Board (MSPB)—is not available with respect to Senate-confirmed presidential appointees or, in OSC's opinion, commissioned officers within the White House.  Rather, for such employees, OSC submits a report describing the violation to the president for appropriate disciplinary action in accordance with 5 U.S.C. § 1215(b).  OSC has no role in the disciplinary process beyond issuing such a report.  President Trump's failure to ensure compliance by his senior officials allowed for, as one federal court said of a senior administration official, members of the administration to "violate the Hatch Act with seeming impunity . . . ."[31]  The challenges that this presented for OSC's Hatch Act enforcement are detailed in Part IV.

OSC's position with respect to commissioned officers is grounded in constitutional considerations.[32]  Some have suggested that OSC's position is incorrect and that OSC should attempt to seek discipline against commissioned officers before the MSPB notwithstanding those concerns.  One organization even unsuccessfully sued OSC seeking to compel the agency to initiate disciplinary proceedings against a commissioned officer.  But even if OSC were incorrect, and it could seek disciplinary action against commissioned officers before the MSPB, that would not have led to a different outcome here for the simple reason that the MSPB did not have a quorum at any point during the Trump administration.  Accordingly, OSC's public reports to the president about Hatch Act violations by commissioned officers are—as both a practical

---

[30] See OSC Clarifies its Hatch Act Role in Light of Republican National Convention (Aug. 26, 2020), https://osc.gov/News/Pages/20-27-OSC-Hatch-Act-RNC.aspx.
[31] Citizens for Responsibility and Ethics in Washington v. U.S. Office of Special Counsel, 480 F. Supp. 3d 118, 134 (D.D.C. 2020).
[32] See infra Part IV(1).

matter and considering OSC's legal determination regarding the MSPB's jurisdiction—the most effective enforcement tool available to the agency.

The Trump administration officials described in this Part, who OSC concludes violated the Hatch Act, have all left government service.  Accordingly, there is no potential for any disciplinary action.  OSC is nevertheless issuing this report in order to educate employees about Hatch Act-prohibited activities, highlight the enforcement challenges that OSC confronted in investigating the violations, and deter those who would seek to engage in similar violations in the future.

2.    **OSC Received Numerous Complaints Alleging that Senior Trump Administration Officials Violated the Hatch Act in the Months Prior to the 2020 Election**

OSC received over 100 complaints alleging that the senior Trump administration officials described in this Part violated the Hatch Act by using their official authority or influence to interfere with or affect an election.  In essence, each allegation was that the subject official campaigned on behalf of President Trump's reelection while acting within the scope of his or her official duties.  In so doing, the subject officials allegedly violated 5 U.S.C. § 7323(a)(1), which prohibits an employee from using his or her official authority or influence for the purpose of interfering with or affecting the result of an election.  Pursuant to this prohibition, which is described more fully in the next section, an employee may not support or oppose a candidate for partisan political office while acting in an official capacity or otherwise use the employee's official authority in connection with the employee's political activity.

Specifically, the complaints alleged that the officials listed below violated the Hatch Act in 2020,[33] often during official interviews, i.e., interviews given in an official capacity.  This list does not include allegations that OSC was unable to corroborate or that, even if true, did not constitute a violation of the Hatch Act.[34]

- Then-Secretary of Energy Dan Brouillette,[35] by promoting President Trump's reelection campaign during an official interview on the *Brian Kilmeade Show* on October 26;
- Then-Senior Counselor to the President Kellyanne Conway,[36] by promoting President Trump's reelection campaign during official interviews on Fox News Channel (FNC) on August 12 and 18;
- Then-White House Director of Strategic Communications Alyssa Farah,[37] by promoting President Trump's reelection campaign during an official interview on FNC on October 9;

---

[33] All date references are to the year 2020 unless expressly noted otherwise.

[34] For example, OSC received hundreds of complaints alleging that President Trump and Vice President Pence violated the Hatch Act, but neither is subject to the provisions of the Hatch Act that OSC enforces.  *See supra* Part III(1).

[35] OSC File No. HA-21-000094.

[36] OSC File No. HA-19-005052.

[37] OSC File No. HA-21-000054.

- Then-U.S. Ambassador to Israel David Friedman,[38] by promoting President Trump's reelection campaign during an official interview with Al-Ain on October 4;
- Then-Senior Advisor to the President Jared Kushner,[39] by promoting President Trump's reelection campaign during an official interview on CNN on August 23;
- Then-White House Press Secretary Kayleigh McEnany,[40] by promoting President Trump's reelection campaign during an official interview on FNC on August 20 and during official remarks to the press on October 23;
- Then-White House Chief of Staff Mark Meadows,[41] by promoting President Trump's reelection during official interviews on FNC on July 6 and with *POLITICO* on August 26, and by promoting the campaign of congressional candidate Madison Cawthorn during an official interview on FNC on July 6;
- Then-Senior Advisor to the President for Policy Stephen Miller,[42] by promoting President Trump's reelection campaign during an official interview on FNC on July 31;
- Then-White House Deputy Press Secretary Brian Morgenstern,[43] by promoting President Trump's reelection during official interviews on One America News Network (OAN) on October 9 and 27;
- Then-National Security Advisor Robert O'Brien,[44] by promoting President Trump's reelection during an official interview on the *Hugh Hewitt Show* on June 25;
- Then-Secretary of State Michael Pompeo,[45] by changing U.S. Department of State policy to allow himself to speak in support of President Trump's reelection at the RNC, and then by using his official authority when giving that speech;
- Then-Chief of Staff to the Vice President Marc Short,[46] by promoting President Trump's reelection during official interviews on Fox Business on June 22 and August 13, and also during an official interview with the group Campus Reform on August 27; and
- Then-Acting Secretary of Homeland Security Chad Wolf and other Trump administration officials,[47] by presiding over or orchestrating a naturalization ceremony for the purpose of creating content for the RNC.[48]

---

[38] OSC File No. HA-21-000055.
[39] OSC File No. HA-20-000449.
[40] OSC File No. HA-20-000280.
[41] OSC File No. HA-20-000302.
[42] OSC File No. HA-20-000318.
[43] OSC File No. HA-21-000091.
[44] OSC File No. HA-20-000281.
[45] OSC File No. HA-20-000376.
[46] OSC File No. HA-20-000202.
[47] OSC File No. HA-20-000395.
[48] OSC also received complaints against Advisor to the President Ivanka Trump, HA-19-004116, alleging that she violated the Hatch Act by engaging in political activity on a social media account. Because the complaints relate to activity on social media, an issue which has raised substantial enforcement challenges for OSC, those complaints are addressed along with other enforcement challenges in Part IV.

13

### 3.     Legal Standard Required to Establish a Hatch Act Violation

To prove a Hatch Act violation, OSC must establish by a preponderance of the evidence[49] that an employee covered by the Hatch Act engaged in prohibited political activity.  As relevant to the incidents described in this report, the Hatch Act prohibits covered employees from using their official authority or influence for the purpose of interfering with or affecting the result of an election.  The relevant statutory citations are 5 U.S.C. § 7322, which defines the employees subject to the Hatch Act, and 5 U.S.C. § 7323, which states the applicable prohibition.

   *A.  The employees described in this Part were all covered by the Hatch Act.*

Section 7322 of Title 5 of the *U.S. Code* defines the employees subject to the Hatch Act:

(1) "employee" means any individual, other than the President and the Vice President, employed or holding office in—
     (A) an Executive agency other than the Government Accountability Office; or
     (B) a position within the competitive service which is not in an Executive agency; but does not include a member of the uniformed services or an individual employed or holding office in the government of the District of Columbia.

This definition encompasses virtually all federal civilian executive branch employees.  For purposes of the Hatch Act, the White House Office (WHO) is an "Executive agency" as that term is used in § 7322(1)(A).[50]  All the officials described in this report were employees of WHO or another executive agency other than the Government Accountability Office.  All were therefore subject to the Hatch Act.

   *B.  It is a prohibited use of official authority for an employee to support or oppose a candidate for partisan political office while acting in an official capacity.*

Section 7323(a) of Title 5 of the *U.S. Code* states the prohibition relevant to this Part:

an employee may take an active part in political management or in political campaigns, except an employee may not—
     (1) use his official authority or influence for the purpose of interfering with or affecting the result of an election.

---

[49] This is the burden of proof that OSC must meet in Hatch Act cases prosecuted before the Merit Systems Protection Board (MSPB).  *See Special Counsel v. Purnell*, 37 M.S.P.R. 184, 188 (1988).

[50] *See* 27 U.S. Op. Off. Legal Counsel 118, 119 (2003) (reaffirming an earlier Office of Legal Counsel conclusion that the Hatch Act applies to employees in the White House Office) (citing 19 U.S. Op. Off. Legal Counsel 103, 106-07 (1995)).  The Hatch Act exemption allowing employees "paid from an appropriation for the Executive Office of the President [EOP]," 5 U.S.C. § 7324(b)(2)(B)(i), to engage in limited political activity while on duty or in the federal workplace would be meaningless if WHO employees, who are part of the EOP, were not otherwise subject to the law.  Concluding, as the Office of Legal Counsel has, that WHO employees are subject to the Hatch Act avoids "highly anomalous" results, 27 U.S. Op. Off. Legal Counsel at 119, and is consistent with that cardinal principle of statutory construction to give effect to the words of a statute.  *See* TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001).

This prohibition applies without exception to all executive branch employees covered under the Hatch Act.[51]  The attendant Hatch Act regulation gives examples of the types of activity this prohibition encompasses.[52]  For example, the regulation makes clear that it is a prohibited use of official authority for employees to use their official title or position while participating in political activity.[53]  "Political activity" is defined as activity directed toward the success or failure of a political party, partisan political group, or candidate for partisan political office.[54]  The prohibited "political activity" described in this report can be understood as campaign-related activity.  Because of the Hatch Act, the president may not use the power of the executive branch—namely, its senior officials—to campaign for the election of any candidate, including an incumbent president and vice president.  That task falls to political parties, partisan political groups, and the candidates themselves.  Thus, federal employees may not weigh in on political campaigns or promote or oppose candidates while speaking, writing, or otherwise acting in an official capacity.

Both Article III courts and the Merit Systems Protection Board (MSPB) have interpreted "political activity" as encompassing far more than just express advocacy for the electoral success or failure of a candidate.  In *Burrus v. Vegliante*, members of a federal employee union displayed, in their workplace, posters comparing the positions and voting records of two candidates for president.[55]  The posters did not explicitly recommend that viewers support either candidate, but rather merely "suggested that [one slate] held positions more favorable to the interests of postal workers than the [other slate]."[56]  The Second Circuit rejected the idea that the poster was not political activity, finding that while it "purported to present only factual information, the [union did] not seriously dispute that it was intended to generate support for" a candidate.[57]  Accordingly, making statements of fact, when intended to generate electoral support for or opposition to a candidate, is considered political activity under the Hatch Act.

---

[51] A separate provision of the Hatch Act prohibits employees from engaging in political activity while on duty or in the federal workplace.  *See* 5 U.S.C. § 7324(a)(1)-(2).  However, certain Senate-confirmed presidential appointees and commissioned officers within the EOP are exempt from those prohibitions in § 7324(a) and may engage in limited political activity not otherwise prohibited by the Hatch Act while on duty or in the federal workplace.  *See* 5 U.S.C. § 7324(b).  This "7324(b) exemption" exists because the senior-level employees to whom it applies are presumed to be always on duty.  Thus, a rule prohibiting those employees from engaging in political activity while "on duty" would effectively bar them from engaging in political activity at any time.  To avoid imposing such a broad restriction, Congress expressly exempted this limited category of employees from the restrictions in § 7324.  *See generally* H.R. Rep. No. 103-16 (1993).  All the employees described in this Part qualify for that exemption.  While most of the violations described herein took place while employees were on duty or in the federal workplace, OSC has no evidence that any one employee's on-duty political activity was so pervasive as to constitute a violation of § 7324.  Accordingly, this Part focuses exclusively on the use of official authority prohibition, for which there are no exemptions for Senate-confirmed presidential appointees or EOP commissioned officers.
[52] *See* 5 C.F.R. § 734.302.
[53] *See* 5 C.F.R. § 734.302(b)(1).
[54] 5 C.F.R. § 734.101.  This definition differs from the common understanding of an administration's "political" work, which consists of persuading sitting members of Congress to support necessary legislation, persuading the American public of the importance of the administration's proposed policies, and arguing against policies and legislation with which it disagrees.
[55] Burrus v. Vegliante, 247 F. Supp. 2d 372, 373 (S.D.N.Y. 2002), *rev'd*, 336 F.3d 82 (2d Cir. 2003).
[56] *Id.* at 373-74.
[57] 336 F.3d at 84.

In *Special Counsel v. Malone*, the MSPB determined that an employee violated the use of official authority prohibition when he "acted in his official capacity to further a partisan political campaign."[58]  The violation occurred when he informed people doing business with his agency of an upcoming partisan fundraiser.  The employee did not solicit attendance or political contributions; rather, he provided factual information about the existence of the event.[59]  Nevertheless, the employee violated the Hatch Act because he "intended to promote the fundraiser for political purposes."[60]

Similarly, in *Special Counsel v. DePaolo,* an MSPB judge held that an employee violated the use of official authority prohibition when she "tout[ed]," "advertised," and "advanced [a candidate's] campaign promise" while acting in the scope of her official duties—presiding over a deportation hearing.[61]  That campaign promise related to changing the immigration law at issue in the case.  The MSPB judge found that "advancing [the candidate's] campaign promise to change the law during a hearing where that law negatively affected a party . . . was an attempt to encourage votes for [the candidate] and [a political party]."[62]  The employee thus engaged in political activity in violation of the Hatch Act even though she did not expressly instruct anyone to vote for or against a candidate and was speaking about a proposed policy change.

The rule that emerges from these cases is clear:  a federal employee acting in an official capacity may not make statements or take actions that are akin to campaigning for or against a candidate for partisan political office or otherwise promote or disparage that candidate's campaign.  Those prohibited statements can take the form of suggestively comparing candidates' records and positions, as in *Burrus*; providing factual information for the purpose of promoting a campaign, as in *Malone*; or advancing a candidate's campaign promise, as in *DePaolo*.  This rule is consistent with at least one purpose of the Hatch Act—to prevent using federal employees as a taxpayer-funded campaign staff.[63]

While distinguishing permissible official activity from prohibited campaign activity can be challenging, making certain types of statements—such as attacking the campaign of a candidate for partisan political office, explaining why voters should support a particular candidate, comparing campaign proposals, and forecasting what would happen if certain candidates are elected—is unquestionably political activity, and officials representing the U.S. government are prohibited from making such comments while engaged in official duties.[64]  Doing so risks giving the impression that the government itself has a preference for one candidate over another, the pernicious possibility of which was one of the principal motivations for passage of the Hatch Act in the first place.[65]  Accordingly, OSC considers such statements

---

[58] 84 M.S.P.R. 342, 363 (1999).

[59] *Id.* at 365.

[60] *Id.*

[61] MSPB Docket No. CB-1216-18-0016-T-1, at 11, 21 (Sept. 13, 2019).

[62] *Id.* at 22.

[63] *See* U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548, 565-66 (1973).

[64] This is not to say that all election-related discussions are prohibited.  Numerous agencies, including OSC, have responsibilities that inherently require them to engage with electoral issues.

[65] *See Letter Carriers*, 413 U.S. at 565 ("it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent").

made in an official capacity to be political activity prohibited by § 7323.  And while it likely would not have violated the Hatch Act if the officials made the statements described in the following section when speaking in a personal capacity, each did so while speaking in an official capacity as a Trump administration official.

**4.      The Subject Officials Violated the Hatch Act by Campaigning on Behalf of President Trump's Reelection While Acting Within the Scope of Their Official Duties**

OSC concludes that the 13 senior Trump administration officials listed in section 2 of this Part violated the Hatch Act by campaigning for President Trump's reelection while acting within the scope of their official duties.  The individual violations fell broadly within two categories: eleven officials committed violations during official interviews or media appearances, and two officials committed violations in connection with the RNC.

Notably, even if the subjects were still in government service, not all of these violations necessarily would have resulted in OSC sending the president a report for disciplinary action.  Some were less egregious than others and, consistent with OSC's long-established practice, likely would have resulted in OSC issuing a letter warning the official not to violate the Hatch Act in the future.  OSC is nevertheless including them here because they are all violations, regardless of their magnitude, and they illustrate the larger pattern of violations by senior officials across the Trump administration that is described in section 5 of this Part.  That pattern demonstrates that the Trump administration tacitly or expressly approved of using the power of the executive branch to assist President Trump's reelection.

>  *A.   Eleven senior Trump administration officials violated the Hatch Act during official interviews or media appearances.*

Eleven Trump administration officials— Dan Brouillette, Kellyanne Conway, Alyssa Farah, David Friedman, Jared Kushner, Kayleigh McEnany, Mark Meadows, Stephen Miller, Brian Morgenstern, Robert O'Brien, and Marc Short—violated the Hatch Act over the course of 18 different official interviews or media appearances.[66]  In each case, the subject official was identified by their official title, discussed administration policies and priorities related to their official duties, and/or spoke from the White House grounds.[67]  Accordingly, the subject officials were acting in an official capacity when making the statements described in this subsection.

Furthermore, the statements were directed toward the success of President Trump's reelection campaign and/or the failure of then-candidate Joseph R. Biden, Jr.'s presidential campaign.  The officials listed here compared how candidates performed or would perform in debates, questioned candidates' qualifications, compared campaign proposals, sometimes mocked candidate Biden and his campaign, and forecast what would happen if certain candidates

---

[66] The fact that OSC has specifically identified only these 18 official interviews and media appearances is not intended to suggest that the subject officials may not have violated the Hatch Act in other official interviews or appearances.

