**No. 23-12958**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————

The State of Georgia

*Plaintiff-Appellee*,

v.

Mark R. Meadows,

*Defendant-Appellant*.

————————

On Appeal from the United States District Court
for the Northern District of Georgia, No. 1:23-cv-03621-SCJ

————————

## DEFENDANT-APPELLANT'S APPENDIX
## VOLUME V OF V

————————

George J. Terwilliger, III
John S. Moran
Michael L. Francisco
Francis J. Aul
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Washington, D.C. 20006
(202) 857-2473
gterwilliger@mcguirewoods.com

*Counsel for Defendant-Appellant Mark R. Meadows*

# INDEX

**Docket/**
**Tab No.**

**Volume I**

District Court Docket Sheet, No. 1:23-cv-3621-SCJ.................................................A

Indictment, 23SC188947 (Fulton Cnty. Sup. Ct. Aug. 14, 2023) ...........................B

Notice of Removal (Aug. 15, 2023)...........................................................................1

Order that the Parties Participate in an Evidentiary Hearing Concerning the Notice
of Removal (Aug. 16, 2023)...........................................................................6

Motion to Dismiss Charges Based on Supremacy Clause Immunity (Aug. 18,
2023) ...........................................................................................................15

Corrected Brief in Support of Motion to Dismiss (Aug. 19, 2023) .......... 16-1

Emergency Motion for Relief Immediate Removal, or an Order Prohibiting DA
Willis from Arresting Defendant Mark Meadows (Aug. 22, 2023).............17

Declaration of John S. Moran (Aug. 22, 2023) ......................................... 17-1

Email from John Moran to DA Willis (Aug. 16, 2023) ............................ 17-2

Email from DA Willis to John Moran (Aug. 16, 2023) ............................ 17-3

Letter from John Moran to DA Willis (Aug. 21, 2023) ............................ 17-4

Email from DA Willis to John Moran (Aug. 22, 2023) ............................ 17-5

Letter from John Moran to DA Willis (Aug. 22, 2023) ............................ 17-6

Motion for Entry of Pretrial Scheduling Order and Proposed Pretrial
Scheduling Order, 23SC188947 (Fulton Cnty. Sup. Ct. Aug. 16, 2023)
..................................................................................................... 17-7

State's Response to Emergency Motion for Relief Immediate Removal, or an Order
Prohibiting DA Willis from Arresting Defendant Mark Meadows (Aug. 23,
2023) ...........................................................................................................23

**Docket/**
**Tab No.**

## Volume II

Order Denying Emergency Motion for Immediate Removal or an Order Prohibiting DA Willis from Arresting Defendant Mark Meadows (Aug. 23, 2023).......25

State's Response to Notice of Removal (Aug. 23, 2023)........................................27

Excerpt of Michael Shirkey Interview (June 8, 2022) ............................. 27-1

Excerpt of Cassidy Hutchinson Interview (Mar. 7, 2022) ....................... 27-2

Excerpt of John McEntee Deposition (Mar. 28, 2022) ............................. 27-3

Excerpt of Office of Special Counsel Hatch Act Report (Nov. 9, 2021).. 27-4

Reply to State's Response to Notice of Removal (Aug. 25, 2023) .........................45

Order Requesting Supplemental Briefing (Aug. 29, 2023) .....................................63

## Volume III

Transcript of Evidentiary Proceedings (August 28, 2023), *1 of 2* ...........................65

Mark Randall Meadows

Direct Examination.................................................................... *App.380*
Cross Examination ................................................................... *App.426*
Redirect Examination ............................................................... *App.518*

## Volume IV

Transcript of Evidentiary Proceedings (August 28, 2023), *2 of 2* ...........................65

Kurt Robert Hilbert

Direct Examination.................................................................... *App.532*
Cross Examination ................................................................... *App.554*

**Docket/**
**Tab No.**

Brad Raffensperger

    Direct Examination...................................................................*App.557*
    Cross Examination ..................................................................*App.586*
    Redirect Examination ...............................................................*App.593*

Exhibits Admitted During Evidentiary Proceedings

    Mark Meadows's Commission (Mar. 31, 2020) [Def.'s Ex. 1] .....................C

    Declaration of Scott Gast (Aug. 27, 2023) [Def.'s Ex. 3].............................D

    Declaration of Benjamin Williamson (Aug. 27, 2023) [Def.'s Ex. 4] .......... E

    Email from Mark Meadows to Jason Miller (Dec. 6, 2020) [State's Ex. 1] .. F

    Entry of Appearance for Kurt R. Hilbert, *Trump v. Raffensperger*, 2020-cv-343255 (Dec. 7, 2020) [State's Ex. 2] ...................................G

    Recording of Call with Secretary Raffensperger (Jan. 2, 2021) [State's Ex. 3].............................................................................................H

**Volume V**

State's Supplemental Brief (Aug. 31, 2023)..............................................66

Meadows's Supplemental Brief (Aug. 31, 2023) ....................................67

Order Declining Jurisdiction and Remanding Case to Fulton County Superior Court (Sept. 8, 2023)......................................................................69

Notice of Appeal (Sept. 8, 2023) ..........................................................71

Emergency Motion to Stay Remand Order (Sept. 11, 2023)...................74

State's Opposition to Emergency Motion to Stay Remand Order (Sept. 12, 2023) ....................................................................................78

Order Denying Emergency Motion to Stay Pending Appeal (Sept. 12, 2023) .......80

# **Tab 66**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | CIVIL ACTION NO. |
| | ) | 1:23-cv-03621-SCJ |
| | ) | |
| v. | ) | |
| | ) | RE: NOTICE OF REMOVAL |
| | ) | OF FULTON COUNTY |
| | ) | SUPERIOR COURT |
| MARK RANDALL MEADOWS | ) | INDICTMENT NO. |
| | ) | 23SC188947 |

## STATE OF GEORGIA'S POST-HEARING BRIEF

Following an evidentiary hearing held on August 28, 2023, the Court directed the parties to submit additional briefing on a single question:

> Count 1 of the Indictment (pertaining to Georgia's Racketeer Influenced and Corrupt Organizations Act (RICO), O.C.G.A. § 16-14-4(c)) contains a number of overt acts attributed to Mr. Meadows. Would a finding that at least one (but not all) of the overt acts charged occurred under the color of Meadows's office, be sufficient for federal removal of a criminal prosecution under 28 U.S.C. § 1442(a)(1)?

For all of the following reasons, the State of Georgia responds that the answer to this question is no. A finding that at least one, but not all, of the overt acts attributed to the defendant would not be sufficient to authorize removal.

## I.     The defendant's prosecution commenced not from any individual overt act, but from his entry into a conspiracy.

The defendant's prosecution was not commenced against him "for or related to any act" under color of his office. 28 U.S.C. § 1442(a)(1). The defendant's prosecution commenced because he knowingly and willfully entered into an agreement to violate the Georgia RICO Act. The overt acts alleged in the Indictment, as with any indictment charging a violation of a conspiracy statute containing an overt act requirement, are required to be pled only to "demonstrate the conspiracy was actually 'at work'". *Nordahl v. State*, 306 Ga. 15, 26 n.22 (2019), citing *Carlson v. United States*, 187 F.2d 366, 370 (10th Cir. 1951).

The defendant is charged in Count 1 with agreeing to join a conspiracy that planned to overturn the lawful results of an election in Georgia. A scenario where at least one, but not all, of the overt acts attributed to the defendant in Count 1 of the Indictment occurred under color of office would not be sufficient to authorize removal because it would not demonstrate that his agreement to join in the RICO conspiracy described in Count 1 was an act "for or related to" his duties as Chief of Staff.

An examination of RICO and conspiracy law more generally illustrates the crucial difference between a single overt act and joining a conspiracy. Count 1 charges the defendant with a violation of O.C.G.A. § 16-14-4(c), in that he

2

"conspired and endeavored to participate in" an enterprise to violate O.C.G.A § 16-14-4(b). Subsection (a)(1) of the statute is violated when a person "together with one or more persons conspires to violate any of the provisions of subsection (a) or (b) of this Code section and anyone or more of such persons commits any overt act to effect the object of the conspiracy . . ." O.C.G.A. § 16-14-4(b) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

The question posed by this Court contemplates a finding that the defendant has committed at least one overt act under Count 1 outside the color of his office. This would be *more* than what is required to demonstrate the defendant's participation in the RICO conspiracy. In contrast to a substantive violation of O.C.G.A. § 16-14-4(b), a conspiracy to violate that provision does not, as the language of subsection (c)(1) makes clear, require that a defendant commit or agree to commit two acts of racketeering activity himself. *Faillace v. Columbus Bank & Trust Co.*, 269 Ga. App. 866, 870, 605 S.E.2d 450, 454 (2004), citing *Salinas v. United States*, 522 U.S. 52, 63 (1997). Under Georgia law, a person is guilty of a RICO conspiracy "if they knowingly and willfully *join a conspiracy* which itself contains a common plan or purpose to commit two or more predicate acts." *Cotman*

*v. State*, 342 Ga. App. 569, 585, 804 S.E.2d 672, 684 (2017) (emphasis added). While Georgia RICO, unlike federal RICO, requires that one of the conspirators commit an overt act, *there is no requirement that the defendant himself commit an overt act* because "each actor in a conspiracy is responsible for the overt actions undertaken by all the other co-conspirators in furtherance of the conspiracy." *Pasha v. State*, 273 Ga. App. 788, 616 S.E.2d 135, 138 (2005) (citing *Causey v. State*, 154 Ga. App. 76, 79, 267 S.E.2d 475, 479 (1980); *accord Akintoye v. State*, 340 Ga. App. 777, 780, 798 S.E.2d 720, 724 (2017) (applying general conspiracy law to RICO: "It is well settled that when individuals associate themselves in an unlawful enterprise, any act done in pursuance of the conspiracy by one or more of the conspirators is in legal contemplation the act of all."). This is consistent with federal conspiracy law. *Bannon v. United States*, 156 U.S. 464, 469 (1895) (rejecting proposed requirement that the government allege defendant personally commit an overt act).

Because "[a] conspiracy is a partnership in crime . . .", *Pinkerton v. United States*, 328 U.S. 640, 644 (1946),[1] the gravamen of a RICO conspiracy is "premised

---

[1] Georgia courts have applied *Pinkerton*. *McLeod v. State*, 279 Ga. 99, 102, 772 S.E.2d 641, 644 (2015). Thus, "[as] a co-conspirator and party to a crime, the racketeering activity underlying Whaley's RICO violation included not only the acts of himself, but also of Rice." *Whaley v. State*, 343 Ga. App. 701, 704, 808 S.E.2d 88, 92 (2017).

not upon the commission of the predicates of racketeering, or even an agreement to commit predicate acts, but upon an agreement to participate in the affairs of the criminal enterprise through a pattern of racketeering activity."[2] *de la Osa v. State*, 158 So.3d 712, 731 (Fla. App. 2015) (citing, *inter alia*, *Salinas,* 522 U.S. at 63-66).

The Indictment alleges that the defendant conspired to violate the Georgia RICO statute, and the State of Georgia has submitted evidence substantiating that allegation. The defendant coordinated and actively participated in a phone call between codefendant Donald J. Trump, lawyers for Mr. Trump's presidential campaign, and officials from the Georgia Secretary of State's Office, during which Mr. Trump berated the Secretary to overturn the results of an election Mr. Trump had lost. On the call, the defendant used the inclusive pronoun "we" to refer to information possessed by the campaign and its lawyers, and he directly disputed the Secretary's investigatory findings regarding the number of "dead voters," insisting "I can promise you there are more than that." Earlier, the defendant contacted another Secretary of State official and inquired whether the Trump campaign could "speed up" a signature audit by providing funding directly to the State. And after

---

[2] *See Jefferson County v. Acker*, 527 U.S. 423, 447 (1999) (Scalia, J., concurring in part and dissenting in part) ("The point is only that the officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official functions.").

insisting that he did not play "any role" in the coordination of slates of "fake electors" throughout several states, the defendant was forced to acknowledge under cross-examination that he had in fact *given direction to* a campaign official in this regard. Specifically, the defendant wrote an email, State's Exhibit 1, in which he said, "We just need to have someone coordinating the electors for the states" and attached a memorandum written by co-defendant Kenneth Chesebro recommending the organization of slates of presidential electors to meet and cast votes for Mr. Trump in states Mr. Trump had lost.[3]

The defendant has not disputed his participation in these events; he simply argues that all of them were within the scope of his duties and occurred under color of office. The Court thus has undisputed evidence of the defendant committing the act at issue in Count 1: conspiring to violate Georgia's RICO statute by joining in a common plan to overturn the results Georgia's 2020 presidential election. A finding that some of the *overt acts* attributed to the defendant occurred under color

---

[3] The Court has ample basis not to credit some or all of the defendant's testimony from the evidentiary hearing. In addition to the contradiction highlighted above, the defendant said repeatedly that he misused the pronoun "we," an assertion that would materially alter the plain meaning of several of his relevant statements. The defendant also repeatedly insisted he was merely "trying to land the plane" and achieve "a peaceful transition of power," a statement clearly belied by his participation in the Trump campaign's attempts to overturn the outcome of Georgia's election.

of office would not suffice to show that the defendant's *joining in the conspiracy* was itself under color of office or even related to it.

A case familiar to this Court provides a useful example of a scenario where a federal officer's entry into a conspiracy *could* occur under color of office. In *Baucom v. Martin*, a local prosecutor was considering filing charges against an FBI agent for the agent's activities related to an attempt to bribe a local official. 677 F.2d 1346, 1347-48 (11th Cir. 1982). The attempted bribe was part of a joint federal-state investigation into local government corruption and possible federal RICO violations. The Eleventh Circuit held that any attempt to secure a bribe fell within the agent's duties as a federal officer conducting such an investigation and the prosecution was therefore barred by Supremacy Clause immunity. *Id.* at 1350. If the agent and others had been charged with conspiracy for their coordinated plan seeking to bribe a local official, the case would have been subject to removal because the *act of conspiring* in that case would clearly have been committed under color of the agent's office.

The circumstances of this case are easily distinguishable. The defendant conspired not for any purpose related to his duties as Chief of Staff, but to transform Mr. Trump from a losing political candidate into a winning one, no matter what the outcome of the election had actually been. The conspiracy did not involve a

common plan seeking to fulfill a federal objective or enforce federal law; it sought to fulfill an openly personal goal of Mr. Trump's that the defendant acknowledged he shared. A finding that, as part of that conspiracy, the defendant may have committed one or even several acts that fell within the color of his office would not demonstrate that he was being prosecuted for an act "for or related to" his office. That is because the gravamen of the charge, the relevant *act* as contemplated by section 1442(a)(1), remains *conspiring itself*, and there is no evidence before the Court demonstrating that the conspiracy in which the defendant participated sought to further some authorized or lawful federal interest related to the defendant's office. As a result, the answer to the Court's question is no: a finding that some but not all of the defendant's overt acts were committed under color of his office would not suffice to authorize removal of his case.[4]

---

[4] A single reference in *Mesa v. California* stating that, regarding the presence of a federal question, "if there be a single such ingredient in the mass, it is sufficient. That element is decisive upon the subject of jurisdiction," provides no support for a contrary result. 489 U.S. 121, 129 (1989), citing *The Mayor v. Cooper*, 6 Wall. 247, 252 (1868). That statement related to the requirement that a defendant assert a federal defense, *id.*, and it does not reduce the defendant's burden in making the necessary showing: "It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and *he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty*." *Mesa*, 489 U.S. at 131-32, citing *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926) (emphasis added). Here, in the question posed by this Court, the defendant

## II.   The defendant cannot demonstrate that he has a colorable federal defense.

In the scenario outlined in this Court's question, the defendant would not be able to raise a "colorable federal defense." Such a defense is required in order to secure removal. *Mesa v. California*, 489 U.S. 121, 136 (1989). In the context of removal, "colorable" means "plausible." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996). The defendant has attempted to raise a defense of Supremacy Clause immunity, which requires him to show both that he was performing "an act which he was authorized to do by the law of the United States" and that, in performing that authorized act, "he did *no more than what was necessary and proper* for him to do." *In re Neagle*, 135 U.S. 1, 75 (1890) (emphasis added). In the Eleventh Circuit, a defendant's claim of Supremacy Clause immunity is negated by any evidence that they acted out of "personal interest, malice, actual criminal intent, or for any other reason than to do [their] duty as [they] saw it." *Baucom*, 677 F.2d at 1350.

A finding that some but not all overt acts occurred under color of office would not suffice to authorize removal of a conspiracy to violate Georgia's RICO statute. By contrast, a finding that some of the defendant's overt acts *did not* occur under

---

has not made a showing "excluding the possibility" that his prosecution is based on "acts or conduct of his not justified by his federal duty."

color of office would affirmatively *defeat* his attempt at removal because it would make it impossible for the defendant to plausibly raise a complete defense of Supremacy Clause immunity to Count 1.

As noted above, the question posed by this Court contemplates a finding that the defendant has committed at least one overt act under Count 1 outside the color of his office, which is *more* than what is required to convict the defendant under Count 1. This is because the State of Georgia need not prove that the defendant himself committed an overt act in furtherance of the conspiracy, but only that *someone* had committed such an overt act.[5] That person could be any other co-conspirator.[6] However, in the question posed by the Court here, where one or more

---

[5] Again, the example drawn from the facts of *Baucom* above is useful. If the federal agent in that case had been indicted for conspiracy, he still would have been able to remove his case, even if held responsible for the overt acts of *all* other co-conspirators. This is because those overt acts would all have been no more than what was "necessary and proper" to effectuate the bribery investigation and its plan, "an act which he was authorized to do under the laws of the United States." *Neagle*, 135 U.S. at 75.

