No. 23-12958

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

THE STATE OF GEORGIA,

*Plaintiff-Appellee*,

*v.*

MARK R. MEADOWS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Georgia, No. 1:23-cv-03621 (Jones, J.)

**BRIEF FOR FORMER JUDGES, PROSECUTORS, AND STATE AND
FEDERAL EXECUTIVE OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFF-APPELLEE AND AFFIRMANCE**

FRED WERTHEIMER
DEMOCRACY 21 EDUCATION FUND
2000 Massachusetts Avenue N.W.
Washington, D.C. 20036
(202) 355-9600

JOHN THOMAS MORGAN III
J.TOM MORGAN, ATTORNEY, LLC
160 Clairemont Avenue, Suite 645
Decatur, Georgia 30030
(404) 687-6418

SETH P. WAXMAN
DANIEL S. VOLCHOK
JOSEPH M. MEYER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000

*Counsel for Amici Curiae*

September 25, 2023

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1-1 and 26.1-2, the undersigned certifies that, to the best of amici's knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal, and that amici are aware of no additional attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal other than those listed in the appellant's, appellee's, and other amici's already-filed certificates.

/s/ *Seth P. Waxman*
SETH P. WAXMAN

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF AMICI'S IDENTITY AND INTEREST ................................... 1

ISSUE PRESENTED .............................................................................. 3

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 3

ARGUMENT ....................................................................................... 5

I. MR. MEADOWS WAS INDICTED FOR ELECTIONEERING CONDUCT UNRELATED TO ANY DUTY OF HIS OFFICE .......................................... 5

II. MR. MEADOWS HAS NO COLORABLE FEDERAL DEFENSE .................... 14

III. REMOVAL HERE WOULD NOT SERVE THE PURPOSE OF THE FEDERAL-OFFICER REMOVAL STATUTE ............................................ 18

CONCLUSION .................................................................................... 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Arizona v. Manypenny*, 451 U.S. 232 (1981).................................................3, 14, 16

*Baucom v. Martin*, 677 F.2d 1346 (11th Cir. 1982) ...............................................15

*Bond v. United States*, 572 U.S. 844 (2014) .........................................................3

*Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135 (11th Cir. 2017)...................................................................................6

*Charudattan v. Darnell*, 834 F.App'x 477 (11th Cir. 2020) ...................................11

*Clinton v. Jones*, 520 U.S. 681 (1997).................................................................7

*County of San Mateo v. Chevron Corporation*, 32 F.4th 733 (9th Cir. 2022) .......................................................................................5

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) .................................16

*Jefferson County v. Acker*, 527 U.S. 423 (1999) .........................................4, 5, 6, 7

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020)....................6, 10

*Maryland v. Soper*, 270 U.S. 9 (1926)................................................................5, 6

*Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022).................................................................................6, 13

*Michigan Welfare Rights Organization v. Trump*, 2022 U.S. Dist. LEXIS 215474 (D.D.C. Nov. 28, 2022)....................................................9, 10

*Minnesota by Ellison v. American Petroleum Institute*, 63 F.4th 703 (8th Cir. 2023) ................................................................................6, 10

*Myers v. Bowman*, 713 F.3d 1319 (11th Cir. 2013) ...............................................11

*New York v. Trump*, 2023 U.S. Dist. LEXIS 124733 (S.D.N.Y. July 19, 2023)...............................................................................................7

*Poindexter v. Greenhow*, 114 U.S. 270 (1885)......................................................13

*Roudebush v. Hartke*, 405 U.S. 15 (1972) .................................................8

*Salkin v. Labrosse*, 2019 U.S. Dist. LEXIS 215160 (D.N.J. Dec. 13, 2019) .................................................................................................11

*Tennessee v. Davis*, 100 U.S. 257 (1879) .........................................18, 19

*Thompson v. Trump*, 590 F.Supp.3d 46 (D.D.C. 2022)............................8, 9, 13, 15

*United States ex rel. Drury v. Lewis*, 200 U.S. 1 (1906) .......................14

*United States v. Sandlin*, 575 F.Supp.3d 16 (D.D.C. 2021) ....................8

*United States v. Stevens*, 559 U.S. 460 (2010) ......................................16

