No. 23-12958

_____

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

The State of Georgia,
*Plaintiff-Appellee*,

v.

Mark R. Meadows,
*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of Georgia,
Case No. 1:23-cv-03621-SCJ

_____

**BRIEF FOR APPELLEE
THE STATE OF GEORGIA**

_____

FANI T. WILLIS
District Attorney
Atlanta Judicial Circuit
136 Pryor Street SW
Atlanta, Georgia 30303
404-612-4981
Fani.WillisDA@fultoncountyga.gov

F. MCDONALD WAKEFORD
  Chief Senior Assistant
  Assistant District Attorney

ANNA GREEN CROSS
  Special Prosecutor

Case No. 23-12958

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2(b), on behalf of Appellee the State of Georgia, the undersigned hereby certifies that the Certificate of Interested Persons and Corporate Disclosure Statement provided in the Brief of Appellant appears complete.

Respectfully submitted, this 25th day of September, 2023.

By: *s/ F. McDonald Wakeford*

F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit
Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
fmcdonald.wakeford@fultoncountyga.gov

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

INTRODUCTION ....................................................................1

STATEMENT OF THE CASE ...........................................................1

SUMMARY OF THE ARGUMENT .....................................................9

ARGUMENT ...................................................................11

   **I.**  **Appellant has not demonstrated that he has been prosecuted for acts taken under color of his office.** ...........................................11

     *A.*  *An "act" under 28 U.S.C. § 1442(a)(1) means a "charge" or "claim."* ..12

     *B.*  *The district court properly defined some limits to Appellant's scope of duties as Chief of Staff.* ......................................................19

     *C.*  *The evidence overwhelmingly demonstrated that Appellant's actions were outside the scope of his duties and therefore not taken under color of his office.* ....................................................................27

   **II.**  **Appellant has not demonstrated that he has a colorable Supremacy Clause immunity defense.** ................................................32

CONCLUSION ..................................................................39

CERTIFICATE OF COMPLIANCE ...................................................40

**CERTIFICATE OF SERVICE** .........................................................41

# TABLE OF AUTHORITIES

## Cases

*Baucom v. Martin*, 677 F.2d 1346 (11th Cir. 1982) .................................16

*Castillo v. Snyders*, 497 F.Supp. 3d 299 (N.D. Ill. 2020).........................16

*Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135 (11th Cir. 2017)................... 11, 17

*Clinton v. Jones*, 520 U.S. 681 (1997).....................................................36

*Colorado v. Symes*, 286 U.S. 510 (1932)............................................. 12, 27

*Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770 (E.D. Pa. 2010).....................37

*In re Neagle*, 135 U.S. 1 (1890)...............................................................32

*Jefferson County v. Acker*, 527 U.S. 423 (1999) .......................................16

*Kellogg Brown & Root Srvs. v. United States*, 575 U.S. 650 (2015) .....................12

*Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424 (11th Cir. 1996).......................32

*Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022). ...........16

*Mesa v. California*, 489 U.S. 121 (1989).....................................................27

*Moore v. Harper*, 600 U.S. ----, 143 S. Ct. 2065 (2023) .......................................22

*Nadler v. Mann*, 951 F.2d 301 (11th Cir. 1992)..........................................12

*People v. Trump*, 2023 U.S. Dist. LEXIS 124733 (S.D.N.Y. July 19 2023) ... 12, 27

*Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012).....................................16

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ............................................21

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017). ......................................35

*Thompson v. Trump*, 590 F. Supp. 3d 46, 78 (D.D.C. 2022)...............................23

*United States v. Jules*, 244 Fed. Appx. 964 (11th Cir. 2007) ...............................32

*Willingham v. Morgan*, 395 U.S. 402 (1969). ..........................................36

## Statutes

28 U.S.C. § 1442 .......................................................................5, 11

28 U.S.C. § 1442 ................................................................ 12, 27

5 U.S.C. § 2732(a)(1).....................................................................24

O.C.G.A. § 16-14-4...........................................................................2

O.C.G.A. § 16-4-4............................................................................13

## Regulations

28 U.S.C. § 1442 .............................................................................9

5 C.F.R. § 734.101 ...........................................................................25

5 C.F.R. § 734.302(b)(2)....................................................................25

5 C.F.R. §734.302(b)(2)......................................................................5

5 U.S.C. § 2732(a)(1)..............................................................................................5

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1......................................................................21
U.S. Const. art. II, § 3 ...............................................................................23

**INTRODUCTION**

Federal officer removal under 28 U.S.C. § 1442(a)(1) is designed to protect federal authority, but in this case, there is no federal authority to protect. Following a full evidentiary hearing, and having failed to meet his low burden before the federal district court for the Northern District of Georgia, Appellant Mark Randall Meadows now asks this Court to apply a jurisdiction designed to insulate federal authority from state interference to a case concerning precisely the opposite: Appellant and his co-defendants engaged in activities designed to accomplish *federal* meddling in matters of *state* authority. Appellant can point to no law, no constitutional provision, and no lawful duty which authorized him to take the actions he did, and his testimony at the evidentiary hearing in this case underscored the case *against* his removal rather than *for* it. For the reasons shown below, the State of Georgia respectfully requests that this Court affirm the district court's order, which is based on overwhelming evidence, specific points of law, and a respect for the proper role of federalism in the State of Georgia's prosecution of its own criminal laws.

**STATEMENT OF THE CASE**

**A. The Orchestrated Effort to Subvert the 2020 Georgia Presidential Election**

As alleged in the indictment returned by a Fulton County grand jury on August 14, 2023, several individuals—including Appellant-Defendant Mark Meadows—knowingly and willfully joined a conspiracy to unlawfully change the outcome of

the 2020 presidential election in then-President Trump's favor. Doc. [1-1].[1] The nineteen charged defendants, along with dozens of unindicted co-conspirators, are alleged to have constituted a criminal organization within the meaning of the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") "whose members and associates engaged in various related criminal activities including, but not limited to, false statements and writings, impersonating a public officer, forgery, filing false documents, influencing witnesses, computer theft, computer trespass, computer invasion of privacy, conspiracy to defraud the state, acts involving theft, and perjury." *Id*. at 15; *see* O.C.G.A. § 16-14-4(b).

Among the alleged efforts made by participants in this conspiracy are

- **False Statements to, and Solicitation of, State Legislatures.** This includes false statements made before members of the Georgia General Assembly on December 3, December 10, and December 30, 2020. Doc. [1-1] at 15-16. The false statements concerned unsubstantiated allegations of election fraud in the November 3, 2020 presidential election, and was intended to persuade Georgia legislators to reject lawful electoral votes cast by the duly elected and qualified presidential electors nominated by the winning candidate's political party in favor of the nominated electors of the losing candidate, *i.e.*, then-President Trump. Analogous false statements were made to legislators in Arizona, Michigan, and Pennsylvania to achieve similar campaign goals in those states.

