No. 23-12958

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————————

The State of Georgia,

*Plaintiff-Appellee*,

v.

Mark R. Meadows,

*Defendant-Appellant*.

————————————

On Appeal from the United States District Court
for the Northern District of Georgia, No. 1:23-cv-03621-SCJ

————————————

## REPLY BRIEF FOR APPELLANT MARK R. MEADOWS

————————————

George J. Terwilliger, III
John S. Moran
Michael L. Francisco
Francis J. Aul
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006
(202) 857-2473
gterwilliger@mcguirewoods.com

*Counsel for Defendant-Appellant Mark R. Meadows*

No. 23-12958, *The State of Georgia v. Mark R. Meadows*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. Rule 26.1-1(a)(3), Appellant certifies that the following attorneys, law firm, and persons have an interest in the outcome of this particular case, in addition to those listed in Appellant's Opening Brief:

1.  Chemerinsky, Erwin, *amicus*

2.  Childress, Marcus, attorney for *amici*

*3.*  Frosh, Brian, *amicus*

4.  Graber, Mark A., *amicus*

5.  Jenner & Block LLP

6.  Kallen, Michelle, attorney for *amici*

7.  Marshall, Mary E., attorney for *amici*

8.  Miller, Tom, *amicus*

9.  Shane, Peter M., *amicus*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................3

I.    The Jurisdictional Inquiry Under § 1442(a) Is Simple to Meet and to Apply
      ....................................................................................................3

II.   The "Gravamen" Approach Is Unsupported by Precedent and, in Any Event,
      Would Not Defeat Removal Here ...............................................12

III.  The State's Arguments on the Merits of Meadows's Immunity Defense Are
      Both Irrelevant and Wrong ........................................................18

CONCLUSION ....................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006).............................................................................3

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015)...........................................................................20

*Arizona v. Manypenny*,
    451 U.S. 232 (1981).........................................................................8, 9

*Baucom v. Martin*,
    677 F.2d 1346 (11th Cir. 1982) ......................................................6, 22

*Bell v. Hood*,
    327 U.S. 678 (1946).........................................................................3, 4

*Blue Cross & Blue Shield of Alabama v. Sanders*,
    138 F.3d 1347 (11th Cir. 1998) .......................................................4, 6

*Castillo v. Snyders*,
    497 F. Supp. 3d 299 (N.D. Ill. 2020)........................................... 12, 13

*Caver v. Cent. Alabama Elec. Coop.*,
    845 F.3d 1135 (11th Cir. 2017) ..................................................... passim

*Colorado v. Symes*,
    286 U.S. 510 (1932)...........................................................................10

*Crews v. Air & Liquid Sys. Corp.*,
    2014 WL 636362 (N.D.N.Y. Feb. 18, 2014).....................................19

*CSX Transp., Inc. v. Alabama Dep't of Revenue*,
    888 F.3d 1163 (11th Cir. 2018) .........................................................10

*Davis v. Central Ala. Elec. Coop.*,
    2015 WL 4742496 (S.D. Ala. Aug. 11, 2015)...................................19

*Fisher v. PNC Bank, N.A.*,
    2 F.4th 1352 (11th Cir. 2021) .............................................................4

*Gates v. A.O. Smith Water Prods. Co.*,
    2014 WL 104965 (N.D.N.Y. Jan. 9, 2014) ........................................................19

*Georgia v. Heinze*,
    637 F. Supp. 3d 1316 (N.D. Ga. 2022)................................................ 4, 10, 16

*Gordon v. Air & Liquid Sys., Corp.*,
    990 F. Supp. 2d 311 (E.D.N.Y. 2014) ................................................................19

*Hagen v. Benjamin Foster Co.*,
    739 F. Supp. 2d 770 (E.D. Pa. 2010)................................................................19

*Idaho v. Horiuchi*,
    253 F.3d 359 (9th Cir. 2001) ..............................................................................17

*In re McShane*,
    235 F. Supp. 262 (N.D. Miss. 1964)..................................................................17

*Jefferson Cnty. v. Acker*,
    137 F.3d 1314 (11th Cir. 1998) .......................................................... 2, 3, 5, 11

*Jefferson Cnty. v. Acker*,
    527 U.S. 423 (1999).................................................................................. passim

*Joyner v. A.C. & R Insulation Co.*,
    2013 WL 877125 (D. Md. Mar. 7, 2013) ........................................................19

*Kentucky v. Long*,
    837 F.2d 727 (6th Cir. 1988) ..............................................................................11

*Kircher v. Putnam Funds Tr.*,
    547 U.S. 633 (2006)..........................................................................................4, 6

*Kraus v. Alcatel-Lucent*,
    2018 WL 3585088 (E.D. Pa. July 25, 2018) ....................................................19

*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2020) ................................................................ 4, 5, 14

*Lobo v. Celebrity Cruises, Inc.*,
    704 F.3d 882 (11th Cir. 2013) ..............................................................................5

*Magnin v. Teledyne Cont'l Motors*,
   91 F.3d 1424 (11th Cir. 1996) .................................................. 1, 5, 10

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
   578 U.S. 374 (2016) ........................................................................8

