[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-12958

_____

THE STATE OF GEORGIA,

Plaintiff-Appellee,

*versus*

MARK RANDALL MEADOWS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03621-SCJ

_____

Before William Pryor, Chief Judge, and Rosenbaum and Abudu, Circuit Judges.

William Pryor, Chief Judge:

This appeal requires us to decide whether Mark Meadows, former chief of staff at the White House, may remove his state criminal prosecution to federal court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). After a Fulton County grand jury indicted Meadows for conspiring to interfere in the 2020 presidential election, Meadows filed a notice to remove the action to the Northern District of Georgia. The district court held an evidentiary hearing and then remanded because Meadows's charged conduct was not performed under color of his federal office. Because federal-officer removal under section 1442(a)(1) does not apply to *former* federal officers, and even if it did, the events giving rise to this criminal action were not related to Meadows's official duties, we affirm.

## I. BACKGROUND

Mark Meadows served as chief of staff at the White House and assistant to former President Donald Trump when the November 2020 presidential election occurred. Trump lost his bid for reelection by a margin of 306 to 232 in the Electoral College. In 2023, a Fulton County grand jury indicted Meadows, Trump, and 17 other defendants with crimes related to election interference in Georgia. The indictment charged Meadows with two state law crimes: conspiracy in violation of the Georgia Racketeer Influenced and Corrupt Organizations Act, *see* Ga. Code Ann. § 16-14-4(b), (c),

and soliciting the violation of oath by a public officer, *see id.* §§ 16-4-7, 16-10-1.

The indictment alleged that Meadows joined and committed eight overt acts in furtherance of an illegal conspiracy to "change the outcome of the election in favor of Trump." These eight acts were as follows:

> *Act 5*: Attending a meeting with Michigan state legislators in which Trump "made false statements concerning [election] fraud."

> *Act 6*: Sending a text message to United States Representative Scott Perry of Pennsylvania that asked, "Can you send me the number for the speaker and the leader of PA Legislature. POTUS wants to chat with them."

> *Act 9*: Meeting with Pennsylvania state legislators to discuss holding a special session of the Pennsylvania General Assembly.

> *Act 19*: Requesting that Trump political aide John McEntee prepare a memorandum "outlining a strategy for disrupting and delaying the joint session of Congress on January 6" by having former Vice President Mike Pence "count only half of the electoral votes from certain states."

> *Act 92*: Traveling to Cobb County, Georgia, to attempt to observe a nonpublic signature match audit, at which point state election officials had to "prevent[]

[Meadows] from entering into the space where the audit was being conducted."

*Act 93*: Arranging a telephone call between Trump and Georgia Secretary of State Chief Investigator Frances Watson, in which Trump "falsely stated" that he had won the presidential election "by hundreds of thousands of votes" and told Watson that "when the right answer comes out you'll be praised."

*Act 96*: Sending a text message to an employee of the Office of the Georgia Secretary of State that asked, "Is there a way to speed up Fulton county signature verification in order to have results before Jan 6 if the trump campaign assist financially."

*Act 112*: Soliciting Georgia Secretary of State Brad Raffensperger to violate his oath of public office by "unlawfully altering" "the certified returns for presidential electors," in violation of Georgia Code sections 16-4-7 and 16-10-1.

Meadows filed a notice of removal in the district court, *see* 28 U.S.C. § 1455, based on federal-officer jurisdiction, *see id.* § 1442(a)(1). Meadows argued that the overt acts charged in the indictment related to his official responsibilities as chief of staff and that he had colorable federal defenses. The district court denied summary remand and ordered an evidentiary hearing. *See id.* § 1455(b)(5).

At the hearing, Meadows testified about his role as chief of staff. He explained that his job was a "24/7" responsibility and that

his function "was to oversee all the federal operations" and to "be aware of everything that was going on." He stated that his responsibilities included meeting with cabinet officials, members of Congress, business leaders, and state officials, including governors. Meadows was invited to "almost every meeting" involving the President, as either a principal or an observer. He advised the President on a range of federal issues, from national security to the agricultural supply chain to prescription drug policy. He also gave political advice and explained that "everything that [the President] do[es] from a policy standpoint has a political implication." Declarations from White House staffers corroborated that Meadows was "on duty" at all hours even when away from the White House and that he was responsible for "managing the President's calendar" and "arranging meetings, calls, and other discussions with federal, state, and local officials."

Meadows testified that he understood that, as chief of staff, he was bound by the Hatch Act. *See* 5 U.S.C. § 7323(a)(1) (providing that a government employee may not "use his official authority or influence for the purpose of interfering with or affecting the result of an election"). Meadows understood the Act to prevent him from "advocat[ing] for a particular candidate" in his official capacity and from "campaign[ing] actively . . . in [his] official title."

Finally, Meadows testified about his responsibilities as specifically related to the overt acts charged in the indictment:

> *Act 5 (Michigan legislators meeting)*: Meadows testified that he was present and that "most of that [meeting]

had to do with allegations of potential fraud in Michigan." He stated that his presence was relevant to his responsibility to broadly "give advice to the President" and to "be aware of what is consuming the President's time."

*Act 6 (Scott Perry text)*: Meadows acknowledged sending a text message asking for the phone number of the Pennsylvania House Speaker and testified that he "regularly" retrieved the phone numbers of state officials for the President.

*Act 9 (Pennsylvania legislators meeting)*: Meadows testified that "to the best of [his] recollection," he was not at the portion of the meeting discussing the election.

*Act 19 (McEntee memorandum)*: Meadows testified that he did not ask McEntee for any memorandum on a strategy to disrupt Congress.

*Act 92 (Cobb County visit)*: Meadows testified that his observation of the nonpublic signature match audit in Cobb County was relevant to the "transfer of power" to the Biden administration, because the "open question . . . in the President's mind" about Georgia voter fraud posed a roadblock to the transition plan. According to Meadows, the visit "relate[d] completely" to his official responsibilities because he needed to "look at the [signature audit] process that they were going through" to ensure "everything [was] being done right" to smooth the transition. Meadows also testified that he went to Cobb County under his

own discretion and that "[n]o one directed [him] to go."

*Act 93 (Watson call)*: Meadows admitted to arranging a call between Watson and Trump. He testified that the call was related to his chief of staff duties because "the President was interested in all of the election outcomes [being] . . . accurate as they affected him."

*Act 96 (financial assistance text)*: Meadows admitted to sending a text message asking whether it was possible to speed up Fulton County's signature verification if the Trump campaign "assist[ed] financially." But he denied that the message was a "financial offer" and asserted that he "wasn't speaking on behalf of the [Trump] campaign." Instead, Meadows explained that he had recently learned that a Wisconsin vote recount was possible if the Trump campaign paid for it, so he wanted to understand if a Georgia recount was also impeded by "financial constraints." Meadows testified that he wanted to understand whether the impediment was "a financial resource issue . . . [or] manpower issue."

*Act 112 (Secretary Raffensperger solicitation)*: Meadows admitted to being on the call with Trump, Secretary Raffensperger, and several attorneys who represented either Trump personally or the Trump campaign. Meadows testified that the purpose of the call was to obtain "signature verification in Fulton County" and that the President wanted to find "a less litigious way" of doing so. Meadows asserted that verification was

the President's goal in his official capacity, but he apparently "d[id] not know" whether verification was also a goal of the Trump campaign.