[67] Furthermore, none of the subject officials argued that they were not speaking in an official capacity when making the statements.

were elected.  In short, they made campaign statements.  OSC therefore has concluded that these 11 Trump administration officials violated 5 U.S.C. § 7323(a)(1) by campaigning on behalf of President Trump's reelection during official interviews or media appearances.

    i.    Factual Findings

    a.    Secretary of Energy Dan Brouillette

Secretary of Energy Dan Brouillette appeared on the *Brian Kilmeade Show* in his official capacity on October 26.  The segment began with the host playing a clip from the October 22 presidential debate between President Trump and candidate Biden, in which candidate Biden said that if elected he would transition away from the oil industry and replace it with renewable energy.[68]  After the host asked, "Is it a big deal that Joe Biden wants to ban [fracking] and then, upon further review, says 'just ban it on federal land?'" Secretary Brouillette argued against candidate Biden's purported proposal, said that Americans should question whether those purported proposals were something they should support, and told listeners how they should evaluate candidate Biden's statements:

> Oh it's an enormous deal.  What it would do is move us back to dependence on foreign nations.  It moves us back into a state of dependence on the Middle East.  And it's really a fundamental question, Brian, that Americans need to ask themselves—is that where we want to go back?  Is that what we want to go back to?  And, you know, the amount of jobs lost would be enormous. . . . [T]he past administration, they nearly killed coal.  They did everything they possibly could to kill coal.  So when they say that they want to kill oil and gas, a word to the wise, believe them.[69]

The host later said, "[T]he energy stocks are taking a pounding now.  There's a fear that [Biden] could win, and no one's buying that the former vice president is going to leave fossil fuels alone, that he was misinterpreted."  Secretary Brouillette responded by amplifying the host's concerns that candidate Biden would not "leave fossil fuels alone" if he were to win the election:

> No one should buy it.  As I said earlier, look, you know, when they say they will kill oil and gas, they mean it.  They've done it with coal here in the United States, and no one should misquote them, no one should ignore their words.  It's very, very important. . . .[70]

    b.    Senior Counselor to the President Kellyanne Conway

Ms. Conway appeared on FNC in her official capacity on August 12 and 18.  During the August 12 interview, Ms. Conway made the following comments critical of candidate Biden's

---

[68] *Biden's fracking plan would move the US back to dependence on Middle East: Brouillette*, Brian Kilmeade Show (Oct. 26, 2020), at 0:00-0:23, https://video.foxbusiness.com/v/6204747806001#sp=show-clips.
[69] *Id.* at 2:45-3:24.
[70] *Id.* at 6:54-7:10.

selection of Kamala Harris as his running mate and questioned then-candidate Kamala Harris's qualifications to serve as vice president:

> She's a safe and unsurprising pick, in my view. . . . I think we can do two things as a nation.  We can stop and applaud when history is made in our fragile young democracy.  And then we can also call into question why perhaps somebody should not be the vice president or the president of the United States.[71]

After then describing her experience as President Trump's campaign manager, Ms. Conway returned to the topic of candidate Harris's selection and forecast how her election would be detrimental for the United States:

> In the case of Kamala Harris, it'll be very easy to say somebody who seems, who presents, as progressive and "forward-looking" could actually bring our nation backward on many things that matter to America.  So by way of quick example, backward on all the economic gains we had.  She would raise the corporate tax rate from 21% to 35%, they would do away with all the gains we've had as a nation through our Paycheck Protection Program and Tax Cuts and Jobs Act.  Why is that important?  Because so many Americans benefitted from those simple measures.  Our deregulation agenda. . . .[72]

Moments later, Ms. Conway continued her critique of candidate Harris:

> These are tough jobs.  And we should look at the qualifications for the job.  This is a woman who's for abortion in the ninth month, she's against the Second Amendment, she's against parts of the First Amendment, frankly, she will raise your taxes, she will put our regulations back, she's been terrible on criminal justice, and may I just say, Sandra, as a last point—the Democrats rejected her. . . .[73]

During the August 18 interview, Ms. Conway attacked both the Democratic Party and its presidential nominee, candidate Biden.  Of the party, she said its convention would be a "swamp reunion"[74] and contrasted it with the upcoming Republican convention, which she characterized as the "people's convention."[75]  She also said that the Democratic convention showed that the "Democratic Party itself has no confidence in the competence of their nominee, Joe Biden,"[76]

---

[71] *Conway on Joe Biden's 'safe' VP pick Kamala Harris:  Democrat voters already 'rejected her'*, America's Newsroom (Aug. 12, 2020), at 0:51-1:12, https://www.foxnews.com/politics/kamala-harris-biden-kellyanne-conway.amp.

[72] *Id.* at 1:45-2:20.

[73] *Id.* at 3:18-3:40, https://www.foxnews.com/politics/kamala-harris-biden-kellyanne-conway.amp.

[74] *Conway claims DNC speakers attacking Trump to distract from 'feckless, reckless and cantankerous' Biden*, Hannity (Aug. 18, 2020), at 0:59, https://www.foxnews.com/politics/kellyanne-conway-dnc-biden-feckless-reckless-cantankerous.

[75] *Id.* at 4:28.

[76] *Id.* at 1:44-1:50.

whom Ms. Conway said had "done less in 47 years in Washington than Donald Trump has done in 47 months in Washington."[77]

### c.  White House Director of Strategic Communications Alyssa Farah

Ms. Farah appeared on FNC in her official capacity on October 9.  During that interview, Ms. Farah said of the two presidential candidates that:

> I can't think of a starker contrast of two candidates against each other than even while sick with COVID the president's got boundless energy and is taking questions and being as transparent as possible on his positions and the fact that we still don't have basic answers on policy from the Joe Biden campaign.[78]

The host then asked, "What about the concern the campaign has for the possibility of only getting back on stage one time before the American people vote?"  Ms. Farah responded with the "White House perspective" on the campaign event:

> Speaking from the White House perspective, we think it's incredibly important that we draw out the true policy distinctions between what this president has accomplished in four years and what his opponent has failed to accomplish in 47 years, and the best way to do that is to have both of them live on stage together. . . .[79]

### d.  U.S. Ambassador to Israel David Friedman

U.S. Ambassador to Israel David Friedman gave an interview in his official capacity on October 4 during which he told viewers that U.S. policy toward Iran was "the most consequential issue of the election."  He then suggested that a Biden/Harris victory might lead to an increase in Iran's "malign activity" or put that country on the pathway to obtaining a nuclear weapon:

> I think this may be the most consequential issue of the election.  Maybe entirely the most consequential issue, because as you know Joe Biden was part of the Obama administration which negotiated and implemented the Iran deal . . . [which] created a pathway for Iran to gain a nuclear weapon [and] did nothing to restrain Iran from its malign activity. . . . So we think right now we're in a very good place in terms of the sanctions that we have imposed upon Iran.  If we continue on this path, we think Iran will ultimately have no choice but to end its malign activity.  A new administration, especially if it consists of people who were part of the Obama administration, I think it presents a real risk that those gains that we have fought so hard for, together with our allies in the Gulf, our allies in Israel, we've worked really hard to get Iran, I think, to a much better

---

[77] *Id.* at 2:10-2:15.
[78] Bill Hemmer Reports (@HemmerReports), Twitter (Oct. 9, 2020 3:46 PM), at 0:25-0:44, https://twitter.com/HemmerReports/status/1314648374281408513.
[79] *Id.* at 2:17-2:35.

place.  I'd hate to think that a new administration would undermine that, but regrettably if Biden wins I think they might. . . .[80]

      e.   Senior Advisor to the President Jared Kushner

Mr. Kushner appeared on CNN in his official capacity on August 23.  In that interview, Mr. Kushner said the Democratic convention offered a "very dark vision" for the country and little "by way of policy or solutions," while also previewing the Republican campaign message:

> I think these conventions are a real kickoff.  We saw the Democrats last week have a very dark vision for America.  You were talking about the great diversity earlier of their party, but a lot of those Republicans are not—I mean, those are people who are Washington elites, a lot of insiders, people who have, you know, made their lives and their careers off of Washington.  President Trump represents the American people.  He's the outsider president.  And I think you're going to see a very hopeful vision for America that he's going to be unleashing.  You're going to see a real diversity of the Republican Party that he has built.  You're going to see it's going to be different than how the media tells you.  And unlike the Democrats last week where there was a lot of complaints, they didn't offer much by way of policy or solutions, President Trump will be laying out, you know, real policies, real visions, real solutions for how he brings our country back and makes it stronger than ever before. . . .[81]

      f.   White House Press Secretary Kayleigh McEnany

Ms. McEnany appeared on FNC in her official capacity on August 20.[82]  During that interview she was asked about the Democratic convention and some of the attacks against President Trump.  Ms. McEnany responded by defending the president but then went on to compare the two candidates' campaign strategies:

> It's a baseless attack. . . . And I have watched [President Trump] be emotional and show empathy and show great character that is exactly the opposite of what President Obama has said.  But what this president is doing—he doesn't hide in basements.  He goes out and talks to the American people.  He's travelled more than 6,000 miles this week, he'll be out to Pennsylvania today.  He looks the American people in the eye.  He talks directly to them while Democrats just have a bunch of politicians lying amongst themselves.[83]

---

[80] Al-Ain (Oct. 4, 2020), at 0:03-1:30, https://twitter.com/alain_4u/status/1312691430142377984.

[81] Fareed Zakaria GPS (Aug. 23, 2020), http://transcripts.cnn.com/TRANSCRIPTS/2008/23/fzgps.01.html.

[82] Ms. McEnany also appeared on television during the 2020 election cycle in her capacity as a Trump campaign official, which was permissible under the Hatch Act.  The interviews described in this report, however, are all ones that she gave in her capacity as the White House Press Secretary and not as a campaign spokesperson.

[83] *Kayleigh McEnany reacts to DNC speeches:  Obama failed this country, Trump reversed it*, America's Newsroom (Aug. 20, 2020), at 2:20-2:58, https://video.foxnews.com/v/6182923723001#sp=show-clips.

On October 23, while answering questions from reporters on White House grounds, Ms. McEnany made the case for President Trump's reelection and questioned whether candidate Biden would fight for the American people if elected:

> Look, this is the most important election in American history, because what's at stake in this election are jobs, the economy, recovering from COVID. [President Trump] believes he's the best person to do that. He thinks he has a four-year proven track record of that. Eleven days out from an election, the American people deserve to hear from their leaders, and it's very interesting that you've had the other candidate been sequestered away for five days. President Trump's been out and about, and I think if you're going to not fight for the vote of the American people, I don't think you're going to fight for the American people as president.[84]

### g. White House Chief of Staff Mark Meadows

Mr. Meadows gave three interviews in his official capacity during which he campaigned for President Trump's reelection or, in one case, for the election of Madison Cawthorn, who at the time was a candidate for Mr. Meadows's former congressional seat in North Carolina. On July 6, Mr. Meadows appeared on the FNC program *Fox & Friends*.[85] One of the hosts gave a brief biography of Mr. Cawthorn, said that he was "ready for the job," and asked Mr. Meadows what he expected would happen in the upcoming election.[86] Rather than pivot from answering a question about a candidate for partisan political office, Mr. Meadows instead responded by saying, "Well, Madison will be a great member of Congress. . . . Obviously he'll be a great member of Congress."[87] Mr. Meadows went on to say that "the people of Western North Carolina have rallied behind him, will continue to do so, and in November we will keep that seat. But not only that seat, we will pick up additional seats because it's time that Congress starts getting things done and helping this president instead of being an obstructionist."[88]

Mr. Meadows then gave two interviews in which he discussed President Trump's campaign strategy and attacked candidate Biden. The first was on the FNC program *Hannity*[89] on July 6, and the second was on the *POLITICO* program *Plug In With Playbook* on August 26.[90] During the *Hannity* interview, after the host mentioned a speech by President Trump, Mr. Meadows said the following:

> Not only was it a historic speech, but he laid out really the difference: Are we

---

[84] *Kayleigh McEnany Speaks to Reporters at White House*, C-SPAN, at 6:11-6:44 (Oct. 23, 2020), https://www.c-span.org/video/?477281-1/kayleigh-mcenany-speaks-reporters-white-house.

[85] *Mark Meadows previews Trump's upcoming rally in New Hampshire*, Fox & Friends (July 6, 2020), https://www.youtube.com/watch?v=YCjWsT3-M0I.

[86] *Id.* at 10:40.

[87] *Id.* at 10:52-11:04.

[88] *Id.* at 11:08-11:24.

[89] *Mark Meadows:  President Trump is the only thing standing between a mob and the American people*, Hannity (July 6, 2020), https://www.foxnews.com/transcript/mark-meadows-president-trump-is-the-only-thing-standing-between-a-mob-and-the-american-people.

[90] *Plug In With Playbook Interview with White House Chief of Staff Mark Meadows*, POLITICO (Aug. 26, 2020), https://www.politico.com/live-events/2020/08/26/plug-in-with-playbook-interview-with-white-house-chief-of-staff-mark-meadows-000968.

going to be for anarchy, or are we going to be for the rule of law and making sure that American citizens feel safe once again in their home?  This president is willing to do that.  Where is Joe Biden?  In his basement.  You know, it's amazing.  We've seen Joe Biden for 40 years talk a good game—but we've seen no results.[91]

And in the *Plug In With Playbook* interview Mr. Meadows was asked what President Trump could do in the next 69 days to win the election.  He responded by describing the Trump campaign's strategy through election day:

> Well I think it's not just what he does over the next 69 days—and so let me just be clear, I'm going to talk in my personal capacity as we talk about some of these things so that we don't get everybody tweeting at me that I'm violating the Hatch Act with the two of you.[92]  So from a political standpoint, if I put on my political hat, here's what I see is, it's not just what he's going to do in the next 69 days, but it's what he's building on from the three and a half years prior to that.  But it's taking the next 69 days, focusing on what we've accomplished, but then what are we going to do next.  And it's taking it to literally five different states, Wisconsin is one of those, North Carolina is one of those, Florida is another, Arizona and Pennsylvania.  If we look at those states and making sure that we take a message, not only about jobs, but also about how we're going to set a different agenda between this president and candidate Joe Biden.  Because really right now the contrast is still not being made.  You know, it's, the only contrast that's being talked about is that Joe Biden has been a nice guy for 47 years and Donald Trump has not been in the last four years.  And so if we look at that, let's look at the policies that really matter, that's what we're going to try to focus on.  It's about hitting those individuals who are real concerned about their job but also about what the next four years might be all about for them.[93]

### h.   Senior Advisor to the President for Policy Stephen Miller

Mr. Miller appeared on FNC in his official capacity on July 31.  During that interview, he mocked candidate Biden as being under the control of "23-year-old" campaign staff:

> As you know, Joe Biden is stuck in a basement somewhere and he just emerges every now and again and somebody hands him a notecard and he says whatever

---

[91] *Hannity*, at 3:21-3:45.
[92] OSC previously has advised that officials cannot "switch hats" during an official interview and then engage in political activity under the guise that they are now speaking in a personal capacity.  *See* Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-16-3113 (Julián Castro) (June 24, 2016) (former Secretary of Housing and Urban Development Julián Castro violated the Hatch Act by engaging in political activity during an official interview even though he prefaced the political comments by saying "now taking off my HUD hat for a second and just speaking individually").  Because Mr. Meadows gave this interview in his official capacity, he was prohibited from engaging in political activity at any point during the interview.
[93] *Plug In With Playbook*, at 7:06-8:43.

his 23-year-old staffer tells him to say and then he dutifully disappears to be seen a week later. . . .[94]

i.   White House Deputy Press Secretary Brian Morgenstern

Mr. Morgenstern appeared on OAN in his official capacity on October 9 and 27.  During the October 9 interview, he said of the presidential debates:

> The Biden campaign's resistant [to a third debate] of course because the Biden campaign doesn't want to have him in person debating with the president. They've been trying to weasel out of this for weeks.  So when the commission, you know, tried to unilaterally change formats you know the Trump campaign and the White House are not going to be in favor of that because the president is strong in in-person debates and gets Vice President Biden off-balance and off his guard, and that's important for the American people to see who's going to be the strong leader representing them for the next four years. . . .[95]

After speaking about President Trump's relative strength during in-person campaign debates, Mr. Morgenstern then described the contrast between the two campaigns:

> [T]hat contrast is critically important, the economic messages on job creation from President Trump, the record on judicial appointments, frankly the record on pandemic management between how President Trump has mobilized the entire country versus how Vice President Biden botched the swine flu handling.  I mean, there couldn't be more contrast.  Law and order, of course, the president talks about so much and is so important.[96]

Later in the interview, Mr. Morgenstern continued his comparisons of President Trump and candidate Biden:

> I mean look at the vice president's record on race.  His record on law and order is abysmal.  They are going to end fracking, even though they now won't admit it. Even though they said it just, you know, weeks ago. . . .[97]

And during the October 27 interview, he described President Trump's upcoming campaign strategy:

> It is going to be multiple events every day, the president is going to visit with the American people, with his classic sense of humor, and he is going to remind them that one side is for freedom.  It is for economic growth.  It is for job creation.  It's

---

[94] *Stephen Miller:  Nobody who mails in a ballot has their identity confirmed*, Fox & Friends (July 31, 2020), at 3:25-3:40, https://video.foxnews.com/v/6176997244001#sp=show-clips.
[95] *Dan Ball Interview With White House Deputy Press Secretary, Brian Morgenstern*, Real America with Dan Ball (Oct. 9, 2020), at 5:38-6:09, https://www.youtube.com/watch?app=desktop&v=eFz3GrETdec.
[96] *Id.* at 6:28-6:53.
[97] *Id.* at 9:00-9:11.

for lower taxes, deregulation.  It is for better trade deals.  It is for more peace deals and less war.  It is for price transparency and lower health care costs.  The other side is offering riots.  They are offering court packing.  They are offering the 25th Amendment to try to remove the president.  They are offering one of the most radical climate change agendas, job-killing agendas, free speech stifling agendas maybe we have ever seen in our entire history.  And so the choice could not be starker.  And here, as you noted, we have one candidate fighting for every vote, visiting every swing state multiple times, and another one hiding away.  Because they know that the more America sees of their ticket, the less they like them.[98]

j.   National Security Advisor Robert O'Brien

Mr. O'Brien appeared on *The Hugh Hewitt Show* in his official capacity on June 25.  During that interview, he was asked how a Biden victory would impact policy towards China.  Rather than answer a question nominally about policy matters, Mr. O'Brien instead argued for President Trump's reelection:

I expect the president to be reelected and reelected overwhelmingly. . . . I think the president's going to come out on top.  The American people see the leadership that he's providing not just with respect to China, they saw him build the greatest economy in the history of the world.  We took a very bad hit because of this virus that came from China.  But who do you want to turn to to rebuild the economy— the guy who's proven he can do it, President Trump, or somebody who's been in Washington for 40 years?  So I think the president's going to be reelected, and I think the American people are going to rally around him.[99]

k.   Chief of Staff to the Vice President Marc Short

Mr. Short gave three interviews in his official capacity during which he engaged in political activity.  During a June 22 appearance on Fox Business, Mr. Short said:

I think that Donald Trump was elected in many cases because Hilary Clinton represented the establishment.  Joe Biden was elected to Congress in 1972.  1972, he's been in Washington, DC.  I think the reality is this president has begun to shake up that establishment order, he's made changes, and Joe Biden continued to support appeasement with China.  This president has a different answer.  This president lowered taxes, this president reduced regulations.  Joe Biden continues to stand for the failed policies of the left, and if he's done anything to modernize

---

[98] *Dan Ball Interview W/ White House Deputy Press Secretary, Brian Morgenstern*, Real America with Dan Ball (Oct. 27, 2020), at 7:55-9:00, https://www.youtube.com/watch?app=desktop&v=49lgOqi90fo.
[99] *NSA Chief O'Brien Applauds Decision Ordering Dismissal Of Charges Against His Predecessor Gen. Flynn*, The Hugh Hewitt Show (June 25, 2020), at 8:28-9:16, https://www.youtube.com/watch?v=09-xa6E3Zkw.

his policies it's to listen to AOC on the environment and Ilhan Omar on policing.[100]

Elsewhere in that interview, Mr. Short said, "[T]here are legitimate questions that Vice President Biden is yet to face media in over 80 days and seems trapped inside his basement at the moment."[101]

During an August 14 appearance on Fox Business, Mr. Short was asked about candidate Harris and answered:

> Well, you know, Maria, I think that we can celebrate the fact that a daughter of two immigrants has had such a celebrated political career to be elected statewide and now be the nominee for the Democrat Party. I think what's more concerning is some of the socialist ideas she seems to have imported from overseas as well. Whether or not that is $4 trillion in tax increases or mandating a government takeover of healthcare, I think what gives us greater pause is the policies that she's advocated. But it's going to present a tremendous contrast to the American people to choose between a freedom and opportunity agenda that the Trump/Pence administration stands for versus a path to socialism and decay that we believe the Biden/Harris ticket stands for.[102]