[6] Georgia law is clear on this point: where a defendant is charged with conspiracy and also separately charged with a single overt act alleged against him, the fact that he was found not guilty of the charge involving the overt act does not foreclose a finding of guilty based upon the conspiracy where there is sufficient evidence of the commission of overt acts by others in furtherance of that conspiracy. *Thomas v. State*, 215 Ga. App. 522, 523, 451 S.E.2d 516, 517 (1994); *Hall v. State*, 241 Ga. App. 454, 460, 525 S.E.2d 759, 764 (1999) (defendant could be convicted of conspiracy even if the jury did not believe he committed the one overt act which he was independently alleged to have committed, as long as the overt act that his

10

overt acts fall outside the defendant's color of office, the State of Georgia's case would be much stronger than that: the person who committed an overt act would be *the defendant*. This would put the required showing under *Neagle* that he "did no more than what was necessary and proper for him to do" out of reach. Any Supremacy Clause immunity defense premised upon the argument that *some*, but not all, of the defendant's overt acts fell within the color of his office would be incomplete and insufficient, because a defense applicable only to individual overt acts does not function as a defense to a violation of O.C.G.A. § 16-14-4(c).[7]

---

co-conspirator allegedly committed was proven). As *Pasha* and the other cases cited above make clear, the State need not prove that Meadows engaged in *any* overt acts, so long as it shows that at least one co-conspirator engaged in at least one overt act. Indeed, under both Georgia and federal law an overt act need not be a crime in itself. *McCright v. State*, 176 Ga. App. 486, 487, 336 S.E.2d 361, 363 (1985). *See, e.g., Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975) ("The overt act requirement in the conspiracy statute can be satisfied much more easily. Indeed, the act can be innocent in nature, provided it furthers the purpose of the conspiracy."); *Pierce v. United States*, 252 U.S. 239, 243 (1920) ("Yet the overt act need not be in and of itself a criminal act; still less need it constitute the very crime that is the object of the conspiracy."). Federal conspiracy law is to the same effect. *See, e.g., Bannon v. United States*, 156 U.S. 464, 468-469 (1895) (refusing to require that an overt act be proven against every member of the conspiracy).

[7] *See Donovan v. Schiavone Constr. Co.*, 601 F. Supp. 574, 579 n.7 (S.D.N.Y. 1985) (applying state substantive law to determine that where defendant's submitted defense of withdrawal did not include an additional required element, "under the applicable law, petitioner's claims regarding his withdrawal from [a conspiracy], if proven, *may not constitute a defense at all*.") (emphasis added).

11

Given the weight of authority contrary to the defendant's position, he will likely emphasize the permissive standards related to raising a colorable federal defense. However, while the defendant need not show a "clearly sustainable defense"[8] at this stage, he cannot even show a *possibly* sustainable defense." Likewise, while he is not required to "virtually win his case,"[9] he cannot even show that his defense would make it *possible* for him to win his case. Supremacy Clause immunity could do neither under the scenario contemplated in this Court's question. To hold that a "plausible" defense need not be a "complete" defense would reduce the test for federal removal from "permissive" to "nearly invisible." Indeed, many federal courts have held that a "colorable federal defense" must be a "complete defense," a minimum requirement so uncontroversial that it does not appear to have ever been challenged. *See Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770, 778, 783 (E.D. Pa. 2010) ("Thus, the Court concludes that a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant

---

[8] *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

[9] *Id.*

asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial.").[10]

Simply put, "[s]ection 16-14-4(c) makes it illegal 'for any person to conspire or endeavor to violate' Section 16-14-4(a) [or (b)]. To violate section 16-14-4(c), one must either commit an overt act to 'effect the object of' the endeavor or conspiracy or a co-conspirator must commit such an overt act." *Doe v. Red Roof Inns, Inc.*, 21 F.4th 714, 728 (11th Cir. 2021). To prove that the defendant conspired to violate the RICO statute, the State of Georgia must prove that *some* co-conspirator committed *an* overt act. This scenario in the question posed by this Court contemplates the *defendant himself* having committed at least one overt act

---

[10] Courts that have followed *Hagen*'s formulation requiring the showing of a "complete defense" without any dispute include the Third Circuit, *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 815 (3d Cir. 2016); the Southern District of Alabama, *Morgan v. Bill Vawn Co., Inc.*, 2011 WL 6056083, * 5 (S.D. Ala. Dec. 6, 2011), *Davis v. Central Ala. Elec. Coop.*, 2015 WL 4742496 (S.D. Ala. Aug. 11, 2015); the Southern, Eastern, and Northern Districts of New York, *Williams v. Aetna Life Ins. Co.*, 2013 WL 593505, * 6 (S.D. N.Y. Jan. 30, 2013), *Gordon v. Air & Liquid Systems, Corp.*, 990 F.Supp.2d 311, 316-17 (E.D. N.Y. 2014), *Gates v. AO Smith Water Prods. Co.*, 2014 WL 104965, * 4-5 (N.D. N.Y. Jan. 9, 2014), *Crews v. Air & Liquid Systems, Corp.*, 2014 WL 636362, * 3 n. 2 (N.D. N.Y. Feb. 18, 2014); and many others. *See also Walkup v. Air & Liquid Systems Corp.*, 2013 WL 5448623, * 4-5 (D. Del. Sept. 26, 2013); *Joyner v. A.C. & R. Insulation Co.*, 2013 WL 877125, * 6 (D. Md. Mar. 7, 2013); *Thompson v. Crane Co.*, 2012 WL 1344453, * 20 (D. Haw. April 17, 2012); *Kraus v. Alcatel-Lucent*, 2018 WL 3585088 (E.D. Pa. July 25, 2018).

outside the color of his office. Such a finding would demonstrate that Supremacy Clause immunity could not function as a complete, and therefore plausible, defense. Thus, if the Court finds that any of the defendant's overt acts were not committed under color of his office, the defendant cannot raise a colorable defense of Supremacy Clause immunity.

## III.   The defendant sees no distinction among his overt acts.

The scenario contemplated by the Court in its order seeking additional briefing distinguishes among the overt acts allegedly committed by the defendant, suggesting that some may fall under the color of his office while others may not. The State of Georgia again observes that the defendant makes no such distinction. In his Motion to Dismiss (Document 16-1), filed on August 19, the defendant insists that "[a]ll of the alleged conduct as to Mr. Meadows relates to protected political activity that lies in the heartland of First Amendment" and "[a]ll the substantive allegations in the Indictment concern unquestionably political activity and thus, if not covered by Supremacy Clause immunity, the charges would be barred by the First Amendment." Doc. 16-1 at 23-24. The State of Georgia has already submitted arguments to the Court regarding the interaction between the defendant's admission, the prohibitions applicable to him under the Hatch Act, and the scope of his duties as Chief of Staff. However, the State observes that the defendant has

14

characterized the "gravamen"[11] of his own conduct—all of his conduct—as "unquestionably political activity."

## **CONCLUSION**

The defendant was indicted not for any individual overt act but for entering into a conspiracy to violate Georgia's RICO Act. The defendant must raise a colorable federal defense, not to some subset of overt acts, but to actual violation of O.C.G.A. § 16-14-4(c) with which he is charged. Thus, a finding that some, but not all, of the over acts attributed to the defendant in the Indictment occurred under the color of his office would not suffice to authorize removal. Instead, a finding that some, but not all, of the overt acts attributed to the defendant did *not* occur under color of his office would defeat the defendant's attempts at removal. Such a finding would preclude the defendant from raising a complete Supremacy Clause immunity defense to Count 1, and it would not alter the fact that the defendant had no lawful authority to enter into a conspiracy intended to overturn the results of Georgia's presidential election. Even if the burden on a defendant seeking removal is permissive, it is not nonexistent, particularly when his case is a criminal prosecution. Where the evidence before the Court and the defendant's own

---

[1111] *See Acker*, 527 U.S. at 447 (Scalia, J., concurring in part and dissenting in part).

admissions demonstrate that his conduct was not authorized by federal law or "no more than what is necessary and proper" for the performance of his duties, the defendant cannot meet his burden, and his Notice of Removal must fail.

Respectfully submitted, this 31st day of August 2023.

FANI T. WILLIS
DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT

By: s/ F. McDonald Wakeford
F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit
Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
fmcdonald.wakeford@fultoncountyga.gov

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this pleading complies with the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.) in that it is double-spaced and composed in 14-point Times New Roman font.

This 31st day of August 2023.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify the foregoing was served upon the following by email:

Joseph M. Englert
McGuire Woods LLP
1230 Peachtree Street NE, Suite 2100
Atlanta GA 30309
(404) 443-5500
jenglert@mcguirewoods.com

George J. Terwilliger
John S. Moran
Michael Francisco
McGuire Woods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com

Dated this 31st day of August, 2023.

*s/ F. McDonald Wakeford*
F. McDonald Wakeford

17

**Tab 67**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

|  |  |  |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-03621-SCJ |
| | ) | |
| MARK R. MEADOWS, | ) | |
| | ) | |
| *Defendant.* | ) | |

## SUPPLEMENTAL BRIEF OF DEFENDANT MARK R. MEADOWS IN SUPPORT OF HIS NOTICE OF REMOVAL

The Court has asked for supplemental briefing on whether "a finding that at least one (but not all) of the overt acts charged occurred under the color of Meadows's office [would] be sufficient for federal removal." The answer is "***yes***."

## I.   Removal Is Required If the "Prosecution" Relates to "Any Act" That Occurred in the Course of Official Duties

Statutory text, binding precedent, and hornbook law confirm that a prosecution is removable if any part relates to an "act under color of [federal] office." 28 U.S.C. § 1442(a)(1). Removal is thus required if at least one overt act charged has "a 'connection' or 'association,'" *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017), to even "the outer perimeter of [Mr. Meadows's] line of duty," *Barr v. Matteo*, 360 U.S. 564, 575 (1959).

***Statutory Text***. Two particular aspects of the statutory text confirm this

1

principle: (a) the Federal Officer Removal Statute refers to removal of "[a] civil action or criminal prosecution," not of particular claims, counts, or theories;[1] and (b) it authorizes removal of prosecutions "against or directed to" a federal officer "for or relating to *any act* under color of [federal] office." 28 U.S.C. § 1442(a) (emphasis added).[2] The statutory text itself thus shows that the case would be removable if some but not all of the charged conduct related to Mr. Meadows's official duties.

*Binding Precedent*. The Fulton County District Attorney knows from recent experience "that if one claim cognizable . . . is present, the entire action is removed, regardless of the relationship between the Section 1442 claim and the non-removable claims." *Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1325–26 & n.8 (N.D. Ga. 2022) (denying remand of charges by Fulton County District Attorney against federal task force officers).[3]

---

[1] Federal courts similarly construe 28 U.S.C. § 1441, which provides for removal of a "civil action" over which federal jurisdiction exists. *See, e.g.*, *Ladies Mem'l Ass'n Inc. v. City of Pensacola, Fla.*, No. 3:20CV5681/MCR/ZCB, 2023 WL 2561785, at *3 (N.D. Fla. Mar. 17, 2023) ("If the complaint contains 'even one federal claim[,]' then the defendant has 'the right to remove the entire case to federal court.'") (quoting *Convent Corp. v. City of N. Little Rock*, 784 F.3d 479, 483 (8th Cir. 2015)).
[2] *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017) (requiring removal where an officer asserts a federal defense to even one claim).
[3] The State argued the officers "could not be acting under color of federal authority because they violated the Fourth Amendment," *id.* at 1324—much like the argument here based on the Hatch Act. The *Heinze* Court rejected the argument, holding that it "concern[ed] the merits of the criminal charges . . . and [was] irrelevant to whether the Defendants acted under the color of federal authority for removal purposes." *Id.*

This proposition is binding precedent under *Nadler v. Mann*, 951 F.2d 301, 305 n.9 (11th Cir. 1992). There, the Eleventh Circuit addressed jurisdiction under § 1442(a)(1) and immunity under the Liability Reform Act, 28 U.S.C. § 2679, in a defamation case against an Assistant U.S. Attorney who was also a candidate for judicial office. On immunity, the Court concluded—under a state-law standard inapplicable here—that arranging a meeting between a whistleblower and the FBI was an official act but that leaking the investigation to the press was not. *See Nadler*, 951 F.2d at 305–06. On removal, however, the Court made clear that the entire case was appropriately removed, quoting the same language used in *Heinze*. *See id.* at 306 & n.9. *Nadler* thus makes clear that the Court must permit removal if any (not necessarily all) of the charged conduct relates to Mr. Meadows's official duties.

Many other federal courts agree. *See, e.g.*, *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) ("Assuming for the sake of argument that some of the [plaintiff's] allegations . . . do not relate to the [defendants'] acts under color of federal office, 'removal need not be justified as to all claims . . . ; rather, the defense need only apply to one claim to remove the case."); *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602 (5th Cir. 2018); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017); *see also Mesa v. California*, 489 U.S. 1, 129 (1989) ("[I]f there be a single such ingredient in the mass, it is sufficient."). Indeed, Mr. Meadows is

3

aware of *no* case refusing removal because the action or prosecution involved a mix of official and unofficial conduct. *Cf. Sawyer*, 860 F.3d at 257 (reversing remand order involving "mixed" claims).[4]

**Hornbook Law**. Lastly, it is hornbook law that § 1442(a)(1) "authorizes removal . . . even if only one of the controversies it raises involves a federal officer." WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3726 (rev. 4th ed. 2009).

## II.   The State's Framing of the Case Does Not Control Removal

Removal is also required, even if the State has charged some acts beyond Mr. Meadows's official duties, because what controls is Mr. Meadows's articulation of his federal defense, not the State's articulation of its state charges. *See Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 (2006) (explaining that § 1442(a) "is an exception to the 'well-pleaded complaint' rule" and allows "'suits against federal officers [to] be removed despite the nonfederal cast of the complaint'") (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1,

---

[4] Justice Scalia's partial dissent in *Jefferson County v. Acker*, 527 U.S. 423 (1999), which the State cites in a footnote, *see* State Supp. Br., Dkt. No. 66, at 5 n.2, is not to the contrary. There, Justice Scalia argued that an "officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official functions." *Id.* at 447 (Scalia, J., concurring in part, dissenting in part). Mr. Meadows would meet that standard, but in any event, the Supreme Court did not adopt it. *See id.* at 433 (majority opinion). The Court was also addressing the level of connection needed between a claim and an official act, not how to treat removal of "mixed" claims.

App.705

10 (1983); *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)).[5] The State's extended analysis of its theory of liability under the Georgia RICO Act, *see* State Supp. Br., Dkt. No. 66, at 2–7, 11 & n.7, 13–14, is thus beside the point.

The State also cannot avoid removal by charging a mix of removable and non-removable conduct. Any contrary rule would lead to absurd results; a State could charge even the most quintessential official act and defeat removal by tacking on unofficial conduct. That would reflect a "narrow, grudging" interpretation the Supreme Court has rejected, *Willingham v. Morgan*, 395 U.S. 402, 407 (1969), and would invert "the presumption under the federal officer removal statute [which] favors removal, for the benefit of the federal officer involved the case," *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011).

Federal courts have even held that a plaintiff (or here, the State) cannot evade removal by expressly disclaiming *any* reliance on official acts. *See* WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, *supra*, § 3726;[6] *Asbestos Prod. Liab.*

---

[5] Even after removal, "entitlement to Supremacy Clause immunity is to be ascertained by looking only at federal law." S. Waxman & T. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 YALE L.J. 2195, 2233 (2003); *see Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920).

[6] *Id.* (explaining that "purported disclaimers" of reliance on official acts are "ineffective, as impermissibly attempting to deprive federal officers of their right to have jurisdiction under the federal officer removal statute determined by a federal court under the requirements established by Section 1442").

*Litig.*, 770 F. Supp. 2d at 741–43. This case could therefore be removed even if the Indictment alleged *no* acts by Mr. Meadows and charged only, for example, that he had joined a RICO conspiracy. Normally, "an action may be removed . . . only if a federal district court would have original jurisdiction," which means that any "federal question . . . must appear on the face of a properly pleaded complaint" and "an anticipated or actual federal defense generally does not qualify a case for removal." *Jefferson Cnty.*, 527 U.S. at 430–31. But federal officer removal is "exceptional in this regard. . . . [S]uits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Id.* at 431. Here, Mr. Meadows has pleaded a connection to his official duties and asserted a colorable federal defense; that is all he needs to do. *Cf. Heinze*, 637 F. Supp. 3d at 1325 ("The Defendants have alleged that they were acting as federal officers in accordance with federal law and therefore entitled to immunity. That is all that is required.").[7]

---

[7] The State's claim that it could convict without showing that Mr. Meadows took *any* illegal act, *see* Hearing Tr. 253:5–6, Aug. 28, 2023 (hereinafter "Tr."), is irrelevant. Mr. Meadows could still remove by pleading that the State's case related to his federal duties. The fact that the Indictment sets forth multiple acts of specific charged conduct only makes that task simpler. Mr. Meadows needs only to show he had a good-faith belief that he was acting within the scope of his duties, *see Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982); *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988), which his unrebutted testimony shows, *see infra* Part III.