*United States v. Williams*, 553 U.S. 285 (2008) ...................................17

*Vote Forward v. DeJoy*, 490 F.Supp.3d 110 (D.D.C. 2020) ...................9

*Watson v. Philip Morris Companies*, 551 U.S. 142 (2007)..............19, 20

*Willingham v. Morgan*, 395 U.S. 402 (1969) ...................7, 13, 14, 16, 18

## STATUTES

3 U.S.C. §§15-18.......................................................................................8

28 U.S.C. §1442............................................................................1, 3, 5, 13, 20

Act of March 3, 1863, §5, 12 Stat. 755...................................................19

Removal Clarification Act of 2011, Pub. L. 112-51, §2, 125 Stat. 545 (2011)..................................................................................................6

Violation of Oath by Public Officer, O.C.G.A. § 16-10-1 .....................17

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, §4.............................................................................3, 8

U.S. Const. art. II, §1 ..........................................................................3, 8, 9

## LEGISLATIVE MATERIALS

9 Cong. Deb. 461 (1833)..........................................................................19

## OTHER AUTHORITIES

The Federalist No. 68 (Hamilton) (Clinton Rossiter ed., 2003) ...............................9

The Federalist No. 81 (Hamilton) (Clinton Rossiter ed., 2003) ...............................3

Office of Special Counsel, *Federal Hatch Act Advisory: Candidate Visits to Federal Agencies* (Feb. 15, 2018) ...................................................10

*Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. O.L.C. 214 (1982) ................................................10, 11

*Transcript: President Trump's Phone Call With Georgia Election Officials*, N.Y. Times (Jan. 3, 2021), https://www.nytimes.com/ 2021/01/03/us/politics/trump-raffensperger-georgia-call-transcript.html .......................................................................................12, 18

Volokh, Eugene, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981 (2016) ...................................................17

# STATEMENT OF AMICI'S IDENTITY AND INTEREST[1]

Amici, listed below, are former judges, prosecutors, and state and federal executive officials with experience in both state and federal court, including experience with the federal-officer removal statute, 28 U.S.C. §1442, as well as with respect to drawing the line between the official and political activities of the president and other senior executive officeholders. As such, amici have an interest in the proper division of responsibility between state and federal courts as well as in the just enforcement of criminal laws.

**Donald B. Ayer** served as U.S. Deputy Attorney General in the George H.W. Bush Administration (1989-1990); U.S. Principal Deputy Solicitor General in the Reagan Administration (1986-1988); and U.S. Attorney for the Eastern District of California in the Reagan Administration (1981-1986).

**John J. Farmer Jr.** served as Acting Governor of New Jersey (January 8, 2002); New Jersey Attorney General (1999-2002); Chief Counsel to Governor Whitman of New Jersey (1997-1999); Deputy Chief Counsel to Governor Whitman (1996-1997); and Assistant U.S. Attorney for the District of New Jersey in the George H.W. Bush and Clinton Administrations (1990-1994).

---

[1] All parties consent to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no entity or person other than amici and their counsel contributed money intended to fund the preparation or submission of this brief.

**Charles A. Fried** served as Associate Justice of the Massachusetts Supreme Judicial Court (1995-1999); U.S. Solicitor General in the Reagan Administration (1985-1989); and Special Assistant to the U.S. Attorney General in the Reagan Administration (1984-1985).

**Stuart M. Gerson** served as Acting U.S. Attorney General in the Clinton Administration (1993); U.S. Assistant Attorney General for the Civil Division in the George H.W. Bush and Clinton Administrations (1989-1993); and Assistant U.S. Attorney for the District of Columbia in the Nixon and Ford Administrations (1972-1975).

**J. Michael Luttig** served as Judge of the U.S. Court of Appeals for the Fourth Circuit (1991-2006); U.S. Assistant Attorney General for the Office of Legal Counsel in the George H.W. Bush Administration (1990-1991); and Assistant Counsel to President Reagan (1980-1981).

**Alan Charles Raul** served as General Counsel to the U.S. Department of Agriculture in the George H.W. Bush Administration (1989-1993); General Counsel to the Office of Management and Budget in the Reagan Administration (1988-1989); and Associate Counsel to President Reagan (1986-1988).