- **False Statements to, and Solicitation of, High-Ranking State Officials.** The indictment alleges that members of the enterprise made

---

[1] In accordance with Eleventh Circuit Rule 28-5, references to the record of this case will refer to the document number from the district court docket in brackets, with the page number following where applicable. References to Appellant's Brief will be noted as "App. Br. at X," with X representing the relevant page number.

false statements to Georgia officials, including the Governor, the Secretary of State, and the Speaker of the House of Representatives, urging those officials to violate their oaths of office by unlawfully changing the outcome of the November 3, 2020 presidential election in Georgia in favor of the losing candidate, then-President Trump. Doc. [1-1] at 16-17. Analogous false statements were made to state officials in Arizona, Michigan, and Pennsylvania to achieve similar corrupt campaign goals in those states.

- **Creation and Distribution of False Electoral College Documents.** The indictment alleges that the conspirators created false Electoral College documents and recruited individuals to convene and cast false Electoral College votes at the Georgia State Capital on December 14, 2020, then transmitted those false documents to the President of the United States Senate, the Archivist of the United States, and the Chief Judge of the United States District Court for the Northern District of Georgia. Doc. [1-1] at 17. The false documents were intended to disrupt and delay the joint session of Congress on January 6, 2021, in order to unlawfully change the outcome of the November 3, 2020 presidential election in favor of co-conspirator and Co-Defendant Trump. Similar schemes were attempted in Arizona, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin, all with the same corrupt intent to subvert the lawful outcome of the 2020 presidential election.

- **Harassment and Intimidation of Fulton County Election Workers.** Members of the criminal enterprise falsely accused a Fulton County election worker of committing election crimes; those false accusations were repeated to Georgia legislators and others in an effort to unlawfully change the outcome of the November 3, 2020 presidential election. Doc. [1-1] at 17. The election worker was harassed, intimidated, and pressured to falsely confess to election crimes. *Id*.

- **Solicitation of High-Ranking United States Department of Justice Officials.** Members of the enterprise corruptly solicited high-ranking Department of Justice officials to make false statements to Georgia State government officials. Doc. [1-1] at 18.

- **Solicitation of the Vice President of the United States.** Members of the enterprise are alleged to have corruptly solicited the Vice President

3

of the United States to violate the United States Constitution and federal law by unlawfully rejecting Electoral College votes cast by duly elected and qualified presidential electors from Georgia and other states.  Doc. [1-1] at 18.

- **Unlawful Breach of Election Equipment.**  Members of the enterprise unlawfully conspired to access secure voting equipment and voter data in Coffee County, Georgia and elsewhere.  In Coffee County, conspirators stole ballot images, voting equipment software, and personal voter information.  The stolen data was then distributed to other members of the enterprise, including members in other states. Doc. [1-1] at 18.

- **Obstructive Acts in Furtherance of the Conspiracy.**  In an effort to cover up the conspiracy and in furtherance of its aims, members of the enterprise filed false documents, made false statements to government investigators, and committed perjury in judicial proceedings.  Doc. [1-1] at 19.

**B. Appellant-Defendant Mark Meadows' Role and Effort to Remove the Case**

Appellant Meadows is accused of joining and participating in the above-outlined criminal conspiracy, in violation of O.C.G.A. § 16-14-4(b), and in a series of overt acts that evidenced the conspiracy.  Doc. [1-1] at 13-71.  In addition, Meadows is charged separately with Solicitation of Violation of Oath by Public Officer, based on his and Co-Defendant Trump's solicitation of Georgia Secretary of State Brad Raffensperger, a public officer, to violate his oath of office by altering the certified returns for presidential electors in the November 3, 2020 presidential election.  *Id.* at 87 (Count 28).

Appellant served as the Chief of Staff to then-President Trump for a ten-month period spanning March 2020 through January 20, 2021. Doc. [65] at 11. Based on this federal employment, Appellant filed a Notice of Removal pursuant to 28 U.S.C. §§ 1442 & 1455. Doc. [1]. The Honorable Steve C. Jones declined to order summary remand, and instead scheduled an evidentiary hearing. Doc. [6].

**C. The Evidentiary Hearing**

The district court held the evidentiary hearing on August 28, 2023. Much of the day-long hearing consisted of the direct and cross-examination of Appellant-Defendant Meadows himself. Doc. [65] at 9:155. Meadows described himself as the senior official "in charge of the Executive Office of the President" with a broad and almost limitless portfolio of duties. *Id*. at 13-14. At the same time, Meadows acknowledged that his role of Chief of Staff did not exempt him from the requirements of the Hatch Act, which he knew to prohibit a federal employee from using "his official authority or influence for the purpose of affecting the result of an election." *Id*. at 39:135-36; *see also* 5 U.S.C. § 2732(a)(1), 5 C.F.R. §734.302(b)(2) (prohibiting a federal employee from using his or her official title while participating in political activity). Meadows conceded that working for a political campaign, specifically the Trump Re-Election Campaign, would be outside the scope of his federal office. Doc. [65] at 113:4-6 ("[W]orking for the campaign, if I were working for the campaign, that would not be my role as Chief of Staff.").

5

Time and again, however, Meadows admitted to engaging in acts that under any reasonable analysis constitute campaign activity outside his role as a federal employee, and which establish participation in the criminal RICO conspiracy with which he is charged. As a threshold matter, under questioning, Meadows admitted that then-President Trump had a personal interest in being re-elected and a personal interest in seeing the adverse election results in Georgia, Michigan, and other states overturned. Doc. [65] at 64 (Trump had a personal interest in seeing Michigan election outcome reversed in Trump's favor), 88 (Trump had personal interest in seeing Georgia election result overturned). Meadows shared those personal and political interests. *Id*. at 146 (Meadows wanted Trump to win election, "certainly" had a personal interest in Trump winning reelection). Meadows also undertook actions simply to avoid being yelled at by his boss, then-President Trump. *Id*. at 148 (Meadows assisted with coordinating fake electors across several states, including Georgia, in an effort to avoid the then-President Trump yelling at him).