*Mesa v. California*,
   489 U.S. 121 (1989) .................................................................. 4, 8, 10

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ......................................................................15

*Morgan v. Bill Vann Co.*,
   2011 WL 6056083 (S.D. Ala. Dec. 6, 2011) ....................................19

*Osborn v. Bank of U.S.*,
   22 U.S. (9 Wheat.) 738 (1824) ..........................................................8

*Pack v. AC & S, Inc.*,
   857 F. Supp. 26 (D. Md. 1994) ........................................................8

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016) ...........................................................19

*Resnick v. KrunchCash, LLC*,
   34 F.4th 1028 (11th Cir. 2022) ......................................................4, 6

*Ruppel v. CBS Corp.*,
   701 F.3d 1176 (7th Cir. 2012) .........................................................12

*Steffel v. Thompson*,
   415 U.S. 452 (1974) .........................................................................6

*Texas v. Kleinert*,
   855 F.3d 305 (5th Cir. 2017) ..................................................... 17, 23

*Thompson v. Crane Co.*,
   2012 WL 1344453 (D. Haw. Apr. 17, 2012) ....................................19

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022) ............................................. 20, 21

*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480 (1983)................................................................8

*Walkup v. Air & Liquid Sys. Corp.*,
   2013 WL 5448623 (D. Del. Sept. 26, 2013).........................19

*Watson v. Philip Morris Cos., Inc.*,
   551 U.S. 142 (2007)..............................................................11

*Williams v. Aetna Life Ins. Co.*,
   2013 WL 593505 (S.D. Ala. Jan. 30, 2013) .........................19

*Willingham v. Morgan*,
   395 U.S. 402 (1969).......................................................2, 3, 5

*Winters v. Diamond Shamrock Chem. Co.*,
   901 F. Supp. 1195 (E.D. Tex. 1995)......................................7

*Wyoming v. Livingston*,
   443 F.3d 1211 (10th Cir. 2006) ...............................6, 7, 17

**Statutes**

28 U.S.C. § 1331 ...........................................................................6

28 U.S.C. § 1442(a) ............................................................ passim

28 U.S.C. § 1446 ...........................................................................5

28 U.S.C. § 1455(b)(5)..................................................................5

28 U.S.C. § 2072 ...........................................................................6

*An act to approve with modifications certain proposed amendments to the Federal
   Rules of Criminal Procedure*,
   Pub. L. 95-78, 91 Stat. 319 (July 30, 1977)...........................6

**Other Authorities**

Amendments to Federal Rules of Criminal Procedure,
   425 U.S. 1157 (1975)...............................................................6

BRAD RAFFENSPERGER, INTEGRITY COUNTS (2021) ................22

Mot. to Remand,
    ECF No. 8, *Georgia v. Heinze*, No. 1:21-cv-04457-VMC (N.D. Ga. Nov. 29, 2021) ............................................................................................16

## INTRODUCTION

The Supremacy Clause immunizes federal officers from state prosecution for acts undertaken as part of their official duties. When a State brings such a prosecution, the Federal Officer Removal Statute provides a ready means for an officer to invoke federal jurisdiction and have the immunity defense adjudicated in federal court. Jurisdiction under 28 U.S.C. § 1442(a) turns simply on whether the case (1) has some "'connection' or 'association' to the federal office" of a removing officer; and (2) involves a "colorable federal defense." *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142–45 (11th Cir. 2017) (quotations omitted). In an effort to thwart removal by a Chief of Staff to the President for actions taken in the West Wing, the State would have this Court abandon established standards prescribing how to apply that simple jurisdictional test.

Like any jurisdictional inquiry, however, the test for federal-officer removal should be readily administrable at the outset of a case. And it is. Under settled law, a court treats these jurisdictional thresholds as imposing a "quite low" bar, *Caver*, 845 F.3d at 1144; "credit[s] the [removing officer's] theory of the case for purposes of both elements of [the] jurisdictional inquiry," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999); and does not ask whether the federal defense will ultimately prevail, *see id.* at 431; *Caver*, 845 F.3d at 1145; *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996), because the whole point of the Federal Officer Removal

Statute is to provide a federal forum for adjudicating that federal defense, *see Willingham v. Morgan*, 395 U.S. 402, 409 (1969); *Jefferson Cnty. v. Acker*, 137 F.3d 1314, 1323 (11th Cir. 1998).

Applying those standards here should have resulted in a simple decision to permit removal. The State's contrary and novel view requires a district court to undertake a much more intensive analysis at the very beginning of the case: a court should focus on the "heart" or "gravamen" of the State's charges to ensure the case is not too easily removed, *see* Opp. 12–19; cabin the federal officer's discretionary authority, *see* Opp. 19–26; weigh any evidence against the removing officer with a thumb on the scale to favor the State's interest in prosecuting on home turf, *see* Opp. 27–32; and adjudicate the asserted federal defense on the merits, at least enough to send it back down, *see* Opp. 32–38.

That approach is plainly gerrymandered to defeat removal here. It lacks any basis in the text of § 1442(a), relevant precedent, or the purposes underlying the Federal Officer Removal Statute. All of those sources compel the opposite conclusion: that the case for removal here is straightforward and overwhelming.