Georgia presented rebuttal evidence, including evidence that Meadows was acting on behalf of the Trump campaign during the call with Secretary Raffensperger. Secretary Raffensperger testified that he understood Meadows to be asking for a resolution to *Trump v. Kemp*, 511 F. Supp. 3d 1325 (N.D. Ga. 2021), and other Georgia election-challenge lawsuits. He stated, "Those were Trump campaign lawyers [on the call], so I felt that it was a campaign call." Georgia also submitted a recording of the call, in which Meadows requested to sidestep the legal roadblocks to a Georgia vote recount:

> [T]here are allegations where we believe that not every vote or fair vote and legal vote was . . . counted . . . . What I'm hopeful for is there some way that we can find some kind of agreement to look at this a little bit more fully. You know the president mentioned Fulton County. . . . [S]o Mr. Secretary, I was hopeful that, you know, in the spirit of cooperation and compromise is there something that we can at least have a discussion to look at some of these allegations to find a path forward that's less litigious?

The district court remanded. It explained that section 1442(a)(1) requires Meadows to prove that he is a federal officer, that his charged conduct was performed under color of federal office, and that he has a "colorable" federal defense. *See Caver*

*v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017). The district court found that Georgia had conceded that Meadows was an "officer" because he had served as chief of staff "at the time of the events alleged." But it found that Meadows had failed to prove any causal connection between his charged conduct and his office, because the "gravamen" of Georgia's case and the "heavy majority" of the overt acts were not connected with the performance of Meadows's official duties. The district court did not address whether Meadows had a colorable federal defense.

After Meadows filed this appeal, *see* 28 U.S.C. § 1447(d), we ordered supplemental briefing on whether section 1442(a)(1) applies to former federal officers, in the light of our decision in *United States v. Pate*, 84 F.4th 1196 (11th Cir. 2023) (en banc). Georgia argued that section 1442(a)(1) applies only to current officers, and Meadows argued that the statute covers former officers.

## II. STANDARD OF REVIEW

We review *de novo* issues of removal jurisdiction. *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 780–81 (11th Cir. 2005).

## III. DISCUSSION

The federal-officer removal statute protects an officer of the United States from having to answer for his official conduct in a state court. *See* 28 U.S.C. § 1442(a)(1). Section 1442(a)(1) provides a right of removal to federal court if a defendant proves that he is a federal officer, his conduct underlying the suit was performed under color of federal office, and he has a "colorable" federal defense. *Caver*, 845 F.3d at 1142; *see also Jefferson County v. Acker*, 527 U.S. 423,

431 (1999). The defendant bears the burden of proof, *Leonard v. Enter. Rent a Car*, 279 F.3d 967, 972 (11th Cir. 2002), but that bar is "quite low," *Caver*, 845 F.3d at 1144 (citation and internal quotation marks omitted).

We divide our discussion in two parts. First, we explain that section 1442(a)(1) does not apply to *former* officers—so Meadows, as a former chief of staff, is not a federal "officer" within the meaning of the removal statute. Second, we explain that even if Meadows were an "officer," his participation in an alleged conspiracy to overturn a presidential election was not related to his official duties.

A.  *Section 1442(a)(1) Does Not Apply to Former Federal Officers.*

Section 1442(a)(1) provides that "any officer . . . of the United States" may remove to federal court a criminal prosecution "for or relating to any act under color of such office." We have long understood the statute to afford a *current* federal officer a federal forum for the adjudication of his liability or guilt. *See Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir. 1989) (first citing *Willingham v. Morgan*, 395 U.S. 402, 405 (1969); and then citing *Loftin v. Rush*, 767 F.2d 800, 804 (11th Cir. 1985)). But the statute does not apply to *former* federal officers.

Our interpretation of a statute must begin "with the language of the statute itself." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989). The text of section 1442(a)(1) applies to only current officers. It is silent on the removal of a prosecution commenced against a *former* officer of the United States. The ordinary meaning of "officer" does not include "former officer." *See Pate*, 84

F.4th at 1201–02 (determining the meaning of "officer" using dictionary definitions, common understanding, and the Dictionary Act, 1 U.S.C. § 1). And the ordinary meaning usually controls. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, [a] [c]ourt normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them.").

The whole text of section 1442 reinforces the ordinary meaning of subsection (a)(1). Indeed, in contrast to the silence in subsection (a)(1), subsection (b) expressly provides for the removal of actions commenced against a former officer. Section 1442(b) grants a right of removal to a person "who is, or at *the time the alleged action accrued was*, a civil officer of the United States." 28 U.S.C. § 1442(b) (emphasis added). This variation in language connotes a difference in meaning: when Congress includes "particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)); *accord Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25, at 170 (2012) ("[A] material variation in terms suggests a variation in meaning.").

The presumption that Congress intentionally omitted any reference to former officers applies "with particular force" to this statute. *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015). The provisions containing disparate language are "in close proximity" to each other, *id.*, and address the same subject matter, *see DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2004); *see also* Scalia & Garner, *Reading Law* § 39, at 252 ("Statutes *in pari materia* are to be interpreted together, as though they were one law."). "[W]hen Congress uses different language in *similar sections*, it intends different meanings." *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000) (emphasis added) (citing *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). The explicit reference to former officers, in an adjacent section that also addresses removal jurisdiction, suggests that section 1442(a)(1) does not apply to former officers.

To be sure, the term "officer" may sometimes include former officers. But that interpretation must be supported by "compelling textual evidence," and the "statutory context [must] make[] clear" that Congress intended the broader meaning. *Pate*, 84 F.4th at 1208–10.

In *Pate*, we discussed two instances where textual indicia supported an interpretation of the term "employee" or "officer" as including formers. *Id.* First, in *Robinson v. Shell Oil Co.*, the Supreme Court held that "employee" as used in section 704(a) of Title VII of the Civil Rights Act of 1964 included former employees because section 704(a) provided "reinstatement" as a remedy, which could

be awarded only to former employees. 519 U.S. 337, 342–43 (1997). Second, in *Davis v. Michigan Department of Treasury*, the Supreme Court held that a statutory reference to "compensation," 4 U.S.C. § 111(a), which necessarily included retirement benefits, implied coverage of retired employees. 489 U.S. 803, 808–09 (1989).

But in *Pate*, we held that another statute, 18 U.S.C. § 1114, lacked any textual indicia to support a "strained" interpretation including former officers. 84 F.4th at 1210. The same is true here: no indicia from text or structure suggest that section 1442(a)(1) covers former officers.

Meadows argues that the discrepancy between subsections (a) and (b) can be explained by the provisions' different "focuses." Section 1442(a)(1) focuses on "conduct" and requires an act relating to the defendant's federal office, argues Meadows, but section 1442(b) requires no such act and removal instead turns on the defendant's "status" as an officer when the action accrues. Meadows contends that the explicit reference to former officers in subsection (b) reflects the different showings required from a current and from a former officer—the first must prove that he *is* an officer, while the second must prove that he was an officer *when the action accrued*. Meadows argues that section 1442(a)(1), in contrast, demands only proof that a person held federal office *at the time of the official act* alleged in the suit.

We rejected a similar interpretive approach applied to a similar statute in *Pate*. In *Pate*, we explained that the secondary condition in the statute—requiring an officer to be targeted "on account

of the performance of official duties"—could not alter the primary condition—that the officer be a current federal employee. *Id.* at 1204 (internal quotation marks omitted) (quoting 18 U.S.C. § 1114). So too here.