He then made statements similar to the "path to socialism" attack in a subsequent interview. On August 27, Mr. Short gave an interview to the group Campus Reform in his official capacity. The host asked, "[T]he RNC kicked off last night, the end-of-the-week message that you want voters to have taken away from things, when all this is said and done, what do you want that to be?" Mr. Short then laid out the Trump campaign platform and contrasted it with the Biden campaign platform:

> Voters are going to have a really stark contrast this November. They'll have an opportunity to choose between hope and opportunity versus socialism and decline. And I think you're going to hear that laid out throughout the week. Of opportunities that we have to say here's a pro-freedom agenda that's consistent with all of the tax reform, deregulation, that helped create 7.5 million jobs before the pandemic broke out. And those are policies that we want to see continued. We also will cherish opportunities like school choice. I think that that's something that this administration has advocated. I think in a second term you'll see us take an even more aggressive push for that. And you'll hear families in the next couple days that have benefited from school choice opportunities. And so that'll be a key component of the agenda. But I think it's in stark contrast to where Democrats have painted a very dark picture of America. And a picture that I think the policies they are embracing of Bernie Sanders basically, in essence,

---

[100] *Pollsters are underestimating Trump voters: Marc Short*, The Evening Edit w/ Elizabeth MacDonald (June 22, 2020), at 4:51-5:26, https://video.foxbusiness.com/v/6166480779001#sp=show-clips.
[101] *Id.* at 1:55-2:02.
[102] *Israel-UAE peace deal is a tribute to Trump's Iran policy: Marc Short*, Mornings with Maria (Aug. 14, 2020), at 1:15-1:54, https://video.foxbusiness.com/v/6181133933001?playlist_id=937116503001#sp=show-clips.

saying that what was once radical is now mainstream in our party.  They are more or less fully embracing the unity package between Biden and Sanders that leads to a true socialist future for our country.[103]

ii.    <u>Analysis</u>

Each of these 11 senior Trump administration officials violated the Hatch Act by campaigning on behalf of President Trump—and, in the case of Mr. Meadows, also on behalf of a congressional candidate—while acting in an official capacity.  While speaking as government officials, and purportedly presenting the official position of the United States of America, not the Trump campaign, they repeatedly promoted President Trump's candidacy and attacked candidates Biden and Harris. Those attacks often specifically referenced Joe Biden and Kamala Harris's candidacies for president and vice president.  And the partisan, political nature of the attacks is self-evident.  For example, Mr. Morgenstern said that candidate Biden was "hiding away" because "the more America sees of the [Biden/Harris] ticket, the less they like them," and Mr. Short said the 2020 election "present[s] a tremendous contrast to the American people to choose between a freedom and opportunity agenda that the Trump/Pence administration stands for versus a path to socialism and decay that we believe the Biden/Harris ticket stands for." Although these statements, and the others cited in the preceding section, were made in the context of official interviews, they were wholly unrelated to any legitimate government business.[104]  Rather, they were explicitly directed at promoting President Trump's reelection and opposing candidate Biden's candidacy.  Accordingly, making these statements was political activity under the Hatch Act.  By engaging in these taxpayer-funded campaign activities while speaking in an official capacity, these officials violated the § 7323(a)(1) prohibition against using their official authority or influence for the purpose of interfering with or affecting the result of an election.

The Trump White House Counsel's Office, in responding on behalf of the subjects to OSC's investigative requests in these cases, made two primary arguments against finding Hatch Act violations.  The first was that the Hatch Act does not apply, and was never meant to apply, to "assertions of fact . . . that neither advocate for or against a political party or candidate" or to "commentary on significant policy issues."  The second was that finding violations in these cases might violate employees' free speech rights under the First Amendment.  OSC refutes each argument in turn.

As to the first, OSC agrees that government officials acting in an official capacity may make statements of fact that do not constitute political activity without violating the Hatch Act.  OSC similarly agrees that the Hatch Act does not prohibit such officials, while acting in an official capacity, from commenting on significant policy issues.  Concern that the Hatch Act might be used to prevent government officials from making these types of statements dates back

---

[103] *EXCLUSIVE: Inside the Trump Administration's Plan to Combat China, Protect Free Speech*, Campus Reform (Aug. 27, 2020), at 0:30-1:38, https://www.youtube.com/watch?v=fKrSnKG9Yoo&t=1s.
[104] Mr. Meadows even appeared to acknowledge during his *POLITICO* interview that he was about to make statements prohibited by the Hatch Act when he tried to "put on [his] political hat" and speak in a "personal capacity."  As noted *supra* note 93, an employee cannot circumvent the Hatch Acy by simply "switching hats" during an official interview.

to passage of the law in 1939.  In his signing statement, President Roosevelt wrote that all government employees, "from the highest to the lowest," retained the right under the Hatch Act "to give to the public factual information relating to the conduct of Government affairs.  To rule otherwise would make it impossible for the people of the United States to learn from those who serve the Government vital, necessary, and interesting facts relating to the manifold activities of the Federal Government."[105]

President Roosevelt's message emphasized that the Hatch Act does not prohibit government officials from making factual statements "relating to the conduct of Government affairs."  But the statements described in this section are not factual statements about the conduct of government affairs or, as the Trump administration described it, "commentary on significant policy issues."  To take just one example, senior administration officials repeatedly referred to candidate Biden as "hiding in his basement" and, as Mr. Miller said, "emerg[ing] every now and again [to say] whatever his 23-year-old staffer tells him to say and then he dutifully disappears to be seen a week later."  It simply cannot be argued that in doing so they were providing what President Roosevelt described as "vital, necessary, and interesting facts relating to the manifold activities of the Federal Government."  Even those interviews that included some discussion of policy, such as Secretary Brouillette's, contained political activity—in that case, warning what would happen if candidate Biden were to win the election.[106]  Making those statements, and the other similar statements and actions that OSC concludes violated the Hatch Act, was akin to campaign activity.  And wielding the official authority of the government to make partisan political statements is exactly the sort of conduct that the Hatch Act was meant to prohibit.[107]

As to the second argument, that the conduct described herein is protected by the First Amendment, the Trump administration provided OSC with no credible legal basis for its position.  Rather, it simply insinuated that finding a violation in these cases "risks violating the First Amendment" and would be "likely unconstitutional."  This bare assertion is fatally undermined by substantial authority supporting the proposition that the Hatch Act's restrictions on government employee speech are constitutional.

As previously noted, the Supreme Court has twice upheld the Hatch Act's constitutionality in cases brought by public employees claiming that it deprived them of their First Amendment rights.[108]  But more broadly, the government can—and regularly does—constitutionally limit speech by government employees.[109]  The Supreme Court has articulated a two-part inquiry for analyzing the constitutionality of such limitations on employee speech.[110]

---

[105] Message from the President of the United States Relating to Senate Bill 1871, An Act to Prevent Pernicious Political Activities, at 3-4 (Aug. 2, 1939).

[106] Secretary Brouillette told OSC that he "intentionally deflected [his] response to avoid commenting on the election or specific comments made by candidates," but he did not reconcile that statement with the fact that he said candidate Biden's statements were "an enormous deal" and that "no one should buy" that candidate Biden would "leave fossil fuels alone" if he were to win.

[107] *See generally supra* Part II (describing the historical developments leading to the Hatch Act).

[108] *See* U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548 (1973); United Pub. Workers of Am. v. Mitchell, 330 U.S. 75 (1947).

[109] *See, e.g.*, Snepp v. United States, 444 U.S. 507 (1980) (affirming the constitutionality of a prepublication review requirement for former employees of the Central Intelligence Agency).

[110] *See* Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).

The first question is whether the employee is speaking as a private citizen upon matters of public concern.  If so, then the second question is whether the regulation of the employee's speech can be justified by the government's interest in promoting the efficiency of the public service.  But if under the first prong an employee is not speaking as a private citizen, then the employee "has no First Amendment cause of action" because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[111]

All the violations in this section involve federal employees acting within the scope of their official duties—i.e., giving media interviews on behalf of the Trump administration. Accordingly, they have no cognizable free speech interest under the First Amendment.  Because each employee engaged in political activity while acting in an official capacity, each employee violated the Hatch Act.

### B. Senior Trump administration officials violated the Hatch Act during the Republican National Convention.

Three weeks before the RNC, President Trump was asked about the Hatch Act implications of using the White House as the venue for the RNC.  He responded, "There is no Hatch Act" concern because "it doesn't pertain to the president."[112]  Although President Trump was correct in that he was not subject to the law, his answer ignored the fact that the Hatch Act did apply to those senior administration officials who were asked to engage in RNC-related activities on his behalf.  Two officials that OSC investigated, Secretary Pompeo and Acting Secretary Wolf, were asked to participate in RNC-related activities for the president.  Those requests came from the White House or, in Secretary Pompeo's case, possibly the Trump campaign or President Trump himself.[113]  OSC acknowledges that the source of the requests might have placed Secretary Pompeo and Acting Secretary Wolf in a difficult position but nevertheless concludes that each violated the Hatch Act by participating in RNC-related activities.

Secretary Pompeo's violations relate to his changing U.S. Department of State (State Department) policy to allow himself to speak at the RNC and thereafter using his official authority while giving that speech to promote President Trump's candidacy.  Acting Secretary Wolf's violation relates to an official naturalization ceremony he presided over that was produced for the RNC.  Both reflect the Trump administration's willingness to manipulate government business for partisan political ends.

---

[111] *Id.* at 418, 421.

[112] *President Trump Holds Coronavirus News Conference*, C-SPAN, at 25:37-25:41 (Aug. 5, 2020), https://www.c-span.org/video/?474563-1/president-trump-comments-mail-voting-fraud-claims.

[113] As noted *infra* note 122, it is unclear from the memorandum directing the policy change who made the request, as that memorandum variously refers to the request coming from "the White House," "the President's campaign," or otherwise being made "by or for the President."

i.      Factual Findings – Secretary of State Michael Pompeo and the Jerusalem Speech

On or about August 21, Secretary Pompeo approved a change to a State Department policy that until then had prohibited him and all other political appointees at the State Department from engaging in many partisan political activities, such as addressing a political party convention. However, he approved a change to the policy—for the Secretary of State only—just days before he delivered a taped speech from Jerusalem to the RNC. Under the new policy, the Secretary of State "is not restricted from addressing a political party convention when requested by or for the President."[114] That decision was made against the advice provided to Secretary Pompeo by senior State Department lawyers.[115]

The restrictions that the State Department imposed upon its political appointees are derived from the president's authority to restrict the political activity of presidential and political appointees pursuant to 5 C.F.R. § 734.104. That authority was delegated to the Secretary of State in 1994,[116] and the State Department policy was promulgated shortly thereafter. The policy is based upon the importance of ensuring that the State Department's work—advocating for American interests abroad on a nonpartisan basis—is not viewed as overtly partisan. Similar restrictions apply at the Departments of Defense, Justice, and Homeland Security, whose work likewise requires the appearance of nonpartisanship.[117] Since the policy went into effect in the mid-1990s, neither OSC nor the State Department is aware of a sitting Secretary of State addressing a political convention.

OSC has no evidence that the change Secretary Pompeo approved was driven by a measured reconsideration of the underlying policy rationale for the existing restrictions. Secretary Pompeo had in fact himself reaffirmed those restrictions in December 2019. And in July 2020, less than a month before Secretary Pompeo approved the exception for the Secretary of State, the State Department circulated a document issued under his signature that reiterated the political activity restrictions on State Department political appointees, including the Secretary of State. Those restrictions prohibited the Secretary of State from addressing a political party convention.

---

[114] Memorandum from the Under Secretary of State for Management to the Designated Agency Ethics Official 1 (Aug. 21, 2020).

[115] OSC has reviewed the document provided to Secretary Pompeo and concluded that the State Department accurately advised him with respect to the Hatch Act implications of both changing the policy and delivering a speech to the RNC. OSC further concludes that Secretary Pompeo disregarded that advice. OSC refers all questions about this document to the State Department.

[116] Memorandum for the Secretary of State, 59 Fed. Reg. 54,121 (Oct. 27, 1993).

[117] See, e.g., Memorandum from Lee J. Lofthus, Assistant Attorney General for Administration, to all Department of Justice Non-Career Employees 1 (June 10, 2020) ("In consideration of the Department's mission, Attorneys General have previously determined that, as a matter of Department policy, all political appointees will be subject to the rules that govern 'further restricted' employees under the Hatch Act to ensure there is not an appearance that electoral politics plays any part in the Department's day-to-day operations."), available at https://www.justice.gov/jmd/file/834496/download; Joint Ethics Regulation, U.S. Dep't of Defense, 6-200(d) (Nov. 17, 2011) ("As a matter of longstanding DoD policy . . . DoD employees who are appointed by the President, by and with the advice and consent of the Senate (e.g., the Secretary of Defense, the Secretaries of the Military Departments, etc.) . . . may not engage in activities that could be interpreted as associating the DoD with any partisan political cause or issue."), available at https://dodsoco.ogc.osd.mil/Portals/102/550007r.pdf.

The policy change was precipitated by Secretary Pompeo being asked, on behalf of President Trump, to participate in the RNC.[118]  Secretary Pompeo thereafter planned to tape an address to the RNC while on official State Department travel overseas.  The memorandum directing the change stated that "while the overall goal of projecting a non-partisan foreign policy remains sound," an exception to the policy was warranted "[g]iven that the Secretary's participation in the national convention is requested on behalf of the President."[119]  The memorandum further stated that the existing policy was based "on an exercise of the President's own authority" and that "the Department should not exercise that authority to interfere with otherwise permissible actions directed or requested by or for the President."[120]

Secretary Pompeo's plan also implicated a State Department policy, codified in the Foreign Affairs Manual, which provides that a "U.S. citizen employee, spouse, or family member shall not engage in partisan political activities abroad."[121]  That policy prohibits all U.S. citizen employees and family members, including family members who are not government employees, from engaging in many activities related to U.S. elections while overseas.  On August 21, one of Secretary Pompeo's subordinate political appointees granted him a "one-time exception" to that policy "in the event [Secretary Pompeo] chooses to address the Republican National Convention and needs to record his remarks while on travel."[122]  No other U.S. citizen State Department employees stationed overseas, or their spouses or family members, received the benefit of the exception.

The State Department further advised Secretary Pompeo with respect to how to comply with the Hatch Act when delivering the speech.  As he did with the policy change, Secretary Pompeo disregarded that advice.

Secretary Pompeo proceeded to record the speech for the RNC while on official State Department travel to Jerusalem, a city that was the site of a significant Trump administration foreign policy achievement.  Secretary Pompeo highlighted the location when he introduced himself:

> I'm Mike Pompeo.  I'm speaking to you from beautiful Jerusalem, looking out over the Old City.  I have a big job—as Susan's husband and Nick's dad.  Susan and Nick are more safe, and their freedoms more secure, because President Trump has put his America First vision into action.[123]

---

[118] The memorandum directing the policy change, issued by one of Secretary Pompeo's subordinate political appointees, begins by noting that "[t]he Secretary has been asked to record an address to the Republican National Convention (RNC)."  Memorandum from the Under Secretary of State for Management, at 1.  However, it is unclear from the memorandum from whom the request came, as it variously refers to a request from "the White House," the "President's campaign," and a request made "on behalf of the President."  *Id.*

[119] *Id.*

[120] *Id.*

[121] 3 Foreign Affairs Manual 4123.3.

[122] Memorandum from the Under Secretary of State for Management, at 1.

[123] *Mike Pompeo delivers remarks at 2020 RNC*, ABC News (Aug. 24, 2020), at 0:00-0:21, https://abcnews.go.com/Politics/video/mike-pompeo-delivers-remarks-2020-rnc-72612744.

Secretary Pompeo did not expressly refer to his position as Secretary of State. He did, however, speak almost exclusively about official matters. During the speech, which lasted less than four minutes, Secretary Pompeo covered numerous issues within his portfolio as Secretary of State: China trade policy; North Korean denuclearization; Ukrainian arms sales; treaties with Russia; controlling Iran's nuclear weapons; and brokering a peace deal between Israel and the United Arab Emirates. He also described how President Trump is perceived in foreign capitals and praised the Trump administration's decision to move the U.S. embassy in Israel to "this very city of God, Jerusalem, the rightful capital of the Jewish homeland."[124]

ii.    Analysis – Secretary of State Michael Pompeo and the Jerusalem Speech

OSC concludes that Secretary Pompeo violated the Hatch Act in two instances. First, he did so by authorizing a last-minute change to State Department policy for the purpose of promoting President Trump's reelection. And second, he did so by devoting nearly the entirety of his RNC speech to discussing matters within his purview as Secretary of State, thereby using his official authority in furtherance of President Trump's reelection.

The Hatch Act prohibits government officials from taking official actions for the purpose of promoting a candidate's campaign for partisan political office. In 2011, OSC issued a report that found more than a dozen instances of government officials scheduling and participating in purportedly official events that were actually coordinated to benefit various political campaigns.[125] In each case, the event at issue was nominally related to the work of the relevant agency, and thus in theory could have been conducted as an official event, but the underlying facts established that each event's true purpose was to promote a candidate. OSC concluded that this manipulation of official government business to serve partisan ends violated § 7323(a)(1).

Secretary Pompeo's approval of the change to State Department policy is a similar manipulation of government business to benefit a particular candidate. The timing, justification, and scope of the change suggest its sole purpose was to promote President Trump's reelection campaign.

In December 2019, Secretary Pompeo reaffirmed the policy that prohibited him and all other State Department political appointees from addressing a political convention. Presumably, that decision reflected a consideration on his part that the policy—then in effect for nearly 30 years—was sound and in the best interests of the State Department. In or about August 2020, Secretary Pompeo was asked to support President Trump's reelection by speaking at the RNC. The existing policy precluded him from doing so. Secretary Pompeo thereafter authorized a change to the policy, less than one week prior to his speech, in order to allow himself to support President Trump's reelection campaign. The new policy allows for the Secretary of State to engage in political activity when "directed or requested by or for the President."[126]

---

[124] *Id.* at 2:58-3:02.
[125] *See generally* Investigation of Political Activities by White House and Federal Agency Officials During the 2006 Midterm Elections, Chapter Five (Jan. 2011) (government officials cannot engage in otherwise-permissible events if the underlying purpose is to promote the campaign of a candidate for partisan political office).
[126] Somewhat paradoxically, the new policy realizes the fears of both proponents *and* opponents of the Hatch Act. Proponents of the Hatch Act worried that without the law the president might turn the executive branch into a

The impetus for the change was that President Trump, or someone acting on his behalf, requested that Secretary Pompeo record an address for the RNC.  Thus, it appears that Secretary Pompeo reversed his earlier decision to affirm the policy because it prohibited him from campaigning on behalf of a specific candidate for partisan political office.  There is no evidence that the change was driven by a reassessment of the underlying policy considerations implicated by the existing restrictions.  As noted above, when Secretary Pompeo had a chance to review the policy just eight months earlier he chose to reaffirm the then-existing restrictions.  And the memorandum directing the policy change noted the merits of the existing policy.[127]  Rather, the evidence shows that the change was motivated by a desire to promote President Trump's reelection.