6

III.     **The Record Makes Clear That the Prosecution Relates to Acts That Occurred in the Course of Mr. Meadows's Official Duties**

Under these black-letter legal principles, Mr. Meadows is entitled to removal. His unrebutted testimony establishes the broad scope of his official duties as "Assistant to the President and Chief of Staff,"[8] which may generally be classified in three categories: (A) providing the President close, confidential advice;[9] (B) using his discretion to gather information (including from state and federal officials) on a wide range of federal interests and potential policies to be able to advise the President on a moment's notice;[10] and (C) acting as a "gatekeeper" to the President and managing the President's time to advance federal interests.[11] Managing the President's time was especially critical after Election Day to ensure the federal government continued to function and there was a "peaceful transition of power." Tr. 96:24–25; *see also* Tr. 28:11–30:3 (discussing post-election federal priorities).

---

[8] *See* DX-001 (Presidential Commission).

[9] Tr. 19:23–20:5, 33:14–34:5, 38:23–39:6, 44:23–45:4, 45:8–11, 51:24–52:14, 63:2–10, 81:6–18, 81:19–82:19, 85:3–13.

[10] Tr. 33:22–23 ("There were no rhyme or reason where [the President's] questions might come up."), 34:2–5 ("[H]aving a broad understanding of what was going on was . . . critically important as a senior advisor to the President so that I could anticipate what logistics were needed and what we needed to do."); *see also* Tr. 17:9–18:12 (food shortages, airline bankruptcies, prescription drugs), 20:8–14 (military operations), 23:2–14 (COVID-19), 51:24–52:14 (election integrity), 81:19–82:5 (legislation, executive orders, and election integrity).

[11] Tr. 34:23–35:10, 44:23–44:7, 61:6–14.

Mr. Meadows also exercised more specific duties in support of these general functions.[12] He managed the White House staff and regularly coordinated meetings between the President and state and federal officials and outside constituents.[13] He fielded inquiries from people trying to reach the President, to the point that it seemed his "phone number was plastered all over every bathroom wall in America." Tr. 24:11–12. His overarching duty was to ensure that the President could effectively lead the federal government and its operations. Mr. Meadows was thus on duty "24/7," and traveled with the President, or sent a designee, at all times.[14]

Even if the Court were to conclude that *some* charged conduct falls outside Mr. Meadows's official duties,[15] removal would be justified by finding that even one charged act was related. But the record establishes that each charged "Act" in Count I of the Indictment, in fact, relates:

### Act 5 - Michigan Oval Office Meeting

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 44:6–7, and his conduct was consistent with the duties and responsibilities of

---

[12] *See generally* DX-003 (Gast Decl.), ¶¶ 2–6; DX-004 (Williamson Decl.), ¶¶ 3–14.

[13] Tr. 12:4–13:5, 21:12–24, 31:9–18.

[14] Tr. 11:19–16:1.

[15] The Court should not so conclude. The Court need not and should not adjudicate Mr. Meadows's immunity defense in deciding removal; it should determine only whether Mr. Meadows has asserted the requisite connection and a colorable defense. *See Caver*, 845 F.3d at 1142. Moreover, if the Court finds that some conduct relates to Mr. Meadows's official duties, this suffices; opining that other acts might fall beyond his duties would be unnecessary *obiter dictum*.

8

that role, including managing the President's time,[16] maintaining awareness of matters before the President,[17] maintaining capability to advise the President or delegate to others,[18] monitoring action items that may follow a meeting,[19] addressing the federal interest in free and fair elections,[20] and maintaining awareness of matters that could lead to proposed legislation or executive orders.[21] The State presented no contrary evidence.[22]

### Act 6 – Text Soliciting Phone Number

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 46:24–25, and his conduct was consistent with the duties and

---

[16] Tr. 44:9–13 (describing role in wrapping up meetings), 59:1–2 ("[P]art of me being there in my official capacity would have been to try and assist with time management and wrap-up the meeting . . . .").

[17] Tr. 45, 45:5–7 (describing need to "be aware of what is consuming the President's time or taking his attention").

[18] Tr. 44:25–45:3 ("Certainly as Chief of Staff, again, giving advice to the President, but also making sure that the White House counsel is informed, others being able to give advice to the President.").

[19] Tr. 58:20–21 (describing meetings "where the President might request at a later date something that would happen").

[20] Tr. 59:18–24 ("[F]rom a standpoint of trying to make sure that elections are—are accurate, you know, does that have a federal nexus, I would assume it would have a federal nexus. I mean, we have operations within the federal government that tries to make sure our elections are accurate, whether it's [DHS], DOJ or others.").

[21] Tr. 62:10–16 ("[T]he President . . . often makes recommendations on legislation that could come up, make recommendations on how to make sure elections are safer and secure. There is potential for executive orders . . . . So all of those things would be part of why you would have to be in a meeting like that.").

[22] The State did not move for admission of Michael Shirkey's testimony before the January 6th Select Committee, though the State attached it as an exhibit to its Response brief. Had it, Mr. Meadows would have objected to the transcript as unreliable hearsay. But even if considered, the Shirkey transcript shows only that "Mr Meadows sat on the sofa behind [the participants]" and later took them on a "detailed tour" of the White House, Shirkey Tr., Dkt. No. 27-1, at 15:4–5, 20–21, which corroborates Mr. Meadows's testimony.

responsibilities of that role, namely gathering information (and phone numbers in particular) for the President.[23] Mr. Meadows frequently obtained phone numbers for the President, Tr. 66:14–18, and in this instance, did not know why the President wanted to speak with Pennsylvania legislators, Tr. 66:19–67:15. The State presented no contrary evidence.

### Act 9 – Pennsylvania White House Meeting

Mr. Meadows "was not actually in this meeting," Tr. 48:11–12, but to the extent he was involved at all, it was in his role as Chief of Staff, Tr. 48:4–7. He was called down beforehand to notify visiting legislators of their positive COVID tests. Tr. 48–49. His conduct was consistent with the duties and responsibilities of that role, namely protecting the President's health and physical safety.[24] The State presented no contrary evidence.

### Act 19 – Requesting McEntee Memo

Mr. Meadows "did not ask" Mr. McEntee for this memo, Tr. 50:12; *see also* Tr. 50:7, 51:7–8, but to the extent he was involved at all, it would

---

[23] Tr. 46:24–47:1 ("[C]ertainly, [it was] in my role as Chief of Staff to get additional phone numbers for the President on a variety of individuals."), 47:8–10 ("Just the President wanted the phone number. So I was asked on a pretty regular occasion for numbers."), 66:14–18 ("And getting a phone number for the President of the United States was—was something that I did regularly. And so as Chief of Staff, getting numbers that was not readily available for the White House switchboard, I did on a pretty regular basis.").

[24] Tr. 48:23–49:3 ("I recall going down to—to the cabinet room where they were assembling at that particular point, introduced myself as the Chief of Staff, and then tried to let the individuals know that there was three of them that wouldn't be able to meet with the President because they had—had, you know, come down with a positive COVID test"), 74:6–11 ("[T]he federal role obviously was protecting the President of the United States when I went down to make sure that he was not getting COVID. So security of our Commander in Chief, that was a federal role in me being there. And trying to make sure that we followed . . . White House protocols . . . that I put in place.").

have been in his role as Chief of Staff, Tr. 49:17–19, and it would have been consistent with the duties and responsibilities of that role, including directing and supervising staff of the Office of the President in preparing memos and other tasks,[25] maintaining awareness of matters before the President,[26] and advising the President on matters of federal law, including implementation of the Electoral Count Act, 3 U.S.C. § 15. The State presented no contrary evidence, including no evidence that Mr. Meadows arranged or attended such a meeting; nor did the State introduce a memo prepared by Mr. McEntee.[27]

### Act 92 – Visiting Cobb County Civic Center

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 51:20–23,[28] and his conduct was consistent with the duties and responsibilities of that role, including gathering information about and maintaining awareness of matters the President would likely bring up,[29]

---

[25] Tr. 49:17–19 ("[I]t was common for the Chief of Staff, in his role of Chief of Staff, to ask individuals for memos on a variety of topics, and—and I often did so."), 49:22–23 (identifying McEntee was the principal member of the White House staff responsible for personnel matters).

[26] *See supra* n.17.

[27] The State did not move for admission of Johnny McEntee's testimony before the January 6th Select Committee, though the State attached it as an exhibit to its Response brief. Had it, Mr. Meadows would have objected to the transcript as unreliable hearsay. But even if considered, the McEntee transcript shows only that Mr. McEntee did not "remember" who asked him to write a memo, but "it was probably the President," McEntee Tr., Dkt. No. 27-3, at 144:20–21; that he could not "remember who it was" who asked about the topic, *id.* at 142:21–23; and that he does not recall to whom he gave the memo, *id.* at 145:7–8, none of which shows Mr. Meadows did anything, much less that he exceeded his federal role.

[28] *See also* Tr. 85:7–10 ("I believed I was there supporting the President, as I've mentioned earlier, in my federal role as Chief of Staff, which, bluntly, is to keep him well-informed and well-advised on a variety of issues.").

[29] Tr. 52:9–14 ("I felt like that anticipating where the President would not only ask, but bring it up, . . . to see the actual count in process would keep me well informed so that I could advise the President of what I observed in person instead of reading about it or hearing speculation from other people."), 53:4–7 (explaining that he was

11

informing and advising the President on matters of concern to manage the President's ability to give time and attention to Presidential duties,[30] and maintaining knowledge about matters that could be subject to proposed legislation or executive orders.[31] The State presented no contrary evidence; indeed, its witness, Secretary Raffensperger, contradicted the State's allegations and testified that Mr. Meadows "didn't express any objections as far as [he was] aware to how that audit was being conducted" and "didn't ask for anything to be done differently when he visited that audit." Tr. 218:9–16.

## Act 93 – President's Call to Frances Watson

Mr. Meadows considered arranging this call part of his role as Chief of Staff, Tr. 53:17–21, and did not participate in the call itself, Tr. 89:10–11. His conduct was consistent with the duties and responsibilities of that role, including arranging and staffing the President's calls and

---

"truly just in a fact-finding mode to observe what they were doing and felt like the Secretary of State's office was doing a good job on that."), 77:11–12 ("[M]y concern was that—that if there was an audit procedure being done, to reiterate with the President the veracity of that audit . . . ."), 77:22–24 ("[T]hat question did come up [with the President] and I was able to talk about how I felt like Ms. Watson and the GBI had done an outstanding job in Cobb County.").

[30] Tr. 81:9–15 (explaining that he was "trying to make sure that I kept the President well informed . . . . Broadly looking at his time and trying to make sure that, with all of the other things that were going on, checking off a box to say this has been checked, that's a question that's been asked and answered."), 96:20–97:2 ("And being able to take this particular question of signature verifications . . . off the table, would allow for one area to be closed. Be able to work towards, you know, a peaceful transition of power, continue to work on the other issues . . . [F]or me, it was being able to take an open question off the table.").

[31] Tr. 81:10–11 (explaining that it was important to "be able to inform [the President] of any potential for executive orders, future legislation"), 81:23–82:5 (describing "the potential federal interest, the potential for future legislation, for executive orders, . . . for other federal agencies to be aware. You know, it's not just the President. It would be—in terms of elections, it's [DHS], it's DOJ, it's others that all are concerned about a free and fair election. And so being able to advise him of that was—was critical. That's part of—part of my role.").

App.713

meetings,[32] and maintaining awareness of matters before the President.[33] The State presented no contrary evidence; the State did not call Ms. Watson, despite issuing a subpoena for her testimony, and introduced no evidence of the call itself.

### Act 96 – Text Regarding Signature Verification

Mr. Meadows did not text Ms. Watson, as charged in the Indictment, Tr. 54:8–10, though communicated something similar to Jordan Fuchs as part of a broader text message, Tr. 90:14–16. Contrary to the State's characterization, the message was not a "financial offer" but an inquiry about the ability "to speed things up," Tr. 91:25–92:2, based on a similar development in Wisconsin, Tr. 92:6–17. Mr. Meadows considered these communications part of his role of Chief of Staff, Tr. 54:3–4, and his conduct was consistent with the duties and responsibilities of that role, including gathering information on matters before the President,[34] advising the President,[35] and managing the President's time and ability to give attention to federal duties by closing

---

[32] *See generally* Tr. 16:8–15; *see also* Tr. 89:7–8 (acknowledging that he "arrange[d] a telephone call between Ms. Watson and then President Trump").

[33] Tr. 16:10–13 ("Part of my job was to . . . be aware of everything that was going on or try to be aware of everything, which ended up being a much more difficult task than I could ever, ever imagine"), 19:24–20:5 ("So a lot of times the meetings asked for were getting so I could give the President advice, either in private or in the meeting. . . . [R]eally it was about me trying to be aware."), 33:18–34:5 ("[Q] Why did you need to know what was going on, including politically? [A] One, to give advice to the President of the United States. To help prioritize his time. But the other is, is trying to skate to where the puck is. There were no rhyme or reason where questions might come up, . . . [a]nd so having—having a broad understanding of what was going on was . . . critically important as a senior advisor to the President so that I could anticipate what logistics were needed and what we needed to do.").

[34] Tr. 92:15–17 (explaining that the issue "came up" based on a recent White House meeting about a similar recount issue in Wisconsin).

[35] Tr. 92:23–93:2 ("I didn't speak for the campaign, didn't work for the campaign. But certainly being able to advise the President of the United States. You know, he was looking at ways to make sure that we could get a definitive yes or no quickly.").

out matters of ongoing concern to the President.[36] The State presented no contrary evidence and did not introduce the text message in question.

## Act 112 – January 2 Secretary Raffensperger Call

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 51:4–11,[37] and his conduct was consistent with the duties and responsibilities of that role, including maintaining awareness of matters before the President,[38] setting up meetings between the President and state officials at the President's request,[39] managing the President's time by addressing matters taking the President's attention and impacting the ability to address matters of ongoing federal concern,[40] and addressing

---

[36] *See supra* n.30.

[37] *See also* Tr. 124:16–17 ("I was actually in my Chief of Staff's office by myself.").

[38] Tr. 129:16–19 ("What I'm saying is I kept getting asked about it in my official duties as Chief of Staff of the President of the United States. I kept getting asked about Fulton County and was there going to be a signature verification.").

[39] Tr. 110:16–18 ("Me setting up a phone call for the President of the United States at his direction was certainly something that I believe was in my duty as Chief of Staff to help facilitate.").

[40] Tr. 127:23–128:12 ("[F]or me it was all about trying to make sure that a number of these allegations . . . make sure we've got those issues dealt with. And . . . be able to finish up the things that we had in 60 days, have a peaceful transfer of power, make sure that we got all of that done. . . . And if I knew that [allegations] were not true, it was much easier for me to speak with authority with the President."), 123:21–133:1 ("At least we've got something here that hopefully we can agree upon . . . Let's get this particular issue off the table. Hopefully get the attorneys together where they can talk about it. And . . . use that as an opportunity to close out the call."), 149:24–150:5 ("I felt like that if we could get both groups together where the attorneys were talking to each other, that they would be able to look at the veracity of some of the claims . . . and make a determination as to whether they were valid or not valid and hopefully get this off of the President's concern list and as we look to continue on towards January 20th what ultimately would happen."), 151:2–8 ("[T]here were a number of issues that continued to get raised in the White House. Questions of whether allegations of fraud . . . . But I also had a timeline in terms of getting certain things done. And those, so long as they were open questions, would not allow us to continue with the transition.").

14

the federal interest in free and fair elections.[41] The State did not present contrary evidence; Secretary Raffensperger confirmed Mr. Meadows's limited role in the call (consistent with audio recording introduced into evidence), noting that Mr. Meadows "was acting on behalf of the President," Tr. 219:14; making clear that he did not believe Mr. Meadows's participation or statements on the call were "inappropriate," Tr. 220:16; and acknowledging that Mr. Meadows did not make any requests to change vote totals, Tr. 222:6–9, or make allegations of voter fraud, Tr. 220:5–7.[42]

Thus, based on the Notice of Removal and the record before the Court, each one of these charged acts has a sufficient connection to Mr. Meadow's official duties to support removal. But based on the black-letter law outlined above, the Court need not reach that conclusion to permit removal. If the Court finds that any charged conduct relates to Mr. Meadow's official duties, that is the end of the inquiry; removal must be permitted.

*     *     *     *     *

The Court should promptly permit removal and so notify the state court.

---

[41] Tr. 110:2–6 ("[C]ertainly in a broad sense, [I was] trying to make sure that we had accurate, fair elections, . . . whether that's . . . an Article I, II, and III responsibility, we all want an accurate election.").

[42] State witness Kurt Hilbert testified that he "never met Mr. Meadows," Tr. 163:5; that he did not consult with Mr. Meadows about Trump campaign litigation, Tr. 179:17–20; that he never spoke to Mr. Meadows after the January 2 call, Tr. 181:13; and that he understood that Mr. Meadows participated on the call because he was Chief of Staff, Tr. 184:22–25.

Dated: August 31, 2023

Joseph M. Englert
MᴄGᴜɪʀᴇWᴏᴏᴅs LLP
1230 Peachtree St., N.E., Suite 2100
Atlanta, GA 30309
(404) 443-5500
Jenglert@mcguirewoods.com

Respectfully submitted,

*/s/ George J. Terwilliger III*

George J. Terwilliger, III*
John S. Moran*
Michael Francisco*
Robert J. Bittman*
Emily Erb Kelley*
Francis J. Aul*
MᴄGᴜɪʀᴇWᴏᴏᴅs LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com
rbittman@mcguirewoods.com
ekelley@mcguirewoods.com
faul@mcguirewoods.com
* Admitted *Pro Hac Vice*

*Counsel to Mark R. Meadows*

16

## CERTIFICATE OF SERVICE

On August 31, 2023, the foregoing **Supplemental Brief of Defendant Mark R. Meadows in Support of His Notice of Removal** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This, the 31st day of August, 2023.


 /s/ John S. Moran

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that 14-point Times New Roman font was used for this document and that it has been formatted in compliance with Local Rule 5.1.