**William F. Weld** served as Governor of Massachusetts (1991-1997); U.S. Assistant Attorney General for the Criminal Division in the Reagan Administration

(1986-1988); and U.S. Attorney for the District of Massachusetts in the Reagan

Administration (1981-1986).

## ISSUE PRESENTED

Whether appellant Mark Meadows is entitled to removal under 28 U.S.C.

§1442.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Constitution of the United States confers upon the 50 States a

compelling interest in prosecuting—in their own courts—criminal interference

with their administration of federal elections.  *See* U.S. Const. art. I, §4; *id*. art. II,

§1.  Consistent with the States' constitutional authority over the integrity of the

federal elections they administer, the federal-officer removal statute, 28 U.S.C.

§1442, does not permit removal here.

In conceiving our federal system, the Framers insisted that "the fitness and

competency of [state] courts should be allowed in the utmost latitude."  The

Federalist No. 81 (Hamilton) at 485 (Clinton Rossiter ed., 2003).  And "[p]erhaps

the clearest example of traditional state authority is the punishment of local

criminal activity."  *Bond v. United States*, 572 U.S. 844, 858 (2014).  To preserve

that longstanding tradition, the Supreme Court has recognized a "strong judicial

policy against federal interference with state criminal proceedings."  *Arizona v.

Manypenny*, 451 U.S. 232, 243 (1981).  In keeping with that "strong judicial

policy," removal of a state criminal prosecution to federal court is permitted by the federal-officer removal statute only where a federal officer both (1) faces criminal charges for conduct arising under color of his office and (2) identifies a colorable federal defense. *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). Because neither of those elements is satisfied here, the Court should affirm the decision below remanding this case to the Fulton County Superior Court.

The conduct charged here by the Fulton County District Attorney— interference by Mark Meadows with the 2020 presidential election in Georgia in order to aid Donald Trump's candidacy—bore no connection to any duty of Mr. Meadows's (or Mr. Trump's) office. Neither the president nor his chief of staff has any duty to superintend or participate in a State's selection of its presidential electors. And there is no plausible basis for Mr. Meadows to claim Supremacy Clause immunity, protection under the First or Fourteenth Amendment, or any other federal defense to the charges. Finally, the purpose of the federal-officer removal statute—to protect federal operations by preventing retribution in state court for locally unpopular exercises of federal authority—would not be served by removal here. To the contrary, removal would be perverse, as this prosecution arises from interference with *state*-government operations and seeks to vindicate Georgia's voice in a federal election, the very contest from which federal authority flows.

**ARGUMENT**

I.     **MR. MEADOWS WAS INDICTED FOR ELECTIONEERING CONDUCT UNRELATED TO ANY DUTY OF HIS OFFICE**

The federal-officer removal statute provides that an officer may remove a state prosecution only if it is "for or relating to any act under color of [his] office." 28 U.S.C. §1442(a)(1).  That requirement is not remotely met here.  Mr. Meadows is charged for his efforts to pressure election officials in Georgia to award the State's electoral votes to Mr. Trump in the 2020 presidential election, as well as for supporting similar pressure applied by Mr. Trump himself.  None of that conduct was grounded in any official duty of the White House chief of staff.  Indeed, neither the Constitution nor any other source of federal law affords the chief of staff (or the president) *any* role in the selection of a State's presidential electors.  To the contrary, the executive branch is deliberately (and understandably) walled off from that selection process.  There is thus no basis for removal.

A.     "The defendant has the burden of proving by a preponderance of the evidence that the requirements for removal jurisdiction have been met." *County of San Mateo v. Chevron Corporation*, 32 F.4th 733, 746 (9th Cir. 2022), *cert. denied*, 143 S.Ct. 1797 (2023).  Historically, defendants invoking the federal-officer removal statute have had to show "a causal connection between the charged conduct and asserted official authority." *Acker*, 527 U.S. at 431.  In other words, the prosecution had to be "based on or arise[] out of" conduct the officer

performed "under authority of federal law in the discharge of his duty and only by reason thereof." *Maryland v. Soper*, 270 U.S. 9, 33 (1926).