To those personal ends, Meadows undertook a series of actions that both furthered the conspiracy as alleged in the Indictment and advanced his and Trump's personal interests. Meadows communicated with the Trump Campaign on the coordination of the fraudulent elector slates. Doc. [65] at 143-46 (email from Meadows to campaign official: "[w]e just need to have someone coordinating the electors for the states"; forwarding memo from Co-Defendant Cheseboro). When

6

questioned about a meeting held on or about November 20, 2020 with then-President Trump, Rudy Giuliani (as an attorney for Trump and/or the Trump campaign), and legislators from Michigan to discuss allegations of election fraud in that state, Meadows acknowledged being present and was unable to articulate any specific federal role or policy that was furthered by his participation. Doc. [65] at 59:16-18 ("I think all of us as Americans want to make sure there are vote counts and . . . that it is a free and fair election."). Georgia Secretary of State Brad Raffensperger's testimony established unequivocally that there is no federal role for executive branch employees in the certification or administration of elections in Georgia. *Id*. at 189. Despite that fact, Appellant repeatedly contacted Georgia State officials to advance Trump campaign goals of overturning the Georgia results:

- Went on his own initiative to personally observe a Cobb County signature audit being conducted by State officials and law enforcement, *id*. at 76-77;

- Sent a text message to a Secretary of State employee offering Trump campaign funds for a Fulton County signature verification, *compare id*. at 91 ("is there a way to speed up Fulton county's signature verification in order to have results before Jan 6 if the Trump campaign assists financially") *with* 93 (admitting he had no authority to offer federal funds for that purpose), 195 (acknowledging federal government had no role in the signature audit);

- Participated in a January 2, 2021 call with Secretary Raffensperger, then-President Trump, and Trump's personal and campaign attorneys related to Trump campaign litigation, *id*. at 210 (Raffensperger

believed it was a campaign call), 103 (purpose of call was Trump's demand for signature verification in Fulton county), 105-06, 124-25, 163-64, 166-67 (campaign attorneys involved in call were not federal employees);

- Served as contact for campaign litigation attorneys, through attorney Cleta Mitchell, whom Meadows had recruited to assist with campaign litigation in Georgia, *id*. at 105-06, 122 (Meadows asked Ms. Mitchell to come to Georgia for the Trump campaign), 169 (Ms. Mitchell liaison to the Office of the President for litigation attorney), 170 (Mitchell had contact with Meadows for campaign litigation purposes).

In Meadows' view, the scope of his employment as Chief of Staff and his advancement of federal policy and goals was so broad as to encompass the then-President's private litigation:

Q.    Is settlement of private litigation, does that have any federal purpose?

A.    When that federal – when that legislation – when that litigation involves elections, I saw it as part of my role as the Chief of Staff to try to deal with that.  The President gave clear direction on wanting to deal with it.

*Id*. at 110:7-12.  Meadows was unable to give any example of an action done at the President's direction, short of stumping directly for a political campaign, that he considered to be outside the scope of his role as Chief of Staff.  *Id*. at 112-13. According to Appellant, even acting to solely advance a campaign goal or interest is not outside the parameters of his federal office.  *Id*. at 114.

**D. The District Court's Order Remanding the Case to Fulton County Superior Court**

8

Post-hearing, the district court requested supplemental briefing from the parties on the question of the impact a finding that "at least one (but not all) of the overt acts charged [in Count 1, the RICO charge] occurred under the color of Meadows's office, be sufficient for federal removal of a criminal prosecution under 28 U.S.C. § 1442(a)." Doc. [63]. Following the submission of that supplemental briefing, the district court issued an order remanding the criminal prosecution of Meadows back to Fulton County Superior Court, concluding that Meadows failed to meet his burden of demonstrating that removal is proper and consequently that the district court lacked subject-matter jurisdiction. Doc. [69] at 1. Specifically, the district court determined that Meadows had not met his burden of clearing even the quite low hurdle of establishing that the actions he "took as a participant in the alleged enterprise (the charged conduct) were related to his federal role as White House Chief of Staff." *Id.* at 34.

## SUMMARY OF THE ARGUMENT

The district court properly declined to remove Appellant Meadows's case under 28 U.S.C. § 1442(a)(1).

First, the court engaged in a careful and exacting analysis in concluding that Appellant had not met his burden to demonstrate a connection between the charges against him and his official duties. Essentially, Appellant did not demonstrate that he is being prosecuted "for or relating to" any "act" he took under color of office.

The district court correctly determined that the relevant "act" means the "charge," and under a RICO conspiracy charge, that act is associating with the alleged conspiracy. This type of act differs from most cases in that it is not a "discrete" or "isolated" act, so in order to determine whether it related to Appellant's official duties, the court drew from precedent and looked at the "gravamen" or "heart" of the charge.

The court then determined what limits could be found on the scope of duties for a White House Chief of Staff; although Appellant could not (and does not) articulate any except for one, the court found obvious boundaries created by the Constitution, federal statutes, and regulations. Evaluating the evidence adduced at the hearing on this matter, the district court determined that Appellant had failed to meet a very low bar; instead, the evidence overwhelmingly indicated that the gravamen of his charged conduct concerned activities that fell outside the scope of his official duties, either because there was no basis for executive branch authority over matters related to Georgia's post-election activities or because Appellant's actions were taken for the direct benefit of the Trump campaign. As a result, Appellant had not made the required showing under the test for removal, and the court could not take jurisdiction.

Second, Appellant has not raised a colorable, or plausible, federal defense of Supremacy Clause immunity. Appellant cannot show that he took any action for the

purpose of "enforcing federal law," and he has admitted that he conceived of all of his relevant actions as unquestionably political activity of the very type which is forbidden to executive branch employees. Appellant also has not demonstrated that any subjective belief he had that his actions were "necessary and proper" for his official duties was "objectively reasonable." The evidence also indicated that Appellant had personal, rather than official, motivations for his actions on behalf of the Trump campaign, vitiating any claim to a Supremacy Clause immunity defense under this circuit's established precedent. Finally, even when viewed in the light most favorable to Appellant, the evidence does not demonstrate that Supremacy Clause immunity can provide him with a complete defense, and an incomplete defense is not a plausible one.

## ARGUMENT

### I.    Appellant has not demonstrated that he has been prosecuted for acts taken under color of his office.

As this Court is well aware, in seeking removal of his case, the defendant must first make a showing that he is a federal officer subjected to criminal prosecution "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "The phrase 'relating to' is broad and requires only a 'connection' or 'association' between the act in question and the federal office." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (internal citations omitted). This is not typically a high bar to clear. However, "[n]ot every act of or on behalf of a federal

11

officer is an act under color of office." *People v. Trump*, 2023 U.S. Dist. LEXIS 124733, *14 (S.D.N.Y. July 19 2023). "[T]he person seeking the benefit of [federal officer removal] should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was *confined to his acts as an officer*." *Colorado v. Symes*, 286 U.S. 510, 520 (1932) (emphasis added). The district court engaged in careful consideration of this question which proceeded in several discrete steps.