The Court should reverse.

## ARGUMENT

## I.   THE JURISDICTIONAL INQUIRY UNDER § 1442(a) IS SIMPLE TO MEET AND TO APPLY

Section 1442(a) represents a simple jurisdictional threshold meant to get federal officers' federal defenses promptly *into* federal court, not to keep them out. *See, e.g.*, *Willingham*, 395 U.S. at 409 ("[Federal officers] should have the opportunity to present their version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish."); *Acker*, 137 F.3d at 1323 (explaining that § 1442(a) "fulfills Congress' intent that questions concerning the exercise of Federal authority, the scope of Federal immunity and Federal–State conflicts be adjudicated in Federal court") (quotation omitted). The State says this case is about "*federal* meddling in matters of *state* authority." Opp. 1 (emphasis original). Under the Supremacy Clause and Federal Officer Removal Statute, a question of alleged "*federal* meddling" should be resolved in federal court.

The threshold for federal-question jurisdiction is already low under § 1331, though for claims removed under § 1442(a), it gets even lower. In both cases, the low jurisdictional threshold ensures ready administrability, and courts need not resolve the merits to ascertain their jurisdiction. *Bell v. Hood*, 327 U.S. 678 (1946), establishes the famously permissive standard for federal-question jurisdiction under § 1331; the federal claim need be only "colorable." *E.g.*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 n.10 (2006). Under *Bell*, a plaintiff's mere assertion of a federal

3

claim is nearly always dispositive. "[A] federal court may dismiss a federal question claim for lack of subject matter jurisdiction only if: (1) 'the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction'; or (2) 'such a claim is wholly insubstantial and frivolous.'" *Blue Cross & Blue Shield of Alabama v. Sanders*, 138 F.3d 1347, 1352 (11th Cir. 1998) (quoting *Bell*, 327 U.S. at 682–83). "The federal courts have a virtually unflagging obligation to exercise the jurisdiction given them," *Fisher v. PNC Bank, N.A.*, 2 F.4th 1352, 1356 (11th Cir. 2021) (cleaned up), and the exceptions are "exceedingly narrow," *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1034 (11th Cir. 2022).

This same requirement from *Bell* of a "colorable" federal claim informs the requirement from *Mesa v. California*, 489 U.S. 121, 137 (1989), of a "colorable federal defense." *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020) (en banc). "[A]n asserted federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *Id.* (quotations omitted); *accord Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006). The non-frivolous assertion of an immunity defense will generally establish both jurisdictional elements. And a district court can easily satisfy itself of its jurisdiction by applying this simple standard. *See, e.g.*, *Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1322–25 (N.D. Ga. 2022) (permitting

removal of murder charges brought by the Fulton County District Attorney against federal task force officers).

The district court should not have belabored the jurisdictional inquiry here, where the officer in question is the Chief of Staff to the President and the conduct giving rise to his indictment occurred within the West Wing during the course of his official duties. *Cf. Willingham*, 395 U.S. at 409 ("[O]nce petitioners had shown that their only contact with respondent occurred inside the penitentiary, while they were performing their duties, . . . they had demonstrated the required 'causal connection.'"); *see also Latiolais*, 951 F.3d at 296 (noting that 2011 amendments to § 1442(a) expanded its reach beyond the "causal connection" standard).

A federal court does not probe the merits to assess jurisdiction. *Cf.* Opp. 31–32. This is true for jurisdictional inquiries generally, *see, e.g.*, *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 891 (11th Cir. 2013), and especially true for § 1442(a), *see Magnin*, 91 F.3d at 1427; *Caver*, 845 F.3d at 1145. The whole point is to provide a federal forum for adjudicating the merits of a federal defense, *see Willingham*, 395 U.S. at 409; *Acker*, 137 F.3d at 1323, not to reserve some subset of arguable federal defenses for litigation in state court.[1]

---

[1] The reference in 28 U.S.C. § 1455(b)(5) to an "evidentiary hearing" makes no difference, as it imposes no substantive or evidentiary burden. Before the 1970s, civil and criminal cases were both governed by the procedures outlined in § 1446. The Rules Committee then proposed new procedures for removal of criminal cases.

It is indisputable that Meadows could sue the District Attorney in federal court for a declaratory judgment to establish his federal defense, *see Baucom v. Martin*, 677 F.2d 1346, 1349 (11th Cir. 1982) (citing *Steffel v. Thompson*, 415 U.S. 452 (1974)), and the district court would have to exercise federal-question jurisdiction, *see Sanders*, 138 F.3d at 1352; *Resnick*, 34 F.4th at 1034. But that is an unnecessarily roundabout tactic that § 1442(a) avoids by providing a ready path to federal court. The State maintains removal under § 1442(a) should be harder to invoke than federal-question jurisdiction under § 1331, but that transparent effort to avoid removal is belied by settled principles that establish the opposite.