The syntax of section 1442(a) does not suggest that removal depends on the *singular* condition that the defendant held office at the time of his charged conduct. Instead, the statute prescribes *multiple* independent conditions for removal: first, the defendant must be "any officer . . . of the United States," and second, the suit he seeks to remove must be "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1); *cf. Pate*, 84 F.4th at 1203–05 (statutory provision, covering "any officer or employee of the United States . . . while such officer or employee is engaged in or on account of the performance of official duties," imposed two independent conditions). Although the secondary condition of section 1442(a)(1)—that the officer's act relate to his federal office—limits the class of officers eligible for removal, that condition does not "expand the scope" of the first condition "beyond its ordinary meaning." *Id.* The requirement that a defendant be a current "officer . . . of the United States" stands as an independent prerequisite for removal. *See* 28 U.S.C. § 1442(a)(1).

Meadows also contends that subsections 1442(a)(1) and (b) cannot be read in conjunction because they were drafted separately and not combined until 1948 as part of a broader codification. *See* 62 Stat. 869, 938 (June 25, 1948). The predecessor to section 1442(a)(1) was enacted in 1833, *see* 4 Stat. 632, 633 § 3 (Mar. 2,

1833), decades before the predecessor to section 1442(b), *see* 17 Stat. 44 (Mar. 30, 1872); *see also Watson v. Philip Morris Cos.*, 551 U.S. 142, 148–49 (2007) (recounting statutory history). We disagree.

The disparate origins of these subsections do not rebut the presumption that the variance in their language is meaningful. We have explained that "dissimilar language need not always have been enacted at the same time or found in the same statute" to warrant the presumption that dissimilarities are meaningful when the statutes "exist within the same field of legislation." *Pate*, 84 F.4th at 1202 (internal quotation marks omitted) (citing *United States v. Papagno*, 639 F.3d 1093, 1099 n.3 (D.C. Cir. 2011) (Kavanaugh, J.) (cataloging examples)). Moreover, the statutory history reveals that Congress *in fact* contemplated the relationship between the two removal provisions. Congress expressly cross-referenced the predecessor to subsection (a) in the enacted text of the predecessor to subsubsection (b). *See* 17 Stat. 44 (Mar. 30, 1872) (predecessor to subsection (b), providing that removal shall occur "in the same manner as now provided for . . . by the provisions of section three of the act of March second, eighteen hundred and thirty-three [predecessor to subsection (a)]"). This cross-reference reinforces the presumption that the variance in language between the two provisions reflects a deliberate choice. *MacLean*, 574 U.S. at 391; *Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 862 (11th Cir. 2007) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling." (citation and internal quotation marks omitted)).

Congress has had ample opportunity to modify the discrepancy between subsections (a) and (b), but it has not done so. The two provisions have been codified in adjacent subsections of the United States Code since 1948. Congress did not modify the relevant variance during codification or during revisions in 1996, 2011, or 2013. *See* Pub. L. No. 104-317, § 206, 110 Stat. 3847, 3850 (Oct. 19, 1996); Pub. L. No. 112-51, § 2, 125 Stat. 545, 545–46 (Nov. 9, 2011); Pub. L. No. 112-239, § 1086, 126 Stat. 1632, 1969–70 (Jan. 2, 2013). Our precedents establish that the decision to preserve grandfathered language, despite a "clear ability" to modify it, is significant. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir. 2001) (citation and internal quotation marks omitted).

Earlier versions of section 1442(a)(1) also evidence that when Congress intended to permit removal by former officers, it expressed that intent with clear language. The 1911 codification of the removal provision used nearly identical language and was also silent as to former officers. *See* 36 Stat. 1087, 1097, § 33 (Mar. 3, 1911) (providing for removal of any suit "commenced in any court of a State *against any officer* . . . on account of any act done under color his office." (emphasis added)). But the same section of the 1911 statute permitted removal by former officers of another class: Congress used temporal language to allow the removal of "any suit . . . commenced against any person for [or] on account of anything done by him *while an officer of either House of Congress* in the discharge of his official duty." *Id.* (emphasis added). The temporal language in the congressional-officer provision supports the view that

the contrasting silence in the federal-officer provision, within the same section of the same statute, controls its interpretation.

Meadows identifies no precedent from either the Supreme Court or this Court permitting removal under section 1442(a)(1) by a former officer. True, in *Mesa v. California*, the Supreme Court used past-tense language to explain that the defendants "were federal employees at the time of the incidents," 489 U.S. 121, 123 (1989), but the underlying circuit decision made clear that the defendants *remained* employees during the state prosecution, *see California v. Mesa*, 813 F.2d 960, 961 (9th Cir. 1987) ("[Defendants] *are* United States mail carriers charged with violations of state law." (emphasis added)); *see also* Petition for Writ of Certiorari, *Mesa*, 489 U.S. 121 (No. 87-1206), 1988 WL 1094058, at *2 ("[Defendants] *are* employees of the United States Postal Service." (emphasis added)). Likewise, in *Maryland v. Soper*, the defendants "averred that they were Federal prohibition agents" at the time of removal. 270 U.S. 9, 22 (1926) (adjudicating removal under the predecessor statute to section 1442(a)). Nor can Meadows identify a precedent from our Circuit clearly involving a former officer. *See Cohen*, 887 F.2d at 1454 (apparently current deputy marshal and federal agents sought removal); *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) (unclear whether a federal manufacturing inspection representative was still employed when he sought removal).

We acknowledge that, in the 190-year history of the federal-officer removal statute, no court has ruled that former officers are excluded from removal. And we acknowledge that former officers

have removed actions in other circuits. But in most of these deci-sions—many of which were summary removals and some of which were nonprecedential—the courts did not discuss the text of sec-tion 1442 at all. *See, e.g.*, *Eagar v. Drake*, 829 F. App'x 878, 881 (10th Cir. 2020); *Arizona v. Elmer*, 21 F.3d 331, 334 (9th Cir. 1994); *Meros v. Dimon*, No. 2:18-cv-510, 2019 WL 1384390, at *1 (S.D. Ohio Mar. 27, 2019). And in others, the courts did not address the former-of-ficer question. *See, e.g.*, *Guancione v. Guevara*, No. 23-cv-01924-JSW, 2023 WL 3819368, at *1 (N.D. Cal. June 5, 2023); *Brunson v. Adams*, No. 1:21-CV-00111-JNP-JCB, 2021 WL 5403892, at *3 (D. Utah Oct. 19, 2021). So the decisions permitting former officers to remove have tended to involve cursory jurisdictional rulings, which we do not credit. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings of this sort . . . have no precedential effect.").

Indeed, we are aware of only one court that has squarely ad-dressed the former-officer question, in dictum, and it fails to per-suade us. *See New York v. Trump*, No. 23 Civ. 3773 (AKH), 2023 WL 4614689, at *5 (S.D.N.Y. July 19, 2023) (stating that former officers may remove under section 1442(a)(1)). Without considering the ordinary meaning of the statutory text, that district court reasoned that section 1442(a)(1) should apply to former officers because it "would make little sense if this were not the rule, for the very *pur-pose* of the Removal Statute is to allow federal courts to adjudicate challenges to acts done under color of federal authority." *Id*. (em-phasis added). But the "best evidence of that purpose is the statu-tory text adopted by both Houses of Congress and submitted to the

President." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991); Scalia & Garner, *Reading Law* § 2, at 56 ("[T]he purpose must be derived from the text."). Purpose "must be defined precisely, and not in a fashion that smuggles in the answer to the question before the decision-maker." Scalia & Garner, *Reading Law* § 2, at 56.