Notably, the memorandum directing the policy change begins by stating that the "Secretary has been asked to record an address to the Republican National Convention (RNC)." While it is unclear who made the request—the memorandum variously refers to "the White House," the "President's campaign," and a request made "on behalf of the President"—it is clear that the reason for the policy change was that Secretary Pompeo was asked to engage in political activity in support of the president's campaign.  This reinforces the conclusion that the policy change was driven not by a reassessment of the relevant policy considerations, but by a desire to benefit the President's reelection.  It also substantially undercuts any argument that the policy should have been amended, as stated in the memorandum, so as not to "interfere with otherwise permissible actions directed or requested by or for the President."  Even if the request came from President Trump himself, the nature of the request—that Secretary Pompeo speak at the RNC in furtherance of President Trump's reelection campaign—makes it one that President Trump necessarily would have made in his capacity as a candidate.  Secretary Pompeo was not asked by the president to reconsider or revise the existing policy in order to best serve the interests of the State Department.  Instead, he was asked by, or on behalf of, a candidate for partisan political office to engage in political activity prohibited by existing State Department policy.  He chose to accede to that request.  To facilitate that political activity, Secretary Pompeo had to exercise his official authority to amend the policy.  That he did so to promote President Trump's reelection is a manipulation of official business—in this case, State Department policy—for the purpose of benefiting a candidate for partisan political office.  Accordingly, Secretary Pompeo violated the Hatch Act by authorizing the policy change.

Secretary Pompeo's speech also required that he be granted a "one-time exception" from a separate State Department policy that prohibits all U.S. citizen employees, and their spouses and family members, from engaging in political activity while on State Department-related travel abroad.  The "one-time" nature of that exception provides further evidence that the changes to State Department policy were for the purpose of promoting President Trump's reelection rather

---

political machine, while opponents worried that the Hatch Act would infringe upon employees' First Amendment rights to engage in the political process.  Under the new State Department policy, the Secretary of State is still prohibited from engaging in most political activity *unless* specifically directed by or for the president.  In other words, the Secretary of State cannot independently engage in most types of political activity, thus substantially limiting the Secretary's First Amendment rights, and yet is also a one-person "political machine" subject to the whims and partisan inclinations of the president.

[127] Memorandum from the Under Secretary of State for Management, at 1 ("the overall goal of projecting a non-partisan foreign policy remains sound").

than a result of some broader reassessment of State Department policies and interests.  As with the policy change, the stated justification for the "one-time exception" was that the request for Secretary Pompeo to speak at the RNC came from President Trump.  The ultimate effect was that while all other U.S. citizen State Department employees stationed overseas and their spouses and family members were not allowed to undertake many actions related to the 2020 election, Secretary Pompeo was permitted to record an address to the RNC, while travelling abroad to Israel, for the purpose of supporting President Trump's reelection.

Separately, Secretary Pompeo's speech constituted a misuse of his official authority because he discussed the work of his agency while engaging in political activity.  OSC has long advised Cabinet officials that, when speaking in a personal capacity for a partisan political purpose—which Secretary Pompeo apparently attempted to do by introducing himself as "Susan's husband and Nick's dad" rather than as Secretary of State—they must avoid talking about the work of their agencies to ensure that they do not mix their official work with their personal political activity.  This is so officials do not implicitly or explicitly rely upon their official authority to strengthen the impact of their political activity, which would constitute a prohibited use of their official authority to interfere with or affect an election.[128]  The State Department's guidance to Secretary Pompeo was consistent with OSC's previous advice.  The State Department also recommended that Secretary Pompeo seek guidance from OSC if he chose to give the speech, yet Secretary Pompeo never did so.

Secretary Pompeo's speech was focused almost exclusively on the work of the State Department.  In less than four minutes he discussed seven major Trump administration foreign policy decisions.  His reference to his wife and son at the beginning of the speech appears intended to convey that he was speaking in a personal capacity.  But even assuming that were true, Secretary Pompeo nevertheless violated the Hatch Act by repeatedly discussing the Trump administration's foreign policy accomplishments.  OSC concludes that Secretary Pompeo's decision to speak in support of President Trump's reelection by describing the Trump administration's foreign policy record—i.e., the work of the State Department—was not coincidental.  Instead, Secretary Pompeo did so because his official authority as the sitting Secretary of State gave greater weight to his endorsement of President Trump's reelection, an endorsement that was predicated almost entirely upon descriptions of the State Department's work.  Thus, OSC concludes that Secretary Pompeo violated the Hatch Act by speaking extensively about State Department business while giving a political speech, and thereby using his official authority in furtherance of President Trump's reelection.

    iii.    <u>Factual Findings – Acting Secretary of Homeland Security Chad Wolf and the Naturalization Ceremony</u>

On August 25, President Trump and Acting Secretary of Homeland Security Chad Wolf presided over a naturalization ceremony in the Cross Hall of the White House.  Footage of that ceremony was then broadcast that evening as part of the RNC.  The evidence that OSC gathered shows that this official U.S. government event was scheduled and conducted for the purpose of producing content to be used at the RNC.  Although Acting Secretary Wolf was the person about

---

[128] *Cf.* 5 C.F.R. §§ 734.302(b)(1) and 303(c) (prohibiting government employees from using their official titles in connection with their personal political activity).

whom OSC received complaints, the evidence shows that other officials at both DHS and within the Trump White House were instrumental in orchestrating the ceremony for the RNC. However, due to enforcement challenges that are more fully described in the next Part, OSC was unable to identify which specific DHS and White House employees were most culpable.[129] Accordingly, while this section and the following analysis focus on OSC's conclusion that Acting Secretary Wolf violated the Hatch Act, others likely violated the law as well.

Internal emails show that in early August, the White House and DHS were discussing options for a naturalization ceremony hosted by a "high level principal."  On August 17, the White House communicated to DHS that it wanted to conduct a small naturalization ceremony presided over by President Trump and featuring applicants from Florida, Texas, Arizona, Wisconsin, and Nevada.  As of August 17, the ceremony was scheduled to take place on or around Constitution Day, September 17.

But on Tuesday, August 18, the White House decided to move the ceremony to the following week—the week of the RNC.  The DHS contact coordinating with the White House noted that the ceremony was a "close hold" and that the White House was "very anxious" about the event.  Other DHS employees also understood that the ceremony was to be "super close hold" and "as close hold as possible."

On Thursday, August 20, Acting Secretary Wolf's scheduler communicated with a White House employee who said that the ceremony would be "pre-taped" for the RNC.  The scheduler then emailed a DHS ethics official and said that Acting Secretary Wolf "was asked to participate in a small naturalization ceremony" that "is going to be recorded and then played at the RNC." The ethics official correctly concluded that staging an official event in coordination with a political party and for the purpose of creating content for that party's national convention would violate the Hatch Act.  The ethics official emailed the scheduler the following morning and said that it would likely violate the Hatch Act for Acting Secretary Wolf to participate in the ceremony.

On Friday, August 21, the scheduler forwarded the ethics official's email to DHS's acting Chief of Staff (CoS) and DHS's Senior Official Performing the Duties of the General Counsel (GC).  The scheduler told the GC that the CoS would call him to discuss the ethics official's determination that the Hatch Act precluded Acting Secretary Wolf from participating in the naturalization ceremony.

Also on August 21, the GC spoke with the DHS ethics official and asked if the Hatch Act violation would be cured by the White House characterizing the ceremony as an official event. The ethics official advised that this would not cure the problem, since the original purpose of the event was to use government resources to produce content for a political convention.  That day, the GC spoke with an attorney in the White House Counsel's Office, and they agreed that the

---

[129] *See infra* Part IV(2) (describing deficiencies in the responses that OSC received to investigative questions about the naturalization ceremony).  Most of the documents produced in response to OSC's requests were provided only after the political appointees involved in the naturalization ceremony had left government service, which further limited OSC's ability to seek additional information.  *See infra* Part IV(7) (describing the limits to OSC's subpoena power in light of the lack of a quorum on the Merit Systems Protection Board).

ceremony would be planned and executed as an official event.  The White House attorney communicated that determination to White House staff and, according to that attorney, the ceremony "was thereafter organized and executed as an official event."

OSC repeatedly warned both DHS and the Trump White House that, because the ceremony was designed to produce content for the RNC, the proposed naturalization ceremony would violate the Hatch Act even if it was later characterized as an official event.  OSC first advised a DHS ethics official of this on August 20, prior to the event being reclassified as an official event, and again on August 25, the morning of the event, after learning that it had been reclassified.  OSC similarly advised the White House on August 20 and 24.  As late as 10 a.m. on the morning of the ceremony—just 45 minutes prior to the event—the DHS ethics official emailed DHS leadership, including the GC, stating that Acting Secretary Wolf should not participate in the ceremony.  A DHS employee replied and copied the CoS, writing "please note. Can you reach out to OGC soonest?"

The GC responded to the ethics official's August 25 email by writing that White House lawyers had advised him that this would be an official event and that "[a]fter the event, they stated that the photographs and video will be publicly released."  The GC forwarded the email to the CoS at 10:04 a.m.

During an investigatory interview with OSC, the CoS said that if he knew there were any Hatch Act concerns with the event then he would have told Acting Secretary Wolf.  Emails reviewed by OSC show that the CoS knew on August 21 that a DHS ethics official had advised that Acting Secretary Wolf likely could not participate in the ceremony.  The CoS then discussed that email with the GC.  As late as Sunday evening, August 23, the CoS and the GC were emailing about whether Acting Secretary Wolf could participate in the ceremony consistent with the Hatch Act.  The CoS nevertheless told OSC that he never saw the ethics official's original email, in which she advised that Acting Secretary Wolf's participation would likely violate the Hatch Act, and that he was not otherwise aware of any Hatch Act concerns with the ceremony.

During an investigatory interview with OSC, the GC asserted that he disregarded the ethics official's advice because, as he stated repeatedly, the ethics official's analysis was based on the incorrect assumption that the ceremony was going to be livestreamed during the RNC. However, nothing in the email records shows that the ethics official's advice was based upon the impression that the event would be livestreamed.  To the contrary, the ethics official's initial advice was in response to an email stating that the ceremony would be "recorded and then played at the RNC."  The ethics official's response explicitly referred to the event "being taped for the RNC" rather than livestreamed.  The GC was forwarded the email with the ethics official's analysis.

OSC submitted questions to the White House attorney for a written response.  He declined to answer many of the questions and claimed that many—although he did not identify which ones specifically—involved privileged information.  He did not identify which privilege was at issue.  The White House attorney claimed to have first learned about the naturalization ceremony from either the DHS GC or OSC and that upon investigating the matter he learned that "consideration was being given to holding [the ceremony] as part of the convention."  As an

apparent defense of the White House's decision to classify the event as official and place it on YouTube for the Republican Party to use as part of its convention, the White House attorney wrote that President Trump "had previously participated in a naturalization ceremony at the White House in 2019, and I believed footage from that ceremony was made available on the White House YouTube website."  A comparison of the publicly available footage from the 2019 ceremony and the August 25 ceremony shows that the 2019 ceremony video was of lower quality, had lower production value, and was edited down to 45 seconds.[130]  The video of the August 25 ceremony, by contrast, was of noticeably higher quality and ran nearly 10 minutes long.[131]  It was shown in its entirety during the RNC.  OSC also asked about reports that the Trump White House referred media questions about the ceremony, a purportedly official event, to the Trump campaign.[132]  The attorney responded that "referral of press questions to the Trump campaign may have been appropriate depending on the nature of the questions" and did not elaborate further.

In a written statement to OSC, Acting Secretary Wolf said that:

prior to my participation in the August 25, 2020 naturalization ceremony that was held at the White House, I did not know whether video of the ceremony was going to be made publicly available or that it would be used at the Republican National Convention.

He further stated that his staff did not raise the matter with him beforehand because the event was cleared in advance by the DHS Office of the General Counsel (OGC).  Acting Secretary Wolf acknowledged that OGC spoke with the White House Counsel's Office, which said there were no Hatch Act concerns, but did not reference OGC's multiple conversations with OSC in which OSC said that his participation was prohibited by the Hatch Act.

iv.   Analysis – Acting Secretary of Homeland Security Chad Wolf and the Naturalization Ceremony

As noted above, the Hatch Act prohibits government officials from holding purportedly official events for the purpose of promoting a candidate for partisan political office.[133]  With respect to the naturalization ceremony, the evidence shows that the ceremony was orchestrated to create content that would be shown during the RNC.  The White House said as much to DHS, and a White House attorney directly involved said that only after Hatch Act concerns were raised was the ceremony "*thereafter* organized and executed as an official event."[134]  OSC concludes that Acting Secretary Wolf violated the Hatch Act by presiding over a naturalization ceremony held for the purpose of creating content for the RNC.

---

[130] *Compare* https://www.youtube.com/watch?v=9ydkQPwMe2k, *with* https://www.youtube.com/watch?v=vb9qXvGAQTA.

[131] Video of the 2019 ceremony was also not uploaded to the White House YouTube channel until over two weeks after the event.  Video of the August 25 ceremony was uploaded that same evening.

[132] Tarini Parti and Michael C. Bender, *Immigrants in Trump-Led Ceremony Didn't Know They Would Appear at RNC*, The Wall Street Journal, https://www.wsj.com/articles/immigrants-in-trump-led-ceremony-didnt-know-they-would-appear-at-rnc-11598481345.

[133] *See supra* note 129 and accompanying text.

[134] Emphasis added.

Government functions cannot be scheduled, coordinated, or designed for the purpose of promoting a political party, campaign, or candidate for partisan political office. That the White House decided subsequently to classify the event as official, and thereby use even more government resources to stage an event intended for use as part of a political campaign, does not cure the Hatch Act problem. As of August 20, the White House and DHS understood that the August 25 ceremony was scheduled so that it could be featured as part of the RNC—i.e., to serve a partisan political purpose. Therefore, the Hatch Act prohibited federal employees from participating in the event in an official capacity.

OSC does not have direct evidence showing that Acting Secretary Wolf knew in advance that the White House intended to use the naturalization ceremony as content for the convention. And Acting Secretary Wolf claimed in a written statement to OSC that prior to the ceremony he "did not know whether video of the ceremony was going to be made publicly available or that it would be used at the Republican National Convention." However, circumstantial evidence strongly supports the conclusion that he knew, or should have known, of its intended use by the White House. The ceremony was held on the second day of the RNC—a convention that Acting Secretary Wolf was himself scheduled to attend—and at the White House, which was the venue for the RNC. In addition, multiple senior DHS officials, including the GC, CoS, and senior agency ethics official, knew of the partisan political nature of the event as of Friday, August 21; OSC's evidence indicates that at least one of them would have informed Acting Secretary Wolf of the White House's intended purpose for scheduling and filming the naturalization ceremony during the RNC.[135]

Furthermore, it is clear that the ceremony itself was problematic under the Hatch Act because this official event was orchestrated to be part of the RNC. And political appointees at both DHS and the White House moved ahead with the event despite being informed by a DHS career ethics attorney and OSC that doing so for the purpose of creating content for the RNC would violate the Hatch Act. That decision is emblematic of the Trump administration's willful disregard for the Hatch Act.

5.    **The Trump Administration Ignored the Hatch Act and Approved of Senior Officials Illegally Campaigning on Behalf of President Trump**

OSC concludes that the Trump administration tacitly or expressly approved of senior officials violating the Hatch Act by campaigning for President Trump's reelection. This conclusion is based upon the administration's refusal to hold officials accountable for their violations, the frequency and similarity of the violations, and the fact that some administration officials repeatedly ignored the advice OSC provided to them.

---

[135] The CoS, for example, told OSC that if he knew there were Hatch Act concerns with Acting Secretary Wolf's participation then he would have raised those with Acting Secretary Wolf. Emails show that the CoS did know of Hatch Act concerns less than 48 hours before the event. While the CoS claims that he did not inform Acting Secretary Wolf of those concerns, OSC does not fully credit the CoS's testimony given other statements in his interview that were inconsistent with the evidence OSC gathered in its investigation. Furthermore, OSC finds it unlikely that none of the DHS and White House officials who were aware that both a career DHS attorney and OSC had Hatch Act concerns with the ceremony informed Acting Secretary Wolf of that fact, even if only to prepare him for questions about his participation afterward.

The cumulative effect of these repeated and public violations was to undermine public confidence in the nonpartisan operation of government. Equally troubling, the obvious noncompliance by senior administration officials also caused career federal employees to ask OSC whether they were still required to comply with the Hatch Act. As OSC previously stated in a letter to the president documenting Hatch Act violations by Ms. Conway, such conduct by senior administration officials "erode[s] the principal foundation of our democratic system—the rule of law."[136]

> A. *The Trump administration refused to hold senior officials accountable for violating the Hatch Act and in at least one case publicly defended a senior official who OSC found violated the Act.*

OSC sent President Trump three reports documenting numerous unequivocal violations of the Hatch Act by senior Trump administration officials.[137] OSC wrote a fourth report documenting Hatch Act violations by a senior Trump administration official but, because that report was not completed until February 2021, OSC sent it to President Biden.[138] Because of the appointments held by the subjects of those three reports submitted to President Trump, OSC concluded it could not pursue disciplinary action against the officials before the Merit Systems Protection Board. It was therefore incumbent upon President Trump to discipline employees where appropriate. He did not do so. Instead, he defended and supported even the most egregious of the violators. In so doing, the administration sent a clear message to similarly-situated officials—there will be no consequences for breaking the law by campaigning on behalf of President Trump and other Republican candidates at taxpayer expense.

The Trump administration was not the first to use the power of government for partisan purposes. OSC has issued reports documenting Hatch Act violations by administrations of both parties, including a comprehensive report describing coordinated political activities during the George W. Bush administration and multiple reports of violations by cabinet secretaries during the Obama administration.[139] OSC received an unprecedented number of Hatch Act complaints against Trump administration officials, but that is almost certainly, at least in part, a reflection of greater public awareness of the Hatch Act and the public's ability to report alleged violations to OSC and the increased use of social media. Because OSC generally only investigates incidents it receives a complaint about, OSC is unable to definitively state that senior officials in previous administrations did not commit violations like those committed by

---

[136] Transmittal Letter from Henry Kerner, Special Counsel, U.S. Office of Special Counsel, to Donald J. Trump, President of the United States of America, at 1 (June 13, 2019).
[137] Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-20-000279 (Peter Navarro) (Nov. 18, 2020); Report of Prohibited Political Activity Under the Hatch Act, OSC File Nos. HA-19-0631 & HA-19-3395 (Kellyanne Conway) (May 30, 2019); Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-18-0966 (Kellyanne Conway) (Mar. 6, 2018).
[138] *See* Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-20-000091 (The Honorable Carla Sands) (Feb. 12, 2021).
[139] *See* Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-16-3113 (Julián Castro) (June 24, 2016); Report of Prohibited Political Activity under the Hatch Act, OSC File No. HA-12-1989 (Kathleen G. Sebelius) (Aug. 23, 2012); Investigation of Political Activities by White House and Federal Agency Officials During the 2006 Midterm Elections (Jan. 2011).

39

Trump administration officials, but about which OSC never received a complaint.  What distinguishes the Trump administration, however, is the administration's response to OSC's prophylactic and enforcement efforts.

When OSC found violations in previous administrations, White House and other senior government officials generally acknowledged wrongdoing and took steps necessary to correct those violations.  For example, after OSC concluded that taxpayer funds were improperly used to pay for former Secretary of Health and Human Services Kathleen Sebelius to engage in political activity, Ms. Sebelius reimbursed the U.S. Treasury for those costs.  In response to an OSC investigation that concluded former Secretary of Housing and Urban Development Julián Castro violated the Hatch Act, he acknowledged his error and directed his agency to enhance its Hatch Act training.  And when OSC concluded that a senior Obama administration White House official violated the Hatch Act while making public statements, the Obama White House counseled that employee regarding the Hatch Act's restrictions.  OSC found no evidence of any subsequent violations by that employee.  The Trump administration, by contrast, disregarded the law and refused to hold senior officials accountable.