This, the 31st day of August, 2023.

/s/ John S. Moran

John S. Moran*
MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

**Tab 69**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **THE STATE OF GEORGIA** | **CIVIL ACTION FILE** |
| **v.** | **No. 1:23-CV-03621-SCJ** |
| **MARK R. MEADOWS,** | **RE: NOTICE OF REMOVAL OF FULTON COUNTY SUPERIOR COURT INDICTMENT NO. 23SC188947** |
| **Defendant.** | |

**ORDER**

This matter appears before the Court following Defendant Mark R. Meadows's filing of a Notice of Removal. Doc. No. [1]. [1] This Order addresses a relatively narrow question: Has Meadows carried his burden of demonstrating that removal of the State of Georgia's criminal prosecution against him is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)? Having considered the arguments and evidence, the Court concludes that Meadows has not met his burden. Therefore, the Court **DECLINES** to assume jurisdiction over the State's

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

criminal prosecution of Meadows under 28 U.S.C. § 1455 and **REMANDS** the case to Fulton County Superior Court. [2]

Because the Court lacks jurisdiction over this matter, the Court **DIRECTS** the Clerk to **TERMINATE** all pending motions and **CLOSE** this case.

## I.    BACKGROUND

Meadows served as the White House Chief of Staff. [3] Defendant's Exhibit ("DX") 1. His tenure began on March 31, 2020 and ended on January 20, 2021, when President Biden assumed the Office of President of the United States. Id.; Doc. No. [65] ("Hearing Tr.") Tr. 9:22–10:3.

On August 14, 2023, a Fulton County, Georgia Grand Jury returned an indictment charging 19 Defendants with various crimes related to alleged post-election interference with the 2020 presidential election in Georgia ("the

---

[2] Despite using the term "remand" the Court has not actually assumed jurisdiction over this case under Section 1455, and the State proceedings are ongoing. Nevertheless, Section 1455 itself conceives of some form of remand, 28 U.S.C. § 1455(b)(4), and other federal courts who have failed to find that federal jurisdiction exists over a criminal prosecution have "remanded" the prosecution to the state court. See, e.g., New York v. Trump, ---F. Supp. 3d----, No. 23 CIV. 3773 (AKH), 2023 WL 4614689, at *1 (S.D.N.Y. July 19, 2023).

[3] Meadows's commission lists his official title as Assistant to the President and Chief of Staff. See DX 1. For consistency in this Order, the Court will use the term "White House Chief of Staff" to encompass Meadows's full title of "Assistant to the President and Chief of Staff."

2

Indictment"). Doc. No. [1-1]. The Indictment charged all Defendants with conspiracy under the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") Act, O.C.G.A. § 16-14-4(c). Doc. No. [1-1], 13 (Count 1). It also charged different co-Defendants with other various criminal violations. See generally Doc. No. [1-1], 72–97 (Counts 2–41).

The Indictment charges Meadows specifically with the RICO conspiracy, O.C.G.A. § 16-14-4(c), and solicitation of violation of oath by a public officer, O.C.G.A. §§ 16-14-7 & 16-10-1. Doc. No. [1-1], 13 (Count 1), 87 (Count 28). Meadows argues that the charges against him relate to the scope of his official duties and that he has colorable federal defenses. See, generally Doc. No. [1]. Based on those arguments, on August 15, 2023, Meadows filed his Notice of Removal of the criminal prosecution in this Court. Id.

Relying on 28 U.S.C. § 1455, Meadows asserts federal officer jurisdiction under 28 U.S.C. § 1442. See, generally id. The Court declined to summarily remand Meadows's removal action and ordered an evidentiary hearing be held on the Notice of Removal on August 28, 2023, pursuant to Section 1455(b)(5). Doc. No. [6]. The Court also ordered the State to respond to Meadows's Notice of Removal (id.), which it did on August 23, 2023 (Doc. No. [27]). Meadows replied

3

on August 25, 2023. Doc. No. [45]. The same day, the Court permitted amicus curiae to file a brief in support of declining jurisdiction. Doc. Nos. [54]; [55].

Before the hearing, Meadows filed a Motion to Dismiss (Doc. No. [15]) and an Emergency Motion to enjoin his arrest in Fulton County, Georgia (Doc. No. [17]). The Motion to Dismiss remains outstanding on the Court's Docket. The Court denied Meadows's Emergency Motion under 28 U.S.C. § 1455(b)(3), which expressly mandates that the state court criminal proceeding continues until the federal court notifies the state court that it has assumed federal jurisdiction over the prosecution. Doc. No. [25].

On August 28, 2023, the Court held a hearing on Meadows's Notice of Removal. Doc. No. [62]. Meadows personally testified[4] and, through counsel, admitted a number of exhibits, including two declarations of persons who

---

[4] At a criminal trial, the State has the burden of proof. Thus, at a criminal defendant's trial on the merits, he never has the obligation of presenting a defense or testifying, and those choices can never be held against him. U.S. Const. amend. V. For a notice of removal, however, the Defendant has the burden of establishing subject matter jurisdiction. 28 U.S.C. § 1455(b)(5); See Leonard v. Enter. Rent a Car, 279 F.3d 967, 972 (11th Cir. 2002) ("A removing defendant bears the burden of proving proper federal jurisdiction."); cf. also Maryland v. Soper, 270 U.S. 9, 34 (1926) (discussing defendant's testifying in support of their notice of removal of a criminal indictment) (collecting cases).

worked in the White House at the time he was the White House Chief of Staff and were familiar with his role in the administration as Chief of Staff. The State called Kurt Hilbert, an attorney who represented President Trump and the Trump campaign in 2020, and Georgia Secretary of State, Brad Raffensperger. The State also admitted a number of exhibits, including an audio recording of the January 2, 2021 phone call between President Trump, Secretary Raffensperger, and others, in which Meadows participated. State's Exhibit ("SX") 3.

At the conclusion of the hearing, the Court took the matter of its jurisdiction over the criminal prosecution under advisement. The Court subsequently ordered post-hearing briefing regarding the role of the Indictment's alleged overt acts for purposes of determining applicability of the federal officer removal statute. Doc. No. [63]. The Parties timely submitted the requested briefing. Doc. Nos. [66]; [67]. Having considered the arguments put forth by the Parties, the evidence submitted at the evidentiary hearing, and the briefing on this matter, the Court now enters this Order concluding that the Court lacks federal jurisdiction over Meadows's criminal prosecution.

5

## II.    LEGAL STANDARD

"[A] federal district court should be slow to act 'where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court.'" Cameron v. Johnson, 390 U.S. 611, 618 (1968) (quoting Douglas v. City of Jeannette, 319 U.S. 157, 162 (1943)). There is a "strong judicial policy against federal interference with state criminal proceedings." Arizona v. Manypenny, 451 U.S. 232, 243 (1981) (quoting Huffman v. Pursue, Ltd., 420 U.S. 592, 600 (1975)).

An exception to those general concepts of federalism is the federal officer removal statute, 28 U.S.C. § 1442(a)(1). That statute, allows for federal jurisdiction over "a criminal prosecution . . . against . . . any officer (or any person acting under that officer) of the United States . . . for or relating to any act under color of such office." Federal officer removal "is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." Florida v. Cohen, 887 F.2d 1451, 1453 (11th Cir. 1989) (citing Willingham v. Morgan, 395 U.S. 402, 405 (1969)). However, because of a preference for state courts conducting their state prosecutions, removal of a state criminal prosecution requires a "more detailed showing" of

6

the relation between the acts charged and the federal role at issue. <u>Willingham v. Morgan</u>, 395 U.S. 402, 409 n.4 (1969). Furthermore, federal courts must maintain a balance between what Section 1442 allows and respect for a State's right to deal with matters properly within its domain.

Meadows removed this criminal prosecution under 28 U.S.C. § 1455, which provides the procedure for removing a state criminal prosecution to a federal district court. "28 U.S.C. § 1455 'merely provides procedures that must be followed in order to remove a criminal case from state court when a defendant has the right to do so under another provision.'" <u>Maine v. Counts</u>, No. 22-1841, 2023 WL 3167442, at *1 (1st Cir. Feb. 16, 2023) (quoting <u>Kruebbe v. Beevers</u>, 692 F. App'x 173, 176 (5th Cir. 2017) (per curiam)). Upon filing a notice of removal, the Court must promptly determine whether the notice and its attachments clearly fail to establish the Court's subject matter jurisdiction, and if they do, the case is summarily remanded to state court. 28 U.S.C. § 1455(b)(4). If summary remand is not granted, then the district court must "promptly" hold an evidentiary hearing to determine the "disposition of the prosecution as justice shall require." <u>Id.</u> § 1455(b)(5). Based on the facts adduced at the hearing and the arguments put forth by the Parties, the Court must determine whether the

7

Defendant has met his burden in establishing that the Court has subject matter jurisdiction over his criminal prosecution. <u>Trump</u>, 2023 WL 4614689, at * 5 (citing <u>United Food & Comm. Workers Union v. CenterMark Props. Meriden Square, Inc.</u>, 30 F.3d 298, 301 (2d Cir. 1994)).

Under 28 U.S.C. § 1442, the question of the scope of a federal officer's authority contains issues of law and fact. <u>See</u> <u>Nadler v. Mann</u>, 951 F.2d 301, 305 (11th Cir. 1992) ("[D]etermination[s] of whether an employee's actions are within the scope of his employment involve[ ] a question of law and fact.").

Ultimately, for removal under Section 1455 to be proper, the removing party must show that there is a basis for the federal court to exercise jurisdiction over the criminal prosecution. <u>See</u> <u>Leonard</u>, 972 F.3d at 972  ("A removing defendant bears the burden of proving proper federal jurisdiction."). If the Court lacks federal jurisdiction, then the case cannot proceed in this forum.

The Supreme Court has cautioned that "an airtight case on the merits in order to show the required causal connection" is not required and that courts are to "credit" the movant's "theory of the case" for the elements of the jurisdictional

inquiry.[5] <u>Jefferson Cnty. v. Acker</u>, 527 U.S. 423, 432 (1999). "The point is only that the officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official duties." <u>Id.</u> at 447 (Scalia, J., dissenting).

## III.   ANALYSIS

To determine whether Meadows is able to remove based on federal officer jurisdiction pursuant to 28 U.S.C. § 1442(a)(1), the Court must answer the following questions: (1) whether Meadows was a federal officer during the time of the allegations in the Indictment, (2) whether the charged conduct in the criminal prosecution were undertaken for or related to Meadows color of office,[6] and (3) whether Meadows has put forth a colorable federal defense for the

---

[5] The Court notes that this language in <u>Acker</u> refers to the colorable defense prong of the analysis. 527 U.S. at 432. It is unclear whether the theory of the case language applies to the second prong of the analysis. Nevertheless, the Court will evaluate the theory of the case as it relates to the color of office because at least one district court recently has applied it in this manner. <u>See</u> <u>Georgia v. Heinze</u>, 637 F. Supp. 3d 1316, 1322 (N.D. Ga. 2022).

[6] Acts taken under color of office, must be either "vested with, or appear to be vested with, the authority entrusted to that office." <u>Color of Office</u>, <u>Black's Law Dictionary</u> (11th ed. 2019).

criminal prosecution. <u>Caver v. Cent. Ala. Elec. Coop.</u>, 845 F.3d 1138, 1142 (11th Cir. 2017).

The State concedes that at the time of the events alleged in the Indictment, Meadows was a federal officer and his role was the White House Chief of Staff. Hearing Tr. 251:12–17. Thus, the Court must next evaluate the second question of whether the acts in the Indictment relate to his role as White House Chief of Staff.

To determine whether the charged conduct was undertaken for, or related to Meadows's color of office, the Court must: (A) define the act(s) allegedly undertaken by Meadows in the Indictment, (B) ascertain the scope of the federal officer role of the White House Chief of Staff, and (C) analyze whether Meadows showed that the act(s) in the Indictment were for or related to the role of the White House Chief of Staff.

### A.    **The Federal Officer Removal Statute**

The Court must define what constitutes an "act" under 28 U.S.C. § 1442(a)(1). Then, the Court must assess how the "act" functions under the RICO

10

statute. Finally, the Court will establish the contours of the act as they relate to Meadows in the Indictment.[7]

### 1.   *Section 1442: The Text and Precedent*

The pertinent portion of § 1442(a)(1) provides: "[a] . . . criminal prosecution that is commenced in a State court and that is against or directed to . . . any officer . . . of the United States . . . in an official or individual capacity, for or relating to any act under color of such office" "may be removed by them to the district court of the United States." The phrase "for or relating to any act under color of such office" modifies the earlier clause, "[a] criminal prosecution . . . that is directed against or directed to an officer" of the United States. 28 U.S.C. § 1442(a)(1). This structure indicates that the criminal prosecution must arise from an act that is for or relating to the color of a federal office. Even if a criminal defendant can characterize individual instances of behavior as part of his official duties within the broader charged conduct, this is not enough to convey subject matter jurisdiction on this Court. Put differently,

---

[7] This Court primarily focuses on the Indictment's RICO charge because the other charge against Meadows, soliciting a violation of an oath by a public official, is also alleged as an overt act (with evidence submitted) in support of the RICO charge. Compare Doc. No. [1-1], 50 (Overt Act 112), with id. at 87 (Count 28).

11

facts indicating that a criminal defendant at times operated under the scope of his federal office will not provide this Court with subject matter jurisdiction under Section 1442 unless the State is criminally prosecuting the officer for those specific acts.

This interpretation is consistent with other courts' analyses. Specifically, courts have looked at whether the "claims" or the "charges" related to acts taken within the scope of the federal office.[8] In Nadler, the Eleventh Circuit suggested that the district court had subject matter jurisdiction where "one *claim* is cognizable under Section 1442 . . . ." 951 F.2d at 306 n.9 (emphasis added) (quoting National Audubon Soc. v. Dep't of Water & Power, 496 F. Supp. 499, 509 (E.D. Cal. 1980)). Therefore, the Court looks at (1) what the charges are against the federal officer, and (2) whether the charged conduct is for or relates to the color of the federal office.

The cases cited by Meadows support the proposition that courts look to the whole "claim" alleged, not just isolated facts supporting the claim, to determine

---

[8] "Claims" in civil actions correspond to "charges" in criminal prosecutions. Cf. Kellogg Brown & Root Srvs. v. United States, 575 U.S. 650, 653 (2015) ("[W]e must decide . . . whether the Wartime Suspension of Limitations Act applies only to criminal *charges* or also to civil *claims*." (emphasis added)).

whether Section 1442 has been satisfied. Doc. No. [67], 2 nn.1–3; see also Heinze, 637 F. Supp. 3d at 1323 ("[A] federal officer can remove a criminal proceeding commenced in a State court where the criminal *charges* involve actions taken 'in an official or individual capacity . . . .'" (quoting 28 U.S.C. § 1442(a)(1) (emphasis added)); Ladies Mem'l Ass'n Inc. v. City of Pensacola, No. 3:20CV5681/MCR/ZCB, 2023 WL 2561785, at *3 (N.D. Fla. Mar. 17, 2023) ("If the complaint contains 'even one federal *claim*[,]' then the defendant has 'the right to remove the entire case.'" (alteration in original) (emphasis added) (quoting Convent Corp. v. City of N. Little Rock, 784 F.3d 479, 483 (8th Cir. 2015))); Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 257 (4th Cir. 2017) (finding removal where an officer asserts a federal defense to even one *claim*). Thus, the Court looks at the criminal charge to determine whether the charge relates to the scope of Meadows's federal office.

"To satisfy the [scope of federal office] requirement, the officer must show a nexus, 'a causal connection, between the charged conduct and asserted official authority." Acker, 527 U.S. at 431 (quoting Willingham, 395 U.S. at 409). The Supreme Court has articulated the following test for the "under color of office" requirement:

> There must be a causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty.

Mesa v. California, 489 U.S. 121, 131–32 (1989) (quoting Soper, 270 U.S. at 32). Under Eleventh Circuit jurisprudence, a key factor in determining applicability of the federal officer removal statute "is whether there is a causal connection between [the State's charges] and an act of Defendant [] that forms the basis of those claims." Caver, 845 F.3d at 1144.

The Court notes that the RICO charge against Meadows presents a novel question in this case. Most cases invoking federal officer removal involve claims based on discrete actions taken by a defendant. For example, in Heinze, the defendants were charged with the discrete acts of felony murder, aggravated assault with a deadly weapon, burglary, false statements, and violation of oath by a public officer." 637 F. Supp. 3d at 1318, nn.1–2. A RICO conspiracy, alternatively, involves wide-ranging allegations of licit and illicit activities, undertaken by an association of individuals, and in furtherance of a criminal enterprise. See Section (III)(A)(1) infra. The State's prosecution in this case is

14

illustrative: the conspiracy charged here is alleged to have occurred over many months, included at least 19 individuals, and encompassed 161 overt acts. Doc. No. [1-1].

Although RICO conspiracies are rarely removed under Section 1442, the Court is not without some precedent to guide the analysis. In 1982, the Eleventh Circuit evaluated whether an FBI agent, as a federal officer, had a federal immunity defense under the Supremacy Clause against a Georgia RICO charge. Baucom v. Martin, 677 F.2d 1346, 1347–48 (11th Cir. 1982).[9] The Eleventh Circuit affirmed the district court, who found that the sole overt act alleged against the FBI agent related to bribing a state court judge. Id. at 1348–51. The district court found, and the Eleventh Circuit affirmed, the conduct charged against the FBI agent was taken within the scope of the agent's federal office because the bribery occurred during the execution of a state and federal criminal investigation into judicial corruption. Id.