In 2011, Congress amended the federal-officer removal statute by inserting the words "or relating to" in the phrase "for or relating to any act under color of such office." Removal Clarification Act of 2011, Pub. L. 112-51, §2, 125 Stat. 545, 545 (2011). While courts have disagreed on the precise effect of that amendment, every court that has applied the amended statute has agreed that it permits removal only where a case is at least "*connected* or *associated*[] with acts under color of federal office," *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc). That includes this Court, which interprets the phrase "relating to" as requiring at least "a 'connection' or 'association' between" the charged conduct and some official duty. *Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135, 1144 (11th Cir. 2017).

Courts also agree that the connection between the charged conduct and an official duty may be "too remote," *Minnesota by Ellison v. American Petroleum Institute*, 63 F.4th 703, 715 (8th Cir. 2023), or "too tenuous to support removal," *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 234 (4th Cir. 2022), *cert. denied*, 143 S.Ct. 1795 (2023). That is why courts look to the "heart," *id*., or "gravamen" of the case when asking whether the defendant's actions were, "if not required by, at least closely connected with, the performance of his official

functions," *Acker*, 527 U.S. at 447 (Scalia, J., dissenting). And in a criminal case, as here, a defendant seeking removal must make a "more detailed showing" of the required connection, owing to the "more compelling state interest in conducting criminal trials in the state courts." *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969).

B. Mr. Meadows cannot identify any official duty bearing any connection to the conduct for which he is charged. He is charged with efforts to manipulate Georgia officials who had roles in administering the presidential election in their State; namely, the Georgia Secretary of State, *see* App.64 (count 1, act 112), App.101 (count 28), and the Secretary's Chief Investigator, *see* App.58 (count 1, act 93), App.59 (count 1, act 96). He is also charged with attempting to infiltrate a signature-match audit taking place in Cobb County, Georgia. *See* App.58 (count 1, act 92). Even assuming Mr. Meadows's position qualified him as a federal officer for purposes of the removal statute at the time of his alleged conduct (this brief takes no position on that unsettled question), and assuming the statute applies to former officers (another question on which this brief takes no position), "[n]ot every act of or on behalf of a federal officer is an act under color of office," *New York v. Trump*, 2023 U.S. Dist. LEXIS 124733, *20 (S.D.N.Y. July 19, 2023); *see also Clinton v. Jones*, 520 U.S. 681, 695 (1997). The acts charged here certainly were not.

1.     Neither the president nor his chief of staff has *any* duty (or authority, for that matter) to superintend state election officials' administration of a federal election in any way resembling the manner alleged.  As the Supreme Court has explained, the Constitution "empowers *the States*" and "*Congress*" "to regulate the conduct of [federal] elections."  *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972) (emphases added); *see also* U.S. Const. art. I, §4 (Elections Clause); *id.* art. II, §1 (Electors Clause).  Likewise, while the Electoral Count Act assigns duties to various congressional officials—"the presiding officer [i.e., the vice president acting as president of the Senate], the Speaker [of the House], the Senators, the Representatives, the tellers [who count electoral votes], and others"—it prescribes *no* role for the president or his chief of staff.  *United States v. Sandlin*, 575 F.Supp.3d 16, 23 (D.D.C. 2021); *see also* 3 U.S.C. §§15-18.

Nor did the Constitution's Take Care Clause vest Mr. Trump or Mr. Meadows with any relevant duty.  That is because the clause "does not extend to government officials over whom [the president] ha[d] no power or control," *Thompson v. Trump*, 590 F.Supp.3d 46, 78 (D.D.C. 2022) (emphasis omitted).  The clause thus did not confer on Mr. Trump or Mr. Meadows any duty to manage or direct the congressional officials with roles prescribed by the Electoral Count Act—those officials were members "of a co-equal branch[] not subject to

Executive Branch control," *id*.—much less to manage or direct *state* election officials.

This is not by accident. It is instead by design that "our country has a highly decentralized system of election administration, in which states and localities are primarily responsible for regulating and managing elections." *Vote Forward v. DeJoy*, 490 F.Supp.3d 110, 123 (D.D.C. 2020). Indeed, the Framers ensured "that the election of the President" would be "well guarded … from any sinister bias," not only by fostering a "detached and divided" process "in each State," but also by "exclud[ing] from eligibility" to serve as presidential electors "all those who from situation might be suspected of too great devotion to the President in office." The Federalist No. 68 (Hamilton) at 410-411; *see also* U.S. Const. art. II, §1, cl. 2. Surely, then, the Framers did not contemplate supervision of a presidential election by a sitting president himself (or his chief of staff).