### A. An "act" under 28 U.S.C. § 1442(a)(1) means a "charge" or "claim."

The district court first applied precedent to answer a straightforward question in a straightforward manner: what is the relevant "act" under 28 U.S.C. § 1442(a)(1)? Relying on authority from a variety of sources, including this Court, the district court established that one must look to the charges in the indictment in order to determine the "acts" relevant to analysis under section 1442. Doc [69] at 11-13. This is because the "act" at issue is necessarily defined by the "claim" presented. *Id. See Nadler v. Mann*, 951 F.2d 301, 306 n.9 (11th Cir. 1992) (a district court has subject matter jurisdiction where "one *claim* is cognizable under Section 1442 . . . .") (emphasis added). In a criminal case, a "claim" corresponds to a "charge" in an indictment. *See* Doc. [69] at 12 n.8 (citing *Kellogg Brown & Root Srvs. v. United States*, 575 U.S. 650, 653 (2015)). Under Count 1 of the indictment, Appellant is charged with conspiring to violate Georgia's RICO statute while associated with a criminal

12

enterprise that had a common plan and purpose to unlawfully change the outcome of Georgia's presidential election in co-defendant Trump's favor. As the district court carefully explained, a RICO conspiracy charge under O.C.G.A. § 16-4-4(c) requires only that a defendant "conspire or endeavor to ['conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity']" and that *any* co-defendant take an overt act in furtherance of the conspiracy. Doc. [69] at 17-20. Thus, for purposes of removal, Appellant's association with the conspiracy is the "charge," and therefore the "act," that must be evaluated under the test for removal. *Id.* at 20-21 ("Because the 'act' as defined by Section 1442(a)(1) means the charge against Meadows—under Georgia's RICO statute—his criminal prosecution is removable when his association with the conspiracy relates to the color of his federal office…the act at issue for purposes of the Indictment's RICO charge is Meadows's alleged *association* with the conspiracy.").

A key to Appellant's arguments is his mischaracterization, or dismissal, of this first analytical step. Appellant cites to the very same language from *Nadler* as the district court but insists, without elaboration, that the district court's reasoning somehow "conflicts" with it. App. Br. at 32. He also argues that, in looking to the nature of the charges against Appellant *at all*, the district court "ignores" clear precedent establishing that federal officer removal is an exception to the "well-pleaded complaint" rule. App. Br. at 31-32. But, as should be clear from Appellant's

13

own arguments, that exception relates to the courts' ability to grant jurisdiction based upon a defendant's articulation of a colorable federal defense, *not* to how a district court should define the relevant "acts" which it must analyze under the test for removal. Appellant offers no substantive argument or authority that can challenge the district court's determination that it must look to the nature of the charges in the indictment to determine the relevant act for purposes of removal analysis.[2]

Having brushed past the district court's threshold determination of how to define what the relevant "act" actually is, Appellant is then free to insist that the "act" can be any of his individual actions that he asserts were taken under color of his office, whether or not they are even elements of the charges against him. In Appellant's reckoning, the district court could not define the relevant act for purposes of removal, and neither could the State of Georgia; only *he* can articulate what the relevant acts are. Appellant would have the district court not merely accept his "theory of the case" as it evaluates his claim of a federal defense or even his arguments regarding the scope of his duties, but also how the court should fundamentally define the "acts" at issue. Appellant then insists that any individual

---

[2] While Appellant also argues that the State "disavowed" or "disclaimed" the overt acts in the Indictment, this is not the case. The State merely argued a correct point of law regarding RICO charges, which is that overt acts are neither *charges* nor *elements of an offense*. They therefore do not constitute the *acts* that require analysis under the test for removal.

official act, if arguably taken under color of his office, suffices to authorize removal. App. Br. at 31-32.

This approach was specifically rejected by the district court based on the structure of section 1442(a)(1), which

> indicates that the criminal prosecution must arise from an act that is for or relating to the color of a federal office. Even if a criminal defendant can characterize *individual instances of behavior* as part of his official duties within the broader charged conduct, this is not enough to convey subject matter jurisdiction on this Court. Put differently, facts indicating that a criminal defendant at times operated under the scope of his federal office will not provide this Court with subject matter jurisdiction under Section 1442 *unless the State is criminally prosecuting the officer for those specific acts*.

Doc. [69] at 11-12 (emphasis added). The district court's conclusion flows naturally from its reliance on precedent demonstrating that the relevant "act" is found in the "charge," and the conduct for which Appellant was charged is his association with the RICO conspiracy.

While the district court did not adopt Appellant's preferred approach, wherein *any* individual conduct related to his official duties could authorize removal, neither did it adopt the interpretation that would have most benefitted the State of Georgia: that the overt acts involving Appellant, because they are not elements of the RICO charge, are irrelevant for purposes of removal. Instead, despite the fact that overt acts are not elements of the charge, the court still found "that they are relevant

evidence of whether Meadows's association with the enterprise related to his role as White House Chief of Staff." Doc. [69] at 20.

The Court then examined precedent from the Eleventh Circuit (*Baucom v. Martin*, 677 F.2d 1346, 1347–48 (11th Cir. 1982)) before observing that a recent Fourth Circuit case had sought to identify the "heart" of a plaintiff's claims where some, but not all, of the relevant activities arguably fell within the scope of a federal office. Doc. [69] at 16 (citing *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 234 (4th Cir. 2022)). Even if some activities were federal in nature, the Fourth Circuit looked to the complaint as a whole to determine that the "heart" of the plaintiff's claims had to do with concealment and misrepresentation, activities that did not have any relationship to official duties. *Id.* This approach echoed Justice Scalia's observation in *Jefferson County v. Acker*: "The point is only that the officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official duties." 527 U.S. 423, 447 (1999) (Scalia, J., dissenting). *See also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (citing *Acker* and upholding removal because "the gravamen of the claim" occurred while the defendant was acting under color of federal authority); *Castillo v. Snyders*, 497 F.Supp. 3d 299, 306 (N.D. Ill. 2020) (evaluating totality of defendant's conduct and finding he established that he had been acting under color of his authority because "the gravamen of [Plaintiff's]

16

claims" arose from defendant's conduct to achieve a federal objective). The district court then set out to evaluate whether the evidence demonstrated a connection between the "heart" of the RICO charge against Appellant and Appellant's official duties, "in order to determine whether Meadows's association with the alleged conspiracy (the conduct for which he was charged) related to the scope of his federal duties." *Id.* at 21-22.

This reasoned middle approach represents the district court's application of existing precedent to the novel circumstances of a RICO charge which encompasses a broad array of conduct taken at different times and places and under different circumstances. The Court is able to evaluate the relevant "act" as defined by precedent and the structure of section 1442(a)(1) (Appellant's association with the conspiracy) even where that act is not a "discrete action" but a collection of actions; instead of conflating those individual instances of conduct with the relevant "act," the district court determined that it would use them to determine whether there was a "causal connection between [the State's charges] and an act of Defendant that forms the basis of those claims." *Id.* at 14 (citing *Caver* at 1144).

Appellant claims that the district court created a "conspiracy exception" that "flipped the standard on its head." App. Br. at 31. However, the conclusion reached by the district court regarding individual instances of conduct was *not* that the State could "defeat removal if it could possibly try the federal official without relying on

an official act, even if official acts appear on the face of the Indictment," as Appellant insists. *Id*. Instead, the Court reached the rational conclusion required by the established precedents it had identified: "Because the inquiry hinges on whether Meadows's association with the conspiracy related to the color of his office, however, jurisdiction is not *conferred* simply because a single overt act relates to Meadows's federal office." Doc. [69] at 22 (emphasis added). The Court did not find that a single overt act can defeat jurisdiction; it found that a single overt act was not *sufficient to confer* jurisdiction. In claiming that the district court "flipped the standard on its head," Appellant elides the careful reasoning of the Order and overstates his case.