*First*, § 1442(a) "is an exception to the well-pleaded complaint rule" and allows removal "despite the nonfederal cast of the complaint." *Kircher*, 547 U.S. at 644 n.12 (quotation omitted); *see also* Br. 20, 31–32. Without citing a single case,

---

*See* Amendments to Federal Rules of Criminal Procedure, 425 U.S. 1157, 1163–64 (1975). This proposal ultimately became the procedures now reflected in § 1455, subject to specific tweaks Congress made on timing. *Compare id.*, *with An act to approve with modifications certain proposed amendments to the Federal Rules of Criminal Procedure* § 3, Pub. L. 95-78, 91 Stat. 319, 321–22 (July 30, 1977). Under the Rules Enabling Act, this new Rule could "not abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072, and Congress for its part did not impose any new substantive burden. To the contrary, the changes were meant "to minimize the disruption . . . from frivolous and dilatory petitions for removal . . . but, at the same time, provide ***a fair opportunity for the defendant with grounds for removal to have his petition heard***." S. Rep. 95-354, *reprinted in* 1977 U.S.C.C.A.N. 527 (July 20, 1977) (emphasis added). Federal courts have dispensed with the evidentiary hearing where it was not necessary. *See, e.g.*, *Wyoming v. Livingston*, 443 F.3d 1211, 1225 (10th Cir. 2006).

the State dismisses this principle, claiming it "relates to . . . a defendant's articulation of a colorable federal defense, *not* to how a district court should define the relevant 'acts' which it must analyze under the test for removal." Opp. 20. But that is simply wrong. A court is to "credit the [removing officer's] theory of the case for purposes of ***both elements*** of [the] jurisdictional inquiry," not just the "colorable federal defense" element. *Acker*, 527 U.S. at 432 (emphasis added); *see also Winters v. Diamond Shamrock Chem. Co.*, 901 F. Supp. 1195, 1199 (E.D. Tex. 1995) (applying the exception to the "well-pleaded complaint" rule to the "connection" element under § 1442(a)), *aff'd*, 149 F.3d 387 (5th Cir. 1998); *Pack v. AC & S, Inc.*, 857 F. Supp. 26, 28 (D. Md. 1994) (same).

The State's contrary position makes no sense. State prosecutors can readily avoid pleading a connection between the charges they bring and an act by the defendant under color of federal office (though the State actually did that here for Meadows). An indictment can easily state a charge, up to and including murder, that, standing alone, would not be part of an officer's official duty. The removing officer will therefore need to establish through his own assertions that the charges relate to acts under color of his office. *See, e.g.*, *Livingston*, 443 F.3d at 1215–16 (permitting removal of charges against U.S. Fish & Wildlife Service employees for state offenses facially unrelated to official conduct based on the defendants' allegations that they were conducting a federal operation at the time). The court does not conduct

a novel and complex analysis of the "heart" or "gravamen" of the State's case. Opp. 16–17. The court simply looks at the Notice of Removal and accompanying pleadings and determines whether the removing officer adequately alleges a connection to or association with an act under color of office and a colorable federal defense. *See Caver*, 845 F.3d at 1142.

**Second**, the § 1442(a) standard is readily satisfied because the Supreme Court made clear in *Mesa* that it rests on the broadest conception of "arising under" jurisdiction under Article III of the Constitution, not on the narrower statutory scope of "arising under" for purposes of § 1331. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 385 (2016) (explaining the distinction). The *Mesa* Court read an implicit "colorable federal defense" requirement into § 1442(a) to shore up the statute's "substantive Art. III foundation" and avoid "grave constitutional problems." *Mesa*, 489 U.S. at 137. Given that purpose and the lack of any express "federal defense" requirement, the statute can and should be interpreted to reach any case within its scope that "might call for the application of federal law." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 492 (1983) (citing *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738 (1824)).

Quoting *Arizona v. Manypenny*, 451 U.S. 232 (1981), and subsequent cases, the State argues that removal would contravene "strong judicial policy against federal interference with state criminal proceedings because preventing and dealing

8

with crime is much more the business of the States than it is of the Federal Government." Opp. 27 (quotations omitted). But *Manypenny* itself makes clear that this state interest does not defeat removal under § 1442(a); the murder prosecution there was removed. The Court emphasized that "removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties," 451 U.S. at 241; explained that "[t]he act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice" and "***enables the defendant to have the validity of his immunity defense adjudicated, in a federal forum***," *id.* at 241–42 (emphasis added); and held the defendant officer had properly "vindicated the federal policies supporting removal" "by obtaining a federal forum," *id.* at 243. The question presented there presupposed that the case was properly removed to federal court: "the sole question posed here is whether respondent's removal of the state prosecution to federal court for trial alters the nature of the State's otherwise well-established right, under state law, to seek review of the instant judgment of acquittal." *Id.* at 240. It was in that context—*i.e.*, only after assuring the federal officer of a federal forum—that the Court emphasized the State's interest in pursuing an appeal that was authorized by state law but not otherwise available in federal

court. In short, *Manypenny* underscores that removal is appropriate even when the State has a strong interest in pursuing its state-law prosecution.[2]

Given these well-established principles, the removal question here is not close. The threshold jurisdictional questions under *Bell* and the even laxer § 1442(a) cases are meant to be simple both for the removing defendant to meet and for the district court to apply. Meadows's assertion of a plainly non-frivolous immunity defense sufficed to establish both elements, and the district court should have reached that conclusion easily. *Cf. Heinze*, 637 F. Supp. 3d at 1325. The district court unnecessarily complicated that simple task instead, and the State now urges this Court to spread that novel approach across the Circuit. That would be wrong as a matter of law and misguided as a matter of policy.