The Supreme Court has explained that the purpose of federal-officer removal is to protect the federal government from the "interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court . . . officers . . . of the Federal Government acting within the scope of their authority." *Watson*, 551 U.S. at 150 (alterations adopted) (internal quotation marks omitted) (quoting *Willingham*, 395 U.S. at 406)). Because the federal government "can act only through its officers and agents," if states could unconditionally try federal officers, "the operations of the general government may at any time be arrested at the will of one of [the states]." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Shielding officers performing current duties effects the statute's purpose of protecting the operations of federal government. But limiting protections to current officers also respects the balance between state and federal interests, by enforcing a "'policy against federal interference with state criminal proceedings.'" *Mesa*, 489 U.S. at 138 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981)).

The Supreme Court has instructed that federal courts must "retain[] the highest regard for a State's right to make and enforce its own criminal laws." *Manypenny*, 451 U.S. at 243. The jurisdiction

to try state offenses should not "be wrested from [state] courts" lightly. *Colorado v. Symes*, 286 U.S. 510, 518 (1932). Interpreting section 1442(a)(1) as limited to its ordinary meaning counters "true state hostility" against the enforcement of unpopular national laws and limits federal jurisdiction to cases in which the hostility is actually "directed against federal officers' efforts to carry out their federally mandated duties." *Mesa*, 489 U.S. at 139; *see also Soper*, 270 U.S. at 32 ("The constitutional validity of [federal-officer removal] rests on the right and power of the United States to secure the efficient execution of its laws and to prevent interference . . . by state prosecutions instituted against federal officers in enforcing such laws."). In contrast, a state prosecution of a *former* officer does not interfere with ongoing federal functions—case-in-point, no one suggests that Georgia's prosecution of Meadows has hindered the current administration.

Meadows argues that section 1442(a) is intended to provide a federal forum that is coextensive with federal immunity defenses, which may be available to former officers. *See Willingham*, 395 U.S. at 407 ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court."); *cf. Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (absolute immunity is available to former presidents). Meadows asserts that section 1442(a) is "meant to avoid" all state adjudications of federal immunities. We disagree.

Meadows cites no authority suggesting that state courts are unequipped to evaluate federal immunities. State courts have long

adjudicated, for example, whether federal officers are entitled to Supremacy Clause immunity under *In re Neagle*, 135 U.S. 1 (1890). *See, e.g.*, *People v. Denman*, 177 P. 461, 465 (Cal. 1918); *State v. Adler*, 55 S.W. 851, 853 (Ark. 1900); *State v. Waite*, 70 N.W. 596, 597–98 (Iowa 1897). And they have continued to do so after the codification of the modern federal-officer removal statute in 1948. *See, e.g.*, *Battle v. State*, 258 A.3d 1009, 1021–25 (Md. Ct. Spec. App. 2021); *State v. Deedy*, 407 P.3d 164, 188–89 (Haw. 2017); *State v. Velky*, 821 A.2d 752, 759–60 (Conn. 2003). Likewise, state courts regularly adjudicate whether state officers sued for violating federal rights are entitled to official or qualified immunity. *See, e.g.*, *Rustici v. Weidemeyer*, 673 S.W.2d 762, 772 (Mo. 1984); *Johnson v. Morris*, 453 N.W.2d 31, 37–40 (Minn. 1990); *Moody v. Ungerer*, 885 P.2d 200, 202–03 (Colo. 1994); *Gentile v. Bauder*, 718 So. 2d 781, 784–75 (Fla. 1998); *Clancy v. McCabe*, 805 N.E.2d 484, 493–94 (Mass. 2004); *King v. Betts*, 354 S.W.3d 691, 703 (Tenn. 2011).

B.  *Meadows's Charged Conduct Was Not Performed Under Color of Federal Office.*

Even if section 1442(a)(1) applied to former officers, we would still affirm because Meadows fails to prove that the conduct underlying the criminal indictment relates to his official duties. Section 1442(a)(1) permits a federal officer to remove a state prosecution that is "for or relating to any act under color of [his] office." The officer must establish a "causal connection between the charged conduct and asserted official authority." *Acker*, 527 U.S. at 431 (citation and internal quotation marks omitted). So we must identify the "act" or charged conduct underlying Georgia's

prosecution, the scope of Meadows's federal office, and the existence of a causal nexus between Meadows's conduct and his office.

We proceed in three parts. First, we explain that Meadows's culpable "act" was his alleged *association with* the conspiracy to overturn the presidential election, as charged in the indictment. Second, we explain that Meadows's "color" of office did not include superintending state election procedures or electioneering on behalf of the Trump campaign. Third, we conclude that Meadows's association with the alleged conspiracy was not related to his office of chief of staff. Simply put, whatever the precise contours of Meadows's official authority, that authority did not extend to an alleged conspiracy to overturn valid election results.

### 1.  The "Act"

We must first define Meadows's section 1442(a)(1) "act" underlying the RICO charge, for the inchoate crime of conspiracy. Georgia argues—and the district court ruled—that Meadows's culpable "act" was his *association with* the alleged conspiracy. The district court determined that evaluating that "act" required looking to the "heart" of Meadows's conspiracy-related activity, instead of individually evaluating each overt act alleged in the indictment. *See Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 234 (4th Cir. 2022). The district court looked to the "gravamen," *Acker*, 527 U.S. at 447 (Scalia, J., concurring in part and dissenting in part), and "heavy majority of overt acts," instead of evaluating whether any particular act related to Meadows's office. The district court treated

the overt acts in the indictment as "relevant evidence" of, but not identical to, the "act" required by section 1442(a)(1).

Meadows, on the other hand, argues that each overt act in the indictment is an "act" for purposes of federal-officer removal. He argues that so long as any *one* of his actions—sending any message or participating in any meeting—related to his official duties, he is entitled to remove. Meadows further argues that the district court applied an incorrect legal test by looking to the "heart" or "gravamen" of Georgia's indictment because it could not do any weighing at all—it was required to accept Meadows's interpretation of "act" at face value.

We agree with Georgia. Looking to the heart of the indictment is consistent with our precedents defining a defendant's culpable "act" for purposes of federal-officer removal. Our precedents provide that the "act" anchoring removal must be defined by the "claim" brought against the defendant, and that federal courts have jurisdiction only when "one *claim* cognizable under Section 1442 is present." *Nadler v. Mann*, 951 F.2d 301, 306 n.9 (11th Cir. 1992) (emphasis added); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017) (holding that removal is justified if a federal defense applies to any claim); *Convent Corp. v. City of North Little Rock*, 784 F.3d 479, 483 (8th Cir. 2015) (holding that removal is justified if one federal claim is present). So an accused's removal theory must accord with a claim—a *criminal charge*—brought against him.