OSC issued an unprecedented number of reports, four in all, documenting Hatch Act violations by senior Trump administration officials.[140]  Those included two reports concerning Counselor to the President Kellyanne Conway, whose repeated, flagrant violations led OSC to call for the president to remove her from federal service.[141]  OSC further issued warning letters to eight White House employees notifying them that they had violated the Hatch Act.  And OSC made itself available to the White House and provided both training materials and advisory opinions as requested.

OSC expected that, as a result of its repeated enforcement and outreach efforts, the administration would take the necessary actions to ensure that employees complied with the law.  But rather than attempt to comply with the law, the most senior officials in the administration were publicly and, reportedly, privately dismissive of the Hatch Act's restrictions.  Mark Meadows, the White House Chief of Staff, said during an interview that "nobody outside of the Beltway really cares" about whether senior administration officials violated the Hatch Act and called such allegations "a lot of hoopla."[142]  Ms. Conway, when asked about OSC's first report concluding that she had violated the Hatch Act, responded by saying "blah, blah, blah," and "let

---

[140] Three of those reports were sent to President Trump, while the fourth related to an investigation that was not completed until February 2021, and so the resulting report was sent to President Biden rather than President Trump. *See supra* note 155 and accompanying text.

[141] The other two reports involved violations by former senior Trump administration officials Peter Navarro and Carla Sands.  *See id.*  Because neither is identified here as having committed additional Hatch Act violations, this report does not further discuss their past violations.

[142] *Plug in with Playbook Interview with White House Chief of Staff Mark Meadows*, at 10:56-11:14, POLITICO (Aug. 26, 2020),  https://www.politico.com/live-events/2020/08/26/plug-in-with-playbook-interview-with-white-house-chief-of-staff-mark-meadows-000968.

me know when the jail sentence starts."[143]  And in 2020 it was reported that White House staffers "privately scoff at the Hatch Act and say they take pride in violating its regulations."[144]

The administration's defiance of the Hatch Act is perhaps best exemplified by its failure to take any apparent action against employees in even the most clear-cut cases.  OSC's second report documenting violations by Ms. Conway was the first to ever recommend that the president remove a presidential appointee from federal employment.  Despite that recommendation, President Trump not only refused to act but publicly defended Ms. Conway, reiterating the baseless claim that taking action against her for statements made in her official capacity would "take away her right of free speech."[145]  OSC is similarly unaware of any efforts by the Trump administration to discipline any employees for the violations that OSC brought to its attention.  The Trump White House could not have sent a clearer message that there would be no consequences for senior administration officials violating the Hatch Act.

The president's refusal to require compliance with the law laid the foundation for the violations described in this Part.  In each of these instances, senior administration officials used their official authority or influence to campaign for President Trump.  Based upon the Trump administration's reaction to the violations, OSC concludes that the most logical inference is that the administration approved of these taxpayer-funded campaign activities.  OSC further concludes that these violations likely would not have occurred had the Trump administration made clear to senior officials that they should act in accordance with the Hatch Act and that there would be consequences for violating it.

> B.  *The Trump administration took no apparent action to control or prevent senior administration officials from committing frequent and similar violations of the Hatch Act.*

The complaints that OSC received and investigated show a pattern of similar conduct by senior Trump administration officials designed to bolster President Trump's chance of reelection. The Trump administration was well aware that the conduct at issue was prohibited under the Hatch Act.  With respect to media appearances, OSC thoroughly documented in two reports to President Trump how an official might violate the Hatch Act by advocating for the success or failure of a candidate for partisan political office during an official interview.[146]  With respect to the naturalization ceremony, OSC communicated directly with the White House and DHS attorneys to convey that holding the ceremony for the purpose of creating content for the RNC would violate the Hatch Act.  That these repeated violations were allowed to continue shows that the Trump administration was either unwilling or unable to ensure that senior administration

---

[143] Brett Samuels, *Kellyanne Conway dismisses Hatch Act violation:  'Let me know when the jail sentence starts,'* The Hill (May 29, 2019), https://thehill.com/homenews/administration/445914-kellyanne-conway-dismisses-hatch-act-violation-let-me-know-when-the.

[144] Michael M. Grynbaum and Annie Karni, *Republicans Rush to Finalize Convention ('Apprentice' Producers Are Helping),* N.Y. Times, https://www.nytimes.com/2020/08/22/us/politics/republican-convention-preview.html.

[145] Judson Berger, *Trump on 'Fox & Friends':  I will not fire Kellyanne Conway after watchdog rebuke,* Fox News (June 14, 2019).

[146] *See generally* Report of Prohibited Political Activity Under the Hatch Act, OSC File Nos. HA-19-0631 & HA-19-3395 (Kellyanne Conway) (May 30, 2019); Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-18-0966 (Kellyanne Conway) (Mar. 6, 2018).

officials complied with the Hatch Act.  OSC concludes that the administration was unwilling to do so because it approved of, and in at least one case coordinated, these illegal acts.

Beginning as early as May 2020, and continuing through election day on November 3, senior Trump administration officials used official media interviews and appearances to campaign for President Trump's reelection.  Administration officials spoke favorably of the Trump campaign, not just the Trump administration and its policies, and repeatedly contrasted the Trump campaign with the Biden campaign.  Officials also used the appearances to expressly campaign against candidate Biden's candidacy for president and mock his conduct on the campaign trail.  The attacks on candidate Biden generally revolved around three core themes: that candidate Biden was part of "the establishment" and had achieved nothing during his time in public service; that candidate Biden was "hiding in his basement" and unwilling to fight for Americans' votes; and that a Biden/Harris administration would lead to "socialism and decay" or otherwise be detrimental to the United States.

Multiple administration officials criticized candidate Biden for being part of "the establishment" and for purportedly accomplishing little during his time as an elected official.  For example, Mr. Meadows said "[w]e've seen Joe Biden for 40 years talk a good game—but we've seen no results."  Mr. O'Brien compared President Trump's and candidate Biden's records by asking "who do you want to turn to to rebuild the economy—the guy who's proven he can do it, President Trump, or somebody who's been in Washington for 40 years?"  And Ms. Conway argued that candidate Biden "has done less in 47 years in Washington than Donald Trump has done in 47 months in Washington."  Further evidence that this messaging originated from the White House comes from Ms. Farah, who said that the "White House perspective" was that it was "incredibly important" to compare "what this president has accomplished in four years and what his opponent has failed to accomplish in 47 years."

Multiple officials also remarked how candidate Biden lacked energy compared with President Trump and was "in his basement" in an apparent attempt to portray him as unwilling to appear in public or work for the votes of American citizens.  Mr. Meadows, in one of his interviews, talked about how President Trump was working to make sure that American citizens feel safe once again in their home.  He then asked rhetorically, "Where is Joe Biden?  In his basement."  In a Fox Business appearance, Mr. Short said, "there are legitimate questions that Vice President Biden is yet to face media in over 80 days and seems trapped inside his basement at the moment."  And on July 31, Senior Advisor to the President for Policy Stephen Miller said on FNC that "Joe Biden is stuck in a basement somewhere" and "just emerges every now again . . . and then he dutifully disappears to be seen a week later."

Two weeks before the election, Ms. McEnany similarly noted that candidate Biden was "sequestered away for five days" and questioned candidate Biden's willingness to "fight for the American people as president."  Mr. Morgenstern echoed those points just four days later, saying that "one candidate," President Trump, was "fighting for every vote" while "another one [is] hiding away" because the Biden campaign knows "the more America sees of their ticket, the less they like them."

The preceding excerpts show that senior Trump administration officials repeatedly attempted to paint candidate Biden both as an "establishment candidate" with nothing to show for his 40-plus years of public service and as a candidate who was "low-energy" or unwilling to "leave his basement" and fight for the votes of the American people.  In addition to those two general lines of attack against candidate Biden's candidacy, multiple senior Trump administration officials made negative statements about a hypothetical Biden/Harris administration to induce support for President Trump's reelection and opposition to candidate Biden's campaign.

For example, Ms. Conway said that if candidate Harris were elected she would "bring our nation backward on many things that matter to America."  Mr. Short noted that the Trump/Pence administration offered American voters a "freedom and opportunity agenda . . . versus a path to socialism and decay that we believe the Biden/Harris ticket stands for" and later referred to the election as "an opportunity to choose between hope and opportunity versus socialism and decline."  And Mr. Morgenstern said that the Biden campaign was "offering one of the most radical climate change agendas, job-killing agendas, free speech stifling agendas maybe we have ever seen in our entire history."

These campaign-style statements—all directed toward the success or failure of a candidate for partisan political office—are similar to those that, in its prior reports to President Trump, OSC concluded an administration official could not make during an official interview.  Thus, the Trump administration knew that making the types of statements described in this Part was prohibited.  Yet the frequency of those violations only increased as the election approached.  OSC can only conclude that this is because the administration approved of senior administration officials campaigning for President Trump's reelection during official interviews and, in particular, by highlighting the themes described above.

Evidence of the Trump administration's willingness to actively coordinate, rather than just approve of, Hatch Act violations comes from the August 25 naturalization ceremony.  A White House lawyer involved with the ceremony told OSC that White House staff members informed him that "consideration was being given to holding [the] ceremony *as part of the convention*."[147]  Communications from the White House to DHS five days before the ceremony show that the White House not only considered holding the ceremony as part of the RNC, but that it had in fact decided to "pre-tape" the ceremony so that it could be "played at the RNC."  The event was not, as the Trump administration tried to suggest in public statements, coincidentally filmed and uploaded to the White House YouTube page on the same day that it was shown at the RNC.[148]  Rather, it was planned by the Trump White House precisely so that it could be used as part of the convention.  Knowing that footage from the August 25 ceremony was intended to be used during the RNC that same night, the relevant Trump administration officials had an obvious solution if they truly wanted to avoid violating the Hatch Act:  delay

---

[147] Emphasis added.

[148] *See* Zolan Kanno-Youngs and Michael D. Shear, *Trump Takes Night Off From Anti-Immigrant Talk to Swear In U.S. Citizens*, N.Y. Times ("White House officials said Wednesday that the ceremony . . . was an official government event because it was taped Tuesday afternoon and publicly made available on the White House website.  A White House spokeswoman said the president's re-election campaign had simply decided to use it once it was on the website."), https://www.nytimes.com/2020/08/26/us/politics/trump-naturalization-ceremony-rnc.html.

posting the video on YouTube until the following day, at which point it could not have been shown during the convention as planned.  Instead, the Trump White House rushed to edit and post the video in just a few hours.[149]

Finally, the violations described in this Part reveal an unmistakable pattern:  in each case, career civil service attorneys—not just at OSC, but also at DHS and the State Department—warned that certain conduct was prohibited by the Hatch Act.  And in each case, Trump administration political appointees, and particularly Trump administration attorneys, ignored the advice of the career officials.  Those political appointees both baselessly defended obvious violations and asserted legally dubious workarounds to the concerns identified by the career officials.  It is clear that they did not do so in reliance on the strength of their legal arguments—as noted elsewhere in this report, Trump administration political appointees cited essentially no legal authorities for their positions regarding the Hatch Act—but rather to support the Trump administration's effort to have executive branch officials use their official authority or influence in furtherance of the president's reelection.  The fact that OSC could not prosecute these cases before the MSPB, and the corresponding ability of Trump administration political appointees to circumvent the law to enable or condone these violations, is one of several Hatch Act enforcement challenges that is described more fully in the next Part.

In sum, at least 13 senior Trump administration officials violated the Hatch Act as described in section 4.  Recall that one of Congress's goals in passing the Hatch Act was to ensure that the power and prestige of the government would not be corrupted to create a taxpayer-funded campaign apparatus within the executive branch.  Congress's fear was realized here.  These Trump administration officials, while acting in an official capacity, engaged in campaign activities that were in many cases indistinguishable from the Trump campaign's own rhetoric and activities.[150]  Contrary to its assertion to OSC that it took "seriously the principles codified in the Hatch Act," the Trump administration took no apparent action to control or prevent the violations.  Instead, it welcomed, supported, and in at least one case coordinated these taxpayer-funded campaign activities.

---

[149] In the case of the only other White House naturalization ceremony that the Trump administration identified, video of the event was not posted on the White House YouTube channel for over two weeks.

[150] See, e.g., Donald J. Trump for President, Inc., "Delaware," https://www.youtube.com/watch?v=9PUfxZQa7WQ (30-second advertisement claiming that candidate Biden is "hiding" in "his basement," is "diminished," and has a record of "five decades of failure").

<u>PART IV:  ENFORCEMENT CHALLENGES</u>

The 2020 election cycle raised new and unanticipated challenges to OSC's Hatch Act enforcement efforts.  Those challenges substantially affect OSC's ability to ensure that executive branch employees comply with the restrictions that Congress has imposed upon their political activity.  Notably, several of the challenges described herein apply to all of OSC's Hatch Act cases and not just those involving senior administration officials.  Each of the following sections concludes with a potential solution to the described enforcement challenge.

1.      **OSC's enforcement tools are limited with respect to Senate-confirmed presidential appointees (PAS) and White House commissioned officers**

When OSC concludes that an employee has violated the Hatch Act and the violation warrants disciplinary action, OSC may seek disciplinary action pursuant to 5 U.S.C. § 1215.  Section 1215 creates a bifurcated enforcement scheme in which certain high-level officials are subject to a different disciplinary process than are all other federal employees.  In the case of most employees, § 1215 authorizes OSC to file a complaint for disciplinary action with the Merit Systems Protection Board (MSPB).[151]  The MSPB is an independent, quasi-judicial, executive branch agency consisting of a three-member Board, which serves as an appellate body in Hatch Act cases, and administrative law judges (ALJs), who preside over the initial hearing of those cases.  If an ALJ establishes that an employee violated the Hatch Act, the ALJ can order any combination of the following penalties:  a letter of reprimand; suspension; reduction in grade; removal from federal employment; debarment from federal employment for a period not to exceed five years; and a civil penalty not to exceed $1,125.[152]

For PAS and White House commissioned officers, OSC may not pursue disciplinary action through the MSPB.  Rather, for PAS, OSC must report its findings to the president pursuant to 5 U.S.C. § 1215(b), after which the president may take "appropriate action."[153]  For commissioned officers, OSC similarly reports its findings to the president for appropriate action.  In the latter case, however, that decision is based upon OSC's conclusion, supported by an opinion from the U.S. Department of Justice's Office of Legal Counsel, that constitutional considerations preclude the MSPB from disciplining commissioned officers.[154]  To avoid raising difficult constitutional questions, OSC reports to the president Hatch Act violations by commissioned officers because the president unquestionably has the authority to discipline those employees.  This decision is further based upon OSC's expectation that in such cases the president would take action, disciplinary or otherwise, sufficient to impress upon senior administration officials that they must comply with the Hatch Act.  OSC makes public all reports to the president of Hatch Act violations by PAS and commissioned officers.

---

[151] *See* 5 U.S.C. § 1215(a)-(b).
[152] 5 C.F.R. § 1201.126(a).  Note that the statutory maximum penalty amount is $1,000, *see* 5 U.S.C. § 7326, but that amount is subject to annual adjustment by the MSPB pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.
[153] 5 U.S.C. § 1215(b).
[154] *See* 2 U.S. Op. Off. Legal Counsel 107, 108-09 (1978) (questioning the constitutionality of the MSPB disciplining senior presidential appointees).

45

OSC does not have any role in the disciplinary process for PAS or commissioned officers beyond issuing a report. Furthermore, there is no requirement that OSC be notified of any resulting disciplinary action. Thus, deterrence for such employees must come from some combination of (1) an employee's inherent desire to avoid illegal activity, (2) the prospect of a public OSC report and the attendant press attention, and (3) an administration's willingness to impose meaningful consequences for established violations of the law. When one, or more, of those factors is missing, the risk that an employee might choose to intentionally engage in political activity in violation of the Hatch Act increases accordingly.

During the Trump administration, OSC brought cases before the MSPB and settled cases for disciplinary action prior to filing complaints with the MSPB.[155] Those cases involved both career employees and a Trump administration political appointee who was not a commissioned officer. OSC also reported to then-President Trump violations by commissioned officers so that he could take appropriate disciplinary action. The president did not do so and, because of the existing statutory scheme, OSC was left with no options to ensure that those senior-most members of the Trump administration complied with the law. Two statutory changes would likely resolve this enforcement challenge. First, an amendment allowing OSC to pursue substantial monetary penalties against PAS and commissioned officers before the MSPB—rather than the full range of more constitutionally suspect disciplinary actions under existing law— would empower OSC to directly hold those employees accountable for their Hatch Act violations. Second, statutory clarification that the MSPB has jurisdiction over former employees for Hatch Act violations committed during their period of federal employment would ensure that OSC's enforcement efforts are not frustrated by employees resigning or otherwise separating from government service prior to OSC initiating disciplinary proceedings.

## 2.    OSC did not receive from the Trump administration the good faith cooperation necessary to ensure full compliance with the Hatch Act

OSC is authorized to issue subpoenas and request from agencies the information necessary to complete its investigations.[156] However, OSC can neither enforce its own subpoenas[157] nor compel agencies to respond to its investigative requests.[158] Given the limits on its investigative authorities and the time required to complete investigations, OSC necessarily depends upon agencies and employees for good faith cooperation with OSC investigations. Those investigations are fact-finding in nature, and the fact that OSC has opened an investigative file does not mean that it has already determined that the subject employee violated the Hatch Act. Nevertheless, the Trump White House at times acted as though its role was to defend the officials that OSC was investigating rather than cooperate with OSC's fact-finding process. For example, OSC requested information from then-National Security Advisor Robert O'Brien after he made the following statement on the *Hugh Hewitt Show*:

---

[155] *E.g.*, Special Counsel v. Patton, MSPB Docket No. CB-1216-21-0007-T-1, 2021 MSPB LEXIS 1118 (Mar. 30, 2021); Special Counsel v. Salekin, MSPB Docket No. CB-1216-18-0004-T-1, 2020 MSPB LEXIS 1718 (Apr. 28, 2020); Press Release, U.S. Office of Special Counsel, OSC Announces Discipline for Federal Employees Who Violated the Hatch Act (Feb. 22, 2021).

[156] *See* 5 U.S.C. § 1212(b).

[157] *See infra* Part IV(7).

[158] The remedy for an agency's failure to comply with an OSC investigative request is for OSC to submit a report to Congress. *See* 5 U.S.C. § 1212(b)(6).

I expect the president to be reelected and reelected overwhelmingly. . . . I think the president's going to come out on top.  The American people see the leadership that he's providing not just with respect to China, they saw him build the greatest economy in the history of the world.  We took a very bad hit because of this virus that came from China.  But who do you want to turn to to rebuild the economy— the guy who's proven he can do it, President Trump, or somebody who's been in Washington for 40 years?  So I think the president's going to be reelected, and I think the American people are going to rally around him.

Specifically, OSC asked Mr. O'Brien for an explanation of his remarks and any documents related to, or a detailed description of, the purpose of the interview, at whose request it was scheduled, and whether Mr. O'Brien knew in advance any topics to be discussed.  The Trump White House responded on Mr. O'Brien's behalf as follows:

> Your office identified a statement that National Security Advisor O'Brien made during a June 25, 2020 media interview, but that statement does not constitute a Hatch Act violation.