---

[9] Baucom was not a removal case. Rather, it was a federal suit filed by the officer to preemptively prevent the commencement of a state criminal prosecution. Baucom, 677 F.2d 1346.

15

On the other hand, the Fourth Circuit Court of Appeals held that the district court did not err in declining to exercise jurisdiction under Section 1442 where "the heart of [the plaintiff]'s claims" did not relate to the scope of federal duty. Mayor & City Council of Balt. v. BP P.L.C., 31 F.4th 178, 234 (4th Cir. 2022). In that case, the civil complaint alleged that the defendants, as agents of the United States, contributed "to climate change by producing, promoting, selling, and concealing the dangers of fossil[-]fuel products." Id. at 233 (alteration in original). The Fourth Circuit affirmed the district court's finding that defendants did not show a basis for federal officer removal by looking at the complaint as a whole. The Fourth Circuit determined that while some activities were arguably within the scope the federal office (i.e., the production and concealment of hazardous fossil fuels was controlled or directed by a federal officer), the "lack of federal control over the production and sale of *all* fossil-fuel products is relevant to the nexus analysis." Id. at 234. Moreover, even if production and sales were controlled or directed by a federal officer, the "heart" of the claims asserted was concealment and misrepresentation—which did not remove to the defendant's official duties. Id. Ultimately, the Fourth Circuit concluded that the activities relating to the official duties (i.e., production and sales) were "too

16

tenuous" to the allegations of concealment and misrepresentation "to support removal under § 1442." Id. at 234.

Thus, under the text of the statute, binding authority, and persuasive authority, the Court finds that "act" in the federal officer removal statute is best defined as the "heart" of the criminal charge. BP PLC, 31 F.4th at 234. With this in mind, the Court now turns to the charges at issue in this case.

### 2.    The Georgia RICO Charge

The Indictment charges Meadows and his 18 Co-Defendants with engaging in a RICO conspiracy to violate RICO statute. RICO statute provides that it is unlawful "to conspire or endeavor to ['conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity'.]" O.C.G.A. § 16-14-4(c) (quoting id. § 16-14-4(b)). An "enterprise" is defined as "any person . . . or association, or group of individuals associated in fact although not a legal entity[.]" Id. § 16-14-3(3). The enterprise itself need not be illicit. Id For purposes of this case, a "[p]attern of racketeering activity" requires at least two acts of racketeering activity with "same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents[.]" Id. § 16-14-3(4).

17

"Racketeering activity" includes the commission (or attempted commission or solicitation, coercion, or intimidation of another to commit) of a variety of Georgia criminal statutes. See id. § 16-14-3(5)(A). It also can include violations of certain types of state or federal laws outside the State of Georgia. Id. § 16-14-3(5)(B)–(C).

The RICO *conspiracy* charge only requires, at the least, that one co-conspirator commit an "overt act to effect the object of the conspiracy[.]" Id. § 16-14-4(c)(1). While not specifically defined in the RICO statute, the Georgia Supreme Court has indicated that an overt act under the general conspiracy provision, O.C.G.A. § 16-14-8, means "a specific type of open or manifest act made in furtherance of a conspiracy to commit a crime." Bradford v. State, 285 Ga. 1, 4, 673 S.E.2d 201, 204 (2009). Critically, for conspiracy crimes, "the indictment [need not] set forth the particulars of the overt act." State v. Pittman, 302 Ga. App. 531, 535, 690 S.E.2d 661, 664 (2010) (quoting Bradford v. State, 283 Ga. App. 75, 78, 640 S.E.2d 630, 633 (2006), rev'd on other grounds Bradford, 285 Ga. at 1, 673 S.E. at 203). Indeed, "the government is not required to prove the overt act specified in the indictment." Nordahl v. State, 306 Ga. 15, 26, 829 S.E. 2d 99, 109 (2019). Nor, must the State ultimately prove that each co-conspirator

18

defendant committed an overt act, so long as one co-conspirator committed overt acts in furtherance of the conspiracy. Cf. Thomas v. State, 215 Ga. App. 522, 523, 451 S.E.2d 516, 517 (1994).

In sum, to establish a RICO conspiracy the State only need prove that any co-conspirator committed one overt act in furtherance of the conspiracy, whether the overt act was specifically charged in the Indictment or not. In other words, the State can prove its RICO charge against Meadows by showing any one of his co-Defendants committed *any* overt act in furtherance of the conspiracy—whether that overt act is in the Indictment or not.

The overt acts alleged against Meadows specifically "includ[e] but are not limited to" (Doc. No. [1-1], 20): attending a meeting with President Trump and Michigan officials about election fraud in Michigan (id. at 21 (Overt Act 5)), messaging a United States Representative from Pennsylvania (id. at 21 (Overt Act 6)), meeting with Pennsylvania legislators about an election-related special session (id. at 22 (Overt Act 9)), requesting a memo regarding "disrupting and delaying the joint session of Congress on January 6, 2021" when electors' votes were to be counted (id. at 24 (Overt Act 19)), physically attending and observing a nonpublic Georgia election audit and recount (id. at 44 (Overt Act 92)),

19

arranging a phone call between President Trump and the Georgia Secretary of State's Chief Investigator regarding the Georgia presidential election results (id. (Overt Act 93)), messaging the Chief Investigator about the potential for a quicker signature verification of the Fulton County election results if "the [T]rump campaign assist[ed] financially" (id. at 45 (Overt Act 96)), and soliciting Georgia Secretary of State Brad Raffensperger to violate his oath of office by altering the certified returns for presidential electors (id. at 50 (Overt Act 112); see also id. at 87 (Count 28 against Meadows under O.C.G.A. §§ 16-14-7 & 16-10-1)).

While the Indictment's named overt acts are not elements of the RICO conspiracy charged, the Court still finds that they are relevant evidence of whether Meadows's association with the enterprise related to his role as White House Chief of Staff. See Section (III)(C)(2) infra.

To clarify, under Georgia RICO, the overt acts are not elements of the RICO charge. They are used to illustrate the existence of the conspiracy and the various alleged co-conspirators' association with the conspiracy. Georgia law makes clear that the State need not prove the existence of any particular overt act to prove its RICO claim, nor must the State prove any of the overt acts that are currently alleged in the Indictment. Because the "act" as defined by Section 1442(a)(1)

20

means the charge against Meadows—under Georgia's RICO statute—his criminal prosecution is removable when his association with the conspiracy relates to the color of his federal office.

### 3. *The Alleged Act Taken for Purposes of Federal Officer Removal*

Federal officer removal is appropriate when the gravamen, or "heart" of the charge relates to the federal office. BP P.L.C., 31 F.4th at 234. As stated above, the Court determines that the actual "act" alleged against Meadows is the RICO charge, not the overt acts. Section 1442 requires the Court to determine if Meadows was acting within the scope of his federal office in the alleged act of associating with a conspiracy to violate various Georgia criminal statutes. Put differently, the act at issue for purposes of the Indictment's RICO charge is Meadows's alleged *association* with the conspiracy. The overt acts, however, "by and large . . . only serve to tell a broader story about" the conspiracy to "unlawfully change the outcome of [the 2020 presidential] election in favor of [President] Trump" but they are "not the source of [criminal] liability." Id. at 233; Doc. No. [1-1], 14.

The Court acknowledges that, even though it was not required, the State chose to include these overt acts in the Indictment. Unsurprisingly, Meadows

21

structured his evidentiary presentation to the Court and his briefing around the eight overt acts in which he is mentioned. Following the hearing, the Court itself ordered supplemental briefing on the issue of whether a finding that some, but not all overt act(s) involving Meadows acting under color of federal office was enough to trigger the removal statute. Doc. No. [63]. And to be sure, defining Meadows's "act" as associating with the alleged RICO conspiracy does not preclude assessing the overt acts alleged. See Baucom, 677 F.2d at 1346 (evaluating the overt acts alleged against the FBI agent to determine whether his involvement in the conspiracy was for his federal duties). Accordingly, the Court's subsequent discussion of the "relating to" requirement for federal officer removal includes an analysis of the overt acts in order to determine whether Meadows's association with the alleged conspiracy (the conduct for which he was charged) related to the scope of his federal duties.

Because the inquiry hinges on whether Meadows's association with the conspiracy related to the color of his office, however, jurisdiction is not conferred simply because a single overt act relates to Meadows's federal office. After all, the Indictment alleges a series of associative acts spanning over a year, and the overt acts attributed to Meadows span three months. Doc. No. [1-1], 15–71.

22

Undoubtedly, during that time Meadows performed actions for or that related to the color of his office. But the relevant inquiry is what activities go the *heart* of Meadows's participation in the enterprise and whether those activities relate to the scope of his federal office. If they do not, then Meadows cannot satisfy his burden of establishing subject matter jurisdiction under the federal officer removal statute.

### B.   Meadows's Role as a Federal Officer

Having defined the "act" at issue for federal officer removal, the Court now turns to Meadows's federal office and its scope. This inquiry is necessary because the authority of Meadows's office will dictate the scope of the duties associated with that role. At the evidentiary hearing, Meadows testified broadly to the scope of his role as White House Chief of Staff; he also offered two declarations to further describe the Chief of Staff's role. Hearing Tr. 9:8 (commencing Meadows's testimony), 156:19–158:24 (admitting the two declarations as DX 3 and 4).[10] Meadows also testified about his role specifically in reference to the Indictment's overt acts.

_____

[10] The Court admitted these declarations over the State's objection and indicated that it would assess the weight to be given the declarations given they are unsworn and

### 1.   *The White House Chief of Staff Role*

Meadows was the White House Chief of Staff and Assistant to President Trump from March 30, 2020 until January 20, 2021. DX 1; Hearing Tr. 9:25–10:3. His official title was "[A]ssistant to the President and Chief of Staff." Id. at 13:8–10; DX 1. He described himself as "the senior official in charge of the Executive Office of the President." Hearing Tr. 14:3–5; see also DX 3 ¶ 3 (indicating Meadows had "broad responsibilities" including "advising and assisting the President and managing the staff of the White House Office within the Executive Office of the President"); DX 4 ¶ 4 (asserting that Meadows "[was] responsible for keeping the trains running on time for the White House [and] the Executive Branch of the federal government"). Meadows described his position to require "oversee[ing] all the federal operations," which extended to actions taken inside of and outside of the West Wing. Hearing Tr. 13:10–12.

Specifically, Meadows testified that he was part of "almost every meeting" with the President, either as a "principal" or as an "observer." Id. at 16:8–10; DX

---

unnotarized. Hearing Tr. 158:23–24. In this Order, the Court considers these declarations but affords their contents most weight when corroborated by other testimony or evidence.

24

4 ¶ 6 ("Meadows's general practice was to attend many but not all the meetings between the President and other parties, regardless of subject matter."). In meetings, "principals" may "have a particular position" regarding a "particular issue" and would "try to show the pros and cons of [the] arguments so that some resolution could be made." Hearing Tr. 19:1–8. Even as an "observer," he attended the President's meetings because his job required him to "try to be aware of everything [in the meeting] . . . even if [he] was not a principal[.]" Hearing Tr. 16:10–15; DX 4 ¶ 5 ("Meadows was responsible for administering the planning and scheduling of the President's meetings, telephone conferences, and other engagements, regardless of subject matter."). These meetings might include "members of Congress, other executive branch officials[, and] state or local government officials." Hearing Tr. 21:12–20; see also DX 3 ¶ 5 (indicating the Chief of Staff was "responsible for managing the President's calendar, arranging meetings, calls, and other discussions with federal, state, and local officials, as well as private citizens").

Meadows testified that as Chief of Staff he had to "be aware of the President's schedule." Hearing Tr. 19:16. This meant he would "move meetings along . . . do the wrap-up . . . and bring things to a close where there was an

action item[.]" Id. at 19:16–22. If other executive branch staff were in the meeting to ensure it efficiently ended, then Meadows's involvement might be limited to a "quick pop in" on the meeting. Id. at 20:19–25.

Meadows asserts that another function of Meadows's role as White House Chief of Staff was "to be generally aware of what's going on" because he often was called upon to give the President advice. Id. at 19:23–20:7, 45:8–11. It also helped Meadows "prioritize [the President's] time" and "skate to where the p[uck] is" on certain issues. Id. at 33:20–24.

Meadows also testified that as White House Chief of Staff he was bound by the Hatch Act[11] and he could not engage in political activity. Hearing Tr. 39:7–25; 135:21–136:5. As discussed more fully below, the Hatch Act prohibits "an employee" from "us[ing] his official authority or influence for the purpose of affecting the result of an election." 5 U.S.C. § 2732(a)(1). This includes, "[u]sing his or her official title while participating in political activity." 5 C.F.R. § 734.302(b)(2). And political activity is defined as, "activity directed toward the

---

[11] To be clear, no Hatch Act violation has been charged against Meadows. And the Court is not determining if Meadows violated the Act, or if there is any merit to a potential Hatch Act claim.

26

success or failure of a political party, candidate for partisan political office, or partisan political group." Id. § 734.101.

The Court finds that the color of the Office of the White House Chief of Staff did not include working with or working for the Trump campaign, except for simply coordinating the President's schedule, traveling with the President to his campaign events, and redirecting communications to the campaign. Thus, consistent with his testimony and the federal statutes and regulations, engaging in political activities is exceeds the outer limits of the Office of the White House Chief of Staff.

### 2.   Meadows's Testimony and Theory of the Case

Meadows's theory of the case is that he is entitled to immunity because the Indictment relates to his role as White House Chief of Staff. Doc. No. [1]. As part of his direct and cross examination testimony, Meadows addressed how the overt acts related to his specific federal role as the White Chief of Staff. Ultimately, Meadows concluded that, based on the topics and circumstances discussed in his testimony, he had not done anything outside the scope of his role as the White House Chief of Staff. Hearing Tr. 111:18–19. However, he did admit that there

27

could be activities the President requested which would be outside of the scope of the role a. Id. at 112:15–113:11.

While the Court credits Meadows's testimony about his role as White House Chief of Staff, it will give greater weight to the testimony of specific tasks that he outlined as within the scope of his office (i.e., time management, attending meetings, briefing the President, etc.). Meadows testified consistently about these duties on both direct and cross-examinations. Additionally, these duties are corroborated by the Declarations filed in support of Meadows's Notice of Removal (DXs 3, 4). However, the Court gives less weight to his assertions that all actions he took were within the scope of his office. When questioned about the scope of his authority, Meadows was unable to explain the limits of his authority, other than his inability to stump for the President or work onbehalf of the campaign. Hearing Tr. 111:12–113:6. The Court finds that Meadows did not adequately convey the outer limits of his authority, and thus, the Court gives that testimony less weight.[12]

_____

[12] In this case, Meadows was the main witness presenting testimony for his case. Thus, the Court must determine the appropriate amount of weight to assign to his testimony when evaluating it, the same as it does any other witness in an evidentiary hearing. However, given the nature of the motion, and the pending criminal proceedings the

28

**C.      RICO: Meadows Was Not Acting Under Color of Office**

The Court now turns to whether the acts alleged against and taken by Meadows are related to the color of his office as White House Chief of Staff. It ultimately concludes that the relevant acts are outside the scope of Meadows's federal office.

> ### 1.      *Federal and Statutory Limitations Regarding the Scope of the Office of White House Chief of Staff*
>
> #### a)      Constitutional requirements

The Constitution does not provide any basis for executive branch involvement with State election and post-election procedures. The Elections Clause expressly reserves the "Times, Places, and Manner" of elections to state legislatures. U.S. Const. art. I, § 4, cl. 1; see also Shelby Cnty. v. Holder 570 U.S. 529, 543 (2013) ("[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." (quoting Gregory v. Ashcroft, 501 U.S. 452, 461–62 (1991)); U.S. Term

---

Court makes these decisions with great caution. The determinations here do not go to Meadows's propensity to be truthful as a general matter. However, the Court cannot undertake the task assigned by 28 U.S.C. § 1455(b)(5) without assigning the appropriate weight to the testimony.

Limits, Inc. v. Thornton, 514 U.S. 779, 833–34 (1995) ("[T]he Framers understood the Elections Clause as a grant of authority [to state legislatures] to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints."). States have been tasked under the Elections Clause to "provide a complete code" for elections which ought to include "regulations 'relat[ing] to . . . prevention of fraud and corrupt practices [and] counting of votes . . . .'" Moore v. Harper, 600 U.S. ----, 143 S. Ct. 2065, 2085 (2023) (quoting Smiley v. Holm, 285 U.S. 355, 366 (1932)). This is not a power incident to a State's police powers but "derives from an express grant in the Constitution." Fish v. Kobach, 840 F.3d 710, 727 (10th Cir. 2016).

Courts have previously faced tough questions in cases involving Congress's power to use its lawmaking authority to oversee or empower the States in their duties under the Elections Clause. Cf. e.g., id. at 725–26 ("The Supreme Court has recently and repeatedly reaffirmed that 'the power the Elections Clause confers is none other than the power to pre-empt[ ]' . . . 'The Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to

30

preempt state legislative choices.'" (quoting Arizona v. Inter Tribal Council of Ariz., Inc., 571 U.S. 1, 14–15 (2013) (first quotation); Foster v. Love, 522 U.S. 67, 69 (1997) (second quotation))). Indeed, when the Supreme Court has discussed federal power limiting States' authority over elections, it has cited to *congressional* power, not executive power. See, e.g., Shelby Cnty., 570 U.S. at 543.