As another court recently concluded, therefore, Mr. Trump's interference with state election officials cannot "possibly constitute executive action in defense of the Constitution." *Michigan Welfare Rights Organization v. Trump*, 2022 U.S. Dist. LEXIS 215474, *13 (D.D.C. Nov. 28, 2022). The same goes for Mr. Meadows's interference, as well as his support of Mr. Trump's. And it makes no difference whether Mr. Trump or Mr. Meadows believed that either was addressing suspected voter fraud or election irregularities in Georgia (suspicions, it bears

noting, that have never been substantiated).  As in the case just cited, Mr. Trump

(and Mr. Meadows) cannot "offer any reason to believe [their] efforts to expose

'election fraud' were part of any executive effort."  *Id.*

2.     Even if the law were otherwise, such that the president (and thus

perhaps his chief of staff) *had* a role in ensuring that state election officials fairly

administer the presidential election in their State, that is not what Mr. Meadows is

alleged to have done.  The required connection between the alleged conduct and

any official duty would therefore still be missing, or at least "too remote" to

support removal, *Ellison*, 63 F.4th at 715.  Mr. Meadows is charged for his efforts

to "change the outcome of the election in favor of Trump," App.28; for efforts, that

is, in service of Mr. Trump's candidacy.  Such conduct constitutes electioneering;

it is not "connected or associated" with any official duty, *Latiolais*, 951 F.3d at 292

(emphasis omitted).

All three branches of the federal government agree that electioneering is *not*

an official function:  Congress distinguished in the Hatch Act between

electioneering activities and official conduct, applying restrictions on federal

employees' activities in the former category but not the latter.  *See* Office of

Special Counsel, *Federal Hatch Act Advisory: Candidate Visits to Federal

Agencies* 1-2 (Feb. 15, 2018).  The executive branch's Office of Legal Counsel

does not consider expenses for campaign travel to be official expenses.  *Payment*

*of Expenses Associated with Travel by the President and Vice President*, 6 Op.

O.L.C. 214, 216-217 (1982).  And federal courts routinely distinguish between

official and campaign conduct.  This Court, for example, has held that the

management of a sheriff's campaign webpage was not state action because "'acts

of officers in the ambit of their personal pursuits are not done under color of law.'"

*Charudattan v. Darnell*, 834 F.App'x 477, 482 (11th Cir. 2020) (quoting *Myers v.*

*Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013)).  As another court held in a

similar context, "[t]he opposite conclusion would impermissibly stretch the

definition of 'under color of law.'"  *Salkin v. Labrosse*, 2019 U.S. Dist. LEXIS

215160, *10 (D.N.J. Dec. 13, 2019).

Meadows contends that there is no "'political' exception" to the removal

statute.  Dkt. 32 at 34-35.  That is wrong.  For the reasons just explained, the

statute's "under color of … office" requirement is just such an exception.

Nor should this Court credit Mr. Meadows's attempt to blur the line between

official and political conduct, *see* Dkt. 32 at 35-39, as the conduct charged here

undeniably falls on the political side of the line.  Mr. Meadows conceded as much

below, stating in his motion to dismiss that "[a]ll the substantive allegations in the

Indictment concern *unquestionably* political activity."  App.170 (emphasis added).

The indictment confirms that concession was correct.  For instance, it alleges that

Mr. Meadows sent a text message asking the Georgia Secretary of State's Chief

Investigator if it was possible "to speed up Fulton county signature verification …

*if the [T]rump campaign assist[s] financially*." App.59 (count 1, act 96) (emphasis

added). Mr. Meadows's contention that this message "was not a 'financial offer'

but an inquiry about the ability 'to speed things up,'" Dkt. 4-1 at 8 n.5 (quoting

App.462-463), ignores the portion of the text message italicized above. The

indictment also alleges that on January 2, 2021, Mr. Meadows and Mr. Trump

"unlawfully solicited, requested, and importuned Georgia Secretary of State Brad

Raffensperger" to "unlawfully influenc[e] the certified returns for presidential

electors." App.101 (count 28); *see also* App.64 (count 1, act 112). This

communication's purpose was unquestionably to aid Mr. Trump's candidacy. Mr.