Appellant also argues that *Acker* requires only that a removing party broadly "allege" that the case was brought "for" engaging in official acts. App. Br. at 32. But the language Appellant cites from *Acker* does not actually dispute Justice Scalia's articulation regarding the "gravamen" of a claim. *Acker*, like most cases, involved a *single, discrete act* that was not in dispute: the non-payment of a tax. The parties (and the Justices) merely disputed how to *characterize* that act. The questions before the district court here were wholly different: what exactly *is the act* that this prosecution is *for*, and how can the court determine whether it relates to Appellant's official duties? These are the questions that render an appraisal of the "gravamen" or "heart" of the charge so appropriate under the circumstances of this case.

18

Thus, the district court did not create some exception without a basis in the law. Instead, it looked to what precedent it could in order to evaluate whether Appellant could establish a connection between the *act* at the heart of the RICO charge against him and his scope of duties as Chief of Staff. As demonstrated below, once the court determined the appropriate limits to Appellant's official duties, the evidence overwhelmingly demonstrated that Appellant had not met his burden, low as it may be.

## B. The district court properly defined some limits to Appellant's scope of duties as Chief of Staff.

Having determined that the relevant act under its removal analysis is Appellant's alleged association with a RICO conspiracy, the district court next set out to define the scope of Appellant's role as Chief of Staff in order to determine whether his act was taken under color of his office. The court first recounted Appellant's own testimony and evidence submitted at the evidentiary hearing (Doc. [69] at 24-28) and then turned to the constitutional and statutory limits placed upon the President and/or the employees of the executive branch (*Id.* at 29-33). Overall, the district court determined that Appellant could not provide any cogent explanation of the scope of his duties, while the Constitution's Elections Clause and the Hatch Act each provide clear limitations to the roles of the President and executive branch employees. Appellant argues that the district court erred in reaching these

conclusions, but his arguments fail to actually address the district court's central points.

Appellant devotes much of his brief to providing quotations and statements about the nature of the White House Chief of Staff's job. App. Br. at 26-29, 34-39. Appellant asserts that the record is clear that the Chief of Staff's role is broad, powerful, and in at least some respects, inextricably political. These contentions, however, are not what is in dispute. What Appellant was required to show was that there was some connection between his charged conduct and the scope of his duties, however broad they may be. His conclusory assertion that "[i]t should be beyond dispute that the Chief of Staff can and should manage the President's time and attention to ensure the effective operation of government" (App. Br. at 39) does not actually grapple with anything that the district court found relating to the *limits* of the Chief of Staff's role. This could be because, as the district court observed (Doc. [69] at 111:12-113:6), Appellant could not articulate the limits of his role at the hearing and even now acknowledges almost no limit to his role at all, regarding his duties as "*at least* coextensive with those of the President" (App. Br. at 38) (emphasis added) and the President's, in turn, as essentially limitless. During the hearing, Appellant's counsel pronounced of Appellant, **"He *is* federal operations."** Doc. [65] at 239:7-8. It could also be because Appellant argues that any judicial holding on the outer limits of the scope of the Chief of Staff's role, or at least any

holding contradicting his own definition of that role, would violate the Separation of Powers by "purporting to limit the role of the President's Chief of Staff through judicial fiat." App. Br. at 29. Appellant thus argues that neither the district court nor this Court could actually engage in the "color of office" analysis required under the removal test without violating the Constitution.[3] The State of Georgia responds that this argument, to say the least, is meritless, and federal courts are empowered under the Constitution to determine a federal employee's scope of office for removal purposes. Here, the district court properly evaluated relevant sources in order to do exactly that.

The district court found that both the Constitution and relevant federal legislation provide guidance on the outer limits of lawful executive branch authority. **First**, regarding the Elections Clause, the district court observed that "an express grant in the Constitution" endows the States—not the executive branch—with "*clear constitutional authority*" over their own election administration and post-election procedures. Doc. [69] at 29-30, 32 (emphasis original); *see* U.S. Const. art. I, § 4, cl. 1; *see also Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) (the Framers intended that the States should retain "the power to regulate elections"). This includes the

---

[3] Even the Attorney General's scope-of-office certifications under the Westfall Act, which Congress intended to conclusively establish whether a federal officer was acting within the scope of his or her duties, are subject to *de novo* judicial review upon challenge. *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1305 (11th Cir. 2022).

responsibility to create a "complete code" with regulations concerning "prevention of fraud and corrupt practices [and] counting of votes…". *Moore v. Harper*, 600 U.S. ----, 143 S. Ct. 2065, 2085 (2023) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). There is simply no "close call" regarding whether the President or the executive branch more generally has any role to play in States' administration of their elections. Doc. [69] at 31. To the extent that the Constitution contemplates any federal role in the "mechanics" of elections, that role belongs to *Congress* and its authority over *congressional* elections, not to the executive branch. *See Shelby Cnty.*, 570 U.S. at 543.

Appellant responds by insisting that "The Federal Government has a substantial interest in the administration of elections" and then points to authorities providing some election-related roles to Congress. App. Br. at 40-41. Obviously, these authorities do not respond to the district court's point, which is that there is no role for the *President* or the *executive branch* in State-level elections operations. The only executive branch role in election-related matters actually identified by Appellant is the role of the Department of Justice's Civil Rights Division and Election Crimes Branch in litigation and federal law enforcement. *Id.* at 41-42. Even then, Appellant does not clarify how any evidence introduced at the hearing related to special operations of the Department of Justice or his role in facilitating them as Chief of Staff, or generally how the Civil Rights Division or Election Crimes Branch

have anything at all to do with his case. Certainly, he points to nothing that supports a claim of error by the district court in determining Appellant had no role in state-level elections operations as Chief of Staff.

**Second**, regarding the Take Care Clause, U.S. Const. art. II, § 3, the district court observed that that the President's authority to "take Care that the Laws be faithfully executed" does not "extend to government officials over whom [the Executive] has no power or control." Doc. [69] at 31 n.13 (citing *Thompson v. Trump*, 590 F. Supp. 3d 46, 78 (D.D.C. 2022). Appellant declares that the district court's analysis is "facile" in that it ignores the possible role the President could play in either advising Congress, proposing legislation, or supervising federal officials who "might interact" with state officials, and that the President does not need to have actual authority when he has a "legitimate interest." App. Br. at 43. Appellant provides no authority for the proposition that a "legitimate interest" confers lawful authority on the President under the Take Care Clause, an interpretation that would obliterate any limit to his power under the Clause, which does not "confer limitless presidential authority or the authority to encroach on the powers vested in the co-equal branches." *Thompson*, 590 F. Supp. 3d at 77 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952)). And, once again, he does not point to any evidence that Appellant was assisting in "taking care" that a federal law was

being executed, or that Appellant was ensuring that the President could "advise" Congress regarding state-level elections operations.