---

[2] The State also cites *Colorado v. Symes*, 286 U.S. 510 (1932), and footnote 4 in *Willingham* to suggest that a criminal defendant bears a heightened burden. *See* Opp. 27–28. That is simply wrong. *Willingham* was a civil case in which the Court merely suggested in *dicta* in a footnote that the level of detail required to remove a criminal case "might be" higher. 395 U.S. at 409 n.4; *cf. CSX Transp., Inc. v. Alabama Dep't of Revenue*, 888 F.3d 1163, 1186 (11th Cir. 2018) ("The Court's footnote musing about what might have been if something were different is doubtless dicta."). *Manypenny* puts to bed any concern that removal is inconsistent with the State's interest in its state prosecution. The cited language in *Symes*, moreover, was overtaken by *Mesa*'s "colorable federal defense" requirement, which ensures that removed cases will always satisfy Article III, *see Mesa*, 489 U.S. at 137, and thus obviates the concern in *Symes* and predecessor cases for requiring detailed pleading to establish federal jurisdiction, *see id.* at 132–33. But even if the level of pleading required were higher, it is still firmly established that the defendant does not need to prove his case to remove. *See Magnin*, 91 F.3d at 1427; *Caver*, 845 F.3d at 1145. Meadows has set forth in detail the connection between the State's prosecution and his official acts, sufficient to satisfy even a heightened pleading standard.

While the district court was supposed to credit Meadows's assertions, *see Acker*, 527 U.S. at 432, the State's arguments reinforce that the case belongs in federal court. That is where the federal questions the State raises must be resolved. On the "connection" element, the State relies on the purported "*limits* of the Chief of Staff's role," Opp. 20, and disputed interpretations of "the Elections Clause," Opp. 21; "the Take Care Clause," Opp. 23; and "the Hatch Act," Opp. 24. On the "colorable federal defense" element, the State's arguments similarly hinge on "the lawful scope of [Meadows's] authority as Chief of Staff," Opp. 33, and the adequacy of his asserted immunity defense, *see* Opp. 34–38. Those are "questions concerning the exercise of Federal authority [and] the scope of Federal immunity" that Congress wants to "be adjudicated in Federal court." *Acker*, 137 F.3d at 1323.[3]

## II. THE "GRAVAMEN" APPROACH IS UNSUPPORTED BY PRECEDENT AND, IN ANY EVENT, WOULD NOT DEFEAT REMOVAL HERE.

Section 1442(a) asks whether the prosecution is "for or relat[es] to any act under color of [federal] office," 28 U.S.C. § 1442(a)(1), and that determination is

---

[3] The politically-charged nature of this case further bolsters the basis for removal. *See Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007) (explaining removal protects federal officers from "local prejudice" against unpopular federal laws or officials); *see also Acker*, 527 U.S. at 447 (Scalia, J., concurring in part and dissenting in part); *Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir. 1988). Adjudicating an immunity defense in federal court has other benefits as well, such as capitalizing on the federal judiciary's relatively greater experience with the federal issues that arise in such cases.

based on the removing officer's allegations about his conduct and its relationship to his official duties. The task should have been particularly straightforward here because the Indictment alleges specific acts Meadows supposedly took in connection with the charged offenses, and Meadows established through both pleading and evidence—unrebutted by the State—that those acts related to his duties as Chief of Staff.

But the State contends, and the district court agreed, that those allegations in the Indictment are irrelevant to determining what the prosecution is "for." Instead, the State argues, the Court should focus only on the "heart" or "gravamen" of its case, claiming that Meadows's alleged "conspiring to violate Georgia's RICO statute" constitutes "the relevant 'act' under 28 U.S.C. § 1442(a)(1)" for assessing jurisdiction. Opp. 12–13, 16–17. That is simply sophistry aimed at defeating removal, and precedent does not support it.

***First***, Meadows explained why the "gravamen" approach is dead wrong, *see* Br. 31–34, and the State has not revived it. Neither *Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012), nor *Castillo v. Snyders*, 497 F. Supp. 3d 299 (N.D. Ill. 2020), supports the State's position. *See* Opp. 16–17. *Ruppel* established federal jurisdiction over a mesothelioma claim against a naval contractor, explaining that "the gravamen of Ruppel's complaint occurred while CBS acted under color of federal authority." 701 F.3d at 1181. The Seventh Circuit cited nothing in particular in referring to the

"gravamen" of the case and certainly did not develop a "gravamen" test for denying removal. The *Castillo* Court also permitted removal and did so because "the gravamen of Tlapa's claims against the Sheriff arise from the Sheriff's actions to assist federal authorities." 497 F. Supp. 3d at 306. These fleeting references to the "gravamen" of the case in ***permitting removal*** do not remotely support the State's position. A district court cannot deny removal by converting the State's general allegation of a criminal offense into the relevant "act" for purposes of removal.