Meadows is charged with the inchoate crime of conspiracy, that is, "participat[ing] in, directly or indirectly, [an] enterprise" to

illegally overturn the results of the presidential election. GA. CODE ANN. § 16-14-4(b). A criminal conspirator is not defined by any single *actus reus* in furtherance, but by his *agreement to join* the conspiracy. Indeed, the state need not prove that Meadows committed any of the overt acts charged in the indictment, *see Nordahl v. State*, 829 S.E.2d 99, 109 (Ga. 2019), or that he engaged in any overt act at all so long as one of his coconspirators did, *see Thomas v. State*, 451 S.E.2d 516, 517 (Ga. Ct. App. 1994). Not only that, but an overt act need not, in and of itself, be criminal in nature to support a conspiracy charge. *See McCright v. State*, 336 S.E.2d 361, 363 (Ga. Ct. App. 1985). In other words, Georgia does not prosecute Meadows because attending any individual meeting or sending any specific message was itself illegal; Georgia prosecutes Meadows because his alleged agreement to join and his alleged conduct undertaken to further the conspiracy are illegal. So we must look to the core of the factual allegations to identify whether Meadows's conduct in aggregate furthered the alleged enterprise to overturn the election.

To allow Meadows to remove the action if any *single* allegation in the indictment related to his official duties would run contrary to both the removal statute and precedent. *See Mesa*, 489 U.S. at 131–32 ("It must appear that the prosecution of him, for whatever offense, has arisen out of the *acts* done by him." (emphasis added) (citation and internal quotation marks omitted)). Meadows relies on *Baucom v. Martin* to argue that *each* overt act is dispositive for removal. 677 F.2d 1346, 1347–48 (11th Cir. 1982) (affirming Supremacy Clause immunity for a Federal Bureau of Investigations agent facing prosecution under Georgia's RICO statute for

allegedly administering one bribe). But *Baucom* was a Supremacy Clause immunity case and did not concern the propriety of federal-officer removal. *See id.* Even if it had, the charge against Baucom alleged only one overt act, so that act represented the "heart" of the state prosecution. But because Meadows's culpability does not depend on any discrete act, he cannot remove by proving that one act was undertaken in his official capacity. The district court correctly determined that we must look to the "heart" of Meadows's conduct to determine whether his section 1442(a)(1) "act"—of conspiring to "unlawfully change the outcome of the election in favor of Trump"—supports removal.

### 2. The "Color" of Meadows's Office

Section 1442(a) permits the removal of a criminal prosecution commenced against any officer "for or relating to any act *under color of such office*." 28 U.S.C. § 1442(a)(1) (emphasis added). Acts taken under color of office are those "vested with, or appear to be vested with, the authority entrusted to that office." *Color of Office*, Black's Law Dictionary (11th ed. 2019). The "color of office" element requires acts to be done "in enforcement of federal law." *Mesa*, 489 U.S. at 131–32 (citation and internal quotation marks omitted). Meadows must identify a source of positive law for his assertions of official authority for us to determine whether his alleged acts were attributable to exercises of that authority. *See In re Neagle*, 135 U.S. at 75 (an official act is an "act which [the officer] was *authorized to do by the law* of the United States" (emphasis added)); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (official actions

are those *"committed by law* to [the officer's] control or supervision"
(emphasis added)).

Meadows asserts that he proved his authority by testifying
to his official duties, and he describes the "color" of his office as
nearly limitless. He argues that anything that could be described as
"manag[ing] the President's time and attention to ensure the effec-
tive operation of government" fell within his duties. He asserts that
his duties were "at least coextensive with those of the President"
and that "he is federal operations." Meadows does not contest the
finding that he "was unable to explain the limits of his authority."
Instead, he argues that his failure is not fatal to removal because we
must accept his assertions at face value under *Acker*. Meadows
would have us abdicate any analysis of the limits of his authority
and accept his "theory of the case" that virtually *any* function of
federal operations falls within the color of office of the chief of staff.
*Acker*, 527 U.S. at 432.

We cannot rubber stamp Meadows's legal opinion that the
President's chief of staff has unfettered authority, and *Acker* does
not instruct us to eschew our duty of independent review. *Acker*
credited two judicial officers' "adequate threshold showing" on a
question of statutory interpretation. 527 U.S. at 432. The Supreme
Court credited the judges' "theory of the case" when it declined to
"choose between [disputed] readings" of a municipal ordinance,
but that deference involved crediting a *plausible* reading of a *specific*
legal authority. *Id.* But Meadows's theory of the case is not plausi-
ble. *Acker* does not instruct us blindly to accept an expansive

proclamation of executive power relying on no source of positive law. Instead, our judicial duty demands an independent assessment of the limits of Meadows's office.

Meadows asserts that the White House chief of staff has duties related to the supervision of state elections and campaign-related "political" activity. In particular, he maintains that broad authority and few limitations can be found in the Elections Clause, the Take Care Clause, various election statutes, and the Hatch Act. But the district court concluded, and we agree, that the federal executive has limited authority to superintend the states' administration of elections—neither the Constitution, nor statutory law, nor precedent prescribe any role for the White House chief of staff. And even if some authority supported a role for the chief of staff in supervising states' administration of elections, that role does not include influencing which candidate prevails. After all, "[t]he Office of the President has no preference for who occupies it." *Thompson v. Trump*, 590 F. Supp. 3d 46, 82 (D.D.C. 2022).

> a.  The White House Chief of Staff Has No Role
> in Supervising State Elections.

Meadows concedes that the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." The Constitution empowers only the states and Congress to "regulate the conduct of [federal] elections." *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972); *see* U.S. CONST. art. I, § 4, art. II, § 1. As the Supreme Court has explained, the "Framers of the Constitution intended the States to keep for themselves, as

provided in the Tenth Amendment, the power to regulate elections." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (internal quotation marks omitted) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991)). The states are responsible for enacting "a complete code for . . . elections," including "regulations relati[ng] to . . . prevention of fraud and corrupt practices [and] counting of votes." *Moore v. Harper*, 143 S. Ct. 2065, 2085 (2023) (first alteration in original) (internal quotation marks omitted) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).

Nor does federal statutory law provide the White House chief of staff any role in the supervision of state elections. For example, the Electoral Count Act, Pub. L. No. 45-90, 24 Stat. 373 (Feb. 3, 1887), assigns duties to congressional officials—the Vice President in his role as presiding officer of the Senate, the Speaker of the House, senators, and representatives—but not to the President or his chief of staff. *Cf. United States v. Sandlin*, 575 F. Supp. 3d 16, 23 (D.D.C. 2021). Although Meadows offers a list of statutes related to congressional oversight, he identifies only two sources of election-related authority within the executive branch: the Department of Justice Civil Rights Division and its Election Crimes Branch. But he fails to explain how the duties of his office or his charged conduct implicated either division of the Department.

Meadows argues that the Take Care Clause, U.S. CONST. art. II, § 3, empowers the President with broad authority to "ensure that federal voting laws are enforced." But he concedes that the President has no "direct control" over the individuals—members

of Congress and state officials—who conduct federal elections. And tellingly, he cites no legal authority for the proposition that the President's power extends to "assess[ing] the conduct of state officials." We are aware of no authority suggesting that the Take Care Clause empowers federal executive interference with state election procedures based solely on the federal executive's own initiative, and not in relation to another branch's constitutionally authorized act.

b. The White House Chief of Staff May Not Engage in Electioneering on Behalf of a Political Campaign.