> Mr. O'Brien was asked a question about the "difference in policy" positions held by President Trump and former Vice President Joe Biden with respect to China, and the interviewer flagged for the audience that national security advisors "don't do politics."  In response to this question, Mr. O'Brien provided limited commentary on the current state of the election and conveyed the widely accepted view that "it's going to be a close, hotly-contested race."  Mr. O'Brien then pointed to some of the President's policy accomplishments, including with respect to China and the economy.  Further, he explained that the President has an established record with regard to the economy, while making a factual assertion that Mr. Biden has been in public office for 40 years.  Finally, he offered a prediction regarding the outcome of the election based on the President's past policy accomplishments.

> Mr. O'Brien did not violate the Hatch Act with this statement, which was made in response to a direct question and consisted of facts and a discussion of the President's policy accomplishments.  He did not advocate for or against a political candidate or party.

The response mischaracterized Mr. O'Brien's statement, concluded without any legal analysis or justification that Mr. O'Brien did not violate the Hatch Act, and was not responsive to OSC's investigative request.  The Trump White House provided similar responses in other cases, and OSC has limited tools in such circumstances to compel more responsive answers to its investigative requests.[159]

---

[159] For example, the U.S. Department of Education (ED) provided similarly inadequate responses in connection with a Hatch Act investigation of former Secretary of Education Betsy DeVos.  Despite repeated and detailed requests from OSC, ED did not provide information necessary for OSC to make a determination as to whether Ms. DeVos

47

Timing considerations also make it essential that an administration take necessary steps to ensure Hatch Act compliance by its senior officials in the final months of an election cycle. This is because Hatch Act investigations often take significant amounts of time and, in any event, OSC cannot in most cases stop violations from happening in real time. Even in the case of violations that appear straightforward on their face, OSC must investigate and gather the relevant facts before reaching a conclusion. In the best of circumstances that process generally takes weeks to months.[160] This creates a window in the final months of an election cycle where even if an administration official violates the Hatch Act, any resulting public report or disciplinary action would not occur until after the election. However, the harm—the use of official authority or influence to interfere with or affect an election—would result on or before election day. Thus, an administration desirous of both using its powers for electoral benefit in violation of the Hatch Act and avoiding any pre-election ramifications from violating the law could do so by condoning violations within that window. As described in detail in Part III, OSC has concluded that the Trump administration did tacitly or expressly approve of myriad Hatch Act violations; many of them occurred within that critical period immediately prior to the 2020 election during which OSC was unable to both investigate and resolve the violations prior to election day.

Finally, the Trump administration made dubious claims of privilege to avoid responding to certain of OSC's questions. In response to an OSC Request for Information about the August 25 naturalization ceremony described in Part III, a former Trump administration lawyer wrote:

> Many of the questions in the Request for Information involve privileged information concerning discussions within the White House Counsel's Office or with other staff members within the White House. While preserving that privilege, this response attempts to answer OSC's questions.

The response did not, in fact, answer the majority of OSC's questions. Furthermore, the specific privilege at issue was never identified, and it is unclear what, if any, privilege would apply. OSC's statutory authority states that "a claim of common law privilege . . . shall not prevent the Special Counsel from obtaining any material" related to an OSC investigation.[161] And any assertion of a generic "executive privilege"—i.e., a privilege against disclosing certain materials outside of the executive branch—would appear to be unavailing considering that OSC is within the executive branch.[162] Nevertheless, there is no forum in which OSC can seek adjudication of the Trump administration's claim of privilege. A statutory amendment granting the MSPB

---

violated the Hatch Act during an official interview. OSC closed that file because ED's deficient responses meant that OSC had insufficient evidence to reach a conclusion regarding her conduct. Similarly, another allegation OSC received was that the Trump administration held a pardon ceremony that, like the naturalization ceremony described *supra* Part III(4)(B), was intended to create content for use at the 2020 Republican National Convention. OSC received a deficient response to an investigative request related to the pardon ceremony and was unable to complete the investigation into whether the Hatch Act was violated in connection with that ceremony.

[160] For example, OSC's typical response deadline to requests for information is two to three weeks. And where a recipient is unable to meet that deadline, OSC's investigative timeline is delayed accordingly.

[161] 5 U.S.C. § 1212(b)(5)(C)(i).

[162] *See* 13 U.S. Op. Off. Legal Counsel 153, 154 (1989) (memorandum from William P. Barr stating that executive privilege is "a privilege against disclosing information requested *by the courts, the public, or the legislative branch*") (emphasis added).

greater authority to enforce OSC's subpoenas and other investigative requests would likely resolve this enforcement challenge.[163]

3.   **Prior OSC advice to executive branch agencies—that the Hatch Act does not prohibit agencies from defending an administration's policy positions—appears to have been interpreted in a way that allowed senior agency officials to engage in political activity under the guise of defending the Trump administration's policy positions**

The Hatch Act regulations define "political activity" as activity directed toward the success or failure of a political party, partisan political group, or candidate for partisan political office.[164]  Discussing, promoting, or defending an administration's policy positions generally does not constitute political activity because those policy positions relate to the official work of the government rather than the campaign of a candidate for partisan political office.  OSC therefore, historically, has advised both executive agencies and the White House that an administration can, consistent with the Hatch Act, both promote its own policies and defend them from criticism.  OSC did not anticipate the ways in which that advice could be used by an administration to justify communications that, in OSC's view, were made for the purpose of promoting President Trump's reelection.  Because the communications described in this section were ostensibly made in reliance upon OSC's prior advice, OSC is not concluding that any officials violated the Hatch Act in connection with these communications.  Rather, OSC is describing the incidents here to provide additional advice to ethics officials who may be asked to review such communications and to clarify that, in the future, OSC will likely consider communications made under similar circumstances to violate the Hatch Act.

An important factor in OSC's analysis of agency communications about an administration's policies is timing.  As an election draws nearer, and particularly an election in which the incumbent president is on the ballot, an agency's scrutiny of its public statements about the current administration should increase.  Statements that OSC considers suspect are those that are equivalent to a "closing argument" for an incumbent president's reelection campaign.  Examples of such statements are those that credit the incumbent personally for agency accomplishments and/or that focus on the administration's past accomplishments rather than new or future programs or initiatives.  On social media, posts immediately prior to the election that directly reference the incumbent, and where the agency social media account does not normally reference the incumbent, are also indicative of an attempt to improperly promote the incumbent's campaign rather than promote or defend the administration's policies.

In the days and weeks immediately prior to the 2020 election, some Trump administration political appointees appear to have used official communications to advocate for President Trump's reelection.  One complaint involved an op-ed written by then-Secretary of Agriculture Sonny Perdue in his official capacity, while the remainder related to agency social media posts.  Both the op-ed and the posts in question were ostensibly related to the Trump administration's policies.  However, the timing and content of the communications, along with

---

[163] One such possibility would be to authorize the MSPB to order compliance with OSC subpoenas rather than, as is currently the case under 5 U.S.C. § 1204(c), for the MSPB to have to seek enforcement in a federal district court.
[164] 5 C.F.R. § 734.101.

the frequency of the social media posts, suggests that their true purpose was to promote President Trump's campaign.

Secretary Perdue's op-ed was published on November 2, the day before the election.[165] Rather than focus on any new U.S. Department of Agriculture (USDA) programs or policies, the op-ed primarily summarized accomplishments from the Trump administration's first term. For example, the op-ed referenced "the president's historic 2017 tax reform" and said that by "fighting for better trade deals, expanding the use of ethanol, or connecting rural Americans to high-quality broadband Internet, the President has made sure that America is better off." The op-ed concludes by saying that "farmers today are better off thanks to President Trump's policy initiatives, trade policies and his strong support" and that an increase in farm income since 2016 "didn't happen by accident." The fact that the op-ed was published the day before the election and praised President Trump's past accomplishments, some in areas only tangentially related to the work of USDA, strongly suggests that its purpose was to promote President Trump's reelection rather than the work of USDA.

Most of the social media-related complaints filed with OSC alleged violations by then-Secretary of the Interior David Bernhardt. The instances noted in the complaints occurred during late October 2020 and, read collectively, they point to an effort to promote President Trump's reelection using U.S. Department of the Interior (DOI) social media accounts. Notably, Secretary Bernhardt tagged President Trump's Twitter account 27 times in the two months prior to the election but only five times in the two months afterward.

The week before the election, Secretary Bernhardt tweeted repeatedly about the Trump administration's conservation record. On October 26, 2020, Secretary Bernhardt tweeted a link to a DOI report about DOI's economic impact in fiscal year 2019 and wrote that President Trump's "agenda for public lands has been a major boon for communities throughout the country."[166] Soon afterward, the DOI Press Secretary account retweeted the post and provided statistics comparing fiscal year 2016 to fiscal year 2019, a comparison period that seems designed to emphasize the administration's accomplishments during its first term rather than the information contained in the fiscal year 2019 report.[167]

The following day, Secretary Bernhardt tweeted a video entitled "President Trump's Conservation Record" that appeared to be little more than a campaign ad focused on the administration's first-term conservation accomplishments.[168] The video included clips

---

[165] Sonny Perdue, *Agriculture Secretary Perdue:  President Trump is Fighting for our farmers, ranchers, and rural America*, Fox Business (Nov. 2, 2020), https://www.foxbusiness.com/politics/agriculture-secretary-perdue-trump-farmers-ranchers-rural-america.

[166] *See* Secretary David Bernhardt (@SecBernhardt), Twitter (Oct. 26, 2020 10:42 AM), https://twitter.com/SecBernhardt/status/1320782868239552515.  That tweet linked to a press release announcing DOI's annual economic report with the headline "Trump Administration's Interior Supports $336 Billion in Economic Activity and 1.9 Million Jobs."  Prior press releases announcing the annual economic report referred to the "Interior Department," not "Trump Administration's Interior."

[167] *See* U.S. Department of the Interior Press Secretary (@DOIPressSec45), Twitter (Oct. 26, 2020 10:45 AM), https://twitter.com/DOIPressSec45/status/1320783746954571777.

[168] *See* Secretary David Bernhardt (@SecBernhardt), Twitter (Oct. 27, 2020 3:40 PM), https://twitter.com/SecBernhardt/status/1321174874426167297.

celebrating achievements under President Trump's leadership, such as a groundbreaking ceremony and bill signing, along with a text reel highlighting the administration's work.  Strong language was used to tout the administration's leadership, with statements such as the "Single LARGEST Investment," "Secured Historic $900 Million a Year for Conservation FOREVER," and "More Imperiled Species Recovered in First Term Ever."[169]  The video concluded with President Trump at an event in Florida celebrating "our incredible record of natural conservation and environmental protection over the last four years."[170]

Unlike some other videos prepared by DOI, this one promoted the Trump administration's first-term record rather than specific programs or pieces of legislation.  The DOI political appointee who requested that the video be assembled wrote in an email that the video was "to highlight the admin[istration's] environmental/conservation record similar to the videos we created to highlight the passage of the [Great American Outdoors Act]," thus placing the focus squarely on the administration's first-term accomplishments.  The nature of the request so alarmed an employee involved with preparing the video that he wrote in an email:  "I want to respectfully note (for the record and my own legal protection) that I am doing it under protest, that I believe it's still a video with basic political intent, and is therefore a Hatch Act violation."

The employee's concern began when he received the first draft of an op-ed that was to form the basis for the video.  That op-ed expressly focused on the election; it began with the words, "As election day approaches . . . ."  DOI ethics officials edited the op-ed to address, among other things, concern that its publication would violate the Hatch Act.  While the changes may have been made in an effort to technically conform with OSC's existing Hatch Act advice, the edits did not scrub the op-ed of the author's original intent—to promote President Trump's reelection.  That original intent taints both the op-ed and the resulting video.

DOI attorneys were not asked to review the video until the day it was scheduled to be released.  They raised concerns about both the timing and content of the post, but a DOI political appointee insisted that the timing—one week before the election—was coincidental and that the video was intended to promote DOI's work rather than President Trump's candidacy.  DOI attorneys ultimately determined that OSC's existing Hatch Act advice did not provide a basis for advising against publishing the video.  But OSC finds the timing and content of DOI's posts, including a video based upon a draft op-ed that referenced the imminent election and praised the Trump administration's first-term record, show that they were intended to promote President Trump's reelection.

OSC also received complaints alleging that the social media accounts of the U.S. Patent and Trademark Office (USPTO) and its parent agency, the U.S. Department of Commerce (DOC), violated the Hatch Act.  As with the DOI tweets, the USPTO and DOC tweets' timing, content, and focus on past events all suggest that their purpose was to promote President Trump's reelection.  On October 29, 2020, the USPTO tweeted a "reminder" from its official Twitter account, attributed to USPTO Director Andrei Iancu, that read:  "Just a reminder, under President Trump's leadership, the U.S. intellectual property ecosystem ranks #1 in the world,

---

[169] *Id.*
[170] *Id.*

according to the 2020 International IP Index."[171]  The USPTO Twitter account only referenced President Trump in connection with USPTO programs one other time during the Trump administration, and that was to celebrate the signing of the 10 millionth U.S. patent.[172] Furthermore, the 2020 International IP Index was released in February 2020, yet USPTO chose to highlight the ranking—and expressly credit President Trump—over eight months later and just five days before the 2020 election.  Additionally, the day prior to the election the DOC posted three tweets about Trump administration accomplishments.  These tweets all credited President Trump directly for programs that had been in existence for years, such as the administration's "Pledge to America's Workers" and the National Council for the American Worker.[173]

The use of government communications tools to promote an incumbent president's political campaign is an example of the sort of "corrupt political machine" that motivated Congress to pass the Hatch Act in the first place.[174]  While the op-ed and social media posts described above do not seem to have been motivated by anything other than promoting President Trump's reelection, they also broadly relate to the administration's policy proposals and matters within each agency's jurisdiction.  As noted above, OSC has advised that agencies generally may defend and promote an administration's policies consistent with the Hatch Act.  To the extent that these posts—and, in particular, the DOI video that was based upon an op-ed whose purpose OSC concludes was to promote President Trump's reelection—go beyond what OSC intended in its advisory opinions, OSC is using this opportunity to clarify that posts and other communications made for the purpose of promoting a candidate for partisan political office, including an incumbent president, are prohibited by the Hatch Act.

OSC recommends that agency ethics officials conduct inquiries, consistent with the examples and analysis in this section, into the purposes of agency communications that reference a candidate for elected office, including an incumbent president, and are scheduled to be disseminated within 60 days of the relevant election.  If the purpose of an official communication is to promote or oppose a candidate, then an employee may not make that communication regardless of the language used.  In other words, an employee cannot make a communication "Hatch Act compliant" by simply deleting the most suspect words or phrases.  OSC further recommends that if agency ethics officials have concerns about a particular op-ed or post they should advise delaying the communication until after the election, since presumably no harm would result from the delay unless the purpose of the communication is to bolster a candidate. Ethics officials can also contact OSC with any questions about whether making certain communications may implicate the Hatch Act.

---

[171] U.S. Patent and Trademark Office (@USPTO), Twitter (Oct. 29, 2020, 1:30 PM), https://twitter.com/uspto/status/1321912211963564049.
[172] U.S. Patent and Trademark Office (@USPTO), Twitter (June 19, 2019 5:30 AM), https://twitter.com/uspto/status/1141322413050933248.  The account also wished President Trump a speedy recovery from his COVID-19 diagnosis and twice tweeted about President Trump's declaration of a National Day of Mourning in 2018 after President George H.W. Bush's death.
[173] *See, e.g.*, U.S. Department of Commerce (@CommerceGov), Twitter (Nov. 2, 2020 12:32 PM), https://twitter.com/CommerceGov/status/1323362349651173376.
[174] U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 565 (1973).

4.       **OSC does not have the authority to issue or update Hatch Act regulations**

The Hatch Act is codified at 5 U.S.C. §§ 7321-7326.  Those sections describe generally the applicable definitions, prohibitions, exceptions, and penalties.  The implementing regulations, which are far more expansive than the statutes, are found at 5 C.F.R. part 734.  Unlike statutes, which may only be amended by an act of Congress, regulations may be amended by an executive branch agency through a rulemaking process.  While OSC has exclusive authority to investigate and prosecute alleged Hatch Act violations, the U.S. Office of Personnel Management (OPM) is the agency vested with authority to promulgate Hatch Act regulations.[175]  OSC's inability to issue or amend Hatch Act regulations means that it cannot update those regulations when circumstances expose gaps in the existing regulatory structure.

Many of the Hatch Act's prohibitions govern how federal employees communicate about partisan political matters.  OPM last substantively revised the Hatch Act regulations in 1996.  Needless to say, how people communicate has changed dramatically since 1996.  The Hatch Act's regulations have not kept pace with those technological developments.[176]  And despite OSC notifying OPM about needed changes to the regulations, OPM has not proposed any substantive amendments.[177]

While OSC does not have rulemaking authority with respect to the Hatch Act, it is authorized to issue advisory opinions.[178]  The advisory opinions are not themselves binding law, but instead an explanation of how a particular set of facts would violate or not violate one of the Hatch Act's statutory prohibitions.[179]  For example, OSC has published advisory opinions explaining OSC's position as to what social media activities violate the Hatch Act.[180]  But the Trump administration argued that OSC acted outside its authority by creating and then enforcing new law regarding social media accounts.  At one point the Trump White House wrote that "OSC has no authority to issue binding rules that effectively function as Hatch Act regulations."[181]  But the advisory opinion at issue does not purport to contain binding rules; rather, it is an advisory document explaining to federal employees how to comply with the Hatch

---

[175] *See* 5 C.F.R. § 734.102(c); 18 U.S. Op. Off. Legal Counsel 1, 6 (1994).

[176] As just one example, none of the substantive Hatch Act regulations or examples refer to email as a possible form of political activity.  But it is clear from case law that the Hatch Act prohibits sending an email if the content of the email, or the facts regarding when and to whom an employee sent it, violate one of the Hatch Act's prohibitions.  *See* Special Counsel v. Ware, 114 M.S.P.R. 128, 133-34 (2010) (employee violated the Hatch Act by forwarding emails soliciting political contributions); Special Counsel v. Wilkinson, 104 M.S.P.R. 253, 262 (2006) (employee violated the Hatch Act by distributing campaign material via email while on duty and in the federal workplace).

[177] OSC submitted proposed regulatory amendments to OPM during both the George W. Bush and Obama administrations.  OPM did not pursue rulemaking in either case.

[178] 5 U.S.C. § 1212(f).

[179] For example, OSC has published advisory opinions describing how employees might violate the Hatch Act when using email, in accordance with the case law cited *supra* note 200.

[180] *E.g.*, The Hatch Act:  Frequently Asked Questions on Federal Employees and the Use of Social Media and Email 5 (Revised Dec. 18, 2015), https://osc.gov/Documents/Hatch%20Act/Advisory%20Opinions/Federal/Social%20Media%20and%20Email%20FAQs.pdf.

[181] Letter from Pat A. Cipollone, Counsel to the President, to Henry Kerner, Special Counsel, U.S. Office of Special Counsel, at 5 (June 11, 2019).