Conversely, there are no similar close calls presented when executive authority is at issue. As a constitutional matter, executive power does not extend to overseeing states' elections.[13] Apart from spheres where federal supremacy

---

[13] The only potential constitutional authority, the Take Care Clause, does not enable the type of election oversight to which the State's Indictment pertains. See U.S. Const. art. II, § 3 ("[The President] shall take Care that the Laws be faithfully executed[.]"). Yet, executive authority under the Take Care Clause "does not extend to government officials over whom [the Executive] has no power or control." Thompson v. Trump, 590 F. Supp. 3d 46, 78 (D.D.C. 2022). The Court accordingly rejects Meadows's suggestion that the Take Care Clause provides a basis for finding executive authority over state election procedures. Doc. No. [45], 9–10.

The Court is also unpersuaded by Meadows's contention that his acts involving state election procedures are within executive power to advise Congress. Doc. No. [45], 10. It would be inconsistent with federalism and the separation of powers, to find that activities which are delegated to the states are also within the scope of executive power because the executive branch may advise Congress. Cf. Fish, 840 F.3d at 725–26 ("The [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but *only so far as Congress* declines to preempt state legislative choices." (quoting Foster, 522 U.S. at 69). The Court will not find that the executive branch has some advisory authority in this space in light of the *express* constitutional grant over elections to the States.

31

supersedes, "States function as political entities in their own right." <u>Bond v. United States</u>, 564 U.S. 211, 221 (2011). Here, there is *clear constitutional authority* delegating the procedures of elections to the States. <u>See</u> Const. art. I, § 4, cl. 1. Thus, the executive branch cannot claim power to involve itself in States' election procedures when the Constitution clearly grants the States the power to manage elections under the Elections Clause.

### b)   <u>Statutory requirements</u>

Statutorily, the Hatch Act is helpful in defining the outer limits of the scope the White House Chief of Staff's authority. The State argues, and Meadows agrees, that he is bound by the Hatch Act, a law that prohibits federal employees from engaging in political activity. Doc. No. [27]; Hearing Tr.136:3–5. While the Court does not rely on the merits of a Hatch Act violation, it does recognize that the Hatch Act provides that political activity is not included in the outer limits of the role of the White House Chief of Staff. The Hatch Act prohibits executive branch employees from "us[ing] [their] official authority or influence for the purpose of interfering with or affecting the result of an election[.]" 5 U.S.C. § 7323(a)(1). The federal regulation governing political activities of federal employees prohibits the same. 5 C.F.R. § 734.302(a). The regulation,

32

moreover, broadly defines "political activity" to be "activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." Id. § 734.101. The types of behaviors that Meadows is alleged to be involved in included post-election activities and election outcomes in various States pertaining to a particular candidate for office. If these potentially political activities indeed come against the Hatch Act, its regulations limit such efforts. These prohibitions on executive branch employees (including the White House Chief of Staff) reinforce the Court's conclusion that Meadows has not shown how his actions relate to the scope of his federal executive branch office. Federal officer removal is thereby inapposite.

### 2. Meadows's Has Not Met His Burden in Establishing the Acts Are Related to His Federal Office

Even under the "quite low" bar for federal officer removal, the Court concludes that Meadows has not met his burden to show that his criminal prosecution can be removed under the federal officer removal statute. "Although the words 'acting under' are 'broad,' the Supreme Court has emphasized that they are not 'limitless.'" BP PLC, 31 F.4th at 228–29 (quoting Watson v. Philip Morris Cos., Inc., 551 U.S. 142, 150 (2007)); Acker, 527 U.S. at 447 (Scalia, J., dissenting) (opining that the act that forms the basis of "the gravamen of the

33

suit . . . [is] at least closely connected with, the performance of his official functions.").

The Court concludes that Meadows has not met even the "quite low" threshold for removal. Again, what the Court must decide for purposes of federal officer removal is whether the actions Meadows took as a participant in the alleged enterprise (the charged conduct) were related to his federal role as White House Chief of Staff. The evidence adduced at the hearing establishes that the actions at the heart of the State's charges against Meadows were taken on behalf of the Trump campaign with an ultimate goal of affecting state election activities and procedures. Meadows himself testified that working for the Trump campaign would be outside the scope of a White House Chief of Staff. Hearing Tr. 113:2–6.

As the Court has also explained, the overt acts are merely illustrative in nature and not elements of the crimes charged against Meadows. Nevertheless, the overt acts are set out in the Indictment and Meadows shaped his entire evidentiary presentation around them. Therefore, the Court will assess each of Meadows's overt acts to factually determine if they fall within the scope of Meadows role as a federal officer.

34

The Court finds Meadows only carried his burden in showing that one of the eight overt acts attributed to Meadows could have occurred within the scope of Meadows's federal office. Overt Act 6 provides that Meadows "sent a text message to United States Representative Scott Perry from Pennsylvania and stated, 'Can you send me the number for the speaker and the leader of PA Legislature[?] POTUS wants to chat with them.'" Doc. No. [1-1], 21. Because Overt Act 6 is phrased so broadly, it is conceivable that it encompasses an activity that is within the scope of Meadows's federal duties. Meadows testified that as part of his role as Chief of Staff, he would retrieve phone numbers of various state officials. Hearing Tr. 47:8–10 ("I was asked on a pretty regular occasion for numbers . . . ."). The omission in the Indictment of the context Meadows sought this phone number, when coupled with the testimony that retrieving phone numbers for state officials was a routine part of his role as Chief of Staff, leaves the Court to conclude Overt Act 6 arguably occurred within the scope of Meadows's duties as White House Chief of Staff.

The Court finds that the evidence presented does not show that most of the remaining overt acts were related to the scope of Meadows's role as Chief of

35

Staff.[14] The procedures States utilize to conduct elections and ensure results are not part of the executive branch's role or powers. See Section (III)(C)(1)(a) supra. As a senior official in the executive branch, therefore, Meadows cannot have acted in his role as a federal officer with respect to any efforts to influence, interfere with, disrupt, oversee, or change state elections: those activities are expressly delegated to the States.

Overt Act 96 alleges that Meadows sent a text message to the Office of the Georgia Secretary of State's Chief Investigator Frances Watson[15] asking, "[i]s there a way to speed up Fulton County signature verification in order to have results before Jan 6 if the [T]rump campaign assists financially." Doc. No. [1-1], 45. At the hearing, Meadows testified that no federal funds would be available to

---

[14]  At the hearing, Meadows disputed the merits of Overt Acts 9 and 19. Hearing Tr. 43:10–49:9, 73:18–22, 50:4–9. With respect to Overt Act 9, he disputed that he participated in the November 25, 2020 meeting with the Pennsylvania Legislatures. Hearing Tr. 43:10–49:9, 73:18–22. Similarly, Meadows disputed that he asked McEntee for the memorandum as alleged in the Indictment. Hearing Tr. 50:4–9; Doc. No. [1-1], 24 (Overt Act 19). Meadows is not required to show that he is innocent of the charges against him to successfully remove his case.  Soper, 270 U.S. at 32–33. Neither is the State required to prove the overt acts as part of its burden of proof at trial. See Section (III)(A)(2) supra. Accordingly, to the extent necessary, the Court treats the evidence propounded in support of Overt Acts 9 and 19 as neutral to the determination of whether particular Overt Acts were within the scope of Meadows's federal office.

[15] At the hearing, Meadows testified that he believed the message was to Ms. Jordan Fuchs, not Ms. Watson. Hearing Tr. 90:1–6.

the Trump campaign to support this request. Hearing Tr. 93:10–12. Nevertheless, Meadows testified that he was not speaking for the campaign in this message, but that it was "in keeping of me trying to ask a person who should know whether it's a financial resource issue, you know, manpower issue or whatever. So I wasn't speaking on behalf of the campaign." Id. at 93:3–6.

Meadows failed to provide sufficient evidence that these actions related to any legitimate purpose of the executive branch. The Court determines as a matter of fact, making a request to the Georgia Secretary of State's Office regarding a possibility that the Trump campaign could provide financial resources to fund the recount effort, even if not directly on behalf of the campaign, is still campaign-related political activity. Thus, Meadows has not met his burden in establishing that Overt Act 96 related to the scope of his official duties.

Similarly, Overt Act 92 alleges that Meadows traveled to Cobb County, Georgia where he "attempted to observe the signature match audit being performed there by law enforcement officers from the Georgia Bureau of Investigations and the Office of the Georgia Secretary of State." Doc. No. [1-1], 44. Meadows testified that his actions with respect to this allegation were:

> in line with [his duties], because what I did was go to the Cobb County convention center to look at the

37

> process that they were going through. And in doing so
> was trying to, again, check that box to say, all right,
> everything is being done right here, and so if there's
> allegations of fraud, we need to move on to something
> else.

Hearing Tr. 152:4–17. The Court factually finds that Meadows overseeing State election recount processes related to President Trump's reelection campaign. Meadows failed to provide sufficient evidence that these actions related to any legitimate purpose of the executive branch. Accordingly, the Court finds Meadows has not met his burden in establishing that Overt Act 92 is related to scope of the Office of White House Chief of Staff.

Overt Act 112 alleges that Meadows participated in the January 2, 2021 phone call with Donald Trump and Secretary Raffensperger to unlawfully solicit the Secretary of State to alter the certified returns for the presidential electors for the November 3, 2022 presidential election. Doc. No. [1-1], 51. At the hearing Meadows rationalized his involvement in this call as seeking a compromise and settlement of the Trump campaign's suit against the State of Georgia. He testified "this phone call, setting it up with the attorneys where they could find some kind of compromise. . . ." Hearing Tr. 108:14–17. He acknowledged that the lawyers on the phone call were lawyers for either the President Trump personally or the

38

Trump campaign and that no lawyers from the Office of White House Counsel or the Department of Justice were on the call. Id. at 107:11–108:1; 210:3. The Supreme Court has instructed that involvement in private litigation is not part of the executive branch's role or powers. See Clinton v. Jones, 520 U.S. 681, 702 n.36 (1997). Therefore, based on the evidence presented, the Court finds that the January 2, 2021 phone call was made regarding private litigation brought by President and his campaign against the State of Georgia. It was therefore outside Meadows's federal role as an executive branch officer.

Furthermore, another participant on the call, Raffensperger testified that "[t]hose were Trump campaign lawyers [on the call], so I felt that it was a campaign call." Id. 210:2–3. In the same vein, Meadows's participation in the phone call clearly reflects campaign-related interests. He said:

> Mr. Secretary, obviously there is, there are allegations where we believe that not every vote or fair vote and legal vote was -- was -- counted and that's at odds with the representation from the secretary of state's office. What I'm hopeful for is there some way that we can find some kind of agreement to look at this a little bit more fully. You know the president mentioned Fulton County. But in some of these areas where there seems to be a difference of where the facts seem to lead, and so Mr. Secretary, I was hopeful that, you know, in the spirit of cooperation and compromise is there something that we can at least have a discussion to look at some of these allegations to find a path forward that's less litigious?

SX 3, 12:49–14:00. The record is clear that Meadows substantively discussed investigating alleged fraud in the November 3, 2022 presidential election. Therefore, the Court finds that these contributions to the phone call with Secretary Raffensperger went beyond those activities that are within the official role of White House Chief of Staff, such as scheduling the President's phone calls, observing meetings, and attempting to wrap up meetings in order to keep the President on schedule. Rather, Meadows's participation on the January 2, 2021 call was political in nature and involved the President's private litigation, neither of which are related to the scope of the Office of White House Chief of Staff. By failing to adduce evidence that these actions related to any legitimate purpose of the executive branch, Meadows did not satisfy the burden of showing that these actions related to the color of his office.

Finally, the Court finds that activities by Meadows—even if characterized as scheduling meetings or phone calls or taken for the purpose of advising the President—are "political activities" under the pertinent regulations if they were for the purpose of furthering the common objective of success of a particular presidential candidate. See 5 C.F.R § 734.101. Overt Acts 5 and 93 relate to attending and scheduling meetings and placing phone calls. Doc. No. [1-1], 21–

40

22, 44. The Court finds that the underlying substance of those meetings and calls were related to political activities and not to the scope of Meadows's federal office.

For the meeting with Michigan state officials, Meadows testified that he recalled "most of that [meeting] had to do with allegations of potential [election] fraud in Michigan . . . .".[16] Hearing Tr. at 44:20–22; see also id. at 64:2–7. He also acknowledged that "President Trump had a personal interest in the outcome of the election in Michigan." Id. at 63:12–15; see also id. at 64:8–13. Accordingly the meeting in Overt Act 5 was outside the scope of his federal executive branch office as they related to State election procedures following the presidential election.

The Court also finds that Overt Act 93 was outside the scope of Meadows's federal executive role. Overt Act 93 alleges that Meadows arranged a phone call between President Trump and the Georgia Secretary of State's Chief Investigator.

---

[16]  Meadows later testified that he did not know of any specific election challenge in Michigan by the Trump campaign or the federal government. Hearing Tr. 57:21–58:4. He further clarified however that "[Trump] was concerned about the election results, but in terms of a lawsuit, [Meadows was] not aware of it." Id. at 63:22–24. The Court finds Meadows's knowledge of President Trump's concern about the election sufficient to find that, at the time of this meeting, Meadows had a general awareness of the post-election activities in Michigan regarding the state's election procedures.

Meadows admits to arranging this phone call. Hearing Tr. 53:17–20. Meadows later testified that he received this phone number either through his attendance of the Cobb County election recount or by his primary contact at the Georgia Secretary of State's Office. Hearing Tr. 89:15–24. Meadows failed to provide sufficient evidence that these actions related to any legitimate purpose of the executive branch. Accordingly, the Court finds that Meadows failed to carry his burden in showing that Overt Act 93 was in the scope of Meadow's official role as Chief of Staff.

As set forth above, the Court finds insufficient evidence to establish that the gravamen, or a heavy majority of overt acts alleged against Meadows relate to his role as White House Chief of Staff. The State has put forth evidence that at various points during the time of the alleged conspiracy Meadows worked with the Trump campaign, which he admitted was outside of the role of the White House Chief of Staff. See SX 3 12:49–14:00. Tr. 91:11–20; 95:19–96:23. In light of the State's evidence that Meadows undertook actions on behalf of the campaign during the time period of the alleged conspiracy, Meadows was required to come forward with competent proof of his factual contention that his actions involving challenges to the outcome of the Georgia's Presidential election results were

within his role as Chief of Staff. His efforts fall short. See Mesa, 489 U.S. at 131–32 ("There must be a causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty.").

Instead, the evidence before the Court overwhelmingly suggests that Meadows was not acting in his scope of executive branch duties during most of the Overt Acts alleged. Even if Meadows took on tasks that mirror the duties that he carried out when acting in his official role as White House Chief of Staff (such as attending meetings, scheduling phone calls, and managing the President's time) he has failed to demonstrate how the election-related activities that serve as the basis for the charges in the Indictment are related to any of his official acts. As the substance of the overt acts constituted a significant part of Meadows's testimony and proof of his acting within the scope of his federal office, the Court concludes that based on the factual evidence, Meadows was not acting in the scope of his office for purposes of federal officer removal.

43

### D.    Count 28

Count 28 of the Indictment is substantively the same as Overt Act 112 in the RICO charge. <u>Compare</u> Doc. No. [1-1], 50, <u>with</u> <u>id.</u> at 87. The Court has already determined that the January 2nd phone call was not related to Meadows's role as White House Chief of Staff. <u>See</u> Section III(C)(2) <u>supra</u>. For the same reasons, the Court determines that Meadows's participation on this phone call was not related to the color of the Office of the White House Chief of Staff. Thus, Meadows has not met his burden in establishing that Count 28 related to the color of his office and the Court lacks subject matter jurisdiction over that claim.

### E.    **Federal Defenses**

The third prong of Section 1442 removal requires the defendant to allege colorable federal defenses. <u>Caver</u>, 845 F.3d at 1145. Meadows asserts that he has immunity from the charges, under the Supremacy Clause, because he was acting pursuant to the scope of his office. In his Motion to Dismiss, he also asserts a First Amendment political speech defense and a Due Process defense. Doc. No. [15-1], 29–31. Because Meadows has failed to carry his burden with respect to the

44

charged conduct's relationship to the scope of his federal office, the Court declines to address Meadows's defenses.[17]

### F.   Federalism

Finally, the Court finds support for its conclusion that Meadows was not acting in the scope of his federal officer role for the purpose of Section 1442. Federal officer removal's "'basic' purpose is to protect the Federal Government from the interference with its 'operations[.]'" Watson, 551 U.S. at 150 (2007). It "is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." Caver, 845 F.3d at 1142 (quoting Cohen, 887 F.2d at 1453). At least in the civil context, "[t]he removal statute itself merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." Mesa, 489 U.S. at 136.

---

[17] The Superior Court may have to decide these issues at a later time, and evaluating them here should be avoided unless absolutely necessary. The "principle of federalism" shows "that federal courts must not interfere in state judicial processes because state courts of general jurisdiction are authorized and competent, as front-line fora, to adjudicate all relevant questions of both state and federal law." Penthouse Intern., Ltd. v. Webb, 594 F. Supp. 1186, 1192 (N.D. Ga. 1984) (citing Younger v. Harris, 401 U.S. 37, 43–44 (1971)).

Here, Section 1442's purposes would not be fulfilled by removal. Meadows raises a federal officer immunity defense that the Indictment's charged acts were made under his federal authority and directed at state actions. The Indictment's associations and acts, as well as Meadows's presented evidence, however, all indicate that federal officials (or those purporting to act on behalf of federal officials) engaged in post-election activities that clearly fall outside executive authority and expressly within the constitutional gamut of the States.