Trump told Secretary Raffensperger that he needed to "find 11,780 votes"—in Mr.

Trump's words, exactly "one more than" he needed, as a *candidate*, to win in

Georgia. *Transcript: President Trump's Phone Call With Georgia Election

Officials*, N.Y. Times (Jan. 3, 2021).[2] The precise tailoring of the demand leaves

no doubt that this communication was made in service of Mr. Trump's candidacy,

not any official duty. What's more, the way Mr. Trump prefaced the demand—

"*All I want to do is this.* I just want to find 11,780 votes," *id*. (emphasis added)—

---

[2] *Available at* https://www.nytimes.com/2021/01/03/us/politics/trump-raffensperger-georgia-call-transcript.html.

makes clear that the communication was made *exclusively* to aid Mr. Trump's candidacy.

*   *   *

This prosecution is not "for or relating to any act under color of [Mr. Meadows's] office," 28 U.S.C. §1442(a)(1), because the office of president (and *a fortiori* the office of White House chief of staff) has *no* duty or even authority to participate in the administration of a State's presidential election as alleged here. And even if those offices *had* such a duty, the charged conduct still would not relate to that duty, because "[t]he Office of the President has no preference for who occupies it," *Thompson*, 590 F.Supp.3d at 82, and the alleged interference with the presidential election in Georgia clearly evinced such a preference. At the very least, any connection to an official duty is "too tenuous to support removal," *Mayor & City Council of Baltimore*, 31 F.4th at 234. Mr. Meadows has failed to make the requisite "detailed showing" otherwise, *Willingham*, 395 U.S. at 409 n.4. Remand is therefore required.[3]

---

[3] The assertion made below by Mr. Meadows's counsel that Mr. Meadows "*is* federal operations," App.610 (emphasis added), is frankly chilling. Such assertions "obliterate[] the line of demarcation that separates constitutional government from absolutism, free self-government based on the sovereignty of the people from that despotism, whether of the one or the many, which enables the agent of the state to declare and decree that he is the state; to say '*L'Etat, c'est moi.*'" *Poindexter v. Greenhow*, 114 U.S. 270, 291 (1885).

## II.    MR. MEADOWS HAS NO COLORABLE FEDERAL DEFENSE

To remove a case against him, a federal officer must "raise a colorable defense arising out of [his] duty to enforce federal law." *Willingham*, 395 U.S. at 406-407.  The Supreme Court imposed this separate removal requirement because the Court (in its words) "retains the highest regard for a State's right to make and enforce its own criminal laws." *Manypenny*, 451 U.S. at 243.  To respect that right, the Court held, federal-officer removal of a "prosecution under state law" must be "limited to assuring that an impartial setting is provided in which the federal defense of immunity can be considered." *Id*. at 242.  Mr. Meadows fares no better on this requirement than on the requirement discussed in Part I, for essentially the same reasons discussed there.

A.      Mr. Meadows's principal purported federal defense is that his conduct is shielded by Supremacy Clause immunity.  *See* Dkt. 32 at 17-19, 23; App.120-124; App.157-168.  But no such immunity exists where "it [cannot] reasonably be claimed that" the officer's conduct was "in the performance of a *duty imposed by ... Federal law*." *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8 (1906) (emphasis added).  None of the conduct for which Mr. Meadows is charged arose from or is related to any duty imposed on him by federal law.  As explained in Part I, no federal statute or constitutional provision empowers (let alone requires) the president or his chief of staff to interfere in a State's presidential election.