**Third**, the district court used the clear prohibitions of the Hatch Act to assist it in determining the outer limit of an executive branch employee's lawful duties. During the evidentiary hearing, Appellant acknowledged that he was "bound by the Hatch Act and he could not engage in political activity." Doc. [69] at 26; Doc. [65] at 39:7-25, 135:21-136:5. He now argues the opposite, claiming that the "Act does not operate to define the role of a President or his senior aides," and, if it somehow did "limit the duties of the President's Chief of Staff" as he himself testified, "such limitations would violate the Separation of Powers." App. Br. at 43-44. Appellant thus does not so much contend with the district court's straightforward application of the Hatch Act as insist that the Act should not apply to him, despite his testimony that it did exactly that. What Appellant now urges, then, is that an *exception* should be made for him.

The district court's clear reasoning indicates why Appellant has taken this contradictory, extreme, and self-serving position: the Hatch Act paints a very clear outer boundary on authorized conduct for executive branch employees that Appellant crossed, admittedly, time and again. As the court observed, the Act prohibits employees from using their "official authority or influence for the purpose of affecting the result of an election." 5 U.S.C. § 2732(a)(1). This includes "using

his or her official title while participating in political activity." 5 C.F.R. § 734.302(b)(2). Political activity is defined in turn as "activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." 5 C.F.R. § 734.101. The analysis is quite simple: the Hatch Act, a federal law, explicitly defines types of activity which fall outside the lawful scope of an executive branch employee's role. The Court, analyzing the evidence submitted, determined that Appellant was engaged in "post-election activities and election outcomes in various States pertaining to a particular candidate for office," and that thereby went outside of his lawful role because he had "not shown how his actions relate to the scope of his federal executive branch office." Doc. [69] at 33.

Against this, Appellant claims either that the Hatch Act does *not* in fact apply to him (despite his testimony otherwise), that it somehow violates the Separation of Powers if it *does* apply to him, or, failing either of those positions, that the district court has somehow invented a "political exception" to the scope of the Chief of Staff's duties that "blinks reality." App. Br. at 34-38. This latter argument is based entirely on ignoring the very specific definition of "political activity" cited by the district court and found at 5 C.F.R. § 734.101, which Appellant does not cite or even acknowledge. Instead, Appellant attempts to conflate that statutory definition with a general concept of "political activity" in the abstract, claiming that the district court has attempted to remove "politics" from the Chief of Staff's role. Obviously, the

25

district court did no such thing, and when you remove this obvious conflation from the mix, Appellant's argument falls apart. Instead, it is clear that he *has no argument* unless one either ignores the Hatch Act entirely or refuses to apply it to him. Ironically, Appellant seeks an exception from the Hatch Act for himself while accusing the district court of somehow creating one that is harmful to him.

The district court, of course, did no such thing. It likewise did not "invert"  It merely examined the prohibitions found under the Act, analyzed the evidence of Appellant's activities in this case, and determined that Appellant had engaged in acts that constituted unauthorized "political activity" under the specific language of federal regulations. What the court did, to Appellant's chagrin, was *not* create an exception for him.

The boundaries set by the district court on Appellant's scope of duties and "color of office" find their basis in the Constitution and federal law. Appellant can point to no constitutional provision, federal law, regulation, or other authority that countenanced his actions in this case, so he merely argues that the Court *cannot* look to any of those sources for limits to his lawful duties. This is true even where Appellant himself *testified* that a statute limits his authority. As a result, the district court did not err in defining some limits to the scope of Appellant's official duties, and, as shown below, the application of those meager limits demonstrates why Appellant failed to meet the low bar required for removal of his case.

## C. The evidence overwhelmingly demonstrated that Appellant's actions were outside the scope of his duties and therefore not taken under color of his office.

After defining the relevant "act" for purposes of section 1442(a)(1) and determining some of the outer boundaries of a Chief of Staff's scope of duties, the district court determined that "the evidence before the Court overwhelmingly suggests that Meadows was not acting in his scope of executive branch duties during most of the Overt Acts alleged." Doc. [69] at 43. The district court's evaluation of the evidence is sound, and there is no reason to question its credibility determinations or assessment of witness testimony. As a result, its Order declining jurisdiction should be affirmed.

As noted above, "the person seeking the benefit of [federal officer removal] should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was *confined to his acts as an officer*." *Symes*, 286 U.S. at 520 (emphasis added). In criminal cases, "the [Supreme Court's] liberal construction of the statute should be balanced against a 'strong judicial policy against federal interference with state criminal proceedings' because 'preventing and dealing with crime is much more the business of the States than it is of the Federal Government.'" *People v. Trump*, 2023 U.S. Dist. LEXIS 124733, *14 (S.D.N.Y. July 19 2023) (quoting *Mesa v. California*, 489 U.S. 121, 138 (1989) (quoting in turn *Arizona v. Manypenny*, 451 U.S. 232, 243

(1981)). This means "a more detailed showing" is necessary for the removal of a criminal case. *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969).

The removing party bears the burden of demonstrating that removal is proper, and if the non-removing party "appropriately challenges" the facts presented in the notice of removal, the removing party "must support [its factual averments] by competent proof." *Trump*, 2023 U.S. Dist. LEXIS 124733 at *15. This is precisely what the district court found Appellant had failed to accomplish. "In light of the State's evidence that Meadows undertook actions on behalf of the campaign during the time period of the alleged conspiracy, Meadows was required to come forward with competent proof of his factual contention that his actions involving challenges to the outcome of the Georgia's Presidential election results were within his role as Chief of Staff. His efforts fall short." Doc. [69] at 42-43.

The district court arrived at this conclusion after evaluation of each of the eight overt acts in the Indictment which mention Appellant's involvement. Having determined that "[t]he procedures States utilize to conduct elections and ensure results are not part of the executive branch's role or powers," the court reasoned that Appellant therefore "cannot have acted in his role as a federal officer with respect to any efforts to influence, interfere with, disrupt, oversee, or change state elections: those activities are expressly delegated to the States." *Id.* at 36. In light of this, the court found that Appellant had not presented sufficient evidence that overt acts 92,

96, or 112 related to "any legitimate purpose" of the executive branch within the scope of his duties as Chief of Staff. Rather, these overt acts concerned campaign-related activity that the court determined fell outside that scope. The district court made such determinations even *after* discussing Appellant's testimony as to each overt act. *Id.* at 36-40.