The State also tries to rehabilitate its reliance on Justice Scalia's partial dissent in *Acker. See* Opp. 18. Meadows previously noted that, over Justice Scalia's dissent, the *Acker* Court held that "it was sufficient for removal purposes for [the removing judges] to allege that the licensing tax was 'for' broadly 'engag[ing] in [their] occupation' as judges." Br. 32 (quoting 527 U.S. at 432–33). The State responds that this holding "does not actually dispute Justice Scalia's articulation regarding the 'gravamen' of a claim" because "*Acker* . . . involved a *single, discrete act* that was not in dispute: the non-payment of a tax." Opp. 18. Therefore, the State argues, *Acker* was "merely" about "how to *characterize* that act," while this case involves a "wholly different" question of "what exactly *is the act* that this prosecution is *for*." Opp. 18. That misses the point and would, at most, confirm that the issues motivating Justice Scalia's use of the term "gravamen" are irrelevant here. The State also fails to respond to Congress's broadening of the statute after *Acker*. Justice Scalia's

dissenting opinion focused on the relatively limited scope of the word "for," but Congress subsequently expanded § 1442(a) to add the broader phrase "or relating to." *See* Br. 32–33; *see also Latiolais*, 951 F.3d at 297 (holding this expansion requires reconsideration of pre-2011 cases rejecting removal).

*Second*, the State defends the district court's novel reading of § 1442(a) under which the alleged RICO conspiracy is the "act" Meadows must show was under color of office. *See* App.739–40; Opp. 12–13. That too is clearly wrong.

The State's reading of § 1442(a) contradicts the plain meaning of the text and controlling precedent. The statute provides for removal of a prosecution against a federal officer "***for or relating to any act under color of such office***." 28 U.S.C. § 1442(a)(1) (emphasis added). The "act" is tied to the removing officer's official duties, not to the "charge" or "claim" the State asserts. It makes no sense to say "the 'act' as defined by Section 1442(a)(1) means the charge against Meadows." App.739–40. Federal officials do not engage in "claims" or "charges" under color of office; they engage in "acts" under color of office. And those acts are governed by their duties under federal law, not by the contours of state law. That is the very premise of federal supremacy.

In any event, the 2011 amendments to § 1442(a) drop the curtain on this issue. Congress replaced "for any act" with "for *or relating* to any act." *Latiolais*, 951 F.3d at 292 (describing the change and its effects). This change displaced the "causal

14

connection" test courts had previously applied and "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Id.*[4] Before 2011, it may have made sense to say the defendant was being prosecuted "for" the offense charged in the Indictment,[5] though *Acker* makes clear that the State's claim does not control, *see* 527 U.S. at 432. But after 2011, the charge is clearly not the focus. A removing officer need not show he is being prosecuted "for" an act under color of office, only that the prosecution "relat[es] to" such an act. The ordinary meaning of "relating to" "is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)). It pulls the textual focus even further from the State's charges.

    ***Third***, the State's argument here—that Meadows is charged for conspiring to overturn the 2020 election, and conspiring to overturn the 2020 election is not part

---

[4] The Fifth Circuit noted that, while this Court still sometimes refers to "the 'causal connection' test," it has also "cited the amended 'relating to' language and essentially implemented a connection rationale for removal." *Id.* at 292 (citing *Caver*, 845 F.3d at 1144 n.8).

[5] Even then, however, it is equally natural to look beyond the indictment. A prosecutor, for instance, might say he is charging a defendant "for" disorderly conduct, while the defendant might say he is being charged "for" his public criticisms of local officials. Both are perfectly natural uses of "for." And even the pre-2011 caselaw makes clear that a removing officer, like the hypothetical persecuted protestor, is not stuck with the State's characterization of the case.

of a Chief of Staff's duties—is the same basic argument that States have raised and federal courts have rejected for more than a century. The Fulton County District Attorney made essentially the same argument in *Heinze*. *See* Mot. to Remand, ECF No. 8, at 1–2, *Georgia v. Heinze*, No. 1:21-cv-04457-VMC (N.D. Ga. Nov. 29, 2021) (arguing that removal was improper because "Defendant has been indicted on *state* murder charges for killing a Georgia civilian" which was not within the officer's official duties). But the district court there correctly recognized "that the merits of the criminal charges . . . is irrelevant to whether the Defendants acted under the color of federal authority for removal purposes." 637 F. Supp. 3d at 1324.

In removal and immunity cases, the State always argues that the alleged offense (murder, assault, bribery, tax-evasion, whatever) is outside the scope of the defendant's official duties. Courts have been rejecting that argument for as long as there have been federal-officer removal and a doctrine of Supremacy Clause immunity. The cases have involved:

> some of the most dramatic clashes between states and the federal government in U.S. history, such as Mississippi's prosecution of a federal marshal for breach of the peace for using tear gas to control riots erupting over the admission of the first African American student to its state university; California's prosecution of a federal marshal for killing a former justice of the state supreme court who he thought was about to assassinate Supreme Court Justice Stephen Field; and, more recently, Idaho's prosecution of a federal agent for killing an unarmed woman (and a pet dog) in connection with the notorious raid on a cabin at Ruby Ridge.