Meadows argues that the district court incorrectly determined that the Hatch Act imposed limitations on his authority because the Act "does not operate to define the role of a President or his senior aides." But the Act applies to the President's staff and Meadows testified that he was bound by it. It admits no exceptions to its prohibition on a federal official using his "official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). And the prohibition extends to any participation in "activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." 5 C.F.R. §§ 734.101, 734.302(b)(2).

We take Meadows's point that the President is an inherently "political leader[]," *United States v. Nixon*, 418 U.S. 683, 715 (1974), who occupies a unique role by personally embodying one of "the two political branches," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015). And the President's subordinates, in their official

duties, may "exercis[e] not their own but [the President's] discretion." *Myers v. United States*, 272 U.S. 52, 132 (1926). But although defining the limits of impermissible "political" activity is challenging, we reject Meadows's assertion that there is "literally no way in the real world" to separate governance from prohibited political or campaign-related activity.

Electioneering *on behalf of* a political campaign is incontrovertibly political activity prohibited by the Hatch Act. Campaigning for a specific candidate is not official conduct because the office of the President is disinterested in who holds it. *See Thompson*, 590 F. Supp. 3d at 82. Indeed, the political branches themselves recognize that electioneering is not an official federal function. The Hatch Act provides congressional limitations on campaign-related activity by federal employees. *See* 5 U.S.C. § 7323(a)(1). And the executive branch applies internal restrictions on electioneering: for example, the Office of Legal Counsel does not allow campaign travel to be considered an official expense. *See Payment of Expenses Associated with Travel by the President & Vice President*, 6 Op. O.L.C. 214, 216–17 (1982).

The district court did not err in ruling, based on the Hatch Act and Meadows's own testimony, that activity on behalf of the Trump reelection campaign was unrelated to Meadows's federal duties. Meadows testified that he understood the Hatch Act to prohibit him from "advocat[ing] for a particular candidate" and from "campaign[ing] actively . . . in [his] official title." And he concedes

that, for example, "[g]iving a speech in support of the President at a campaign rally" would fall outside the scope of his office.

Meadows cannot have it both ways. He cannot shelter behind his testimony about the breadth of his official responsibilities, while disclaiming his admissions that he understood electioneering activity to be out of bounds. That he repeatedly denied having any role in, or speaking on behalf of, the Trump campaign, reflects his recognition that such activities were forbidden to him as chief of staff.

### 3. The Causal Nexus

Section 1442(a)(1) provides that prosecutions are removable only when brought against officers "for or relating to" any act under color of federal office. Meadows must establish some "causal connection" or "association" between his alleged conspiracy-related activity and his federal office, and the bar for proof is "quite low." *Caver*, 845 F.3d at 1144 (citation and internal quotation marks omitted). Still, Meadows must be "specific and positive" in showing that his charged conduct "was confined to his acts as an officer." *Symes*, 286 U.S. at 520. And the Supreme Court has explained that, in "a criminal case, a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." *Willingham*, 395 U.S. at 409 n.4; *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[D]icta from the Supreme Court is not something to be lightly cast aside." (citation and internal quotation marks omitted)).

As the removing party, Meadows bears the burden of proof. *See Leonard*, 279 F.3d at 972. Meadows was obligated to support the factual averments linking his conduct and his office "by competent proof." *United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994) (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014) (applying the "competent proof" standard to federal-officer removal). In determining whether Meadows's proof was competent, the district court was entitled to evaluate the demeanor and presentation of witnesses, assess the credibility of testimony including Meadows's, and weigh competing evidence.

The district court carefully weighed all evidence relevant to Meadows's charged conduct before finding that he failed to "provide sufficient evidence" that his association with the alleged conspiracy was "related to any legitimate purpose of the executive branch." The district court credited Meadows's denials of certain overt acts and weighed only those he admitted committing. It found only the text to Representative Perry, requesting the phone number of the "leader of PA Legislature," to be related to Meadows's official duties. The district court determined that the remainder of Meadows's conduct involved either unauthorized interference with state election procedures or prohibited campaigning. We agree.

As we have explained, the Hatch Act limits a federal officer's electioneering. Meadows had no official authority to operate on

behalf of the Trump campaign. But he offers no other plausible jus-
tification for calling and soliciting Secretary Raffensperger to alter
the certified returns for Georgia electors. Meadows testified to "set-
ting . . . up [the telephone call] with the attorneys where they could
find some kind of compromise" on the signature verification, but
he admits that the attorneys involved were employed by either
Trump personally or by the Trump campaign—no attorneys from
the Office of White House Counsel or the Department of Justice
were present. Meadows's participation in the call reflected a clear
attempt to further Trump's *private* litigation interests: he urged the
participants to "find[] a path forward that's less litigious." And Sec-
retary Raffensperger testified that he "felt that it was a campaign
call" because "[t]hose were Trump campaign lawyers."

　　Meadows's text to Watson was also self-evidently campaign-
related. He inquired, "Is there a way to speed up Fulton county
signature verification in order to have results before Jan 6 *if the
trump campaign assist financially.*" (Emphasis added). That election-
eering activity is not part of the executive power. Meadows later
testified that his text was not a "financial offer" and that he was not
actually speaking on behalf of the campaign, but the district court
was entitled to find otherwise.

　　Nor did Meadows's official duties include interference with
state election procedures. Neither the Constitution, *see Roudebush*,
405 U.S. at 24, nor any federal statute, nor any precedent permits
the President's chief of staff to oversee, disrupt, or change the state
results of presidential elections. Authority over electoral

proceedings is expressly delegated to the states. *See Moore*, 143 S. Ct. at 2085. Meadows offers no official rationale for traveling to Cobb County and attempting to infiltrate the nonpublic signature-match audit being performed by law enforcement officers. Although Meadows testified that he was trying to ensure that "everything [was] being done right," he stated that he traveled to Georgia under his own discretion and that "no one directed [him] to go."

Meadows also cannot point to any authority for influencing state officials with allegations of election fraud. Meadows testified that his meeting with the Michigan state officials mostly discussed the purported fraud in the 2020 election and was related to "President Trump['s] . . . personal interest in the outcome of the election in Michigan." He testified to arranging a call between Trump and Watson, in which Trump reiterated allegations of fraud, asserted he had won Georgia "by hundreds of thousands of votes," and suggested to Watson that "when the right answer comes out you'll be praised." But the White House chief of staff has no role in overseeing signature verifications or recount processes, or in superintending states' administration of election procedures. Meadows cannot establish that any of these acts related to his federal office.

At bottom, whatever the chief of staff's role with respect to state election administration, that role does not include altering valid election results in favor of a particular candidate. So there is no "causal connection" between Meadows's "official authority" and his alleged participation in the conspiracy. *See Willingham*, 395

U.S. at 409 (citation and internal quotation marks omitted). Meadows is not entitled to invoke the federal-officer removal statute.

## IV. CONCLUSION

We **AFFIRM** the order remanding this criminal action.

23-12958          ROSENBAUM, J., Concurring          1

ROSENBAUM, Circuit Judge, joined by ABUDU, Circuit Judge, concurring:

Imagine that the day the President of the United States leaves office, sixteen states where his policies were unpopular indict him and all his Cabinet members, simply for carrying out their constitutionally authorized duties.[1] Is it possible that state courts in those sixteen jurisdictions would fairly, correctly, and promptly resolve any federal defenses the former President and Cabinet members might have? Of course, it is. It may well even be likely. But given the local sentiment that led to the indictments in this hypothetical scenario, it's also possible they would not.