Act statutes and regulations when using social media.[182]  Like many advisory opinions, it describes conduct that OSC has concluded would violate the Hatch Act.  OSC's advisory function is a critical component of the overall statutory scheme that helps to alleviate any potential First Amendment concerns associated with the Hatch Act and prevent violations before they occur.[183]

OSC met repeatedly with the Trump White House to discuss senior officials' social media accounts.  OSC also issued warning and cure letters to Trump administration officials regarding their social media usage, and its second report to the president describing Hatch Act violations by Kellyanne Conway comprehensively addressed how her use of social media violated the Hatch Act.  But the violations continued—including by Ms. Conway—on accounts that were purportedly "personal" accounts but that Trump administration officials used for official purposes.[184]  For example, OSC substantiated a complaint against Advisor to the President Ivanka Trump.[185]  Ms. Trump used her @IvankaTrump Twitter account for substantial official government activity and also to promote numerous candidates for partisan political office.[186]  OSC concluded that because Ms. Trump used the Twitter account in her official capacity, she violated the Hatch Act by also using it to engage in political activity.  However, the lack of any regulations or examples addressing the use of social media accounts for political activity—and, in particular, purportedly "personal" social media accounts—weakened OSC's position in the eyes of the White House and allowed the White House to claim that there was no basis for OSC's position.

The Trump administration's argument regarding OSC's authority to issue advisory opinions is incorrect, but the fact that the administration was able to raise it in the first place exposes the problems inherent in OSC's lack of rulemaking authority.  If OSC had the authority to issue Hatch Act regulations, then it would do so as necessary to respond to changing factual and legal circumstances, such as the increasing prevalence of social media.  Without that authority, OSC's Hatch Act enforcement efforts remain vulnerable to those who use the absence of certain examples in the Hatch Act regulations as a defense for engaging in prohibited conduct.

---

[182] Hatch Act Guidance on Social Media (Revised Feb. 2018), https://osc.gov/Documents/Hatch%20Act/Advisory%20Opinions/Federal/Social%20Media%20Guidance.pdf.

[183] *See* U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548, 580 (1973).

[184] In a related context, the Second Circuit held that during President Trump's term as president, his former @realDonaldTrump Twitter account was not a "private, personal account" but rather an official government account because it was used to communicate and interact with the public about the administration and make announcements about matters related to official government business.  Knight First Amendment Institute at Columbia University v. Trump, 928 F.3d 226, 234-36 (2019), *vacated as moot*, 141 S. Ct. 1220 (2021).  OSC uses a similar analysis to determine whether a purportedly personal account is being used for official purposes such that the Hatch Act prohibits the owner of the account from engaging in political activity on the account.  *See* Hatch Act Guidance on Social Media 8.

[185] OSC File No. HA-19-004116.

[186] For example, Ms. Trump used her @IvankaTrump Twitter account to repeatedly promote the campaigns of U.S. Senate candidates David Perdue, *e.g.*, @IvankaTrump, Twitter (Jan. 2, 2021), https://twitter.com/IvankaTrump/status/1345529064690495493, Kelly Loeffler, *e.g.*, @IvankaTrump, Twitter (Dec. 27, 2020), https://twitter.com/IvankaTrump/status/1343298900472561670, and Joni Ernst, @IvankaTrump, Twitter (Nov. 2, 2020), https://twitter.com/IvankaTrump/status/1323424027516481536, along with the presidential campaign of President Trump, *e.g.*, @IvankaTrump, Twitter (Nov. 2, 2020), https://twitter.com/IvankaTrump/status/1323516565514452993.  She also regularly tweeted or retweeted multiple times per day about matters within her official portfolio as a government employee.

This challenge could be resolved by either a statutory amendment expressly granting OSC rulemaking authority for the Hatch Act or a determination within the executive branch that such rulemaking authority should be vested with OSC.[187]

**5.      Existing law is unclear with respect to which portions, if any, of the White House may be used for public partisan political events and who may authorize such uses**

OSC received hundreds of Hatch Act complaints regarding those portions of the 2020 Republican National Convention (RNC) that were held at the White House.  The complaints related to, among other things, RNC activities held in outdoor spaces, such as the South Lawn and the Rose Garden.  OSC also received a complaint about the use of a conference room in the Eisenhower Executive Office Building (EEOB), which is adjacent to the White House, on election day as a campaign "war room."  While the underlying principles of the Hatch Act seem to suggest that using the White House or its grounds for partisan political events or to host a campaign "war room" should be prohibited, the applicable statutes and regulations are ambiguous.

Section 7324 of Title 5 states that an employee may not engage in political activity while "*in* any room or building occupied in the discharge of official duties by an individual employed or holding office in the Government of the United States or any agency or instrumentality thereof."[188]  The statute does not, on its face, restrict political activity outdoors on federal property.  The attendant Hatch Act regulation, however, states that a room or building occupied in the discharge of official duties "includes, but is not limited to . . . [p]ublic areas . . . of buildings under the custody and control of the" General Services Administration (GSA).[189]  The GSA defines a "public area" as "any area of a building under the control and custody of GSA that is ordinarily open to members of the public, including lobbies, *courtyards*, auditoriums, meeting rooms, and other such areas not assigned to a lessee or occupant agency."[190]  Finally, the regulation also provides that a room or building occupied in the discharge of official duties "does not include rooms in the White House, or in the residence of the Vice President, which are part of the Residence area or which are not regularly used solely in the discharge of official duties."[191]

Thus, the statutory restriction refers only to indoor areas and does not appear to have any exceptions, while the regulatory definition "includes but is not limited to" certain outdoor areas under the custody and control of the GSA that are ordinarily open to members of the public and excludes areas of the White House not "regularly used solely in the discharge of official duties." It is unclear whether OPM, in writing that the definition was "not limited to" certain outdoor areas such as courtyards, intended for other outdoor areas to also be off limits for political activity.[192]  It is also unclear whether the White House is even a room or building under the

---

[187] OPM's authority to issue Hatch Act regulations is based upon a legal opinion from the Department of Justice and not expressly granted by statute.  *See* 18 U.S. Op. Off. Legal Counsel 1, 6 (1994).

[188] 5 U.S.C. § 7324(a)(2) (emphasis added).

[189] 5 C.F.R. § 734.101.

[190] 41 CFR 102-71.20 (emphasis added).

[191] 5 C.F.R. § 734.101.

[192] It is also unclear whether the White House is even a room or building under the custody and control of the GSA such that its outdoor spaces would be treated the same as outdoor spaces in GSA-controlled buildings.

custody and control of the GSA such that its outdoor spaces would be treated the same as outdoor spaces in GSA-controlled buildings. And finally, it is unclear what it means for an area of the White House to be "regularly used solely" for official duties. Given these ambiguities, OSC was unable to conclude that RNC events held at the White House were held in a "room or building occupied in the discharge of official duties" such that federal employees would have been prohibited from participating in those events.

The complaints regarding a campaign "war room" in the EEOB presented similar challenges. As an initial matter, unlike the White House—portions of which are excluded from the definition of a federal room or building for purposes of the Hatch Act—the entirety of the EEOB is a federal room or building in which most federal employees are prohibited from engaging in political activity. But the complaints OSC received about political activity in the EEOB concerned political activity by a political party, which is a private organization, rather than by federal employees. This raises two principal questions. The first is whether the Hatch Act applies to employees of private organizations or other nonfederal entities. It does not, and they are therefore not prohibited by the Hatch Act from engaging in political activity on federal property.[193] The second is whether the Hatch Act prohibits federal employees from using their official authority to authorize use of the EEOB or other federal workplaces for campaign-related activities. It does. However, the president and the vice president are specifically exempt from the Hatch Act.[194] Because neither is covered by the Hatch Act, there is no Hatch Act violation if either the president or vice president authorizes nonfederal entities to use space inside the EEOB for partisan political activity.[195] While this appears inconsistent with Congress's expressed intent that the Hatch Act bar political activity in the federal workplace,[196] such activity by nonfederal entities is currently not proscribed by the Hatch Act when the use is authorized by the president or the vice president. These related challenges likely will require a statutory fix clarifying in which areas of the White House grounds employees are prohibited from engaging in political activity and under what circumstances, if any, such areas may be used by nonfederal employees for political activity.

### 6. OSC has no clear mechanism for obtaining reimbursement for taxpayers when a government official engages in taxpayer-funded campaign activity while on official government travel

The Hatch Act permits certain high-level officials to engage in political activity while on duty provided that, as stated in 5 U.S.C. § 7324(b)(1), the costs associated with that political

---

[193] The Hatch Act only applies to federal civilian executive branch employees and to certain state and local government employees. Thus, while other laws may govern the conduct on federal property of those who are not federal employees, the Hatch Act does not.

[194] 5 U.S.C. § 7322(1).

[195] OSC asked the Trump White House who authorized use of the EEOB by the Trump campaign but did not receive an answer.

[196] E.g., 139 Cong. Rec. 15,739 (July 15, 1993) (statement of Sen. Glenn) (Passage of the Hatch Act Reform Amendments of 1993 would mean "no political activity on the job. There are no exceptions to that. There will be no political activity of any kind on the job."); Statement on Signing the Hatch Act Reform Amendments of 1993, 2 Pub. Papers 1696 (Oct. 6, 1993) (Under the Hatch Act Reform Amendments of 1993, "all political activity in the Federal workplace will be prohibited.").

activity are not paid for with U.S. Treasury funds.[197]  But when Treasury funds are used to pay for political expenses, OSC is authorized by 5 U.S.C. § 1216(a) to investigate and seek disciplinary or corrective action for violations of that provision of § 7324.  Yet, most such violations are committed by PAS and, as described above, OSC cannot pursue disciplinary against PAS at the MSPB.  Therefore, there is no clear way to obtain corrective action, i.e., reimbursement to the government, against either a current or former PAS in such cases.[198]  Thus, even if OSC concludes that a PAS grossly misused U.S. Treasury funds for campaign activities in violation of the Hatch Act, OSC is unable to recover those costs for taxpayers unless the PAS agrees to voluntarily reimburse the government.

This issue arose during the Trump administration when then-Secretary of Agriculture Sonny Perdue failed to reimburse the U.S. Treasury for costs associated with his political activity despite two OSC requests that he do so.  In August 2020, Secretary Perdue gave a speech supporting President Trump's reelection.  He delivered the speech while in his official capacity and on taxpayer-funded travel.  On October 8, 2020, OSC wrote to Secretary Perdue, explained that he violated the Hatch Act by engaging in political activity while speaking in his official capacity and on official travel, and told him that the U.S. Treasury needed to be reimbursed for the costs associated with that political activity.[199]

A senior U.S. Department of Agriculture (USDA) political appointee responded to OSC's letter on December 1, 2020.  That appointee made legally unsupported defenses of Secretary Perdue's conduct.[200]  OSC rebutted the appointee's arguments in a letter dated December 14, 2020, and reiterated that Secretary Perdue needed to reimburse the U.S. Treasury for the costs of his political activity.  On January 8, 2021, a second USDA political appointee emailed OSC to say that the appointees "st[ood] by [their] argument and anticipate[d] that no reimbursement will occur."  To date, OSC has no evidence that Secretary Perdue has reimbursed the U.S. Treasury.  A statutory amendment allowing OSC to seek reimbursement from the traveling official personally before the MSPB in such cases would help to ensure that taxpayer dollars are not improperly used for partisan political purposes.

---

[197] *See* 5 U.S.C. § 7324(b)(1); 5 C.F.R. § 734.503.

[198] There are two obstacles to seeking corrective action against a PAS at the MSPB.  For a PAS who is currently a government employee, the MSPB cannot use its usual enforcement tool of withholding salary because PAS are specifically excluded from the salary withholding provision, 5 U.S.C. § 1204(e)(2)(A); for a PAS who is a former government employee, the MSPB likely lacks jurisdiction.  *See* Special Counsel v. Owens, 11 M.S.P.R. 128, 129-30 (1982) (dismissing for lack of jurisdiction an OSC complaint filed after an individual left government service).  *But see* Special Counsel v. Malone, 84 M.S.P.R. 342, 362-63 (1999) (suggesting in dicta that, at least in Hatch Act cases, the Board's jurisdiction attaches at the time of the violation rather than when the complaint is filed).

[199] Pursuant to 5 C.F.R. § 734.503(a), Secretary Perdue was required to reimburse the U.S. Treasury for those costs "within a reasonable period of time."  This rule ensures that U.S. taxpayers are not improperly subsidizing political campaigns, and in particular those campaigns supporting or supported by an incumbent president.

[200] USDA argued, without citing to any legal authority, that statements "of a factual, predictive, and/or policy-based nature . . . do not implicate the Hatch Act's prohibitions," echoing the Trump White House's position that "assertions of fact . . . in the context of policy discussions" are not prohibited by the Hatch Act.  OSC stands on ample legal authority when stating that such statements are political activity if they also advocate for the success or failure of a political party, partisan political group, or candidate for partisan political office.  *See supra* Part III(3).

### 7.      The MSPB has not had a quorum since January 2017

The MSPB, before which OSC prosecutes alleged Hatch Act violations, ordinarily consists of three Senate-confirmed presidential appointees.  However, the MSPB has not had a two-member quorum since January 6, 2017, and it has not had a single member since March 1, 2019.  The lack of a quorum on the MSPB has had two primary effects upon OSC's Hatch Act enforcement.  First, OSC is unable to obtain precedent-setting judicial decisions or disciplinary action in cases where an employee chooses to appeal an adverse decision by an administrative law judge (ALJ) to the MSPB.  And second, OSC is unable to enforce subpoenas issued pursuant to its statutory authority.

Only the MSPB can issue precedential decisions interpreting the Hatch Act.  Initial decisions issued by an ALJ, while applicable to a particular case, are not binding in future prosecutions.[201]  OSC relies upon the MSPB's precedential decisions to clarify how the Hatch Act applies in new or unanticipated circumstances, such as in the context of political activity on social media.  With no quorum on the MSPB and no ability to issue Hatch Act regulations, OSC is forced to rely on increasingly outdated law when issuing advisory opinions.  While OSC believes that each of its advisory opinions is an accurate statement of the law, an administration determined to push back against an OSC advisory opinion can point to the lack of recent case law or regulations to justify its opposition.  OSC's experience dealing with the Trump administration shows that this is not merely an abstract risk.

More broadly, the lack of a quorum on the MSPB means that employees can postpone the consequences of their Hatch Act violations by appealing an adverse initial decision.  If the ALJ presiding over a Hatch Act case agrees that the subject employee violated the law, then the ALJ can order disciplinary action pursuant to 5 U.S.C. § 7326.  However, if an employee appeals that decision then the disciplinary action is stayed until the appeal is heard by the full MSPB.  In one particularly egregious case, an employee was ordered removed from his job in 2017 for repeatedly running for partisan political office in violation of the Hatch Act despite warnings from both his agency and OSC.[202]  The employee appealed and was allowed to remain in his job. In 2018, he again violated the Hatch Act by running for that same office.  Yet the employee remains in the federal workforce, despite the removal order, because there is no MSPB quorum to hear his appeal.  That appeal is still pending.

Finally, the lack of an MSPB quorum also limits OSC's investigative tools.  Pursuant to 5 U.S.C. § 1212(b)(2), OSC may issue subpoenas in connection with cases that it is investigating. However, OSC cannot independently enforce its subpoenas.  Instead, it must request that the MSPB seek enforcement of the subpoena through the relevant United States district court. Because the MSPB had no members during the time frame relevant to this report, OSC could not effectively wield its subpoena power.  Ensuring that there are always at least two confirmed MSPB members would resolve several of the challenges described in this Part.  Furthermore, a statutory amendment authorizing OSC to seek enforcement of its subpoenas in Article III courts in the event that the MSPB does not have a quorum would guard against a recurrence of these issues if the MSPB were to ever lack a quorum in the future.

---

[201] 5 C.F.R. § 1201.113.
[202] Special Counsel v. Arnold, MSPB Docket No. CB-1216-16-0017-T-1, 2017 MSPB LEXIS 128 (Jan. 10, 2017).

## PART V:  CONCLUSION

OSC received hundreds of complaints alleging Hatch Act violations by senior Trump administration officials during the 2020 election cycle.  This report is the culmination of OSC's investigation of those complaints.  As described in Part III, OSC has concluded that at least 13 different Trump administration officials violated the Hatch Act on one or more occasions.  Both because of the positions that the former officials held and the fact that they are no longer government employees, OSC has no statutory authority to pursue these cases beyond issuance of this report.

This report, however, is not the only Hatch Act enforcement action that OSC took against senior Trump administration officials during the 2020 election cycle.  OSC issued reports to then-President Trump detailing Hatch Act violations by some of these same officials and recommending disciplinary action, including, in the case of Ms. Conway, recommending removal.[203]  OSC also sought reimbursement for the government where it determined that U.S. Treasury funds were used for political travel,[204] and, when possible, pursued disciplinary action before the Merit Systems Protection Board.[205]  OSC undertook these Hatch Act enforcement efforts notwithstanding the enforcement challenges described in Part IV.

Congress's judgment in passing the Hatch Act was that "partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences."[206]  None of those goals is achievable if the power of the federal government is used to campaign for candidates, as happened during the 2020 election cycle.  OSC's objective with this report is to use these violations to educate employees about Hatch Act-prohibited activities, and describe the enforcement challenges that OSC confronted in investigating the violations, in the hope of preventing similar violations from occurring in the future.  Moving forward, OSC will continue to advise on and enforce the Hatch Act, consistent with its statutory authorities, in furtherance of Congress's intent to separate the nonpartisan administration of government from partisan political campaigns, and OSC hopes that Hatch Act enforcement can be improved by addressing the enforcement challenges described in this report.

---

[203] *See* Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-20-000279 (Peter Navarro) (Nov. 18, 2020); Report of Prohibited Political Activity Under the Hatch Act, OSC File Nos. HA-19-0631 & HA-19-3395 (Kellyanne Conway) (May 30, 2019); Report of Prohibited Political Activity Under the Hatch Act, OSC File No. HA-18-0966 (Kellyanne Conway) (Mar. 6, 2018).
[204] *See supra* notes 223-24 and accompanying text (describing OSC's attempts to seek reimbursement for costs the U.S. government paid in connection with partisan political activity).
[205] *See* Special Counsel v. Patton, MSPB Docket No. CB-1216-21-0007-T-1, 2021 MSPB LEXIS 1118 (Mar. 30, 2021).
[206] U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 564 (1973).

**Tab 45**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| THE STATE OF GEORGIA, ) | |
| ) | |
| v. ) | Case No. 1:23-cv-03621-SCJ |
| ) | |
| MARK R. MEADOWS, ) | |
| ) | |
| *Defendant.* ) | |

## REPLY OF DEFENDANT MARK R. MEADOWS TO THE STATE OF GEORGIA'S RESPONSE TO HIS NOTICE OF REMOVAL

The State opposes removal because, in their view, Mr. Meadows did not act in his official capacity as Chief of Staff when he set up a call between the President and Georgia Secretary of State and took other actions alleged in the Indictment. Thus, they say, those actions had no "connection" to his official duties,[1] and Mr. Meadows does not have even a "colorable defense."[2] The State is wrong.

There is no "election" or "politics" exception to the Supremacy Clause or the Federal Officer Removal Statute, and the State mischaracterizes federal law and the Chief of Staff's role. In any event, the State's arguments about Mr. Meadows's

---

[1] Opp. at 5 (conceding that removal "requires only a 'connection' or 'association,'" which is "not typically a high bar to clear") (quoting *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017)).

[2] Opp. at 14 (acknowledging that "'colorable'" simply "means 'plausible'") (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)).

App.352

conduct and federal authority are properly considered *once the case is removed*, not on the threshold question of removal, which presents a "quite low" bar, *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (internal quotation omitted). The Court should permit removal at or promptly after Monday's hearing.