Assuming jurisdiction over this criminal prosecution would frustrate the purpose of federal officer removal when the state charges allege—not *state interference* with constitutionally protected federal activities, but—*federal interference* with constitutionally protected state actions. This result cannot stand in the face of federalism, "a concept which retains vitality and importance in our modern constitutional scheme," and the Constitution's express delegation of election activities to States. United States v. Ballinger, 395 F.3d 1218, 1248 (11th Cir. 2005) (Birch, J., dissenting). Thus, the purposes of federal officer removal are served, rather than thwarted, by the Court's conclusion that it has no jurisdiction over the removal of Meadows's criminal prosecution.

46

\* \* \* \*

As the foregoing analysis illustrates, the Court concludes that Meadows has not shown that the actions that triggered the State's prosecution related to his federal office. The Constitution, federal statute and regulation of executive branch employees, and the purpose of Section 1442 support this conclusion. Meadows's alleged association with post-election activities was not related to his role as White House Chief of Staff or his executive branch authority.

The Court acknowledges that federal officer's "relating to" requirement is "broad." Caver, 845 F.3d at 1144. The Court also acknowledges that "[f]ederal courts credit the removing party's theory of the case for purposes of determining if a federal officer both acted 'under color of office' and raised 'a colorable federal defense.'" Heinze, 637 F. Supp. 3d at 1322 (quoting Acker, 527 U.S. at 432). The Court does not take lightly these standards in rendering its conclusion that federal officer removal is not supported here. Rather, the Court concludes that if it were to agree with Meadows's arguments regarding removal, the Court would have to turn a blind eye to express constitutional power granted to the States to determine their election procedures, as well as federal statutory and regulatory limitations on political activities of executive branch officials. The Court would

47

be ignoring the evidence Meadows himself submitted of his post-election related activities and the purpose of the federal officer removal statute. It would be legally and factually erroneous for the Court to do so.

The Court makes clear this Order determines only that, as a federal court with limited jurisdiction, it lacks any basis for jurisdiction over Meadows's criminal prosecution. The Court's conclusion is not to suggest any opinion about the State's case against Meadows. The Court makes no ruling on the merits of the charges against Meadows or any defense that he may offer. Meadows maintains the presumption of innocence and bears no burden of proving that he did not commit the crimes charged against him. The burden of proof beyond a reasonable doubt remains with the State. This Order's sole determination is that there is no federal jurisdiction over the criminal case. The outcome of this case will be for a Fulton County judge and trier of fact to ultimately decide.

The Court also makes clear that its determination on Meadows's notice of removal and its jurisdiction over his criminal prosecution does not, at this time, have any effect on the outcome of the other co-Defendants who have filed notices

48

of removal of the criminal prosecution against them.[18] The Court will assess these Defendants' arguments and evidence following the forthcoming hearings on the notices of removal, independent of its conclusion in this Order.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DECLINES** to assume jurisdiction over the State's criminal prosecution of Meadows under Section 1455 and **REMANDS** the case to Fulton County Superior Court. The Court also **DIRECTS** the Clerk of Court to **TERMINATE** all pending motions and **CLOSE** this case.

**IT IS SO ORDERED** this 8th day of September, 2023.

_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[18] See <u>Georgia v. Jeffrey Bossert Clark</u>, No. 1:23-cv-03721-SCJ (NDGa.); <u>Georgia v. David James Shafer</u>, No. 1:23-cv-03720-SCJ (NDGa.); <u>Georgia v. Shawn Micah Tresher Still</u>, No. 1:23-cv-03792-SCJ (NDGa.); <u>Georgia v. Cathleen Alston Latham</u>, No. 1:23-cv-03803-SCJ (NDGa.).

49

**Tab 71**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |  |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-03621-SCJ |
| | ) | |
| MARK R. MEADOWS, | ) | |
| | ) | |
| *Defendant.* | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Defendant Mark R. Meadows appeals to the U.S.

Court of Appeals for the Eleventh Circuit from the Order, Dkt. No. 69, issued by

Judge Steve C. Jones on September 8, 2023.

1

Dated: September 8, 2023

Joseph M. Englert
McGuireWoods LLP
1230 Peachtree St., N.E., Suite 2100
Atlanta, GA 30309
(404) 443-5500
Jenglert@mcguirewoods.com

Respectfully submitted,

*/s/ George J. Terwilliger III*

George J. Terwilliger, III*
John S. Moran*
Michael Francisco*
Robert J. Bittman*
Emily Erb Kelley*
Francis J. Aul*
McGuireWoods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com
rbittman@mcguirewoods.com
ekelley@mcguirewoods.com
faul@mcguirewoods.com
* Admitted *Pro Hac Vice*

*Counsel to Mark R. Meadows*

2

## <u>CERTIFICATE OF SERVICE</u>

On September 8, 2023, the foregoing **_Notice of Appeal_** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This, the 8th day of September, 2023.


 /s/ John S. Moran

John S. Moran*
MᴄGᴜɪʀᴇWᴏᴏᴅs LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted _Pro Hac Vice_

3

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that 14-point Times New Roman font was used for this document and that it has been formatted in compliance with Local Rule 5.1.

This, the 8th day of September, 2023.

<u>/s/ John S. Moran</u>

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

4

**Tab 74**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |  |
|---|---|---|
| THE STATE OF GEORGIA, | ) ) ) | |
| v. | ) ) ) | Case No. 1:23-cv-03621-SCJ |
| MARK R. MEADOWS, | ) ) ) | |
| *Defendant.* | ) ) | |

## DEFENDANT MARK R. MEADOWS'S
## EMERGENCY MOTION FOR STAY PENDING APPEAL

Pursuant to Civil Rule 62 and Local Rule 7.2(b), Mark R. Meadows asks this

Court to stay the effect of its order, *see* Remand Order, Dkt. No. 69, which declined

jurisdiction and remanded this case to state court, pending his appeal to the U.S.

Court of Appeals for the Eleventh Circuit, *see* Notice of Appeal, Dkt. No. 71. Mr.

Meadows intends to seek expedited review in the Court of Appeals later today.[1] He

has a right to appeal, *see* 28 U.S.C. § 1447(d), and a stay of the remand order is

prudent "to help prevent [this] removed case from becoming a shuttlecock, batted

---

[1] While this is a criminal case, the Court has docketed it as a civil matter. To avoid any uncertainty about the applicable rules, Mr. Meadows seeks a stay in the district court before requesting a stay from the Court of Appeals. Given the urgency of the matter, however, Mr. Meadows intends to ask for a stay from the Court of Appeals together with his request for expedited review, unless this Court grants a stay before he does so this afternoon.

1

back and forth between a state court and a federal court." *Forty Six Hundred LLC v. Cadence Educ., LLC*, 15 F.4th 70, 81 (1st Cir. 2021).

While Mr. Meadows respectfully believes the Court erred, this Court need not agree to stay the Remand Order. The Court may stay its order if Mr. Meadows has "a substantial case on the merits" and the other stay factors—irreparable harm, balance of equities, and public interest—favor a stay. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (internal quotation omitted); *see also Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, No. 1:16CV534, 2016 WL 3346349, at \*2 (E.D. Va. June 16, 2016) (first factor calls for the court to "determine whether there is a strong likelihood that the issues presented on appeal *could be rationally resolved* in favor of the party seeking the stay"). The Court should issue a stay here to prevent the irreparable loss of the rights that Mr. Meadows asserts under the Federal Officer Removal Statute and the Supremacy Clause.

*First*, Mr. Meadows has at least a substantial case on the merits. The Court's own order states that the case presented a "novel question," which informed the Court's decision. Remand Order at 14. The Court then relied on the State's novel theory of prosecution to distinguish numerous well-established precedents that favor removal for federal officers. But the Court of Appeals will review those issues *de novo*. *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 780–81 (11th Cir.

2

2005); *Jefferson Cnty. v. Acker*, 137 F.3d 1314, 1316 (11th Cir. 1998), *rev'd on other grounds*, 527 U.S. 423 (1999). There are several aspects of the Court's remand order that depart from ordinary removal precedent and therefore provide Mr. Meadows at least a substantial case on the merits before the Eleventh Circuit:

*Failing to Credit Mr. Meadows's Account of His Conduct and Duties*. The Supreme Court has held that federal courts must credit the removing party's theory when determining whether he acted under color of federal office. *See Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999). But in the Remand Order, this Court departed from that command and credited the State's allegations over Mr. Meadows's testimony or discounted Mr. Meadows's testimony. *See, e.g.*, Remand Order at 19 (crediting the State's allegations that Meadows requested a memo on "disrupting and delaying the joint session of Congress on January 6, 2021" and that he attended a meeting about election fraud in Michigan, when he presented evidence that neither event occurred); *id.* at 36 n.14 (holding that the Court would "treat the evidence propounded . . . as neutral to the determination of whether particular Overt Acts were within the scope of Meadows's federal office" because of the State's allegations).

*Inverting the Standard for Removal of "Mixed" Cases*. Both the statutory text and binding Eleventh Circuit precedent make clear that, if any portion of a prosecution is removable, the entire case is removable. *See* 28 U.S.C. § 1442(a);

3

*Nadler v. Mann*, 951 F.2d 301, 305 n.9 (11th Cir. 1992). But in the Remand Order, this Court effectively held the opposite: that the case should be remanded if there is any way the State could prove its case without relying on an official act. *See, e.g.*, Remand Order at 19 ("In sum, to establish a RICO conspiracy the State only need prove that any co-conspirator committed one overt act in furtherance of the conspiracy, whether the overt act was specifically charged in the Indictment or not. In other words, the State can prove its RICO charge against Meadows by showing any one of his co-Defendants committed *any* overt act in furtherance of the conspiracy—whether that overt act is in the Indictment or not."); *id.* at 43 (recognizing at least some alleged Overt Acts involved Meadows acting within his official duty, but still not permitting removal).

**Raising the Burden on Mr. Meadows to Justify Removal**. The threshold for removal under the Federal Officer Removal Statute is "quite low," *Caver v. Central Alabama Elecric. Cooperative*, 845 F.3d 1135, 1144 (11th Cir. 2017), and does not "demand an airtight case on the merits in order to show the required causal connection," *Acker*, 527 U.S. at 432. But in the Remand Order, this Court held Mr. Meadows to a higher standard, effectively requiring him to prove his defense and justify the full scope of his duties in order to obtain removal. *See, e.g.*, Remand Order

4

at 28 ("Meadows was unable to explain the limits of his authority, other than his inability to stump for the President or work on behalf of the campaign.").

There is a substantial possibility that the Eleventh Circuit will disagree with this Court on at least one of these issues, or on other issues Mr. Meadows will raise on appeal. The first factor therefore favors a stay.

***Second***, absent a stay, there is a substantial risk Mr. Meadows will be irreparably injured. Injuries are irreparable when they are "not easily measurable in monetary terms." WRIGHT & MILLER, 11A FED. PRAC. & PROC. CIV. § 2948.1 (3d ed.); *see also Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) (injuries are irreparable only when they cannot be remedied with money). The federal rights Meadows invokes here include freedom not only from liability—*i.e.*, conviction and incarceration—but from the burdens of a state-court defense. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

The irreparable harm has already begun. Meadows was compelled to surrender on Wednesday, August 24, after the District Attorney refused a modest delay of arrest pending federal removal. Meadows has since been compelled to waive arraignment, to post a bond, and to begin preparing a defense for potential state prosecution. Meadows has sought to minimize this harm by asking the state

5

court to sever and stay his case. The state court held a hearing last Thursday on related issues, but to date, has not rejected the State's aggressive timeline.

At a minimum, the Court should stay the remand order to protect Meadows from a conviction pending appeal. Absent a stay, the State will continue seeking to try Meadows **42 days from now** on October 23, 2023. If the State gets its way, Meadows could be forced to go to trial—and could be convicted and incarcerated—*before* the standard timeline for a federal appeal would play out. The rights Meadows asserts "would be effectively nullified" if the prosecution goes forward during this appeal. *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 868 (5th Cir. 1984); *see also Davis*, 100 U.S. at 262–263 (explaining that the Supremacy Clause protects federal officials against being brought to trial in state court).

The second factor thus strongly favors a stay.

**Third**, a stay of Remand Order will not prejudice the State, nor other defendants in state court, because it would not prevent other ongoing proceedings; it would only prevent the court from entering a verdict against Meadows. And it will not prevent proceeding in state court if the State prevails on appeal. Whatever minimal burden the State faces from a stay pales in comparison to the burden on Meadows. The third factor thus strongly favors a stay.

**Finally**, a stay is in the public interest. The very premise of Supremacy Clause immunity and the Federal Officer Removal Statute is that it is vitally important to the proper functioning of our Federal Government that federal officials be free from state arrest and prosecution when carrying out their duties. *See Tennessee v. Davis*, 100 U.S. 257, 263 (1879). For the State to proceed to trial and seek to impose a verdict, it would give rise to the very "chilling effect" that federal law goes out of its way to protect against. *Tanella*, 374 F.3d at 147; *see generally In re Neagle*, 135 U.S. 1 (1890). A stay also prevents this case "from becoming a shuttlecock, batted back and forth between a state court and a federal court." *Forty Six Hundred LLC*, 15 F.4th at 81. Any public interest in faster state-court proceedings "is overshadowed by the rat's nest of comity and federalism issues which would arise should" the Eleventh Circuit agree that Mr. Meadows is entitled to removal. *See Northrop*, 2016 WL 3346349, at *4.

*   *   *   *   *

The Court should stay the Remand Order pending appeal.

7

Dated: September 11, 2023

Joseph M. Englert
MᴄGᴜɪʀᴇWᴏᴏᴅs LLP
1230 Peachtree St., N.E., Suite 2100
Atlanta, GA 30309
(404) 443-5500
Jenglert@mcguirewoods.com

Respectfully submitted,

*/s/ John S. Moran*

George J. Terwilliger, III*
John S. Moran*
Michael Francisco*
Robert J. Bittman*
Emily Erb Kelley*
Francis J. Aul*
MᴄGᴜɪʀᴇWᴏᴏᴅs LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com
rbittman@mcguirewoods.com
ekelley@mcguirewoods.com
faul@mcguirewoods.com
* Admitted *Pro Hac Vice*

*Counsel to Mark R. Meadows*

8

## <u>CERTIFICATE OF SERVICE</u>

On September 11, 2023, the foregoing **Defendant Mark R. Meadows's Motion to Stay Pending Appeal** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This, the 11th day of September, 2023.


 /s/ John S. Moran

John S. Moran*
McGuireWoods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

9

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that 14-point Times New Roman font was used for

this document and that it has been formatted in compliance with Local Rule 5.1.

This, the 11th day of September, 2023.

/s/ John S. Moran

John S. Moran*
McGuireWoods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

10

**Tab 78**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | CIVIL ACTION NO. |
| | ) | 1:23-cv-03621-SCJ |
| | ) | |
| v. | ) | |
| | ) | RE: NOTICE OF REMOVAL |
| | ) | OF FULTON COUNTY |
| | ) | SUPERIOR COURT |
| MARK RANDALL MEADOWS | ) | INDICTMENT NO. |
| | ) | 23SC188947 |

### THE STATE OF GEORGIA'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S EMERGENCY MOTION FOR STAY PENDING APPEAL

Defendant Mark R. Meadows has moved this Court for an Emergency Motion for Stay Pending Appeal. Pursuant to this Court's Order, the State of Georgia, by and through Fulton County District Attorney Fani T. Willis, responds that the defendant's motion does not show he can carry the heavy burden required to receive such a stay. The State of Georgia respectfully asks that this Court deny the Emergency Motion.

"A stay is considered 'extraordinary relief' for which the moving party bears a 'heavy burden.'" *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (quoting *Winston-Salem/Forsyth Cty. Bd. Of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971)). As noted by the defendant in his Motion, the applicable standard consists

of a four part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018). These factors "contemplate individualized judgment in each case, [and] the formula cannot be reduced to a set of rigid rules." *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987). The State of Georgia will consider each factor in turn.

**The defendant has not made a "strong showing" that he is likely to succeed on the merits.** The first factor requires the court to "determine whether there is a strong likelihood that the issues presented on appeal could be rationally resolved in favor of the party seeking the stay." *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, No. 1:16CV534, 2016 WL 3346349, at *2 (E.D. Va. June 16, 2016). This Court has acknowledged that "the RICO charge against Meadows presents a novel question in this case" since "[m]ost cases invoking federal officer removal involve claims based on discrete actions taken by a defendant." In resolving the question before it, this Court could thus hardly have "depart[ed] from ordinary removal precedent" as the defendant claims. Instead, over the course of 49 pages, the Court considerately and rationally applied existing precedent to the facts before it.

The defendant's purported examples of "departures" from "ordinary precedent" demonstrate as much. First, he claims that this Court "failed to credit Mr. Meadows's account of his conduct and duties." The defendant points to the Court's discussion of Overt Acts 9 and 19 at page 36 n.14 of the Remand Order, but that footnote does not support his claim. Instead, it demonstrates that the Court *did* credit the defendant's insistence that he did not participate in those two overt acts as alleged in the Indictment. However, as the Court explained with considerable care in its Order, the State is not "required to prove the overt acts as part of its burden of proof at trial." *Id.* Since the defendant had disputed the veracity of overt acts which the State was not actually required to prove, the Court merely considered them "neutral" and did not appear to give them any weight in its further analysis. *Id.* The only reason the Court considered the acts differently than other overt acts was, explicitly, the defendant's disputations made during his testimony.