14

The reasoning of *Thompson v. Trump*, 590 F.Supp.3d 46 (D.D.C. 2022), is instructive. The court there held that Mr. Trump had no official duty to urge the vice president or members of Congress to violate their own federal-law duty to certify electoral votes on January 6, 2021—and thus he was not immune from liability for such exhortation—because, as noted, the president's duties under federal law (including the Constitution's Take Care Clause) do "*not* extend to government officials over whom he has no power or control." *Id*. at 78. Just as Mr. Trump had no power over the vice president or members of Congress performing their prescribed roles in the certification process, so too he (and Mr. Meadows) had no power over Georgia officials administering the presidential election in that State. And just as the *Thompson* court explained that the Electoral Count Act "prescribes no role for a sitting President" in the tabulation of votes in the electoral college, *id*. at 77, no statute or constitutional provision permits any role for the president or his chief of staff in the administration of a particular State's determination of those votes.

This Court has held, moreover, that Supremacy Clause immunity does not extend to an officer who "acted because of any personal interest" rather than "to do his duty" under federal law. *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982). That is the situation here. Again, Mr. Meadows is charged for his efforts to "change the outcome of the election in favor of Trump," App.28; in other words,

for efforts to aid Mr. Trump's candidacy. Because the charged conduct constitutes electioneering, it is, as explained in Part I, personal and not official.

B.     In his motion to dismiss, Mr. Meadows invoked the First and Fourteenth Amendments as "contingent defenses," should his claim to Supremacy Clause immunity be rejected. App.169 n.9; *see* App.169-171. To begin with, however, even if there were any merit to those defenses (and as explained below, there isn't), it is unlikely either could satisfy the colorable-federal-defense requirement for officer removal. As noted, the Supreme Court has both required officers to "raise a colorable defense *arising out of their duty to enforce federal law*," *Willingham*, 395 U.S. at 406-407 (emphasis added), and held that federal-officer removal must be "limited to assuring that an impartial setting is provided in which the federal defense *of immunity* can be considered," *Manypenny*, 451 U.S. at 242 (emphasis added). Mr. Meadows has not even attempted to show that either of his "contingent defenses" satisfies these requirements.

In any event, Mr. Meadows has no plausible claim to a defense under the First or Fourteenth Amendment.

Mr. Meadows's First Amendment defense ignores the "historic and traditional" exception to the protection of free expression for "speech integral to criminal conduct," *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)). That disregard

is striking given that "[s]peech integral to criminal conduct is now a standard item on lists of First Amendment exceptions." Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 983 (2016) (quotation marks omitted). Mr. Meadows contends specifically that his and Mr. Trump's January 2, 2021, "discussion with the Georgia Secretary of State" (which is the subject of count 28) receives First Amendment protection because it was "about public issues of political importance." App.170. But the indictment alleges that that "discussion" was part of Mr. Meadows's charged crime of soliciting the Georgia Secretary of State "to engage in conduct constituting the felony offense of Violation of Oath by Public Officer, O.C.G.A. § 16-10-1." App.101. And the Supreme Court has specifically held that "solicitation," i.e., speech "intended to induce or commence illegal activities," is "undeserving of First Amendment protection." *United States v. Williams*, 553 U.S. 285, 298 (2008). That precedent squarely forecloses Mr. Meadows's First Amendment defense.

Equally groundless is Mr. Meadows's claim that his prosecution violates due process because the statutes under which he is charged "are unconstitutionally vague as applied to the charges against" him. App.171. Mr. Meadows has offered no actual argument, let alone a colorable one, as to why that is so. *See* App.170-171. And it obviously is not. Take, for instance, the conduct on which Mr. Meadows's motion to dismiss focused: his and Mr. Trump's "discussion with the

Georgia Secretary of State." App.170. As noted, that "discussion" was in fact an exhortation that Secretary Raffensperger—the officer sworn to faithfully certify Georgia's election results—"find 11,780 votes" to swing the election for Mr. Trump, *Transcript: President Trump's Phone Call With Georgia Election Officials*. It is hard to imagine a clearer example of soliciting a public officer to violate his oath. Mr. Meadows's suggestion that he lacked fair notice that such an exhortation could constitute criminal solicitation is absurd.

## III. REMOVAL HERE WOULD NOT SERVE THE PURPOSE OF THE FEDERAL-OFFICER REMOVAL STATUTE

The federal-officer removal statute reflects Congress's concern that because federal officers may be required by law to take official actions that are unpopular with local populations, they could face unjustified state charges, which could in turn impede federal operations. That concern is not remotely implicated here.