Regarding overt acts 5 and 93, the district court determined that the evidence did not support Appellant's contention that they concerned merely the workaday routine of the Chief of Staff such as meetings or phone calls. Instead, the evidence demonstrated that the actual substance of the acts concerned the type of "political activity" devoted to the "purpose of furthering the common objective of success of a particular presidential candidate" and thus specifically prohibited by regulation. *Id.* at 40 (citing 5 C.F.R. § 734.101). Again, the court reached this conclusion only *after* assessing Appellant's own testimony and weighing it against all of the evidence. Doc. [69] at 40-42.[4]

Appellant insists that he "comfortably" met the standard required of him for removal by providing testimony on each of the overt acts alleged and how they

---

[4] The Court found that overt act 6 was arguably within the scope of Appellant's duties, while overt acts 9 and 19 were merely "neutral." Doc. [69] at 35, 36 n.14. While Appellant insists that this was error, since his testimony had disputed the veracity of overt acts which the State was not actually required to prove, the Court merely considered them "neutral." This was not error; error, arguably, would have been to weigh these overts against Appellant regardless.

related to some duty that could be within the proper scope of his office. App. Br. at 24-26. Thus, his "clear and unrebutted testimony" demonstrated the "federal interests at play" and should have authorized removal. *Id.* at 50. The problem for Appellant is that he was cross-examined. The district court *did* evaluate his testimony, extensively; it was his own time on the stand which contributed mightily to the district court's determination that the evidence weighed "overwhelmingly" against his claims. In order to find *for* Appellant, "[t]he Court would be ignoring the evidence Meadows himself submitted of his post-election related activities and the purpose of the federal officer removal statute." Doc. [69] at 48. Additionally, his testimony was not "unrebutted"; the district court noted that "the State has put forth evidence that at various points during the time of the alleged conspiracy Meadows worked with the Trump campaign, which he admitted was outside the role of the White House Chief of Staff." *Id.* at 42. Finally, his testimony as also not "clear"; Appellant could not articulate what limits existed for his role, he was contradicted

by the evidence on the stand,[5] and at several points he attempted to explain that his use of the word "we" did not actually signify that he meant "we."[6]

Appellant appears to insist that his own testimony, free from any challenge, should be the only evidence considered. It is not clear what role an evidentiary hearing should play in Appellant's conception of removal, where once he has advanced a theory and given his own self-serving testimony, all inquiry should end. The district court, of course, was free to evaluate Appellant's testimony and "determine the appropriate amount of weight to assign to his testimony when evaluating it, the same as it does any other witness in an evidentiary hearing," although in these circumstances, the court did so with extreme care. Doc. [69] at 28 n.12. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than

---

[5] After insisting that he did not play "any role" in the coordination of slates of "fake electors" throughout several states, Appellant was forced to acknowledge under cross-examination that he had in fact given direction to a campaign official in this regard. Specifically, Appellant wrote an email, State's Exhibit 1, in which he said, "We just need to have someone coordinating the electors for the states" and attached a memorandum written by co-defendant Kenneth Chesebro recommending the organization of slates of presidential electors to meet and cast votes for Mr. Trump in states Mr. Trump had lost. Doc. [65] at 140-146.

[6] The district court was free to consider that, several times, Appellant insisted that the word "we" somehow did not mean "Appellant and the campaign" despite the obvious context of Appellant's statements. Doc. [65] at 96, 146, 148. Appellant's claimed personal foible of misuing "we" appeared at various points where an ordinary understanding of "we" would include Appellant within the Trump campaign and its efforts.

a reviewing court to assess the credibility of witnesses…[A] trial court's credibility determination 'is conclusive on the appellate court unless the judge credits exceedingly improbable testimony… [The Eleventh Circuit] will overturn a district court's credibility determination where the credited testimony is unbelievable." *United States v. Jules*, 244 Fed. Appx. 964, 972 (11th Cir. 2007) (internal citations omitted). The district court was free to consider all of the evidence, the demeanor and presentation of the witnesses (including Appellant) on the stand, and the overall picture presented. When combined with the limits to the Chief of Staff's duties which it had identified, the Court's determination that Appellant had not carried his burden in demonstrating a sufficient connection between the gravamen of the charge against him and his federal duties was sound, and its Order should be affirmed.

## II.    Appellant has not demonstrated that he has a colorable Supremacy Clause immunity defense.

To remove a case under Section 1442, Appellant also must raise a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 136 (1989). In the context of removal, "colorable" means "plausible." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996). Appellant has raised the defense of Supremacy Clause immunity, which requires him to show both that he was performing "an act which he was authorized to do by the law of the United States" and that, in performing that authorized act, "he did no more than what was necessary and proper for him to do." *In re Neagle*, 135 U.S. 1, 75 (1890). Although the district court did not reach the

question of whether Appellant raised a colorable federal defense, he has failed to demonstrate that this is a "plausible" defense. Furthermore, in this circuit, a defendant's claim of Supremacy Clause immunity is negated by evidence that they acted out of "personal interest, malice, actual criminal intent, or for any other reason than to do [their] duty as [they] saw it." *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

Appellant's assertion of a Supremacy Clause immunity defense falls far short of plausibility for several reasons. First, as detailed above, his relevant activities were not within the lawful scope of his authority as Chief of Staff. In his own motion to dismiss, Appellant admitted that even in his candid estimation, his pertinent activities were all "unquestionably political" in nature and therefore, by definition, outside the lawful scope of his authority as Chief of Staff. *See* Doc. [15-1] at 23-24. Additionally, again, there is no role for the executive branch in the States' administration of elections under the Constitution. It is the States that are empowered to select electors who will cast votes for president and vice president, and the electors transmit a tally of those votes to the President of the Senate. U.S. Const. art. II, § 1, cl. 3; *id.* amend. XII. The States are left to determine the manner of their elections. State officials, and not federal ones, prepare the elections, conduct them, assemble the ballots, count the votes, and certify the results. Logical, then, that Appellant and other co-defendants spent enormous time and effort contacting, cajoling, pressuring,

and otherwise interacting with State officials in the relevant time period: because the President *had no authority of his own* in the administration of the election. Federal removal is designed to protect federal functions from State interference, but that was not a risk in these 2020 or 2021 events, and is not a risk now. Instead, this case concerns attempts to interfere in *state* functions by *federal* officials without any authority of their own.

Second, even if Appellant had arguably acted as authorized under federal law (rather than directly contrary to it), that authority would be negated by the evidence of his "personal interest, malice, actual criminal intent" or any motivation "for any other reason than to do his duty as he saw it." *Baucom*, 677 F.2d at 1350. Appellant admitted that he had a personal interest in co-defendant Trump winning the 2020 election, and any rational evaluation of his actions demonstrates that he was acting on behalf of the Trump campaign throughout the period of the alleged conspiracy. Doc. [65] at 146:6-16. Appellant does not dispute this—he admitted that all of the activity at issue in the indictment falls under the right of individuals to campaign for election "vigorously and tirelessly." Doc. [15-1] at 24. Appellant cannot plausibly argue that these activities were somehow "authorized" by federal law when the evidence demonstrates his personal interest, criminal intent, and overall motivations "for any other reason than to do his duty as he saw it," particularly when he has

34

admitted that the activities were clearly political and tied to the "vigorous and tireless" advocacy in favor of Trump's election.