16

*Livingston*, 443 F.3d at 1213 (citing *In re McShane*, 235 F. Supp. 262 (N.D. Miss. 1964); *In re Neagle*, 135 U.S. 1 (1890); *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001)). But throughout all of these cases, the courts have not simply accepted the prosecutors' charges at face value. To the contrary, under § 1442(a), "the State's allegations do not control the causal-connection analysis." *Texas v. Kleinert*, 855 F.3d 305, 312 (5th Cir. 2017) (citing *Acker*, 527 U.S. at 432).

***Finally***, even if the "gravamen" of the case were the right focus, Meadows would still be entitled to removal. By the State's own admission, the gravamen of its prosecution is Meadows's alleged participation in a conspiracy to change the outcome of the 2020 election. *See* Opp. 12–13. What did Meadows allegedly do in connection with that conspiracy? He allegedly committed the eight acts the State specifically enumerated in the Indictment. Meadows has plausibly asserted—which is all he needs to do at this jurisdictional stage—that those acts were all done in connection with his official duties. *See* Br. 6–11, 24–26. And the State cannot defeat removal simply by casting those official acts as "political." *See* Br. 34–45; pp.19–23 *infra*. The district court therefore erred in remanding the case, even under its misguided "gravamen" approach.

### III.  THE STATE'S ARGUMENTS ON THE MERITS OF MEADOWS'S IMMUNITY DEFENSE ARE BOTH IRRELEVANT AND WRONG.

The merits of Meadows's immunity defense are irrelevant to the current question of the jurisdictional inquiry under § 1442(a). *See* Br. 24, 35, 44–45; Part I *supra*. All that matters is whether the defense is "colorable." That inquiry should begin and end with acknowledging that a state prosecutor has charged the President's Chief of Staff for arranging and attending meetings in the West Wing. That federal immunity defense is at least "colorable." But Meadows's defense is far more than "colorable." It is compelling. The State's arguments against immunity are simply wrong.

*"Complete Defense."* The State's claim that a federal defense must be both "colorable" and "complete," Opp. 37–38, by which the State means a defense that would entitle the defendant to a full acquittal. That argument would present no impediment to removal anyway, but it is also disingenuous. The State cites several cases supposedly supporting this "complete defense" requirement. Opp. 37 & n.9. To be sure, the phrase "complete defense" appears in those cases. But they stand for the exact opposite of what the State claims in its brief.

In every case the State cites, the court *denied remand* because the defendant asserted a colorable federal defense which the court declined to scrutinize on the

merits.[6] None of those cases suggests, as the State does, that a district court may force a federal officer to litigate his immunity defense in state court based on the court's threshold assessment that the defense, while otherwise colorable, is not "complete." The State's lead case, *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770 (E.D. Pa. 2010), says just the opposite, holding that, once a federal defense is plausibly asserted, the court engages in no detailed probing of the merits. *Id.* at 782. "For policy reasons, Congress has erected a road to federal court for litigants who can invoke a federal defense. ***It is not the Court's role to impose judicially created tolls on those who seek to travel it***." *Id.* at 783 (emphasis added).

*Political Activity*. It is patently obvious that being Chief of Staff to the President of the United States involves engagement on "political" matters, including matters related to elections. The State's contrary argument and the district court's contrary ruling—that "political activity" lies categorically beyond the office of the

---

[6] *See Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783 n.13 (E.D. Pa. 2010); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 815 (3d Cir. 2016); *Morgan v. Bill Vann Co.*, 2011 WL 6056083, at *5 (S.D. Ala. Dec. 6, 2011); *Davis v. Central Ala. Elec. Coop.*, 2015 WL 4742496, at *4 (S.D. Ala. Aug. 11, 2015); *Williams v. Aetna Life Ins. Co.*, 2013 WL 593505, at *6 (S.D. Ala. Jan. 30, 2013); *Gordon v. Air & Liquid Sys., Corp.*, 990 F. Supp. 2d 311, 316–18 (E.D.N.Y. 2014); *Gates v. A.O. Smith Water Prods. Co.*, 2014 WL 104965, at *4–5 (N.D.N.Y. Jan. 9, 2014); *Crews v. Air & Liquid Sys. Corp.*, 2014 WL 636362, at *3 (N.D.N.Y. Feb. 18, 2014); *Walkup v. Air & Liquid Sys. Corp.*, 2013 WL 5448623, at *4–5 (D. Del. Sept. 26, 2013); *Joyner v. A.C. & R Insulation Co.*, 2013 WL 877125, at *6–7 (D. Md. Mar. 7, 2013); *Thompson v. Crane Co.*, 2012 WL 1344453, at *20 (D. Haw. Apr. 17, 2012); *Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018).

Chief of Staff—is not just an error of law. It also ignores the fundamental federal interest in having a Chief of Staff assist the President even when politics are at play.

*First*, the State completely misconstrues the Elections Clause. *See* Opp. 21–23. When it comes to federal elections, the States exercise federal power, delegated by the Federal Constitution and subject to federal supervision, not their own residual sovereignty. The "dominant purpose of the Elections Clause . . . was to empower Congress to override state election rules," including "to act as a safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interests over those of the electorate." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 814–15 (2015) (citing THE FEDERALIST No. 59, pp. 362–63 (C. Rossiter ed. 1961) (A. Hamilton)).