Yet under 28 U.S.C. § 1442(a)(1), the federal-officer removal statute, the former President and Cabinet members would have no guarantee that a federal court (the Supreme Court, in that context) would ever consider their federal defenses on direct appeal.[2] And even if the Supreme Court eventually considered their cases, that wouldn't happen until after they had spent significant time and money defending themselves. So even though a federal court

---

[1] This hypothetical scenario does not describe Mark Meadows's situation. Meadows has not established that the State has charged him for or relating to an act under color of his office as White House chief of staff. For that reason, he could not remove his case to federal court under 28 U.S.C. § 1442(a)(1), even if that statute extended to former federal officers who undertook their challenged acts while in office.

[2] A person convicted in state court can file a habeas action in federal court under 28 U.S.C. § 2254, but not until after he's exhausted all remedies available in state court. So that person may serve a substantial part of his sentence of incarceration before federal habeas is granted.

might have found their federal defenses meritorious as a matter of law and dismissed their cases, these former officials may not see a federal forum until much of the damage has been done. In short, foreclosing removal when states prosecute former federal officers simply for performing their official duties can allow a rogue state's weaponization of the prosecution power to go unchecked and fester.

The consequences of that are profound. For starters, prosecutions of former federal employees for undertaking locally unpopular actions—but actions that are still within the bounds of their official duties[3]—can cause a crisis of faith in our government and our courts. Not only that, but these types of actions can cripple government operations, discourage federal officers from faithfully performing their duties, and dissuade talented people from

---

[3] I emphasize that this concurrence addresses only those state prosecutions of former federal officers whose charged acts fell within the scope of their official duties. It does not pertain to state prosecutions of former federal officers for acting outside the scope of their official duties and violating state law. That's so because, "[u]nder our federal system, it goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government." *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) (cleaned up). And states have a "compelling . . . interest in conducting criminal trials in the state courts," *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1981), when anyone—including a former federal officer—has allegedly violated state criminal law and has not done so to carry out federal law. As the Supreme Court has explained, "Absent any indication that the removal statute was intended to derogate from the State's interest in evenhanded enforcement of its laws, we see no justification for providing an unintended benefit to a defendant who happens to be a federal officer." *Manypenny*, 451 U.S. at 243.

entering public service.  After all, who needs the aggravation and financial burden from being criminally prosecuted (even in one state) just for carrying out official responsibilities?  And federal officers who are reluctant to do their duty, or a dearth of talented and enthusiastic people willing to serve in public office, could paralyze our democratic-republic system of government.

This nightmare scenario keeps me up at night.  In my view, not extending the federal-officer removal statute to former officers for prosecutions based on their official actions during their tenure is bad policy, and it represents a potential threat to our republic's stability.  Of course, my role as a judge does not allow me to rewrite laws to fit my view of what's wise.  Rather, I must faithfully interpret the laws as they are written.  So today I join the Majority Opinion because it does that.

But *Congress* enjoys the prerogative to revise Section 1442(a)(1) to include former federal officers.  And I respectfully urge Congress to consider prompt action to do just that.  A simple amendment to Section 1442(a)(1) to cover former federal officers— that is, to allow former federal officers prosecuted for actions for or relating to their official duties to remove their cases to federal court—would fix this grave problem.

My analysis proceeds in two parts.  First, I show that Congress has long recognized removal as an invaluable tool in protecting current federal officers from state prosecutions brought against them only for carrying out their official responsibilities.  Second, I explain how extending this protection to former federal officers for

their acts in the line of duty also furthers the purposes of federal-officer removal.

## I.

Unfortunately, my nightmare scenario has some precedent in our nation's history—at least with respect to current federal officers. This section recounts just some of that history and shows how Congress has used federal-officer removal statutes to address the problem of state prosecution of (then-current) federal officers for carrying out their official (though locally unpopular) responsibilities in the past.

I begin with the first time this problem seems to have arisen, more than 200 years ago. During the War of 1812, the United States imposed an embargo on trade with England. *See Willingham*, 395 U.S. at 405. New Englanders detested that policy. *See id.* So out of a concern for "protect[ing] federal officers [who enforced the embargo] from interference [with their official duties] by hostile state courts," Congress enacted a federal-officer removal provision in an 1815 customs statute. *Id.* Among other things, that provision authorized customs officers to remove to federal court state prosecutions against them for conducting their official duties. *See Tennessee v. Davis*, 100 U.S. 257, 267–68 (1879).

Not twenty years later, the problem of state hostility to federal policies and the officers who executed them as part of their official duties arose again—this time in the South. In 1828 and

1832, Congress imposed tariffs that Southerners deeply disliked.[4]  A South Carolina convention responded by purporting to nullify those federal tariffs.  *See id.*  It also professed to criminalize United States officers' local collection of duties under the tariff laws.  *Id.*

Congress reacted by passing the Force Act of 1833.  *Id.*  As relevant here, that law authorized removal of any state criminal prosecution of a federal officer for performing his official duties under the revenue laws.  *Id.*  At the time, Senator Daniel Webster reasoned that removal would "give a chance to the [federal] officer to defend himself where the authority of the law was recognised [sic]," 9 Cong. Deb. 461 (1833), rather than a state forum that might resist federal policy.  And the Supreme Court has characterized "[t]he purpose of" the Force Act's federal-officer removal provision as "prevent[ing] paralysis of operations of the federal government." *Gay v. Ruff*, 292 U.S. 25, 32 (1934).

Congress enacted federal-officer removal provisions during other periods of our history as well—for instance, during the Civil War and Reconstruction, when protracted state resistance against the federal government existed.  *See* Act of March 3, 1863, ch. 81, § 5, 12 Stat. 755, 756–57 (1863); Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171 (1866).[5]  In support of these provisions, legislators rose to

---

[4] *Nullification Proclamation: Primary Documents in American History*, Library of Congress Research Guides, (last visited Dec. 17, 2023) https://perma.cc/7GWT-GJWK.

[5] Also in 1866, Congress enacted the statutory predecessor to 28 U.S.C. § 1443(2), which authorized removal of all criminal prosecutions "commenced

describe the conditions federal officers were facing in states hostile to their execution of official federal duties.

Senator Daniel Clark recounted, "A great many vexatious suits have been brought . . . where Federal officers have been pushed very hard and put to great hardships and expense, and sometimes *convicted of crime, for doing things which were right in the line of duty*, and which they were ordered to do and which they could not refuse to do." Cong. Globe, 39th Cong., 1st Sess. 1880 (1866) (emphasis added).   And Representative Samuel McKee pointed out some consequences of these legal actions:   in his words, these actions were "harassing, annoying, and even driving out of the State the men who stood true to the flag . . . .   There no protection is guarantied [sic] to a Federal soldier." Cong. Globe, 39th Cong., 1st Sess. 1526 (1866).