\*     \*     \*     \*     \*

On Monday, August 14, 2023, the State charged Mr. Meadows on two state-law counts as part of a 19-defendant, 41-count case under the Georgia RICO Act, O.C.G.A. § 16-14-4(c). *See* Indictment, Dkt. No. 1-1. Mr. Meadows promptly removed under the Federal Officer Removal Statute, 28 U.S.C. § 1442, the following day, Tuesday, August 15. *See* Notice of Removal, Dkt. No. 1. This Court declined summary remand on Wednesday, August 16, and set an evidentiary hearing for Monday, August 28, consistent with 18 U.S.C. § 1455(b)(5). *See* Order, Dkt. No. 6. The State has now responded to the Notice of Removal. *See* Dkt. No. 27.

## I.     Mr. Meadows Has Met the Low Threshold for Removal

Mr. Meadows is entitled to removal under 28 U.S.C. § 1442(a)(1) because he has met the very low threshold for removal by a federal official. It is undisputed that Mr. Meadows served as a federal official during the relevant period—specifically, as Chief of Staff to the President of the United States. To obtain removal, he needs only to (1) "show 'a causal connection between what [he] has done under asserted

2

official authority and the action against him,'" *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)), and (2) "raise a colorable federal defense," *id*. Those are easy showings to make, and Mr. Meadows has made them.

    *First*, it is clear from the Notice of Removal, the Indictment, and even the State's Response that there is at least some causal connection between the conduct charged and Mr. Meadows's role as Chief of Staff. The charged conduct all occurred during his tenure and as part of his service in that role. The conduct alleged in the Indictment plainly came about because Mr. Meadows was serving as Chief of Staff to then-President Donald J. Trump, and the Chief of Staff has broad-ranging duties to advise and assist the President. This is not a case where the defendant was plainly "acting on a frolic of their own which had no relevancy of their official duties." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (internal quotation omitted). And even that is how the State wishes to characterize it, Mr. Meadows "should have the opportunity to present [his] version of the facts to a federal, not a state, court," since "[t]his is exactly what the removal statute was designed to accomplish." *Id.* at 409.

    The lenient "connection" standard derives from the broad language of the Federal Officer Removal Statute, which covers any claims "for or relating to any act" under color of federal office. 28 U.S.C. § 1442(a)(1). As the Eleventh Circuit

has held, "[t]he phrase 'relating to' is broad and requires only a 'connection' or 'association' between the act in question and the federal office." *Caver*, 845 F.3d at 1144 (internal quotation omitted). While the State disputes whether Mr. Meadows's conduct was actually required or properly considered part of his official duties, those arguments are more relevant to the separate issue of immunity; they do not negate a finding that the conduct had a connection to Mr. Meadows's official duties.

***Second***, Mr. Meadows "raise[s] a colorable federal defense." *Caver*, 845 F.3d at 1142. The Eleventh Circuit "gives this portion of § 1442(a)(1) a broad reading so as to encompass all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 1145 (cleaned up). In deciding removal, the Court need not—indeed cannot—adjudicate the immunity defense on the merits. A colorable "defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Magnin*, 91 F.3d at 1427; *see also Caver*, 845 F.3d at 1145 (11th Cir. 2017) ("The law does not require that the removing defendant virtually win his case before it can be removed."); *see* Opp. at 14.

Here again, Mr. Meadows has cleared the low bar for removal. It is undisputed that the Supremacy Clause provides immunity from "suits under state law against federal officials carrying out their executive duties," *Kordash v. United States*, 51 F.4th 1289, 1293 (11th Cir. 2022), including former federal officials who served at

the time of their alleged conduct, *see Maryland v. Soper*, 270 U.S. 9, 34–35 (1926); *Camero v. Kostos*, 253 F. Supp. 331, 335 (D.N.J. 1966). And again, it is undisputed that Mr. Meadows was a federal official at the time of the charged conduct.

The only dispute the State asserts here is whether Mr. Meadows is entitled to immunity based on the nature of the conduct charged and the scope of his duties. To the extent that dispute might require resolution, it does not preclude the antecedent removal for which the statute broadly provides. On the merits, immunity turns on "whether a federal official's acts have some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law." *Kordash*, 51 F.4th at 1293 (internal quotation omitted). Thus, even at that stage, the federal official need not prove that he stayed within his lawful authority, only that he reasonably believed he was.[3] As to removal, "the lenient colorable federal defense requirement" focuses on the removing official's version of the case, not the State's competing narrative. *Caver*, 845 F.3d at 1145–46. Again, the Court "need not . . . determine the merits of that position" in order to reach removal. *Id.* at 1146.

## II.   The State's Arguments for a "Political Exception" to the Supremacy Clause Are Without Legal Basis and Therefore Unpersuasive

While the State's characterization of Mr. Meadows's conduct and official

---

[3] A federal-law violation defeats immunity only when it was clear and willful. *See, e.g.*, *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

duties are largely irrelevant at the removal stage, they are also wrong. Neither the

duties of the Chief of Staff nor the laws and Constitution of the United States draw

a clean line between federal authority, on the one hand, and elections and politics,

on the other. Indeed, creating an "election" or "politics" exception to removal and

official immunity would have sweeping consequences for the role of the Chief of

Staff and the operation of the Federal Government going forward.

While the Court need not resolve the State's arguments against immunity to

effecuate removal, those arguments miss the mark. The State's myriad specific

arguments boil down to two general ones: (a) that there is no federal authority to be

involved in "political" activity involving Georgia's presidential election, and (2) that

Mr. Meadows acted out of a personal interest to see the President reelected.

### A.   Elections and Politics Do Not Fall Beyond Federal Authority

The State argues repeatedly that Mr. Meadows has no immunity if his conduct

related to Georgia's administration of the 2020 Presidential Election or involved

"politics." *See* Opp. at 15 (describing Mr. Meadows's conduct as "'unquestionably

political' in nature and therefore, by definition, outside the lawful scope of his

authority as Chief of Staff");[4] *id.* ("[T]he activities in which he assisted Mr. Trump

---

[4] The State does not provide a definition of "political" or "the lawful scope of [the] authority [of the] Chief of Staff." *See id*.

6

were all 'unofficial' activities concerning his efforts to remain in office for a second term, and there is no authority for a president or his chief of staff to take any actions concerning the administration of a presidential election."); *id.* at 16 ("[T]he President himself *had no authority of his own* in the administration of the election.").

That notion is fundamentally flawed for several reasons.

***First***, contrary to the theme of the State's response, the Federal Government has a substantial interest in the proper administration of federal elections, even though the States also play an important role. *See, e.g.*, Electoral Count Act, 3 U.S.C. § 5, et. seq. (1887) (governing process for electoral vote counting and certification by the States); Voting Rights Act, 52 U.S.C. § 10301, et seq. (1965) (illegal to deny or restrict voting rights because of a citizen's race); National Voter Registration Act, 52 U.S.C. § 20501, et seq. (1993) (requires most states to allow registration to vote by mail); Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301, et. seq. (1999) (governing right to register and vote absentee in federal elections); Help America Vote Act, 52 U.S.C. § 20901, et seq. (2002) (requiring use of provisional ballots in federal elections); *see generally* U.S. Code, Title 52 ("Voting and Elections").[5]

---

[5] *See also Bush v. Gore*, 531 U.S. 98, 100 (2000) (addressing post-election challenge to counting of ballots and election procedures in Presidential election); *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 73 (2000) (addressing whether "changing

*Second*, contrary to the State's claim, the Hatch Act does not put Mr. Meadows's charged conduct beyond the scope of his official duties and thus beyond a "colorable" immunity defense. The Hatch Act is a red herring, particularly at this stage. Any dispute about the Hatch Act is a proper matter for the federal court *after* removal. Nonetheless, Mr. Meadows complied with federal law in connection with the charged conduct, and neither OSC, nor DOJ, nor any other competent federal enforcement authority has suggested otherwise despite the intense focus and public nature of the alleged acts.[6]

---

the State's elector appointment procedures after election day, violated the Due Process Clause or 3 U.S.C. § 5 [Electoral Count Act], and whether the decision of that court changed the manner in which the State's electors are to be selected, in violation of the legislature's power to designate the manner for selection under Art. II, § 1, cl. 2"); Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 396 (2021) ("In the decentralized system adopted by the United States, the federal government does not itself conduct elections. Instead, elections are run by state and local governments, with limited but important oversight and regulation by the federal government."); U.S. Department of Justice, *Federal Prosecution of Election Offenses* 1 (Richard C. Pilger ed., 8th ed., 2017) ("[T]he effective prosecution of corruption of the election process is a significant federal law enforcement priority."). The Department of Justice includes a Civil Rights Division, Voting Section ("The Voting Section enforces the civil provisions of the federal laws that protect the right to vote."), as well as Criminal and Civil branches (*e.g.*, the Election Crimes Branch) that relate to the litigation of election related offenses.

[6] Vice President Gore's then Chief of Staff recalls that, during the 2000 Florida Recount, he was actively engaged with both the Gore-Lieberman campaign and legal proceedings contesting the election results. *See* Charles Burson, *What Should Have Been*, Daily Beast (Apr. 25, 2017), https://www.thedailybeast.com/what-should-have-been. It would be equally absurd to suggest that violated the Hatch Act.

The State points to an Office of Special Counsel report, Dkt. 27-4, Ex. D ("Report"), that discusses "three interviews" Mr. Meadows gave *before* election day about conduct *entirely unrelated* to the conduct charged here. Even as to those speeches, the OSC report acknowledges that the White House Counsel's Office defended Mr. Meadows, arguing that "*the Hatch Act does not apply*" and that OSC's findings would "violate employee's free speech rights under the First Amendment." Report at 27 (emphasis added). OSC also acknowledges that for commissioned officers like the Chief of Staff, it "may only submit a report to the president"; it does not have enforcement authority. Report at 2.

**Third**, the State cannot draw a meaningful distinction between the official responsibilities of the President and those of other federal officials whose duties indisputably relate to the administration of elections. Under the Federal Constitution, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2191 (2020) (plurality opinion) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3, cl. 3). The President "cannot delegate ultimate responsibility or the active obligation to supervise that goes with it." *Free Enter. Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 496 (2010)

(internal quotation omitted). Thus, nothing is beyond the scope of the President's duty unless it is beyond the duty of the entire Executive Branch.

Indeed, even if elections and "politics" *were* beyond the authority of the entire Executive Branch, the President (and by extension, his Chief of Staff) would still appropriately inquire into them to the extent they fall within *Congress's* authority. Under Article I, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but *the Congress may at any time by Law make or alter such Regulations*, except as to the Places of chusing Senators." U.S. Const., art. I, § 4, cl. 1 (emphasis added). The President, in turn, plays a constitutional role in supporting this congressional function; Article II provides that the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." *Id.*, art. II, § 3.[7] Thus, even for matters committed exclusively to Congress, the President still has authority—and indeed a duty—to inquire and to make recommendations.

_____

[7] Indeed, "[t]he Framers considered, and rejected, making it optional for the President to recommend legislation to Congress . . . apparently concerned that the President would refrain from engaging with Congress on important issues out of fear that Congress would resent the intrusion on its legislative power and exact political revenge." Benjamin J. Schwartz, *The Recommendations Clause and the President's Role in Legislation*, 168 U. Pa. L. Rev. 767, 770–71 (2020).

***Finally***, the State conflates (i) the distinction between the President's official and unofficial duties, including as a candidate, and (ii) the Chief of Staff's duties as the his principal assistant and advisor. *See* Opp. at 15 ("[T]he activities in which [Mr. Meadows] assisted Mr. Trump were all 'unofficial' activities concerning his efforts to remain in office for a second term, and there is no authority for a president or his chief of staff to take any actions concerning the administration of a presidential election.").[8] As Chief of Staff, Mr. Meadows did not stop assisting the President just because the President was doing something personal or political. To take one example, certain White House personnel *must* travel with the President and do so in their official capacities, even when the President travels to a campaign rally; one such essential traveler is the Chief of Staff, or his designee. One would not say the pilot of Air Force One ceases to be a military official when he flies the President to an unofficial event. The same goes for the Chief of Staff. They do not take off their "official" hats just because the President takes off his.

## B.     The "Personal Interest" Principle Does Not Apply Here

The State also cannot stop removal by alleging that Mr. Meadows acted out of a "personal interest" in seeing President Trump reelected. Opp. at 15 (quoting

---

[8] The latter point is so obviously belied by numerous such sources of authority, but the State's position also ignores the Chief of Staff's critical role of assisting the President comprehensively.

11

*Baucom*, 677 F.2d at 1350). None of the four cases the State cites involve an alleged

distinction between political and official duties, and they are wholly inapposite here.

*Baucom*, the one Eleventh Circuit case, involved an FBI special agent who

"had participated during the course of an investigation in an alleged bribery attempt

of a [Georgia] state prosecutor." 677 F.2d at 1347. The Court of Appeals held that

he was immune, even though he willfully violated Georgia law, because "his acts in

the bribery scheme were within his authority as an FBI agent, and . . . any state

conviction of him for those acts would contravene the Supremacy Clause of the

Constitution of the United States." *Id*. The State cites a passage from the court's

admonition that "[e]ven if the officer makes an error in judgment in what the officer

conceives to be his legal duty, that alone will not serve to create criminal

responsibility in a federal officer." *Id.* at 1350. The court found "no suggestion that

Baucom acted because of any personal interest, malice, actual criminal intent, or for

any other reason than to do his duty as he saw it. His good faith cannot be seriously

questioned." *Id. Baucom* does not remotely suggest that Mr. Meadows loses

immunity if he wanted the President to be reelected. Rather, *Baucom* supports

removal—and immunity—because it shows that he is protected so long as he had a

good-faith belief, even mistaken, that his conduct was within "his duty as he saw it."

The three out-of-circuit cases are equally unavailing. In *Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017), the Fifth Circuit affirmed dismissal of state manslaughter charges against a federal task force officer; the court noted that "none of the evidence suggests that Kleinert acted out of personal interest or bore any ill will toward [the suspect he shot]." *Id.* at 317. In *Reed v. Madden*, 87 F.2d 846 (8th Cir. 1937), the Eighth Circuit reversed denial of habeas relief to a federal agent indicted for manslaughter; the court noted "that [Reed], in good faith, believed that his life and the lives of those for whose presence he felt responsible were in danger, and that the action complained of here was taken in that belief." *Id.* at 851. And in *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977), the Ninth Circuit affirmed habeas relief to a federal agent charged with second-degree murder and involuntary manslaughter for a fatal shooting during a drug raid; in discussing the Ninth Circuit standard for Supremacy Clause immunity, the court stated that "[e]ssential to this determination, assuming the truth of the state's evidence, is whether the official employs means which he cannot honestly consider reasonable in discharging his duties or otherwise acts out of malice or with some criminal intent." *Id.* at 728.

Each case turned on whether the federal official fired the fatal shot in a good-faith exercise of federal duties as opposed to out of criminal malice. They have nothing to do with the supposed line between official federal duties and unofficial

13

political activity. Nor do they remotely suggest that Mr. Meadows cannot claim immunity if he wanted the President to be reelected. *Cf.* Opp. at 16 ("[T]he defendant shared a 'personal interest' with Mr. Trump in seeing the Trump campaign achieve its goal of reversing Trump's electoral loss in Georgia."). Like *Baucom*, these cases further support immunity (and thus also show at least a "colorable" defense for purposes of removal) because they reinforce that Mr. Meadows need not prove that his conduct complied with federal law in retrospect; he is entitled to immunity because he acted in good faith to further what he understood to be his official duties.

## III.   The Allegedly Broad Scope of the Georgia RICO Act Is Irrelevant

The State finally argues that Mr. Meadows "misapprehends the nature of Georgia RICO law and conspiracy law generally," under which, it says, "[a]n overt act 'need not be a crime in itself.'" Opp. at 19 (quoting *McCright v. State*, 176 Ga. App. 486, 487 (1985); citing *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)). That alleged misapprehension is irrelevant. Under *Neagle*, "entitlement to Supremacy Clause immunity is to be ascertained by looking only at federal law"; the whole point is that a federal official carrying out his duties is not "obliged to consider state criminal law at all before acting." Seth P. Waxman & Trevor W.

Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 YALE L.J. 2195, 2233 (2003).[9]

Of course, the State does not cite a single case suggesting that it can overcome removal under 28 U.S.C. § 1442(a)(1) by charging a federal official under a state criminal statute that does not require a criminal act. There is no such case. Indeed, the State's apparently sweeping theory of liability only further underscores the importance of removal. Supremacy Clause immunity and the Federal Officer Removal Statute protect against, among other things, the risk that a State "may administer not only the laws of the State, but equally Federal law, in such a manner as to paralyze the operations of the government." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). The State's assertion of the broad scope of the Georgia RICO Act against a White House Chief of Staff should be tested in federal court, not in state court.

\*     \*     \*     \*     \*

The Court should therefore promptly remove Mr. Meadows's case and so notify the state court pursuant to 28 U.S.C. § 1455(b)(5).

---

[9] *See also Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (holding that immunity applies to "even the most unquestionable and most universally applicable of state laws, such as those concerning murder"); *Ohio v. Thomas*, 173 U.S. 276, 283 (1899) ("[F]ederal officers who are discharging their duties in a state . . . are not subject to the jurisdiction of the state in regard to those very matters of administration which are thus approved by federal authority.").

Dated: August 25, 2023

Joseph M. Englert
MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP
1230 Peachtree St., N.E., Suite 2100
Atlanta, GA 30309
(404) 443-5500
Jenglert@mcguirewoods.com

Respectfully submitted,

*/s/ George J. Terwilliger III*

George J. Terwilliger, III*
John S. Moran*
Michael Francisco*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com
* Admitted *Pro Hac Vice*

*Counsel to Mark R. Meadow*

16

## CERTIFICATE OF SERVICE

On August 25, 2023, the foregoing ***Reply of Defendant Mark R. Meadows to the State of Georgia's Response to His Notice of Removal*** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record. A courtesy copy will also be provided by email to the attorneys for the other defendant who contacted chambers today and suggested a postponement of the hearing, since these attorneys have not yet entered an appearance in this case.

This, the 25th day of August, 2023.


 /s/ John S. Moran

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that 14-point Times New Roman font was used for this document and that it has been formatted in compliance with Local Rule 5.1.

This, the 25th day of August, 2023.

  /s/ John S. Moran

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

# **Tab 63**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE STATE OF GEORGIA,

v.

MARK RANDALL MEADOWS,

    Defendant.

CIVIL ACTION FILE

No. 1:23-CV-03621-SCJ

RE: NOTICE OF REMOVAL OF
FULTON COUNTY SUPERIOR
COURT INDICTMENT NO.
23SC188947

<u>ORDER</u>

Having held an evidentiary hearing in the above-captioned matter, the

Court deems it proper to request limited additional briefing on the following

issue:

> Count 1 of the Indictment (pertaining to Georgia's
> Racketeer Influenced and Corrupt Organizations Act
> (RICO), O.C.G.A. § 16-14-4(c)) contains a number of
> overt acts attributed to Mr. Meadows. Would a finding
> that at least one (but not all) of the overt acts charged
> occurred under the color of Meadows's office, be
> sufficient for federal removal of a criminal prosecution
> under 28 U.S.C. § 1442(a)(1)?

The Parties shall file supplemental briefing by **5:00 p.m., Thursday,**

**August 31, 2023.**

IT IS SO ORDERED this 29th day of August, 2023.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

2