Second, the defendant claims that the Court flouted precedent establishing that "if any portion of a prosecution is removable, the entire case is removable" by "effectively h[olding] the opposite." This too is inaccurate. The Remand Order explains how a case is removable if any discrete *claims* or *charges*, not merely "any portion," relate to acts taken within the scope of federal office. Doc [69] at 12-13. In light of this, the Court then analyzed the nature of the RICO charge and made the uncontroversial observation that the prosecution does not have to prove all, or indeed

*any*, overt acts attributed to the defendant to achieve a conviction against him for a RICO conspiracy charge, and that therefore the relevant "act" was not any (or every) overt act but instead the defendant's "alleged *association* with the conspiracy." *Id.* at 20-21. The Court then drew from precedent from both the Eleventh Circuit and the Fourth Circuit to determine that it had to identify the "heart" or "gravamen" of the RICO charge and analyzed the overt acts "in order to determine whether Meadows's association with the alleged conspiracy (the conduct for which he was charged) related to the scope of his federal duties." *Id.* at 21-22. The conclusion reached by the Court regarding overt acts was *not* "that the case should be remanded if there is any way the State could prove its case without relying on an official act," as the defendant insists. Doc. [74] at 4. Instead, the Court reached the rational conclusion required by the established precedents it had identified: "Because the inquiry hinges on whether Meadows's association with the conspiracy related to the color of his office, however, jurisdiction is not *conferred* simply because a single overt act relates to Meadows's federal office." Doc. [69] at 22 (emphasis added). The Court did not find that a single overt act can defeat jurisdiction; it found that a single overt act was not *sufficient to confer* jurisdiction. The defendant elides the careful reasoning of the Remand Order and overstates his case.

Third, the defendant argues that this Court held him to a higher standard than authorized in the removal context, "effectively requiring him to prove his defense

and justify the full scope of his duties in order to obtain removal." What the Court

actually found was that the defendant could not articulate the scope of his duties *at

all*: because "Meadows was unable to explain the limits of his authority," the Court

gave his testimony in that regard "less weight." Doc. [69] at 28. This sort of appraisal

is "the same as [the Court] does any other witness in an evidentiary hearing." *Id.* at

n.12. The Court thus did not hold the defendant to a higher standard but to precisely

the same standard as any other witness. It merely assigned less weight to the

defendant's insistence that all of his actions were within the scope of his official

duties because the defendant could not describe what the limits to the scope of his

official duties actually were.

Far from making a strong showing that he is likely to succeed on the merits in

his appeal, the defendant has not actually made *any* showing. His arguments are

overbroad and do not actually address the careful reasoning employed by the Court

in its Remand Order. He thus has presented no basis to conclude that he is likely to

succeed in his appeal, and the first factor cuts against him.

**The relative effects of a stay.** The second factor for the Court's consideration

is whether the applicant will be irreparably injured absent a stay, while the third

factor is whether issuance of the stay will substantially injure the other parties

interested in the proceeding. As this Court has already determined in denying the

defendant's prior Emergency Motion, 28 U.S.C. 1455 specifically contemplates that

a criminal case will continue to proceed as a defendant's Notice of Removal is considered. The defendant attempts to paint his participation in those proceedings as a form of injury, but they are merely what is required of him by the express language of section 1455(b)(3): the case proceeds, so all parties must proceed as well. The defendant asks "at a minimum"[1] that the Court stay its Remand Order in order to prevent the entry of a judgment against the defendant while he is still litigating his appeal. However, there is no basis to conclude that such an eventuality is likely or even possible. The defendant is already seeking expedited procedures on appeal, and even the most optimistic timeline for his trial in this case would not see a verdict reached for months. Evaluation of the second and third factors indicates that the likelihood of any injury is too remote to weigh in favor of the grant of a stay.

**The public interest weighs against the grant of a stay.** The final factor for this Court's consideration, "where the public interest lies," does not weigh in the defendant's favor either. This Court has actually clarified its appraisal of the public interest in this matter twice already. *See* Doc. [25] at 4-5; Doc [69] at 45-46. It is clear that the public interest is best served by minimal federal intrusion into this state

---

[1] The defendant refers to such relief as the "minimum" as if there were additional relief which this Court could grant, but it does not actually ask for any relief aside from a stay of the Remand Order. However, again, this Court has already outlined why it would not be proper to enjoin or otherwise halt the state court proceedings in the defendant's case. *See* Doc. [25]. Unsurprisingly, the defendant has now asked the Eleventh Circuit to issue an injunction to entirely cease his prosecution pending his appeal. *See* USCA11 Case 23-12958, Doc. [4-1] at 21-22.

prosecution, particularly where, as here, the case involves "not *state interference* with constitutionally protected federal activities, but *federal interference* with constitutionally protected state actions." Doc. [69] at 46. The defendant merely makes the same argument to this Court for a third time, and this factor does not weigh in his favor.

## Conclusion

The defendant cannot carry his heavy burden to demonstrate that the relevant factors weigh in his favor. His arguments do not actually address the reasoning of the Remand Order and instead talk around it. He asks for relief from purely speculative injuries. And he cannot cite to any pertinent public interest weighing in his favor, particularly when this Court has already found his arguments unpersuasive. As a result, the State of Georgia respectfully asks that this Court deny the defendant's request for a stay pending his appeal.

Respectfully submitted this 12th day of September 2023.

FANI T. WILLIS
DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT


By:

By: ~~s/ F. McDonald Wakeford~~
F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit

Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
fmcdonald.wakeford@fultoncountyga.gov

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that this pleading complies with

the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.) in

that it is double-spaced and composed in 14-point Times New Roman font.

This 12th day of September 2023.

s/ *F. McDonald Wakeford*
F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit
Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
Fmcdonald.wakeford@fultoncountyga.gov

## **CERTIFICATE OF SERVICE**

I hereby certify the foregoing was served upon the following by email:

Joseph M. Englert
McGuire Woods LLP
1230 Peachtree Street NE, Suite 2100
Atlanta GA 30309
(404) 443-5500
jenglert@mcguirewoods.com

George J. Terwilliger

John S. Moran
Michael Francisco
McGuire Woods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com

Dated this 12th day of September, 2023.

*s/ F. McDonald Wakeford*

F. McDonald Wakeford

**Tab 80**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| THE STATE OF GEORGIA | **CIVIL ACTION FILE** |
| v. | **No. 1:23-CV-03621-SCJ** |
| MARK R. MEADOWS, | **RE: NOTICE OF REMOVAL OF** |
| Defendant. | **FULTON COUNTY SUPERIOR COURT INDICTMENT NO. 23SC188947** |

## <u>ORDER</u>

This matter appears before the Court on Defendant Mark R. Meadows's Emergency Motion for a Stay Pending Appeal.[1] Doc. No. [74]. The State filed its expedited opposition response. Doc No. [78].  The Court has reviewed the Emergency Motion and concludes that Meadows failed to show a stay should be granted. Thus, the Court **DENIES** Meadows's Motion for an Emergency Stay. Doc. No. [74].

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

On September 8, 2023, the Court issued an order declining to assume jurisdiction over Meadows's removal of his State criminal prosecution under 28 U.S.C. §§ 1455 and 1442. Doc. No. [69]. Accordingly, the Court remanded the case to Fulton County Superior Court. Id. The same day, Meadows filed his notice of appeal to the Eleventh Circuit. Doc. No. [71]. On September 11, 2023, Meadows filed the instant Emergency Motion seeking to stay the Court's remand order pending resolution of his appeal. Doc. No. [74]. Meadows is also seeking an emergency stay with the Eleventh Circuit. See Emergency Motion to Stay Pending Appeal, Georgia v. Mark Meadows, No. 23-12958 (11th Cir. Sept. 11, 2023), ECF No. 4. The Eleventh Circuit has not yet issued its ruling on the requested emergency stay.[2]

---

[2] Meadows also seeks expedited review of his appeal with the Eleventh Circuit. Doc. No. [74], 1; Emergency Motion to Stay Pending Appeal, Georgia v. Mark Meadows, No. 23-12958 (11th Cir. Sept. 11, 2023), ECF No. 4. As of the time of this Order, however, the Eleventh Circuit has not indicated whether it will consider Meadows's appeal on an expedited basis.

The Eleventh Circuit has, however, issued a briefing schedule on the emergency motion and ordered the Parties to respond to a question about Section 1442(a)(1)'s applicability to former federal officers. Id. at ECF No. 7 (11th Cir. Sept. 12, 2023). The Eleventh Circuit's question, however, has no effect on the remainder of this Court's order denying Meadow's emergency stay. Cf. Fed. R. Civ. P. 62(g) (ensuring that Rule 62 "does not limit the power of the appellate court" to issue a stay or "an order to preserve the status quo or the effectiveness of the judgment to be entered").

As a general rule "[t]he filing of a notice of appeal generally 'confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'" In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007) (quoting Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982)). Federal Rule 62 "provides an exception to the general rule." Fed. Trade Comm'n v. Vylah Tec LLC, No. 217CV228FTM99MRM, 2017 WL 10844699, at *2 (M.D. Fla. Oct. 27, 2017). Specifically, Rule 62 allows for a "Stay of Proceedings to Enforce a Judgment." Fed. R. Civ. P. 62.

Meadows seeks an Emergency Stay under Federal Rule of Civil Procedure 62 and the appliable stay factors. Doc. No. [74]. The State's response likewise evaluates Rule 62 and the factors. Doc. No. [78].[3]

---

[3] Neither Party articulates specifically how Rule 62 operates in relation to a remand order, let alone a decision implicating Section 1455(b)(5). The Court notes that Rule 62 contains no language that specifically applies to the procedural posture at issue here. Rule 62 provides for an automatic stay for "execution on a judgment and proceedings to enforce it," a more permanent stay after posting a bond or other security, and modifications to injunctions. Fed. R. Civ. P. 62(a)–(d). The Court has nevertheless found a number of district courts that have stayed remand orders under Rule 62 when the remand order has been appealed under 28 U.S.C. § 1447(d). See, e.g., Martin v. LCMC Health Holdings, Inc., No. CV 23-411, 2023 WL 5173791, at *1 (E.D. La. Aug. 11, 2023); Overlook Gardens Props., LLC v. Orix USA, L.P., No. 4:17-CV-101 (CDL), 2017 WL 4953905, at *6 (M.D. Ga. Nov. 1, 2017); Norhtrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC, No. 1:16CV534(JCC/IDD), 2016 WL 3180775, at *1–2 (E.D. Va. June 7, 2016); but see, e.g., Arnold v. Garlock, Inc., 278 F.3d 426, 437 (5th Cir. 2001) (pre-Section 1447(d)

Meadows seeks a stay of the order remanding—or more specifically, declining to exercise jurisdiction over—his criminal prosecution initiated in Fulton County Superior Court. Doc. No. [74]. While ordinarily remand orders are not appealable, Meadows sought to remove his criminal prosecution under the federal officer statute, 28 U.S.C. § 1442, which is an exception to the ordinary rule and provides the right to appeal. 28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.").

An emergency stay may be granted if the movant shows (1) he is "likely to prevail on the merits on appeal," (2) "absent a stay [he] will suffer irreparable damage," (3) the State would not suffer "substantial harm from the issuance of the stay," and (4) "that the public interest will be served by issuing the stay." Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986) (citing Jean v. Nelson,

_____

amendments allowing appeals of remands for federal officer removal actions); James v. P M G O P C O – Wash. LLC, No. 21-CV-2407, 2022 WL 4351998, at *1 (W.D. La. Sept. 19, 2022). Therefore, the Court will address the motion under the authority of Rule 62.

4

683 F.2d 1311, 1312 (11th Cir. 1982)). Under the framework of these factors, granting or denying a stay is "an exercise of judicial discretion." <u>Nken v. Holder</u>, 556 U.S. 418, 433 (2009) (quoting <u>Virginian Ry. Co. v. United States</u>, 272 U.S. 658, 672–73 (1926)). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." <u>Id.</u> at 433–34. The Court now addresses each factor and determines that Meadows has not met his burden to show any one of the factors favors a stay here.

## I.   LIKELIHOOD OF SUCCESS ON THE MERITS

"Ordinarily the first factor [likelihood of prevailing on the merits] is the most important." <u>Garcia-Mir</u>, 781 F.2d at 1453. In his motion, Meadows argues that he has a substantial case on the merits. Doc. No. [74], 2. He first points to the Court's recognition that the issues presented in his removal action were novel and then asserts three specific contentions of error. <u>Id.</u> at 2–5. These arguments simply preview the issues Meadows is raising on appeal. There is nothing in the summary of arguments he plans to raise in his challenge to the denial of removal to convince this Court that its decision was incorrect.  Thus, Meadows has shown no likelihood or prevailing on the merits of his appeal.

5

The Court acknowledges that the first factor here—a substantial likelihood of success on the merits—can be also satisfied by a "lesser showing" that he has a "substantial case on the merits" *if the other stay factors are met*. Garcia-Mir, 781 F.2d at 1453 (11th Cir. 1986) (quoting Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981)). However, as specified below, the Court finds that he has not carried his burden on the other factors and therefore, the lower standard for this first factor is not applicable.

## II.   IRREPARABLE HARM

Meadows fails to show that anything more than a possibility of irreparable harm in absence of a stay. Some "possibility" of irreparable harm is insufficient, and more than "mere possibility" is required. Nken, 556 U.S. at 435 (internal quotations omitted from second quotation). Meadows claims that he would be irreparably harmed because the federal rights implicated in his appeal under the federal officer removal statute "include freedom not only from liability . . . but from the burdens of a state-court defense." Doc. No. [74], 5. He also asserts that he has already been harmed because—despite having filed his notice of removal—he had to surrender, waive arraignment, post bond, and begin preparations for a defense in Fulton County Superior Court. Id. He fears future

6

harm because the State wishes to begin trial in Fulton County Superior Court in October even if his federal appeal has not been resolved. Id. at 6.

Section 1455(b)(3) provides that "[t]he filing of a notice of removal of a criminal prosecution shall not prevent the State court in which such prosecution is pending from proceeding further." The Court cannot ignore clear statutory requirements that, despite Meadows's filing of the notice of removal, the State proceedings continued. See 28 U.S.C. § 1455(b)(3); see also Doc. No. [25] (denying Meadows's first emergency motion to prohibit the State Court criminal proceedings from continuing). Thereby, Meadows's alleged previous harm is not a basis for finding irreparable harm to grant his Emergency Motion.

Furthermore, Meadows's contentions that he would be irreparably harmed by the possibility of facing trial next month are insufficient to carry his burden on the emergency stay requested. No trial date has been set for Meadows, and he admits that it is not guaranteed his trial will be in October. Doc. No. [74], 6 ("*If the State gets its way*, Meadows could be forced to go to trial . . . ." (emphasis added). Meadows has also sought severance of his prosecution and a stay of his proceedings in the State Court. Id. at 5–6. These motions are still pending. Id. The Court finds that Meadows has not shown irreparable injury based on the

7

continuation of proceedings in the State Court when the State Court has yet to

rule on his motion to stay or schedule a trial date. Therefore, the injury Meadows

asserts does not arise above the "too lenient" *possibility* of irreparable harm.

Nken, 556 U.S. at 435. Thus, the Court concludes that Meadows has not shown

irreparable injury warranting an emergency stay.

### III.   PREJUDICE TO THE STATE

Nor do Meadows's conclusory assertions that the State would not be

prejudiced meet his burden as to the third stay factor. Though the State did not

articulate specific prejudice it would suffer if a stay was issued (Doc. No. [78],

5–6), the Court has already determined that a state has a strong interest in its

criminal prosecutions being free from federal interference.[4] See, e.g., Willingham

v. Morgan, 395 U.S. 402, 409 n.4 (1969) (requiring a "more detailed showing" for

federal removal of state criminal prosecutions based on an increased State

interest). Thus, the strong federalism interests at stake here are sufficient for the

---

[4] For example, the Anti-Injunction Act prohibits federal courts from "grant[ing] an injunction to stay proceedings in a State court" absent certain circumstances. 28 U.S.C. § 2283. Additionally, Younger abstention requires that "federal courts . . . abstain from interfering with ongoing state criminal prosecutions" based on comity and federalism concerns. Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs, 405 F.3d 1298, 1315 n.9 (11th Cir. 2005).

Court to conclude Meadows has failed to establish that the State would be prejudiced by a stay.

## IV.   THE PUBLIC INTEREST

Finally, Meadows claims that the public interest is served by a stay because of the Supremacy Clause and the federal officer interests at issue in his removal action. Doc. No. [74], 7. The Court acknowledges that there is a public interest in protecting federal officers from state interference under the Supremacy Clause. The Court, however, has already determined that Meadows failed to show he is entitled to federal removal under the federal officer statute because he was not acting in the scope of his federal office at the time of the acts alleged.[5] See generally Doc. No. [69]. Moreover, the Court indicated that the federal and state interests at issue in Meadows's action actually favor the resolution of his case in the State Court, rather than federal court. Id. at 46; see also Doc. No. [78], 6–7. Thus, in the Court's view, the public interest in this case favors State comity and federalism, which would not be served by issuing an emergency stay of the remand order.

---

[5]  The Court did not issue any ruling on Meadows's asserted federal defenses. Doc. No. [69], 44–45.

## V.   CONCLUSION

In sum, the Court concludes that Meadows has not shown he is entitled to an emergency stay under the aforementioned factors. The Court thereby denies his request for a stay pending appeal of his removal of his State criminal prosecution.  Cf. Hutchinson v. New York, 86 S. Ct. 5, 5–6 (1965) (Memorandum of Justice Harlan) (declining an application for "a stay of a remand order pending appeal" of "criminal charges . . . sought to be removed to the federal courts").

For the foregoing reasons, the Court **DENIES** Meadows's Emergency Motion for a Stay Pending Appeal. Doc. No. [74].

**IT IS SO ORDERED** this ___12th___ day of September, 2023.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

10

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ George J. Terwilliger, III*
George J. Terwilliger, III