The removal statute's history makes that plain. Congress enacted the first two versions to prevent state laws from defeating the enforcement of federal trade policy. The first version "was part of an attempt to enforce an embargo on trade with England over the opposition of the New England States, where the War of 1812 was quite unpopular." *Willingham*, 395 U.S. at 405. The second "was passed in consequence of an attempt by one of the States of the Union to make penal the collection by United States officers within the State of duties under the tariff laws." *Tennessee v. Davis*, 100 U.S. 257, 268 (1879). As the Supreme Court

later explained (quoting Senator Daniel Webster's views from the time of the second version's enactment), "where state courts might prove hostile to federal law, and hence to those who enforced that law, the removal statute would 'give a chance to the [federal] officer to defend himself where the authority of the law was recognised.'" *Watson v. Philip Morris Companies*, 551 U.S. 142, 148 (2007) (quoting 9 Cong. Deb. 461 (1833)). That remains the core purpose of the removal statute.

During the Civil War, Congress revised the statute both to permit removal of actions brought against officers during the war and to improve the capacity of the federal government to collect revenue. *See* Act of March 3, 1863, §5, 12 Stat. 755, 756-757. Shortly thereafter, the Supreme Court explained that without the removal statute, "the operations of the [federal] government [could] at any time be arrested at the will of one of [its member States]." *Davis*, 100 U.S. at 258. In the latter half of the nineteenth century too, then, Congress and the Court understood the statute as a means to prevent local populations from impeding federal operations.

More recently, the Supreme Court has reaffirmed that the removal statute's "purpose is to protect the Federal Government from the interference with its operations that would ensue" were a State able to arrest and try a federal officer for "acting … within the scope of [his] authority." *Watson*, 551 U.S. at 150 (quotation marks omitted). Such "interference" would flow from the fact that "[s]tate-court

19

proceedings may reflect local prejudice against unpopular federal laws or federal officials." *Id.* (quotation marks omitted).

To say the least, the statute's purpose to prevent interference with federal operations would not be served by removing the charges against Mr. Meadows from Georgia state court. This prosecution does not threaten to impede any federal policy or prevent the federal government from carrying out its operations. The charges are not unjustified retribution for a legitimate exercise of federal authority. It is Georgia, not the federal executive, that is responsible for administering the State's selection of its presidential electors—including assuring the integrity of that selection. Allowing it to do so, including by leaving it to the State's own courts to adjudicate any alleged violations of the State's criminal laws, is in no way contrary to, and in fact is fully consistent with, the purpose of the federal-officer removal statute.

Put simply, the Constitution entrusts the administration of federal elections to the States. It deliberately insulates such administration from the president and his staff. Consistent with that constitutional design, the federal-officer removal statute does not permit removal here.

## CONCLUSION

The district court's order that Georgia's prosecution of Mr. Meadows cannot be removed to federal court under 28 U.S.C. §1442 should be affirmed.

Respectfully submitted,

/s/ *Seth P. Waxman*

FRED WERTHEIMER
DEMOCRACY 21 EDUCATION FUND
2000 Massachusetts Avenue N.W.
Washington, D.C. 20036
(202) 355-9600

SETH P. WAXMAN
DANIEL S. VOLCHOK
JOSEPH M. MEYER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000

JOHN THOMAS MORGAN III
J.TOM MORGAN, ATTORNEY, LLC
160 Clairemont Avenue, Suite 645
Decatur, Georgia 30030
(404) 687-6418

*Counsel for Amici Curiae*

September 25, 2023

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(g)(1) and 29(a)(4), the undersigned certifies that this brief complies with the type-volume limitation of Rules 32(a)(7)(B) and 29(a)(5).

1.    Exclusive of the portions exempted by Rule 32(f), the brief contains 4,692 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Rule 32(g)(1), the undersigned has relied upon the word-count feature of this word-processing system in preparing this certificate.

*/s/ Seth P. Waxman*
SETH P. WAXMAN

# CERTIFICATE OF SERVICE

On this 25th day of September, 2023, I electronically filed the foregoing

using the Court's appellate CM/ECF system.  Counsel for all parties to the case are

registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Seth P. Waxman*
SETH P. WAXMAN