Third, Appellant cannot credibly argue that he did no more than that which was "necessary and proper" for him to do. "For conduct to be 'necessary and proper,' an officer must subjectively believe that his actions were appropriate to carry out his federal duties, and that belief must be objectively reasonable." *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017). As the record demonstrates, there is no authority anywhere for the President or his Chief of Staff to insert themselves into the electoral processes of the State of Georgia—meaning Appellant's actions were neither necessary nor proper. "The Office of the President has no preference for who occupies it. . . . A function of the presidency therefore is *not* to secure or perpetuate incumbency." *Thompson*, 590 F. Supp. at 82 (emphasis original). Appellant offers no support for how it would be "objectively reasonable" to believe that his duties as chief of staff included acting on behalf of the Trump campaign, pressuring state officials, or pursuing unlawful strategies designed to ensure co-defendant Trump's reelection, particularly when Meadows admitted in his own testimony that he was bound by the limits of the Hatch Act. Even if there were some authority supporting Appellant's actions, violating state law for a purported federal purpose "must be the rare exception" and in every case must be "clearly seen to be reasonable, necessary, and proper." *Id.* at 1351. Even if Appellant did act at the behest of or in service to

the person who was resident at the time, that is not enough to demonstrate a plausible Supremacy Clause immunity defense. "Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty." *Clinton v. Jones*, 520 U.S. 681, 705 n.40 (1997). A claim of immunity for unofficial acts cannot be "grounded purely in the identity of [the President's] office." *Id.* at 695. There is no demonstrable basis for federal authority related to Appellant's actions, while the district court received ample evidence of personal, political, unofficial intentions and activities, many or most of which Appellant readily admits.

Finally, Appellant cannot demonstrate that Supremacy Clause immunity is a complete defense for him, i.e., the relevant benchmark. Supremacy Clause immunity could not accomplish this for Appellant under the present circumstances because he has admitted that he was bound by the Hatch Act and therefore, *any* activity taken on behalf of the Trump campaign would be sufficient to demonstrate his association with the alleged conspiracy.

Thus, while Appellant need not show a "clearly sustainable defense"[7] at this stage, he must at least be able to show it is a *plausibly* sustainable defense. Likewise, while he is not required to "virtually win his case,"[8] he cannot clear the low bar of

---

[7] *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

[8] *Id.*

demonstrating that his defense would make it *possible* for him to win his case. To hold that a "plausible" defense need be anything less than a "complete" defense would reduce the test for federal removal from permissive to nearly nonexistent. Indeed, many federal courts have held that a "colorable federal defense" must be a "complete defense," a minimum requirement so uncontroversial that it does not appear to have ever been challenged. *See Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770, 778, 783 (E.D. Pa. 2010) ("Thus, the Court concludes that a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial.").[9] As the district court observed, Appellant has failed to identify facts which, even when considered in the

---

[9] Courts that have followed *Hagen*'s formulation requiring the showing of a "complete defense" without any dispute include the Third Circuit, *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 815 (3d Cir. 2016); the Southern District of Alabama, *Morgan v. Bill Vawn Co., Inc.*, 2011 WL 6056083, * 5 (S.D. Ala. Dec. 6, 2011), *Davis v. Central Ala. Elec. Coop.*, 2015 WL 4742496 (S.D. Ala. Aug. 11, 2015); the Southern, Eastern, and Northern Districts of New York, *Williams v. Aetna Life Ins. Co.*, 2013 WL 593505, * 6 (S.D. N.Y. Jan. 30, 2013), *Gordon v. Air & Liquid Systems, Corp.*, 990 F.Supp.2d 311, 316-17 (E.D. N.Y. 2014), *Gates v. AO Smith Water Prods. Co.*, 2014 WL 104965, * 4-5 (N.D. N.Y. Jan. 9, 2014), *Crews v. Air & Liquid Systems, Corp.*, 2014 WL 636362, * 3 n. 2 (N.D. N.Y. Feb. 18, 2014); and many others. *See also Walkup v. Air & Liquid Systems Corp.*, 2013 WL 5448623, * 4-5 (D. Del. Sept. 26, 2013); *Joyner v. A.C. & R. Insulation Co.*, 2013 WL 877125, * 6 (D. Md. Mar. 7, 2013); *Thompson v. Crane Co.*, 2012 WL 1344453, * 20 (D. Haw. April 17, 2012); *Kraus v. Alcatel-Lucent,* 2018 WL 3585088 (E.D. Pa. July 25, 2018).

light most favorable to him, demonstrate how all of his activity could have been "necessary and proper" or how a subjective belief in as much could be objectively reasonable. Even leaving aside such testimony as Appellant's revealing and repeated use of the term "we," no evidence at all was provided to explain Appellant's contradictory testimony about the email contained in State's Exhibit 1. Doc. [65] at 140-46. This evidence alone, even when viewed in the most favorable light, demonstrates Appellant's association with the campaign, the conspiracy, and makes it impossible for him to completely shield himself with Supremacy Clause immunity.

The district court was correct in finding that Appellant had not met his burden to demonstrate his acts were taken within the color of his office. Should this Court reach the question of a colorable federal defense, Appellant's proffered Supremacy Clause immunity falls similarly short. Such a defense could not plausibly apply to all of Appellant's actions in order to explain his association with the alleged conspiracy and thus could not be a *complete* defense, particularly given Appellant's own testimony and arguments advanced regarding the Hatch Act, his participation in vigorous and tireless campaign activity, and his personal motivations. Having failed to raise a plausible federal defense, Appellant cannot make the required showing for removal and remand to the Superior Court of Fulton County is proper.

38

## CONCLUSION

For the foregoing reasons, because Appellant Meadows's arguments fail to demonstrate that the district court erred in declining to apply removal jurisdiction, the State of Georgia respectfully requests that this Court affirm the district court's order.

Respectfully submitted, September 25, 2023.

By: *s/ F. McDonald Wakeford*
F. MCDONALD WAKEFORD
Chief Senior Assistant District Attorney
WILL WOOTEN
Atlanta Judicial Circuit
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
404-612-4981
fmcdonald.wakeford@fultoncountyga.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this document contains 9887 words.

 2. This motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

This 25th day of September 2023.

<u>*s/ F. McDonald Wakeford*</u>

F. McDonald Wakeford

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify the foregoing was served upon the following by the PACER electronic filing system, as well as by email and US Mail:

George J. Terwilliger, III
John S. Moran
Michael J. Francisco
Francis J. Aul
McGuire Woods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-2473
gterwilliger@mcguirewoods.com

Dated this 25th day of September, 2023.

*s/ F. McDonald Wakeford*

F. McDonald Wakeford

41