*Second*, the State dismisses the President's constitutional role in recommending and approving legislation, as well as his "Take Care" duties, *see* Opp. 23, but it is wrong again. The State concedes that the President may have a "legitimate interest" in the administration of Presidential elections but disputes "that a 'legitimate interest' confers lawful authority on the President under the Take Clare Clause." Opp. 23 (citing *Thompson v. Trump*, 590 F. Supp. 3d 46, 77 (D.D.C. 2022)). *Thompson* (currently pending before the D.C. Circuit) is about the merits of immunity, not removal, and confirms "[t]he President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election

Commission, agencies over which he has appointment authority." 590 F. Supp. 3d at 78. But *Thompson* reaches the mistaken conclusion that this interest is relevant only to cases that "involve litigation to enforce federal election laws." *Id*. Because the President and the Department of Justice he supervises have authority to *initiate* litigation, they necessarily have authority to *consider* litigation, and the Chief of Staff has a clear role in *gathering information* to inform the President's decision-making. *See* Br. 24–26, 28, 38–39.

**Third**, the State continues to press its misguided claim, Opp. 24–26, that the Hatch Act prohibits the Chief of Staff from exercising his duties if they relate to "political" matters. *See generally* Br. 43–45. The State cannot defeat immunity—and certainly not jurisdiction—with a novel interpretation of the Hatch Act that the Federal Government has never endorsed.

The State identifies no judicial decision, nor any enforcement matter from the Office of Special Counsel, holding that the type of post-election conduct Meadows is alleged to have engaged in violates the Hatch Act. (The report the State relied on below involved a wholly unrelated issue from the pre-election period.) Meadows is not aware of any authority suggesting that advising the President on post-election matters, coordinating meetings for the President, or learning about allegations of election fraud would violate the Hatch Act, even if the reelection campaign was the topic *du jour*. The best the State can do is quote broad language of the Hatch Act

and assert—without citing any authority—that it clearly applies to Meadows's conduct. Indeed, in its entire discussion of the Hatch Act, *see* Opp. 24–26, the State does not cite a single case or enforcement matter.[7]

***Personal Interest or Malice***. The State argues that Meadows's official authority is also "negated by the evidence of his 'personal interest, malice, actual criminal intent' or any motivation 'for any other reason than to do his duty as he saw it.'" Opp. 40 (quoting *Baucom*, 677 F.2d at 1350). Yet that is not what *Baucom* holds. Those quotes come from laudatory descriptions of Baucom's conduct, but this Court never suggested it was establishing a standalone test to deny immunity (much less to deny removal, which was not at issue in *Baucom*). And even if there were a standalone "personal interest" test, it could not possibly apply to an official's desire to see the incumbent President reelected. Any contrary rule would lead to absurd results. Indeed, the State's primary witness below acknowledges that he "voted for President Trump." BRAD RAFFENSPERGER, INTEGRITY COUNTS 15 (2021). The State

---

[7] The State also distorts an email Meadows sent to campaign officials. *See* Opp. 6, 31 n.5. Meadows perfunctorily noted "we just need to have someone coordinating the electors for the states." App.676. This was an email routing to campaign officials a campaign matter the President was concerned with. This exchange, in which Meadows made sure that the *campaign* handled the electors issue, should satisfy even the most stringent "no politics in the West Wing" theory. No fair reading of that email, the State's only proffered evidence, supports its allegation that Meadows "assisted with coordinating fake electors." Opp. 6; *see also* App.511:25–512:3.

must believe his "personal interest" did not prevent him from conducting his official duties as the Georgia Secretary of State.

***Necessary or Proper***. The State argues that it was not "'objectively reasonable' [for Meadows] to believe that his duties . . . included acting on behalf of the Trump campaign, pressuring state officials, or pursuing unlawful strategies designed to ensure co-defendant Trump's reelection." Opp. 41 (citing *Kleinert*, 855 F.3d at 314). Of course, that argument assumes the State's slanted characterization of Meadows's conduct. As applied to the *facts*, it was surely reasonable for Meadows to believe he was acting within the scope of his duties when he set up and staffed Oval Office meetings or tracked down contact information at the President's request. For the Chief of Staff, assisting the President is the job. In creating the office that empowered him to do that job, Congress left wide room for discretion. Meadows's belief that he was acting in an official capacity was objectively reasonable by any fair measure.

## CONCLUSION

The Court should reverse the decision below and remand with instructions for the district court to permit removal and so notify the state court.

Respectfully submitted,

/s/ George J. Terwilliger, III
George J. Terwilliger, III
John S. Moran
Michael L. Francisco
Francis J. Aul
McGuireWoods LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006
(202) 857-2473
gterwilliger@mcguirewoods.com

*Counsel for Defendant-Appellant*
*Mark R. Meadows*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 28-1, because it contains 6,118 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. 2.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Respectfully submitted this 28th day of September, 2023.

*/s/ John S. Moran*
John S. Moran

*Counsel for Defendant-Appellant Mark R. Meadows*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ John S. Moran*
John S. Moran