So it's no surprise that federal officers later relied on the 1863 and 1866 federal-officer removal provisions when they faced indictment for acting within the scope of their official federal duties.   For instance, in 1879, a federal officer was executing his official responsibilities as a revenue collector to seize illegal distilleries, when a group of armed men fired on him. *Davis*, 100 U.S. at 260–61.   In

---

in any State court against any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue of or under color of authority derived from this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof." Civil Rights Act of 1866, 14 Stat. 27 (1866); *see also City of Greenwood, Miss. v. Peacock*, 384 U.S. 808, 821–22 (1966).   Congress was concerned with state interference with federal Reconstruction and legislated accordingly.

self-defense, the officer returned fire, striking and killing one of the aggressors. *Id.* Tennessee charged the federal officer with murder. *Id.* But the 1866 federal-officer removal provision allowed the officer to remove the matter to federal court. *Id.* at 271.

As the Supreme Court explained, if a federal officer acting within his official duties "can be arrested and brought to trial in a State court, for an alleged offence [sic] against the law of the State, yet warranted by the Federal authority they possess, and if the [federal] government is powerless to interfere at once for their protection,—if their protection must be left to the action of the State court,—the operations of the [federal] government may at any time be arrested at the will of one of the States." *Id.* at 263. Even more to the point, the Supreme Court warned that "[t]he State court may administer not only the laws of the State, but equally Federal law, in such a manner as to paralyze the operations of the government." *Id.*

In later years, the Supreme Court offered more observations about these federal-officer removal provisions. In *Mitchell v. Clark*, the Court noted, for example, that the purpose of the Civil War and Reconstruction federal-officer removal provisions was to protect federal officers "engaged in the discharge of very delicate duties among a class of people who . . . were intensely hostile to the government"— those rebelling against the Union. 110 U.S. 633, 639 (1884).

Prohibition presented another period in which federal law won no popularity contests in some locales. So through the

National Prohibition Act, Congress extended federal-officer removal to prohibition officers. National Prohibition Act, ch. 85, § 28, 41 Stat. 305, 316 (1919). That provision traced its origins to the 1863 and 1866 federal-officer removal provisions. *State of Maryland v. Soper*, 270 U.S. 9, 31–32 (1926). As the Supreme Court explained, "Congress not without reason assumed that the enforcement of the National Prohibition Act was likely to encounter in some quarters a lack of sympathy and even obstruction, and sought . . . to defeat the use of local courts to embarrass those who must execute it." *Id*. at 32. So it authorized federal-officer removal to combat that problem.

Local opposition to federal policy—and use of the federal-officer removal statute to mitigate prejudice from that opposition—is by no means a vestige of the past. In 2006, the Tenth Circuit upheld federal-officer removal (and immunity) for an employee of the U.S. Fish and Wildlife Service who was prosecuted for misdemeanor trespass in Wyoming state court. *Wyoming v. Livingston*, 443 F.3d 1211, 1225, 1230 (10th Cir. 2006). The defendant had entered private property while capturing and collaring wolves as part of a federal operation to reintroduce grey wolves to the region. *Id*. at 1213–15. But because Wyoming is "heavily dependent on livestock for its economic well-being," the wolf reintroduction program was "met with vehement local opposition." *Id*. at 1213–14. Indeed, the court noted record evidence that the prosecution was "not a bona fide effort to punish a violation of Wyoming trespass law . . . but rather an attempt to hinder a locally unpopular federal program." *Id*. at 1231. So it concluded that federal-officer

removal was proper to prevent that local "hind[rance]." *See id.* at 1225, 1231.

This brief walk through some of our history shows that states have in fact indicted federal officers for carrying out their official duties when those duties have been locally unpopular. And that local opposition is not limited to a particular policy, era, or region of the country. But recognizing the potential harms from state indictments of federal officers for acting within the scope of their jobs, Congress has enacted (and reenacted) federal-officer removal protection to "protect federal officers from interference by hostile state courts." *Willingham*, 395 U.S. at 405.

## II.

With this historical backdrop in mind, I return to my present concern: the lack of removal protection for former federal officers prosecuted by states for performing their official (but perhaps locally unpopular) federal duties.

To be sure, there's a certain logic behind the limitation of Section 1442(a)(1)'s removal protection to current federal officers. Prosecuting current (not former) federal officers for performing their sworn federal duties makes the most sense if a state seeks to interfere with ongoing federal functions. Prosecuting someone who is no longer a federal officer, generally, will not directly paralyze ongoing federal operations. And as the Majority Opinion points out, we must "retain[] the highest regard for a State's right to make and enforce its own criminal laws." Maj. Op. at 19 (quoting *Manypenny*, 451 U.S. at 243).

It's also true that state courts are certainly capable of evaluating federal defenses.  *See id.* at 20–21.  And in most cases, we can count on them to do so correctly and fairly.  Plus, state officials may try to be respectful of ongoing government operations by waiting to charge federal officers until they leave office.

But Congress created federal-officer removal statutes because it recognized that the risks to our federal government are just too great if a state court isn't capable—for whatever reason—of quickly, correctly, and fairly adjudicating federal defenses when a federal officer has been indicted for carrying out his official federal responsibilities.  And a state trying to interrupt a federal policy or (misguidedly) vindicate a local interest it feels a federal law has threatened could view prosecuting former federal officers for performing their official federal duties as a way to effect those objectives.  That's especially so because, as things currently stand, a state could not hope to accomplish these goals by indicting current federal officers without risking the possibility that they would remove the actions to federal court.

Yet state prosecutions of former federal officers for doing their official duties can also cripple the federal government, just like prosecutions of current federal officers can.  Consider an ongoing federal policy or operation.  If a state prosecutes a former federal officer for his official role in that, current federal officers who are responsible for continuing to carry out that policy or operation may well be chilled from doing so out of concern that they, too, will be prosecuted by the state when they leave their positions.

Or if states start indicting high-profile former federal officers, upon stepping down, for their official actions while in office, our national leaders may cease taking any significant action for the country in an effort to avoid later state prosecution. After all, it's hard to think of any federal policy that's not unpopular somewhere in the country. If undertaking meaningful action within the scope of official authority becomes too risky for a federal officer because she will have to pay the state piper later, why bother even entering public service in the first place? But without talented and enthusiastic people willing to serve our country, the future would be bleak.

And I haven't even started to discuss the undermining effect that constant and repeated state prosecutions of former federal officers for doing their official duties would have on the perceived legitimacy of our system of government. The longer a state prosecution drags on when the former federal officers are entitled to dismissal, the more those who disfavor the officers' official duties may wrongly come to believe that the federal government has acted illegally. And the more this happens, the more it chips away at (and over time, takes a sledgehammer to) our government's perceived legitimacy.

These harms are serious. Fortunately, though, they can also be easily addressed if Congress amends the federal-officer removal statute to expressly include former federal officers.

The government's interests in protecting against rogue state prosecutions of federal officers for carrying out their official duties

do not evaporate as soon as a particular officer leaves her post. Nor do they evaporate upon a change in presidential administration. So the protections for federal officers likewise should not evaporate when they leave their government employment.

Our decision today has consequences both for former federal officers and the federal government itself. To mitigate those consequences, and to reinforce the purposes of federal-officer removal, I respectfully urge Congress to amend Section 1442(a)(1) to cover former officers.

### III.

In sum, the text and structure of the federal-officer removal statute—especially given our recent precedent *United States v. Pate*, 84 F.4th 1196 (11th Cir. 2023) (en banc)—compel our conclusion that former federal officers cannot invoke the statute. But not covering former federal officers comes with a great potential cost to our government and those who serve in it. So I respectfully urge Congress to amend Section 1442(a)(1) to protect former federal officers.